IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

Civil Division

```
RECEIVED
Civil Clerk's Office
JUN 2 6 2006
Superior Court of the
District of Columbia
Washington, D.C.
```

ULLICO INC.
1625 Eye Street, N.W.
Washington, DC 20006,

    Plaintiff,

    v.

CASSTEVENS
11244 Greenbriar Chase
Oklahoma City, OK 73170,

    Defendant.

CIVIL ACTION NO:

CALENDAR NO:

JUDGE:

NEXT EVENT:

JURY DEMAND

*0004928-06*

## COMPLAINT
### (Breach of Fiduciary Duty; Unjust Enrichment; Rescission)

1.    This complaint seeks compensatory and equitable relief in connection with profits that Bill Casstevens ("Casstevens") as member of the Board of Directors of Plaintiff, obtained through self-interested transactions during the period 1998-2001.

### Jurisdiction and Venue

2.    This Court has jurisdiction pursuant to D.C. Code §§ 13-422 and 13-423.

### Parties

3.    Plaintiff ULLICO Inc. is a corporation formed under the laws of the state of Maryland, with its principal place of business in the District of Columbia ("ULLICO"). ULLICO was created in 1987 as a holding company to raise capital for its various subsidiaries that provide insurance, pension, health and management and lending services to unions, union members and their families, and benefit funds. Its subsidiaries include The Union Labor Life Insurance Company, formed in 1925, to provide life insurance to union members in high-risk

**06 1388**

**FILED**

AUG - 4 2006

NANCY MAYER WHITTINGTON, CLERK
625234.1 U.S. DISTRICT COURT.

Jul 10 08 04:44p        Lea & Bill Casstevens                    405-703-0998        p.5

jobs. ULLICO's Board of Directors (the "Board") has historically consisted primarily of present or former officers of unions affiliated with the AFL-CIO and their affiliated Taft-Hartley funds, who are major ULLICO shareholders.

4.      Defendant Bill Casstevens ("Casstevens") served as a Director of the Company from 1997-2003.

### Facts

5.      During the relevant period, ULLICO was a privately held corporation with three classes of stock that consist of (i) voting Capital Stock; (ii) Class A voting stock; and (iii) Class B non-voting stock. By June 1998, ULLICO had issued and outstanding approximately 256,000 shares of Capital Stock, 6.7 million shares of Class A stock, and 753,000 shares of Class B stock.

### ULLICO Invests in Global Crossing

6.      In February 1997, the Board approved as part of a private equity investment program an investment of approximately $7.6 million in a new non-public company called Nautilus LLC, the predecessor of Global Crossing.

7.      In August 1998, Global Crossing became a publicly traded company with its initial public offering, at which time ULLICO's share of Global Crossing was worth more than 30 times its initial investment; over the life of that investment, ULLICO realized a gross profit of approximately $486 million on its original investment.

8.      Throughout 1998 and 1999, Global Crossing's value continued to rise dramatically, so that by the end of 1999 ULLICO's unrealized and after tax realized gains on its Global Crossing investment were more than $1 billion or 85% of ULLICO's total stockholders' equity. Because of the skyrocketing value of its Global Crossing stock, the book value of ULLICO's stock increased nearly 600% between December 31, 1997 and December 31, 1999.

625214.1

## ULLICO Adopts a Formal Repurchase Program in 1997

9.    Before 1997, ULLICO paid high annual cash and stock dividends, typically in the range of an annual 8% cash and 10% stock dividend. However, in the spring of 1997 the Board decided to use a share redemption program to replace dividends as the principal means to distribute to shareholders a return on their investment and also to provide liquidity for ULLICO's larger shareholders.

10.    In May 1997, in order to implement its decision to transition away from dividends to shareholder distributions through stock redemptions, the ULLICO Board approved a formal stock repurchase program, under which ULLICO would repurchase shares of ULLICO Class A and B stock that had been acquired through what had been known as the preferred certificate program (the "1997 Repurchase Program"). The 1997 Repurchase Program envisioned that ULLICO would be allowed to repurchase $180 million in Class A and B stock over 11 years, with $30 million of stock being repurchased in 1997 and $15 million in each of the following 10 years. Consistent with the business purpose for the 1997 Repurchase Program, ULLICO decreased its dividend from 8% in 1996 to 2% in 1997 and 1998 and eliminated dividends completely in 1999.

11.    Consistent with its business objective to replace dividends with other types of distributions, the Board envisioned that to the extent more shares were tendered than could be repurchased with the funds allocated for any particular repurchase program, the share redemptions would be prorated based on the total number of shares tendered, thereby ensuring the proportionate and equitable distribution of ULLICO's funds among shareholders. The only exception authorized by the Board at the inception of the program was among holders of 10 or

3

fewer shares who tendered all their shares, all of which would be repurchased without proration. However, prior to the actual commencement of the 1997 Repurchase Program, the proration threshold was raised from 10 to 10,000 shares. This change in threshold was never approved by the Board or the Executive Committee.

### ULLICO Adopts a New Share Price Valuation System in Connection With the 1997 Repurchase Program

12.    Historically, the price of ULLICO's stock had been set at $25 per share. In order to facilitate the 1997 Repurchase Program, the Board decided that beginning in May 1997, it would abandon its method of valuing its stock at $25 per share, and would set the price per share annually under a "book value" method based on ULLICO's prior year-end audited book value per share. Under this method, the stock price was determined by taking the "Total Shareholder Equity," as reflected on the Company's audited December 31 balance sheet, and dividing it by the total number of outstanding shares of Capital, Class A and B stock. The initial price set in May 1997, based on the book value of the stock as of December 1, 1996, was $27.06 per share.

13.    Based on the pricing formula adopted in connection with the 1997 Repurchase Program, ULLICO adopted the following prices per share for the period 1997 -2003:

a.    May, 1997 - May, 1998:  $27.06

b.    May, 1998 - May, 1999:  $28.70

c.    May, 1999 - May, 2000:  $53.94

d.    May, 2000 - May, 2001:  $146.04

e.    May, 2001 - May, 2002:  $74.87

f.    May, 2002 – May, 2003:  $46.58.

625234.1

### Defendant Utilizes the New Price Formula to Reap
### Personal Benefits from the Run Up of ULLICO Stock

14.     With the clear prospects for the dramatic rise in ULLICO stock as a result of the Global Crossing investment, defendant took advantage of a series of programs in a manner that unjustly enriched him at the expense of ULLICO's other shareholders.  These programs were either to the exclusion of ULLICO's other shareholders or structured in a manner that allowed defendant and other insiders to disproportionately benefit himself in relationship to other larger shareholders.

15.     Beginning in 1998, the management of ULLICO designed, sponsored, endorsed, and implemented a series of programs and transactions that allowed officers and directors of the company to divert to themselves corporate profits and other distributions generated by the Global Crossing investment.  These programs included:

  (1)     the 1998 and 1999 Stock Offer Programs, available only to officers and directors;

  (2)     the 1998, 1999, 2000, and 2001 Formal Repurchase Programs, which had the effect of exempting officers and directors from any proration and which, in fact, allowed certain officers and directors, including Casstevens, to receive disproportionate distributions of ULLICO funds; and

  (3)     a program of "discretionary" repurchases in 2000 and 2001, under which ULLICO Chairman, CEO and President Robert Georgine caused ULLICO to repurchase nearly $15 million of ULLICO stock from corporate insiders.

625234.1

A key feature to many of these programs was the use of the price formula, adopted by the Board

in May 1997 for the purpose of distributing to shareholders a return on their investment in

replacement of dividend distribution, to improperly direct millions of dollars to corporate

insiders.

### The 1998 and 1999 Stock Offer Programs to Corporate Insiders

16.    On February 11, 1998, the Board's Executive Committee, headed by Robert A.

Georgine and including Casstevens, appointed purportedly pursuant to Article VI, Section 1 of

the By-Laws, a Compensation Committee to ". . . act on all matters concerning compensation

and the establishment and administration of all programs and agreements relating to

compensation, whether current or deferred," provided, however, that "[n]o member of the

Committee shall participate in the determination of any matter affecting his own compensation."

17.    On July 27, 1998, purportedly pursuant to the Executive Committee's February

11, 1998, resolution, and motivated by the remarkable performance of ULLICO's Global

Crossing investment, the Compensation Committee authorized the offer of up to 2,000 shares of

Class A stock to each director and officer of ULLICO, including Casstevens, and directed

Georgine to implement the program "at the earliest opportunity" (the "1998 Stock Offer

Program").

18.    On February 13, 1999, the Executive Committee again appointed a Compensation

Committee to act on all matters concerning the compensation of officers and employees

(omitting any mention of directors). On May 13, 1999, the Compensation Committee authorized

Georgine to offer up to 4,000 shares of ULLICO stock to senior officers and directors at "book

value" of $53.94 per share based on the Company's 1998 year-end financials, (the "1999 Stock

425234.1

Offer Program"). The offers were to occur at "some time during the course of the year 1999 at

the Chairman's [Georgine's] discretion."

19.    Because the members of the Compensation Committee were eligible to participate

in the 1998 and 1999 Stock Offer Programs, the actions of the Compensation Committee

violated the February 11, 1998 and February 13, 1999 Executive Committee resolutions that

expressly prohibited the Compensation Committee from participating in matters directly

affecting their own compensation.  In addition, the Compensation Committee exceeded the

delegation of authority pursuant to the February 13, 1999, Executive Committee resolution when

it included directors as eligible participants under the 1999 Stock Offer Program.

20.    In addition to its aforesaid *ultra vires* actions, the Compensation Committee also

exceeded the scope of permissible activity with respect to the 1998 and 1999 Stock Offer

Programs under Article VI, Section 2 of ULLICO's by-laws.  Under that provision of the by-

laws, the Executive Committee, which established the Compensation Committee, did not have

the authority to authorize the issuance of stock and therefore could not have delegated any such

authority to the Compensation Committee.  Moreover, prior Board resolutions and other

provisions of ULLICO's by-laws allowed only those directors and officers that had been granted

the right of purchase to buy ULLICO stock; and none of the directors or officers that were

eligible to participate in the 1998 and 1999 Stock Offer Programs had been so designated.

21.    Following the actions of the Compensation Committee with respect to the 1998

and 1999 Stock Offer Programs as aforesaid, Casstevens was offered the opportunity to buy

4,000 shares of ULLICO stock in the second half of 1998 at a price of $28.70 (rather than the

2,000 approved by the Compensation Committee) and an additional 4,000 shares in December

6Z5334.1

1999 at a price of $53.94.  These prices were based on the book value price for the shares as of December 31 preceding the actual dates of purchase.

22.    Casstevens purchased 4,000 shares of stock pursuant to the 1998 Stock Offer Program and 4,000 shares of stock pursuant to the 1999 Stock Offer Program.

23.    Casstevens was able to purchase ULLICO stock with knowledge that the purchase price was substantially below the book value that would likely be determined as of December 31, 1998 and 1999 and adopted by the Board the following May as the price for ULLICO stock.

24.    The 1998 and 1999 Stock Purchase Programs approved by the Compensation Committee resulted in improper self-interested transactions between ULLICO and Casstevens that violated Maryland law.

25.    The actions of the Compensation Committee in approving the 1998 and 1999 stock offers were not reported to ULLICO's Board of Directors or Executive Committee, were not approved by either the Board or its Executive Committee, and to the extent that the Compensation Committee was deemed to have been delegated such authority, that delegation constituted a violation of Section 2-411 of the Maryland Code and otherwise violated the standards for fiduciary duties under Section 4-405.1.

26.    The Compensation Committee lacked authority to cause ULLICO to issue stock to Casstevens in 1998 and 1999 and, therefore, the sale of stock to Casstevens is invalid.

## The 1998, 1999, 2000 and 2001 Repurchase Programs

27.    On May 4, 1998, the Executive Committee, which included Casstevens, authorized a $15 million repurchase program for Class A and B stock at $28.70 a share — the book value as of December 31, 1997.  On June 30, 1998, a letter sent to company shareholders announcing the program; and on November 9, 1998, a formal offer was extended to ULLICO's

625234.1

shareholders to repurchase stock under the program.  As in 1997, the 1998 repurchase program included a provision exempting holders of 10,000 or fewer shares from the program's proration provisions.

28.    On May 17, 1999, the Executive Committee – including Casstevens – authorized a $15 million repurchase of ULLICO stock at the "book value" price of $53.94 per share.  On November 16, 1999, a formal offer was extended to repurchase $15 million of Class A and B stock at $53.94 a share.  The repurchase offer closed on December 17, 1999, the same day an offer was made to Casstevens to purchase stock under the 1999 stock offering.  Like the 1997 and 1998 repurchase programs, the 1999 repurchase program again exempted from proration holders of fewer than 10,000 shares who tendered such shares.  The repurchase offer was oversubscribed, and resulted in shareholders of more than 10,000 shares being allowed to redeem only 91.93% of shares tendered.  Despite the doubling of Company stock price in a single year, Casstevens did not sell stock acquired pursuant to the 1998 stock offer in the 1999 Repurchase Program.

29.    As of December 31, 1999, Global Crossing stock had risen to $100 per share (before adjustments for stock splits).  However, by May 2000, Global Crossing stock had fallen to nearly half its December 31, 1999 price levels and accordingly the actual book value of ULLICO was falling precipitously.

30.    Despite the quickly declining value of ULLICO's Global Crossing investment, on May 10, 2000, the Executive Committee, which included Casstevens, set once again the price of ULLICO stock based on its book value as of the preceding December 31, and thereby approved a record high ULLICO stock price of $146.04 per, a price nearly three times the price of $53.94 adopted by the Board the previous May.

9

31.     In light of the declining value of ULLICO's Global Crossing investment and its

predictable effect on the value of ULLICO stock, the Executive Committee recognized that the

stock price of $146.04 represented a premium over its actual value and on May 10, 2000,

approved an "extraordinary" repurchase program in order to distribute equitably to all

shareholders some of the returns on the Global Crossing investment (the "extraordinary"

repurchase plan).

32.     Under the "extraordinary" repurchase plan, ULLICO would repurchase up to 20%

of ULLICO's outstanding stock, including Capital Stock, from all shareholders.  The program

had an aggregate value of approximately $240 million and ULLICO planned to sell $360 million

of its shares of Global Crossing by the end of 2000 in order to obtain the necessary cash to

implement the program.

33.     The "extraordinary" repurchase program was subject to a number of conditions,

including that the market price of Global Crossing stock, then trading at about $33 per share, had

to be not less than $43 per share, a price within approximately 15% of Global Crossing's stock

price on December 31, 1999.  In the event that the program was oversubscribed, which was

anticipated, all shareholders, including officers and directors, would be treated equally by having

the same percentage of their stock holdings redeemed, except that tenders of shares by

shareholders holding 100 shares or less would be accepted in total, without proration.

34.     On May 11, 2000, the Board approved this "extraordinary" repurchase program

with the conditions established by the Executive Committee, after receiving from Credit Suisse

First Boston an opinion that the program was favorable to stockholders and has been balanced in

a manner so that it will not jeopardize ULLICO's "well-being."

35.     By the end of August 2000, the market value of ULLICO's Global Crossing

investment had lost over $475 million since December 31, 1999.  By November 2000, the stock

price of Global Crossing had failed to reach the $43 level; and on November 3, 2000, with

Global Crossing stock trading at only $23 5/8 per share, the Board abandoned the

"extraordinary" repurchase program. In its place, the Board approved a $30 million repurchase

program at $146.04 per share, limited to holders of Class A and Class B shares (the "Actual 2000

Repurchase Program").  This Program together with Georgine's unprecedented use of

"discretionary" repurchases, discussed infra, provided grossly disproportionate redemptions to

officers and directors.

36.     The Actual 2000 Repurchase Program had a number of features that Casstevens

manipulated to his benefit.  In order to implement the program, all shareholders holding more

than 2% of outstanding Class A and Class B Stock had to tender 100% of their holdings.  Given

the high premium reflected in the purchase price of $146.04 and the 2% rule, it was likely that

over $800 million of stock would be tendered in an offering capped at $30 million, and that as a

result, severe proration would occur.  Nevertheless, there existed an exemption from proration

for shareholders owning 10,000 shares or less, even though the Board was not informed as to the

disproportionate benefit that exemption would have for corporate insiders.  Moreover, insiders,

including Casstevens, were further benefited by selling ULLICO shares (at $146.04 per share),

outside the formal repurchase program, and through the "discretionary program" administered by

Georgine in 2000 and 2001, even though none of the details of those discretionary repurchases

were disclosed to the Board.

37.     On November 21, 2000, a letter was sent to ULLICO's shareholders announcing

the Actual 2000 Repurchase Program.  This letter misstated that all shareholders would "share

11

625234.1

ratably in the offering" and failed to disclose that shareholders holding fewer than 10,000 shares could avoid proration or that such shareholders could sell their shares outside the program at Georgine's "discretion" at the price of $146.04. On the contrary, Georgine stated that the company "continues to reserve its right, pursuant to the bylaws, to repurchase shares outside the Repurchase Program at $25 per share."

38.     Casstevens, who was a shareholder and members of the Board of Directors, never took any steps to correct these misleading and incorrect statements in the November 21, 2000 letter.

39.     On December 14, 2000, ULLICO formally offered to repurchase $30 million of Class A and Class B Stock, but not Capital Stock. In the tender offer documents that accompanied the offer, the exemption from proration for holders of less than 10,000 shares was disclosed, although there was no disclosure that Georgine intended or might repurchase shares from holders of 10,000 or less shares outside the formal program at $146.04, that all ULLICO senior officers and directors except Georgine held less than 10,000 shares, and that several officers and directors, including Georgine, had already redeemed shares at $146.04 through various "discretionary" repurchases in 2000 before the tender offer commenced. To the contrary, the tender offer documents represented that "[t]he Company has not been advised that any of its directors and executive officers presently intend to tender any Shares personally owned by them pursuant to the Offer" and that shares of the company "represented[ed] an excellent long-term investment opportunity."

40.     As one would have expected, the Actual 2000 Repurchase Program was wildly oversubscribed and, as a result, under the Program's proration rules ULLICO could only repurchase 2.2% of the stock tendered by each shareholder owning more than 10,000 shares. In

12

625234.1

contrast, the senior officers and directors who tendered shares had all of their shares repurchased without proration at $146.04. As a result, the senior officers and directors who tendered shares received more under the $30 million Actual 2000 Repurchase Program than they would have received under the abandoned $240 million Extraordinary Repurchase Program, which did not provide for any significant proration.

### Georgine's "Discretionary" Repurchases in 2000-2001

41.     There had existed for some time an informal "discretionary" repurchase program, whereby ULLICO stock was eligible for repurchase at the discretion of the Board Chairman. Historically, this "discretionary" program had been used to address unusual situations such as cases of shareholder emergencies or hardship or to redeem shares upon the death of a shareholder. Though in existence for many years, this discretionary program was not formally presented to the Board for approval until November 2000.

42.     Following the Board's adoption of the $240 million Extraordinary Repurchase Program in May 2000 (which would have exempted from proration only holders of 100 or less shares) but before the satisfaction of those conditions imposed on that program, such as a rise in Global Crossing stock to $43 per share, and in advance of any authorization to go forward with any replacement repurchase program, Georgine undertook a series of unprecedented "discretionary" repurchases of ULLICO stock, where, at his sole discretion, the company repurchased shares from certain officers and directors at the price of $146.04.

43.     Between May 2000 and November 2000, when the Actual 2000 Repurchase Program was authorized, Georgine, pursuant to this "discretionary" program, caused ULLICO to repurchase nearly 30,000 shares of company stock from senior officers and directors at $146.04.

625234.1

None of these purchases were ever disclosed to the full Board or to the shareholders in the tender offer documents that accompanied the later Actual 2000 Repurchase Program.

44.     Following the expiration of the Actual 2000 Repurchase Program on January 16, 2001, and before the May 2001 Board meeting at which a substantially lower ULLICO share price was established, Georgine continued to exercise his "discretion" and caused ULLICO to repurchase an additional 31,212 shares of ULLICO stock at $146.04, including shares of Capital Stock. Georgine repurchased 7,642 shares of ULLICO stock from Casstevens through this program. Georgine lacked authority to cause ULLICO to repurchase this stock and, as a result, the sale of stock by Casstevens through the "discretionary" program was invalid.

45.     The existence of these discretionary repurchases was not advertised to ULLICO shareholders, nor was it ever adequately disclosed to the full Board. At the November 3, 2003, Board meeting an attempt was made to authorize these discretionary repurchases, by passing resolutions permitting Georgine to approve stock repurchases outside the formal programs and ratifying "any and all actions taken by the Chairman or other appropriate officers of the Corporation falling within the scope of any of the preceding resolutions . . . taken at any time." However, details concerning the specific discretionary purchases purportedly ratified were never disclosed to the Board in connection with the ratification.

### Total Stock Repurchased at $146.04 Per Share

46.     From 2000-01, pursuant to the 2000 Actual Repurchase Program and Georgine's "discretionary" repurchases, the Company repurchased 305,636 shares of Class A and Capital Stock at the rate of $146.04 per share, resulting in a total cost to the Company of approximately $44.6 million, $30 million pursuant to the Actual 2000 Repurchase Program and $14.6 million in Georgine's "discretionary" purchases. Of the $14.6 million in discretionary repurchases made

625234.1

by Georgine, 62.6% were from senior officers and directors, with an aggregate value of $9.2 million. None of the individual repurchases were disclosed to or approved by the full Board, the Executive Committee, or ULLICO shareholders.

47.    During the period 2000-2001, twenty directors and senior officers holding only 1.3% of ULLICO stock, redeemed 93,923 shares of Class A and Capital shares at $146.04 per share and received $13.7 million, or 31% of the total funds distributed by the Company for stock repurchases while the share price was set at $146.04. Approximately $9.6 million of the $13.7 million distributed to senior officers and directors was used to repurchase shares originally purchased under the 1998 and 1999 Stock Offer programs. The directors and officers participating in these purchases collectively realized pre-tax profits of at least $10.7 million.

## Count I -- Breach of Fiduciary Duty; Aiding and Abetting Breaches of Fiduciary Duty

48.    ULLICO incorporates herein by reference and makes a part hereof the allegations of paragraphs 1 through 47.

49.    At all material times herein, Casstevens, in his capacity as a ULLICO director, was under statutory and other fiduciary obligations to ULLICO, including, without limitation, those obligations set forth in Md. Code, Section 2-405.1(a) to perform his duties as a member of the Board (i) in good faith; (ii) in a manner he reasonably believed to be in the best interests of the company; and (iii) with the care that a very prudent person in a like position would use under similar circumstances.

50.    Casstevens knew, or should have known, that his participation in the 1998 and 1999 Stock Offer Programs, and the Discretionary Repurchase Program in 2001 resulted in self-interested transactions between ULLICO and himself, through which he improperly benefited or

625234.1

profited in money, property or services, including obtaining pretax profits on those transactions in the amount of $809,628.

52.   As a result of the 1998 and 1999 Stock Offer Programs, and the Discretionary Repurchase programs in 2001, Casstevens improperly participated and profited in self-interested, unfair stock transactions with ULLICO, which unjustly enriched him and resulted in a waste of corporate assets.

53.   As a direct and proximate cause of his acts and omissions aforesaid, Casstevens breached his duties and obligations to ULLICO, aided and abetted such breaches by others, or otherwise improperly benefited and profited from tainted, unfair and improper stock transactions.

54.   As a direct and proximate cause of Casstevens's breach of duties and obligations to ULLICO and aiding and abetting such breaches as aforesaid, ULLICO has been damaged and injured.

55.   As a result of the events and his conduct as aforesaid, ULLICO is entitled to recover, and Casstevens is obligated to disgorge and return to the ULLICO, any and all profits and benefits he obtained in connection with, or as a result of the 1998 and 1999 Stock Offer Program and the 2001 discretionary repurchases.

## COUNT II – UNJUST ENRICHMENT

56.   ULLICO incorporates herein by reference and makes a part hereof its allegations set forth in paragraphs 1 through 55.

57.   Through the stock offers and repurchases, ULLICO conferred a benefit upon Casstevens.

58.   Casstevens retains the benefits conferred by ULLICO through the stock offers and repurchases.

16

625234.1

59.     Casstevens's retention of these benefits is unjust.

60.     As a result of the events and his conduct as aforesaid, ULLICO is entitled to recover, and Casstevens is obligated to disgorge and return to the ULLICO, any and all profits and benefits he obtained in connection with, or as a result of the 1998 and 1999 Stock Offer Program, the Actual 2000 Repurchase Program and the 2000 and 2001 discretionary repurchases.

## COUNT III -- RESCISSION
### 1998 and 1999 Stock Offers

61.     ULLICO incorporates herein by reference and makes a part hereof its allegations set forth in paragraphs 1 through 60.

62.     The offers of ULLICO stock to Casstevens by the Compensation Committee and Georgine in 1998 and 1999 was *ultra vires* and invalid.

63.     As a result, Casstevens's purchase of stock in 1998 and 1999 is invalid and should be rescinded.

64.     As a result of the conduct of Casstevens, ULLICO is entitled to rescind and cancel the sales of ULLICO stock to Casstevens in 1998 and 1999.

## COUNT IV -- RESCISSION
### Stock Repurchases

65.     ULLICO incorporates herein by reference and makes a part hereof its allegations set forth in paragraphs 1 through 64.

66.     The repurchases and redemptions of Casstevens's stock through the "discretionary" repurchases aforesaid, were invalid and otherwise in breach of Georgine's and Casstevens's duties and obligations.

625236.1

67.    As a result of the invalid repurchases and redemptions as aforesaid, ULLICO is entitled to rescind and cancel the repurchases of ULLICO stock by ULLICO from Casstevens through the discretionary repurchase programs.

WHEREFORE, Plaintiff ULLICO Inc. demands the following relief:

1.    As to Count I, judgment against in an amount to be determined at trial, but in any event, no less than $809,628.

2.    As to Count II, judgment against in an amount to be determined at trial, but in any event, no less than $809,628.

3.    As to Count III, an Order declaring that the sale of ULLICO stock to Casstevens in 1998 and 1999 was invalid and rescinding and otherwise cancelling those sales.

4.    As to Count IV, an Order declaring that the repurchase of ULLICO stock from Casstevens through the Discretionary Repurchase Program was invalid and resoinding and otherwise cancelling those repurchases.

5.    Such other and equitable relief as the Court may deem appropriate, including set-offs, recoupments, and constructive trusts in favor of plaintiff, and prejudgment interest and the costs of this Action, including reasonable attorneys' fees.

MILLER & CHEVALIER CHARTERED

By _____

James A. Bensfield (DC Bar #189-084)
Anthony J. Trenga (DC Bar #218255)
Mark J. Rochon (DC Bar #376042)
Matthew T. Reinhard (DC Bar # 474941)
655 Fifteenth Street, N.W., Suite 900
Washington, DC 20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
atrenga@milchev.com
Attorneys for Plaintiff


**JURY DEMAND**

Plaintiff demands a jury as to all issues so triable.


_____

Anthony J. Trenga
Attorney for Plaintiff


19

625234.1

Jul 10,06 04:43p        Lea & Bill Casstevens                405-703-0996                    p.1

Receives- 7/5/06



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

ULLICO INC.
Vs.
WILLIAM CASSTEVENS

C.A. No.      2006 CA 004928 B

## INITIAL ORDER

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order, and any General Order issued by the judge to whom the case is assigned. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(o).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

Chief Judge Rufus G. King, III

Case Assigned to: Judge JUDITH E RETCHIN
Date:  June 26, 2006
Initial Conference: 9:30 am, Friday, October 06, 2006
Location:   Courtroom 220
            500 Indiana Avenue N.W.
            WASHINGTON, DC 20001

Caio.doc

Jul 10,06 04:44p    Lea & Bill Casse~         4U5-703-U99b              p.3

CA Form 1

## Superior Court of the District of Columbia
### CIVIL DIVISION
500 Indiana Avenue, N.W., Room JM170
Washington, D.C. 20001  Telephone: 879-1133

ULLICO INC.
1625 Eye Street, N.W.
Washington, DC 20006    *Plaintiff*

vs.

0004928-06

Civil Action No. [            ]

WILLIAM J. CASSTEVENS
11244 Greenbriar Chase    *Defendant*
Oklahoma City, OK  73170

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon your exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government you have 60 days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue, N.W. between 9:00 am. and 4:00 pm., Mondays through Fridays or between 9:00 am. and 12:00 Noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

*Clerk of the Court*

Anthony J. Trenga (DC BAR #218255)
Name of Plaintiff's Attorney

Millcer & Chevalier Chartered
Address

655 15th Street, NW, Washington, DC 20005

(2020) 626-5800
Telephone

By _____
                    Deputy Clerk

Date    6/26/06

PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 170

YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF D.C., 500 INDIANA AVENUE, N.W., ROOM JM 170

Form CV(4)-453/Mar. 93

NOTE:  SEE IMPORTANT INFORMATION ON BACK OF THIS FORM

Jul 10 06 04:43p    Lea & Bill Casstevens    405-703-0996    p.2

**IMPORTANT: IF YOU FAIL TO SERVE AND FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, DO NOT *FAIL TO ANSWER WITHIN THE REQUIRED TIME***

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (628-1161) or the Neighborhood Legal Services (682-2700) for help or come to Room JM 170 at 500 Indiana Avenue, N.W., for more information concerning where you may ask for such help.