IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

| | | |
|---|---|---|
| ULLICO INC., | ) | |
| Plaintiff, | ) | CASE NUMBER: 1:06CV01388 (RJL) |
| v. | ) | DECK TYPE: General Civil |
| | ) | |
| WILLIAM CASSTEVENS, | ) | |
| Defendant. | ) | |
| | ) | |

## MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff ULLICO Inc. ("ULLICO"), pursuant to Federal Rule of Civil Procedure 56 and

Local Civil Rules 7(h) and 56.1, hereby moves for partial summary judgment against defendant

Billy Casstevens on Counts I, II and IV of the Complaint on the grounds that there are no

genuine issues of material fact and ULLICO Inc. is entitled to judgment as a matter of law, as set

forth in more detail in the accompanying Statement of Material Facts as to Which ULLICO

Contends There is no Genuine Dispute and Memorandum of Points and Authorities.

May 29, 2007                                  MILLER & CHEVALIER CHARTERED


By: ___/s/ Victor Tabak_____
James A. Bensfield (DC Bar #189-084)
Anthony J. Trenga (DC Bar #218255)
Mark J. Rochon (DC Bar #376042)
Brian A. Hill (DC Bar # 456086)
Matthew T. Reinhard (DC Bar # 474941)
Kevin G. Mosley (DC Bar #488495)
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
atrenga@milchev.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

|  |  |  |
|---|---|---|
| ULLICO INC., | ) | |
| Plaintiff, | ) | CASE NUMBER: 1:06CV01388 (RJL) |
| v. | ) | DECK TYPE: General Civil |
| | ) | |
| WILLIAM CASSTEVENS, | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ULLICO'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff ULLICO Inc. ("ULLICO"), pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rules 7(h) and 56.1, respectfully submits this Memorandum of Points and Authorities in support of its Motion for Partial Summary Judgment on Counts I, II and IV of the Complaint.

### INTRODUCTION AND SUMMARY OF FACTS AND ARGUMENT

In 1998 and 1999, defendant Billy Casstevens ("Casstevens") purchased unlawfully issued stock from ULLICO and subsequently improperly sold it and other accumulated stock back to the company in 2001 at a premium over its actual value without the statutorily required disclosures to, and approvals by, the ULLICO Board of Directors. As a result of these transactions, Casstevens realized $810,375.68 in profits.

There are no material issues of fact with respect to Casstevens' stock transactions, and ULLICO is entitled as a matter of law to obtain disgorgement of Casstevens' stock profits under Counts I, II and IV based on his breaches of fiduciary duty and unjust enrichment, and to an order declaring that Casstevens' purchases and re-sales of stock are rescinded and cancelled. In

761661 b

addition, because the amount recoverable is an "ascertainable sum certain," ULLICO is also entitled to an award of pre-judgment interest on that amount.

## FACTS

The facts that support this motion are set forth in Plaintiff ULLICO Inc.'s Statement of Material Facts as to Which It Contends There is No Genuine Dispute (hereinafter "SOF"), and are stated in connection with the applicable arguments set forth below.

## ARGUMENT

"Summary judgment may be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits or declarations, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Hancock v. Homeq Servicing Corp.*, Civ. Act. No. 05-0307, 2007 U.S. Dist. LEXIS 31051, at *11 (D.D.C. Apr. 27, 2007). "Material facts are those that 'might affect the outcome of the suit under the governing law....'" *Id.* "An issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

"On a motion for summary judgment, the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, depositions, deposition excerpts, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial." *Id.* at *12. "The non-moving party 'is required to provide evidence that would permit a reasonable jury to find' in its favor." *Id.* "If the non-movant's evidence is 'merely colorable' or 'not significantly probative,' summary judgment may be granted." *Id.* at *12-13. "To defeat summary judgment, the non-moving party must have more than 'a scintilla of evidence to support [its] claims.'" *Id.* at *13 (alteration in

2

original).  Applying this standard to the undisputed facts of this case demonstrates that ULLICO is entitled to summary judgment on Counts I, II and IV of the Complaint.

I.    ULLICO IS ENTITLED TO SUMMARY JUDGMENT ON COUNTS I AND IV REGARDING CASSTEVENS' REPURCHASES AND REDEMPTIONS OF ULLICO STOCK IN 2001 DUE TO CASSTEVENS' FAILURE TO COMPLY WITH MARYLAND CORPORATIONS AND ASSOCIATIONS CODE SECTION 2-419

ULLICO is entitled to summary judgment on its breach of fiduciary duty and rescission claims under Counts I and IV because of Casstevens' failure to disclose and obtain the required approval for his self-interested stock transactions in March 2001.  By not making any disclosure, he failed to comply with Md. Code Ann., Corps. & Ass'ns § 2-419.  Consequently, the transactions are void as a matter of law.

At all material times herein, Casstevens was a director of ULLICO Inc. and a member of ULLICO's Executive Committee.  SOF ¶ 1.

The undisputed facts establish that in each of 1998 and 1999 Casstevens purchased 4,000 shares of ULLICO Class A stock.  SOF ¶¶ 5, 19, 21, and 25.  This purchase of a total of 8,000 shares of Class A stock occurred in three separate transactions, each time through offers purportedly approved by the ULLICO Compensation Committee.  SOF ¶¶ 5, 14-16, 18, 20, 22-24.  It is also undisputed that Casstevens was aware that the Compensation Committee lacked the authority to issue stock.  SOF ¶ 13.  Although Casstevens knew that the Compensation Committee did not have the authority to issue stock, he failed to raise with the Board any issues regarding the fact that the letters announcing the stock purchase offer stated that the Compensation Committee was the source of authority for the issuance of the stock he purchased.  SOF ¶¶ 13, 26.

The undisputed facts also establish that Casstevens had 7,312 of the 9,312 shares of Class A stock he held repurchased by ULLICO in March of 2001 through the Actual 2000 Repurchase

3

Program and 330 shares of Capital stock repurchased in March 2001 through Georgine (sometimes referred to as the "discretionary" repurchases). SOF ¶¶ 6-7, 28, 39, 42, 55. The resolution purporting to authorize Casstevens' re-sales of stock in March of 2001 was passed by the Board of Directors on November 3, 2000. SOF ¶ 39, 41, 44. The resolution presented to the Board at that meeting purported to, *inter alia*, grant Georgine discretion to make future stock repurchases. *Id.* Casstevens voted to approve this resolution. SOF ¶ 39.

It is undisputed that Casstevens was financially interested in the resolution, as were all other directors voting for that resolution except one -- Terence O'Sullivan. SOF ¶¶ 46-47. Neither the resolution itself nor the presentation at that meeting disclosed Casstevens' stock holdings, any particulars as to the amount of profit he stood to realize from the transactions covered by the resolution, or his conflict of interest resulting from his financial interest in the resolution. *See* Exhibit 21 to SOF. During the meeting, Casstevens never disclosed to the Board his then-current stock holdings of ULLICO Class A and Capital stock, his financial interest in the resolution, the amount of profit he stood to gain from the repurchases being considered, or the *ultra vires* nature of the source of his Class A stock holdings. SOF ¶ 49. Nor did Casstevens ever seek the Board's approval for ULLICO's repurchases of his Class A or Capital stock holdings in the company, or for permission to deviate from the terms of the offer to purchase. SOF ¶¶ 52, 53.

The resolution presented to the Board also purported to authorize a formal $30 million repurchase program with an exemption from proration for shareholders who held less than 10,000 shares of stock and properly tendered all of their stock. SOF ¶ 41. During the meeting, however, Casstevens never disclosed to the Board that he held less than 10,000 shares of ULLICO stock, and would, therefore, be entitled to have the Company repurchase all his Class A

4

stock without proration. SOF ¶ 49. Nor did Casstevens or anyone else disclose the likely disproportionate benefit insiders would receive at the expense of ULLICO's larger shareholders. SOF ¶¶ 49-54. This nondisclosure was compounded on November 21, 2000 when Georgine sent a letter to all shareholders, including Casstevens, concerning the $30 million redemption program that the Board had authorized on November 3, 2000. SOF ¶ 51; Exhibit 28 to SOF. In that letter, Georgine stated that "[t]he Company anticipates receiving in excess of the $30 million it is offering to repurchase," but, rather than disclosing the disproportionate benefit Casstevens and other insiders would receive through the 10,000 share exemption from pro-ration, Georgine represented without qualification that the Company would "pro-rate each submission so all participating Stockholders share equitably in the offering." *Id.* The November 21, 2000 letter also indicated that the Company continues to "reserve its right, pursuant to its By-laws, to repurchase shares outside the Repurchase Program at $25 per share." SOF ¶ 55.

In March 2001, Casstevens sold 7,312 of his 9,312 Class A shares of ULLICO stock through the $30 million program approved at the November 3, 2000 Board meeting. SOF ¶¶ 6-8, 28, 40. As a result of the 10,000 share exemption, and despite failing to tender all of his Class A shares, Casstevens successfully redeemed 100% of the ULLICO Class A stock he tendered while other larger shareholders received redemption of only 2.2% of their stock holdings. SOF ¶¶ 42-43. In March of 2001, Casstevens also sold all of his ULLICO Capital stock back to the company through Georgine and the "discretionary" repurchase program. SOF ¶¶ 7, 55. Notwithstanding the language of the November 21, 2000 letter indicating that stock would be repurchased outside the Repurchase Program at $25, Casstevens received $146.04 per share for the Capital shares he sold back to ULLICO in March 2001. *Id.* In 2000 and 2001, through the $30 million program and the purchases of stock at $146.04 pursuant to Mr. Georgine's

5

discretion, 20 ULLICO officers and directors holding approximately 1% of ULLICO's stock, including Casstevens, received a total of 31% of the funds paid by the company to redeem ULLICO Class A and Capital stock at $146.04 per share. SOF ¶ 57.

According to the "longstanding common law rule in Maryland . . . any contract between a corporation and one of its officers or directors as to a matter in which the officer or director had a substantial personal interest was void or voidable." *Sullivan v. Easco Corp.*, 656 F. Supp. 531, 533 (D. Md. 1987). Interested director transactions are now governed by Section 2-419 of the Maryland Corporations and Associations Code. *See Storetrax.com, Inc. v. Gurland*, 915 A.2d 991, 1002 (Md. 2007) (stating that Section 2-419 governs contracts "between a corporation and one of its directors with a financial interest in the subject matter of the transaction."). Section 2-419 states in relevant part that: "a contract or other transaction between a corporation and any of its directors . . . is not void or voidable" so long as "[t]he fact of the . . . interest is disclosed or known to: [t]he board of directors or the committee, and the board or committee authorizes, approves, or ratifies the contract or transaction by the affirmative vote of a majority of disinterested directors."

The interested director may avail himself of the "safe harbor" provided by the statute in two ways. The primary method is "by disclosing to the corporation the conflict of interest and pertinent facts surrounding the conflict so that a majority of the remaining disinterested shareholders or directors may ratify the transaction or . . . otherwise take action to protect the corporation's financial interests." *Storetrax.com*, 915 A.2d at 1002. Indeed, the statute "impose[s] a duty upon [officers and directors] to reveal all facts material to the corporate transactions." *Id.* at 1003.

764661.6

Provided that the primary option is unavailable, the secondary option for utilizing the statutory safe harbor is for the director to prove that the transaction is "fair and reasonable to the corporation." Md. Code Ann., Corps. & Ass'ns § 2-419(b)(2). *See also Sullivan*, 656 F. Supp. at 535 (holding that under Md. Code Ann., Corps. & Ass'ns § 2-419, when the director's financial interest has not been disclosed, the director has the burden of showing that the transaction is fair and reasonable to the corporation).

Here, it is undisputed that Casstevens did not disclose to the Board his financial interest in the resolutions passed on November 3, 2000. SOF ¶¶ 46, 49. The undisputed evidence also establishes that Terence O' Sullivan, the only disinterested director in attendance at the November 3 meeting, his first as a director, did not know of Casstevens' financial interest in the resolution in question. SOF ¶¶ 47-48, 50. As a result, the disinterested director was unable to make an informed decision regarding the transaction.

The transaction is therefore void under Section 2-419 unless Casstevens meets his burden of showing that the transaction was fair and reasonable to the corporation. *Sullivan*, 656 F. Supp. at 535. Casstevens has not asserted fairness and reasonableness as an affirmative defense, and has not adduced any evidence that the transactions at issue were fair and reasonable to ULLICO. Indeed, it is difficult to see how Casstevens could possibly prove the fairness of his stock transactions, particularly his re-sales of Capital Stock in 2001 at $146.04 when the Company had the right to repurchase those shares at the price of $25 per share and the actual "book value" of those shares was determined to be at year end 2000 only $74.87 per share.

Moreover, Casstevens knew that the price of $146.04 represented a premium over the stock's actual value. Casstevens attended the May 10, 2000 Executive Committee meeting and was informed that due to Global Crossing stock trading at about $33 per share, the $146.04 share

7

price was a premium over the then actual value of ULLICO's stock. SOF ¶¶ 30, 32. Casstevens was aware of the fact that the ULLICO stock price for each succeeding year was based on the book value of ULLICO stock on December 31 of the prior year. SOF ¶ 5. Casstevens also understood the relationship between the value of Global Crossing stock and the value of ULLICO stock. SOF ¶ 32. Casstevens had been informed that Global Crossing stock had failed to reach the price target for the Extraordinary Repurchase Program, and he was also informed that Global Crossing had lost value between May 2000 and November 2000. SOF ¶ 32; Exhibit 21 to SOF at USDC 0003168. In addition, Casstevens received the November 21, 2000 letter from Robert Georgine to stockholders indicating that any repurchases of stock outside the program would be at $25. SOF ¶ 51; Exhibit 28 to SOF at USDC 0048086-0048087.

Accordingly, in March of 2001, Casstevens was aware that the $146.04 price that was a premium in May of 2000 was even more of a premium price seven months later. He was aware in March 2001 that the Board would likely change the value of the stock in May 2001 and that the price would be significantly lower than $146.04. Consequently, Casstevens was aware that any resale of stock at $146.04 per share would represent a significant windfall to him given the true value of the stock and the message provided to other stockholders that repurchases outside the tender offer would be at $25 per share.

Based on the foregoing, it is clear that Casstevens has failed to meet the disclosure requirements of Md. Code Ann., Corps. & Ass'ns § 2-419. Nor has he even claimed, let alone, shown that the transactions were fair and reasonable to ULLICO. Consequently this transaction is voidable as a matter of law. *See Toner v. Baltimore Envelope Co.,* 498 A.2d 642, 648 (Md. 1985) (holding that the remedy for interested transactions entered into by directors in breach of their fiduciary duties is to void such transactions).

764661 b

Casstevens, however, contends that the fact and amount of his stock ownership, and therefore his financial interest, was known by the Board because his stock holdings were disclosed in the notice of annual meeting issued in May 2000 several months prior to the November 2000 Board meeting. *See, e.g.,* Casstevens Depo. (Exhibit 1 to SOF) at 108:20-109:19. This "disclosure" is not sufficient as a matter of law. First, the existence of a notice of annual meeting is not evidence that the only disinterested director that attended the November 3, 2000 Board meeting, Terence O'Sullivan, knew that Casstevens owned stock. O'Sullivan was not a stock holder and consequently would not have received a copy of the proxy statement. SOF ¶ 47. Indeed, the only disinterested director present at the meeting has testified that he did not know of Casstevens' interest in the resolution adopted by the Board on November 3, 2000. SOF ¶ 50. Second, the notice of annual meeting does not "reveal all facts material to the corporate transactions" as required by Maryland law. *Storetrax.com*, 915 A.2d at 1003. There was never any disclosure to anyone, through the notice or otherwise, the extent to which Casstevens stood to benefit from the resolution. Third, there was never any disclosure by Casstevens that he knew that the Compensation Committee, which purported to authorize the issuance of the Class A stock he purchased in 1998 and 1999, did not in fact have the authority to authorize the issuance of stock. *See* SOF ¶ 49. The notice of annual meeting does not state, nor did Casstevens ever disclose, how much he had paid for the stock he owned, how much profit he stood to realize from its sale at the price of $146.04, or the disproportionate degree to which he stood to benefit relative to almost all of ULLICO's non-insider stockholders. Exhibit 26 to SOF at JK 003277. Neither did the notice of annual meeting disclose that Casstevens acquired his holdings of Class A stock through *ultra vires* stock purchase offers. *Id.* Maryland corporate law requires "strict and faithful discharge of duty" *Storetrax.com*, 915 A.2d at 1003 (citing *Booth v.*

*Robinson*, 55 Md. 419, 436-37 (1881)), and does not embrace such an indirect and incomplete method of disclosure.

Casstevens' approach has been soundly rejected in other jurisdictions as well. In *In re Cumberland Farms, Inc.*, 284 F.3d 216 (1st Cir. 2002), the court expressly rejected the argument that a corporate board could or should have learned of the self-dealing of one of its members by examining various quarterly reports to study the changes to certain financial balances between reports. The First Circuit held that such an:

> argument turns the duty of disclosure on its head. "While it is true that officers and directors have a duty of reasonable supervision, this duty is for the benefit of the corporation, not the wrongdoer. . . ." Thus, it is not enough that, through their own investigations, the members of [the] board might have learned -- or at least suspected -- that money was available in CCP: "The mere existence of a suspicion that there has been a breach of trust is not sufficient to constitute a confirmation. For a cestui que trust to 'ratify' or confirm a breach of trust, he must be apprised of all the material facts and as well of their legal effect. No half-hearted disclosure or partial discovery is sufficient in either respect. The trustee's duty of disclosure is not discharged by leaving the cestui to draw doubtful inferences, conclusions and suspicions."

*Id.* at 231 (citations omitted).

Similarly, the court affirmed summary judgment against the non-disclosing parties in *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761 (3d Cir. 1976), a case alleging, *inter alia*, insufficient disclosures to shareholders of a conflict of interest among certain directors with an interest in the transaction at issue. In so doing, the Third Circuit rejected the argument that an interested transaction was properly disclosed because an investor could or should have embarked on an investigation to discern that the interest of the non-disclosing parties:

> This fact of conflicting interests on the[] part [of the non-disclosing directors] was obviously of material interest to the other shareholders in considering their votes on the merger and it was nowhere expressly stated in the proxy statement or letter.... The

764661.b

> Court held on summary judgment that the facts giving rise to the
> conflicting interests were so buried in the documents as not to
> constitute an adequate disclosure to the shareholders and that
> failure adequately to disclose the conflicts constituted a material
> defect in the proxy statement.... "[I]t is not sufficient that
> overtones might have been picked up by the sensitive antennae of
> investment analysts". In the present case many of the statements
> on which the defendant-appellants rely are scattered through and
> rather buried in the lengthy proxy statement. There is nowhere a
> statement giving emphasis to the conflicts of interest....

*Id.* at 773-74 (citations omitted). Moreover, Casstevens himself disclaimed any such duty to

examine proxy statements or a notice of annual meeting at his deposition. When asked: "Did

you feel like you should have tracked the stock holdings of the directors that were printed in

those proxy statements[,]" he replied: "No, I don't think I had any obligation to do that."

Casstevens Depo. (Exhibit 1 to SOF) at 109:15-19.

Thus, a passing reference to Casstevens' stock holdings in a notice of annual meeting

more than six months earlier is not sufficient as a matter of law to fulfill the duty imposed on

him by the Maryland statute. As a result, the transactions are void, and ULLICO is entitled to

rescind the stock transactions in question and obtain disgorgement of Casstevens' stock profits in

the amount of $810,375.20. SOF ¶ 8.

II.    ULLICO IS ENTITLED TO SUMMARY JUDGMENT ON COUNTS I & IV FOR
       BREACH OF FIDUCIARY DUTY DUE TO CASSTEVENS' FAILURE TO
       DISCLOSE MATERIAL FACTS REGARDING HIS PERSONAL INTEREST IN
       REPURCHASES OF ULLICO STOCK

Casstevens' non-disclosures that render his transactions void for non-compliance with

Maryland Corporations and Associations Code § 2-419 also entitle ULLICO to summary

judgment on its breach of fiduciary duty claims under Count I and its rescission claim under

Count IV. As discussed *infra*, Casstevens failed to disclose to the ULLICO Board of Directors

at or prior to its meeting on November 3, 2000: (1) the fact or way he obtained his holdings in

ULLICO stock; (2) that because he held less than 10,000 shares of Class A stock he stood to benefit from the exemption from pro-ration that was part of the $30 million stock redemption program approved at that meeting; (3) that he stood to personally benefit from the resolution giving authorization to Georgine to make future stock repurchases in his "discretion;" and (4) that his ownership of Class A stock, which was the subject of the resolution, was purportedly authorized by the Compensation Committee which he knew had no authority to do so.

While Maryland does not recognize a "universal or omnibus tort for the redress of breach of fiduciary duty by any and all fiduciaries," "[t]his does not mean that there is no claim or cause of action available for breach of fiduciary duty." *Kann v. Kann*, 690 A.2d 509, 521 (Md. 1997). Instead, a plaintiff must (1) identify the "fiduciary relationship involved," (2) identify how the duty was breached, (3) "consider the remedies available," and (4) select the most appropriate remedy. *Id.*

At all relevant times, Casstevens was a Director and member of the Executive Committee of ULLICO Inc. SOF ¶ 1. Under Maryland law, "[i]t is well-settled that directors of a corporation '[o]ccupy a fiduciary relation to the corporation and its stockholders.'" *Storetrax.com, Inc. v. Gurland*, 915 A.2d 991, 1000 (Md. 2007) (citation omitted). "This fiduciary relationship requires that a director 'perform his duties . . . : (1) In good faith; (2) In a manner he reasonably believes to be in the best interests of the corporation; and (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.'" *Id.* at 1000-01 (citation omitted). "As such, directors of a corporation 'are entrusted with powers which are to be exercised for the common and general interest of the corporation, and not for their own private individual benefit.'" *Id.* at 1001 (citation omitted). "This fiduciary duty,

764661.6

furthermore, is not intermittent or occasional, but instead 'the constant compass by which all director actions for the corporation and interactions with its shareholders must be guided.'" *Id.*

It is undisputed that Casstevens enriched himself at ULLICO's expense by causing his Class A and Capital stock to be bought back in early 2001 at the price of $146.04. Casstevens was specifically informed in May of 2000 that a repurchase price of $146.04 set forth in the resolutions approving the Extraordinary Stock Redemption represented a premium above what the stock was then worth. SOF ¶¶ 30, 32. Casstevens also knew that the Extraordinary Stock Redemption as approved in May 2000 would not be implemented because the conditions of that program had not been met. *See* SOF ¶¶ 29-32; Exhibit 21 to SOF at USDC 0003168.

Regarding his re-sales of Capital stock, Casstevens knew that Capital stock would not be eligible for repurchase under the $30 million program, and that the Company reserved its right to purchase all stock outside the $30 million program at $25 per share. *See* SOF ¶¶ 41, 55. Notwithstanding the foregoing, Casstevens redeemed his Capital shares at $146.04 per share. SOF ¶ 55.

Casstevens received through his redemptions of stock a disproportionately high percentage of the funds expended for the repurchase of Class A stock, and a disproportionately high amount of profit on his re-sales of Capital stock based on the indicated price at which such stock was to be redeemed. During the Board Meeting on November 3, 2000 at which the resolution purporting to approve his stock transactions was passed, Casstevens did not disclose the potential for his disproportionate benefit with respect to his Class A holdings, neither did he disclose that he held Capital stock that could be repurchased under other terms of the resolution, nor did he ever seek separate approval for these transactions. *See* SOF ¶¶ 49, 52, 53, 56. During all these times, Casstevens was one of ULLICO's directors and a member of the Executive

764661.6

Committee. SOF ¶ 1. When he caused ULLICO to repurchase his Class A and Capital stock, Casstevens clearly breached his fiduciary duties to ULLICO by failing to conduct himself "in good faith" and "in a manner he reasonably believe[d] to be in the best interests of the corporation."

There is also no doubt that Casstevens breached his duty of disclosure. "One of the primary obligations of an agent to his or her principal is to disclose any information the principal may reasonably want to know. . . . The obligation to disclose is strongest when a principal has a conflicting interest in a transaction connected with the agency." *Insurance Co. of N. Am. v. Miller*, 765 A.2d 587, 597 (Md. 2001). *See also Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.*, 389 A.2d 887, 903 (Md. 1978) (recognizing duty of fiduciary to "make full disclosure of all known information that is significant and material to the affairs" of the fiduciary relationship) (quoting *Herring v. Offutt*, 295 A.2d 876, 879 (Md. 1972)); Restatement (Second) of Agency § 381 cmt. a (1958) (an agent has a duty to give information to the principal when he has "notice of facts which, in view of his relations with the principal, he should know may affect the desires of his principal as to his own conduct or the conduct of the principal"). *See also* Md. Code Ann., Corps. & Ass'ns § 2-419 (transactions between a company and one of its directors whose interest in the transaction causes a conflict are not void or voidable because of that interest so long as the interest is disclosed to or known by the Board and approved by its disinterested directors); *Storetrax.com*, 915 A.2d at 1003 (Section 2-419 "impose[s] a duty upon [officers and directors] to reveal all facts material to the corporate transactions.")

The duty of disclosure principle was recently affirmed in the highly publicized case involving the compensation claimed by Richard Grasso, the former Chairman and Chief Executive Officer of the New York Stock Exchange. *See People v. Grasso*, No. 401620/04,

76-6616

2006 N.Y. Slip Op. 52019U at *25-27 (N.Y. Sup. Ct. Oct. 18, 2006). There the court held that it was a breach of his fiduciary duty for Mr. Grasso to have neglected to reveal to the NYSE Board that his Supplemental Executive Retirement Plan had more than tripled in value in three years and that he was due an advance of $58 million related to the new value of the Plan. *Id.*

In ruling against Mr. Grasso, the court held that he had "a duty of undivided and undiluted loyalty," that "[t]his loyalty is enforced with 'uncompromising rigidity,'" and that "[i]n any transaction between the fiduciary and the beneficiary, the fiduciary is 'strictly obligated' to fully disclose all material facts." *Id.* at *26 (citations omitted). The court further held that Grasso's lack of disclosure "thwarted the Compensation Committee from performing its duty of care and obedience." As a result of the lack of disclosure, the Compensation Committee "made decisions to pay him without knowing his true compensation." *Id.* Importantly, the court held that part of Grasso's "affirmative fiduciary duty" was "making sure that the Committee had all of the information it needed to make an informed decision," and that performance of this duty was required without regard to any "inadvertent knowledge the Board may have achieved." *Id.* at *27.

The undisputed facts in this case demonstrate that Casstevens violated his duty of disclosure. As described above, it is undisputed that he never disclosed his stock holdings at the November 3, 2000 Board meeting, nor did he disclose how much he stood to gain from the transactions covered by the resolution. SOF ¶ 49. Casstevens likewise never raised issues with the Board regarding the source of authority for his purchases of Class A stock in 1998 and 1999, nor did he ever disclose that his resulting holdings of Class A stock numbered less than 10,000 shares, therefore entitling him to participate without proration in the $30 million program then under consideration by the Board. *Id.* He also never disclosed the extent to which he stood to

gain disproportionately relative to the other pro-rated shareholders, either in terms of relative percentage of stock redeemed (*i.e.* 100% of Casstevens' tendered stock would be redeemed vs. 2.2% of the pro-rated shareholders' tendered stock would be redeemed.) Additionally, regarding his Capital stock, Casstevens never disclosed to, or sought authorization from, the Board or its disinterested directors for the repurchase of those shares in March 2001. SOF ¶ 55-56.

Given that the Board was considering a resolution purporting to grant Georgine discretionary authority to make future repurchases of Capital stock, and to authorize a formal repurchase program for Class A stock with no proration for shareholders of less than 10,000 shares, which could, and in fact did, include the future repurchases from Casstevens, Casstevens clearly violated his duty of disclosure to ULLICO by failing to "make full disclosure of all known information that is significant and material to the affairs" of the fiduciary relationship. *Impala Platinum Ltd.*, 389 A.2d at 903.

It is also clear that the remedy of disgorgement is appropriate for these breaches of fiduciary duty. "There are many potential remedies for a breach of fiduciary duty, including restitution, rescission, disgorgement of profits, and constructive trusts." *Avianca, Inc. v. Corriea*, C.A. No. 85-3277, 1993 U.S. Dist. LEXIS 20954, at *11 (D.D.C., May 13, 1993). "It is well established that a court has extraordinary powers when confronted with a violation of a fiduciary duty." *Id.* at *12. "The reason such unusual remedies are tolerated -- even encouraged -- is that there is a pressing need for remedies in fiduciary duty cases, remedies that will serve to deter violations of fiduciary duty." *Id.* at *13.

A disloyal corporate fiduciary is "not entitled to retain any benefit obtained as a result of his breach of duty to the corporation[]." *Leavy v. American Fed. Sav. Bank*, 764 A.2d 366, 373

(Md. Ct. Spec. App. 2000) (citing *Levin v. Levin*, 405 A.2d 770 (Md. Ct. Spec. App. 1979)).

Thus, an appropriate remedy for Casstevens' breaches of fiduciary duty is, at a minimum,

disgorgement of his personal stock profits. Indeed, Maryland law expressly endorses

disgorgement as an appropriate remedy for breach of fiduciary duty. *Lerner Corp. v. Three*

*Winthrop Props., Inc.*, 723 A.2d 560, 566 (Md. Ct. Spec. App. 1999). Accordingly, ULLICO is

entitled to recover from Casstevens the profits he earned on his improperly disclosed sales of

ULLICO stock. ULLICO is therefore entitled to summary judgment for breach of fiduciary duty

under Counts I and IV against Casstevens in the amount of $810,375.20. SOF ¶ 8.

Alternatively, ULLICO is entitled to rescind the stock repurchases due to Casstevens'

breaches of duty and failure to disclose and seek approval for his stock transactions. *See*

*Avianca, Inc.*, 1993 U.S. Dist. LEXIS 20954 at *11. Additionally, as discussed in Section III,

*infra*, Casstevens failed to comply with material terms of the repurchase program pursuant to

which he sold his Class A stock. This, too, provides an independent basis for rescinding the

repurchases and restoring the status-quo ante. *See Plitt v. McMillan*, 223 A.2d 772, 774 (Md.

1966) (stating that "[w]here ... there has been a material breach of a contract by one party, the

other party has a right to rescind it."); *Maslow v. Vanguri*, 896 A.2d 408, 423 (Md. Ct. Spec.

App. 2006) (stating that "rescission will [] be granted ... only for a substantial breach tending to

defeat the object of the contract.") (internal quotation marks omitted). Accordingly, ULLICO is

entitled to recover $1,116,035.20, representing all the proceeds of Casstevens' stock transactions,

and Casstevens is entitled to a return of the 7,312 Class A shares and 330 Capital shares he sold

back to ULLICO in 2001. *See* Exhibit 8 to SOF.

17

III.    ULLICO IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II OF ITS
        COMPLAINT FOR UNJUST ENRICHMENT

ULLICO is also entitled to summary judgment on Count II of its Complaint for unjust

enrichment based on the failure of Casstevens to comply with the terms of the offer to purchase

pursuant to which he tendered his Class A shares, and his knowledge that he avoided proration

despite failing to tender all of his shares as required by the terms of the Actual 2000 Repurchase

Program. *See* SOF ¶¶ 28, 40. *See also* Exhibit 18 to SOF (USDC 0026435-77). Casstevens was

also unjustly enriched due to the repurchase of his Capital stock in March 2001 because he knew

that the price of $146.04 represented a premium over the then-actual-value of ULLICO's stock,

and he also knew that ULLICO reserved the right to repurchase shares of its stock, including

Capital Stock, outside the repurchase program at $25.00 per share. *See* SOF ¶¶ 30, 32, 55.

Given that insiders of ULLICO received a total of 31% of the total funds paid by the company to

redeem ULLICO Class A and Capital stock at $146.04, and for other reasons discussed below, it

would be inequitable for Casstevens to retain the funds representing his unjust enrichment. SOF

¶ 57.

The elements of any unjust enrichment claim are:

1.    a benefit conferred upon the defendant by the plaintiff;

2.    an appreciation or knowledge by the defendant of the benefit;

3.    the acceptance or retention by the defendant of the benefit under such
      circumstances as to make it inequitable for the defendant to retain the benefit
      without payment of it[s] value.

*Klein v. Fidelity & Deposit Co. of Am.*, 700 A.2d 262, 277 (Md. Ct. Spec. App. 1997). The

substance of an unjust enrichment claim can be summarized as follows:

> To qualify for an award of restitution under this theory, [plaintiff]
> must show that [it] conferred a benefit (usually money) on [the
> defendant] under circumstances in which it would be unjust or

18

> inequitable for the defendant to retain the benefit.... Every unjust
> enrichment case is factually unique, for whether there has been
> unjust enrichment must be determined by the nature of the dealings
> between the recipient of the benefit and the party seeking
> restitution, and those dealings will necessarily vary from one case
> to the next.

*BCCI Holdings (Lux.) S.A. v. Khalil*, 56 F. Supp. 2d 14, 64-65 (D.D.C. 1999), *aff'd and rev'd in*

*part on other grounds*, 214 F.3d 168 (D.C. Cir. 2000) (citations omitted).  In this case all the

elements of an unjust enrichment claim have been established.

## A.    Casstevens was Unjustly Enriched by the Repurchase of His Class A Stock Without Proration

A benefit was certainly conferred upon Casstevens by virtue of the non-prorated

repurchase of his Class A shares despite his failure to tender all of his shares as required by the

express terms of the Offer to Purchase.  SOF ¶¶ 28, 40.  Casstevens was aware of this benefit

both by virtue of his receipt of the funds and as evidenced by a letter he sent in connection with

his tender of stock.  *See* SOF ¶ 28 and accompanying exhibits.

As discussed above, Casstevens obtained these funds through a breach of his fiduciary

duties to ULLICO and Maryland corporate law.  Moreover, Casstevens had his stock

repurchased without proration despite failing to tender all of his shares of Class A stock as

required by the offer to purchase.  SOF ¶¶ 28, 40.  Casstevens should have had only 2.2% (no

more than 161 shares) of the 7,312 Class A shares he tendered for repurchase bought back by

ULLICO.  Instead of receiving $1,067,844.48 for the 7,312 Class A shares he tendered,

Casstevens should have received only $23,512.44.  Accordingly, Casstevens was unjustly

764661.6

enriched, at the expense of ULLICO's non-insider shareholders, in the amount of $752,751.42.[1]
SOF ¶ 8.

**B.    Casstevens was Unjustly Enriched by the Repurchase of His Capital Stock for
$146.04 per Share**

Casstevens was also unjustly enriched when ULLICO repurchased his Capital stock in
March 2001 for $146.04 per share. Casstevens knew at the time his 330 shares of Capital stock
were repurchased in March 2001 that the price of $146.04 represented a premium over the actual
value of ULLICO stock. SOF ¶¶ 30, 32, 55. Casstevens also knew that ULLICO reserved the
right to repurchase shares of its stock, including Capital Stock, outside the repurchase program at
$25.00 per share. SOF ¶ 55. Accordingly, a benefit was clearly conferred upon Casstevens by
virtue of ULLICO paying $146.04 per share to repurchase his Capital Stock while the company
had clearly reserved the right to repurchase shares outside any repurchase program at $25.00 per
share. Casstevens was aware of the benefit by virtue of his receipt of the funds from ULLICO
for the repurchase of his Capital Stock. Casstevens was aware of the benefit he received by
virtue of his receipt of the funds.

Casstevens received $48,193.20 in connection with the repurchase of his Capital stock.
SOF ¶ 55. Because ULLICO reserved the right to repurchase stock outside the repurchase
program at $25.00 per share, Casstevens should have received only $8,250 for his Capital stock.
Accordingly, Casstevens was unjustly enriched in the amount of $39,943.20, which represents

---

[1] This figure represents 97.8 percent of Casstevens' stock profits from his sale of Class A shares. Taking
the gross amount he received in connection with his sale of Class A shares ($1,067,844.48) and
subtracting $298,160, which represents his cost basis in those shares, yields a profit of $769,684.48. *See*
SOF ¶ 8 and accompanying exhibit. $752,751.42 represents 97.8 percent of Casstevens' stock profits
from his sale of Class A shares.

76-166 | 6

the difference in price between stock sold to ULLICO for $25.00 per share and the $146.04 per share price Casstevens actually received.

Under the undisputed facts, it would be inequitable for Casstevens to retain the benefit conferred by virtue of his non-prorated stock sales in 2001 and the repurchase of his Capital stock outside the repurchase program at $146.04 per share.

**C.    It would be Inequitable for Casstevens to Retain the Benefit Conferred Upon Him**

Despite Casstevens' statement at his deposition that the repurchase program "doesn't have to be equal to be equitable[,]" Casstevens Depo. at 148:17-18 (SOF Exhibit 1), equity does, in fact, dictate that Casstevens disgorge amounts representing his unjust enrichment.  For Casstevens to now be permitted to retain the proceeds of stock sales that were: 1) in violation of his fiduciary duties; 2) in violation of Maryland Corporate law; 3) never disclosed to the Board of Directors or any disinterested member of the Board of Directors; 4) consummated in a manner not announced to, or generally available to, other shareholders; 5) contrary to the terms of the Offer to Purchase pursuant to which Casstevens tendered his ULLICO Class A stock; 6) made at a price for Capital stock repurchased outside the repurchase program at a price much higher than the price announced to ULLICO's non-insider shareholders; and 7) where insiders received 31% of the total funds paid by the company to redeem ULLICO Class A and Capital stock at $146.04 per share, is clearly inequitable.  As a result, ULLICO is entitled to entry of summary judgment on Count II of its complaint for unjust enrichment with respect to the repurchase of Casstevens' Class A shares and Capital stock in the amount of $792,694.62.

764661 6

IV.    ULLICO IS ENTITLED TO PREJUDGMENT INTEREST

District of Columbia law entitles ULLICO to prejudgment interest on all the foregoing liquidated amounts. D.C. Code § 15-108 "provides that judgment for the plaintiff 'in an action to recover a liquidated debt on which interest is payable by contract or by law or usage . . . shall include interest on the principal debt from the time it was due and payable.'" *Riggs Nat'l Bank v. District of Columbia*, 581 A.2d 1229, 1254 (D.C. 1990). A failure by a party to pay over funds when obligated to do so creates the debtor/creditor relationship within the meaning of D.C. Code Section 15-108. *Id.* "[A] liquidated debt is one which 'at the time it arose ... was an easily ascertainable sum certain ....' 'Even where a bona fide dispute exists as to a debt, courts generally find the liquidated nature of the debt unaffected.'" *Id.* (citations omitted).

The *Riggs* Court recognized the availability of pre-judgment interest even in the absence of explicit statutory authorization or a contractual relationship between the parties. *Id.* at 1255. An award of pre-judgment interest in any analogous context suffices to justify making the award in the instant case. *Id.* Additionally, where, as here, the law serves a remedial purpose, the law "should be generously construed so that the wronged party can be made whole." *Id. See also Federal Mktg. Co. v. Virginia Impression Products Co., Inc.*, 823 A.2d 513, 532 (D.C. 2003) (stating that the remedial purpose of civil contempt sanctions justifies an award of pre-judgment interest, even in the absence of explicit statutory authorization, and that the Court has discretion to order such pre-judgment interest).

The amount of pre-judgment interest is specified by D.C. Code Section 28-3302, which provides for an interest rate of six-percent per annum. *See District of Columbia v. Pierce Associates, Inc.*, 527 A.2d 306, 311 (D.C. 1987) (holding that the six-percent limit on pre-judgment interest in D.C. Code § 28-3302 applies to both D.C. Code §§ 15-108 and 15-109).

22

In this case, all the requirements for an award of pre-judgment interest are satisfied. As a result of voidable transactions that resulted in unjust enrichment and breaches of fiduciary duty, ULLICO is entitled to receive disgorgement of specific and certain stock profits described above. The law that mandates this relief is remedial and should be "generously construed" in favor of remedies. Each of these amounts recoverable was "an easily ascertainable sum certain" "at the time it arose." *Riggs*, 581 A.2d at 1254 (citation omitted). There is clearly a liquidated "debt" due from Casstevens to ULLICO.

No prohibition exists in the District of Columbia against granting pre-judgment interest in tort cases. *See Duggan v. Keto*, 554 A.2d 1126, 1140 (D.C. 1989). Indeed, in *Duggan*, the court allowed prejudgment interest in a conversion case, "to the extent that it will make the injured party whole." *Id.* Given the nature of the underlying conduct, Casstevens is required to disgorge his personal stock profits and restore ULLICO to the position it enjoyed before his breaches of duty and unjust enrichment. An award in this case of pre-judgment interest would be well within the scope of those cases in which District of Columbia courts have awarded a litigant pre-judgment interest. For these reasons, ULLICO is "entitled to prejudgment interest . . . from the date the debt became due and payable." *Pierce Associates*, 527 A.2d at 312.

## CONCLUSION

For the foregoing reasons, ULLICO's Motion for Partial Summary Judgment should be granted. A proposed Order is submitted herewith.

764661 6

May 29, 2007                                Respectfully Submitted,


                                           By:   /s/ Victor Tabak
                                           James A. Bensfield (DC Bar #189084)
                                           Anthony J. Trenga (DC Bar #218255)
                                           Mark J. Rochon (DC Bar #376042)
                                           Brian A. Hill (DC Bar #456086)
                                           Matthew T. Reinhard (DC Bar #474941)
                                           Victor Tabak (DC Bar #480333)
                                           Kevin G. Mosley (DC Bar #488495)
                                           MILLER & CHEVALIER CHARTERED
                                           655 Fifteenth Street, N.W., Suite 900
                                           Washington, DC  20005-5701
                                           Tel. (202) 626-5800
                                           Fax. (202) 628-0858
                                           atrenga@milchev.com

764661 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

ULLICO INC.,                      )
            Plaintiff,            )          CASE NUMBER:  1:06CV01388 (RJL)
      v.                          )          DECK TYPE:  General Civil
                                  )
WILLIAM CASSTEVENS,               )
            Defendant.            )
                                  )

## ORDER

Upon consideration of ULLICO's Motion For Partial Summary Judgment, its Statement

of Material Facts and Points and Authorities in Support thereof, Defendants' Oppositions, and

any Replies thereto, and for good cause shown, it is:

ORDERED that ULLICO's Motion for Partial Summary Judgment be, and the same

hereby is, GRANTED; and it is

FURTHER ORDERED that summary judgment be, and hereby is, entered on Count I of

the Complaint in favor of plaintiff ULLICO Inc. against defendant Billy Casstevens for his

personal stock profits in the amount of $810,375.20; and it is

FURTHER ORDERED that summary judgment be, and hereby is, entered on Count II of

the Complaint against defendant Billy Casstevens for his personal stock profits in the amount of

$792,694.62; and it is

FURTHER ORDERED that summary judgment be, and hereby is, entered on Count IV

of the Complaint in favor of ULLICO Inc. against defendant Billy Casstevens and that the sales

of his stock back to ULLICO in 2001 are hereby declared invalid, rescinded and otherwise

cancelled and that accordingly, he shall return to ULLICO the amount of $1,116,035.20 and that

ULLICO shall return to Billy Casstevens 7,312 Class A shares and 330 Capital shares of

ULLICO stock; and it is

FURTHER ORDERED that pre-judgment interest is awarded on the above stated

amounts, and ULLICO shall file proposed calculations of such amounts with the Court within 20

days of this Order.

DATED: _____, 2007

                                          _____
                                          Richard J. Leon
                                          United States District Judge

761661 6