Exhibit 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
-------------------------------:
ULLICO, INC.,                  :
                               :
     Plaintiff,                :
                               :
         v.                    :   Case No.:
                               :   1:06cv01388 (RJL)
WILLIAM CASSTEVENS,            :
                               :
     Defendant.                :
                               :
-------------------------------:
```

April 3rd, 2007

Deposition of:

BILLY CASSTEVENS,

A witness called by counsel pursuant to

notice, commencing at 9:30 a.m, which was taken at

Miller & Chevalier, 655 15th Street, N.W.,

Ninth Floor, Washington, D.C. 20005

**Page 14**

1  the same day and borrowed $500 and paid for the
2  damage and my brother was working at General Motors
3  in Cleveland, Ohio, said come here, go to work, you
4  can make better money and pay the money off quicker
5  and get back in school. Well, I got involved in the
6  union and never went back.
7  Q  Tell me how you ended up in the position
8  you ultimately held in the union?
9  A  Got elected.
10  Q  After you were elected there did you keep
11  working at General Motors?
12  A  No, I was on leave of absence from General
13  Motors.
14  Q  I'd like to discuss your work history a
15  little bit. Besides the ULLICO Board of Directors
16  were you on any other boards of director?
17  A  Yes.
18  Q  Which ones?
19  A  I was on the board of Blue Shield in
20  Cleveland, Ohio.
21  Q  When was that?

**Page 15**

1  A  Back in the 70s. I was on the -- I served
2  as the trustee of Cleveland State University for
3  nine years. I served on the board of Blue Cross
4  Blue Shield in Michigan sometime in the 80s and out
5  of a lawsuit I was put on the board of Navistar
6  International.
7  Q  What was your role in Navistar
8  International?
9  A  To represent the retirees and the
10  employees that worked for them.
11  Q  What were your roles on the other boards
12  of directors of Blue Cross Blue Shield, what was
13  your Board of Directors role there?
14  A  Just a regular old business to vote on
15  things they were going to do, that's all.
16  Q  Have you ever served on any benefits
17  committees of any of those other boards?
18  A  No.
19  Q  Were you the fiduciary of any retirement
20  plans?
21  A  No.

**Page 16**

1  Q  What about at United Auto Workers, or I'm
2  sorry?
3  A  No, I was a secretary-treasurer made
4  investments but I didn't serve on any of that as a
5  fiduciary.
6  Q  So how then did you invest the pension
7  fund's money that was in your capacity as secretary?
8  A  After I invested the severance fund.
9  Q  I'm going to hand you what's been marked
10  Exhibit Number 1, also Exhibit Number 2.
11  (Casstevens Exhibit No. 1 was marked)
12  Q  The first letter is a November 16th, 1994
13  letter from Robert Georgine to Bill Casstevens. It
14  says that he would like to appoint you as a member
15  of the Board of Directors of the Union Labor Life
16  Insurance Company. Prior to receiving this letter
17  had you had any contact or communications with
18  Mr. Georgine?
19  A  Yes.
20  Q  Could you describe those to me, please?
21  A  I met him and I met with him and one of

**Page 17**

1  his assistants and he asked me about going on the
2  board, but I told him that if you were asking me to
3  go on the board to represent UAW I could not, I
4  would not, but if you asked me to go represent
5  stockholders since I was one I would consider that.
6  Q  And did he say why he asked you to join
7  the board?
8  A  No, I'm assuming that he accepted what I
9  said because I never was on that board to represent
10  UAW.
11  Q  He didn't say why he asked you to join the
12  board?
13  A  I don't recall if he did or not.
14  Q  It says in this letter that he invited you
15  to join the board of the Union Labor Life Insurance
16  Company. At any point since you appointed to the
17  ULLICO board, the ULLICO, Inc. board?
18  A  They're one in the same as far as I know?
19  (Casstevens Exhibit No. 2 was marked)
20  Q  The next exhibit, Exhibit Number 2, is a
21  November 23rd, 1994 letter from you to Mr. Georgine.

Page 18

1  Take a minute to look at it, if you would. Your
2  signature is signed Cas, is that how you normally
3  signed your name in business correspondence?
4      A   Yes, as most people thought Casstevens was
5  two words. They started calling me Cas 60 years ago
6  so I adopted it.
7      Q   And at ULLICO did you serve on any
8  committees?
9      A   Yes.
10     Q   Which ones?
11     A   Audit committee and the executive
12  committee. They called it the subcommittee, that's
13  all I can recall at the moment.
14     Q   Did you ever serve on the compensation
15  committee?
16     A   Yes, one meeting right at the end of my
17  tenure and that was it.
18     Q   What was your role on the audit committee?
19     A   Just a member of the audit committee.
20     Q   What was the audit committee's function?
21     A   To go over the audits of the company and

Page 19

1  meet with the internal auditors and make sure they
2  got whatever they needed to accomplish their task.
3      Q   It was just working as a liaison with the
4  PricewaterhouseCoopers of the world?
5      A   Yes.
6      Q   Did the audit committee serve any other
7  function?
8      A   Not that I can think of right now.
9      Q   And the mortgage committee, what was the
10  mortgage committee's role?
11     A   We approved loans.
12     Q   To whom?
13     A   Contractors basically, that was monies
14  vested in the mortgage committee that was used to
15  make loans basically in the construction industry
16  and create jobs for union tradesmen.
17     Q   Did the mortgage committee handle any
18  loans to company employees?
19     A   Yes.
20     Q   What do you recall about those?
21     A   I remember one Theresa Valentine, that's

Page 20

1  the only one I can remember off the top of my head.
2      Q   What were the standards for granting loans
3  to company employees?
4      A   Basically see that you had the collateral
5  to pay the loan back.
6      Q   And the loans given to company employees,
7  how would you describe the interest rate on those
8  loans versus the standard market rate?
9      A   I don't remember the interest rate on it.
10     Q   You said you were a member of the
11  executive committee?
12     A   Yes.
13     Q   Which one?
14     A   All of them.
15     Q   Of ULLICO, Inc. and Union Labor Life
16  Insurance?
17     A   Yes.
18     Q   What was your role in the executive
19  committee?
20     A   To listen to proposals that were made by
21  basically the officers and agreed or disagreed.

Page 21

1      Q   What was the function of the executive
2  committee?
3      A   I just told you.
4      Q   And what duties did you understand that
5  you had to the corporation as a member of the
6  executive committee?
7      A   Same duties I had as a member of the
8  board.
9      Q   What were those duties?
10     A   Act in good faith and interest to help the
11  company like a competent person would act in similar
12  circumstances.
13     Q   Did you understand that you had a
14  fiduciary duty --
15     MR. HOGAN: Object to the form.
16     A   No.
17     MR. TABAK: On what basis?
18     MR. HOGAN: The form?
19     MR. TABAK: Uh-huh.
20     MR. HOGAN: You stated "so you understand" and
21  that's not in accord with his prior testimony I

Page 50

1 the requirement that any company stock be offered
2 for sale to the corporation first. What did you
3 understand that to mean?
4 A I'm assuming that it meant that they could
5 still sell their stock back at the discretionary
6 part of the chairman.
7 Q At what price was the chairman empowered
8 to repurchase that stock?
9 A I think whatever we had valued the stock
10 at that point in time.
11 Q What was the purpose of the repurchase
12 program that was implemented by the board and the
13 executive committee?
14 A To be growth and equity.
15 Q For whom?
16 A For the stockholders.
17 Q How does repurchasing the stock give the
18 stockholders growth and equity?
19 A The price would be higher.
20 Q So it was your understanding that the
21 repurchase program was designed to repurchase the

Page 51

1 stock at a higher price than it was sold?
2 MR. HOGAN: Objection to the form. That's a
3 complete misunderstanding or misstatement.
4 Q You can answer if you understand my
5 question.
6 A Repeat the question, please.
7 Q Would you read it back.
8 (Record was read)
9 MR. HOGAN: Objection to the form.
10 A It would be repurchased at the price set
11 by the method that we were setting them.
12 Q What method was that?
13 A The one that Credit Suisse First Boston
14 proposed to us and we adopted.
15 Q What method was that?
16 A Whatever it says. I don't recall it.
17 Q What was your understanding of the concept
18 of book value of ULLICO stock?
19 A I don't know if I ever thought about it.
20 Q Was book value the term used to refer to
21 the ULLICO stock price that was set annually?

Page 52

1 A I would assume so.
2 Q Assumed based on what?
3 A Based on what you just said.
4 Q You don't personally know whether book
5 value was the concept of the stock price of ULLICO?
6 A It had a lot of growth.
7 Q How often did ULLICO stock price change?
8 A Once a year.
9 Q Do you know how the price was determined
10 each year?
11 A I never did try to determine it myself so
12 I don't remember the exact terminology.
13 Q How was it determined?
14 A I said I don't remember the exact
15 terminology. I never tried to determine it myself
16 so I don't remember the exact terminology, something
17 about the book value at the end of the year, audited
18 book value at the end of the year, something like
19 that.
20 Q Did you ever ask the questions about how
21 the stock price was determined.

Page 53

1 A No, I didn't need to.
2 Q Why not?
3 A Because it says how it was determined, I
4 just don't remember what it says.
5 Q You didn't want to know how it was
6 determined?
7 A I never --
8 MR. HOGAN: Objection to the form.
9 A I never did try to determine it myself.
10 Q Did you want to know how it was
11 determined?
12 A Not particularly.
13 (Casstevens Exhibit No. 9 was marked)
14 Q Handing you what's been marked as Exhibit
15 Number 9 July 29th, 1998 letter from Bob Georgine to
16 Bill Casstevens. Do you recall receiving this
17 letter?
18 A Yes.
19 Q The second paragraph reads, "one aspect of
20 that at ULLICO has been a continuing program to make
21 our stock available to officers and directors. For

14 (Pages 50 to 53)

Page 54

1 many years we did this on a regular basis."
2    Prior to this July 29th, 1998 letter do
3 you recall how often you were offered ULLICO stock
4 for purchase?
5    A  No, I don't recall.
6    Q  Do you have an approximate number of times
7 that you were offered the stock?
8    A  I don't know if I was at all based on this
9 date I'm not sure.
10    Q  I'm not asking about this particular date.
11 I'm asking prior to this date on July 29th, 1998.
12    A  That's what I'm saying, based on this date
13 I'm not sure when I made the purchases without
14 looking at the record.
15    Q  I'm asking approximately how many times
16 you were offer the opportunity to purchase ULLICO
17 stock?
18    A  I'm not sure if I was before this or not.
19    Q  You testified earlier that you bought
20 1,000 preferred certificates upon joining ULLICO?
21    A  Yes, I did.

Page 55

1    Q  That's at least once.  Were you offered
2 stock any other times?
3    A  I was offered to buy some capital stock
4 but I don't remember the date.
5    Q  I'm not asking the date.  I'm asking the
6 number of times?
7    A  You said prior to this date so I don't
8 remember the date that I did it.
9    Q  Those preferred certificates, how -- did
10 they pay a dividend?
11    A  Yeah, eight percent guaranteed, they
12 compounded I think.
13    Q  What do you mean by compounded?
14    A  The interest was compounded over the
15 years, every three years.
16    Q  What does that mean?
17    A  The interest would be compounded.
18    Q  I'm asking what that means?
19    A  Eight percent of your thing added to what
20 you purchased first day, that's what the interest
21 rate would be on.

Page 56

1    Q  Did you instruct the company to reinvest
2 your dividends in the form of additional preferred
3 certificate shares?
4    A  I don't think -- I'm not sure about that.
5 At the end I know I converted them all to class A
6 stock.
7    Q  When was that?
8    A  I guess the end of that three-year period
9 whenever I bought the stock.
10    Q  The next paragraph says, "the compensation
11 committee has authorized us to make available 2000
12 shares of stock to each member, the Board of
13 Directors of ULLICO, Inc. and each of the officers
14 of ULLICO, Inc.  What do you understand that
15 sentence to mean?
16    A  I don't know because the compensation
17 committee never made a report to the board, only the
18 chairman came and made the offer.
19    Q  You received this letter, correct?
20    A  Yes.
21    Q  Does that sentence mean that the

Page 57

1 compensation committee is the one that's authorizing
2 the issuance of these shares of stock?
3    A  Not to my knowledge, not to my knowledge.
4 The chairman of the compensation committee just had
5 never made a report to the board.  The only report
6 ever made, the offers ever made, was made by the
7 chairman, so why that's there I do not know.
8    Q  Did you understand the compensation
9 committee to have the authority to issue stock?
10    A  Never even gave it a thought because I
11 said they never made a report to us and the chairman
12 had the discretionary authority anyway and why
13 that's there I do not know.
14    Q  Did you think that this stock offer was
15 compensation?
16    A  No.
17    Q  If that's true then why was the
18 compensation committee the one offering the stock?
19    MR. HOGAN:  Objection to the form.
20    A  I just said they didn't, the chairman did,
21 not to us they didn't anyway.

15 (Pages 54 to 57)

Page 58

1    Q    Why do you think this letter says the
2    compensation committee was handling the stock offer?
3    A    I just said I have no idea why that's
4    there.
5    Q    It says that the price was $28.70 that it
6    was offered to you, the price of ULLICO stock
7    offered to you was 28.70 a share, how was that price
8    determined?
9    A    By the value set by Credit Suisse Boston,
10   by the program they put together.
11   Q    So is it your position that this statement
12   that the compensation committee is authorizing the
13   2000 shares of stock, that's your position that
14   that's an error?
15   A    That's incorrect, yes.
16   Q    Did you raise that issue with anyone?
17   A    No.
18   Q    If you thought it was an error why didn't
19   you tell anyone else?
20   A    Well, I didn't think of it until now,
21   okay, not until now, until I saw the report,

Page 59

1    Thompson report, and I said how did they get this
2    because the compensation committee never made a
3    presentation to us, never, not once.
4    MR. TABAK:  We can take a break now.
5    VIDEO TECHNICIAN:  The time now is 10:40, we're
6    going off the record.
7    (Off the record)
8    VIDEO TECHNICIAN:  Time now is 10:53, we are
9    back on the record.
10   BY MR. TABAK:
11   Q    Handing you what's been marked as Exhibit
12   Number 10.  It's a form that says at the top ULLICO,
13   Inc. stock purchase request bates numbered UMIA
14   016213.
15   (Casstevens Exhibit No. 10 was marked)
16   Q    Do you recognize that document?
17   A    Yes.
18   Q    Is that your signature at the bottom?
19   A    Yes.
20   Q    What is this document?
21   A    Stock purchase request.

Page 60

1    Q    For?
2    A    For shares of ULLICO stock.
3    Q    For how many shares?
4    A    You want me to add them up?
5    Q    Which box is checked, Mr. Casstevens, on
6    that form reflecting how many shares?
7    A    2000.
8    Q    Is this the form you submitted in order to
9    purchase ULLICO stock in response to the letter you
10   just received or we just went over?
11   A    I assume so.
12   Q    Do you have any reason to believe it's
13   not?
14   A    No, I don't.
15   Q    What was the date that you signed this
16   form?
17   A    Looks like August 3rd, '98.
18   Q    Go back to Exhibit 4.  That's the letter
19   regarding the Global Crossing IPO.  What's the date
20   of that letter?
21   A    July 31st, '98.

Page 61

1    Q    Do you recall receiving this letter before
2    filling out that form?
3    A    I don't recall when I did it, whatever the
4    dates say I guess is what I did.
5    Q    You don't remember if you got this letter
6    or looked at it before you made the decision to
7    purchase those 2000 shares?
8    A    No, I don't remember.
9    Q    Why did you decide to purchase the 2000
10   shares of ULLICO stock?
11   A    Because it was a good investment.  I
12   bought every share that I could buy, or I should say
13   my wife and I bought every share we could buy.
14   (Casstevens Exhibit No. 11 was marked)
15   Q    Handing you what's been marked as Exhibit
16   Number 11.  It's an October 13th, 1998 letter from
17   Bob Georgine to Bill Casstevens.  What is this
18   letter?
19   A    Evidently a letter that tells they marked
20   the wrong date on something, the way it looks to me.
21   Q    Sorry?

Page 62

1    A    A letter to say they marked the wrong date
2  on some form, that's all it means to me.
3    Q    Is this letter offering an additional 2000
4  shares to each director and officer of ULLICO, Inc.
5  for purchase?
6    A    I don't see that in here.
7    Q    The first paragraph?
8    A    I see it, yes.  Yes, it did.
9    Q    Does this letter mention the compensation
10  committee authorizing this offer?
11    A    Again, I stated as far as I'm concerned
12  the compensation committee never authorized anything
13  to my knowledge and I don't recall them ever making
14  a report to the board.
15    Q    You'd agree that this letter doesn't
16  mention that the compensation committee has
17  authorized this?
18    MR. HOGAN: The document speaks for itself.  We
19  can stipulate it doesn't say anything about a
20  compensation committee.
21    Q    Very well.  What was the authority for

Page 63

1  issuing additional shares as you understood it?
2    A    You mean whose authority it was to do it?
3    Q    What was the basis -- yes, whose
4  authority?
5    A    Chairman.
6    Q    So these additional 2000 shares were
7  offered under the authority of the chairman?
8    A    Yes.
9    Q    As of October 13th, 1998 had you already
10  purchased Global Crossing stock?
11    A    I don't remember the date.  I can get it
12  for you if you want it but I don't remember it.
13    Q    If you'll recall the IPO was in August?
14    A    I didn't do the IPO.
15    Q    I understand that.  I'm trying to
16  establish a timeframe for you.  Between August and
17  October do you recall if you purchased Global
18  Crossing stock?
19    A    I don't remember the date.  I did purchase
20  Global Crossing stock but I don't remember the date.
21    Q    Do you recall whether you held any Global

Page 64

1  Crossing stock at the time you received this October
2  13th, 1998 letter?
3    A    When did they go bankrupt?  I don't even
4  remember.  I don't remember the dates.  If they
5  hadn't gone bankrupt, if I had bought it by then I
6  guess I still had it because I still have the
7  bankrupt certificate in my file.
8    Q    Did the success of the Global Crossing IPO
9  and its rising stock price affect your decision to
10  purchase this additional 2000 shares of ULLICO
11  stock?
12    A    No.
13    Q    What was the basis for your decision to
14  purchase these additional shares?
15    A    Same reason I bought it all along.
16    Q    Which was?
17    A    I thought as a board member you should
18  have some equity in the company.
19    Q    As a board member how much equity did you
20  feel you could have in the company?
21    A    As much as I could buy.

Page 65

1    Q    And did you purchase an additional 2000
2  shares?
3    A    Yes.
4    (Casstevens Exhibit No. 12 was marked)
5    Q    Handing you what's been marked as Exhibit
6  Number 12.  It's a November 6th, 1998 letter from
7  Bob Georgine to Bill Casstevens.  Do you recall
8  receiving that letter?
9    A    I assume I did.
10    Q    The first sentence in that letter
11  describes Global Crossing as -- the investment in
12  Global Crossing as a significant economic event.
13  What did you understand that to mean?
14    A    Whatever it says.
15    Q    What is your understanding of a
16  significant economic event?
17    A    It means what it says, that's all I can
18  say.
19    Q    Did you understand that --
20    A    That's the author's statement.  I don't
21  have any quarrel with it.

Page 78

1 discussed at the board meeting?

2    A    I don't recall it ever being discussed at

3 the board meeting.

4    Q    What about at the executive committee

5 meeting?

6    A    I don't recall it being discussed there

7 either.

8    Q    Did the executive committee have the power

9 to issue stock?

10    MR. HOGAN:  Objection to the form or objection

11 to the extent it asks for a legal opinion.

12    A    I thought I answered that before. I did

13 answer that before.

14    Q    So how could the executive committee

15 delegate the power to issue stock to the

16 compensation committee in this resolution?

17    A    I have no idea because we never did that

18 to my knowledge.

19    Q    Did you vote in favor of this resolution?

20    A    If I did it was -- no one discussed that

21 the compensation committee had a right to issue

Page 79

1 stock.

2    (Casstevens Exhibit No. 15 was marked)

3    Q    Handing you what's been marked as Exhibit

4 15. It's the minutes for the meeting of the

5 executive committee of ULLICO, Inc. for September

6 21st, 1999. Take a look at the third page after all

7 the "further resolves" where they're discussing the

8 financials. Did you attend this meeting?

9    A    Yes.

10    Q    The paragraph beginning for the six-month

11 period ending June 30th, 1999, what do you

12 understand that paragraph to mean regarding the

13 financial state of ULLICO?

14    A    Well, it says what it says. If you want

15 to ask me something specific about one part I'll try

16 to answer that.

17    Q    How were the company's operations doing?

18    A    We had a net gain of 108.4 million. We

19 had an operating loss of 28.2 million.

20    Q    So operations were at a loss; is that

21 correct?

Page 80

1    A    Operations were, overall it was not.

2    Q    That 108.4 million net gain, where did

3 that come from?

4    A    From U.S. West.

5    Q    How did U.S. West facilitate that gain by

6 the company?

7    A    They bought some Global Crossing stock.

8    Q    So a sale of Global Crossing stock

9 holdings netted the company 108.4 million?

10    A    Yes.

11    Q    That paragraph says that other than the

12 Global Crossing gain the company itself was

13 operating at a loss?

14    A    Yes.

15    Q    Handing you what's been marked as Exhibit

16 16.

17    (Casstevens Exhibit No. 16 was marked)

18    Q    It's the minutes for the meeting of the

19 Board of Directors of ULLICO, Inc. on September

20 22nd, 1999. Did you attend this meeting?

21    A    Yes.

Page 81

1    Q    And on the second page the fourth complete

2 paragraph down, is that the same financial report

3 that was delivered at the executive committee

4 meeting the day before?

5    A    Yes.

6    Q    Did it concern you that the company was

7 operating at a loss?

8    A    Yes, they explained why.

9    Q    Did it concern you as a member of the

10 executive committee and Board of Directors?

11    A    Yes, it did. We made some recommendations

12 how to get out of the -- stop loss business that we

13 had in Florida that put a drag on our company for

14 one thing.

15    (Casstevens Exhibit No. 17 was marked)

16    Q    Handing you what's been marked as Exhibit

17 17. It's a December 17th, 1999 letter from Bob

18 Georgine to Bill Casstevens. It's been marked

19 confidential?

20    A    Okay.

21    Q    Do you recall receiving this letter?

Page 82

1    A    Yes.
2    Q    Do you find it unusual that the letter was
3    offering stock for purchase so late in the year?
4    A    I never gave that a thought.
5    Q    In response to this letter did you
6    purchase ULLICO stock?
7    A    Yes, I did.
8    Q    How much stock did you purchase?
9    A    4,000 shares, I should say my wife and I
10   purchased.
11   Q    Why given the two reports you received on
12   the company's finances and operations and the fact
13   that the company was operating at a loss did you
14   think it was a good investment to purchase 4,000
15   shares of ULLICO stock?
16       MR. HOGAN:  Objection to the form.
17   A    Yes.
18   Q    Why?
19   A    I had faith in the company.
20   Q    As of December 17th, 1999 did you own
21   Global Crossing stock?

Page 83

1    A    Again, I can't remember the date when I
2    bought those so if that's important I'll get it for
3    you when I get home, but I don't remember the date
4    when I bought those.
5    Q    You can't recall whether you actually held
6    Global Crossing stock as of this date?
7    A    I still hold the bankrupt receipt but --
8    not a bankrupt receipt but a notice that they went
9    bankrupt.
10   Q    You can't recall whether you held Global
11   Crossing stock as of December 17th, '99?
12   A    No, I can't.
13   Q    Did you understand when you responded to
14   this stock offer that the price of ULLICO stock
15   would be changing in two weeks?
16   A    Never gave it a thought.
17   Q    Were you aware that the price of ULLICO
18   stock was set as of the end of the year each year?
19   A    According to the program it would be, yes.
20   Q    But you didn't -- did you consider what
21   the price of ULLICO would be set at the next year

Page 84

1    prior to deciding to purchase 4,000 shares?
2    A    No, I did not.
3    Q    What was the price at which you purchased
4    this stock?
5    A    This purchase?
6    Q    Uh-huh.
7    A    50 some dollars, $53.94.
8    Q    The previous year what was the price at
9    which you purchased those shares?
10   A    I don't recall off the top of my head.
11   Q    Was it approximately $28.70 a share?
12   A    I think that would be correct, yes.
13   Q    Was there a repurchase program for 1999?
14   A    Yes, that's when I bought these I think.
15   Q    I'm not asking about the stock. I'm
16   asking whether the board and executive committee
17   approved a repurchase program where the company
18   would buy shares of ULLICO stock that was tendered
19   to it?
20   A    Yes, we did.
21   Q    And what was the price of -- what was the

Page 85

1    price set for that repurchase program?
2    A    140 something I believe. I don't remember
3    the exact figure.
4    Q    For 1999?
5    A    1999, yes. No, that was 2000. It was in
6    2000. It was 70 some dollars as I recall, but I
7    don't recall the exact figure.
8    Q    Did the company repurchase its stock at
9    the book value that was set for that year?
10   A    Whatever they purchased they would have to
11   pay whatever the price was.
12   Q    The book value?
13   A    Yes.
14   Q    Was the book value for 1999 $53.94?
15   A    Yes.
16   Q    Does that refresh your recollection that
17   the repurchase program would buy back shares from
18   stockholders who tendered them as $53.94 a share?
19   A    Yes.
20   Q    Did you tender any of your stock that
21   year?

22 (Pages 82 to 85)

Page 102

1  Look at the last page, page 6. Did you attend this
2  meeting?
3      A   Yes.
4      Q   Do you recall receiving a report about the
5  company's investments at this meeting?
6      A   Yes.
7      Q   And what was that report?
8      A   It was a report on the total stockholder
9  equity and the decline.
10     Q   By how much?
11     A   375 million.
12     Q   And the top paragraph there, how much did
13  total assets of the corporation decline between
14  December 31st, '99 and June 30th, 2000?
15     A   That says 579.3 million. I don't quarrel
16  with it.
17     Q   And of that decline how much of it was due
18  to the decrease in the price of Global Crossing
19  stock?
20     A   478.8 million.
21     Q   So what did that mean for ULLICO's overall

Page 103

1  value as a company as of August 29th, 2000?
2      A   I said that earlier, that their equity
3  declined to 375 million.
4      Q   Does that mean the company was worth less
5  than it was at the beginning of the year?
6      A   Yes.
7      Q   Did that mean that the price of 146.04 for
8  the repurchase program, did that represent therefore
9  a greater premium?
10     MR. HOGAN: Objection to the form.
11     A   It represented the price of the stock that
12  we'd already adopted the program to fulfill and I
13  think our obligation was to fulfill that.
14     Q   The price of that stock was set as of the
15  end of '99, the beginning of 2000, correct?
16     MR. HOGAN: Objection to the form.
17     A   That's what the program calls for.
18     Q   So if the company's assets were declining
19  to the extent described here in these minutes,
20  doesn't that mean or did that mean that the company
21  was repurchasing its stock at a greater premium

Page 104

1  later in the year?
2      A   They were repurchasing at the price that
3  was dictated by the program to set the price. I
4  don't think they had any other choice to do anything
5  but that.
6      Q   What was the basis for that price that was
7  set?
8      A   It was based on the last year's financial
9  statements I suppose, put together by Credit Suisse
10  Boston.
11     Q   Were you aware that between May 31st, 2000
12  and October 10th, 2000 there were discretionary
13  repurchases made by Georgine at the 146.04 price?
14     A   No.
15     Q   Were you aware that 3,000 class A shares
16  were purchased from Carabillo?
17     A   No.
18     Q   That 4,000 class A shares were purchased
19  from Grelle?
20     A   No, none of those were ever reported so
21  I'm not aware of any of them.

Page 105

1      Q   I'm going to go through them for the
2  record, that 1250 capital shares were repurchased
3  from Jake west?
4      A   No.
5      Q   That 3386 class A and 886 capital shares
6  were repurchased from Jim Luce?
7      A   No.
8      Q   That 8665 class A shares were repurchased
9  from Mr. Bernard?
10     A   No.
11     Q   That 2000 share were repurchased from
12  Mr. Matalone?
13     A   No.
14     Q   Were any of those repurchases ever
15  disclosed to the board?
16     A   No.
17     Q   To the executive committee?
18     A   No.
19     Q   To you?
20     A   No.
21     Q   Did you attend any board or executive

**Page 106**

1 committee meeting prior to each of those sales I
2 just reviewed with you where they were approved or
3 considered?
4      A   They never came to the board.
5      MR. TABAK: If it's alright with you we're
6 going to do lunch now.
7      VIDEO TECHNICIAN: The time now is 12:04, we're
8 going off the record.
9        (Off the record)
10      VIDEO TECHNICIAN: The time now is 1:00
11 o'clock, we're back on the record.
12        (Casstevens Exhibit No. 21 was marked)
13 BY MR. TABAK:
14      Q   I'm going to hand you what's been marked
15 as Exhibit 21, it's the minutes for the meeting of
16 the Board of Directors of ULLICO, Inc. for November
17 3rd, 2000. Did you attend this meeting,
18 Mr. Casstevens?
19      A   Yes.
20      Q   Were you presented with the resolutions
21 voted on at this meeting in advance of the meeting?

**Page 107**

1      A   I don't recall, and the reason I say that
2 is many times they would mail them to me and I'd
3 leave home to get there before they ever got there
4 so I don't recall if I actually got this before or
5 not.
6      Q   Did you attend the November 3rd, 2000
7 meeting?
8      A   Yes.
9      Q   And if you'll recall earlier we discussed
10 some discretionary repurchases made from the
11 officers and directors, were those disclosed at that
12 November 3rd meeting by anyone?
13      A   No.
14      Q   Were the fact that those discretionary
15 repurchases made disclosed by anyone?
16      A   There was some discussion about how many
17 stocks were purchased, how that was done I'm not
18 sure. I would assume they were results of the buy
19 back program.
20      Q   What do you recall about that report?
21      A   What's in the minutes here. They said it

**Page 108**

1 reported how many stocks that were bought.
2      Q   At the time of the --
3      A   That were bought back and that's why I'm
4 making that statement.
5      Q   At the time of the November 3rd, 2000
6 meeting how much ULLICO stock did you own?
7      A   I don't think I bought any after that
8 date, so 9,000, I don't remember exact figure, 9,000
9 some shares.
10      Q   9312 shares of class A, does that sound
11 about right?
12      A   Yes, and some capital.
13      Q   330 shares of capital stock?
14      A   Yes.
15      Q   Did you seek to purchase any additional
16 stock?
17      A   No.
18      Q   Prior to that meeting?
19      A   No.
20      Q   Did you disclose to the Board of Directors
21 that you held that amount of stock at this meeting?

**Page 109**

1      A   Did I discuss it in the meeting, no, but
2 they could have known that by reading the notice of
3 the meeting because all the stock holdings of all
4 the director was printed in there.
5      Q   Did you discuss your stock holdings with
6 Terry O'Sullivan?
7      A   Same answer. He could have known that too
8 if he read the meeting -- the letter of the meeting
9 because it was printed in there.
10      Q   Did you routinely look at those proxy
11 statements to determine the stock holdings of other
12 officers or other directors?
13      A   No, the only thing I knew about was what I
14 saw in the notice of the meeting.
15      Q   Did you feel like you should have tracked
16 the stock holdings of the directors that were
17 printed in those proxy statements?
18      A   No, I don't think I had any obligation to
19 do that.
20      Q   So as member of the board and the
21 executive committee you didn't have an obligation to

Page 110

1  monitor what stock the directors held by examining
2  the proxy statements?
3      A   I read it if that's what you mean, I knew
4  what it was.
5      Q   You referred earlier to a letter regarding
6  the amount of stock held. What letter is that?
7      A   Letter about stock.
8      Q   You said you received information or a
9  person could have examined the amount of stock a
10 director held by looking at a letter and I'm asking
11 what letter you're referring to?
12     A   It was a letter of the notification of the
13 stockholders meeting.
14     Q   What letter was that?
15     A   One that's sent out to each -- each time
16 we had a stockholders meeting, every year.
17     Q   Is that the proxy statement?
18     A   It's what came with the proxy statement I
19 think, yes.
20     Q   Did you consider whether or not the
21 resolutions you were voting on whether you stood to

Page 111

1  benefit from those resolutions?
2      A   I never thought about it at the time.
3      Q   Sitting here today what do you think, did
4  you have a financial interest in the resolutions
5  voted on?
6      MR. HOGAN: Objection to the form and objection
7  to the relevance of what he thinks today.
8      Q   You can answer the question.
9      A   I sold my stock and I reaped whatever
10 gains that I made on my stock.
11     Q   I'm asking whether you had a financial
12 interest given that you sold your stock in the
13 resolutions voted on?
14     A   I owned stock so I guess I had a financial
15 interest.
16     Q   Did other directors who owned stock have a
17 financial interest in the outcome of the votes on
18 these resolutions?
19     A   I would assume so.
20     Q   Were there any disinterested directors
21 present at the meeting?

Page 112

1      A   Yes, but I don't recall their names, I
2  don't remember who they really were.
3      Q   And the price for -- the price set for the
4  repurchase program was still 146.04; is that
5  correct?
6      MR. HOGAN: Objection to the form.
7      A   Anyone asked me -- there were -- let me
8  go back. There disinterested directors and I think
9  looking at the date Terry O'Sullivan was there, he's
10 a disinterested member.
11     Q   Anyone else?
12     A   There were some others but I don't
13 remember who they were. Him I remember vividly
14 because he's the one that said we didn't do anything
15 illegal.
16     Q   So if you could look at page 2, the last
17 paragraph, the last sentence, it says, "if we focus
18 on Global at close of business today Global
19 traded --
20     MR. HOGAN: Yesterday.
21     Q   Sorry. "If we focus on Global at close of

Page 113

1  business yesterday, Global traded at $23.58 it has
2  not reached the $43 trigger?
3      A   What page?
4      Q   Page 2, the last paragraph.
5      A   What's the question?
6      Q   The question is what happened to Global's
7  stock price between the May 2000 executive committee
8  board meetings and November 3rd, 2000?
9      A   Well, it didn't meet the target.
10     Q   Did it go up or down?
11     A   It went down.
12     Q   Given that Global Crossing's stock price
13 went down -- well, at what price was the repurchase
14 program voted on at the November 3rd, 2000 meeting,
15 what price were they re-buying ULLICO stock at?
16     MR. HOGAN: Objection to the form.
17     A   146.04.
18     Q   It was the same price that had been set
19 earlier?
20     A   Yes.
21     Q   What affect did the decrease in Global

Page 114

1 stock price have on the assets of ULLICO?
2     MR. HOGAN: Objection to the form. There's no
3 time element stated.
4     A    Rephrase it, ask it again.
5     Q    At the November 3rd, 2000 meeting I asked
6 you earlier if Global's stock price had declined
7 between May 2000 and November 2000. You said that
8 it had declined. What affect did that decline in
9 that period have on the value of ULLICO as a
10 corporation?
11     A    I assume it was a negative value.
12     Q    So is it fair to say you would agree that
13 the value of ULLICO's corporation decreased by
14 virtue of the decrease in the Global Crossing's
15 stock price?
16     A    I assume so, yes.
17     Q    Does that meant that the value of ULLICO
18 in your opinion was directly related to Global
19 Crossing's stock price?
20     MR. HOGAN: Objection to the form.
21     A    To some degree.

Page 115

1     Q    To some degree, what else was it related
2 to?
3     A    It's not the only thing. Price can go up
4 and down on our other businesses.
5     Q    Other business meaning the company's
6 operations?
7     A    Yes.
8     Q    And the repurchase program passed at the
9 November 3rd, 2000 meeting, how much dollar value of
10 the company's stock was the company repurchasing?
11     A    30 million I believe, I'm not sure.
12     Q    The original program passed in May 2000,
13 how much dollar value was the company intending to
14 repurchase?
15     A    Over 200 million. I don't remember an
16 exact figure.
17     Q    Given that the price of Global Crossing
18 declined between May 2000 and November 3rd, 2000 was
19 maintaining the 146.04 repurchase price even greater
20 premium than when you passed it in May?
21     MR. HOGAN: Objection to the form.

Page 116

1     A    Ask me that again.
2         (Record was read)
3     Q    Why not?
4     A    Because that was set by -- the program was
5 put together by Credit Suisse First Boston I think
6 we had an obligation to carry out the program based
7 on the terms of what we adopted in that program.
8     Q    And you thought that was the case even
9 though there was a precipitous decline in the value
10 of Global Crossing?
11     A    I thought we had to carry out our
12 obligation to the program.
13     Q    If that's true then why the November 3rd,
14 2000 meeting was a different repurchase program
15 instituted by the board?
16     A    Because it didn't meet the trigger. It
17 didn't meet the trigger thing that was in the
18 original program.
19     Q    So would you agree then that the company
20 was paying a greater premium after the decrease of
21 Global Crossing's stock price than when they

Page 117

1 initially set the price in December 31st, 1999?
2     MR. HOGAN: Objection, that's the same question
3 that he's asked and answered. He stated no.
4     A    No, I don't agree, and I'll say again that
5 I think we were obligated that was the price that
6 was set by the program we adopted and I think we're
7 obligated to use that price.
8     Q    If you'll look at the third full
9 paragraph, the second full paragraph, and the one
10 after that on page 4, please. The third one. You
11 stated earlier that the chairman had the discretion
12 to issue stock and to repurchase it; is that
13 correct?
14     A    Yes.
15     Q    If that's true then why was a resolution
16 needed at the November 3rd, 2000 meeting to confirm
17 this authority?
18     A    As I recall it the outside lawyers said we
19 needed to ratify a program that already exists to
20 make it clear somehow, I assumed that it was in the
21 records.

Page 122

1  Q  Go to the next page, the very top
2  paragraph. Second to the last line says, "a report
3  of such purchases from directors and officers shall
4  be made from time to time for the compensation
5  committee. Were your repurchases that followed this
6  meeting reported to the compensation committee?
7  MR. HOGAN: Objection to the form.
8  A  I have no idea.
9  Q  Did you report them to the compensation
10 committee?
11 A  No, I did not.
12 Q  Why were these repurchases to be reported
13 to the compensation committee?
14 A  I think that basically said that the
15 chairman would report it to the compensation
16 committee as I understand it.
17 Q  Why would the compensation committee be
18 receiving reports of stock repurchases?
19 A  This is a matter of information I guess.
20 Q  If stock wasn't compensation as you said
21 earlier, then why would these repurchases be

Page 123

1  reported to the comp committee?
2  MR. HOGAN: Objection to the form, asked and
3  answered.
4  A  I have no idea and I didn't even know
5  whether the chairman reported to the compensation
6  committee or not.
7  Q  Moving down to the bottom "further
8  resolved" Roman Numeral III, it says prorationing as
9  to shares tendered shall be applicable with respect
10 to tenders if the maximum purchase amount of
11 foresaid would otherwise be exceeded. The chairman
12 or other appropriate officers designated by and may
13 provide for appropriate rounding in such proration."
14 What did you understand that provision of the
15 repurchase program that was passed to mean?
16 A  I guess it meant proration would occur if
17 it was over subscribed.
18 Q  And was this offer over subscribed?
19 A  I think it was.
20 Q  To what degree?
21 A  I don't know.

Page 124

1  Q  If you could look at Roman Numeral V. It
2  reads, "tenders of stock by a stockholder who holds
3  10,000 shares or fewer of stock and who properly
4  tenders all shares of stock that such stockholder
5  beneficially owns will not be subject to the
6  prorationing provisions nor in the aggregate to the
7  overall limit on purchases set forth above." What
8  did you understand that to mean?
9  A  What it says.
10 Q  So someone held less than 10,000 shares of
11 their stock, how much of their stock would they have
12 to tender to avoid proration?
13 A  Well, I don't know that they'd have to
14 tendered it all because the chairman had
15 discretionary authority to accept it in any event.
16 Q  I'm not asking about the chairman's
17 discretionary authority. I'm asking about this
18 repurchase program that was passed at the November
19 3rd, 2000 meeting. Pursuant to the terms of that
20 program, if somebody tendered their stock under that
21 program, they held less than 10,000 shares, did they

Page 125

1  have to tender all their stock to avoid proration?
2  A  A literal reading of it would say that.
3  Q  Is there some alternate reading?
4  A  Yes, I think the chairman had discretion.
5  Q  Was the chairman's discretionary authority
6  a separate way to get stock repurchased or was it
7  co-extensive with this program?
8  A  It was an additional way.
9  Q  So pursuant to this program that you'd
10 agree you'd have to tender all your shares in order
11 to have them not prorated?
12 MR. HOGAN: Objection to the form.
13 A  Maybe to have them not prorated, but it
14 doesn't mean you wouldn't -- they wouldn't be
15 accepted and bought.
16 Q  So if somebody tendered less than all of
17 their shares under the repurchase program's terms
18 would their shares have to be prorated?
19 MR. HOGAN: Objection, argumentative.
20 A  If they were held strictly to that
21 program, yes.

Page 126

1    Q    Can you read the next sentence out loud?

2    A    You may start with the tendered shares of

3    the stockholder?

4    Q    Sure.

5    A    Stockholder holds 10,000 shares or fewer

6    of stock and who properly tenders less than all

7    shares of stock that such stockholder be shown to be

8    subject to prorationing provision and in the

9    aggregate to the overall limit on purchase set forth

10   above.

11   Q    So does that confirm what we just

12   discussed that if you tendered less than all your

13   shares under the program you are to be prorated?

14   A    If it was held strictly to the program,

15   yes.

16   Q    Did you hold less than 10,000 shares of

17   class A stock as of the November 3rd, 2000 meeting?

18   A    Yes.

19   MR. TABAK: Off the record for a minute to

20   change the videotape.

21   VIDEO TECHNICIAN: The time now is 1:38, we're

Page 127

1    going off the record. This is the end of videotape

2    number two.

3    (Off the record)

4    VIDEO TECHNICIAN: The time now is 1:40, we're

5    back on the record. This is the beginning of

6    videotape number three.

7    BY MR. TABAK:

8    Q    Mr. Casstevens, at the November 3rd, 2000

9    meeting did you disclose to anyone that you held

10   less than 10,000 shares of class A stock?

11   A    I disclosed it in my offer to buy.

12   Q    At the meeting did you disclose to anyone

13   that you held less than 10,000 shares of class A

14   stock?

15   A    No, but they would have known that had

16   they read the letter that went with the proxy

17   statement.

18   Q    Did you habitually read those letters that

19   went to the proxy statements?

20   A    I did.

21   Q    So earlier -- didn't you testify earlier

Page 128

1    that you didn't -- you weren't aware of what the

2    stock holdings of other individual directors were?

3    A    I don't think so. I read them but I don't

4    remember them.

5    (Casstevens Exhibit No. 22 was marked)

6    Q    I'm going to hand you what's marked as

7    Exhibit Number 22 which is a letter from you to

8    Mr. Casstevens, says it's stated dated January 11th,

9    2000, but I think the year might be wrong on that.

10   And Exhibit Number 23 which is a letter of

11   transmittal also bearing your name and signature on

12   it.

13   (Casstevens Exhibit No. 23 was marked)

14   A    The date on that should be 2001. I made a

15   correction later but maybe you don't have that copy.

16   Q    Are you familiar with those two documents?

17   A    Yes.

18   Q    In the letter which is apparently

19   mistakenly dated for the year 2000 you write to

20   Mr. Carabillo on the page titled holders of fewer

21   than 10,000 shares, I checked the first box

Page 129

1    indicating that I was tendering all such shares.

2    However, I would like to retain class A stock

3    certificate number 119 (2000 shares). When you

4    tendered your stock you were doing it pursuant to

5    the stock repurchase program passed at the November

6    3rd, 2000 meeting, correct?

7    A    I think when I marked that 10,000 share

8    thing that I decided after that that I wanted to

9    hold the 2000 shares.

10   Q    If you look at the form you submitted

11   which was received January 16th, 2001 according to

12   the stamp on it from the legal department you're

13   only tendering 7312 shares, correct?

14   A    True, but I think I made that decision not

15   to tender them all, based on the reasons I stated

16   her in the letter.

17   Q    If you'll go to the fourth page of Exhibit

18   23. What does the box that I checked on that page

19   say?

20   A    That I'd be tendering --

21   Q    The undersigned either, it says check one

Page 130

1  box, you checked the box that says "was the
2  beneficial owner as of the close of business on
3  September 30th, 2000 and will continue to be the
4  beneficial owner until the expiration date of an
5  aggregate of fewer than 10,000 shares, and is
6  tendering all such shares."
7      A   I guess I made the decision before I did
8  that.
9      Q   So you checked that box but you didn't
10 tender all your shares, did you?
11     A   No, I didn't.
12     Q   So on what basis --
13     A   Wait a minute. I checked that box and I
14 must have made the decision after I checked that box
15 that I wasn't going to tender all my shares.
16     Q   But you only list 7312 shares on the face
17 page of that document where it asks you to detail
18 which shares you're tendering?
19     A   I know that. I know exactly when in
20 time -- as a matter of fact I almost decided to sell
21 none of my shares to tell you the truth, and when I

Page 131

1  started wanting to get rid of all of them I said,
2  well, I do believe that a board member should have
3  some equity in the company that he --
4      Q   Did you comply with the terms of the
5  purchase offer when you submitted your shares for
6  repurchase and checked that box?
7      MR. HOGAN: Objection, argumentative.
8      A   I sent a letter stating what I wanted to
9  do. They could have turned me down. I didn't hear
10 from them and I got the check.
11     Q   You checked the box that says you were
12 holding less than 10,000 shares and you were
13 tendering all your shares. Did you in fact tender
14 all your shares?
15     A   No, I didn't.
16     Q   And what was the basis for you to seek
17 different treatment under the repurchase program?
18     MR. HOGAN: Objection to the form, that's
19 argumentative.
20     A   I didn't seek different treatment. They
21 could have turned me down and I had to make another

Page 132

1  decision, which well could have been to keep it.
2      Q   Do you agree that under the terms of the
3  repurchase program passed at the November 3rd, 2000
4  meeting that you should have been prorated because
5  you didn't tender all your shares?
6      MR. HOGAN: Objection.
7      A   My letter speaks for itself. I made the
8  offer. They could have refused me. And I don't
9  know exactly what I would have done at that point.
10     Q   I'm not asking about your letter, sir, we
11 just --
12     A   That's my answer. That's the only answer
13 I can give you honestly. I took an oath to tell the
14 truth.
15     Q   We just reviewed the terms of the
16 repurchase program which said that a holder of less
17 than 10,000 shares had to tender all shares and the
18 next sentence in the resolution passed said if they
19 don't tender all their shares they'll be subject to
20 proration?
21     MR. HOGAN: And you did not read the next

Page 133

1  couple sentences.
2      Q   Should you, therefore, have been prorated
3  under the terms of the repurchase program?
4      MR. HOGAN: Objection.
5      Q   Not the chairman's discretionary
6  authority?
7      MR. HOGAN: Objection.
8      A   That decision would be made by the
9  chairman, not me.
10     Q   Under the terms of the program?
11     A   He could have made the decision, not me.
12     Q   Under the terms of the program should you
13 have been prorated according to its plain terms
14 which we've read?
15     MR. HOGAN: Counsel, your question doesn't
16 include the next couple sentences which are part of
17 the program.
18     Q   You can answer my question.
19     A   No.
20     (Casstevens Exhibit No. 24 was marked)
21     Q   Handing you what's been marked as Exhibit

34  (Pages 130 to 133)

Page 134

1 Number 24. It's a March 1st, 2001 letter from Bob
2 Georgine to Mr. Casstevens. The second sentence of
3 the first paragraph reads that all shares held were
4 properly tendered in accordance with the terms of
5 the offering memorandum. Is that accurate given
6 that you didn't tender all your shares?
7     A    I didn't tender all my shares.
8     Q    The letter reads, "therefore, ULLICO, Inc.
9 is issuing in payment at the rate of $146.04 per
10 share the amount of $1,067,844.48. So according to
11 this letter did you receive that check pursuant to
12 your participation in the repurchase program passed
13 at the November 3rd, 2000 board meeting?
14     A    I received a letter from the company what
15 their thoughts about why I got it, it was up to
16 them. I don't know.
17     Q    Did you call to the attention of anyone at
18 ULLICO that this letter was inaccurate because it
19 said you had tendered all of your shares properly
20 and in accordance with the terms of the offering
21 memorandum?

Page 135

1     MR. HOGAN: Objection to the form, that's
2 argumentative.
3     A    Did I do what?
4     Q    Did you call that inaccuracy to anyone's
5 attention at ULLICO?
6     A    What inaccuracy?
7     Q    The letter says in the second sentence
8 that all shares held were properly tender in
9 accordance with the terms of the offering
10 memorandum. You've already agreed that you didn't
11 tender all of your shares. Did you call that
12 inaccuracy to the attention of anyone at ULLICO?
13     MR. HOGAN: Objection to the form, it's
14 argumentative.
15     A    I don't consider it an inaccuracy but I
16 wrote a letter to Mr. Carabillo.
17     Q    What did you say in that letter?
18     A    The letter speaks for itself.
19     Q    But that letter was dated before this
20 letter, sir?
21     A    That letter is 2001.

Page 136

1     Q    Letter is January 2001, this letter is
2 March 1st, 2001?
3     A    Did I talk to him back prior to that, no.
4     Q    After you got this letter in March did you
5 tell anyone at the company that they were mistaken
6 and that you should have been prorated because you
7 didn't tender all of your shares?
8     MR. HOGAN: Objection to the form, it's
9 argumentative.
10     A    I had no reason to believe it was
11 mistaken?
12     Q    What did you say, sir?
13     A    I had no reason to believe it was
14 mistaken.
15     Q    You felt like you had tendered all your
16 shares?
17     MR. HOGAN: Objection to the form.
18     A    No, I didn't think that, I said that
19 repeatedly.
20     Q    Did you disclose that you received special
21 treatment with respect to proration to anyone?

Page 137

1     MR. HOGAN: Objection, argumentative.
2     A    I don't think I received special
3 treatment. No, I did not disclose it to anyone.
4     Q    Do you think any other shareholders who
5 held more than 10,000 shares would have liked to
6 partake of a partial tender in order to avoid
7 proration as you did?
8     A    I have no idea.
9     Q    In your opinion would someone have wanted
10 to sell back as much stock as possible at the 146.04
11 price?
12     MR. HOGAN: Objection. How would he know what
13 other people are thinking?
14     Q    I asked him in his opinion.
15     A    Well, I don't have an opinion.
16     Q    Did the proxy statement disclose the
17 chairman's discretionary authority to repurchase
18 stock outside the terms of the offering memorandum?
19     MR. HOGAN: By the proxy statement do you mean
20 the notice of the annual meeting of the
21 shareholders?

Page 138

1    Q    Did the offering memorandum, with respect
2    to the repurchase program?
3    A    I don't recall.
4    Q    Was it fair to other shareholders that you
5    could tender less than all of your stock and still
6    avoid proration?
7    A    I don't think it was unfair. They could
8    have done it, too, if they wanted to.
9    Q    You also had your capital stock
10    repurchased after this meeting; is that correct?
11    A    Yes.
12    Q    And what was the basis for that
13    repurchase?
14    MR. HOGAN: What do you mean? Object to the
15    form. I'm not sure what you mean by the basis.
16    Q    Who repurchased the stock?
17    A    ULLICO.
18    Q    Who authorized the repurchase of the
19    stock?
20    A    The chairman.
21    Q    Pursuant to what authority?

Page 139

1    A    The discretionary authority.
2    Q    And what price was that stock repurchased?
3    A    At the same price as the others.
4    Q    At $146.04?
5    A    Yes.
6    Q    Were you aware that the company had a
7    right to repurchase that capital stock at $25 a
8    share?
9    A    I didn't at that point.
10    Q    I'm sorry?
11    A    It didn't have the authority to purchase
12    them at $25 at that point.
13    Q    But didn't the resolution at the November
14    3rd meeting we discussed earlier say that the
15    chairman could purchase at his discretion the stock
16    at a price lower than the maximum set?
17    A    It said he could but it also said not
18    higher than the price set by the board.
19    Q    So given that, could the chairman have
20    repurchased the capital stock at $25 a share?
21    A    He could offer me that but I don't think

Page 140

1    he'd been able to repurchase them though.
2    Q    Did you disclose the repurchase of your
3    capital stock to the Board of Directors at any
4    point?
5    A    No.
6    Q    To the executive committee?
7    A    No.
8    Q    To Terry O'Sullivan?
9    A    I'm sure Terry knew it but did I
10    personally disclose it to him, no.
11    Q    Did you disclose it to anyone at all?
12    A    My wife, to get her permission to sell it.
13    Q    Why in your opinion was it fair to have
14    your capital stock repurchased when that was
15    specifically excluded from the repurchase program?
16    MR. HOGAN: Objection to the form. We don't
17    agree with the premise.
18    A    I don't think it was unfair.
19    (Casstevens Exhibit No. 25 was marked)
20    Q    Handing you Exhibit 25. It's a copy of
21    the Thompson report. I'm going to ask you to read

Page 141

1    through quickly pages 46 and 47 if you would?
2    A    Okay.
3    Q    Did you know how much stock was
4    repurchased at $146 a share?
5    MR. HOGAN: When?
6    Q    Overall?
7    MR. HOGAN: I'm asking -- your question is
8    asking him did he know, you don't say when did he
9    know.
10    Q    At the time of the November -- after the
11    repurchase program from the November 3rd, 2000
12    meeting and all the repurchases at $146.04 were
13    completed, do you know how much stock was purchased
14    at that price by ULLICO?
15    A    No, not at that time.
16    Q    Today do you know?
17    A    I read it in here.
18    Q    So it's fair to say that today you're
19    aware that 395,636 shares were repurchased at that
20    price for a total cost of 44.6 million dollars?
21    A    I can't quarrel with the figures because I

Page 142

1 don't know.

2    Q    Were you aware at the time of these

3 repurchases and right after the same time period I

4 was asking about that 20 directors and officers

5 redeemed a total of 93,923 shares for a total of

6 13.7 million?

7    A    At what time?

8    Q    Talking about the total repurchases at

9 that price?

10    A    Were they reported to us by anyone?  No.

11    Q    Are you aware of that today sitting here

12 at this deposition?

13    A    Oh, yeah, I read it here.

14    Q    So you're then today aware that 31 percent

15 of all the funds expended to repurchase stock at

16 that price went to officers and directors?

17    A    If that's what the figure turns out to be,

18 I don't quarrel with it.

19    Q    And were you aware at the time in 2001

20 that of the 13.7 million that went to officers and

21 directors that 10.7 million was distributed through

Page 143

1 discretionary repurchases?

2    A    No, I wasn't.

3    Q    Sitting here today do you have any

4 thoughts about the fairness of 31 percent of all the

5 funds in the repurchase program going to insiders?

6    MR. HOGAN:  Objection to the form.

7    A    I don't think it was unfair.  We had one

8 that was under subscribed and they got all the

9 money.

10    Q    So hearing those amounts today do you have

11 any concerns about whether those repurchases in 2000

12 and 2001 were handled fairly and equitably?

13    A    Yes.

14    Q    What are those concerns?

15    A    They were handled equitably is what my

16 answer would have been.

17    Q    You have no concerns about it?

18    A    No, I don't.

19    Q    Is it fair that the insiders had a higher

20 percentage of their stock repurchased than the

21 unions and pension funds that ULLICO was intended to

Page 144

1 serve?

2    A    I don't think it was unfair.  Their stock

3 prices are higher too because of it.

4    (Casstevens Exhibit No. 26 was marked)

5    Q    Handing you what's been marked as Exhibit

6 Number 26.  It is a November 21st, 2000 letter to

7 Billy J. Casstevens and Lou Ellen Casstevens from

8 Robert Georgine.  If you could take a minute to look

9 at that letter.  I'm going to ask you mostly about

10 the second page?

11    A    Okay.

12    Q    Was this letter generated specifically for

13 you or did every shareholder receive a similar

14 letter?

15    A    I would assume that everyone did.  I don't

16 know about every shareholder but I'm sure every

17 board member did.  It says stockholders so it

18 probably went to all the shareholders.

19    Q    In the first paragraph on the second page

20 the last sentence reads, "in addition, the company

21 continues to reserve its right pursuant to its

Page 145

1 bylaws to repurchase shares outside the repurchase

2 program at $25 per share."  What do you understand

3 that to mean?

4    A    I think somewhere along the line we made a

5 decision that shares repurchased would be

6 repurchased at the price set at the previous year's

7 end.

8    Q    This letter is dated November 21st, 2000?

9    A    I know that's what it says.  I'm pretty

10 sure that we did that.  I don't know when.

11    Q    Is that the information in this letter to

12 shareholders then inaccurate in your opinion?

13    A    No, I'm not sure of that.

14    Q    Well, was the fact that?

15    A    The letter says what it says and I can't

16 explain that part except to say that I think we

17 changed that $25 thing to be bought back at whatever

18 the going price was.

19    Q    Is that then misleading to shareholders

20 given that you had your capital stock repurchased at

21 $146.04 a share?

**Page 146**

1    MR. HOGAN: Objection, no time element, object.

2    Q    As referred to in the letter?

3    A    I'm not sure.

4    Q    Well, if the company was repurchasing

5    stock outside of the program at $146.04 a share from

6    its directors and officers, is that statement to

7    shareholders that repurchases outside the program

8    would be done at $25 a share misleading?

9    MR. HOGAN: Objection to the form of the

10    question. There's several misstatements in the

11    question.

12    A    I can't answer your question. I don't

13    know.

14    Q    Is that accurate that the company was

15    rebuying shares outside of the repurchase program at

16    $25 a share?

17    A    Yes, they were and that's why I assume

18    somewhere along the line we changed that.

19    Q    Do you remember anyone's shares being

20    repurchased at $25 a share outside the program

21    pursuant to the chairman's discretion following the

**Page 147**

1    November 3rd, 2000 meeting?

2    A    As I stated earlier, those were never

3    reported to us so I don't know of anybody -- I don't

4    recall any.

5    Q    Is it fair to say looking at this letter

6    that a shareholder reading it could reasonably

7    conclude that repurchases outside of the formal

8    program would be at $25 a share?

9    MR. HOGAN: Objection, calls for a legal

10    opinion.

11    A    I don't know if it's fair or not. I can't

12    make a decision for someone else.

13    Q    Does the letter say that outside the

14    program you can have your stock or a shareholder can

15    have their stock repurchased at $146.04 a share by

16    the chairman?

17    A    The letter states what it states.

18    Q    It doesn't say that though, does it?

19    A    It says what you said it said.

20    Q    I'm asking you a question that the letter

21    does not in fact say that an individual can tender

**Page 148**

1    their shares outside of the repurchase program and

2    have them repurchased at $146.04 a share, does it?

3    MR. HOGAN: Objection to the form.

4    A    No, it doesn't say that.

5    Q    The third from the bottom paragraph reads,

6    "the company anticipates receiving shares in excess

7    of 30 million it is offering to repurchase so we'll

8    prorate each submission so all participating

9    stockholders share equitably in the offering." Is

10    that an accurate statement?

11    A    I think so.

12    Q    Does the letter discuss the 10,000 share

13    proration threshold anywhere in it?

14    A    No, it's not in there.

15    Q    Did in fact all shareholders or

16    stockholders share equitably in the offering?

17    A    I think so. It doesn't have to be equal

18    to be equitable.

19    Q    So in your opinion then it's equitable

20    that large institutional shareholders who submitted

21    their shares for repurchase pursuant to the program

**Page 149**

1    had 2.2 percent of their shares repurchased while

2    the company's officers and directors had a hundred

3    percent of their shares repurchased in most cases?

4    A    What's your question?

5    Q    That's equitable in your opinion?

6    A    It's equitable because the price of their

7    stock went up considerably, too, that they kept.

8    Q    Did you tell anyone at ULLICO that the

9    letter didn't say that a shareholder could submit

10    their shares for repurchase at $146.04 a share to

11    the chairman?

12    A    No.

13    (Casstevens Exhibit No. 27 was marked)

14    Q    Handing you what's been marked as Exhibit

15    27. It's the minutes for the meeting of the

16    executive committee of ULLICO, Inc. dated February

17    22nd, 2002. I'm going to ask you to look at page 3

18    of those minutes, please?

19    MR. HOGAN: I just notice that Mr. Casstevens

20    made a note on Exhibit Number 24, on the original

21    Exhibit 24.

**Page 182**

1  Q   Based on this note Mr. Carabillo took your
2  note seriously?
3  A   Evidently he must have.
4  Q   Why do you think it says there isn't a
5  method for distributing any shares at this time
6  especially at a price other than what the board sets
7  in May?
8  A   I don't know what he meant by that.
9  Q   I thought that the chairman had
10 discretionary authority to issue stock?
11 A   He does but I don't know what Joe meant by
12 it.
13 Q   Did Mr. Carabillo convey the information
14 in this note to you?
15 A   No.
16 Q   Did he ever inform you that they couldn't
17 sell you an additional 358 shares?
18 A   No, not that I recall in any event I don't
19 think he did.
20 Q   Did you know that Georgine upon his
21 departure from the company offered to use his

**Page 183**

1  severance to pay back your stock profits?
2  A   Offered what?
3  Q   To use his severance to pay back your
4  stock profits?
5  MR. HOGAN: Objection to the form.
6  A   He offered not to pay back mine.
7  Q   Do you know that he offered to pay back
8  your stock profits out of his severance?
9  A   He offered to pay back the board's --
10 profits of the board. He said in that same thing
11 that they had -- even though they had done nothing
12 wrong as I recall he would forego two million
13 dollars, I believe it was two million, something
14 like that, of whatever he had coming and hoped that
15 would resolve the thing. I'm paraphrasing of
16 course, that's the best I recall it.
17 Q   Did you ever discuss this with
18 Mr. Georgine?
19 A   No.
20 Q   Why do you think he offered to do this?
21 A   He's a good hearted guy. And he didn't

**Page 184**

1  believe we did anything wrong. He was a good
2  hearted guy and wanted to get this behind us.
3  Q   What did you do with the profits you
4  obtained from your sale of ULLICO stock back to the
5  company?
6  A   I invested it for my grandchildren.
7  Q   In what?
8  A   In bonds.
9  Q   With all of it?
10 A   Yes, all of it, and then some.
11 Q   Where is that money today?
12 A   Vanguard.
13 Q   A Vanguard bond funds or Vanguard bonds?
14 A   Bond fund.
15 Q   If you turn back to the Thompson report
16 for a moment, please. Exhibit 25, look at page 111
17 which is the first exhibit to the Thompson report?
18 A   Okay.
19 Q   If you look at your name there I want to
20 confirm that these figures are accurate?
21 A   I'm not sure that one figure is accurate

**Page 185**

1  because I think I answered that in one of your
2  submissions or interrogatories or whatever it was
3  and I think I put the figure in it.
4  Q   Was it accurate that you owned 330 shares
5  of capital stock?
6  A   Yes.
7  Q   Is it accurate that you ultimately had
8  1312 shares of preferred certificates that were
9  converted to class A shares?
10 A   Yes.
11 Q   And is it accurate that in 1998 you
12 purchased a total of 4,000 shares of ULLICO class A
13 stock?
14 A   Yes.
15 Q   And is it accurate in 1999 you also
16 purchased 4000 shares of class A stock?
17 A   Yes.
18 Q   And is it accurate that you sold a total
19 including capital stock of 7642 shares?
20 A   That's accurate.
21 Q   And is it accurate that the gross amount

Exhibit 2

ULLICO Inc.

BY-LAWS

(Adopted October 14, 1987 with revisions through May 5, 1997)

Article I

PLACE OF BUSINESS

Sec. 1. The Home Office of the Company shall be in the City of Washington, in the District of Columbia, at 111 Massachusetts Avenue, N.W., or at such other place as may be designated by the Directors.

Article II(A)

CAPITAL STOCK

Sec. 1. AUTHORIZED AND ISSUED. The amount of the authorized Capital Stock shall be Two Million (2,000,000) shares with par value of Twenty-five ($25.00) Dollars per share, totalling Fifty Million ($50,000,000) Dollars, of which the Capital Stock issued shall be such numbers and amounts as shall be determined by the Board of Directors from time to time.

Sec. 2. The ownership of Capital Stock of the Company shall be confined to International and National Trade Unions, Local Unions, State Federations of Labor, City Central Bodies and other forms of organization of labor and members thereof affiliated with AFL-CIO, including benefit trusts affiliated with said organizations, including but not limited to jointly managed pension funds, and to such other labor organizations and members thereof and such Directors or Officers as may be elected or employed by the Company, as the Board of Directors may from time to time grant the right of purchase.

Sec. 3. In order that the Capital Stock may be widely distributed and that all groups of organized labor may participate in the ownership and management of the Company, the aggregate maximum percentage and amount of Issued Capital Stock and Class A Stock, including shares held as Treasury Stock, which may be held, with power to vote, by a National or International Union, or a benefit trust affiliated with said labor organization including but not limited to jointly managed pension funds, shall not be more than nine percent (9%); by any Local Union, Local Central Body or other form of organization included in Article II(A), not more than one percent (1%); and by any individual, not more than one percent (1%).

Sec. 4. All Certificates of Stock shall be signed by the Chairman and Chief Executive Officer, President, Executive Vice President or Senior Vice Presidents, and countersigned by the Secretary-Treasurer, and sealed with the seal of the Corporation.

Sec. 5. Certificates of Stock shall be consecutively numbered and shall show the holder's name and number of shares. Records of Stockholders shall be maintained at the Home Office.

Sec. 6. HOW TRANSFERRED. The Capital Stock may be transferred on the books of the Company either in person or by an attorney, but none of the Stock issued or reissued one or more times may be sold or transferred by the holder thereof, nor be sold or transferred by legal process or operation of law until the Company shall have had an option to acquire the said Stock for the purpose of resale at $25.00 per share, the par value of said Stock. The Company shall have thirty days after the Stock has been tendered to it at its Home Office in which it may purchase such Stock at the aforesaid price.

U 030545

Sec. 7.(a) PARTICIPATION OF THE STOCKHOLDERS AND DIVIDENDS. Subject to such limitations as may be prescribed by law and to the preferential rights of Preferred stockholders, the Capital stockholders shall have the right to have surplus profits of the Company allocated to them annually in an amount fixed each year by the Directors and out of profits so allocated, the Directors may each year declare dividends payable to the Capital stockholders.

Sec. 7.(b) PARTICIPATION OF THE POLICYHOLDERS. After the payment of dividends and the allocation of profits to the stockholders to the extent and as hereinbefore provided, such, if any, as the Directors may deem necessary shall be set aside for an adequate surplus for the benefit and protection of the policyholders, and such amounts as are approved by the Directors shall be paid to the policyholders annually.

Sec. 8. VOTING RIGHTS. The vote on all questions in the stockholders' meeting shall be by shares; and each share of the Stock shall be counted as one vote. All Stock must be voted by the owner of it in person, by proxy, or by a person authorized by a power of attorney to vote such Stock.

No person shall be entitled, whether by proxy or other assignment of voting rights, to exercise voting control over more than nine percent of the total outstanding voting shares of the Company, except that the foregoing restriction shall not apply to a proxy given to an official of the Company in connection with voting at a meeting of stockholders.

## Article II(B)

### PREFERRED STOCK

Sec. 1. AUTHORIZED AND ISSUED. The aggregate amounts of Preferred Stock, Class A Stock and Class B Stock shall be Twenty-four Million (24,000,000) shares, each with a par value of One ($1.00) Dollar per share, totalling Twenty-four Million ($24,000,000) Dollars. The Preferred Stock issued shall be such numbers and amounts as shall be determined by the Board of Directors from time to time. The Preferred Stock shall be issued in one or more series, as designated by the Board of Directors, who shall, from time to time, fix the designations and the powers, preferences and relative, participating, optional or other special rights of the Preferred Stock, and the qualifications, limitations and restrictions thereof.

Sec. 2. The ownership of Preferred Stock shall be confined to International and National Trade Unions, Local Unions, State Federations of Labor, City Central Bodies and other forms of organization of labor and members thereof affiliated with AFL-CIO, and to benefit trusts affiliated with said organizations, including but not limited to jointly managed pension funds, and to such other labor organizations and members thereof and such Directors or Officers as may be elected or employed by the Company, as the Board of Directors may from time to time grant the right of purchase.

Sec. 3. All Certificates of Stock shall be signed by the Chairman and Chief Executive Officer, President, Executive Vice President or Senior Vice Presidents, and countersigned by the Secretary-Treasurer, and sealed with the seal of the Company.

Sec. 4. Certificate of Stock shall be consecutively numbered and shall show the holder's name and number of shares. Records of Stockholders shall be maintained at the Home Office.

Sec. 5. HOW TRANSFERRED. The Preferred Stock may be transferred on the books of the Company either in person or by an attorney. None of the Preferred Stock issued or reissued one or more times may be sold or transferred by the holder thereof, nor be sold or transferred by legal process or operation of law until the Company shall have had an option to acquire the said Stock for the purpose of resale, or to designate a purchaser for the Stock, at $25.00 per share. The Company shall have thirty days after receiving notice of the proposed sale or transfer at its home office during

-2-

. U 030546

USDC 0008087

which time it may purchase or direct the purchase of such Stock at the aforesaid price. If the Company declines to exercise its option, the Stock may only be sold or transferred to an entity or individual eligible to purchase such Stock pursuant to Section 2 of this Article II(B). Any transfer of Preferred Stock to an ineligible purchaser shall be void.

Sec. 6. PARTICIPATION OF THE PREFERRED STOCKHOLDERS AND DIVIDENDS; PREFERENCES UPON LIQUIDATION. Subject to such limitations as may be prescribed by law, the holders of Preferred Stock shall the preferential right to have dividends of the Company paid to them annually in amounts fixed at the time of issuance. Dividends on shares of any series of Preferred Stock shall be cumulative from the date shares of such series are first issued. Upon liquidation or dissolution of the Company, the holders of Preferred Stock shall be entitled to receive out of the assets of the Company available for distribution to stockholders, an amount equal to $25.00 per share plus the amount of all accrued but unpaid dividends with respect to such share, before any payment or distribution shall be made with respect to Capital Stock, Class A Stock or Class B Stock. All series of Preferred Stock shall rank pari passu with respect to distribution of dividends and amounts paid in liquidation.

Sec. 7. VOTING RIGHTS. Holders of the Preferred Stock shall have no voting rights, except as otherwise required by law.

Sec. 8. NO PREEMPTIVE RIGHTS. Holders of the Preferred Stock shall have no preemptive rights.

Sec. 9. CONVERSION OF PREFERRED STOCK. The Company may, at its option, convert shares of any series of Preferred Stock, in whole or in part, into shares of Class A Stock or Class B Stock, at any time after the third anniversary of the date of issuance of such series. The Company shall not convert Preferred Stock into shares of Class A Stock to the extent that such conversion would cause a Stockholder to exceed the ownership limits set forth in Section 3 of Article II(A).

Article II(C)

CLASS A STOCK

Sec. 1. AUTHORIZED AND ISSUED. The aggregate amount of Preferred Stock, Class A Stock and Class B Stock shall be Twenty-four Million (24,000,000) shares, each with a par value of one ($1.00) Dollar per share, totalling Twenty-four Million ($24,000,000) Dollars. The Class A Stock issued shall be such numbers and amounts as shall be determined by the Board of Directors from time to time. The Board of Directors shall, from time to time, fix the designations and the powers, preferences and relative, participating, optional or other special rights of Class A Stock and the qualifications, limitations and restrictions thereof.

Sec. 2. The ownership of Class A Stock shall be confined to International and National Trade Unions, Local Unions, State Federations of Labor, City Central Bodies and other forms of organization of labor and members thereof affiliated with AFL-CIO, and to benefit trusts affiliated with said organizations, including but not limited to jointly managed pension funds, and to such other labor organizations and members thereof and such Directors or Officers as may be elected or employed by the Company, as the Board of Directors may from time to time grant the right of purchase.

Sec. 3. In order that the Class A Stock may be widely distributed and that all groups of organized labor may participate in the ownership and management of the Company, the aggregate maximum percentage of Issued Capital Stock and Class A Stock, including shares held as Treasury Stock, which may be held by a National or International Union, or a benefit trust affiliated with said organizations including but not limited to jointly managed pension funds, shall not be more than nine percent (9%); by any Local Union, Local Central Body or other form of organization included

-3-

U 030547

in Article II(C), not more than one percent (1%), and by any individual, not more than one percent (1%).

Sec. 4. All Certificates of Stock shall be signed by the Chairman and Chief Executive Officer, President, Executive Vice President or Senior Vice Presidents, and countersigned by the Secretary-Treasurer, and sealed with the seal of the Company.

Sec. 5. Certificates of Stock shall be consecutively numbered and shall show the holder's name and number of shares. Records of Stockholders shall be maintained at the Home Office.

Sec. 6. HOW TRANSFERRED. The Class A Stock may be transferred on the books of the Company either in person or by an attorney. None of the Class A Stock issued or reissued one or more times may be sold or transferred by the holder thereof, nor be sold or transferred by legal process or operation of law until the Company shall have had an option to acquire the said Stock for the purpose of resale, or to designate a purchaser for the Stock, at $25.00 per share. The Company shall have thirty days after receiving notice of the proposed sale or transfer at its home office during which time it may purchase or direct the purchase of such Stock at the aforesaid price. If the Company declines to exercise its option, the Stock may only be sold or transferred to an entity or individual eligible to purchase such Stock pursuant to Section 2 of this Article II(C). Any transfer of Class A Stock to an ineligible purchaser shall be void. Any transfer of such Stock to an eligible purchaser shall be void to the extent that it causes the purchaser to exceed the ownership limits set forth in Section 3 of this Article II(C), until the excess Class A Stock is exchanged for Class B Stock.

Sec. 7. PARTICIPATION OF THE CLASS A STOCKHOLDERS AND DIVIDENDS. Subject to such limitations as may be prescribed by law and to the preferential rights of Preferred stockholders, the holders of Class A Stock shall have the right to have surplus profits of the Company allocated to them annually in amounts fixed each year by the Directors and out of profits so allocated, the Directors may each year declare dividends payable to holders of such Stock.

Sec. 8. VOTING RIGHTS. Each share of the Class A Stock shall be counted as one vote. All Class A Stock must be voted by the owner of it in person, by proxy, or by a person authorized by a power of attorney to vote such Stock.

Sec. 9. NO PREEMPTIVE RIGHTS. Holders of the Class A Stock shall have no preemptive rights.

Article II(D)

CLASS B STOCK

Sec. 1. AUTHORIZED AND ISSUED. The aggregate amount of Preferred Stock, Class A Stock and Class B Stock shall be Twenty-four Million (24,000,000) shares, each with a par value of One ($1.00) Dollar per share, totalling Twenty-four Million ($24,000,000) Dollars. The Class B Stock issued shall be such numbers and amounts as shall be determined by the Board of Directors from time to time. The Board of Directors shall, from time to time, fix the designations and the powers, preferences and relative, participating, optional or other special rights of Class B Stock, and the qualifications, limitations and restrictions thereof.

Sec. 2. The ownership of Class B Stock shall be confined to International and National Trade Unions, Local Unions, State Federations of Labor, City Central Bodies and other forms of organization of labor and members thereof affiliated with AFL-CIO, and to benefit trusts affiliated with said organizations, including but not limited to jointly managed pension funds, and to such other labor organizations and members thereof and such Directors or Officers as may be elected or employed by the Company, as the Board of Directors may from time to time grant the right of purchase.

-4-

U 030548

USDC 0008089

Sec. 3. All Certificates of Stock shall be signed by the Chairman and Chief Executive Officer, President, Executive Vice President or Senior Vice Presidents, and countersigned by the Secretary-Treasurer, and sealed with the seal of the Company.

Sec. 4. Certificates of Stock shall be consecutively numbered and shall show the holder's name and number of shares. Records of Stockholders shall be maintained at the Home Office.

Sec. 5. HOW TRANSFERRED. The Class B Stock may be transferred on the books of the Company either in person or by an attorney. None of the Class B Stock issued or reissued one or more times may be sold or transferred by the holder thereof, nor be sold or transferred by legal process or operation of law until the Company shall have had an option to acquire the said Stock for the purpose of resale, or to designate a purchaser for the Stock, at $25.00 per share. The Company shall have thirty days after receiving notice of the proposed sale or transfer at its home office during which time it may purchase or direct the purchase of such Stock at the aforesaid price. If the Company declines to exercise its option, the Stock may only be sold or transferred to an entity or individual eligible to purchase such Stock pursuant to Section 2 of this Article II(D). Any transfer of Class B Stock to an ineligible purchaser shall be void.

Sec. 6. PARTICIPATION OF THE CLASS B STOCKHOLDERS AND DIVIDENDS. Subject to such limitations as may be prescribed by law and to the preferential rights of Preferred stockholders, the holders of Class B Stock shall have the right to have surplus profits of the Company allocated to them annually in amounts fixed each year by the Directors and out of profits so allocated, the Directors may each year declare dividends payable to holders of each class of such Stock.

Sec. 7. VOTING RIGHTS. Holders of the Class B Stock shall have no voting rights, except as otherwise required by law.

Sec. 8. NO PREEMPTIVE RIGHTS. Holders of the Class B Stock shall have no preemptive rights.

<u>Article III</u>

<u>MEETINGS</u>

Sec. 1. REGULAR MEETINGS OF STOCKHOLDERS. The Stockholders shall meet annually during the month of April or on such other date and at such place in the State of Maryland, or in any other place, as shall be selected by the Executive Committee.

Sec. 2. SPECIAL MEETINGS OF THE STOCKHOLDERS. The Chairman and Chief Executive Officer, or a majority of Directors, may at any time call a special meeting of the Stockholders. The holders of twenty-five percent of the issued and outstanding Capital Stock of the Company may also call a special meeting of Stockholders and the Secretary-Treasurer shall, upon receiving reimbursement for the cost of printing and mailing notice of such meeting from the Stockholder or Stockholders demanding same, send notice of such special meeting.

Sec. 3. NOTICE OF MEETINGS OF STOCKHOLDERS. Notice of regular and special meetings of Stockholders shall be given in writing and mailed to the Stockholders no less than ten nor more than ninety days before the time fixed for said meetings. Notice of special meeting shall state the purpose thereof and only such business shall be conducted at the meeting.

Sec. 4. RECORD DATE. The transfer books of the Company shall be closed ten days prior to the date fixed for regular or special meetings of the Stockholders and only Stockholders of record on such date shall be entitled to vote at such meetings.

-5-

U 030549

USDC 0008090

Sec. 5. REGULAR MEETING OF DIRECTORS. The Directors shall hold a regular meeting for the transaction of business and the election of Officers, either immediately preceding or after the annual meeting of the Stockholders each year. They shall hold such other meetings at such times and places as the Directors may elect.

Sec. 6. SPECIAL MEETINGS OF THE DIRECTORS. Special meetings of the Directors may be held when called by the Chairman and Chief Executive Officer or by the request of a majority of the Directors or a majority of the Executive Committee. Reasonable notice shall be given of the holding of such meeting, and only such business transacted as is specified in the Notice.

Sec. 7. COMMITTEE MEETINGS. Meetings of the Executive Committee shall be held at least three times in every year and at such other times as the Chairman and Chief Executive Officer, or a majority of the said committee may appoint. All other committees shall meet whenever called by the Chairman and Chief Executive Officer, Board of Directors or Chairman of the Committee.

Sec. 8. QUORUM. At all meetings of the Stockholders, a majority of the number of shares issued and outstanding, whether attending in person or by proxy, shall constitute a quorum. At all meetings of any other committee, one-third of the members, but in no event less than two, shall constitute a quorum.

Sec 9. "STOCKHOLDERS" DEFINED. For the purpose of this Article III, wherever used herein, "Stockholder" or "Stockholders" shall refer only to holders of Capital Stock and Class A Stock.

### Article IV

### DIRECTORS

Sec. 1. NUMBER, HOW INCREASED. The number of Directors of the Company shall be not less than fifteen, and may be increased to not more than thirty-two by the Directors of the Company, at such time or times as they deem best, or by the Stockholders at any regular meeting.

Sec. 2. QUALIFICATIONS. At least three-fourths of the Directors of the Company must at all times be members of Trade Unions affiliated with the AFL-CIO, provided that no National or International Union as such shall be entitled to more than one representative on the Board of Directors at any one time. Whenever or wherever a director is nominated and elected as representative of a trade union group and ceases to be representative of that group by the action of that group, the Board of Directors or Executive Committee may declare his position of office of director vacant and fill such vacancy.

Sec. 3. TERM OF OFFICE. The term of office of all Directors shall be three years. Directors shall be classified by dividing them into three classes, each consisting as nearly as possible, of an equal number of members. At each annual meeting of the Stockholders, one class of Directors shall be elected to hold office for the term of three years. Each director shall continue to hold office until his term shall have expired and until his successor shall have been elected and shall qualify or until his death or removal or until he shall resign. A director need not be a Stockholder of the Company.

Sec. 4. ELECTION. The class of Directors of the Company, whose terms have expired on the date of the annual meeting, shall be elected by the majority vote of Stockholders entitled to vote at such meeting with each share entitled to one vote.

Sec. 5. POWERS AND DUTIES. The Directors shall conduct, manage and control the affairs and business of the Company, and make rules and regulations not inconsistent with the laws of the State of Maryland, or those of any state in which the Company is doing business, or the By-Laws of the Company, for the guidance of the Officers and management of the affairs of the Company.

-6-

U 030550

USDC 0008091

**Sec. 6  INDEMNIFICATION OF DIRECTORS AND OFFICERS.**

(a)  The Company shall indemnify each former, present and future Director and Officer of the Company against any cost and expenses which may be imposed on, or reasonably incurred by him in connection with any claim, action, suit, or proceeding, whether civil, criminal, administrative or investigative, other than an action brought by or in the right of the Company, hereafter made, instituted, or threatened, in which he may be involved by reason of his being or having been a Director or Officer, such costs and expenses to include judgments, fines or the cost to such Director or Officer of reasonable settlements and reasonable attorneys fees, provided such Director or Officer acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interests of the Company, and with respect to any criminal action or proceeding, had no cause to believe his conduct was unlawful.  The termination of any action, suit or proceeding by judgement, order, settlement, conviction, or please of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in, or not opposed to, the best interests of the Company and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

(b)  In any action or suit brought by or in the right of the Company, the Company shall not indemnify any Officer or Director against judgments, fines or amounts paid in settlement.  Nor shall the Company indemnify such Officer or Director in such actions against any expenses incurred where he has been adjudged to be liable for negligence or misconduct in the performance of his duty to the Company, unless and only to the extent that, a Court determines that the Director or Officer is fairly and reasonable entitled to indemnity for those expenses which the Court shall deem proper.

(c)  The Company may acquire insurance to cover all or part of the indemnification provided for herein, and if such insurance is secured, the Company shall be responsible to indemnify such Officer or Director only to the extent of any loss not covered by such insurance.

<u>Article V</u>

<u>OFFICERS</u>

Sec. 1. ELECTIVE OFFICERS.  The Chairman and Chief Executive Officer, the President, and the Secretary-Treasurer of the Company shall each be elected by the Directors at their annual meeting either immediately preceding or following the annual meeting of the Stockholders for the period of three years or until their successors are elected and have qualified.  The Chairman of the Board shall be elected from the Board and shall be a member of a Trade Union affiliated with the AFL-CIO.  In the event a vacancy occurs between annual meetings, the Executive Committee shall be empowered to fill the vacancy and such incumbent shall hold office until the next annual meeting of the Board of Directors.

Sec. 2. OFFICERS.  A President, Executive Vice President(s), Senior Vice President(s), and Vice President(s) and all other Officers shall be appointed by the Chairman and Chief Executive Officer, with the approval of the Executive Committee and they shall perform such duties as may be delegated by the Chairman and Chief Executive Officer or Executive Committee.

Sec. 3. DUTIES OF CHAIRMAN.  The Chairman shall be the Chief Executive Officer of the Company and shall have full authority and responsibility for the management, conduct and control of the affairs of the Company.  He shall have the authority to convene the Board of Directors and the Executive Committee at any time he may deem it expedient, or whenever requested to do so by a majority of the Executive Committee or by a majority of the Board of Directors, and he shall preside at all meetings of the Company.  The Chairman shall make regular reports to the Board of Directors and the Executive Committee on Company operations and assure conformance thereof to all legal requirements.  In the event of a vacancy in the office of President the title of President shall be added to that of Chairman.  In the case of any vacancy in any office or the inability of any Officer to

-7-

U 030551

USDC 0008092

perform his duties herein specified, the Chairman and Chief Executive Officer may, subject to the approval of the Executive Committee, appoint another Officer to perform said duties during the continuance of such vacancy.

Sec. 4. DUTIES OF THE ELECTED OFFICERS. The President, Executive Vice President(s) Senior Vice President(s) and Vice President(s) shall perform such duties as may be determined by and required of them from time to time by the Chairman and Chief Executive Officer and the Executive Committee.

Sec. 5. DUTIES OF THE SECRETARY-TREASURER. The Secretary-Treasurer shall be the recording Officer of Stockholders, Directors, and permanent Committee Meetings and shall have custody of the corporate funds and securities, keep full and accurate account of receipts and disbursements and deposit all monies and valuables in the name of the Corporation in such depositories as may be designated by the Executive Committee. He shall perform the other customary duties of a Secretary-Treasurer under the direction of the Executive Committee.

<u>Article VI</u>

<u>COMMITTEES OF DIRECTORS</u>

Sec. 1. COMMITTEES. The principal or permanent Committees shall be the following:

> Executive Committee
> Finance and Investment Committee
> Auditing Committee

In addition to these permanent Committees, the Chairman and Chief Executive Officer may from time to time appoint subject to the approval of the Executive Committee such temporary Committees for such purposes as he may deem necessary. With the exception of the Auditing Committee, the Chairman and Chief Executive Officer shall be a member of any and all Committees of the Company ex-officio with full rights and powers of membership.

Sec. 2. In addition to the Chairman and Chief Executive Officer, the President, and the Secretary-Treasurer, the Executive Committee shall consist of not more than sixteen Directors, elected annually by the Directors, of whom at least two-thirds shall be members of trade unions. Between the meetings of the Directors, the Executive Committee shall have and exercise all the duties and powers of the Board of Directors, except that it shall not have authority to declare a dividend, to issue Stock or to recommend to Stockholders any action requiring Stockholder approval.

Sec. 3. The Finance and Investment Committee shall consist of not more than seven Directors selected by the Executive Committee and, in addition thereto, the Chairman and Chief Executive Officer, the President, and the Secretary-Treasurer. The Committee shall have general charge of the finances and the investments of the Company, and shall perform such other duties as may be assigned to it from time to time by the Executive Committee. The Committee shall report to the Executive Committee at the meetings of the Executive Committee.

Sec. 4. The Auditing Committee shall consist of not less than five Directors appointed annually by the Chairman and Chief Executive Officer, subject to the approval of the Executive Committee. It shall satisfy itself as to the accuracy of the financial records of the Company and may employ outside auditors at any time it may deem expedient or may be directed to do so by the Executive Committee.

Sec. 5. The Welfare Committee shall consist of five Directors appointed by the Chairman and Chief Executive Officer, subject to the approval of the Executive Committee. This Committee shall have charge of all welfare activities and plans for the benefit of the employees of the Company.

-8-

U 030552

USDC 0008093

## Article VII

### INVESTMENTS

Sec. 1.  Funds of the Company shall be invested at the discretion of the Finance and Investment Committee or of the Executive Committee.

## Article VIII

### SALARIES

Sec. 1.  The compensation of all elected Officers, Directors and committee members shall be fixed by the Board of Directors or the Executive Committee.

Sec. 2.  The compensation of all appointed Officers shall be fixed by the Chairman and Chief Executive Officer with the approval of the Executive Committee.

## Article IX

### FISCAL YEAR

Sec. 1.  The fiscal year of this Company shall be the calendar year.

## Article X

### BONDS OF OFFICERS AND EMPLOYEES

Sec. 1.  All Officers and employees of the Company who are charged with the receipt or the custody of any cash or securities shall, before entering upon their duties, give to the Company a satisfactory fidelity bond for such amounts as may from time to time be required by the Board of Directors or the Executive Committee.

## Article XI

### AMENDMENTS

Sec. 1.  These By-Laws may be amended by a two-thirds vote of the members of the Executive Committee present at any meeting thereof, or by a majority of the Directors or Stockholders at any regular meeting or special meeting called for that purpose, provided, in all instances, a quorum is present.

-9-

U 030553

USDC 0008094