Exhibit 6

*f11sed: 1/11/01*

Billy J. Casstevens
11244 Greenbriar Chase
Oklahoma City, Oklahoma 73170
Phone. 405-692-0996
Fax    405-703-0996

JAN 1 6

January 11, 2000

ULLICO Inc
Joseph A  Carabillo
Vice President and Assistant Secretary
111 Massachusetts Avenue N  W
Washington, D  C  2001

Dear Mr  Carabillo,

On the page titled: "HOLDERS OF FEWER THAN 10,000 SHARES" I
checked the first box indicating that I was tendering all such Shares,
however, I would like to retain Class A Stock Certificate Number 119
(2,000 Shares). I feel strongly that as a Member of The Board of
Directors of ULLICO Inc, I should invest in ULLICO Inc. to show my
confidence in the Company and it's Leadership.

I will be submitting for repurchase the following.

Class A Stock Certificate # 95 (1,312 Shares), Certificate # 134 (2,000
Shares) and Certificate # 163 (4,000 Shares).

In addition to the above submission, I will be submitting the Capital
Stock in hopes that it can be repurchased at the same price paid to
repurchase Class A and B Stock.

Capital Stock Certificate # 1838 (100 Shares), Certificate # 1839 (200
Shares) And Certificate # 1896 (30 Shares)

Thank you for any consideration you can give to the above request

Sincerely

Billy J. Casstevens
Billy J. Casstevens

USDC 0048079

Exhibit
# ZZ

Exhibit7



Robert A. Georgine
Chairman, President and CEO

ULLICO Inc
111 Massachusetts Ave., N.W.
Washington, DC 20001
202/682-0900

March 1, 2001

VIA OVERNIGHT MAIL

Billy J. Casstevens and Lou Ellen Casstevens
11244 Greenbriar Chase
Oklahoma City, OK 73170

RE:     Offering Memorandum Dated December 14, 2000
        ULLICO Inc. Stock Purchase Program 2000
        Offers of Holders with Fewer than 10,000 Shares

Dear Bill:

In response to ULLICO Inc.'s Offering Memorandum, we received Certificate(s) No. 95, 134, and 163, representing a total of 7,312 shares of Class A Stock. All shares held were properly tendered in accordance with the terms of the Offering Memorandum. Therefore, ULLICO Inc., is issuing in payment, at the rate of $146.04 per share, the amount of $1,067,844.48. A check in that amount is enclosed made out to the holder of record, or as otherwise directed in the Letter of Transmittal.

If you have any questions, please feel free to contact me directly or our Vice President and Chief Legal Officer, Joseph A. Carabillo. His direct number is (202) 682-4909.

Sincerely and fraternally,

Bob Georgine

Enclosures

cc: J. A. Carabillo

USDC 0048076

Exhibit 8

Exhibit 8

Document Filed Under Seal per Joint Protective
Order dated March 29, 2007

Exhibit 9

MEETING OF THE EXECUTIVE COMMITTEE
OF
ULLICO Inc.
Held February 11, 1998
At 111 Massachusetts Avenue, N.W.
Washington, D.C.
1:00 P.M.

**ATTENDEES:**

John J. Barry
Marvin Boede
Kenneth J. Brown
Bill J. Casstevens
John E. Cullerton
John F. Gentleman
Robert A. Georgine
Frank Hanley

John J. Joyce
Joseph F. Maloney
James J. McCarron
James F. M. McNulty
James J. Norton
Jacob F. West
William H. Wynn

**ABSENT:**

Arthur A. Coia

**OTHERS IN ATTENDANCE:**

Joseph A. Carabillo
John K. Grelle
George Holland
James W. Luce

Mark A. Maloney
Charles R. Sormani
Michael R. Steed

Chairman Georgine called the meeting to order and noted that Mr. Coia was unable to attend.

As of September 30, 1997, the Company had 324,732 1/3 shares of Capital Stock issued and outstanding. This reflects repurchases of 9,636 shares of Capital Stock. As of September 30, 1997, a total of 7,773,309 shares of Class A Stock and a total of 133,280 shares of Class B Stock were issued and outstanding. The Chairman told the Committee that approximately $35 million in Preferred Certificates were still outstanding, pending conversion. Significant conversion activity was pending and the numbers reflected were prior to the repurchase program enacted at year-end.

The Minutes of the October 8, 1997 Meeting of the Executive Committee were distributed with the Preliminary Agenda. Hearing no changes or modifications, it was

RESOLVED:    "That the Minutes of the Executive Committee Meeting of October 8, 1997, as distributed with the Agenda for this meeting, be and hereby are approved."

Motion was made, seconded and approved.

The Committee set the date for the Annual Meeting, to be held at The Washington Court Hotel, in Washington, D.C. It was

RESOLVED:    "That the Annual Stockholder Meeting be held on May 5, 1998 at 3:00 p.m. at the Washington Court Hotel in Washington, D.C."

Motion was made, seconded and approved.                                    U 17328

Each year at the Executive Committee's February Meeting, the membership of the Nominating, Proxy, Audit and Compensation Committees are appointed for the next year. A Resolution was requested appointing Marvin J. Boede, Bill Casstevens and Vincent Sombrotto as members of the Nominating Committee. It was

RESOLVED:    "That a Nominating Committee consisting of Marvin J. Boede, Bill Casstevens and Vincent Sombrotto be hereby appointed."

Motion was made, seconded and approved.

A Proxy Committee was proposed, consisting of Messrs. Bahr, Bernard, Joyce, LaSala and Norton. It was

RESOLVED: "That a Proxy Committee consisting of Morton Bahr, William G. Bernard, John T. Joyce, James LaSala and James J. Norton be hereby appointed, with the Committee to have full power of substitution in the event a member or members of the Committee become(s) unable to serve."

Motion was made, seconded and approved.

The Chairman next asked that an Audit Committee, consisting of Messrs. Barry, Boede (as Chairman), Casstevens, Sweeney and West, be appointed. It was

RESOLVED: "That an Audit Committee consisting of Marvin J. Boede (Chairman), John J. Barry, Bill Casstevens, John J. Sweeney and Jake West be hereby appointed and that the Chairman and Chief Executive Officer be authorized to appoint substitute members to the Audit Committee in the event a member or members of the Committee become(s) unable to serve."

Motion was made, seconded and approved.

The final Committee to be appointed was the Compensation Committee. It was asked that Messrs. Barry, West and Wynn be appointed as members of the Compensation Committee. It was

RESOLVED: "That a Compensation Committee consisting of John J. Barry, Jacob F. West and William H. Wynn be appointed to serve for 1998 and that it be hereby authorized to act on all matters concerning compensation and the establishment and administration of all programs and agreements relating to compensation, whether current or deferred. No member of the Committee shall participate in the determination of any matter affecting his own Compensation."

Motion was made, seconded and approved.

The Chairman announced that annually the Committee recommended an Independent Certified Public Account. Coopers and Lybrand was used in this capacity for the past two years and performed satisfactorily. He asked for a motion to recommend them again to the stockholders. It was

RESOLVED: "That Coopers and Lybrand, L.L.P. be recommended to the full Board of Directors and Stockholders at the Annual Meeting to be held May 5, 1998, to be retained as Independent Certified Public Accountants for the Company for the fiscal year ending December 31, 1998."

Motion was made, seconded and approved.

The Chairman next reported that management had recommended a cost of living adjustment for retirees over age 65 and he noted the increase of $690,482 in the liabilities of the Pension Plan as shown in a memorandum which had been distributed with the Agenda for this meeting. He requested a motion, and it was

RESOLVED: "That all employees who are retired and receiving retirement benefits and who have attained age sixty-five on June 30, 1998, including those who are receiving spouses' retirement benefits and who have attained age sixty-five on June 30, 1998, shall have their present pension benefit increased on July 1, 1998 by a percentage equal to .25 percent for each month elapsed since July 1, 1996 (the date of the last increase) or the date of retirement, if later, up to and including June 30, 1998."

2

U 17329

Motion was made, seconded and approved

The final action item concerned the establishment of UNIONCARE of Texas, Inc. The Chairman indicated that this would be a subsidiary of UNIONCARE, Inc., and was being created to receive agency commissions in Texas. He explained that under Texas law, only a Texas domestic agency could collect commissions and we would receive override commissions on some business written in Texas through this Corporation. He requested a motion, and it was

RESOLVED: "That the members of the Executive Committee, and each of them, do hereby authorize the creation of a new indirect subsidiary, UNIONCARE of Texas, Inc., to be incorporated as a direct subsidiary of UNIONCARE, Inc., of which, ULLICO Inc. is the sole shareholder and parent corporation."

Motion was made, seconded and approved.

A special resolution was distributed to the Executive Committee proposing the adoption by ULLICO Inc. and each of its affiliates, of the Presidential Advisory Commission's Consumer Bill of Rights. There was significant discussion of the concept and whether this would put a significant burden on the Company. It was agreed that there would be an impact by adopting the Consumer Bill of Rights, but that there is a more important goal and that is that ULLICO should set an example, as a corporation owned by labor and doing business with labor, in recognizing the rights of individuals. Management believes that this statement of principles embodies sound ideas that need to be reflected in our business operations. The Committee, after consideration, adopted the resolution as proposed by Motion, which was seconded and unanimously approved.

Whereas on March 26, 1997, President William Jefferson Clinton appointed the Advisory Commission on Consumer Protection and Quality in the Health Care Industry to "Advise the President on changes occurring in the health care system and recommend measures as may be necessary to promote and assure health care quality and value and to protect consumers and workers in the health care system."

Whereas as part of its charge, the President asked the Commission to draft a "Consumer Bill of Rights."

Whereas the Advisory Commission, co-chaired by the Honorable Alexis M. Herman, Secretary of Labor; and the Honorable Donna E. Shalala, Secretary of Health and Human Services, included 34 members representing consumers, business, labor, health care providers, health care plans, state and local governments, and health care quality experts.

Whereas, our Chairman, Robert A. Georgine, participated as one of the members in this endeavor.

Whereas, the Presidential Advisory Commission adopted eight areas of consumer rights and responsibilities, which are as follows:

1.   Information Disclosure - Consumers have the right to receive accurate, easily understood information and some require assistance in making informed health care decisions about their health plans, professionals, and facilities.

2.   Choice of Providers and Plans - consumers have the right to a choice of health care providers that is sufficient to ensure access to appropriate high-quality health care.

3    Access to Emergency Services - Consumers have the right to access emergency health care services when and where the need arises. Health plans should provide payment when a consumer presents to an emergency department with acute symptoms of sufficient severity--including sever pain--such that a "prudent layperson" could reasonably expect the absence of medical attention to result in placing that

3

U 17330

consumer's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part.

4.  Participation in Treatment Decisions -- Consumers have the right and responsibility to fully participate in all decisions related to their health care. Consumers who are unable to fully participate in treatment decisions have the right to be represented by parents, guardians, family members, or other conservators.

5.  Respect and Nondiscrimination -- Consumers have the right to considerate, respectful care from all members of the health care system at all times and under all circumstances. An environment of mutual respect is essential to maintain a quality health care system.

    Consumers must not be discriminated against in the delivery of health care services consistent with the benefits covered in their policy or as required by law based on race, ethnicity, national origin, religion, sex, age, mental or physical disability, sexual orientation, genetic information, or source of payment.

    Consumers who are eligible for coverage under the terms and conditions of a health plan or program or as required by law must not be discriminated against in marketing and enrollment practices based on race, ethnicity, national origin, religion, sex, age, mental or physical disability, sexual orientation, genetic information, or source of payment.

6.  Confidentiality of Health Information -- Consumers have the right to communicate with health care providers in confidence and to have the confidentiality of their individually identifiable health care information protected. Consumers also have the right to review and copy their own medical records and request amendments to their records.

7.  Complaints and Appeals -- All consumers have the right to a fair and efficient process for resolving differences with their health plans, health care providers, and the institutions that serve them, including a rigorous system of internal review and an independent system of external review.

8.  Consumer Responsibilities -- In a health care system that protects consumers' rights, it is reasonable to expect and encourage consumers to assume reasonable responsibilities. Greater individual involvement by consumers in their care increases the likelihood of achieving the best outcomes and helps support a quality improvement, cost-conscious environment. Such responsibilities include:

    •   Take responsibility for maximizing healthy habits, such as exercising, not smoking, and eating a healthy diet.

    •   Become involved in specific health care decisions.

    •   Work collaboratively with health care providers in developing and carrying out agreed-upon treatment plans.

    •   Disclose relevant information and clearly communicate wants and needs.

    •   Use the health plan's internal complaint and appeal processes to address concerns that may arise.

    •   Avoid knowingly spreading disease.

    •   Recognize the reality of risks and limits of the science of medical care the human fallibility of the health care professional.

4

U 17331



- Be aware of a health care provider's obligation to be reasonably efficient and equitable in providing care to other patients and the community.

- Become knowledgeable about his or her health plan coverage and health plan options (when available) including all covered benefits, limitations, and exclusions, rules regarding use of network providers, coverage and referral rules, appropriate processes to secure additional information, and the process to appeal coverage decisions.

- Show respect for other patients and health workers.

- Make a good-faith effort to meet financial obligations.

- Abide by administrative and operational procedures of health plans, health care providers, and Government health benefit programs.

- Report wrongdoing and fraud to appropriate resources or legal authorities.

RESOLVED:    "ULLICO Inc., believes that the eight stated goals of this Consumer Bill of Rights and Responsibilities are worthy of encouragement by the business community, and it is the desire that ULLICO adapt its policies and practices and conform its operations with the Consumer Bill of Rights and Responsibilities, as adopted by the Advisory Commission on Consumer Protection and Quality in the Health Care Industry, in all aspects of our endeavor." Be it,

FURTHER
RESOLVED:    "ULLICO Inc., will endeavor to provide a work place which allows each individual to participate in this effort." Be it,

FURTHER
RESOLVED:    "That each officer is charged with ensuring that the areas under their supervision make all necessary effort to achieve these goals in all ULLICO's business activities."

The Chairman noted that this concluded the action items on the agenda and introduced Mr. Grelle. The Chairman said he had asked Mr. Grelle to give a short overview of how the Companies did during the first nine months of 1997.

Mr. Grelle reminded the Committee that since the GAAP conversion took place at the end of 1996, the interim results were not available on an equivalent basis. ULLICO had a net gain of $12.2 million for the nine months ending September 30, 1997. This compared favorably to $5.9 million for the same period in 1996. Primarily, improvement was due to the substantial increase in realized capital gains/losses. A $14.6 million gain was realized in 1997, while a capital loss of $1 million was realized for 1996.

Trust Fund Advisors had pre-tax gain of $2.2 million. The Company realized a third quarter gain of $0.9 million, which was consistent with the prior quarter and an improvement over the first quarter. MRCo's year-to-date earnings were $1.4 million, prior to the minority interest deduction of $800 thousand pre-tax. This was a considerable improvement to the breakeven position at the end of six months. AMI Capital, net of minority interest, contributed $4.1 million to year-to-date earnings Offsetting the improvement was the Financial Freedom year-to-date loss of $1.2 million.

Union Labor Life received new separate account deposits totaling $242 million. Mortgage commitments for J for Jobs set a new all-time high of $309 million with CalPERS funding $27,370,000 and New York State Common Retirement funding $101,520,400. It was estimated that over 10 million hours of union work would be created.

U 17332

5

Separate Account P continued to commit to investments creating union jobs. The most recent commitment was to invest $7.5 million in a facility maintenance company. A 20% rate-of-return had been targeted for "P".

Union Labor Life's year-to-date pre-tax income of $11.8 million is considerably ahead of 1996. The 1996 nine-month gain was only $1.3 million. The improvement during the third quarter of 1997 was due to additional capital gains, a lower loss-ratio on the group business and continued growth in premiums. The year-to-date loss ratio improved to 93%, compared to 97% at the end of six months and health premiums grew to $135 million vs. $117 million for the same period of 1996. Realized capital gains through the third quarter were $4.9 million. Activity during the first nine months included the Expansion of Medicare Select products in Missouri, North Carolina, Ohio and Texas; the filing of Home Health Care products in 21 states; the completion and filing of Medicare Supplement 1998 rate increases; the development of a Final Expense Life product; and the writing of $3 million in annualized Life premiums and $5 million in Health premiums. UNIONCARE had a pre-tax loss of $3.4 million for the nine-month period. The loss was significantly greater than expected due to lower than planned sales in both areas.

The Property & Casualty Group had a pre-tax loss for the nine-month period of $3 million. The loss was primarily caused by significantly higher than planned loss ratios for the workers' compensation product line, which had an $18 million pre-tax loss. However, the Fiduciary line had a very favorable loss ratio, producing a pre-tax gain of $12.8 million. Additionally, a reinsurance arrangement put in place early in 1997, provided some relief, decreasing pre-tax losses by $2.8 million.

Management established an internal fiduciary liability underwriting operation and plans an increase in the fiduciary liability policy limits from $10,000,000 to $25,000,000, reinsuring the majority of the coverage.

Through September 30, 1997, Group Life and Health and Managed Care sales totaled $31.7 million in premium and fees. This was a 58% increase over the same period for 1996. After terminations, net new business growth was $26 million representing 135 new product additions.

Zenith was awarded $2.2 million in new business, representing 52 new clients, during the first nine months of 1997. Fee increases to existing clients also added $800 thousand in annualized revenue. Total revenues of $37.4 million were ahead of plan and 8% ahead of the same period in 1996.

The most significant activities in the Legal Department were designing the structure of the stock repurchase program and the drafting of the prospectus. Bringing the Diplomat to closing also absorbed a significant amount of time. The development of the documentation necessary to bring the Mellon Bank loan syndication to its closing scheduled for October 15th was another major project in the first nine months of 1997. This loan and its syndication required significant resources in the restructuring of certain relationships so that the appropriate security could be pledged.

The Chairman asked the Committee if they had any questions of any of the officers present or any of the written materials provided with the Agenda. The Chairman reviewed the status reports on the Conflict of Interest Questionnaires and the LM-30 forms, which he noted were prepared annually for the Directors.

There being no questions, the Chairman then reminded the Committee of the passing of three members of the Board, and asked for a moment of silence in morning. He then presented three memorials for members of the Board of Directors, who had recently passed away. The first memorial was for Secretary-Treasurer, Lester H. Null, Sr.

Whereas, we have lost a friend in the person of our Secretary-Treasurer, Lester H. Null, Sr., who left this earth on January 6, 1998.

U 17333

Whereas, Mr. Null devoted his life to the American labor movement and the organized men and women who make up that movement, and to ULLICO.

Whereas, Mr. Null moved within the ranks of his union, the International Brotherhood of Potters, until he achieved the office of President in 1969. In that same year he was appointed to the Board of Directors of The Union Labor Life Insurance Company and began his long career with our organization.

Whereas, Lester H. Null, Sr. served as President of the International Brotherhood of Potters until its merger in 1983 with the Glass Molders. Lester H. Null, Sr. was elected Secretary-Treasurer of ULLICO Inc. and the ULLICO Family of Companies in February of 1988. He served ten years in that position and has stamped it with his unique brand of humility and love for the labor movement.

Whereas, Mr. Null in representing the Company at the Union Industries Show had created a unique presence for the ULLICO booth which was known colloquially as "Chick's Place" and

Whereas, Management would like to recognize that very special aspect of Chick that made him everyone's friend and ULLICO's friend. Therefore, be it

RESOLVED: "That the Board of Directors of ULLICO Inc. recognizes that it has lost a friend, companion and supporter of American labor with the death of Lester Hayes Null, Sr. That men of Mr. Null's character and caliber can never be replaced, most especially those we call friend. We want to remember Lester Hayes Null, Sr., "Chick", in a very special way. Therefore, we recognize both his union and labor roots by declaring that the Union Industry Booth representing ULLICO and its Family of Companies shall henceforth bear the name "Chick's Cajun Cafe" and will be graced with a likeness of our good friend Chick so that he can partake amongst his friends of some beers and smokes, good labor comradery and continue to further ULLICO's cause, even from where he now rests." Be it

FURTHER
RESOLVED: "That this Memorial Resolution be made part of the permanent records of ULLICO Inc. That it be engraved on suitable paper to be signed by each of the Board members and delivered to his family as a memento of our appreciation of his service and his friendship."

"God bless you, Chick."

Motion was made, seconded and approved.

The Chairman next introduced the memorial for Melvin H. Roots.

Whereas, Melvin H. Roots a long-time valued friend of American labor passed away on August 4, 1997.

Whereas Melvin H. Roots enjoyed a successful 32-year career with the Plasters and Cement Masons International Union. A friend of labor, a supporter of labor, he was elected to the Board of Directors of ULLICO Inc. in 1985 and served us loyally and well for twelve years. Be it

RESOLVED: "That this Memorial Resolution be made part of the permanent records of ULLICO Inc., in memory of Melvin H. Roots, a member of this Board since 1985. That it be engraved on suitable paper to be signed by each of the Board members and delivered to his family as a memento of our appreciation of his service and his friendship."

Motion was made, seconded and approved.

7

The Chairman then introduced a memorial for Frank W. Carter.

Whereas, Frank W. Carter a recent member of the ULLICO Family, but a long-time valued supporter of organized labor in America passed away on January 15, 1998.

Whereas Frank W. Carter enjoyed a successful 34-year career with the Glass Molders & Potters International Union. A friend of labor, a supporter of labor, he was elected to the Board of Directors of ULLICO Inc. in 1995 and served us well for too short a period of time for our liking. Be it

RESOLVED:    "That this Memorial Resolution be made part of the permanent records of ULLICO Inc., in memory of Frank W. Carter, a member of this Board since 1995. That it be engraved on suitable paper to be signed by each of the Board members and delivered to his family as a memento of our appreciation of his service and his friendship."

Motion was made, seconded and approved.

The Chairman then moved to an Executive Session and delivered his report (a copy of which is included as an addendum to these minutes).

The Meeting was then adjourned and the Chairman was authorized to select the time and place of the next meeting.

Joseph A. Carabillo
Assistant Secretary

Attachments

U 17335

Exhibit 10

Compensation Committee Meeting
July 27, 1998

Good Morning.

Bill Wynn will join us by telephone from Chicago. (Confirm connection.)

This morning we are here primarily to review and accept a recommendation from William M. Mercer Co., a specialist in Executive Compensation. The primary person who worked on this proposal was Ken Hugessen, the man who heads the Global Executive Compensation Program for Mercer.

This report focuses on a program in connection with a single transaction that may only be described as truly extraordinary, but also recommends ULLICO adopt a long-term compensation/incentive program for Officers based on ULLICO stock.

As you all know, in February of 1997 the Executive Committee approved an investment of $8 Million in Atlantic Crossings, a project to build the first privately owned undersea fiber-optic telephone cable from the U.S. to Europe and to Germany then back to create a self-healing ring. That was a start. Since then the idea has grown into a company named Global Crossings which will go

**U 000927**

public in what we hope will be an extraordinary way in the very near future. Here in front of me is the S-1, the 750+ page filing with the SEC which is now being presented to potential investors in what as known as a red herring - the stage where the underwriters can speak with selected potential purchasers. Each of you as Directors will be in that group and will have an opportunity to buy in at the IPO price, currently estimated as between $17 and $19 per share.

Let's talk about ULLICO's position. You may recall Mike Steed's presentation and the video we showed. Our initial $8 Million and related arrangement now translate to slightly over 17,000,000 shares of Global Crossings - the underwriters estimated pricing of between $17 - $19 per share, if it happens,will produce a value of $289 Million to $323 Million. If this pricing holds this is a gain of 36 times our original investment and an unrealized gain of $280 - $315 Million to ULLICO's stockholders. Mike Steed, and our guys will have done very well.

The proposal before you sets aside less than 1% of the gain to ULLICO Stockholders to be paid out to Senior Officers and selected individuals.

There are two other pieces of this program which will also affect Directors and Officers of ULLICO Inc. Each of them will be able to participate in the IPO at the IPO price. A selected group of individuals will have this opportunity,

**U 000928**

almost 1.4 Million shares are being set aside for this purpose. Several of our associates in this deal will also have this opportunity. There is no guarantee that everyone will get all the shares they want, but it is quite an opportunity.

Also each Director and Officer will have the opportunity to buy ULLICO stock, up to 2000 shares (can go up to 4000) at the current $28.70 book value. If the IPO price holds, ULLICO stock will double in value. Of course, no one can predict future events - but we wouldn't be doing this if we were not optimistic. But as you know, all investing is a risk.

The program in front of you pays key people a significant one time bonus. Mercer has looked at thirteen other one time transactions and surveyed the market before making this recommendation. 1% is conservative - two other stockholders have stated their intention to distribute 10% and 25% as their profit respectively. Our program in considerably more conservative and more in line with who we are.

Also the pay out is over 4 years. 50% is payable this year at the IPO date - and we are asking that the amount paid in 1998 be grossed up for tax purposes to make this year's payment real. And since it is ordinary income, this is meaningful.

**U 000929**

In each of the next 3 years the remainder will be paid in installments of 20%, 20% and 10%. Moreover, future payments will vary with the actual value of the Global Crossings investment. So if it holds value or goes up the payments will track and they will track if it goes down.

One final point. We will disclose this plan to the Executive Committee at its next meeting, and ask them to ratify the action taken today. Partly, because this is the first program of its kind at ULLICO and because we want to set the stage for a more structured approach to long-term compensation.

Do you have any questions?

(DISCUSSION)

May I have a motion approving the plan and gross up for taxes and making IPO stock and ULLICO stock available to Directors and Officers, and we would also like this Committee to recommend favorably further consideration of a long-term plan.

All in favor --

Lunch is available in the Coffee Area.

JCARABILLO\EXECICONF COMMITTEE
RAG REMARKS-DRAFT 1

U 000931

Exhibit 11

MINUTES
OF THE
COMPENSATION COMMITTEE
OF
ULLICO INC.

July 27, 1998

ATTENDEES:

John J. Barry
Jacob F. West
William H. Wynn

ABSENT:

None

OTHERS IN ATTENDANCE:

Robert A. Georgine
Joseph A. Carabillo
John K. Grelle

In attendance were Committee members J. West, J. Barry, Committee member William Wynn participated by telephone. Also in attendance were R. A. Georgine, J. A. Carabillo, J, K. Grelle. The first order of business was adoption of the Minutes of the meetings of May 6, 1997 and October 8, 1997. Hearing no changes or modifications from the committee, the minutes were adopted as written and Mr. Carabillo was instructed to sign as Assistant Secretary.

The next item of business was the 1997 incentive program and the increase program for 1998. The discussion centered on the fact that the average increase was 4.3% and there was a market adjustment in officer grades of 3%. Overall, the company increases fit within plan as described. A booklet, Tab A, was distributed to committee members outlining in detail the proposals and specific resolutions. Following a presentation and discussion, the 1997 incentive and 1998 plan was adopted as presented.

Further, the specific bonuses paid to senior officers were reviewed with the committee - these included Messrs. Luce, Steed, Grelle and Carabillo. And the specific dollar amounts of those bonuses were approved. The Committee was reminded that these bonuses are based on a possibility of 125% of midpoint, and that there were further incentives paid to junior officers and non-officer employees. The Committee was asked if they wanted to specifically review each incentive amount and they indicated they did not. In total, $1.087 Million was paid out in incentives, primarily to officers and some to non-officers, the majority of payments to non-officers primarily in the mortgage area of The Union Labor Life Insurance Company.

The next discussion was a review of the Committee's decision some time ago to focus strictly on senior officers. The Committee is comfortable with this arrangement and while setting parameters for officers incentives the Committee expressed no desire to see specific increases.

The next discussion concerned a report and recommendation provided by William M. Mercer & Company. A copy of that report is attached to these minutes at Tab B and incorporated herein. This report deals with a singular occurrence and a unique structure for an incentive payment An overview was provided by Mr. Grelle and comments were provided to the Committee by the

U 000324

Minutes of the Compensation Committee
of ULLICO, Inc. · July 27, 1998

Chairman, a copy of his comments are attached at Tab C and made part of these minutes. After review of both the Mercer Report and the Chairman's comments, the Committee went into Executive Session. In the Executive Session the Mercer program was adopted as written with the following modifications. The allocation of the award to the Chairman, President and CEO which was increased to the same level as that of the Senior Vice President-Investments, the second action was the adoption of the full tax gross-up of the 1998 incentive payments in the primary pool. The Committee noting the extraordinary value of the result to the stockholders fully believe the approved awards to be equitable and reasonable. No officer participated in this discussion although Mr. Georgine was present.

Because of the unusual nature of this significant event and awards the Committee decided to continue its meeting and meet at least once again to review its discussion and conclusions, and to further consider making Class A company stock available to Senior Officers receiving incentive payments, at the book value of $28.70, and the adoption of a non-qualified deferred compensation plan available to the five senior officers as a means of deferring compensation for tax and retirement planning. The Committee did decide to authorize the offer of 2,000 shares of Class A stock of ULLICO Inc. to each Director and Officer of that company and instructed the Chairman to make that available at the earliest opportunity.

On August 3rd the Compensation Committee comprised of Messrs. Barry, West and Wynn reconvened their meeting in Chicago where they were all in attendance at a conference. At the Committee's request, Mr. Georgine was also in attendance. The discussion centered on the report by William M. Mercer and its recommendations on the incentive award plans concerning the awards to be paid in relation to the Initial Public Offering of Global Crossings. The Committee after discussion decided to reaffirm its conclusions and the recommendations made at its session on July 27th, and to specifically allow the Chairman, President and CEO, the Executive Vice President, the Senior Vice President-Investments, the Senior Vice President and Chief Financial Officer and the Vice President and Chief Legal Officer to take up to 100% of current specific awards, not including amounts allowed for tax gross-up, in Class A stock of the Company.

After further consideration, the Committee reaffirmed its belief in the correctness of their position in establishing compensation for the Chairman, President and CEO, and the Senior Vice President Investments at the same level, and accepting the remainder of the report including the awards to the senior officers as recommended by William M. Mercer and to provide for a full gross-up of payments to allow for taxes. The Committee reaffirmed its conclusion that the awards were warranted and equitable and reasonable when one considers the level of gain to the stockholders resulting from this extraordinary event. By requiring that the stockholders show an unrealized gain of at least $200,000,000 from the initial investment the Committee is assured that the award even when considered in its totality, is a relatively small percentage of the ultimate earnings by the stockholders. And because future years' awards are based on continuing stock value it assures that the future awards also reflect a relative percentage of the actual gain to stockholders.

Finally, the Committee agreed to adopt and implement a Non-Qualified Deferred Compensation program for the Chairman, President and CEO, the Executive Vice President, the Senior Vice President-Investments, the Senior Vice President-Chief Financial Officer, and the Vice President and Chief Legal Officer. Plan Document is attached at Tab C. The administrative costs of the program are to be borne by the Company and the Plan shall allow each officer to specifically direct "deemed" investments in ULLICO Inc. Class A stock, and in The Union Labor Life Insurance Company's Separate Accounts A, M and R as well as a interest option based on 15-year Treasury + 2%. A trustee will be selected by the Chief Financial Officer to hold all contributed funds in trust and administer the funds contributed to this plan by the participating officers.

U 000325

Minutes of the Compensation Committee
of ULLICO, Inc. - July 27, 1998

Trustee shall be directed to select investment opportunities which are anticipated to provide equivalent yields as the deemed investments in the Plan so as to minimize any future obligation on the Company to contribute to this plan.

That concluding the business of the Committee, it adjourned.

J. A. Carabillo
Assistant Secretary

JAC/khr

Attachment

DOCS/JV/CORP SEC/MEETINGS/MINUTES
Min/Comp Committee 072498

U 000326

Exhibit 12



**Robert A. Georgine**
Chairman, President and CEO

ULLICO Inc.
111 Massachusetts Ave., N.W.
Washington, DC 20001
202/682-0900

July 29, 1998

Bill J. Casstevens
11244 Greenbrier Chase
Oklahoma City, OK 73170

Dear Bill:

In recent years the subject of corporate governance has been frequently debated. The idea is that management and the board of directors should have their interests in line with the stockholders, and good common sense tells us that this is a good idea. If the stockholders, the true owners of the corporation, do well then the officers and directors should also do well. And the officers and directors in conducting their everyday business should have the interests of the stockholders foremost in their minds.

One aspect of that at ULLICO has been a continuing program to make our stock available to officers and directors. For many years we did this on a regular basis. Since the early 1990s and the offering of Preferred Certificates, this program has not been as active. Now that we have raised capital, converted those certificates into Class A stock and as you know last year having retired stock so that we have a pool of stock available for resale, we would like to renew that opportunity to each member of the Board.

The Compensation Committee has authorized us to make available 2,000 shares of stock to each member of the Board of Directors of ULLICO Inc. and each of the officers of ULLICO Inc. This is a very small group and intentionally so because we are a closely held company. The shares will be sold to you at their book value, as set at the Annual Meeting of $28.70 per share. You may buy all 2,000 shares or any portion thereof which suits your own finances and your interest in the Company.

Over the years I have purchased ULLICO stock whenever it was available, and I intend to purchase additional stock at this time. If you wish to do so please see the form attached. You should send the form in the enclosed prepaid envelope to Joe Carabillo, Vice President and Chief Legal Officer, along with a check in the correct amount. For ease of reference, we have selected some purchase points so that you merely can check the box and the amount is shown. We have also added the word "Other" so that you can select any amount of stock which you desire up to the 2,000 shares.

I hope that this meets your investment needs and that you will be able to join me and participate in this opportunity. I look forward to seeing you in the very near future.

Very truly yours,

Bob Georgine

Enclosure

Exhibit
#9

**U-MIA 016215**