Exhibit 13



**Robert A. Georgine**
Chairman, President and CEO

ULLICO Inc
111 Massachusetts Ave., N.W.
Washington, DC 20001
202 682-0900

October 13, 1998

**PERSONAL AND CONFIDENTIAL - OPEN BY ADDRESSEE ONLY**

Bill J. Casstevens
11244 Greenbriar Chase
Oklahoma City, OK 73170

    RE:   ULLICO Inc. Class A Stock

Dear Bill:

    We have been very pleased by the positive response to our recent correspondence concerning ULLICO Inc. stock. It reinforces our belief that it is important to have Directors who participate in the Company's equity and, therefore, we have decided to make available up to an additional 2000 shares to each Director and Officer of ULLICO Inc.

    It is heartening to know that the support you show at our meetings also translates into an interest to participate in the future fortunes of the company as a stockholder. Words really don't express how much I and the other officers of the company appreciate your support.

    For ease of reference we have attached a copy of our previous letter. The only change is the due date on the form, which is October 30, 1998. Please mark your calendar accordingly and please return the form and your check, as before, to Mr. Carabillo's attention, a prepaid envelope is enclosed for your convenience.

                       Sincerely & fraternally,

                       Bob Georgine

Enclosures

Confidential Treatment
Requested

UL 19353

Exhibit
# 11

Exhibit 14

MEETING OF THE EXECUTIVE COMMITTEE
OF
ULLICO Inc.
Held February 13, 1999
At the Fontainebleau Hilton
Miami Beach, Florida
8:00 A.M.

ATTENDEES:

John J. Barry
Marvin Boede
Kenneth J. Brown
Bill J. Casstevens
Arthur A. Coia
John F. Gentleman
Robert A. Georgine

Frank Hanley
Joseph F. Maloney
James F. M. McNulty
James J. Norton
Jacob F. West
William H. Wynn

ABSENT:

John E. Cullerton
John J. Joyce

James J. McCarron

OTHERS IN ATTENDANCE:

Joseph A. Carabillo
John K. Grelle
George Holland

James W. Luce
Mark A. Maloney
Michael R. Steed

Chairman Georgine called the meeting to order and noted that Mr. Coia came to the meeting, but could not stay, and that Messrs. Cullerton, Joyce, and McCarron were unable to attend.

As of September 30, 1998, the Company had 316,639 shares of Capital Stock issued and outstanding. In the first nine months the Company had repurchased and retired 3,244 2/3 shares of Capital Stock. Also, as of September 30th, a total of 8,120,392 shares of Class A Stock and a total of 133,280 shares of Class B Stock were issued and outstanding.

The Minutes of the November 30, 1998, Meeting of the Executive Committee were distributed with the Preliminary Agenda. Hearing no changes or modifications, it was

RESOLVED:    "That the Minutes of the Executive Committee Meeting of November 30, 1998, as distributed with the Agenda for this meeting, be and hereby are approved."

USDC 0105335

Exhibit
#14

Motion was made, seconded and approved.

The Committee set the date for the Annual Meeting. On motion duly made and seconded, the following resolutions were unanimously adopted:

WHEREAS, Management recommends holding the Annual Stockholder Meeting on May 18, 1999 at the Washington Court Hotel in Washington, D.C. The By-laws of ULLICO Inc. specify that the Stockholders shall meet annually during the month of April or on such other date and at such place in the State of Maryland, or in any other place, as shall be selected by the Executive Committee. Therefore, be it

RESOLVED: "That the Annual Stockholder Meeting be held on May 18, 1999, at 3 p.m. at the Washington Court Hotel in Washington, D.C."

In preparation for the Annual Meeting it is necessary to appoint the membership, consisting of people who are not up for election this year, of the Nominating and Proxy Committees. On motion duly made and seconded, the following resolution was unanimously adopted:

WHEREAS, it is necessary to appoint a Nominating Committee to nominate candidates for election as Directors at the Annual Meeting of Stockholders to be held May 18, 1999; Therefore, be it

RESOLVED: "That a Nominating Committee consisting of John E. Cullerton, Joseph F. Maloney, and William H. Wynn be hereby appointed."

The next resolution is the appointment of the Proxy Committee, and in the same fashion these people are also not up for election this year. On motion duly made and seconded, the following resolution was unanimously adopted:

WHEREAS, it is necessary to appoint a Proxy Committee to serve on behalf of the Stockholders in connection with the election of Directors and such other matters as may be brought before and acted upon at the Annual Meeting of Stockholders to be held May 18, 1999 Therefore, be it

RESOLVED: "That a Proxy Committee consisting of Joseph F. Maloney, James J. Norton, and William H. Wynn be hereby appointed, with the Committee to have full power of substitution in the event a member or members of the Committee become(s) unable to serve."

The Chairman noted that Mr. McCarron is being added to the membership of the Audit Committee, which would now give the Company one more member than the minimum required On motion duly made and seconded, the following resolution was unanimously adopted:

2

USDC 0105336

RESOLVED: "That an Audit Committee consisting of Marvin J. Boede (Chairman), John J. Barry, Bill J. Casstevens, Douglas J. McCarron, John J. Sweeney and Jacob F. West be hereby appointed and that the Chairman and Chief Executive Officer be authorized to appoint substitute members to the Audit Committee in the event a member or members of the Committee become(s) unable to serve."

The final Committee to be appointed was the Compensation Committee. This Committee has full authority to act on all matters concerning compensation of officers and other employees, including all current and deferred compensation, and including the establishment and administration of all plans, programs, and agreements, and including the issuance of stock. The Chairman pointed out that Mr. Cullerton was being added to this committee. On motion duly made and seconded, the following resolutions were unanimously adopted:

WHEREAS, in accordance with Article VI, Section 1, of the By-laws of ULLICO Inc., it is necessary to appointment a Compensation Committee for 1999. The Committee will have full authority to act on all matters concerning compensation of officers and other employees, including all current and deferred compensation, and including the establishment and administration of all plans, programs, and agreements, and including the issuance of stock. This appointment is submitted for approval as required by the Corporation's By-laws. Therefore, be it

RESOLVED: "That a Compensation Committee consisting of John J. Barry, John E. Cullerton, Jacob F. West and William H. Wynn be appointed to serve for 1999, and that it be hereby authorized to exercise all the powers of the Board of Directors, in all matters concerning the compensation of officers and other employees of the Corporation, and its subsidiaries and affiliates under common control, including the award and fixing of current compensation, and the establishment and administration of all plans, programs, and agreements relating to compensation, whether current or deferred; except that the Committee may not cause the issuance of stock except as provided in Section 2-411(b) of the Maryland General Corporation Law. No member of the Committee shall participate in the determination of any matter affecting his own compensation."

The Chairman announced that annually the Committee recommended an Independent Certified Public Account. Coopers and Lybrand, now PricewaterhouseCoopers, was used in this capacity for the past two years and performed satisfactorily. Mr. Georgine asked for a motion to recommend them again to the stockholders. On motion duly made and seconded, the following resolutions were unanimously adopted:

3

USDC 0105337

WHEREAS, it is necessary to retain an Independent Certified Public Accountant for the fiscal year ending December 31, 1999; therefore, be it

RESOLVED: "That PricewaterhouseCoopers be recommended to the full Board of Directors and Stockholders at the Annual Meeting to be held May 18, 1999, to be retained as Independent Certified Public Accountants for the Company for the fiscal year ending December 31, 1999."

The Chairman then reported that three additional items were placed in front of the members.

The first item was a one-year extension on the repayment of Eight Million Dollars ($8,000,000) from MRCo, Inc. to ULLICO Inc. The Note, with the same terms and conditions as the original Note, will now be due at year-end 1999. On motion duly made and seconded, the following resolutions were unanimously adopted:

WHEREAS, in 1993 this Committee approved a loan to MRCo for the purpose of funding Thornapple, Inc. ("Thornapple") and the acquisition of a new subsidiary, AMI Capital, Inc. ("AMIC"). The amount of the loan was $8,000,000 at an 11 percent rate of interest, repayment was scheduled for December 31, 1998. Management of MRCo has asked for a one-year extension. Therefore, be it

RESOLVED "That the Promissory Note originally executed between ULLICO Inc. (the 'Corporation'), as the Lender, and MRCO, Inc., as the Borrower, on December 20, 1993, and originally due on December 31, 1993, is hereby extended for one year and will be due and payable in full on December 31, 1999, or on the last business day of 1999. All other terms and conditions shall remain the same." And be it

FURTHER
RESOLVED:"That the officers of the Corporation be, and each of them hereby is, authorized, directed and empowered on behalf of the Corporation to execute any and all other actions which may be necessary or desirable to effectuate the transaction approved by the foregoing Resolution and their acts and deeds in so doing shall be conclusively presumed to be the acts and deeds of the Corporation."

The second additional item the Chairman discussed was a new Six Million Five Hundred Thousand Dollar ($6,500,000) loan to MRCo, Inc. The Chairman noted that the $6.5 million will be invested as equity in Financial Freedom Senior Funding Corporation to provide a necessary piece of the financing of the acquisition of stock in Transamerica HomeFirst and a portfolio of mortgages and servicing capabilities. The Chairman asked Mr. Steed to say a few words about this transaction.

4

USDC 0105338

Mr. Steed reminded the Committee that Financial Freedom was established in 1996 to manage the reverse mortgage business in California with the intent of expansion. However, we have not had the market penetration we had hoped for, and the reverse mortgage market is going through a consolidation. Transamerica who has been one of our largest competitors through a subsidiary, Transamerica HomeFirst, has decided to exit the business. HomeFirst has staff of about 25 people, and licenses in 34 states, and servicing revenues approximating $1.8 million per year. We are planning to acquire the stock of Transamerica HomeFirst in a transaction valued at around $200 million. Most of the financing is coming through ING, a Dutch-based insurer, and Centre Solutions in the form of a surety contract. In addition, we need to fund $6.5 million in equity for Financial Freedom through MRCo, and Financial Freedom will be borrowing $3 million as debt for future capital needs. Mr. Steed described this as a very favorable leveraged transaction.

The Committee was asked to approve a loan of $6.5 million to MRCo, the direct parent of Financial Freedom Senior Funding Corporation. Director Brown asked about the business and the negative press it has received. Mr. Steed described our product as being somewhat unique and we think more favorable to seniors than our competitors.

Mr. Carabillo did point out that Financial Freedom Senior Funding Corporation and MRCo were both parties to a class action suit brought against them for elder abuse. There are also suits of a similar nature that were brought against Transamerica directly and another competitor Metropolitan. The two suits against Transamerica and Metropolitan were brought by the San Mateo County Attorney, while the suit against Financial Freedom Senior Funding Corporation and our subsidiaries appears to be a parallel action brought by a private attorney. Mr. Carabillo indicated that we are preparing a response to the complaint.

Director Casstevens made inquiry concerning the difficulty with a business that has a bad reputation. Mr. Steed pointed out that our business had received favorable support from the National Council of Senior Citizens and from various government agencies which have reviewed our product, and we believe that we are in compliance with all disclosure requirements.

On motion duly made, and seconded, the following resolutions were unanimously adopted:

WHEREAS, management of Financial Freedom is in the final stages of evaluating and negotiating an acquisition of a mortgage portfolio comprised of over 2,800 loans. The form of the acquisition will be a stock purchase of Transamerica HomeFirst, a subsidiary of the Transamerica group. The total price is approximately $202.5 million, of which $196 million is to be financed from outside sources. An additional $6.5 million is being asked of ULLICO Inc. (the "Corporation"), and there will be an additional $3 million borrowed from an outside source, currently Screen Gems, to complete the financing of both this acquisition and the future operations of Financial Freedom; and

5

USDC 0105339

WHEREAS, MRCo, Inc. ("MRCo") and Financial Freedom's management is asking ULLICO to lend $6.5 million to MRCo on the same terms as negotiated with the outside lender, which will be lending $3 million to Financial Freedom, subject to final documentation and terms. MRCo will then invest the $6.5 million received from the Corporation in Financial Freedom and receive preferred stock to represent this additional investment in the Corporation's subsidiary.

RESOLVED: "That the Chairman, President, and Chief Executive Officer is authorized to execute any documents necessary to effect a loan of $6.5 million to MRCo, Inc. on the same terms, and with the same conditions, as the $3 million loan being negotiated with Screen Gems, or such other third party as may become available, to Financial Freedom Senior Funding Corporation." And be it

FURTHER
RESOLVED: "That the officers of the Corporation be, and each of them hereby is, authorized, directed and empowered on behalf of the Corporation to execute any and all other actions which may be necessary or desirable to effectuate the transaction approved by the foregoing Resolution and their acts and deeds in so doing shall be conclusively presumed to be the acts and deeds of the Corporation."

The third additional agenda item was an approval of a General Indemnification which is in favor of the company that issues bonds and acts as surety to our businesses. This is being asked for in the context of a group insurance program. Jim Luce was asked to explain this transaction before the call for a vote.

Mr. Luce spoke about the new contracts with the HERE local in Atlantic City, New Jersey. This Local has 12,500 members and approximately 38,000 participants in their benefit plan. We are marketing our own PPO, under the name ULLICARE as a replacement to their current carrier. The bond is being asked because the Fund wanted an assurance that ULLICARE would be able to meet its obligation. It required that the contract be written with The Union Labor Life Insurance Company and the surety bond be placed in effect until contracts can be negotiated with ten hospitals. The fee for the performance bond was Thirty-Seven Thousand dollars ($37,500) annually and we anticipated this bond will only be required until the contracts are actually signed with the hospitals.

On motion duly made and seconded, the following resolutions were unanimously adopted:

WHEREAS, Fidelity Deposit provides sureties and bonds which are generally utilized to allow our businesses to meet statutory requirements for transacting certain businesses. The current inventory of the bonds bear a collective exposure of $833,000, and;

USDC 0105340

WHEREAS, the group health business area has negotiated a contract with the Hotel Employees and Restaurant Employees local in Atlantic City, New Jersey (the "Fund"). Said contract obligates the Company to negotiate per diem rates with ten (10) area hospitals. The Union Labor Life Insurance Company ("Union Labor Life") is party to the contract and is warranting that the per diem rates specified in Union Labor Life's contract will not be exceeded by the per diems charged by the hospitals to the Fund participants for treatment received; and

WHEREAS, the Fund is requiring a surety of $5,000,000 to support Union Labor Life's obligations under this arrangement and Fidelity Deposit is requiring a General Indemnification from ULLICO Inc. to support its obligation on all sureties, bonds, etc., before there are any further placements. Therefore, be it

RESOLVED: "That ULLICO Inc. (the 'Corporation'), as the Indemnitor, on behalf of itself and any corporations which it owns, directly or indirectly, in whole or in part, a controlling interest, or any person, firm association, or corporation specifically designated by it, or any combination of the foregoing, agrees to the General Indemnity Agreement, attached hereto, in substantially this form and content." And be it

FURTHER RESOLVED: "That the sureties or bonds, or similar obligations which equal or exceed individually the sum of $5,000,000, require approval of the senior officer for the specific business area, the Chief Executive Officer, the Chief Financial Officer, and the Chief Legal Officer before placement." And be it

FURTHER RESOLVED: "That should the sureties, bonds, or other obligations subject to the General Indemnity Agreement at any time exceed in the aggregate an exposure of $15,000,000, then each subsequent bond, other than those required by law for the purpose of maintaining necessary business licenses and authority, shall require the same approvals as an individual bond of $5,000,000 or more prior to placement with Fidelity and Deposit Company of Maryland ('Fidelity Deposit')." And be it

FURTHER RESOLVED: "That the officers of the Corporation be, and each of them hereby is, authorized, directed and empowered on behalf of the Corporation to execute any and all other actions which may be necessary or desirable to effectuate the transaction approved by the foregoing Resolution and their acts and deeds in so doing shall be conclusively presumed to be the acts and deeds of the Corporation."

7

USDC 0105341

That concluding the action items for this meeting's Agenda, the Chairman noted that the Third Quarter financials were received at Tab C (a copy is included as an addendum to these minutes), which he planned to discuss during the Executive Session.

The next item for discussion was the annual report on Conflict of Interest Questionnaires. In compliance with the requirements of the Insurance Department of the State of Maryland, the Executive Committee adopted a set of resolutions and questionnaires for disclosure of possible conflicts of interest on the part of Directors, Officers, and Supervisory Personnel. Questionnaires have been requested for all such persons for the year 1998, and the Company is in the process of collecting and reviewing the responses. The results will be reported at the next Executive Committee Meeting.

The final annual item was the report on the United States Department of Labor's Forms LM-30 for Directors. Each year the Company completes the necessary forms for filing with the Labor Department by all Directors who are required to report under the Landrum Griffin Act. In accordance with the requirements of the Labor Department for filing Form LM-30, these forms are being completed by us and will be furnished to each Director for filing with the Labor Department prior to April 1, 1999.

The Chairman then moved to an Executive Session and delivered his report (a copy of which is included as an addendum to these minutes).

The Meeting was then adjourned and the Chairman was authorized to select the time and place of the next meeting.

Joseph A. Carabillo
Assistant Secretary

**Attachments**

100 CORPORATE SECRETARY MEETINGS MINUTES
MAICO EXEC COM 3/13/99

8

USDC 0105342

Exhibit 15

Minutes of the ULLICO Inc.

Compensation Committee Meeting

May 13, 1999 · 10:00 A.M.

**Held At**

**The Union Labor Life Insurance Company**
**Home Office Building**
**Washington, D.C.**

In attendance were Mr. West, Mr. Barry, Mr. Wynn. Also in attendance were Mr. Georgine, Mr. Grelle and Mr. Carabillo.

Mr. Georgine asked Mr. Grelle to discuss the matrix and the average allowable increase. Mr. Grelle noted that each year we do a competitive survey to compare our salary plans to the marketplace. It has been decided that we would recommend a 4.3% increase which is up about one-tenth of a percent from 1998 and that the grades would each be adjusted by 3% to keep us competitive with the other local industry. A question was asked about how the 4.3% is applied. Mr. Grelle indicated that a bell curve is used that spreads it among as many people as possible and allows managers to weigh performance into the analysis. Following the discussion, a motion was made and approved.

Mr. Grelle then began discussing a program developed with PriceWaterhouseCoopers to reanalyze our salary structure. He noted that in past years Frank Manley created surveys for officers and Human Resources did all the survey work and analysis for non-officers. Because of this dichotomy a separation developed between certain grades and ranks and overlaps in others -- the program was no longer consistent. PriceWaterhouseCoopers has been hired to review all jobs and reach conclusions as to the nature of the work done and appropriate grading. As they have done their survey they have agreed that there are inconsistencies in the grade and the hope is to develop a cleaner grading system that has a more permanent structure. Also, it is a reevaluation of how incentives are credited. It is the desire of management to have incentives reach down below officer levels by job grade or by complexity rewarding those people who truly contribute to results.

Mr. Grelle then discussed the officer merit increases and suggested that we, as in last year, follow what we did for non-officers and basically apply the 4.3% pool of money and a 3% adjustment in grade. It was noted that all salaries are adjusted as of July 1st. A motion was made and approved concerning the prior discussion.

Mr. Georgine asked Mr. Carabillo to address the Committee and he did so concerning the nature of certain incentive programs where an amount has been committed or the incentive formula has been established. In these cases we have not in the past provided for the death or disability of the individual. It was recommended that we establish that in the event of death of the employee, any amounts payable would go to their beneficiary. And in the event of a disability it would be intended that the Company honor its obligation and make future payments under that incentive program. And then Mr. Carabillo also asked the Committee to provide for normal retirement. He noted that the Company is well aware at the time of structuring an incentive those individuals within the group who may be subject to early retirement. It seemed unfair to penalize them by then denying them the benefit of a defined long-term incentive program that is established for a period of years. There was discussion by the Committee of whether this was equivalent to an annuity or other retirement benefit. It was indicated it was not. The idea here is merely to take certain fixed incentive programs which have a multiple year or multiple point payout and which are established as to amount before the person either suffers death, disability or enjoys normal retirement. After some discussion, the Motion was made and approved.

U 000327

The next item presented by Mr. Carabillo was discussion of a non-qualified deferred plan. The Committee was reminded that last year it had established a non-qualified deferred plan for the Senior Officers. And that program had some very special provisions as to the options the Senior Officers could elect as to how to defer money and what accounts would track for value. Management would now like to establish the same program for all elected officers but for the year 1999 allow only one investment option at a fixed rate to simplify management. This would be a low cost item consisting essentially of a payroll deduction. In the case of an incentive payment it would allow people to defer up to 100% of any incentive. Whereas in the case of salary we would allow them to defer up to 10% of salary. The idea there is because the amount has to be fixed in advance - a person could over commit and find themselves in difficulty on a cash flow basis. It was noted that this plan would be in effect until year end 1999 then on 1/1/2000 we would make a selection of funds available from First National Bank of Maryland, the current Trustee of the non-qualified plan so that people could invest in those mutual funds through this non-qualified plan and the major burden of the accounting would be on the Bank. There was some discussion of this and the Committee voted to approve it unanimously.

The next item for discussion at the Meeting was the idea of an offer of stock to Directors and Officers. It was agreed that the Chairman would be authorized to make an offer of stock of up to 4,000 shares per individual to the Officers and Directors of ULLICO Inc. That offer would be at book value and will be made some time during the course of the year 1999 at the Chairman's discretion.

Joseph A. Carabillo
Assistant Secretary

\[HOMEETINGS\MAY 13 99 COMP COMMITTEE
MINUTES-05/13/99

U 000328

Exhibit 16



**Robert A. Georgine**
Chairman, President and CEO

ULLICO Inc.
111 Massachusetts Ave., N.W.
Washington, DC 20001
202/682-0900

December 17, 1999

PERSONAL & CONFIDENTIAL

Bill J. Casstevens
11244 Greenbriar Chase
Oklahoma City, OK 73170

Dear Bill:

As we said in an offer of stock made last year, the subject of corporate governance has been frequently debated. The idea is that management and the Board of Directors should have their interests in line with the stockholders, and good common sense tells us that this is a good idea. If the stockholders, the true owners of the corporation, do well then the officers and directors should also do well. And the officers and directors in conducting their everyday business should have the interests of the stockholders foremost in their minds.

One aspect of that at ULLICO has been a continuing program to make our stock available to officers and directors. For many years we did this on a regular basis. Since the early 1990s and the offering of Preferred Certificates, this program has not been as active. Now that we have raised capital, converted those certificates into Class A stock and, as you know retired stock in 1997 so that we have a pool of stock available for resale, we are renewing that opportunity to each member of the Board.

The Compensation Committee has authorized us to make available 4,000 shares of stock to each member of the Board of Directors of ULLICO Inc. and each of the officers of ULLICO Inc. This is a very small group and intentionally so because we are a closely held company. The shares will be sold to you at their book value as set at the Annual Meeting of $53.94 per share. You may buy all 4,000 shares, or any portion thereof which suits your own finances and your interest in the Company.

Over the years I have purchased ULLICO stock whenever it was available, and I intend to purchase additional stock at this time. If you wish to do so, please see the form attached. You should send the form in the enclosed prepaid envelope to Joe Carabillo, Vice President and Chief Legal Officer, along with a check in the correct amount. For ease of reference, we have selected some purchase points so that you merely can check the box and the amount is shown. We have also added the word "Other" so that you can select any amount of stock which you desire up to the 4,000 shares.

I hope that this meets your investment needs and that you will be able to join me and participate in this opportunity. I look forward to seeing you in the very near future.

Very truly yours,

*Bob Georgine*

Enclosure

UL 18438

Exhibit 17

MEETING OF THE EXECUTIVE COMMITTEE
OF
ULLICO Inc.
Held May 10, 2000
At 111 Massachusetts Avenue, N.W.
Washington, D.C.
2:00 P.M.

ATTENDEES:
John J. Barry
Marvin Boede
Kenneth J. Brown
Bill J. Casstevens
John E. Cullerton
Robert A. Georgine
Frank Hanley

Joseph F. Maloney
Douglas J. McCarron
James F. M. McNulty
James J. Norton
Jacob F. West
William H. Wynn

ABSENT:
Arthur A. Coia
John F. Gentleman

John J. Joyce

OTHERS IN ATTENDANCE:
Joseph A. Carabillo
John K. Grelle

James W. Luce
Grover L. McKean

Chairman Georgine called the meeting to order and noted that Messrs. Coia, Gentleman, and Joyce were unable to attend.

As of December 31, 1999, the Company had a total of 315,472 shares of Capital Stock, 7,780,103 shares of Class A Stock, and 133,280 shares of Class B Stock issued and outstanding. Stock transactions, were shown at Tab A of the agenda, included the repurchase of 278,086 shares of Class A stock during our 1999 repurchase program.

The action items began with adoption of the Minutes of our Meeting of February 11, 2000, as shown at Tab B of the Agenda. The Chairman asked if there were any changes or modifications. Hearing none, it was

RESOLVED:    "That the Minutes of the Executive Committee Meeting of February 11, 2000, as distributed with the Agenda for this meeting, be and hereby are approved."

Motion was made, seconded, and approved.

Next, the Chairman discussed the stock repurchase for 2000. We have experienced an extraordinary gain because of Global Crossings. At year end Global Crossings was traded at $50 per share and we had total stockholders equity of $1.2 billion. More recently Global has been trading at approximately $33, which means that ULLICO Inc.'s total stockholders equity has declined by over 30%. Even so - Management is recommending an extraordinary distribution to stockholders. This resolution authorizes the Company to make a tender for 20% of its outstanding shares. If 100% of the shareholders tender, this would result in the repurchase of 1,645,623 shares and the Company would pay out to stockholders $240.32 million. To protect the Company this offer is going to be conditioned on certain criteria being met. First, Global Crossings must be trading at no less than $43

U 17284

per share—which is $10 more than it closed the previous day.  And the Company must have a reasonable opportunity, to realize its gain on the stock in order to fund this offer.  It is estimated that the Company will be selling $360 million worth of stock so that after tax we have sufficient funds for the repurchase.  The repurchase is further conditioned on two additional possibilities, either 93% of all shares outstanding must be tendered, or all shareholders holding 1% or more of our outstanding stock must tender.  Both of these conditions protect the Company from any significant change in stock ownership caused by a large shareholder that does not participate in the offer.  A 20% repurchase, absent these controls, could cause a very significant change in percentage ownership and this is something we want to avoid to remain consistent with Company by-laws.

The repurchase price we are recommending is $146.04.  Management recognizes that the Global share price is down and that we may repurchase at a premium.  The Company has a commitment to honor in the repurchase program.  It would not be appropriate for the Company to act inconsistently in 2000.  Management believes that Global Crossings will again return to its previous trading values as it did in 1999.  At mid-year 1999 Global Crossings was trading at $25 and eventually rebounded to $50 at year end.  There is no assurance of this but this is why a price category was established.

John Grelle and Joe Carabillo were available to answer any questions concerning this offer and how it would work.  Following a discussion, it was

RESOLVED:  "That in 2000, the Corporation on October 1st, or as soon thereafter as is practical and in conformance with law and regulation, will offer in an appropriate form of transaction to repurchase approximately 20% of the outstanding shares of ULLICO Inc. stock at an approximate cost of $250,000,000 from all holders of Capital Stock, Class A, and Class B Stocks with the repurchase to be effective on November 1st, or as soon thereafter as is practical, economically sound, and in conformity with law and regulation."  And, it was

FURTHER
RESOLVED:  "That said repurchase program will be in substantial conformity with the Term Sheet which is attached (See Tab D) and made part of this resolution and which will be included in its entirety with the minutes of this meeting, and will be subject to the Corporation receiving i) tenders from each and every stockholder which holds in excess of 1% of company stock; or ii) at minimum receiving tenders representing 93% of all classes of stock issued and outstanding; and iii) Global Crossings, Ltd. must be trading at no less than $43 per share and management is able to realize the gains."  And, it was

FURTHER
RESOLVED:  "That the repurchase program will be based on "Book Value".  The Book Value will be determined at the repurchase date based on the year-end audited financials of ULLICO Inc.  The calculation shall be

2

U 17285

accomplished by taking the "Total of Stockholders Equity" as shown on the financial statement and dividing it by the total number of shares outstanding of Class A, Class B, and Capital Stock." And, it was

FURTHER
RESOLVED:    "That for year-end 1999, said calculation establishes a per share value of $146.04 to be used in calendar year 2000 for repurchases." And, it was

FURTHER
RESOLVED:    "That the Corporation recognizes that the form of this repurchase may cause individuals subject to taxation to be subject to ordinary income tax on the gain. The Corporation will either offer to increase the repurchase from these taxable individuals to 40%, or such amount as is necessary to secure United States capital gains treatment, or if permitted by law, will provide an additional payment for the 20% of shares repurchased equal to the difference between the usual rate of United States capital gains treatment and the maximum rate for ordinary income tax." And, it was

FURTHER
RESOLVED:    "That the appropriate officers and employees of the Corporation shall be, and each of them hereby is authorized, directed and empowered to, on behalf of the Corporation, acknowledge, execute and deliver any and all such actions or documents, which may be necessary or desirable to effectuate the foregoing resolutions, and their acts and deeds in so doing shall be conclusively presumed to be the acts and deeds of the Corporation."

Motion was made, seconded, and approved.

The Chairman noted that this concluded the action items on the agenda and asked if there was any other business to come before this meeting? Hearing none, he called for an Executive Session.

Following the Executive Session the Meeting was adjourned and the Chairman was authorized to select the time and place of the next meeting.

_____
Joseph A. Carabillo
Assistant Secretary

3

U 17286

**ULLICO INC.**
**TERM SHEET**
**STOCK REPURCHASE PROGRAM**

Summary

ULLICO Inc. (the "Company") adopted a policy designed to allow its shareholders to realize value through the appreciation of common stock rather than exclusively through the receipt of dividends. Accordingly, in 1997 the Company repurchased $30,000,000 at $27.06 per share; in 1998 the Company repurchased $4,296,189.10 at $28.70 per share, and in 1999 the Company repurchased $15,000,000 at $53.94 per share of equity holdings. In subsequent years, the Company intends to repurchase up to a set dollar amount of stock at book value.

Description
of Stock

The offer in 2000 will be made for outstanding shares of Capital, Class A and Class B Stocks.

Amount

In 2000, the Company's goal is to offer to repurchase in the form of a tender approximately 20% of all shares outstanding at an estimated cost of $250,000,000, subject to having sufficient earnings and cash flow from operations and from a liquidity event on its holding in Global Crossings, Ltd, provided Global Crossings, Ltd. has a market value of no less than $43 per share and at minimum, if 93% of all stock is tendered; or, tenders are received from any stockholder holding 1% or more of ULLICO Inc. stock, all classes. Tenders by holders of 100 or fewer shares will be accepted in total.

Source of
Funds

Internally generated funds in 1997 and thereafter.

Price per
Share

Book value as of preceding December 31 audited GAAP statements.

Procedures

Issuer tender offer, open for a period of 20 days. Transmittal forms and certificates should be submitted to the Company, attention Chief Legal Officer.

Voting

If, as a result of the repurchases and issue of new certificates, any shareholder would own Class A stock having more than 9% of the aggregate voting power, shares equal to the excess votes will automatically be converted into Class B stock. (There is, and will remain in place, a shareholders agreement that permits voting rights to be adjusted at each meeting in order to stay within the 9% limit).

Capital
Stock

Although the 2000 offer would be made for Capital Stock, the Company intends in the future to offer the greater of book value or $25 per share to repurchase Capital Stock when exercising its right of first refusal upon the death of a shareholder. In the event a holder of Capital Stock gives notice of a desire to transfer such shares, the Company intends to offer to repurchase the shares at book value.

XX\CORPORATE SECRETARY\MEETINGS\MAY 16 00 EXEC
Net Repurchase Term Sheet 5/00

Chairman's Statement
Executive Committee Statement
May 10, 2000

Tomorrow you are going to hear that overall we posted a net income of 58.9 million dollars and had year-end stockholders equity of 1.2 billion dollars. But you are going to hear a lot more tomorrow similar to what we discussed in September at our Greenbrier meeting.

Last May at the 1999 Annual meeting I told you we were moving to correct decisions to enter certain markets, stop loss, group reinsurance, workers compensation, and especially small group. That we would take action in 1999 to stem the losses.

In September we reported to you 28.6 million dollars in losses in operations and the strategies we were going to pursue.   At year end, losses in those operations, including non-recurring charges, totaled 45.8 million dollars. This included 14 million dollars in reserve strengthening for two lines of business -- workers compensation and small employer group in Florida.  It also includes non-recurring restructuring costs for the property and casualty and group life and health operations.  You may remember that we closed our office in Chino and that incurred $5.3 million in costs.  And Y2K -- after tax we had an additional 5.7 million dollars in costs for that one project.

I intend to go into a great deal of depth during the Annual Stockholders Meeting concerning these losses.  Much as we did with the Board in September, we are going to follow this discussion through on each business line and the fact that we are exiting these businesses as quickly as law and regulation allows.

As we discussed in September, this is not going to be an easy presentation, but it is necessary.

I would hope I have your support as we go into the Board meeting tomorrow, and into the Stockholders meeting.

330 Corp Secy Meetings 2000 MAY 10 00 EXEC
Chairmans Statement 5/00

U 17288