Exhibit 18

# ULLICO Inc.

### OFFER TO PURCHASE
### DATED DECEMBER 14, 2000

Name  John K. Grelle

Number  FILE COPY

USDC 0026435

OFFER TO PURCHASE FOR CASH

BY

ULLICO Inc.

FOR UP TO

205,423 SHARES OF ITS COMMON STOCK

AT

$146.04 NET PER SHARE

THE OFFER, PRORATION PERIOD AND WITHDRAWAL RIGHTS WILL EXPIRE AT 5:00 P.M., EASTERN STANDARD TIME (EST), ON JANUARY 16, 2001, UNLESS THE OFFER IS EXTENDED.

ULLICO Inc., a Maryland corporation ("ULLICO" or the "Company"), is offering to purchase up to 205,423 shares of its Class A and Class B Common Stock, $1.00 par value per share (the "Shares"), for $146.04 per Share without interest (the "Purchase Price"), net to the seller in cash, upon the terms and subject to the conditions set forth in this Offer to Purchase and in the related Letter of Transmittal (which together constitute the "Offer"), including the proration provisions described herein. The Company reserves the right, in its sole discretion, to purchase more than the 205,423 Shares pursuant to the Offer.

THE OFFER IS SUBJECT TO THE SATISFACTION OF THE MINIMUM TENDER CONDITIONS SET FORTH IN SECTION 6. IN ADDITION, THE OFFER IS SUBJECT TO CERTAIN OTHER CONDITIONS SET FORTH IN SECTION 7.

NEITHER THE COMPANY NOR ITS BOARD OF DIRECTORS MAKES ANY RECOMMENDATION AS TO WHETHER ANY SHAREHOLDER SHOULD TENDER ANY OF OR ALL SUCH SHAREHOLDER'S SHARES PURSUANT TO THE OFFER. THE OFFER IS MADE AS AN ACCOMMODATION TO SHAREHOLDERS AS A MEANS OF REALIZING

USDC 0026436

VALUE FROM THEIR INVESTMENT IN THE SHARES. THE COMPANY AND ITS BOARD BELIEVE THE SHARES REPRESENT AN EXCELLENT INVESTMENT OPPORTUNITY FOR INVESTORS SEEKING LONG-TERM GROWTH OF CAPITAL. SHAREHOLDERS ARE URGED TO EVALUATE CAREFULLY ALL INFORMATION IN THE OFFER, CONSULT THEIR OWN INVESTMENT AND TAX ADVISORS AND MAKE THEIR OWN DECISIONS WHETHER TO TENDER SHARES AND, IF SO, HOW MANY SHARES TO TENDER.

## IMPORTANT

Any shareholder desiring to tender all or any portion of such Shareholder's Shares should complete and sign the Letter of Transmittal or a facsimile copy thereof in accordance with the instructions in the Letter of Transmittal, mail or deliver it and any other documents required by the Letter of Transmittal, including certificates for such Shares, to the Company, attention Assistant Secretary.

Any questions or requests for assistance or for additional copies of this Offer to Purchase or the Letter of Transmittal may be directed to the Assistant Secretary at the address and telephone number set forth on the back cover of this Offer to Purchase.

THE COMPANY HAS NOT AUTHORIZED ANY PERSON TO MAKE ANY RECOMMENDATION ON BEHALF OF THE COMPANY AS TO WHETHER SHAREHOLDERS SHOULD TENDER OR REFRAIN FROM TENDERING SHARES PURSUANT TO THE OFFER. THE COMPANY HAS NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION IN CONNECTION WITH THE OFFER ON BEHALF OF THE COMPANY OTHER THAN THOSE CONTAINED IN THIS OFFER TO PURCHASE OR IN THE LETTER OF TRANSMITTAL.

USDC 0026437

ANY SHAREHOLDER THAT IS AN EMPLOYEE BENEFIT PLAN THAT IS SUBJECT TO TITLE 1 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), AND THAT TENDERS AND SELLS SHARES TO THE COMPANY WILL BE DEEMED TO HAVE REPRESENTED BY SUCH TENDER AND SALE OF SHARES THAT EITHER (A) THE SALE OF SUCH SHARES BY THE PLAN TO THE COMPANY IS COVERED BY PROHIBITED TRANSACTION CLASS EXEMPTION 84-14 (RELATING TO TRANSACTIONS DETERMINED BY A "QUALIFIED PROFESSIONAL ASSET MANAGER") OR ANOTHER APPLICABLE PROHIBITED TRANSACTION EXEMPTION, OR (B) NEITHER THE COMPANY NOR ANY OF ITS AFFILIATES IS A "PARTY IN INTEREST" (WITHIN THE MEANING OF SECTION 3(14) OF ERISA) WITH RESPECT TO SUCH PLAN.   SEE "CERTAIN LEGAL MATTERS - ERISA CONSIDERATIONS."

USDC 0026438

# TABLE OF CONTENTS

PAGE

INTRODUCTION ................................................................................................ 1

THE OFFER ....................................................................................................... 2

1       Number of Shares; Proration; Extension of the Offer. ............................. 2

2       Tenders by Holders of Fewer than 10,000 Shares. ................................. 3

3       Procedure for Tendering Shares. ............................................................ 3

Proper Tender of Shares. ................................................................................. 3

Signature Guarantees and Methods of Delivery. .............................................. 4

Determinations of Validity; Rejections of Shares; Waiver of Defects;

No Obligation to Give Notice of Defects. ........................................................ 4

4.      Withdrawal Rights. ................................................................................. 5

5.      Acceptance for Payment of Shares and Payment of Shares and
        Purchase Price ....................................................................................... 6

6.      Minimum Tender Requirement ................................................................ 6

7.      Certain Conditions of the Offer .............................................................. 6

8.      Limitation on Ability to Participate in the Offer ...................................... 8

9.      Price Range of Shares; Dividends .......................................................... 9

10.     Background & Purpose of the Offer ....................................................... 9

11.     Certain Information Concerning the Company ........................................ 10

SUMMARY HISTORICAL FINANCIAL INFORMATION ................................. 12

MANAGEMENT'S DISCUSSION AND ANALYSIS
OF CONSOLIDATED FINANCIAL CONDITION
AND RESULTS OF OPERATIONS ................................................................. 1

PRO FORMA FINANCIAL INFORMATION ..................................................... 17

BUSINESS ....................................................................................................... 20

Group Life and Health ..................................................................................... 21

Individual Life and Health & Direct Marketing ................................................ 22

USDC 0026439

Property & Casualty Insurance ............................................................................... 23

Investment Services .............................................................................................. 24

GBL Holdings/Global Crossing ............................................................................ 25

Administrative Services ........................................................................................ 26

Reinsurance ........................................................................................................... 27

Recent Developments ........................................................................................... 27

Regulation ............................................................................................................. 27

State Insurance Regulation ................................................................................... 27

NAIC IRIS Ratios ................................................................................................. 29

NAIC Risk Based Capital Requirements ............................................................. 29

Regulation Under ERISA ..................................................................................... 29

Securities Laws ..................................................................................................... 30

Federal Legislation ............................................................................................... 30

Federal Regulation ................................................................................................ 30

Competition ........................................................................................................... 30

Environmental Considerations ............................................................................. 31

Legal Proceedings ................................................................................................ 32

Properties .............................................................................................................. 32

12.        Source and Amount of Funds. ............................................................... 32

13.        Certain Federal Income Tax Considerations. ....................................... 33

Consequences to Tax-Exempt Organizations. ...................................................... 33

Consequences to Tendering Shareholders of Exchange of Shares

for Cash Pursuant to the Offer. ............................................................................ 33

Consequences to Shareholders who do not Tender Pursuant to the Offer. .......... 34

Federal Income Tax Withholding ......................................................................... 34

14.        Transactions and Arrangements Concerning the Shares. ..................... 35

15.        Certain Legal Matters. .......................................................................... 35

Regulatory Approvals. .......................................................................................... 35

ERISA Considerations .......................................................................................... 35

16.        Extension of Tender Period; Termination; Amendments. .................... 36

17.        Miscellaneous. ...................................................................................... 37

USDC 0026440

To the Holders of Stock
of ULLICO Inc.

## INTRODUCTION

The Company hereby offers to purchase up to 205,423 Shares ($30,000,000) of its outstanding Class A and Class B Common Stock ("Shares") at a price of $146.04 per Share, net to the seller in cash, without interest thereon, and upon the terms and subject to the conditions set forth in this Offer. **This Offer is conditioned upon the tender of all Shares by each holder of Shares that owns in excess of 2% of the number of Shares outstanding (See Section 6) and is made only to holders who, at the time of their tender, are eligible to acquire Shares or Shares of Capital Stock under the Company's By-laws (See Section 8).**

As of September 30, 2000, there were 7,886,333 Shares outstanding. Accordingly, the 205,423 Shares, which the Company is offering to purchase in the Offer, represent approximately 2.6% of the Shares outstanding as of September 30, 2000.

The Company has not been advised that any of its directors and executive officers presently intend to tender any Shares personally owned by them pursuant to the Offer. However, such directors and executive officers are not prohibited from, and may elect to, participate in the Offer. As of September 30, 2000, the Company's directors and executive officers as a group (33 persons) beneficially owned an aggregate of 100,971 outstanding Shares (Class A Common Stock) representing approximately 1.3% of the outstanding Shares. If the Offer is fully subscribed by the Shareholders of the Company and the directors and executive officers of the Company do not participate in the Offer, the aggregate percentage share ownership interest of the Company's executive officers and directors as a group will remain at approximately 1.3% of the outstanding Shares following consummation of the Offer.

There is no public trading market for the Shares. The repurchase price for the Shares has been established by the Board of Directors of the Company as of May 11, 2000 and is based on the book value per share, as of December 31, 1999, determined in accordance with generally accepted accounting principles ("GAAP"). Book value per share is derived by taking the total of all Shares of Capital Stock and Shares outstanding at December 31, 1999, as shown in the Company's 1999 financial statements and dividing that number into Total Stockholders' Equity.

USDC 0026441

## THE OFFER

1.    **Number of Shares; Proration; Extension of the Offer.**

Upon the terms and subject to the conditions of the Offer, the Company will accept for payment (and will thereby purchase) up to 205,423 Shares or such lesser number of Shares as are properly tendered (and not withdrawn in accordance with Section 4) before the Expiration Date at the Purchase Price. The term "Expiration Date" means 5:00 P.M., eastern standard time ("EST") on January 16, 2001, unless and until the Company shall have extended the period of time during which the Offer is open, in which event the term "Expiration Date" shall refer to the latest time and date at which the Offer as so extended by the Company, shall expire. See Section 16 for a description of the Company's right to extend the time during which the Offer is open and to delay, terminate or amend the Offer. Also see Sections 6 and 7 for important conditions to the effectiveness of the Offer. If the Offer is oversubscribed, Shares tendered before the Expiration Date will be subject to proration. The proration period also expires on the Expiration Date.

All Shares purchased pursuant to the Offer will be purchased at the Purchase Price, net to the seller in cash. The Company reserves the right, in its sole discretion, to purchase more than 205,423 Shares pursuant to the Offer. If (a) the Company (i) increases or decreases the price to be paid for Shares, (ii) increases the number of Shares being sought and any such increase exceeds 2% of the outstanding Shares or (iii) decreases the number of Shares being sought, and (b) the Offer is scheduled to expire at any time earlier than the expiration of a period ending on the tenth business day from and including the date that notice of such increase or decrease is first published, sent or given in the manner specified in Section 16, the Offer will be extended until the expiration of such ten business day period. For purposes of the Offer, a "business day" means any day other than a Saturday, Sunday or federal holiday and consists of the time period from 12:01 a.m. through 12:00 midnight, EST.

Assuming satisfaction of the conditions to the Offer, the number of Shares properly tendered by Holders and not withdrawn before the Expiration Date is less than or equal to 205,423 Shares (or such greater number of Shares as the Company may elect to purchase pursuant to the Offer), the Company, upon the terms and subject to the conditions of the Offer, will purchase at the Purchase Price all Shares so tendered and not withdrawn. If before the Expiration Date, the number of Shares that have been properly tendered by Holders and not withdrawn exceeds 205,423 Shares, the Company will accept Shares from all Shares properly tendered by Holders on a pro rata basis, assuming the conditions to the Offer are satisfied. In the event that proration of tendered Shares is required, the Company will determine the final proration factor – i.e., the percentage of each shareholder's tendered Shares that will be purchased in the Offer - as promptly as practicable after

2

USDC 0026442

the Expiration Date. Because of the minimum tender requirement set forth in section 7, it is likely that proration will be required.

All Shares not purchased pursuant to the Offer, including Shares not purchased because of proration, will be returned to the tendering shareholders at the Company's expense as promptly as practicable following the Expiration Date.

If, as a result of the purchases pursuant to the Offer, any shareholder would own Class A Common Stock having more than 9.0% of the aggregate voting power, Shares equal to the excess votes will automatically be converted into non-voting Shares of Class B Common Stock.

**2.    Tenders by Holders of Fewer than 10,000 Shares.**

The Company, upon the terms and subject to the conditions of the Offer, will accept for purchase all Shares properly tendered and not withdrawn before the Expiration Date by any holder, that beneficially owns fewer than 10,000 Shares, provided that such holder tenders all Shares beneficially owned by the holder. These tenders will not be subject to the proration provisions as set forth in the first paragraph of Section 1 herein. This Offer is not available to owners of 10,000 or more Shares even if such owners have separate stock certificates for fewer than 10,000 Shares. Any holder of fewer than 10,000 Shares wishing to tender all Shares beneficially owned by such holder pursuant to the Offer and qualify for this preference must complete the box captioned "Holders of Fewer than 10,000 Shares" on the Letter of Transmittal.

**3.    Procedure for Tendering Shares.**

*Proper Tender of Shares.* For Shares to be properly tendered pursuant to the Offer, the certificates for such Shares, together with a properly completed and duly executed Letter of Transmittal (or a facsimile copy thereof) with any required signature guarantees, and any other documents required by the Letter of Transmittal, must be received before the Expiration Date by Joseph A. Carabillo, Vice President and Assistant Secretary of the Company, at the address set forth on the back cover of this Offer to Purchase.

It is a violation of Section 14(e) of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder (collectively, the "Exchange Act"), and Rule 14e-4 promulgated thereunder, for a person to tender Shares for such person's own account unless the person so tendering:

(a)    owns such Shares; or

USDC 0026443

3

(b)    owns an option, warrant or right to purchase such Shares and intends to acquire Shares for tender by exercise of such option, warrant or right.

Section 14(e) and Rule 14e-4 provide a similar restriction applicable to the tender or guarantee of a tender on behalf of another person.

A tender of Shares made pursuant to any method of delivery set forth herein will constitute a binding agreement between the tendering Shareholder and the Company upon the terms and subject to the conditions of the Offer, including the tendering Shareholder's representation that (i) such shareholder owns the Shares being tendered within the meaning of Rule 14e-4 and (ii) the tender of such Shares complies with Rule 14e-4.

*Signature Guarantees and Methods of Delivery.*  No signature guarantee is required on the Letter of Transmittal if the Letter of Transmittal is signed by the registered owner of the Shares tendered therewith and payment and delivery are to be made directly to such registered owner at such owner's address shown on the records of the Company.  If a certificate representing Shares is registered in the name of a person other than the signer of a Letter of Transmittal, then the certificate must be endorsed or accompanied by an appropriate stock power, a form of which is attached, signed exactly as the name of the registered holder appears on the certificate, with the signature on the stock power guaranteed by a bank, savings and loan association, or brokerage house ("Eligible Institution").  If issuance or delivery of the check for the Purchase Price or of any Shares not purchased is to be in the name of someone other than the registered holder, information in the Letter of Transmittal regarding Special Instructions for Delivery or for Payment of Purchase Price must be provided and signature of the Letter of Transmittal must be guaranteed by an Eligible Institution.

In all cases, payment for Shares tendered and accepted for payment pursuant to the Offer will be made only after timely receipt by the Assistant Secretary of certificates for such Shares, a properly completed and duly executed Letter of Transmittal (or manually signed facsimile thereof) and any other documents required by the Letter of Transmittal.

**THE METHOD OF DELIVERY OF ALL DOCUMENTS, INCLUDING STOCK CERTIFICATES, THE LETTER OF TRANSMITTAL AND ANY OTHER REQUIRED DOCUMENTS, IS AT THE ELECTION AND RISK OF THE TENDERING SHAREHOLDER. IF DELIVERY IS BY MAIL, REGISTERED MAIL WITH RETURN RECEIPT REQUESTED, PROPERLY INSURED, IS RECOMMENDED.**

*Determinations of Validity; Rejections of Shares; Waiver of Defects; No Obligation to Give Notice of Defects.*  All questions as to the number of Shares to be accepted and the validity, form, eligibility (including time of receipt) and acceptance for payment of any tender of Shares will be

USDC 0026444

determined by the Company, in its sole discretion, which determination shall be final and binding on all parties. The Company reserves the right to reject any or all tenders determined by it not to be in proper form or the acceptance for payment of which may, in the opinion of the Company's counsel, be unlawful. The Company also reserves the right to waive any of the conditions of the Offer (except as otherwise provided in Section 6) and any defect or irregularity in the tender of any particular Shares. No tender of Shares will be deemed properly made until all defects or irregularities have been cured or waived. The Company is not obligated to give notice of any defects or irregularities in tenders, and will not incur any liability for failure to give any such notice.

4.    **Withdrawal Rights.**

Except as otherwise provided in this Section 4, a tender of Shares pursuant to the Offer is irrevocable. Subject to this Section 4, Shares tendered pursuant to the Offer may be withdrawn at any time before the Expiration Date and, unless theretofore accepted for payment by the Company, after the Expiration Date.

For a withdrawal to be effective, Joseph A. Carabillo, Vice President and Assistant Secretary, must timely receive (at the address set forth on the back cover of this Offer to Purchase) a written or facsimile transmission notice of withdrawal. Any notice of withdrawal must specify the name of the person having tendered the Shares to be withdrawn and, if different from the name of the person who tendered the Shares, the name of the registered owner of such Shares. If the certificates have been delivered or otherwise identified to the Assistant Secretary, then, prior to the release of such certificates, the tendering Shareholder also must submit the serial numbers shown on the particular certificates evidencing such Shares and the signature on the notice of withdrawal must be guaranteed by an Eligible Institution.

Any questions as to the form and validity (including time of receipt) of notices of withdrawal will be determined by the Company, in its sole discretion, which determination shall be final and binding on all parties. The Company is not obligated to give any notice of any defects or irregularities in any notice of withdrawal, and will not incur any liability for failure to give any such notice. A withdrawal of a tender may not be rescinded and Shares properly withdrawn shall thereafter be deemed not to be validly tendered for purposes of the Offer. Withdrawn Shares, however, may be retendered before the Expiration Date by again following one of the procedures described in Section 3.

USDC 0026445

5.    **Acceptance for Payment of Shares and Payment of Purchase Price.**

Upon the terms and subject to the conditions of the Offer, as promptly as practicable after the Expiration Date, the Company will purchase and pay the Purchase Price for 205,423 Shares (subject to increase or decrease as provided in Sections 1 and 16) or such lesser number of Shares as are properly tendered and not withdrawn as permitted in Section 4. For purposes of the Offer, the Company will be deemed to have accepted for payment (and thereby purchased), subject to proration, Shares which are tendered and not withdrawn when, and if the Company gives oral or written notice to the Assistant Secretary of the Company's acceptance of such Shares for payment pursuant to the Offer.

Payment for Shares purchased pursuant to the Offer will be made by the Company directly to the tendering shareholders.  Under no circumstances will interest be paid on the Purchase Price of the Shares to be paid by the Company, regardless of any delay in making such payment.

6.    **Minimum Tender Requirement.**

Notwithstanding any other provision of the Offer, the Company shall not accept for payment or pay for any Shares tendered unless each holder of Shares that owns in excess of 2% of the number of Shares outstanding, tenders and does not withdraw all of the Shares beneficially owned by such holder, provided that the Company may waive this condition if such waiver will not result in a significant redistribution in the equity ownership of the Company.  As of November 30, 2000, the total number of Shares held by all holders who each hold in excess of 2% of the number of Shares outstanding was 5,378,334.

7.    **Certain Conditions of the Offer.**

Notwithstanding any other provision of the Offer, and in addition to the condition set forth in Section 6, and in addition to (and not in limitation of) the Company's right to extend, amend or terminate the Offer at any time in its sole discretion, the Company shall not be required to accept for payment or pay for any Shares tendered, and may terminate or amend the Offer if, before acceptance for payment of or payment for any such Shares, any of the following shall have occurred (or shall have been determined by the Company to have occurred):

    (a)    there shall have been threatened, instituted or pending any action or proceeding by any government or governmental, regulatory or administrative agency or authority or tribunal or any other person, domestic or foreign, before any court or governmental,

6

regulatory or administrative authority, agency or tribunal, domestic or foreign, which (i) challenges the making of the Offer or the acquisition of Shares pursuant to the Offer, or otherwise, directly or indirectly, relates in any manner to the Offer; or (ii) in the reasonable good faith judgment of the Company, could materially affect the business, condition (financial or otherwise), income, operation or prospects of the Company and its subsidiaries, taken as a whole, or otherwise materially impair in any way the contemplated future conduct of the business of the Company or any of its subsidiaries or materially impair the Offer's contemplated benefits to the Company;

(b)     there shall have been any action threatened, pending or taken, or approval withheld, or any statute, rule, regulation, judgment, order or injunction threatened, proposed, sought, promulgated, enacted, entered, amended, enforced or deemed to be applicable to the Offer or the Company or any of its subsidiaries, by any court or any government or governmental, regulatory or administrative authority, agency or tribunal, domestic or foreign, which, in the Company's reasonable good faith judgment, would or might directly or indirectly (i) make the acceptance for payment of, or payment for, some or all the Shares illegal or otherwise restrict or prohibit consummation of the Offer; (ii) delay or restrict the ability of the Company, or render the Company unable, to accept for payment, or pay for, some or all of the Shares; (iii) materially impair the contemplated benefits of the Offer to the Company; or (iv) materially affect the business, condition (financial or otherwise), income, operations or prospects of the Company and its subsidiaries, taken as a whole, or otherwise materially impair in any way the contemplated future conduct of the business of the Company or any of its subsidiaries;

(c)     there shall have occurred (i) any general suspension of trading in, or limitation on prices for, securities on any United States national securities exchange or in the over-the-counter market (excluding any coordinated trading halt triggered solely as a result of a specified decrease in a market index); (ii) the declaration of a banking moratorium or any suspension of payments in respect of banks in the United States; (iii) the commencement of a war, armed hostilities or other international or national crisis directly or indirectly involving the United States; (iv) any limitation (whether or not mandatory) by any governmental, regulatory or administrative agency or authority on, or any event which, in the reasonable good faith judgment of the Company, might affect, the extension of credit by banks or other lending institutions in the United States; (v) any change in the general political, market, economic or financial conditions in the United States or abroad that could, in the reasonable good faith judgment of the Company, have a material adverse effect on the business, condition (financial or otherwise), income, operations or prospects of the Company

7

and its subsidiaries, taken as a whole; or (vi) in the case of any of the foregoing existing at the time of the commencement of the Offer, in the reasonable good faith judgment of the Company, a material escalation, acceleration or worsening thereof; or

(d) after December 6, 2000 any change shall occur or be threatened in the business, condition (financial or otherwise), income, operations or prospects of the Company and its subsidiaries, taken as a whole, which, in the reasonable judgment of the Company, is or may be material to the Company or affects the anticipated benefits to the Company of acquiring Shares pursuant to the Offer;

which, in the reasonable judgment of the Company, in any such case and regardless of the circumstances (including any action or inaction by the Company) giving rise to such condition, makes it inadvisable to proceed with the Offer or with such acceptance for payment or payment.

The foregoing conditions are for the sole benefit of the Company and may be asserted by the Company regardless of the circumstances (including any action or inaction by the Company) giving rise to any such condition and such condition may be waived by the Company, in whole or in part, at any time and from time to time in its sole discretion. In certain cases, waiver of a condition to the Offer would require an extension of the Offer. See Section 16.

The Company's failure at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right; the waiver of any such right with respect to particular facts and circumstances shall not be deemed a waiver with respect to any other facts or circumstances; and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time. Any determination by the Company concerning the events described above and any related judgement by the Company regarding the inadvisability of proceeding with the acceptance for payment or payment for any tendered Shares will be final and binding on all parties.

## 8.    Limitation on Ability to Participate in Offer.

Notwithstanding any other provision of the Offer, the Company shall not be required to accept for payment Shares held by any holder that is not at such time eligible to acquire Shares or Shares of Capital Stock under the terms of the Company's By-laws, provided that the foregoing shall not apply to:

(a) any holder of Shares who was an officer or employee of the Company who accepted early or normal retirement or became disabled, in each case as defined by an employee benefit plan maintained by the Company;

USDC 0026448

8



(b) any holder who has served as a Director of the Company for period of three years or more;

(c) the fiduciary of the estate of any natural person which estate has acquired Shares upon the death or adjudicated incompetency of any person specified in paragraph (a) or (b) of this Section 7, or any other person succeeding by operation of law by joint tenancy upon the death of any such persons; or

(d) the fiduciary of the estate of any holder who, at the time of his or her death or adjudicated incompetency, was eligible to purchase Shares or Capital Stock of the Company; or any other person succeeding by operation of law or by joint tenancy upon the death of any such person.

9.    **Price Range of Shares; Dividends.**

There is no public trading market for the Company's Shares. Pursuant to the Company's By-laws, shareholders cannot sell or transfer their Shares without first offering such Shares to the Company for purchase at $25 per Share.

The Company paid cash dividends of $.57 per share in 1998, $.54 per share in 1997, and $2.00 per share in 1996. No dividends were paid in 1999 nor have any been paid as of December 6, 2000. The Board may, in its sole discretion, establish or modify its dividend policy from time to time. There can be no assurance as to when or whether the Board will declare additional dividends on Shares.

10.    **Background and Purpose of the Offer.**

The purpose of the Offer is to allow shareholders an opportunity to receive cash for a portion of, or in certain situations, all of their Shares subject to proration. Accordingly, the Company has adopted a policy, which will enable its shareholders to realize value, through the appreciation in value of Shares rather than exclusively through the receipt of dividends. The Company recognizes that there is no public trading market for its Shares and the Offer will provide shareholders with added liquidity.

Pursuant to its policy, the Company repurchased $30 million of Shares in 1997, $4.3 million of Shares in 1998, and $15 million of Shares in 1999. The Company has set a goal of offering to repurchase $30 million of Shares in 2000, and $15 million of Shares annually thereafter, up to an aggregate repurchase amount of $180 million (including the amounts repurchased pursuant to this Offer and in 1997, 1998, and 1999). However, any possible future repurchases of Shares would

USDC 0026449

depend on many factors, including, among others, the availability of sufficient operating cash flow to fund such purchases, the results of the Offer, the Company's business and financial position (including its liquidity and alternative uses for the Company's resources) and general economic conditions. Future purchases, if any, may be on the same terms or on terms, which are more or less favorable to Shareholders than the terms of the Offer.

The Offer is not applicable for outstanding Shares of Capital Stock. However, the Company has from time to time repurchased Capital Stock when exercising its right of first refusal upon the death of a shareholder. In the event a holder of Capital Stock gives notice of a desire to transfer such Shares, the Company currently intends to offer to repurchase the Shares at a repurchase price set by the Board of Directors, not to exceed $146.04 per share, so long as the financial condition of the Company will not be impaired by such repurchase. However, the Company reserves the right to change its policy with respect to such repurchases at any time.

**THE BOARD OF DIRECTORS HAS APPROVED THE MAKING OF THE OFFER. HOWEVER, NEITHER THE COMPANY NOR THE BOARD MAKES ANY RECOMMENDATION TO ANY SHAREHOLDER AS TO WHETHER TO TENDER ANY OR ALL SHARES. SHAREHOLDERS MUST MAKE THEIR OWN DECISIONS AS TO WHETHER TO TENDER SHARES AND, IF SO, HOW MANY SHARES TO TENDER. SHAREHOLDERS ARE URGED TO READ CAREFULLY THE OFFER IN ITS ENTIRETY.**

11.    Certain Information Concerning the Company.

The Company is a holding company incorporated in Maryland on October 9, 1987 to own 100% of the common stock of The Union Labor Life Insurance Company ("Union Labor Life"). The Company was formed in part to facilitate the raising of capital for the Company and its subsidiaries and to afford greater opportunities to acquire other companies, to diversify into other lines of business and to organize subsidiaries along strategic business lines. The stock of ULLICO is not publicly traded, but rather is held by unions, organizations and individuals presently or formerly affiliated with the labor movement, and present directors and officers of Union Labor Life or the Company. In accordance with the Bylaws of the Company, Shares of its stock may not be sold or transferred unless the Company first has the opportunity to purchase the Shares at a price of $25 per share. The Company's principal office is located at 111 Massachusetts Avenue, N.W., Washington, D.C. 20001.

Union Labor Life, the major operating insurance subsidiary of the Company, was created in 1925 by the American Federation of Labor to provide group insurance for union workers who were unable to obtain it at the time. The Company continues to serve the needs of unions, the union workers of America, and their employers for life, accident and health insurance, annuities, and

10

pension products, and, through subsidiaries, property and casualty insurance, individual life insurance and administrative services.

The Company and its subsidiaries are not subject to the periodic reporting requirements of the Exchange Act and therefore do not file reports or other information with the Securities and Exchange Commission. Attached is the Company's Annual Report for 1999 (the "1999 Annual Report") the provisions of which are incorporated herein.

USDC 0026451

## SUMMARY OF HISTORICAL FINANCIAL INFORMATION

The Company's consolidated financial statements for the years 1999 and 1998 (see 1999 Annual Report) are prepared on the basis of GAAP. The preparation of financial statements in conformity with GAAP requires management to make various estimates that affect the reported amounts of assets and liabilities and the disclosures of contingent assets and liabilities as of the date of the consolidated financial statements and the reported amounts of revenues and expenses for the reporting period. Actual results could differ significantly from those estimates.

The following tables set forth certain summary historical consolidated financial information of the Company and its subsidiaries. The historical financial information for the years ended December 31, 1999 and December 31, 1998 has been summarized from the Company's audited consolidated financial statements included in the Company's 1999 Annual Report. The historical information for the six months ended June 30, 2000 and June 30, 1999 has been summarized from the Company's unaudited consolidated financial statements. In the opinion of management, all adjustments necessary for a fair presentation of the Company's financial position as of June 30, 2000 and the results of operations for such six-month period have been included. The results of operations for the six months ended June 30, 2000 are not necessarily indicative of the results which may be expected for the full year 2000 or any other interim period.

The following summary of historical financial information is qualified in its entirety by, and should be read in conjunction with, the audited financial statements contained in the 1999 Annual Report.

USDC 0026452

## Consolidated Balance Sheets
### (in thousands)

| | June 30, 2000 (Unaudited) | December 31, 1999 | December 31, 1998 |
|---|---|---|---|
| Investments | $ 1,654,735 | $ 2,376,568 | $ 1,221,586 |
| Other assets | 561,147 | 576,065 | 420,206 |
| Separate account assets | 2,230,260 | 2,072,842 | 2,035,174 |
| Total Assets | $ 4,446,142 | $ 5,025,475 | $ 3,676,966 |
| | | | |
| Policy liabilities | $ 718,889 | $ 734,121 | $ 710,181 |
| Long-term debt | 25,900 | 36,001 | 56,363 |
| Other liabilities | 644,351 | 980,761 | 420,167 |
| Separate account liabilities | 2,230,260 | 2,072,842 | 2,035,174 |
| Total Liabilities | $ 3,619,400 | $ 3,823,725 | $ 3,221,885 |
| | | | |
| Stockholders' Equity | $ 876,742 | $ 1,201,750 | $ 455,081 |
| | | | |
| Total Liabilities and Stockholders' Equity | $ 4,446,142 | $ 5,025,475 | $ 3,676,966 |

USDC 0026453

## Consolidated Income Statements
### (in thousands)

| | For the Six Months Ended June 30, (Unaudited) | | For the Year Ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2000 | 1999 | 1999 | 1998 |
| **Income:** | | | | |
| Premium Income | $ 189.662 | $ 176,980 | $ 353,785 | $ 324,851 |
| Fee Based Income | 87,473 | 65,235 | 146,271 | 122,587 |
| Investment Income, Net of Expenses | 24,089 | 20,381 | 48,201 | 53,262 |
| Realized Gains on Investments | 86,001 | 184,007 | 199,537 | 7,594 |
| Net Gain on Mortgages Held for Sale | 1,540 | 2,638 | 4,459 | 8,046 |
| Other Income | 4,550 | 1,809 | 6,114 | 7,857 |
| Total Income | $ 393,315 | $ 451,050 | $ 758,367 | $524,197 |
| | | | | |
| **Benefits and Expenses:** | | | | |
| Benefits and Claims | $ 172,479 | $180,552 | $ 358,211 | $303,219 |
| Expenses | 153,860 | 128,230 | 286,878 | 207,793 |
| Total Benefits and Expenses | $ 326,339 | $ 308,782 | $ 645,089 | $ 511,012 |
| | | | | |
| Net Income before Federal and State Income Taxes and Minority Interest | $ 66.976 | $ 142,268 | $ 113,278 | $ 13,185 |
| State Income Tax | (802) | (18,485) | (19,339) | (532) |
| Federal Income Tax (Expense) | (23,961) | (43,544) | (34,923) | (4,045) |
| Minority Interest | 65 | (3) | (116) | (326) |
| Net Income | $ 42,278 | $ 80,236 | $ 58,900 | $ 8,282 |

USDC 0026454

## MANAGEMENT'S DISCUSSION AND ANALYSIS
## OF CONSOLIDATED FINANCIAL CONDITION
### AND RESULTS OF OPERATIONS

The discussion that follows provides an overview of operating results for the six month period ending June 30, 2000 with comparisons to the same period for 1999. This brief report is supplemented by Management's Discussion and Analysis and the more comprehensive consolidated financial statements and related footnotes beginning on page 24 of the 1999 Annual Report. The reader of this discussion and analysis also should take into account the information contained in those statements when considering ULLICO's financial position. All financial data are presented in accordance with GAAP.

Consolidated net income for the six months ending June 30, 2000 was $42.3 million, (consisting of $67.0 million pre-tax income, offset by $24.8 million in tax) as compared to net income of $80.2 million for the same period in 1999. Results for 2000 were aided by a $53.0 million after-tax gain on the sale of a portion of the Company's holding of Global Crossing Ltd. ("Global Crossing") stock in April 2000. Results for 1999 included a $108.4 million after-tax gain on the sale of Global Crossing stock in June 1999. Excluding the Global Crossing gains, ULLICO experienced a $10.8 million loss for the first six months of 2000 as compared to a $28.2 million loss for the same period in 1999. The improved results indicate that the management initiatives taken to stem the flow of losses have started to take effect.

Discontinued operations, however, continued to depress earnings in 2000. Small employer group health insurance and group health reinsurance generated a $4.2 million loss in the first six months due to higher than projected loss incidence and severity. Higher loss severity and reserve strengthening in the discontinued surety and workers' compensation lines of business also generated a $4.7 million loss in the first six months of 2000, including one large surety claim in the first quarter of $1.6 million.

Focusing on continuing operations, group life and health generated a $1.5 million profit in the second quarter, showing a positive trend from the first to second quarter of 2000 and an improvement over the same period in 1999. Seasonality of health benefits typically causes losses in the first quarter. Direct written premium increased $17.3 million in the first six months of 2000 to reach $131.3 million, a 15% improvement over 1999. Management continues to assess health claim trends, product pricing, dividend parameters, and expense levels to improve profitability. Premium

USDC 0026455

increases have also been instituted where appropriate, improving the outlook for the remainder of the year.

The results for the Directly Marketed insurance and Individual Life and Health products for the second quarter showed an improvement over the first quarter and are ahead of 1999. Management continues to review operations and is looking toward a strategic change in the marketing and administration of these businesses to enhance profitability.

Operating profits of Zenith Administrators, Inc. ("Zenith Administrators") have continued as its business grows. Zenith Administrator's fee based income grew $5.4 million in the first six months of 2000 to surpass $36.0 million, an 18% growth over 1999. Management continues to scrutinize operations to contain costs.

Results for the continuing property and casualty insurance lines were $2.0 million pre-tax net income for the first six months of 2000. Overall loss ratios for the continuing lines have improved, indicating stronger underwriting results. Sales, general and administrative expenses for the continuing lines were lower than the same period in 1999 as a result of the restructuring. Although, for the first six months of 2000, recently acquired Tri-City Brokerage generated a loss for the first six months, operations improved in the second quarter. Results are expected to improve in the third and fourth quarters as a result of the new initiative with USI brokerage.

Trust Fund Advisors Inc.'s ("TFA") investment advisory services results continue to be strong, generating $4.0 million pre-tax income in the first six months of 2000, which is $1.0 million ahead of 1999. Fee-based income was favorably impacted by market conditions, which grew $1.9 million over 1999 levels to reach $13.0 million, a 17% increase. Union Labor Life's investment and annuity products also showed continued strong results, generating $5.4 million pre-tax net income in the first six months. Results are $5.1 million ahead of prior year.

Financial Freedom Senior Funding Corporation ("Financial Freedom") and AMI Capital, Inc. ("AMIC") suffered pre-tax losses in the first six months. Results improved in the second quarter, but both entities continue to struggle with meeting production goals and have rising expenses. Financial Freedom was sold in October 2000 to Financial Freedom Holdings, Inc., an affiliate of Lehman Brothers Holdings, Inc. Management is investigating its options to divest ownership of AMIC.

Overall realized gains on investments, excluding Global Crossing, were $5.9 million, including $4.5 million gain on the sale of limited partnerships and $1.4 million gain on mortgages underwritten by AMIC.

USDC 0026456

16

Total assets declined $579.3 million between December 31, 1999 and June 30, 2000 primarily as a result of a $478.8 million decline in the market value of the stock of Global Crossing held by the Company. Separate account assets grew $157.4 million, showing continued growth in the asset management business and favorable market conditions.

Total stockholders' equity declined $375.0 million during the first six months of 2000, primarily as a result of the decline in the market value of the Global Crossing stock holding. Future volatility in the carrying value of the Global Crossing stock will continue to impact stockholders' equity. Retained earnings increased $43.1 million during the first six months of 2000, primarily as a result of the $42.3 million after-tax net income.

## PRO FORMA FINANCIAL INFORMATION

The following tables set forth summary unaudited consolidated pro forma financial information of the Company and its subsidiaries giving effect to the purchase of 205,423 Shares at $146.04 per Share. The Capitalization Table sets forth, as of June 30, 2000 and December 31, 1999, (i) the actual capitalization of the Company and (ii) the pro forma capitalization after giving effect to the Offer. The consolidated pro forma balance sheet information as of June 30, 2000 and December 31, 1999 assumes that the repurchase of Shares by the Company pursuant to the Offer had occurred as of those respective dates. The repurchase of Shares is assumed to be funded by operating cash flows. The nonrecurring costs related to the Offer are anticipated to be approximately $50,000 and would be reflected as an addition to operating expenses. See "Notes to Pro Forma Financial Information and Capitalization" that follows the Tables.

The estimated financial effects of the repurchase of Shares by the Company pursuant to the Offer presented in the pro forma financial information are not necessarily indicative of either the Company's financial position or the results of its operations which would have been obtained had the transactions described above actually occurred on the dates described above, nor are they necessarily indicative of the results of future operations.

The following pro forma financial information is qualified in its entirety, and should be read in conjunction with the audited financial statements contained in the 1999 Annual Report.

USDC 0026457

## ULLICO Inc.
### Pro Forma Balance Sheet Information
#### (in thousands)

| | June 30, 2000 (Unaudited) | | | December 31, 1999 | | |
|---|---|---|---|---|---|---|
| | Historical | Pro Forma Adjustments | Pro Forma | Historical | Pro Forma Adjustments | Pro Forma |
| Total Assets | $ 4,446,142 | (30,000) | 4,416,142 | $ 5,025,475 | (30,000) | 4,995,475 |
| Long-Term Debt | 25,900 | | 25,900 | 36,001 | | 36,001 |
| Total Liabilities | 3,619,400 | | 3,619,400 | 3,823,725 | | 3,823,725 |
| Stockholders' Equity | 826,742 | (30,000) | 796,742 | 1,201,750 | (30,000) | 1,171,750 |
| Total Liabilities & Stockholders' Equity | $ 4,446,142 | (30,000) | 4,416,142 | $ 5,025,475 | (30,000) | 4,995,475 |

USDC 0026458

# ULLICO Inc.
## Pro Forma Capitalization Table
### (in thousands except share information)

| | June 30, 2000 (Unaudited) | | | December 31, 1999 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Historical | Pro Forma Adjustments | Pro Forma | Historical | Pro Forma Adjustments | Pro Forma |
| Long-Term Debt | $ 25,900 | | $ 25,900 | $ 36,001 | | $ 36,001 |
| Stockholders' Equity: | | | | | | |
| Capital stock ($25 par value; 2,000,000 Shares authorized; issued and outstanding 313,497 at 6/30/00 and 315,472 at 12/31/99) | 7,837 | | 7,837 | 7,887 | | 7,887 |
| Class A common stock, voting ($1 par value; 12,000,000 Shares authorized; issued and outstanding 7,773,103 historical and 7,571,788 pro forma at 6/30/00 and 7,780,103 historical and 7,578,788 pro forma at 12/31/99) | 7,773 | (201) | 7,572 | 7,780 | (201) | 7,579 |
| Class B common stock nonvoting ($1 par value;12,000,000 Shares authorized; issued and outstanding 133,280 historical and 129,172 pro forma at 6/30/00 and 12/31/99) | 133 | (4) | 129 | 133 | (4) | 129 |
| Capital surplus | 183,517 | (5,690) | 177,827 | 181,979 | (5,690) | 176,289 |
| Unrealized gains (losses) on investments, net of deferred tax | 505,618 | | 505,618 | 925,209 | | 925,209 |
| Retained Earnings | 121,864 | (24,105) | 97,759 | 78,762 | (24,105) | 54,657 |
| Total Stockholders' Equity | 826,742 | (30,000) | 796,742 | 1,201,750 | (30,000) | 1,171,750 |
| Total Capitalization | $ 832,642 | (30,000) | $ 822,642 | $ 1,237,751 | (30,000) | $ 1,207,751 |

19

USDC 0026459

## Notes to Pro Forma Financial Information and Capitalization Table

The consolidated pro forma balance sheet and capitalization table as of June 30, 2000 and December 31, 1999 assumes that the repurchase of Shares by the Company pursuant to the Offer had occurred as of June 30, 2000 and December 31, 1999, respectively. The adjustments presented in the pro forma financial information reflect the following assumptions:

a)  The consolidated pro forma balance sheet information and capitalization table assume that:

   (i)   205,423 Shares of Class A and Class B Common Stock are tendered in proportion to the Class A and Class B Shares issued and outstanding at December 31, 1999 for $146.04 per Share and the Company funds the repurchase through operating cash flows;

   (ii)  The Shares repurchased pursuant to the offer are retired; and

b)  Operating cash flows are assumed to fund the repurchase of the Shares. Approximately $50,000 in costs related to the Offering are anticipated to be incurred. These costs would be reflected as an addition to operating expenses. No other items are expected to impact consolidated income.

## BUSINESS

The Company provides a wide range of financial services, including life and health insurance, property and casualty insurance (including fiduciary, commercial and director and officer liability insurance), investment advisory services, mortgage banking and servicing, and administrative services. In this summary description of the Company's business unless the context otherwise requires, the term "Company" refers to the consolidated group of ULLICO and its subsidiaries.

The Life and Health Insurance lines of business are provided primarily by Union Labor Life and its subsidiaries Union Standard of America Life Insurance Company ("USA Life") and our newest operation ULLICO Life Insurance Company ("ULLICO Life"). A health insurance line is also provided by Ulico Casualty Company ("Ulico Casualty"), and a preferred provider organization ("PPO") is provided by ULLICARE Limited Partnership ("ULLICARE, Ltd") in which Union Labor Life is the limited partner. The property and casualty lines of business are provided by Ulico

USDC 0026460

Casualty and its subsidiaries Ulico Indemnity Company ("Ulico Indemnity") and Ulico Standard of America Casualty Company ("USA Casualty"). The Investment Services group operates through a variety of the Company's subsidiaries. Union Labor Life markets annuities and pension services to jointly managed trust funds; these funds purchase group annuities through Union Labor Life and direct that their monies be placed in separate accounts operated by Union Labor Life. TFA is an investment advisor that specializes in single client portfolio management. TFA offers a wide range of commercial and residential mortgage programs through MRCo, Inc. ("MRCo") and its subsidiaries. Administrative services are provided by Zenith Administrators and Union Labor Life.

*Group Life and Health*

Union Labor Life provides a range of group life and health insurance products and managed care programs primarily to jointly managed employee benefit plans.

Complete group life and health benefit packages are available including hospitalization, medical, prescription drug, dental, vision, accidental death and dismemberment and disability coverages. These coverages are provided with a range of managed care offerings from utilization management, PPOs, managed pharmacy and provider programs. Fully insured, minimum premium, and flexible premium products are available for the group life and health benefit packages. In addition, Union Labor Life provides administrative-services-only arrangements.

During the year, the Company redefined its group life and health product lines under the UlliCare name. The Company is introducing the UlliCare name as its brand of products and services, along with a new slogan - "Insurance and Care Management in a New Light." The Company's managed-care products currently offered under the UlliCare brand include UlliCare Care Management, UlliCarePlus, UlliCarePPO and UlliCareRX.

The newest product introduced under the UlliCare banner is UlliCare Rx, a prescription drug benefit management program. Prescription drugs represent today's fastest growing health-benefit cost. Evolutionary new pharmaceutical products are appearing that not only cure but also can prevent serious illnesses; but they are also very expensive. The Company's approach is to work with the funds to manage the utilization of these and other medicines to interdict the course of diseases before there is a need for costly medical care. With its insurance and care management programs, Union Labor Life continues to respond to the jointly managed trust fund market's desire for cost-effective, member-sensitive health benefit programs.

During the year, group life and health revenues rose 15 percent in 1999 to $304.6 million, with all major large-group lines of business reporting increases. For 1999 compared to 1998, large-

USDC 0026461

group sales totaled $32.3 million in premium and fees. As a leading provider of benefit services to jointly managed trust funds, Union Labor Life added 99 new large-group clients in 1999.

The positive growth and profitable results from most of the large-group lines were offset by losses from the non-core areas of small-group health and reinsurance-assumed business. Also, claims costs related to our health conversion business exceeded prior-year levels. Continuing losses experienced in the small-group health insurance business sold through Ulico Casualty resulted in actions to exit the Michigan and Florida small-group markets as quickly as state laws permit. Such exit will be completed by end of 2001. Currently the majority of its reinsurance treaties are in run-off mode with run-off expected to be completed at the end of 2001. In addition, the Major Medical and Medicare health conversion business was restructured to reduce future drains from those lines.

Total life insurance in force increased by 10% in 1999 to $15.2 billion. The Company's competitive rates, comprehensive plan designs and responsive administrative arrangements helped the Company gain 52 new group life insurance clients representing $5.4 million in additional group life insurance premiums.

## Individual Life and Health & Direct Marketing

The Company's Individual and Direct Marketing operations are provided by Union Labor Life and ULLICO Life, while UNIONCARE, Inc. ("UNIONCARE") markets these products as well as products of other companies. These operations offer union members a range of supplemental insurance coverages, including accidental death and dismemberment insurance, senior health insurance for retirees, supplemental hospital indemnity insurance providing out-of-pocket cost protection, supplemental term life insurance, nursing home and home health care benefits and long term care insurance. These consumer-oriented insurance products reach fourteen million active and seven million retired union members and their families. UNIONCARE markets these products to members in two distinct ways: Individual Life and Health distributes through a national network of independent agents; and Direct Response Marketing offers products through the mail and telemarketing.

Total new sales for the Individual Life and Health and the Direct Marketing businesses in 1999 amounted to $20.4 million in annualized premiums, including $7.8 million in life insurance sales and $12.6 million in sales of health insurance. Direct Response marketing also began work on several additional products during the year, including a new accidental death program and juvenile life coverage. Four (4) new union clients with a total membership of about 1.8 million members joined UNIONCARE direct response marketing programs in 1999. In 1999, the operation introduced long term care and final expense life insurance products. UNIONCARE also continued to offer a prescription drug discount plan.

USDC 0026462

22

Union Labor Life exited from the Individual Medicare Supplement line of business in late 1999 and is currently exiting the Direct Marketing Medicare Supplement line of business.

In October 1999, Union Labor Life purchased Bradford National Life Insurance Company ("Bradford National"), a Texas insurance company, from Laurel Life Insurance Company. The acquisition secured a company licensed to do business in 46 jurisdictions, excluding New York, at a net cost of approximately $2.53 million. Bradford National was renamed ULLICO Life Insurance Company and will develop, solicit and issue individual universal and whole life insurance products and annuity contracts.

## *Property & Casualty Insurance*

The Casualty companies within the Company offer fiduciary liability, workers' compensation, commercial lines (including general liability, property, and commercial auto), and union directors and officers liability insurance. Ulico Casualty also underwrites accident and health coverages in conjunction with Union Labor Life.

Ulico Casualty is licensed to write at least one line of business in 48 jurisdictions and all lines in 31 states. Ulico Indemnity does business as an excess and surplus lines carrier in 43 jurisdictions. USA Casualty is licensed only in California and is not currently writing business on a primary basis.

Ulico Casualty is a leader in fiduciary coverage for jointly managed employee benefit trust funds. These funds are established pursuant to the Taft-Hartley Act in order to provide retirement and other benefits for union workers. Trustees are appointed by both management and labor. Coverage is offered for up to a $25 million limit liability.

During 1999, management initiated a restructuring plan, which included the consolidation of branch offices and relocation of accounting and information systems functions from Chino, California to Washington, DC. Furthermore, the workers' compensation line of business has been restricted entirely to collectively bargained programs and the surety line of business has been discontinued. The run off of the existing business from these lines was outsourced to reduce expenses to a level commensurate with business activity. Effective January 1, 2000, the underwriting and administrative functions of the union liability line of business, that were previously outsourced, were brought in-house.

Net earned premiums for property and casualty lines in 1999 were $48.1 million, compared with $47.1 million in 1998, a 2% increase. In 1999, the Company continued to make progress to restore stability to the Company's fiduciary and other liability portfolio retaining 95% of policies

USDC 0026463

eligible for renewal. Direct written premiums for the fiduciary line were up $5.4 million in 1999 compared to the prior year. The Company continues to offer commercial packages for local unions and union liability coverage. Direct written premiums for these two products combined were $35.5 million in 1999 compared to $30.0 million in 1998. As a result of the restructuring of the surety lines and workers compensation lines, these direct written premiums were down a combined $2 million during 1999 compared with the prior year.

The Company is currently focusing on four core product lines of business - fiduciary liability, union liability, commercial lines, and collectively bargained workers' compensation.

The Company formed a wholly owned subsidiary, Ulico Insurance Group, Inc., ("UIG") during October 1999. UIG purchased a wholesale property and casualty operation, Tri-City Brokerage, in the fourth quarter of 1999. UIG, through the Tri-Cities entities, will continue the wholesale brokerage operation, as well as provide marketing support for Ulico Casualty projects.

### Investment Services

The Company's investment operation provides a wide range of investment products and services to jointly managed trust funds. Third party investment products and services are offered through Union Labor Life and TFA, a registered investment adviser with the SEC, on a commingled and individually managed basis, respectively. Union Labor Life operates nine separate accounts, and, with other investment products, has $2.5 billion in assets under management. TFA is advisor to five of these separate accounts and also manages an additional $4.9 billion of trust assets. The Company offers other investment products through MRCo, which was formed in 1993 to provide mortgage and real estate products. The Company also makes private capital investments through MRCo.

TFA offers an array of investment products and services through a number of subadvisory relationships. TFA provides a variety of both fixed income and equity products that encompass a broad spectrum of investment needs for the jointly-trusted marketplace. TFA's fixed income products include Broad Market and Intermediate Fixed Income; equity products include Growth, Small Cap, International, and Value. TFA secured new assets totaling $376 million in 1999 and added 16 new clients. Fee income increased to $23.2 million in 1999.

Union Labor Life continues to enjoy success with investments in a number of specialized separate investment accounts which are commingled accounts in which investors purchase units that entitle them to share in the performance of the account. For example, Separate Account J (or "J for Jobs") makes available both construction and long-term permanent fixed rate financing for commercial property built using union labor. Twenty-four mortgage loan commitments issued in 1999 totaled $750 million, surpassing 1998's results of $735 million. It is estimated that these

USDC 0026464

commitments will generate about 11,000 union construction jobs representing about 22 million hours of work. Investor confidence in the J account continued to increase. The co-investment program with the New York State Common Retirement Fund (the "Fund") increased to $1 billion in 1999 from $400 million. Under the agreement, Union Labor Life and the Fund have each committed to invest $500 million in the state of New York for union built projects. On a combined basis, at year-end, over $400 million was committed and/or funded for projects in the state.

A new real estate equity separate account, Separate Account U, was formed in 1999. This Separate Account will develop, purchase, and own a portfolio of commercial and multi-family properties. Like J for Jobs, Separate Account U will specify that union contractors employing union members do all work on the properties.

The asset management business exceeded last year's record gain. Assets under management increased more than $1.4 billion in 1999 to more than $7.4 billion at 1999 year end.

MRCo offers a variety of residential mortgage products and services through its subsidiaries. AMIC is a leading multifamily loan originator under the Federal National Mortgage Association's Delegated Underwriting and Servicing Program. In 1999, AMIC, which is expanding its loan portfolio to include office, industrial and retail properties, closed loans totaling $231 million.

On October 31, 2000, MRCo sold all of its issued and outstanding stock of its subsidiary Financial Freedom to Financial Freedom Holdings, Inc., an affiliate of Lehman Brothers Holdings, Inc. Prior to the sale, Financial Freedom sold certain loans held for sale and all non-agency reverse mortgage loans on its books to MRCo.

*GBL Holdings/Global Crossing*

MRCo is one of the founding investors in Global Crossing, an independent provider of global Internet and long distance telecommunications facilities using a network of undersea digital fiber optic cable systems and associated terrestrial backhaul capacity. In March 1997, in a private transaction, MRCo made a $7.6 million equity investment in Global Crossing. Global Crossing underwent an initial public offering in August 1998 at which time MRCo held 16,590,130 shares, excluding unexercised warrants, representing approximately 8% of the then outstanding common stock of Global Crossing. In March 1999 there was a stock split increasing MRCo's holding to 33,180,260 shares. In June of 1999 pursuant to a tender offer from US West, MRCo sold 3,070,738 shares of Global Crossing stock for $192,688,809. In September 1999 Global Crossing merged with Frontier Corporation. The new company will include an end-to-end global fiber optic network connecting major cities on five continents.

USDC 0026465

25

In February 2000, a subsidiary of MRCo. was formed - GBL Holdings, Inc. ("GBL Holdings"). At GBL Holdings' formation, MRCo made a capital contribution of its entire remaining investment in Global Crossing. In April 2000, GBL Holdings participated in Global Crossing's secondary offering and sold 2,568,160 shares of stock. In September 2000 GBL Holdings sold 960,000 shares of Global Crossing stock and in October it sold 3 million shares. In late October it entered into a transaction to protect itself against some fluctuations in the market value with respect to 5 million shares of Global Crossing stock.

As of November 30, 2000 GBL Holdings held 18,581,362 shares of Global Crossing stock, excluding unexercised warrants and the 5 million shares subject to the transactions described in the previous paragraph. This is approximately 2% of the outstanding common stock of Global Crossing. GBL Holdings also holds warrants to purchase an additional 697,934 shares of Global Crossing at $9.50 per share.

The Company believes that its investment in Global Crossing is a significant success for its shareholders. Global Crossing has commenced service on one of its four planned fiber optic cable systems, and has successfully marketed capacity on that system. Nonetheless, Global Crossing has been in business only since March 1997, has a limited operating history, and is engaged in a business venture with many risk factors. There is no assurance that Global Crossing will continue to be successful in completing and marketing capacity on its systems, that it will realize its business plan, or that its stock will continue to trade at current levels.

### Administrative Services

Zenith Administrators provides a range of third-party administrative services on a fee-for-service basis to unions, trust funds, and employers, and is one of the largest third party administrators in the jointly managed trust fund market. With offices in 32 cities nationwide, Zenith Administrators provides general fund administration, pension benefit management, health claims processing, and managed care products and services. In 1999, Zenith Administrators managed pension benefits for 86 funds, representing 135,000 pensioners and payments of more than $750 million. In 1999, Zenith Administrators processed more than 4 million health claims totaling almost $700 million in payments for 225 clients.

In 1999 Zenith Administrators' total fees for services were $62.3 million, an increase of 14% over 1998. Zenith Administrators gained 64 new clients in 1999, representing an annualized revenue gain of $5.4 million.

26

USDC 0026466

### Reinsurance

The Company's insurance subsidiaries follow the customary industry practice of reinsuring ("ceding") a portion of their risks with other companies. These insurance subsidiaries cede insurance principally to reduce net liability on individual risks, to provide protection against large losses and to obtain greater diversification of risks. The insurance subsidiaries remain contingently liable on ceded insurance should any reinsurer be unable to meet the assumed obligations. The insurance subsidiaries also assume reinsurance from other insurers. The principal reinsurers of the insurance subsidiaries are Peoples Benefit Life Insurance Company, United Teacher Associates Insurance Company, RGA Insurance Company, Lloyd's of London Syndicates, American Home Assurance Company and Lincoln National Life Insurance Company.

### Recent Developments

ULLICO is awaiting approval of its application to the Federal Reserve to become a financial holding company under the new Gramm-Leach-Bliley Act.

On August 11, 2000, the Company entered into an Agreement and Plan of Merger (the "Agreement") with Amalgamated Investments Company ("AIG"), the holding company that owns AmalgaTrust and Amalgamated Bank of Chicago for a price of seventy million dollars ($70,000,000). Through these actions, the Company is moving toward its goal of becoming a full service financial institution serving the labor movement. The Agreement is subject to receiving all necessary regulatory approvals for ULLICO Inc. to become a financial holding company.

### Regulation

### State Insurance Regulation

The Company is the ultimate parent of six insurance companies, Union Labor Life, USA Life, Ulico Indemnity, Ulico Casualty, USA Casualty and ULLICO Life (collectively "Insurance Subsidiaries"). The Insurance Subsidiaries, in common with other insurance companies, are subject to regulation and supervision by the regulatory authorities of the states in which they are licensed to do business. Union Labor Life and USA Life are Maryland domestic insurers. Union Labor Life is licensed to do business in all 50 states and the District of Columbia. USA Life is licensed in eight states in addition to Maryland. ULLICO Life is a Texas domestic insurer and is licensed to do business in 46 jurisdictions. Ulico Indemnity is an Arkansas domestic insurer, while Ulico Casualty is a Delaware domestic insurer, and USA Casualty is a California domestic insurer. These property and casualty insurers are also licensed to do business in a variety of states and the District of Columbia.

USDC 0026467

Each Insurance Subsidiary's domiciliary state has regulatory authority over that insurer. In addition, other states which have granted a license to these Subsidiaries also exercise varying degrees of regulatory authority over them. Such regulatory authority relates to, among other things, licensing of insurers and their agents, the approval of policy forms, the methods of computing reserves, the form and content of financial statements, annual reporting requirements, the type, amount, and valuation of permitted investments, market conduct activities, insurance rates and advertising, and specifying what might constitute unfair practices.

The Insurance Subsidiaries are also subject to various state statutory and regulatory restrictions on their ability to pay dividends to the Company. Generally, ordinary dividends up to specified levels may be paid without prior regulatory approval. Dividends beyond specific levels, i.e., extraordinary dividends, require regulatory approval.

Premium rates are also generally subject to some regulatory review and approval before implementation in each state. All states require that rates not be excessive, inadequate or unfairly discriminatory. The life insurance subsidiaries' operating results, in common with those of the life insurance industry in general, are adversely affected from time to time by delays in regulatory approval of premium rate increases. Some states have enacted variations of competitive rate-making laws which allow insurers to set certain premium rates without having to obtain the prior approval of the state regulatory agency. In these states, competition in both rates and underwriting practices have been substantial.

Further, state insurance holding company acts regulate changes in control and transactions among and between related companies. The Company is a holding company subject to such regulation. Although the specific provisions vary, state holding company acts generally prohibit a person from acquiring a controlling interest in an insurer or in any controlling person of an insurer unless the applicable state regulatory authority has approved the proposed acquisition. The state holding company acts also impose standards on certain transactions with related companies, which include, among other requirements, that the transactions be fair and reasonable, and that transactions exceeding specified limits receive prior regulatory approval.

The Insurance Subsidiaries are subject to periodic financial and market conduct examinations in their domiciliary states. Currently, Ulico Casualty Company, Ulico Indemnity and USA Casualty are undergoing financial examinations from their respective domiciliary states - Delaware, Arkansas and California.

In addition to state insurance laws, the Company and all of its subsidiaries are subject to general business and corporation laws, state securities laws, consumer protection laws, fair credit reporting acts and other laws.

USDC 0026468

*NAIC IRIS Ratios*

The National Association of Insurance Commissioners ("NAIC") has developed a set of financial relationships or "tests" called the Insurance Regulatory Information System ("IRIS") that are designed to identify companies which may require special attention by insurance regulators. The NAIC calculates twelve financial ratios based on statutory financial statements filed with state insurance regulators. A "usual range" of results for each ratio is used for purposes of comparison. An insurance company falling outside the "usual range" in four or more of the ranges will generally become subject to regulatory scrutiny and regulators may then act, if the Company has insufficient capital, to constrain the Company's underwriting capacity. Only ULLICO Life, which was purchased in October 1999 did not come within the usual range for some of the IRIS ratios in 1999. However, ULLICO Life was not subject to regulatory action in 1999 due to IRIS ratio testing.

*NAIC Risk Based Capital Requirements*

The NAIC has adopted risk-based capital ("RBC") standards that are used to determine the amount of total adjusted capital that a life insurance company must have, taking into account the risk characteristics of the company's investments and liabilities. The RBC formula establishes capital requirements for four categories of risk for life and health insurance companies: asset risk; insurance risk; inherent risk; and business risk. For each category, the capital requirements are determined by applying specified factors to various asset, premium, reserve, and other items, with the factor being higher for items with greater underlying risk and lower for items with less risk. The formula is used by insurance regulators as an early warning tool to identify deteriorating or weakly capitalized companies for purposes of initiating regulatory action. The RBC ratios for our life insurance subsidiaries consistently have been above the ranges that would require regulatory or corrective action.

*Regulation Under ERISA*

Certain of the Company's subsidiaries act as fiduciaries and/or parties in interest within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA") with respect to employee benefit plans subject to that Act. The Company and its subsidiaries have an active compliance program to assure that they operate with full knowledge of their status under ERISA and the obligations imposed upon them because of that status. However, there are occasionally court decisions, statutory changes, or regulatory actions which change the nature of the Company's status or obligations. For example, in John Hancock Mutual Life Insurance Company v. Harris Trust and Savings Bank, the Supreme Court held that insurers were subject to ERISA when they dealt with certain assets held in their general accounts. Because this decision represented a change in the law as

29

USDC 0026469

it had been understood by insurers generally, Congress passed legislation and the Department of Labor has promulgated regulations to provide relief to insurers from the consequences of the Harris Trust decision. The Company has reviewed the regulations and its general account contracts under the regulations and has taken appropriate steps to comply with the regulations. In the meantime, the Company will continue to review the law as it develops and as it affects its products and services to assure that it and its subsidiaries remain in compliance with ERISA, but cannot assure that changes in that law will not create unforeseen liabilities in the future.

### Securities Laws

TFA, an investment advisor registered with the SEC under the Investment Advisers Act of 1940, offers a variety of investment products and is subject to regulation under the federal securities laws administered by the SEC. These laws and regulations are primarily intended to benefit investors in the securities markets and grant the SEC authority to investigate, and to bring civil actions in federal district court and administrative proceedings, including proceedings to limit or restrict the carrying on of business by regulated entities, for failure to comply with such laws and regulations.

### Federal Legislation

The United States Congress has from time to time considered legislation to enact various health care proposals, which have included comprehensive national health insurance programs, approaches relying on competition among insurance companies and private administrators, and direct regulation of methods of payments, and potential liability for failure to pay benefits when due. It is not possible at this time to predict which, if any, of such proposals might be adopted or what their impact might be on the group accident and health business of the Company.

### Federal Regulation

Various federal regulators have published regulations implementing provisions of the Gramm-Leach-Bliley Act. These include rules governing bank-insurance affiliations, sales, and cross-marketing, the creation of financial holding companies, privacy of nonpublic personal information, and insurance customer protections for depository institutions. The Company will continue to review all such regulations as they become final and will take all necessary steps to ensure full compliance.

### Competition

USDC 0026470

The Company operates in the highly competitive life insurance industry. There are approximately 2,000 insurers in the life insurance business in the United States. The Company encounters significant competition from other insurance companies in connection with the

development and sale of its products. Many of these companies have financial resources or ratings greater than those of the Company.

The insurance industry is a mature industry. In recent years, the industry has experienced low growth in life insurance sales. However, the demand for retirement savings products has grown as a result of the aging population. Management believes that the Company's ability to compete is dependent upon, among other things, its ability to develop competitive and profitable products and the maintenance of a high rating from rating agencies.

Banks provide competitive alternatives to the Company's annuities and guaranteed investment contracts ("GICs"), which are group annuity contracts or funding agreements that guarantee a stated interest rate for a specified period of time. In the future, banks are expected to provide competition to the Company by selling annuity products provided by other insurance companies and by underwriting and selling annuities or other insurance products that compete directly with the Company.

*Environmental Considerations*

The Company and certain of its subsidiaries are subject to a wide variety of federal, state and local environmental laws and regulations as a result of ownership and operation of real property. An owner or operator of real property may be liable for the costs (including costs associated with compliance, investigation, removal and/or remediation requirements) associated with the presence of waste and/or contamination, including hazardous or toxic substances, on such property or any off-site property, and may be subject to the imposition of penalties and fines or restrictions on operations by governmental agencies or courts, or be subject to the imposition of penalties and fines or restrictions on operations by governmental agencies or courts, or be subject to third party claims and citizen suit actions. An owner or operator of real property may be liable for any injury, threat or harm to health, safety, natural resources, or the environment relating to any violation of environmental laws or regulations. These environmental laws and regulations often impose liability without regard to fault or whether the owner or operator knew of, or was responsible for, the presence of the waste and/or the contamination. Furthermore, a person that arranges for the disposal or treatment of, or transports for disposal or treatment, a hazardous or toxic waste or substance at any property may be liable for such costs. An owner or operator of real property may also be liable for compliance and/or remediation costs associated with underground storage tanks that are present or were formerly located on any owned and/or leased real property. The costs of such liabilities may be substantial, and the presence of such substances or wastes, or the failure to properly address any noncompliance with environmental laws or regulations, may adversely affect the owner's ability to fully utilize the property, to sell or lease the property or to conducts environmental assessments for real estate being acquired for investment and before taking title through foreclosure of mortgages collateralized by

31

USDC 0026471

real property. The Company believes that it has all permits, licenses and approvals from governmental authorities material to the operation of its properties and that any potential costs associated with compliance with environmental laws and regulations, or any remediation of such properties, would not be material to the consolidated financial position of the Company. However, failure to comply with such environmental laws and regulations could result in costs to satisfy environmental compliance and/or remediation requirements and, therefore, there can be no assurance that unexpected environmental liabilities will not arise in the future.

### Legal Proceedings

The Company is a party to various litigation and arbitration proceedings, both as plaintiff and defendant, in the ordinary course of its business. In the opinion of management and legal counsel, the litigation will not have a material effect on the Company's financial position.

### Properties

Union Labor Life owns its eight-story main administrative office building, located in Washington, D.C. This building, which was constructed in 1983, is an air-conditioned, concrete and steel structure having approximately 264,000 square feet of gross floor space and is approximately 62% occupied by the Company and its subsidiaries. As of November 30, 2000, the remainder was fully leased to tenants. It is the Company's intention to sell this building and to construct a new building also in Washington, D.C. to provide needed space for the future growth of the Company. No date has been set for the move. The building secures a line of credit in the amount of $22.5 million. As of November 30, 2000 this line of credit was fully drawn.

Ulico Casualty owns a two-story office building located in Edina, Minnesota. The building has 19,424 square feet of office space and is leased to Zenith Administrators, the sole tenant of the building.

USACC Property Corporation ("USACC Property"), a subsidiary of USA Casualty, owns a four-story office building located in Chino, California, constructed in 1989, with approximately 57,106 square feet of rentable floor space. The building is subject to a $4.96 million mortgage which is held by Union Labor Life. USACC Property currently is seeking a buyer for the building.

### 12.     Source and Amount of Funds.

If 205,423 Shares are purchased by the Company pursuant to the Offer at $146.04 per Share, the aggregate cost to the Company, including all related fees and expenses of the Offer, will be

USDC 0026472

approximately $30 million.  The Company will finance these payments and any other payments pursuant to this Offering Memorandum from working capital and operating cash flows.

**13.    Certain Federal Income Tax Considerations.**

The following summary describes certain United States federal income tax consequences relevant to the Offer.  The discussion contained in this summary is based upon the Internal Revenue Code of 1986, as amended to the date hereof (the "Code"), existing and proposed Treasury regulations promulgated thereunder, administrative pronouncements and judicial decisions, changes to which could materially affect the tax consequences described herein and could be made on a retroactive basis.

This summary discusses only Shares held as capital assets, within the meaning of Section 1221 of the Code, and does not address all of the tax consequences that may be relevant to particular shareholders in light of their personal circumstances, or to certain types of shareholders (such as tax-exempt organizations).

*Consequences to Tax-Exempt Organizations.*  The tax consequences discussed below will not be applicable to any holder exempt from Federal income taxes pursuant to Section 501(c) of the Code.

*Consequences to Tendering Shareholders of Exchange of Shares for Cash Pursuant to the Offer.*  An exchange of Shares for cash in the Offer by a holder subject to tax will be a taxable transaction for United States federal income tax purposes.  As a consequence of the exchange, the Holder will, depending on such holder's particular circumstances, be treated either as recognizing gain or loss from the disposition of the Shares or as receiving a dividend distribution from the Company.  Under Section 302 of the Code, a holder will recognize a gain or loss on an exchange of Shares for cash if the exchange (i) results in a "complete termination" of all such Holder's equity interest in the Company, (ii) results in a "substantially disproportionate" redemption with respect to such Holder or (iii) is "not essentially equivalent to a dividend" with respect to the Holder.  If a holder subject to tax is treated as receiving a dividend distribution from the Company rather than a payment in exchange for Shares, the gross amount of cash paid to the holder pursuant to the Offer will be includible in income by the holder as ordinary dividend income.

If a holder is treated as recognizing gain or loss from the disposition of Shares for cash, such gain or loss will be equal to the difference between the amount of cash received and such holder's tax basis in the Shares exchanged therefore.  Any such gain or loss will be capital gain or loss and will be long-term capital gain or loss if the holding period of the Shares exceeds one year as of the date of the exchange.  Gain or loss must be determined separately for each block of Shares (that is, Shares

USDC 0026473

acquired at the same cost in a single transaction) that is exchanged for cash. A holder may be able to designate which blocks of Shares are tendered pursuant to the Offer if less than all of such holder's Shares are tendered, and the order in which different blocks would be exchanged for cash, in the event of proration pursuant to the Offer. Each Holder should consult such holder's tax advisor concerning the mechanics and desirability of such a designation.

Proration of tenders pursuant to the Offer will cause the Company to accept fewer Shares than are tendered. Therefore, a holder can be given no assurance that a sufficient number of such holder's Shares will be purchased for cancellation pursuant to the Offer to ensure that such purchase will be treated as a sale or exchange, rather than as a dividend, for federal income tax purposes pursuant to the rules discussed above.

*Consequences to Shareholders who do not Tender Pursuant to the Offer.* Shareholders who do not accept the Offer to tender their Shares will not incur any tax liability as a result of the consummation of the Offer.

*Federal Income Tax Withholding.* Under the federal income tax backup withholding rules, unless an exemption applies under the applicable law and regulations, 31% of the gross proceeds payable to a shareholder or other payee pursuant to the Offer must be withheld and remitted to the United States Treasury, unless the shareholder or other payee provides his or her taxpayer identification number (employer identification number or social security number) to the Depositary and certifies that such number is correct. Therefore, unless such an exception exists and is proven in a manner satisfactory to the Depositary, each tendering shareholder should complete and sign the Substitute Form W-9 included as part of the Letter of Transmittal so as to provide the information and certification necessary to avoid backup withholding. Certain shareholders (including, among others, all corporations and certain foreign individuals) are not subject to these backup withholding and reporting requirements. In order for a foreign individual to qualify as an exempt recipient, that shareholder must submit an IRS Form W-8, signed under penalties of perjury, attesting to that individual's exempt status.

**THE TAX DISCUSSION SET FORTH ABOVE IS INCLUDED FOR GENERAL INFORMATION ONLY. EACH SHAREHOLDER IS URGED TO CONSULT SUCH HOLDER'S OWN TAX ADVISOR TO DETERMINE THE PARTICULAR TAX CONSEQUENCES TO HIM OR HER OF THE OFFER, INCLUDING THE APPLICABILITY AND EFFECT OF STATE, LOCAL AND FOREIGN TAX LAWS.**

USDC 0026474

## 14.    Transactions and Arrangements Concerning the Shares.

Based upon the Company's records and upon information provided to the Company by its directors and executive officers, neither the Company nor any of its subsidiaries nor, to the best of the Company's knowledge, any of the directors or officers of the Company, nor any associates of any of the foregoing, has effected any transactions in the Shares during the 40 business days prior to the date hereof.

## 15.    Certain Legal Matters.

*Regulatory Approvals.* If, as a result of the purchase of Shares pursuant to the Offer, any shareholder directly or indirectly, owns, controls, holds with the power to vote, or holds proxies, representing 10% or more of the voting securities of the Company, the Maryland Insurance Administration must approve such purchases. The Company's Bylaws contain ownership restrictions limiting the ownership of voting securities to 9% by any National or International Union and to 1% by any Local Union or individual (the "Ownership Restriction"). Further, shareholder agreements provide for the appointment of the Company as proxy for any shareholder who obtains ownership of Class A Stock securities in excess of the Ownership Restriction; and if as a result of the Offer any Shareholder owns Shares of Class A Stock in excess of the Ownership Restriction, such Shares of Class A Stock in excess of the Ownership Restriction shall be automatically converted into Shares of Class B Stock. Because of the Ownership Restriction and the provisions of the shareholder agreements, the Company does not believe that any approval or other action by governmental, administrative or regulatory authority or agency, domestic or foreign, is required for the Company's acquisition or ownership of Shares as contemplated by the Offer.

*ERISA Considerations.* Before authorizing any sale of Shares to the Company pursuant to the Offer, fiduciaries of pension and other employee benefit plans ("Plans") subject to ERISA should consider, among other matters, ERISA's fiduciary standards and rules under ERISA and the Code that prohibit Plan fiduciaries from causing a Plan to engage in a "prohibited transaction."

Section 406 of ERISA and Section 4975 of the Code prohibit Plans from, among other things, engaging in certain transactions involving "plan assets" with persons who are "parties in interest" under ERISA or "disqualified persons" under Section 4975 of the Code ("Parties in Interest") with respect to such Plan. Under ERISA and the Code, the Company and certain affiliates of the Company may each be considered a Party in Interest with respect to certain holders of Shares that are Plans. With respect to such Plans, the sale of Shares by the Plan to the Company pursuant to the Offer may constitute or result in a prohibited transaction under ERISA or Section 4975 of the Code, unless the sale is covered by Prohibited Transaction Class Exemption ("PTCE") 84-14 (relating to plan transactions made at the direction of a qualified professional asset manager) or another

35

USDC 0026475

applicable exemption. A Plan that sells Shares to the Company pursuant to the Offer will be deemed to have represented by such sale that either (a) the sale is covered by PTCE 84-14 or another applicable exemption, or (b) neither the Company nor any of its affiliates is a Party in Interest with respect to the Plan.

Any pension or other employee benefit plan proposing to sell Shares to the Company pursuant to the Offer should consult with its counsel.

### 16.    Extension of Tender Period; Termination; Amendments.

The Company expressly reserves the right, in its sole discretion, at any time or from time to time and regardless of whether or not any of the events set forth in Section 7 shall have occurred or shall be deemed by the Company to have occurred, to extend the period of time during which the Offer is open and thereby delay acceptance for payment of any Shares by giving oral or written notice of such extension to the shareholders. During any such extension, all Shares previously tendered and not purchased or withdrawn will remain subject to the Offer, except to the extent that such Shares may be withdrawn as set forth in Section 4. The Company also expressly reserves the right, in its sole discretion, to withdraw or terminate the Offer and not accept for payment or pay for any Shares not theretofore accepted for payment or paid for or, subject to applicable law, to postpone payment for Shares under circumstances including but not limited to the occurrence of any of the conditions specified in Section 7 by giving oral or written notice of such termination or postponement to the shareholders. The Company's reservation of the right to delay payment for Shares, which it has accepted for payment, is limited. The Company must pay the consideration offered or return the Shares tendered promptly after termination or withdrawal of a tender offer. Subject to compliance with applicable law, the Company further reserves the right, in its sole discretion, and regardless of whether or not any of the events set forth in Section 7 shall have occurred or shall be deemed by the Company to have occurred, to amend the Offer in any respect (including, without limitation, by decreasing or increasing the consideration offered in the Offer to owners of Shares or by increasing or decreasing the number of Shares being sought in the Offer). Amendments to the Offer may be made at any time or from time to time effected by public announcement thereof, such announcement, in the case of an extension, to be issued no later than 9:00 a.m., EST, on the next business day after the previously scheduled Expiration Date. Any disclosure of a material change in the information published, sent or given to Shareholders will be promptly provided to Shareholders.

If the Company makes a material change in the terms of the Offer or the information concerning the Offer or waives a material condition of the Offer, the Company will extend the Offer. The minimum period during which an offer must remain open following material changes in the terms of the Offer or information concerning the Offer (other than a change in price or a change in

36

USDC 0026476

percentage of securities sought) will depend on the facts and circumstances then existing, including the relative materiality of the changed terms or information.

17.    **Miscellaneous.**

The Offer is not being made to, nor will the Company accept tenders from or on behalf of, owners of Shares in any jurisdiction in which the making of the Offer or its acceptance would not be in compliance with the laws of such jurisdiction. The Company is not aware of any jurisdiction where the making of Offer or the tender of Shares would not be in compliance with applicable law. If the Company becomes aware of any jurisdiction where the making of the Offer or the tender of Shares is not in compliance with any applicable law, the Company will make a good faith effort to comply with such law. If, after such good faith effort, the Company cannot comply with such law, the Offer will not be made to (nor will tenders be accepted from or on behalf of) the holders of Shares residing in such jurisdiction.

ULLICO Inc.

December 14, 2000

Facsimile copies of the Letter of Transmittal will be accepted. The Letter of Transmittal, certificates for Shares, and any other required documents should be sent or delivered by each shareholder to the address set forth below:

Joseph A. Carabillo
Vice President and Assistant Secretary
ULLICO Inc.
111 Massachusetts Avenue, N.W.
Washington, D.C. 20001

Any questions or request for assistance or additional copies of this Offer to Purchase and the Letter of Transmittal may be directed to Joseph A. Carabillo at the telephone number and location listed below:

ULLICO Inc.
111 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Telephone (202) 682-4909
Facsimile (202) 682-6784
E-Mail: jcarabillo@ullicolaw.com

37                                    USDC 0026477