IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Civil Division

| | | |
|---|---|---|
| ULLICO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:06CV01388 (RJL) |
| | ) | |
| BILLY CASSTEVENS, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant, Billy Casstevens (erroneously sued as William Casstevens), by counsel, hereby opposes the Plaintiff's Motion For Partial Summary Judgment for all the reasons set forth in detail in the accompanying (1) Defendant's Statement Of Genuine Issues In Dispute And Necessary To Be Litigated, (2) the separate Defendant's Statement Of Material Facts As To Which Defendant Contends There Is No Genuine Dispute, and in (3) Defendant's Memorandum Of Points And Authorities In Support Of This Opposition.

Respectfully submitted,

HOGAN & HEALD

By:    /s/ Thomas M. Hogan, Esquire
Thomas M. Hogan, Esquire
DC Bar No. 104950
HOGAN & HEALD
11130 Fairfax Blvd., Suite 310
Fairfax, VA 22030
(703) 591-0003
*Attorney for Defendant*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Defendant's Opposition To Plaintiff's Motion For Partial Summary Judgment was served electronically on this 22nd day of June 2007 to:

Victor Tabak, Esquire
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, NW, Suite 900
Washington, DC 20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
(DC Bar # 480333)
*Attorneys for Plaintiff*

/s/ Thomas M. Hogan, Esquire
Thomas M. Hogan, Esquire

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Civil Division

| | | |
|---|---|---|
| ULLICO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:06CV01388 (RJL) |
| | ) | |
| BILLY CASSTEVENS, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF HIS OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1.    The purchases of ULLICO stock by Defendant were not *ultra vires*.

A.    As set forth in paragraphs 1 through 7 of Defendant's Statement of Material Facts As To Which Defendant Contends There is No Genuine Dispute, the By-Laws of ULLICO, Inc. permitted stock to be owned by members of the Board of

Directors, and as set forth in paragraphs 23 through 27 of said Defendant's Statement of Material Facts, they were offered by the Chairman pursuant to proper Resolutions of the Board of Directors for purchase by this Defendant.

B.     As is also set forth in the attached Affidavit of James J. Hanks, Jr., Esquire, the purchase of all such shares was entirely proper and legal under Maryland Corporate law, and not *ultra vires*.

Defendant respectfully submits that Plaintiff's claims that the purchases of ULLICO shares by this Director were *ultra vires* is entirely incorrect on the facts and the law, and said claims should be totally rejected by this Court.

2.     <u>The re-purchases of ULLICO shares from Defendant and his wife by ULLICO were pursuant to proper Resolutions of the ULLICO Board of Directors, were pursuant to a long-standing repurchase program created by ULLICO's professional investment advisor and by their outside legal counsel, did not violate Maryland corporate law, and Mr. Casstevens did not violate the applicable Maryland statute when approving such Resolutions of the Board of Directors.</u>

A.     As set forth in Defendant's Statement of Material Facts As To Which Defendant Contends There is No Genuine Dispute, paragraphs 8 *et seq*., the repurchase program was first begun in 1997 by ULLICO after it was presented, first, to ULLICO's executive committee by an investment advisor, Credit Suisse First Boston, on May 5, 1997, and adopted by the Board on the following day; and the valid business reasons for the repurchase program are set forth in the Resolutions referenced in Defendant's Statement of Material Facts.  The program was adopted after Credit Suisse First Boston proposed it and offered their opinion that the program was fair; and all

implementing meeting minutes, offering memoranda, and other materials at issue were prepared or reviewed by ULLICO's outside legal counsel, investment advisors and auditors.  Even though the Corporate records clearly show that at all times during the years 1997 through 2001 shares of the corporation were owned by the vast majority of the members of the Board of Directors and also by numerous Officers, none of those professional advisors ever expressed any opinion that any of the resolutions, votes, transactions or other matters described in Plaintiff's Complaint were unlawful, unreasonable, inappropriate, bad judgment, careless or otherwise violative of any duty owed by Mr. Casstevens or any other ULLICO Director.

Furthermore, in addition to those Directors who were owners of ULLICO shares, at each meeting of the Board of Directors adopting or re-adopting the repurchase program there were "disinterested" Directors who did not own shares of ULLICO stock. As set forth in the accompanying Affidavit of James J. Hanks, Jr., Maryland corporate law allows for approval of transactions between a corporation and any director so long as the proposed transaction is approved by a majority of the disinterested directors, even if less than a quorum, <u>or</u> subsequently ratified by a majority of the disinterested directors, even if less than a quorum.

B.     For the reasons explained in the accompanying Affidavit of James J. Hanks, Jr., Esquire, an expert in Maryland Corporate law, the decisions of Maryland Courts which use the terms "fiduciary duty" when analyzing the duties of directors of Maryland corporations are essentially *dicta*, and for purposes of the instant case are definitely misleading.  As set forth on pages 11 and 12 of Mr. Hanks' Affidavit, Maryland has a <u>statutory</u> standard of conduct set forth in Section 2-405.1 (a) of the Maryland

General Corporate Law, rather than the judicially-developed standard of conduct based upon the concept of "fiduciary duty," as in Delaware and some other states. As he states on page 12 of his Affidavit, Maryland Corp in 1998 reiterated the principle that the obligations of a fiduciary under trust law do not apply to corporate directors; and even though some Maryland Courts occasionally rely on the term "fiduciary duty" when analyzing the duties of directors in Maryland corporations despite the fact that such language was purposely omitted from the statute, the statute enacted by the legislature supersedes the common law standard and is binding on the Courts. (See footnote 5 of Mr. Hanks' Affidavit on pages 12-13.)

C.    Of the cases cited by Plaintiff in its Memorandum of Points and Authorities in Support of its Motion for Partial Summary Judgment which used the "fiduciary duty" term in their decisions, most are distinguishable. Some are decisions from other jurisdictions; and others, although Maryland decisions, were written prior to the enactment of the present Maryland statute, or involve trustees or other distinguishable factual situations.

3.    All Purchases and Sales by Defendant were subsequently ratified by a Special Committee of Disinterested Directors, and thereafter by the Board of Directors.

In December 2002, after receiving the "Report of the Special Counsel on the ULLICO Purchase and Repurchase Program and Global Crossing Investment" prepared by Governor Thompson of the law firm Winston & Strawn (the "Thompson Report"), the ULLICO Board determined it to be "in the best interest of the Company that the recommendations made in that Report with respect to such sales and the Company's corporate governance practices be considered promptly in order [for]…the board…to

determine what action, if any, would be appropriate in response to such recommendations." The Board also determined "that it would be in the Company's best interest if such recommendations…[were] initially reviewed by directors who had not participated in the company's formal and discretionary stock repurchase programs and that the Board receive the benefit of the considered views of such directors before…tak[ing] any responsive actions." Accordingly, the Board established a Special Committee of the Board of Directors that was authorized to review the Thompson Report and make recommendations to the Board as to the appropriate action or actions that the Board should take in response to the recommendations made in the Report with respect to the profits realized upon the sales of stock purchased by certain directors and officers in the 1998 and 1999 stock purchase offers and later sold back to ULLICO pursuant to the formal 2000 stock repurchase program and the discretionary stock repurchase program.

Subsequently, at its March 13, 2003 meeting, the full Board determined "that it would be in the Company's best interest if the Committee was free to consider recommendations as contained in the [Thompson report] and act independently, without the interim step of reporting to the Board…for concurrence." The Board specifically stated: "Because of the nature of any recommendations, only disinterested directors' votes should be considered in any event." Consequently, the following resolution expanding the Special Committee's authority was unanimously adopted:

> FURTHER RESOLVED: That the members of the Special Committee shall be, subject to their consent, as follows: Daniel H. Mintz (Co-Chair), John T. Dunlop (Co-Chair), John T. Joyce, Lenore Miller, Terence M. O'Sullivan, James H. Rankin, Vincent R. Sombrotto, and John W. Wilhelm. And be it

> FURTHER RESOLVED: That the Special Committee is to independently take such responsive actions as it deems necessary as soon as practicable.

The Special Committee thereafter prepared a comprehensive report which summarized the Committee's principal findings as follows:

> The [Thompson] Report concluded, and the other attorneys agreed, that there were no violations of federal law and regulations. Nothing in the review by the Special Committee suggested anything to the contrary. The Special Committee further concludes that the sales and repurchase of ULLICO shares to officers and directors were transacted in accordance with provisions and procedures developed by competent legal and accounting professionals, did not materially violate corporate by-laws or previous Board actions, and was consistent with the culture and traditional decision making procedures of ULLICO. Neither the [Thompson] Report nor the Committee found any evidence that corporate management deliberately withheld information pertinent to Board decisions. The Committee found no evidence of any accounting irregularities or material misstatement of fact. Nor did the Committee find that the transactions materially injured the interests of any ULLICO employees, shareholders or the corporation.

With regard to perceived inequities between officers and directors who participated in the transactions, on the one hand, and large institutional investors, on the other, the Special Committee determined:

> Finally, nothing before the Committee supported the notion that there is any law requiring that all sales and repurchases of ULLICO stock must in every instance produce an equal proportional result for all shareholders. These facts substantially obviate, therefore, the Thompson Report concern among interactions between a number of procedural rules adopted well before the transaction in question, such as the "10,000 share rule" exempting those with fewer than 10,000 shares from pro-rationing upon repurchase, the fixed formula used to calculate the repurchase price of stock, both set in 1997 and the 2% rule intended to prevent larger shareholders from acquiring unbalanced voting authority that was required by the bylaws.

> Examined at fixed points in time stock repurchases can appear to be inequitable. Over time, however, the apparent disparities were substantially diminished. Thus, from 1997-2002 the directors and officers have net proceeds of about 9 million dollars and the shareholders have net profits of about 55 million dollars in addition to the increased value of stocks still held.

The Special Committee Report concluded:

> For all of the foregoing reasons – the majority of the Special Committee concludes that the Thompson Report uncovered no illegality on the part of Board Members and Officers. John Wilhelm and Terry O'Sullivan (with dissenting views noted below) did not subscribe fully to the analysis adopted by the Special Committee in this section. The majority of the Committee concluded that there was no basis to call for the disgorgement by any officer or director of the proceeds of their investment in the Company.

The Board of Directors met on March 28, 2003, at which time the Chair of the Special Committee reported, *inter alia*:

> The Majority of the Committee found no violation of fiduciary duty with respect to Maryland Corporate law and, therefore, did not believe there should be any type of disgorgement.

Mr. O'Sullivan then spoke for the Special Committee's Minority Opinion. "He concurred with [the] statement that nothing had been done illegally by any ULLICO Director or Officer. He expressed concern, however, that perception becomes reality and thus believed there should be remediation."

The Board of Directors, after discussion, ratified the decision of the majority of the Special Committee:

> A discussion then ensued regarding the return of profits by directors. It was decided that a return of profits would not be in the best interest of the Company since there was no illegal conduct or wrongdoing by the directors and officers as determined by Governor Thompson and the Special Committee of the Board of directors.

Accordingly, all the transactions complained of by Plaintiff has been completely ratified by disinterested Directors, fully satisfying Maryland Corporate Law § 2-419! (See § 2-419 (e) and § 2-418 (e)(2) of the statute.)

4.    Plaintiff's Claim based upon the theory of "Unjust Enrichment" should also be denied.

A.    Plaintiff's "Unjust Enrichment" claim is based first on its claim that all ULLICO stock was purchased by *ultra vires* means, which is totally erroneous as set forth in part 1, above, and all the documents accompanying this Opposition.

B.    Plaintiff's "Unjust Enrichment" claim is based, secondly, on its claim that the re-purchases of stock from Mr. and Mrs. Casstevens were in violation of Maryland law, which is likewise erroneous as set forth in part 2, above, and all the documents accompanying this Opposition.

C.    Any consideration of profits realized by Mr. and Mrs. Casstevens would also necessitate a trial to determine:

(1)    whether their "profits" from the repurchases of their stock should be calculated based on the differences between the book value of $146.04 per share that was paid to them and the book value for those shares at the time of the repurchases, which was $74.87 per share;

(2)    their net, after-tax, investment profits; and

(3)    whatever Corporate losses, if any, have not been recovered by Plaintiff from other Defendants or entities allegedly responsible to Plaintiff for the losses it has claimed.

D.     Plaintiff cites on page 18 of its Memorandum a Maryland case which lists three elements of an "unjust enrichment" claim, but the last of those is not established here.  It is not inequitable for this Defendant to retain the full price received for ULLICO shares in March 2001 when a majority of the Special Committee of disinterested Directors decided two (2) years later, after full consideration of the matter, not to require that Defendant return any portion of those monies.

WHEREFORE, Defendant respectfully requests that, for all the reasons set forth herein and in the accompanying Affidavit, Statements and Exhibits, the Court find that there is no factual or legal basis for entering any judgment in favor of the Plaintiff, and instead enter an Order denying Plaintiff's Motion for Partial Summary Judgment in its entirety.

Respectfully submitted,

HOGAN & HEALD


By:     /s/ Thomas M. Hogan, Esquire
          Thomas M. Hogan, Esquire
          DC Bar No. 104950
          HOGAN & HEALD
          11130 Fairfax Blvd., Suite 310
          Fairfax, VA 22030
          (703) 591-0003
          *Attorney for Defendant*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Defendant's Memorandum Of Points And Authorities In Support Of His Opposition To Plaintiff's Motion For Partial Summary Judgment was served electronically on this 22nd day of June 2007 to:

Victor Tabak, Esquire
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, NW, Suite 900
Washington, DC 20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
(DC Bar # 480333)
*Attorneys for Plaintiff*

/s/ Thomas M. Hogan, Esquire
Thomas M. Hogan, Esquire `

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Civil Division

| | | |
|---|---|---|
| ULLICO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:06CV01388 (RJL) |
| | ) | |
| BILLY CASSTEVENS, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S STATEMENT OF GENUINE ISSUES
### IN DISPUTE AND NECESSARY TO BE LITIGATED

Defendant, by counsel, submits the following statement of genuine issues that preclude the granting of Plaintiff's Motion for Partial Summary Judgment.

**With reference to Plaintiff's Statement of Material Facts, Defendant respectfully submits that the following numbered items in Plaintiff's Statement of Material Facts are in dispute:**

Plaintiff's No. 5:  The shares referenced in this paragraph were purchased by Mr. and Mrs. Casstevens.  (See all the Exhibits attached to Plaintiff's Statement.)

Plaintiff's No. 6:  All the shares referenced in this item were sold by Mr. and Mrs. Casstevens.  (See all the Exhibits referenced in Plaintiff's Item No. 6.)

Plaintiff's No. 8:  The investment profits referenced in this item were those of Billy J. Casstevens and Lou Ellen Casstevens.  (See Plaintiff's Exhibit No. 8.)

Plaintiff's No. 9:  All stock purchased by the Casstevens was issued under the terms of the ULLICO Bylaws which permitted ownership by members of the Board of Directors.  (See Plaintiff's Exhibit No. 2.)  All the stock purchased in 1998 and 1999 was issued pursuant to valid Resolutions of the Board of Directors.  (See Defendant's

Statement Of Material Facts As To Which Defendant Contends There Is No Genuine Issue.)

Plaintiff's No. 13:  Mr. Casstevens did <u>not</u> state in his deposition that he agreed that the Compensation Committee "lacked the authority" to issue stock, and he never stated that he was aware of any issue as to that.  (See Plaintiff's Exhibit No. 1 at 56:21 through 58:17.)

Plaintiff's No. 14:  The Compensation Committee was acting solely to determine the "compensation" of officers; Defendant disputes that they were determining "compensation" of <u>Directors</u>.

Plaintiff's No. 19:  The purchase of 2,000 shares of Class A Stock at $28.70 referenced in this item was by Mr. <u>and Mrs</u>. Casstevens.  (See the Exhibits referenced in Plaintiff's paragraph 19.)

Plaintiff's No. 21:  The purchase of 2,000 shares of Class A Stock at $28.70 referenced in Plaintiff's No. 21 were purchased by Mr. <u>and Mrs</u>. Casstevens.  (See Exhibits referenced in Plaintiff's paragraph 21.)

Plaintiff's No. 25:  The purchase of 2,000 shares of Class A Stock at $53.94 referenced in Plaintiff's No. 25 were purchased by Mr. <u>and Mrs</u>. Casstevens.  (See Exhibits referenced in Plaintiff's paragraph 25.)

Plaintiff's No. 26:  Mr. Casstevens never knew that the Compensation Committee allegedly authorized the issue of stock, and disputes that any shares he and his wife purchased were pursuant to any *ultra vires* offer.  (See Defendant's Statement Of Material Facts As To Which Defendant Contends There Is No Genuine Issue.)

Plaintiff's No. 27:  The calculation referenced by Plaintiff was not made on

December 31, 1999, as claimed by Plaintiff.    That calculation was performed in subsequent months based on December 31, 1999 values of all the assets and liabilities of ULLICO, but not known until the Executive Committee meeting of May 10, 2000. (See Plaintiff's Exhibit 17 and Plaintiff's Complaint, ¶ 13.)

Plaintiff's No. 28:    Defendant disputes that his duties as a member of the Board of Directors was as a "fiduciary" and disputes that the sale of his shares was in violation of any of his duties as a Director.  The sale of Mr. and Mrs. Casstevens' shares was not in contravention of the "Program" since the Chairman had discretion to waive the proration provision.[1]    (See the Waiver Provision in Plaintiff's Exhibit 18, at USDC 0026444-0026445.)

Plaintiff's No. 39:    Mr. and Mrs. Casstevens sold all but 2,000 of their shares of ULLICO Class A Stock, but it is unknown whether those shares were purchased by ULLICO as part of the "Actual 2000 Repurchase Program" or pursuant to the chairman's discretionary authority, which itself was literally part of the "Actual 2000 Repurchase Program."   (See Plaintiff's Exhibits 18 and 21 and Mr. Casstevens' testimony at his deposition (Exhibit 1, 131:8-10; 131:20-132:1; 132:7-9 and 133:2-11.)

Plaintiff's No. 40:    The Actual Repurchase Program also allowed the Chairman to repurchase shares at $146.04 without prorations even if shareholders tendered less than 100% of their shares.  (See Casstevens' deposition pages 199, line 21 through page 201, line 16, attached, and Plaintiff's Exhibit 21, at USDC 0003172 and 0003173.) Additionally, Mr. Casstevens did not testify that he had "improperly" avoided proration. (See Plaintiff's Exhibit 1, page 131, line 20 through 133, line 19.)

---

[1] It is ironic that Plaintiff is complaining that Mr. and Mrs. Casstevens did not make a bigger "profit" by tendering all their Class A Shares.

Plaintiff's No. 41:  This Statement is disputed because, as set forth in Plaintiff's Exhibit 18 and Exhibit 21, the provision requiring that all shares owned be tendered could be waived.  (See Plaintiff's Exhibit 21 at USDC 0003173 and Plaintiff's Exhibit 18 at USDC 00026444-0002645.)

Plaintiff's No. 42:  Mr. and Mrs. Casstevens owned less than 10,000 shares of Class A, and they tended 7,312 of their 9,312 of Class A Stock; and Defendant denies the allegation that they tendered those shares "without proration" since it was up to the Company to apply or not to apply prorations, and not up to Mr. and Mrs. Casstevens. (See Plaintiff's Exhibit 1, at page 131, lines 8-10 and page 131, line 20 through page 132, line 9.)

Plaintiff's No. 45:  As of November 3, 2000, Mr. and Mrs. Casstevens held 9,312 shares of ULLICO Class A Stock.  (See Plaintiff's Exhibit 4.)

Plaintiff's No. 48:  This statement is inaccurate because Mr. Georgine, the Chairman of ULLICO, was not "interested" in the Resolution that approved the Actual 2000 Repurchase Program since all the stock he owned was not effected by that resolution one way of the other.   ULLICO was obligated to repurchase his shares pursuant to Mr. Georgine's contract with ULLICO.  (See the "Thompson Report" and the Affidavit of James J. Hanks, Jr., Esquire, attached.)

Plaintiff's No. 49:  Defendant disputes and denies the assertion that the Class A Stock purchased by Mr. and Mrs. Casstevens was acquired via an *ultra vires* offer (see above).  The Casstevens' ownership of Class A Stock was known by every Director, or should have been known by every Director, by virtue of the 2000 Proxy Statement, (Plaintiff's Exhibit 26).  See also Plaintiff's Exhibit 18 at USDC 0026441 which shows

that the average number of shares owned by all Officers and Directors was obviously less than 10,000 shares each, which put any shareholder on notice that 33 of the Company's Executive Officers and Directors owned shares which would avoid proration.

Plaintiff's No. 50:  Defendant disputes that the letter referenced in Plaintiff's statement No. 51 is factually correct because it is incomplete.  The Exhibit in question, at USDC 0048087, also notified every shareholder:  "other terms and conditions of the repurchase will be described in the Offering Memorandum."  Immediately thereafter it also stated:  "This letter is not intended as an Offer To Purchase Stock – that can only be done through a special Offering Memorandum, which you will receive at the appropriate time (etc.)."  Thereafter, each Shareholder received the actual Offer (Plaintiff's Exhibit 18) which stated that those shares would or would not be subject to proration, and also that the proration provision could be waived at the election of the Company (Plaintiff's Exhibit 18, USDC 0026444-0026445.)

Plaintiff's No. 54:  Defendant disputes the validity of the self-serving, speculative, post hoc statement set forth in Plaintiff's item No. 54, which statement is inadmissible and without probative value.

Respectfully submitted,

HOGAN & HEALD


By:      /s/ Thomas M. Hogan, Esquire
Thomas M. Hogan, Esquire
DC Bar No. 104950
HOGAN & HEALD
11130 Fairfax Blvd., Suite 310
Fairfax, VA 22030
(703) 591-0003
*Attorney for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Defendant's Statement of Genuine Issues In Dispute and Necessary To Be Litigated was served electronically on this 22nd day of June 2007 to:

Victor Tabak (DC Bar # 480333)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, NW, Suite 900
Washington, DC 20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
*Attorneys for Plaintiff*

/s/ Thomas M. Hogan, Esquire
Thomas M. Hogan, Esquire `

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Civil Division

| | | |
|---|---|---|
| ULLICO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:06CV01388 (RJL) |
| | ) | |
| BILLY CASSTEVENS, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH DEFENDANT CONTENDS THERE IS NO GENUINE DISPUTE

1.    ULLICO's By-Laws provide that the ownership of Stock of the Company shall be confined to International and National Trade Unions, Local Unions, State Federations of Labor, City Central Bodies and other forms of organization of labor and members thereof affiliated with AFL-CIO, including benefit trusts affiliated with such organizations, including but not limited to jointly managed pension funds, and to such other labor organizations and members thereof and such Directors or Officers as may be elected or employed by the Company, as the Board of Directors may from time to time grant the right of purchase.  Plaintiff's Exhibit 2, ULLICO By-Laws, Article II (A), § 2; Article II (B), § 2; Article II (C), § 2; Article II (D), § 2.

2.    The By-Laws clearly contemplate that individual ULLICO officers and directors would be entitled to own shares of ULLICO.  *See* ULLICO By-Laws, Article II (A), §2, etc., ¶ 1, *supra*.

3.    ULLICO was organized to ensure that its shares would be "widely distributed" to the authorized holders of ULLICO shares, so that no single person or labor organization could control ULLICO's Board or management. See ULLICO By-

Laws, Article II (A), § 3; Article II (C), § 3.

4.    "In order that the *Stock* may be widely distributed and that all groups of organized labor may participate in the ownership and management of the Company, the aggregate maximum percentage and amount of issued Capital Stock and Class A Stock, including shares held as Treasury Stock, which may be held, with power to vote, by a National or International Union, or a benefit trust affiliated with said labor organization including but not limited to jointly managed pension funds shall not be more than nine percent (9%); by any Local Union, Local Central Body or other form of organization included in Article II(A), not more than one percent (1%); and by any individual, not more than one percent (1%)." *Id*., Article II (A), § 3.

5.    ULLICO By-Laws provide that 24 Million Class A and Class B shares could be issued, in the aggregate, "in such numbers and amounts as shall be determined by the Board of Directors from time to time." *Id*. Article II(C), § 1.

6.    To ensure that issued ULLICO stock not be transferred outside of the limited group of authorized organizations and entities, the By-Laws further provide:

> The Capital Stock may be transferred on the books of the company either in person or by an attorney, but none of the Stock issued or reissued one or more times may be sold or transferred by the holder thereof, nor be sold or transferred by legal process or operation of law until the Company shall have had an option to acquire this said Stock *for the purpose of resale* at $25 per share, the par value of said Stock. The company shall have 30 days after the Stock has been tendered to it at its Home Office in which it may purchase such stock at the aforesaid price.

*Id.*, Article II (A), § 6 (emphasis added). *See also id.*, Article II (C), §.

7.    The By-Laws clearly distinguish between the *issuance* of stock of any kind (Capital or Class A) and the *sale*, re-purchase, transfer or re-sale of such stock. *See*, *e.g.,* Article II (A), § 1 (distinguishing between "authorized" and "issued" shares); Article

II (A), § 6, and Article II(C), § 6 (distinguishing between stock "issued or re-issued one or more times" and stating that such stock "may be sold or transferred by the holder thereof").

8.    On May 5, 1997, ULLICO's Executive Committee met and considered a presentation made by Credit Suisse First Boston concerning a proposed stock repurchase program.  *See* Minutes of Executive Committee Meeting, May 5, 1997, Defendant's Ex. A.

9.    In attendance was at least one director who did not own any ULLICO shares (Cullerton).

10.    The ULLICO director who attended the May 1997 Executive Committee meeting, and who did not own any ULLICO shares at the time, was "disinterested."

11.    The repurchase program was created by Credit Suisse First Boston to provide liquidity for the first time for ULLICO shareholders.  (Defendant's Exhibit A.)

12.    "Following the presentation, there was significant discussion by the Directors.  They focused on the calculation of yield and the benefits of this program to both stockholders and the Company."  *Id.*, at 3.

13.    The Credit Suisse spokesman who made the presentation, Bill Egan, responded that "the value added to the corporation in book value as a measure of value was practical, and passing along his measure to the shareholders aligned both the stockholders' interests and the Company's interests."  *Id*.

14.    Following this discussion, the Executive Committee *unanimously* adopted a series of resolutions authorizing the implementation of ULLICO's first stock repurchase program, "to provide liquidity for up to $180,000,000 of the Class A, Class B

and Preferred Certificates over the next 11 years." *Id.*, at 4.

15.     The resolutions provided that, beginning June 1, 1997, ULLICO would offer to repurchase $30 million worth of such stock, and that "in each of the subsequent years beginning in 1998 and ending in the year 2007, the Corporation will, solely from its operating cash flow, make available up to $15,000,000 in cash to, at the stockholders' request, repurchase stock from holders of Class A, Class B and any remaining Preferred Certificates." *Id.* They provided that the repurchase program "will be based upon 'Book Value,'" to be "determined at each repurchase date based on the prior year end audited financials of ULLICO, Inc.," in accordance with a "Term Sheet" that was attached to the minutes. *Id.*

16.     The resolutions adopted by the Executive Committee at its meeting on May 5, 1997, also provided that the "appropriate officers and employees of the Corporation" were "authorized, directed and empowered" to execute all documents necessary to implement the repurchase program. *Id.*

17.     The stock repurchase program adopted by the Executive Committee and the Board in 1997 were prepared with advice of counsel, as well as accounting professionals and investment advisers.

18.     Credit Suisse First Boston served as investment advisors and offered their opinion that the program was fair.

19.     ULLICO retained both Arnold & Porter and LeBoeuf Lamb as outside legal counsel, and Price Waterhouse Coopers as auditors.  Each was involved, prior to the adoption of the program and during its administration at least through 2001, in creating documents, reviewing information and giving advice about the program.

20.     All of these professional advisors had direct access to and use of corporate records, including records of shares owned by Mr. and Mrs. Casstevens, proxy statements, meeting minutes and the like.  All of the relevant meeting minutes, offering memoranda, correspondence and other materials at issue here were prepared or reviewed by these professionals.

21.     None of the professionals described above ever expressed an opinion to anyone, to the best of Mr. Casstevens' knowledge, that any of the resolutions, votes, transactions and other matters described in the Complaint, were unlawful, unreasonable, inappropriate, bad judgment, careless or otherwise violative of any duty owed by Mr. Casstevens as a ULLICO Director.  Defendant's Responses to Plaintiff's Interrogatories 3, 4 and 7; Defendant's Ex. B.)

22.     On May 6, 1997, ULLICO's Board of Directors met.

23.     In attendance were at least 3 ULLICO directors who did not own any ULLICO shares (Bahr, Cullerton, Sombrotto).

24.     The ULLICO directors who attended the May 1997 Board meeting, and who did not own any ULLICO shares at the time, were "disinterested." *See* Minutes of Board of Directors Meeting, May 6, 1997, Defendant's Ex. C.

25.     At the May 1997 meeting, ULLICO's Board of Directors voted, first, to eliminate the category of Treasury Stock, reflecting a change in Maryland law.  This change, the minutes report, "would allow the Corporation to make repurchased stock available for purchase, but it would not be listed in the Company's financials as Treasury Stock." *Id.*, at 1-2

26.     The Board of Directors also resolved:

That the Chairman of the Corporation is hereby authorized, directed and empowered, at his sole discretion to offer shares of the Corporation's stock that have been repurchased and returned to the status of authorized, but unissued shares, to authorized investors as specified in the Corporation's Charter and By-Laws. *Id.*, at 2.

27. At the May 1997 meeting, the full Board heard a presentation from Bill Egan, the representative of Credit Suisse First Boston from whom the Executive Committee had heard the previous day. *Id.*, at 4. The Board heard that the Executive Committee had approved the repurchase program described above, and following discussions by the Directors, the Board approved the program. (Plaintiff's Complaint, ¶10.)

28. On June 15, 1997, along with all other ULLICO Capital Stock owners, Mr. and Mrs. Casstevens were informed that ULLICO had adopted a "repurchase program" pursuant to which Class A and other such shares would be eligible for repurchase of their shares by ULLICO, from ULLICO's substantial amount of cash on hand (resulting from ULLICO's gradual sale of stock that it owned in Global Crossings), at $27.06 per share. This amount was for the first time based upon GAAP accounting and represented the book value per share as of the prior year-end, December 31, 1996. The June 15 letter stated that this "very fundamental change" was adopted by ULLICO to "provide to [its] shareholders both value on their investment and liquidity," and to "further align the Corporation's interest with our Stockholders' interest." *See* Letter of Robert A. Georgine dated June 15, 1997, Defendant's Ex. D.

29. The program described in the June 15 letter provided for a "formal offer" by ULLICO "to repurchase up to $30 million worth of Class A Stock" that would *not* involve Capital Stock. However, the letter stated that "Capital Stockholders will be

treated as they have been in the past with liquidity provided whenever possible by the Corporation, in accordance with sound corporate practice, based on a request for repurchase from a holder of Capital Stock." *Id.*

30.    On November 10, 1997, ULLICO sent a formal offer, to each of its shareholders, for the purchase of up to 1,108,647 shares of its Class A and Class B common stock, at the "Book Value" of ULLICO's shares as of December 31, 1996, that is $27.06 per share.

31*.*    The Term Sheet (Defendant's Ex. E) provided, among other things, that "Although the [current] offer would not be made for Capital Stock, *the Company intends in the future to offer the greater of book value or $25 per share to repurchase Capital Stock* when exercising its right of first refusal upon the death of a shareholder."   It provided, in addition that, "In the event a holder of Capital Stock gives notice of a desire to transfer such shares, the Company intends to offer to repurchase the shares at book value."   This latter provision was not restricted either in time or to circumstances of a shareholders' death, when adopted by the Executive Committee which was authorized to act between meetings of the Board, thereby authorized the Company to purchase *any* shareholder's Capital Stock at "Book Value."

32.    Mr. and Mrs. Casstevens did not tender any shares in response to this offer.

33.    On May 4, 1998, ULLICO's Executive Committee met and considered the extension of the stock repurchase program adopted the preceding year.  *See* Minutes of Executive Committee Meeting, May 4, 1998, Defendant's Ex. F-1.

34.    In attendance at the meeting was at least one ULLICO director who did

not own any ULLICO shares (Cullerton).

35.     The ULLICO director who attended the May 1998 Executive Committee meeting, and who did not own any ULLICO shares at the time, was "disinterested."

36.     At the May 1998 meeting, "Management proposed to initiate the repurchase offer during the fourth quarter of the year. The repurchases would be made at the stock's book value, which at December 31, 1997, was established at $28.70 per share. In the event of an over subscription, the calculations would be pro rated." *Id.*

37.     At the May 1998 meeting, the Executive Committee approved resolutions, similar to the ones adopted in 1997, providing authority for the repurchase of up to $15 million of ULLICO shares, at "Book Value," as of December 31, 1997, established at $28.70 per share. *Id*.; Plaintiff's Complaint, ¶13.

38.     On May 5, 1998, ULLICO's Board met.

39.     In attendance at the May 1998 Board meeting were at least 3 ULLICO directors who did not own any ULLICO shares (Bahr, Cullerton, Sombrotto).

40.     The three Board members who attended the May 1998 Board meeting, and who did not at the time own any ULLICO shares, were "disinterested." *See* Minutes of Board of Directors Meeting, May 5, 1998, Defendant's Ex. F-2.

41.     At its May 1998 meeting, ULLICO's Board voted to declare a small cash dividend, as contemplated by the 1997 stock repurchase plan that was continued in 1998, after receiving information that ULLICO's "Book Value" had increased to $28.70 per share as of December 31, 1997. *Id.*

42.     On or about July 29, 1998, Mr. Casstevens, among others, was offered the opportunity to purchase up to 2,000 shares of ULLICO's stock at $28.70 per share.

The offer was made in a letter, bearing that date, that acknowledged that "management and the board of directors should have their interests in line with the stockholders, and good common sense tells us that this is a good idea. If the stockholders, the true owners of the corporation, do well," the letter continued, "then the officers and directors should also do well. And the officers and directors in conducting their everyday business should have the interests of the stockholders foremost in their minds." (Plaintiff's Exhibit 12.)

43.    The July 29, 1998 letter to shareholders continued:

One aspect of that at ULLICO has been a continuing program to make our stock available to officers and directors. For many years we did this on a regular basis. Since the early 1990s and the offering of Preferred Certificates, this program has not been as active. Now that we have raised capital, converted those certificates into Class A stock and as you know last year having retired stock so that *we have a pool of stock available for resale*, we would like to renew that opportunity to each member of the Board.

44.    As a result of the Board's earlier resolutions, the shares offered by that letter of July 29, 1998 were *not* Treasury Shares.  The shares offered to Mr. Casstevens in July 1998 were not "issued" by ULLICO.   Rather, they were bought from some shareholders and re-sold to other shareholders, such as Mr. and Mrs. Casstevens.

45.    The offer made to Mr. Casstevens in July 1998 by ULLICO's Chairman, Mr. Georgine, was based upon previous resolutions authorizing Mr. Georgine to sell stock in ULLICO's possession.  (Defendant's Ex. A.)

46.    Mr. Casstevens did not believe, at the time that he purchased shares from ULLICO in July 1998 that the stock was a form of compensation, since he and his wife were buying the stock for value.  Defendant's Responses to Plaintiff's Interrogatory 17, Ex. B.

47.    Another offer to sell up to an additional 2000 Class A shares to Mr. Casstevens was made on October 13, 1998.  (Plaintiff's Exhibit 13.)

48.    On April 16, 1999, prior to the annual ULLICO Board and Shareholder's meetings, a Notice was sent to *all* ULLICO shareholders inviting them to attend the 1999 annual meeting, scheduled for May 18, 1999.  *See* Notice of 1999 Annual ULLICO Shareholders' Meeting, Defendant's Ex. G.

49.    The notice of the 1999 annual meeting provided each shareholder with information concerning, among other things, the number of shares owned by each of the ULLICO directors, including Mr. Casstevens.

50.    On May 17, 1999, ULLICO's Executive Committee met and considered the extension of the stock repurchase program adopted in 1997.  *See* Minutes of Executive Committee Meeting, May 17, 1999, Defendant's Ex. H.

51.    In attendance at the May 1999 Executive Committee meeting were at least two ULLICO directors who did not own any ULLICO shares (Cullerton, McCarron).

52.    The ULLICO directors who attended the May 1999 Executive Committee meeting, and who did not own any ULLICO shares at the time, were "disinterested."

53.    At its May 1999 meeting, the Executive Committee once again approved resolutions, similar to the ones adopted in 1997, providing authority for the repurchase of up to $15 million of ULLICO shares, at "Book Value," as of December 31, 1998, this time established at $53.94 per share.  *Id*.

54.    ULLICO's Board met the following day, May 18, 1999.  *See* Minutes of Board of Directors Meeting, May 18, 1999, Defendant's Ex. I.

55.    Among other things, at its May 1999 meeting, the Board heard and

considered a presentation made by Credit Suisse First Boston concerning ULLICO's ongoing stock repurchase program, as well as a report by ULLICO's chairman about the program. *Id.* The Board also heard that the Executive Committee had voted the previous day to extend the repurchase program based upon a "book value" at year-end (December 31, 1998) of $53.94 per share, "based primarily on unrealized gains from Global Crossings." *Id.*

56.    On July 8, 1999, along with all other ULLICO shareholders, Mr. Casstevens was informed that ULLICO had adopted a "repurchase program" pursuant to which up to $15 million of Class A and other such non-Capital shares would be eligible for repurchase by ULLICO at the rate of $53.94 per share, representing the GAAP "book value" of each ULLICO share as of December 31, 1998. *See* Letter from Robert Georgine dated July 8, 1999, Ex. 2 (Defendant's Ex. J.)

57.    Mr. and Mrs. Casstevens did not accept the offer and chose, instead, to retain their ULLICO Class A shares.

58.    On December 17, 1999, Mr. Casstevens was sent another letter, similar to the July 29, 1998 letter described above, offering the right to purchase up to 4,000 shares of ULLICO Class A stock at $53.94 per share. See Plaintiff's Ex. 16.

59.    Mr. and Mrs. Casstevens accepted the offer and purchased 4,000 shares for $53.94 per share from their own funds. (Defendant's Responses to Plaintiff's Interrogatory No. 17, Ex. B.)

60.    On November 16, 1999, ULLICO's shareholders were sent copies of a formal offer by ULLICO to purchase shares of ULLICO Class A and B stock at $53.94 per share. See Offer to Purchase, Defendant's Ex. K.

61.    The offer required that an accepting shareholder tender its shares by December 17, 1999.

62.    Mr. and Mrs. Casstevens did not tender any shares for sale in response to that offer by ULLICO to purchase shares.

63.    The "1998 and 1999 Stock Purchase Programs" (as defined in the Complaint) were not "interested director transactions."

64.    The prices for repurchase of stock adopted by the Board at its 1998 and 1999 meetings, as described above, were fair and reasonable.

65.    Mr. and Mrs. Casstevens purchased Class A stock from ULLICO at the same price paid by all others who were offered such shares.

66.    On April 11, 2000, prior to the annual ULLICO Board and Shareholder's meetings, a Notice was sent to all ULLICO shareholders inviting them to attend the 2000 annual meeting scheduled for May 11, 2000.  *See* Notice of 2000 Annual ULLICO Shareholders' Meeting, Plaintiff's Ex. 26.

67.    The notice provided each shareholder with information concerning, among other things, the number of shares owned by each of the ULLICO directors including Mr. Casstevens.

68.    Among the shareholders to whom the Notice of the 2000 Annual ULLICO meeting was sent was the Laborers' International Union (LIUNA) which at the time owned approximately 9% of all ULLICO's issued shares.

69.    At the time the Notice of the 2000 Annual ULLICO meeting was sent to the Laborers' International Union (LIUNA), its General President was Terrence O'Sullivan. *See* Notice of 2000 Annual ULLICO Shareholders' Meeting, at 3, Plaintiff's Ex. 26.

70.     The Notice of the 2000 annual meeting specifically named Mr. O'Sullivan as a nominee for election as a ULLICO Director, for a term to expire in 2003, and it specifically disclosed that he did not personally own any ULLICO shares.  *Id.*

71.     Mr. O'Sullivan knew that he would be nominated as a ULLICO Director at the May 2000 meeting.

72.     Mr. O'Sullivan knew that a Notice of the meeting would be sent to ULLICO's shareholders, announcing his nomination and his ULLICO share ownership.

73.     Mr. O'Sullivan received and had the opportunity to know the entire contents of the Notice of ULLICO's 2000 Annual Shareholders' Meeting, including the disclosures made about him and the other ULLICO Directors, especially the disclosures about the personal ownership of ULLICO stock by the other directors named in the Notice.

74.     On May 10, 2000, ULLICO's Executive Committee met again and considered the extension of the stock repurchase program adopted in 1997.  *See* Minutes of Executive Committee Meeting, May 10, 2000, Plaintiff's Ex. 17.

75.     At the May 2000 meeting, the Executive Committee heard of the substantial after tax profits that had been realized by ULLICO from the sale of Global Crossings stock, as well as the substantial increase in shareholders' equity that resulted from ULLICO's continued ownership of Global Crossings shares.  *Id.*

76.     At its May 2000 meeting, the Executive Committee was told that, at year end, December 31, 1999, Global Crossings shares traded at $50 per share and that, at the time of the meeting, those shares were traded at $33 per share, resulting in a 33% decline in ULLICO's total stockholders' equity since that time.  *Id.*

77.    At its May 2000 meeting, the Executive Committee approved resolutions, similar to the ones adopted in 1997, providing authority for the repurchase of ULLICO shares at "Book Value" as of December 31, 1999, established at $146.07 per share. *Id.*

78.    The resolutions adopted by the Executive Committee at its May 2000 meeting contemplated the repurchase by ULLICO of up to 1,645,623 Class A, Class B and Capital Stock, at that amount, for a total of more than $240 million. *Id.*  The offer was made contingent, however, upon a rise in the trading price of Global Crossing shares from its then current value, to $43 per share. *Id.*  The Executive Committee was informed that in 1999, at mid-year, "Global Crossings was trading at $25 and eventually rebounded to $50 at year end." *Id.*  In addition, the repurchase offer was made contingent upon the tender of either 93% of all shares outstanding or tenders from all shareholders holding in excess of 1% of the Company's stock. *Id.*

79.    At its May 2000 meeting, the Executive Committee was informed that "the Global share price is down and that [ULLICO] *may repurchase at a premium*.  The Company has a commitment to honor in the repurchase program.  It would not be appropriate for the Company to act inconsistently in 2000." *Id.*

80.    On May 11, 2000, the Board of Directors met.  *See* Minutes of Board of Directors Meeting, May 11, 2000, Plaintiff's Ex. 22.

81.    At its May 2000 meeting, the Board received a report on the 2000 repurchase program that had been adopted by the Executive Committee the preceding day. *Id.*, at 3-4.

82.    Prior to its May 2000 meeting, the Board was presented with an "agenda item" that described the repurchase program, and that offered the opinion of Credit

Suisse First Boston that the program was "favorable to [ULLICO] stockholders and has been balanced in a manner so it will not jeopardize the Corporation's well being." *Id.*, at 4; Plaintiff's Complaint ¶ 34.

83.    After receiving these materials and management's report, and discussing the program, the Board unanimously adopted a series of resolutions that approved the program. *Id.* Among other things, the Board resolved "That for year-end 1999," the Book Value of ULLICO's stock was "146.04 [per share] to be used in calendar year 2000 for repurchases." *Id.* The resolutions required that the program would be "effective on November 1st [2000], or as soon thereafter as is practical, economically sound, and in conformity with law and regulation." *Id.*

84.    The price of Global Crossings shares did not rise to $43 per share in the period following the May 11, 2000 meeting. *See* Minutes of Board of Directors Meeting, November 3, 2000, at 2, Plaintiff's Ex. 21.

85.    Because the price of Global Crossings shares did not rise to $43 per share in the period following the May 11, 2000 meeting, the repurchase program established at the May 2000 meeting was not implemented.

86.    On November 3, 2000, ULLICO's Board of Directors met again. *Id.*

87.    By the time of the November 2000 meeting, the composition of the Board changed as a result of the elections held at the Company's annual shareholders' meeting in May.

88.    In attendance at the November 2000 meeting was at least one director, Terrence O'Sullivan, who was elected at the May meeting, who owned no ULLICO shares, and who the Plaintiff admits was, at the time, a *disinterested director*. *Id. See*

ULLICO's Statement of Material Facts as to Which It Contends There Is No Genuine Issue, ¶ 47.

89.     Mr. O'Sullivan had the right and opportunity before the meeting, and the duty, to review the materials considered by the Board at the May 2000 meeting and the Notice of ULLICO's 2000 Annual shareholders' meeting.

90.     At the November 2000 meeting, Mr. O'Sullivan, along with all of the other Board members present, voted in favor of *all* of the resolutions adopted at the meeting.

91.     At the November 3, 2000 meeting, Robert Georgine, then ULLICO's Chairman, delivered a lengthy report concerning the repurchase program that had been adopted by ULLICO in 1997 and extended each year thereafter.  *See* Minutes of Board of Directors Meeting, November 3, 2000, at 2 - 5, Plaintiff's Ex. 21.

92.     At the November 2000 meeting, Mr. Georgine remarked:

> Before you today is a Resolution that would offer a 30 million dollar repurchase to all Stockholders. We have done a number of things. First, we have designated an amount we believe we can do reasonably and maintain our cash needs. This includes the purchase of Amalgamated Bank. It also leaves the Company in a better position for offerings in the future while also allowing the businesses and the services we provide to the labor movement to grow. And, we have extended the date past year end. Because of the timing of this meeting and the upcoming holidays, this seems most equitable. The Executive Committee and this Board sets the value of the stock for purposes of repurchases each year. It is set at the Annual Meeting and it remains until the next Annual Meeting.

> In addition, this Resolution also sets some standards. To participate in the-Repurchase, a Stockholder-must be currently eligible to purchase stock. This does not affect any of the trust funds or health and welfare funds, or the unions, but we do have individuals who were eligible at one time to purchase stock and are no longer eligible. It is not appropriate for them to participate in the offering process.

> *The Resolution also sets reasonable standards confirming the Chairman's discretion. Since the founding of this Corporation we have repurchased stock, from individuals, from unions and from estates. It is*

*part of the essence of being a closely held corporation. We do not advertise this and we do not encourage it. As we have said from the very beginning, ULLICO Inc. is a long-term investment and has been a long-term investment since 1925.*

*I have decided that it would be good to have the Board's confirmation of my authority and it is limited in a number of ways. Repurchases cannot be at a price greater than that set by the Executive Committee or the Board and it cannot be from any single stockholder for more than 1 percent of the aggregate total of shares outstanding. Those are simple safeguards so that the Board has not granted unlimited authority to an individual but a reasonable exercise of authority to keep the business of the Corporation functioning. It is important that we move forward. Id.*, at 4.

93.    After hearing Mr. Georgine's remarks at the November 2000 meeting, the Board *unanimously* voted to approve a series of resolutions.  Among other things, the Board *unanimously* voted to establish the price of ULLICO's shares, for the purpose of repurchasing, at $146.04 per share.

94.    At the November 2000 meeting, ULLICO's Board adopted the following resolution:

That for repurchases of Stock and Capital Stock occurring after the date of the Corporation's most recent Annual Meeting, that is to say, May 11, 2000, the maximum repurchase price per share shall be $146.04, being the repurchase price selected by the Board of Directors on such date and representing the book value per share as of December 31, 1999, calculated by taking the total shares of Stock and Capital Stock outstanding at year end and dividing that number into "Total Stockholders Equity" as reported on the Corporation's Audited Financial Statements.

95.    At the November 2000 meeting, the ULLICO Board ratified the decision of the Board, at the May 11, 2000 meeting, establishing the price for repurchase of ULLICO shares at $146.04 per share.

96.    At the November 2000 meeting, the ULLICO Board voted *unanimously* to

confirm the authority previously given to and exercised by the Chairman, Robert Georgine, to repurchase shares of ULLICO's stock at "Book Value" as established by the Board.  (Plaintiff's Ex. 21, at 5-6.)

97.    At the November 2000 meeting, the ULLICO Board voted *unanimously* to adopt the following resolutions:

> RESOLVED: *That the Chairman of ULLICO Inc. (the "Corporation") is hereby authorized and empowered, in his discretion, whenever he deems it consistent with sound financial practice and the best interests of the Corporation, to repurchase shares of Class A Stock or* Class B Stock ("Class A Stock," "Class B Stock" referred to collectively herein as "Stock") or *Capital Stock from those shareholders offering the same to the Corporation*; provided that the authorization granted under this resolution shall not be exercised during any period commencing on the date of an annual meeting and ending on the day next preceding the following annual meeting of shareholders in a total amount with respect to any particular stockholder in excess of 1% of the total outstanding Stock and Capital Stock, taken in the aggregate, of the Corporation computed immediately preceding the repurchase in question. And, it was

> FURTHER RESOLVED: *That the Chairman, in exercising the powers set forth in the preceding resolution, is hereby authorized and empowered to effect such purchases of Stock and Capital Stock offered to the Corporation at such price per share as he shall deem appropriate; provided, however, that such price shall not be greater than that most recently specified by the Board of Directors.* **The authority granted by this resolution and the preceding resolution is in addition to the authority granted by the following resolutions.** And, it was

> FURTHER RESOLVED: *That the powers of the Chairman under the preceding resolutions, the following resolutions*, and any future resolutions adopted with respect to the repurchase of Stock or Capital Stock of the Corporation, *may be exercised with respect to Stock or Capital Stock held by any Director or Officer whatsoever of the Corporation as fully as if such Directors or Officers were persons eligible to purchase Stock or Capital Stock of the Corporation, but were not Directors or Officers*; a report of such purchases from Directors and Officers shall be made from time to time to the Compensation Committee." …

*See* Minutes of Board of Directors Meeting, November 3, 2000, at 5-6, Plaintiff's Ex. 21 (emphasis added).

98.    At the November 2000 meeting, the ULLICO Board voted unanimously to adopt a modified version of the repurchase program adopted in May.  *Id.*, at 6-8. Among other things, the Directors voted in favor of a repurchase program, pursuant to which up to $30 million of Class A and other such non-Capital shares would be eligible for repurchase by ULLICO at the rate of $146.07 per share, the GAAP "book value" of each ULLICO share as of December 31, 1999.  *Id.*

99.    Although the resolutions adopted by the Board at the November 2000 meeting made the purchase of shares from shareholders owning more than 10,000 shares subject to proration, the Board also resolved that "A tender of shares of Stock by a stockholder who holds 10,000 shares or fewer of Stock and who properly tenders all shares of Stock that such stockholder beneficially owns will not be subject to the prorationing provisions nor in the aggregate to the overall limit on purchases set forth above."  *Id.*

100.    The effect of this portion of the resolution was to exempt from pro-rationing repurchases of shares from persons who owned less than 10,000 ULLICO shares, as long as they tendered all of their shares for repurchase.

101.    The other resolutions of the Board, described above, approved application of this exemption to Directors.

102.    At the November 2000 meeting, the ULLICO Board specifically made implementation of the repurchase program "subject to the Corporation's receiving tenders of 100% of the shares beneficially owned by each and every stockholder which

holds in excess of 2% of the shares of Stock; <u>and</u> provided that management may modify or waive such condition at the discretion of the Chairman so long as the repurchase will not cause a significant redistribution of equity." *Id.*, at 7.

103.   No director dissented, or announced his dissent at the November 2000 Board meeting.

104.   No director filed a written dissent *at any time* after the meeting, with respect to *any* of the matters addressed at the November 2000 meeting.

105.   At the time of the November 3, 2000 Board meeting, Mr. Casstevens had no intention to sell any of the ULLICO stock that he then owned. (Plaintiff's Exhibit 1 at 110-111 and 130-131.)

106.   As Mr. Casstevens has testified, he never thought about whether he stood to benefit from the resolutions that he voted on.  (Plaintiff's Ex. 1 at 110-111.).

107.   On November 21, 2000, along with all other ULLICO Capital Stock owners, Mr. and Mrs. Casstevens were informed by letter that ULLICO had adopted a revised "Repurchase Program," pursuant to which $30 million of Class A and Class B stock would be eligible for repurchase by ULLICO at the rate of $146.07 per share.  *See* Plaintiff's Ex. 28.

108.   All of the unions and other entities that were ULLICO shareholders, including the Laborer's International Union (LIUNA), the union of which Mr. Terrence O'Sullivan was then president, were sent the same letter and were offered the same opportunity.

109.   The November 21, 2000 letter notified all of the ULLICO shareholders, in relevant part, of the following:

In my letter of July 12th we communicated the action taken by the Board of Directors at the May 11, 2000 Annual Meeting. That letter discussed our hope to complete what we described and intended as an Extraordinary Stock Repurchase Program. The amount of that repurchase totaled over $240 million. However, as was stated in that letter, the offering was contingent on certain conditions being met. Essentially that Global Crossings, Ltd. must be trading at no less than $43 per share and we had to have a practical opportunity to realize its gains in order to fund that offer.

> *Everyone is well aware of what has happened in the markets since May of this year.* In fact, Global Crossings, Ltd. has not achieved the $43 per share contingency. Therefore, a key condition to the previously announced Repurchase Program has not been met.

On November 3rd the Board of Directors of ULLICO Inc. (the "Company") met to consider this issue. At that meeting the Board took action which supersedes and replaces the actions taken at the May 11, 2000 Meeting. The Company will proceed with a Repurchase Program and this Repurchase Program will be for $30 million worth of the Company's stock. While this is a reduction from the extraordinary event we had discussed earlier, it is an increase from the originally developed and intended Repurchase Program for this year.

> When the Company began this program in 1997, there was a repurchase of $30 million of Class A and Class B Stock and the Company announced its intent based on business circumstances and conditions to repurchase an additional $15 million worth of stock in each of the next succeeding 10 years. At the November 3rd meeting the Board has approved an offer to repurchase $30 million of Class A and Class B Stock based on our current circumstances and the sound financial posture of our Companies. The repurchase value will be $146.04 per share. Management and the Board felt it important to continue the Repurchase Program based on audited financials; although, the repurchase value is established annually by the Board.

There are some conditions to the revised repurchase offer; however, they do not relate to the value of Global Crossings, Ltd. or any other financial considerations. In particular, we must receive tenders of 100% of the shares of all the Stockholders who hold in excess of 2% of the Company stock. This is intended to minimize any over concentration of the Company Stock with certain Stockholders. In addition, as many of you know, our By-laws restrict the relative percentage of shares that can be held by any entity or individual. Those By-law restrictions still continue and we want to make every effort to maintain the balance of ownership of the Company into the future. In addition, the Company continues to reserve its right, pursuant to its By-laws, to repurchase shares outside the Repurchase Program at $25 per share. You should carefully review the Offering Memorandum that you will receive in connection with the Repurchase Program.

* * * * * *

The Company anticipates receiving shares in excess of the $30 million it is offering to repurchase, so it will pro-rate each submission so all participating Stockholders share *equitably* in the offering. Other terms and conditions of the repurchase will be described in the Offering Memorandum.

*See* Plaintiff's Ex. 28 (emphasis added).

110.    Mr. O'Sullivan's union, LIUNA, exercised its rights under the repurchase program adopted by the Board in November 2000.

111.    As a result of its participation in the program adopted by the Board at its November 2000 meeting, LIUNA received more than $1.2 million in proceeds for the shares that it tendered.

112.    Mr. O'Sullivan knew that LIUNA tendered shares in response to the offer made for repurchase following the November 2000 Board meeting.

113.    Mr. O'Sullivan knew that LIUNA received money amounting to more than $1 million for the shares that LIUNA tendered in response to the offer made for repurchase, following the November 2000 Board meeting.

114.    The December 14, 2000 Offer to purchase, Plaintiff's Ex. 18, which

constituted ULLICO's formal offer to *all* ULLICO shareholders, stated:

> As of September 30, 2000, there were **7,886,333 Shares outstanding**. Accordingly, the 205.423 Shares, which the Company is offering to purchase in the Offer. represent approximately 2.6% of the Shares outstanding as of September 30, 2000.

> *The Company has not been advised that any of its directors and executive officers presently intend to tender any shares personally owned by them pursuant to the Offer. However, such directors and executive officers are not prohibited from. and may elect to, participate in the Offer.* As of September 30. 2000, the Company's directors and executive officers as a group (33 persons) beneficially owned an aggregate of 100,971 outstanding Shares (Class A Common Stock) representing approximately 1.3% of the outstanding Shares. If the Offer is fully subscribed by the Shareholders of the Company and the directors and executive officers of the Company do not participate in the Offer, the aggregate percentage share ownership interest of the Company's executive officers and directors as a group will remain at approximately 1.3% of the outstanding Shares following consummation of the Offer.

> There is no public trading market for the Shares. The repurchase price for the Shares has been established by the Board of Directors of the Company as of May 11, 2000 and is based on the book value per share, as of December 31, 1999, determined in accordance with generally accepted accounting principles ("GAAP"). Book value per share is derived by taking the total of all Shares of Capital Stock and Shares outstanding at December 31, 1999, as shown in the Company's 1999 financial statements and dividing that number into Total Stockholders' Equity.

> \* \* \* \* \* \*

> The Company, upon the terms and subject to the conditions of the Offer, will accept for purchase all Shares properly tendered and not withdrawn before the Expiration Date by any holder. that beneficially owns fewer than 10,000 Shares, provided that such holder tenders all Shares beneficially owned by the holder. These tenders will not be subject to the proration provisions as set forth in the first paragraph of Section 1 herein. This Offer is not available to owners of 10,000 or more Shares even if such owners have separate stock certificates for fewer than 10,000 Shares. Any holder of fewer than 10.000 Shares wishing to tender all Shares beneficially owned by such holder pursuant to the Offer and qualify for this preference must complete the box captioned "Holders of Fewer than 10,000 Shares" on the Letter of Transmittal.

> \* \* \* \* \* \*

> Notwithstanding any other provision of the Offer, the Company shall not

accept for payment or pay for any Shares tendered unless each holder of Shares that owns in excess of 2% of the number of Shares outstanding, tenders and does not withdraw all of the Shares beneficially owned by such holder, provided that the Company may waive this condition if such waiver will not result in a significant redistribution in the equity ownership of the Company. As of November 30, 2000, the total number of Shares held by all holders who each hold in excess of 2% of this number of Shares outstanding was **5,378,334**.

*See* December 2000 Offer to Purchase, Plaintiff's Ex. 18, at 1, 3, 6 (emphasis added).

115.   The condition for repurchase set forth in the offer, that "each holder of Shares that owns in excess of 2% of the number of Shares outstanding, tenders and does not withdraw all of the Shares beneficially owned by such holder," was met.

116.   The holders of a majority of the outstanding shares (i.e., at least 5,378,334 out of 7,886,333 Shares outstanding) tendered *all* of their shares, in accordance with the program.

117.   At least $5.4 million was paid under the "Discretionary Repurchase Program" identified in the Complaint in this case, to the owners of ULLICO shares who were *not* ULLICO directors or officers.

118.   ULLICO has reportedly recovered from other Defendants in other cases, including Robert Georgine, Arnold & Porter, PriceWaterhouseCoopers and others, either by way of settlement or otherwise, an amount greatly in excess of $10.7 million. (Judicial Notice requested.)

119.   ULLICO has recovered from other Defendants in related actions an amount that is equal to or greater than the amount of money that ULLICO has alleged to be the pre-tax profits of all of those other persons and Mr. Casstevens resulting from their collective sales of ULLICO shares under the repurchase programs described in the Complaint in this case.

120.    There is no evidence that Mr. Casstevens did *not* rely, in casting his vote on the resolutions for which he voted at the several Board and Executive Committee meetings in which he participated, upon information and materials provided by such professionals, including, for example, information that established the Book Value of ULLICO's shares at each year end, and opinions by Credit Swisse First Boston that programs considered by the Board or the Executive Committee were fair to the corporation.

121.    On March 25, 2003, a Special Committee appointed by ULLICO to evaluate the transactions and matters at issue in this case, found no illegal conduct or wrongdoing on the part of the Directors, stating that "there was no basis to call for disgorgement of the proceeds of their investment."

122.    On March 28, 2003, ULLICO's Board of Directors declared "there was no illegal conduct or wrongdoing by the directors and officers as determined by Governor Thompson and the Special Committee of the Board of Directors."

123.    There is no evidence that, under the circumstances at the time, the programs considered by the Executive Committee or Board were *not* fair to ULLICO and its shareholders as a whole.

124.    The business purpose of the entire share repurchase program, begun in 1997, was set forth in the documents accompanying the decision to initiate the program.

125.    The business purpose of the entire share repurchase program, begun in 1997, was, among other things, to provide all of ULLICO shareholders with liquidity while, at the same time, preserving the balance of share ownership among the many unions that owned ULLICO's shares and ensuring that none of them would

control more than 9% of such shares. *See*, *e.g.*, *See* Minutes of Executive Committee Meeting, May 5, 1997, and Credit Suisse First Boston presentation referenced therein (Defendant's Ex. A).

126.   The business purpose of the entire share repurchase program, begun in 1998, was also to ensure that payments to stockholders for their shares under the Formal Repurchase Program would not be taxed as dividends; to avoid certain requirements of the federal securities laws that would apply to the Company if it had more than 500 stockholders, that would have created substantial expense to ULLICO, which the directors rationally may have sought to minimize or eliminate; and to eliminate small stockholders and thereby reduce the general administrative expenses associated with such additional stockholders.

127.   ULLICO has not offered to return to Mr. and Mrs. Casstevens the cash that they paid for ULLICO stock, plus interest.

Respectfully submitted,

HOGAN & HEALD

By:      /s/ Thomas M. Hogan, Esquire
Thomas M. Hogan, Esquire
DC Bar No. 104950
HOGAN & HEALD
11130 Fairfax Blvd., Suite 310
Fairfax, VA 22030
(703) 591-0003
*Attorney for Defendant*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Defendant's Statement of Material Facts As To Which Defendant Contents There Is No Genuine Dispute was served electronically on this 22nd day of June 2007 to:

Victor Tabak, Esquire
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, NW, Suite 900
Washington, DC 20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
(DC Bar # 480333)
*Attorneys for Plaintiff*

/s/ Thomas M. Hogan, Esquire
Thomas M. Hogan, Esquire `