MEETING OF THE EXECUTIVE COMMITTEE
OF
ULLICO Inc.

Held May 5, 1997
At 111 Massachusetts Avenue, N.W.
Washington, D.C.
2:00 p.m.

ATTENDEES:

John J. Barry
Marvin Boede
Kenneth J. Brown
Bill J. Casstevens
John E. Cullerton
John F. Gentleman
Robert A. Georgine

Frank Hanley
Joseph F. Maloney
James F. M. McNulty
James J. Norton
Lester H. Null, Sr.
Jacob F. West

ABSENT:

Arthur A. Coia
John T. Joyce
William H. Wynn

OTHERS IN ATTENDANCE:

Joseph A. Carabillo
John K. Grelle
George Holland*
James W. Luce

Mark A. Maloney
Charles R. Sormani
Michael R. Steed

*Director, Ulico Casualty Company

Chairman Georgine called the meeting to order and noted that Messrs. Coia, Joyce and Wynn were unable to attend.

As of December 31, 1996, the Company had 334,368 1/3 shares of Capital Stock issued and outstanding. Because of reacquisition and issuance of shares, 2,559 shares of Capital Stock were being held pending resale. Also, as of December 31, 1996, the Company had issued 6,141,959 shares of Class A Stock and 133,280 shares of Class B Stock.

The Minutes of the February 14, 1997 Meeting of the Executive Committee were distributed with the Preliminary Agenda. Hearing no changes or modifications, it was

RESOLVED: "That the Minutes of the Executive Committee Meeting of February 14, 1997, as distributed with the Agenda for this meeting, be and hereby are approved."

Motion was made, seconded and approved.

The Chairman stated that ten years ago there were essentially three corporations: Union

DEFENDANT'S EXHIBIT A

Labor Life; USA Life, and Ulico Casualty. Through acquisitions and mergers and development of new businesses. The ULLICO organization now had twenty-four corporations. As companies and new employees were acquired, we accumulated many different benefit plans, including over twenty health plans, nine 401(k) and profit sharing plans, and pension plans. We also experienced changes in accounting rules concerning benefit plans which have impacted our financials, in particular FAS-106 on retiree health insurance.

He stated a need for there to be a more hands-on style of management of the benefit programs. Management proposed a restructuring by eliminating the Welfare Committee of the Board in favor of a Benefit Committee made up of Senior Management. The management committee would meet regularly to administer, plan and effect changes in the benefit plans.

RESOLVED: "That Article VI, Section 1 of the Corporation's By-laws be amended to eliminate reference to the permanent Committee of the Board of Directors known as the Welfare Committee, that Article VI, Section 5 of the Corporation's By-laws be eliminated in its entirety and that the By-laws shall hereby be amended." And, be it

FURTHER RESOLVED: "The Executive Committee of the Corporation, and each of them, does hereby authorize the creation of a new Benefits Committee to consist of the senior officers of ULLICO Inc., including the Chairman, President and Chief Executive Officer, the Executive Vice President, the Senior Vice President, Insurance Operations, the Senior Vice President, Chief Financial Officer, the Senior Vice President, Investments and the Vice President and Chief Legal Officer." And, be it

FURTHER RESOLVED: "That the Executive Committee of the Corporation, and each of them, does hereby authorize, direct and empower the above named officers to act as fiduciaries to all plans created, or to be created, for the benefit and welfare of the Corporation's employees and the employees of each of its subsidiaries and/or affiliates in which the Corporation, or its subsidiary, owns 80% or more of the outstanding stock, and the Committee shall have full authority for the administration of all such plans." And, be it

FURTHER RESOLVED: "That as fiduciaries, the Committee shall be, and hereby is, further authorized, directed and empowered to appoint trustee(s) as may be deemed necessary and desirable and shall be charged with reporting any and all material changes in each and every plan created for the benefit and welfare of the employees of the Corporation and the employees of each of its subsidiaries in which the Corporation owns 80% or more of the outstanding stock, on an at least an annual basis to the Corporation's Executive Committee." And, be it

FURTHER RESOLVED: "That the appropriate officers and employees of the Corporation shall be, and each of them hereby is, authorized, directed and empowered to, on behalf of the Corporation, acknowledge, execute and deliver any and all such actions or documents, which may be necessary or desirable to effectuate the foregoing resolutions, and their acts and deeds in so doing shall be conclusively presumed to be the acts and deeds of the Corporation."

JW 00493

Motion was made, seconded and approved.

The Chairman told the Committee that Financial Freedom was attempting to expand its activities. Part of the expansion involved endorsements from CalPERS and the National Conference of Senior Citizens. Both organizations mandate that Financial Freedom be authorized to provide loans other than our own product under a Fannie Mae program and loans under a HUD program. Fannie Mae required an assurance that Financial Freedom would maintain at least $250,000 in net worth as long as they were a contracted seller or servicer of Fannie Mae products. The next resolution authorized ULLICO to issue a guaranty to support the net worth of Financial Freedom to that extent.

RESOLVED: "That the appropriate officers of the Corporation, and each of them, are hereby authorized, directed and empowered to, on behalf of the Corporation, provide a guaranty to the Federal National Mortgage Association on behalf of Financial Freedom Senior Funding Corporation, in an amount not to exceed $250,000, for the purpose of maintaining the net worth requirements necessary to remain a qualified seller and/or servicer of the Federal National Mortgage Association's reverse mortgage programs."

Motion was made, seconded and approved.

The Chairman next stated that the next resolution represented something very new. Management was proposing a change in the very nature of our relationship with the Company's stockholders. ULLICO's stockholders are much larger today than they were when the Company formulated its original relationship with its stockholders. Stockholders' capital increased more than forty-four times from what it was at year-end 1991. Also, the average holding of a stockholder has increased forty times from close to sixteen thousand dollars, to over six hundred thousand dollars.

The Chairman introduced Bill Egan from Credit Suisse/First Boston who made a presentation concerning the repurchase program (a copy of Mr. Egan's presentation is attached and made a part of these minutes). Following the presentation, there was significant discussion by the Directors. They focused on the calculation of yield and the benefits of this program to both stockholders and the Company. Mr. Egan, from First Boston, responded that the value added to the corporation in book value as a measure of value was practical, and passing along his measure to the stockholders aligned both the stockholders' interests and the Company's interests. The Company benefits by being able to retain capital for future growth, the stockholders benefit by participating in that growth more directly than they ever have in the history of the Company.

One director asked why the Company does not go public. The response by another director was that it would destroy the mission of the Company and its very unique nature as a labor-owned entity that operates independently but serves the organized working men and women of America.

Another director commented that this really was a major step forward because one of the issues rased in the original purchase of Preferred Certificates was "what was the value of this stock" and did one generate any appreciation in its value. This answers both questions in a very cost efficient, practical manner.

Several officers participating in the discussion indicated that this repurchase program created a market, therefore, set the price for the stockholders, especially those which are pension funds and need to record this in their portfolio. Another indicated that one of the issues which has concerned rating agencies is the payment of large dividends which has hampered investment in future growth,

3

JW 00494

and in this competitive environment, that has become a critical factor in the future of the Company. Following additional discussions a motion was made, seconded and passed unanimously. It was

RESOLVED: "That the Corporation is hereby authorized to enter into a repurchase program designed to provide liquidity for up to $180,000,000 of the holdings of Class A, Class B and Preferred Certificates over the next 11 years." And, be it

FURTHER RESOLVED: "That in 1997, the Corporation on June 1st, or as soon thereafter as is practical and in conformance with law and regulation, will offer to repurchase $30,000,000 worth of equity from the holders of Class A, Class B and Preferred Certificates with the repurchase to be effective on June 30, 1997, or as soon thereafter as is practical and in conformity with law and regulation." And, be it

FURTHER RESOLVED: "That in each of the subsequent years, beginning in 1998 and ending in the year 2007, the Corporation will, solely from its operating cash flow, make available up to $15,000,000 in cash to, at the stockholders' request, repurchase stock from holders of Class A, Class B and any remaining Preferred Certificates." And, be it

FURTHER RESOLVED: "That said repurchase program will be in conformity with the Term Sheet which is attached and made part of this resolution and which will be included in its entirety with the minutes of this meeting (See Tab E)." And, be it

FURTHER RESOLVED: "That the repurchase program will be based on "Book Value". The Book Value will be determined at each repurchase date based on the prior year end audited financials of ULLICO Inc. The calculation shall be accomplished by taking the "Total of Stockholders Equity" as shown on the financial statement and dividing it by the total number of shares outstanding of Class A, Class B, Capital Stock and any Preferred Certificates still outstanding."

FURTHER RESOLVED: "In the event that subscriptions for repurchase exceed the dollar amount available in each of the years of the program, the Corporation shall determine a pro rata allocation among all requesting stockholders and allocate the dollars available among the stockholders requesting repurchase."

FURTHER RESOLVED: "That the appropriate officers and employees of the Corporation shall be, and each of them hereby is, authorized, directed and empowered to, on behalf of the Corporation, acknowledge, execute and deliver any and all such actions or documents, which may be necessary or desirable to effectuate the foregoing resolutions, and their acts and deeds in so doing shall be conclusively presumed to be the acts and deeds of the Corporation."

The Chairman noted that this concluded the action items on the agenda and introduced Mr. Grelle. The Chairman said he had asked Mr. Grelle to give a short overview of how the Companies did during 1996.

JW 00495

Mr. Grelle stated that his report would supplement the information contained in the Annual Report. He reminded the Committee that all financial results were now presented on a Generally Accepted Accounting Principles or "GAAP" basis. This included prior year comparisons which were restated for consistency with the current year's financial results.

Total Company earnings at year-end were $10 million. Earnings were $16.9 million in 1995. Certain items negatively impacted this year results and without three of these items, earnings would have been $17.2 million. The three items included $6.9 million of Diplomat related costs ($4.5 million after taxes), $2.4 million in realized capital losses due to the write-off of a marketing venture ($1.6 million after taxes), and $1.7 million related to a write-down in value for two real estate properties held by Union Labor Life as a result of foreclosure ($1.1 million after taxes).

Mr. Grelle stated that Union Labor Life bore the brunt of these items. Excluding the Diplomat costs and the real estate write-downs, after tax earnings for Union Labor Life were $9.3 million, a 23% increase over 1995. He noted that premium and fee revenues increased by 7% to $232 million. This was a trend reversal and proved to be beneficial in A.M. Best's latest rating review.

Property and Casualty had net earnings of $1.3 million in 1996. 1995 results were only $1.2 million, but Mr. Grelle pointed out that current year results were aided by an accounting change which eliminated a statutory reserve. Operations were negatively impacted by higher than planned loss ratios for the Workers Compensation line and a reserve increase for reported claims of $5 million in the fourth quarter.

Zenith had a net loss of $300,000 compared with a $1,000,000 loss in 1995. Excluding after tax intercompany interest costs, Zenith had a net gain of almost $1 million. The improvement was a result of a 2% increase in fee income and a decrease in costs.

TFA earned $1.7 million after tax. Results from 1995 were $1.9 million. The decrease was due to the loss of funds under management, as reported earlier to the Committee.

MRCo realized net income of $2.2 million, a 47% increase from 1995. The improvement was attributable to AMI Capital's strong performance, offset to some extent by the capital loss from the discontinuance of the Securitas venture.

Overall, ULLICO's balance sheet indicated that total assets grew by $165 million to $2.8 million, a 6% increase over year-end, 1995. Separate Account growth was again important with the GIC maturities of $100 million reducing the overall increase.

Total Stockholder Equity, previously referred to as Capital and Surplus, was $258.7 million, down from 1995's figure of $272 million. While the Company earned $10 million, dividends and Preferred Certificate payments of approximately $20 million caused the net decrease in equity.

Mr. Grelle also indicated that all unrealized Capital gains or losses were recognized under GAAP. The Company had an unrealized gain net of deferred tax of $14.8 million at year-end, 1996.

The Chairman asked the Committee if they had any questions of Mr. Grelle or from any of the written materials provided in the Agenda from the various business units. He stated that the Agenda would be attached to the minutes and become a part of the record.

The Chairman asked for an Executive Session and delivered his report to the Committee (a

JW 00496

complete copy of which is attached as an addendum to these minutes). Afterwards, the Meeting was adjourned and the Chairman was authorized to select the time and place of the next meeting.

_____
Joseph A. Carabillo
Vice President and
Assistant Secretary

Attachments

Chairman's Statement
Executive Session
May 5, 1997

As you heard during the meeting, looking at the bottom line, we did not have as good a year as we did in 1995. That is only one test. I think 1996 was a good year in that we resolved a major problem for this Company. Putting the Diplomat into a position where the Company can finally act on its sale is very important.

We take that event and add to it the one-time write-off on two properties we acquired in foreclosure and the write-off of our investment in the project called Securitas. After eliminating those write-offs from prior year activities, we had virtually an identical year to 1995. In fact, operating gains were up two percent. So the base operations are still sound and getting the Diplomat behind us will be beneficial.

As you know, we are in the process of trying to sell the property and I will tell you that based on the offers we received to date, any gain from this property, even based on the restated value of 40 million dollars at ULLICO Inc., is unlikely. In fact, we may record an additional loss in 1997. Time will tell. We are still evaluating offers. I will keep you advised as to our progress.

What is most important today is the change in our relationship with our stockholders. Many of whom are represented in this room. We were very successful in offering the Certificates and for that I thank all of you in this room who have supported that effort. As we noted in the agenda item, it changed our relationship to our stockholders in a very fundamental way. Because we are a closely held corporation, we had always provided the market for our stock. But if you look at our traditional stockholders, it was not a difficult market to provide. In 1991, when we started the offering, our stockholders had 5.2 million dollars in capital. Even today, our largest Capital stockholder holds less than 800 thousand dollars worth of Capital Stock. Today, we have stockholders who hold 30 million dollars worth of equity. The Company could not go forward with a repurchase of a 30 million dollar block of stock without advanced planning. Therefore, the repurchase program is being established to create liquidity for our stockholders.

At the same time, the pressures in the marketplace are such that payment of cash dividends of the size we were paying, which were four times greater than the average and in some cases more than that, was hamstringing the Company. Therefore, tomorrow, management is going to recommend a two percent dividend. With the change to book value, holders of the shares will have an unrealized gain of two dollars and six cents per share, or about eight and a quarter percent for the year. Total return, unrealized and realized, will be slightly in excess of ten percent. We think that is a good return and that this program will be more positive in the long run. We also believe that the provision of liquidity and value are important goals of the corporation if we are going to remain as we have always been, a labor-owned entity.

There is one additional benefit. I have been emphasizing with the officers the need to add value to our stock. This change will focus attention on book value. It puts additional pressure on the officers who work for us to make sure that our business endeavors add value to the stockholders. This will benefit everyone and I look forward to your support as we move forward on this tomorrow and announce it at the Stockholders Meeting.

One additional item before we leave today. At its meeting, the Nominating Committee decided to move one of our members to a new class of directors. As you know, our directors are elected in groups of a third each year. I would like a motion electing Bill Casstevens to a vacancy which is in the class that will be up for election in 1999. Thank you.

That concludes our meeting.

120 Corporate Secretary Meetings May 5 97 EXEC CTTE
Chairmans STATEMENT EXEC SESS

JW 00498

Addition to Chairman's Statement
Executive Session

RE:   ULLICO PCG/Nautilus

At our last Executive Committee meeting we brought two resolutions to you concerning an investment opportunity. You gave preliminary approval to the formation of a joint venture with the Pacific Capital Group to be called "ULLICO/PCG Advisors." That project has been put on hold. I had questions concerning Mr. Winnick and the adequacy of the due diligence concerning this individual and his company. Also, a statement was made at our last meeting by Mr. Steed which indicated that Pacific Capital Group had a net worth of $200 million. We have been unable to confirm that statement. Mike's response appears to have been an unintentional error since it appears that Mr. Winnick may have personal worth of that magnitude, there is no indication that Pacific Capital Group, who would be our joint venture partner, has that magnitude of capitalization. Thus, I have put this on hold pursuant to that resolution which allowed for additional due diligence and discussion. It is my intent to meet with Mr. Winnick and see if we can reach a common understanding as to going forward and what our business activities would be and some reasonable limitations on Mr. Winnick so that we can be reasonably assured that these are in line with our goals as a company.

I would also like to bring you up-to-date concerning the Nautilus transaction. You will remember that we had extensive discussions about this fiber optic cable that was to be laid under the Atlantic. This transaction did close, though we have not as yet seen final documents. However, when we approved the transaction, we authorized an investment up to $10 million. The actual investment was $8 million as you saw in the resolution we just adopted which authorized a loan of $8 million from Union Labor Life to MRCo.

Addition to Chairman's Statement

JW 00499

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Civil Division

ULLICO, INC.,            )
                         )
    Plaintiff,        )
                         )
v.                       )    Case No.: 1:06CV01388 (RJL)
                         )
BILLY CASSTEVENS,        )
                         )
    Defendant.        )

### DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

**OBJECTIONS APPLICABLE TO ALL INTERROGATORIES:**

1. Defendant objects to Plaintiff's Interrogatories to the extent they purport to impose obligations on Defendant beyond those required by the Federal Rules of Civil Procedure.

2. Defendant objects to Plaintiff's Interrogatories to the extent that they call for the disclosure of personal, confidential, irrelevant information of Defendant and any person not a party to this suit.

3. Defendant's responses to Plaintiff's Interrogatories are based on the assumption that Plaintiff does not intend to seek information protected from disclosure by the attorney work product doctrine, the attorney-client privilege, or any other applicable privilege or doctrine. To the extent that Plaintiff's Interrogatories do call for such information, Defendant objects to them and claims all privileges and protections available to him to the fullest extent provided by law.

**INTERROGATORY NO. 1** Identify any documents in your possession, including all files, notes, correspondence or other media, that you removed from ULLICO.

**RESPONSE:** I did not remove any documents, files, notes, correspondence or "other media" from ULLICO.

**INTERROGATORY NO. 2** Identify any documents relating to ULLICO that you caused to be

LAW OFFICES
HOGAN & HEALD
11130 FAIRFAX BOULEVARD
SUITE 310
FAIRFAX, VIRGINIA 22030
(703) 591-0003

- 1 -


DEFENDANT'S EXHIBIT B

destroyed outside the company's normal document retention policy between 1997 and the date of your response to this interrogatory.

**RESPONSE:** During the years that I was on the Board of Directors I routinely disposed of all correspondence and copies of any company documents that were forwarded to me since I believed that any and all documents would be retained by the company.

**INTERROGATORY NO. 3** If you contend that your participation in the Discretionary Repurchase Program regarding ULLICO stock was in good faith state the factual basis for that contention.

**RESPONSE:** I relied upon all the information provided to me as a member of the Board of Directors of ULLICO, Inc., by ULLICO's officers, attorneys, accountants and other professional advisers, none of which raised any suggestion, hint or possible issue as to the propriety or legality of the programs and transactions referred to in Plaintiff's Complaint. See also the April 2, 2003 Memorandum of James J. Hanks, Jr. [hereafter the Hanks Memorandum] and the Sidley Austin Brown and Wood Summary analysis of the "Report of the Special Counsel" [hereafter the Sidley Austin Summary Analysis]. At the time that my wife and I requested that some of our shares be repurchased we did not know that the percentage of our shares to be repurchased would be larger than the percentage of shares repurchased from other shareholders.

**INTERROGATORY NO. 4** If you contend, with respect to the claims ULLICO makes in the Complaint, that you fulfilled your fiduciary duties "with the care that an ordinarily prudent person in a like position would use under similar circumstances," within the meaning of Md. Code Ann. Corps. & Ass'ns § 2-405.1(a)(3), state the factual basis for that contention.

LAW OFFICES
HOGAN & HEALD
11130 FAIRFAX BOULEVARD
SUITE 310
FAIRFAX, VIRGINIA 22030
(703) 591-0003

**RESPONSE:** I was not personally involved in the creation of the stock offer programs or the repurchase programs that are referenced in ULLICO's Complaint. I relied upon all the information provided to the Board of Directors of ULLICO, Inc., by ULLICO's officers, attorneys, accountants and other professional advisers, none of which raised any suggestions, hint or possible issue as to the propriety or legality of the programs and transactions referred to in Plaintiff's Complaint; and my understanding and belief was that the programs had been developed and/or approved by disinterested, independent financial and legal advisers. I also rely on all the reasons, opinions and conclusions contained in the Hanks Memorandum and in the Sidley Austin Summary Analysis.

**INTERROGATORY NO. 5** If you contend that your participation in the Discretionary Repurchase Program was not an interested transaction within the meaning of Md. Code Ann. Corps. & Ass'ns § 2-419, state the factual basis for that contention.

**RESPONSE:** I am not an attorney and I relied on the fact that none of ULLICO's attorneys, experts, consultants, officers or other Board members ever expressed any indication that any member of the Board might not participate in the Discretionary Repurchase Program because of the provision of the Maryland Corporation Law or for any other reason. Plaintiff has the burden of proof in this suit and therefore is required to prove that my participation in the Discretionary Repurchase Program violated any law. I also rely on all the reason, opinions and conclusions contained in the Hanks Memorandum and the Sidley Austin Summary Analysis.

**INTERROGATORY NO. 6** If you contend that your redemption of stock in the Discretionary Repurchase Programs satisfied the requirements of Md. Code Ann. Corps. & Ass'ns § 2-419,

LAW OFFICES
HOGAN & HEALD
11130 FAIRFAX BOULEVARD
SUITE 310
FAIRFAX, VIRGINIA 22030
(703) 591-0003

state the factual basis for that contention.

**RESPONSE:** I am not an attorney and I relied on the fact that none of ULLICO's attorneys, experts, consultants, officers or other Board members ever expressed any indication that any member of the Board might not participate in the Discretionary Repurchase Program because of the provision of the Maryland Corporation Law or for any other reason. Plaintiff has the burden of proof in this suit and therefore is required to prove that my participation in the Discretionary Repurchase Program violated any law. I also rely on all the reasons, opinions and conclusions contained in the Hanks Memorandum and the Sidley Austin Summary Analysis, and on the fact that the Special Committee of Directors who had not participated in the transactions at issue rejected the Thompson report's recommendations that "profits" from the transactions be returned, thereby ratifying and approving the transactions in satisfaction of that Maryland statute.

**INTERROGATORY NO. 7** State the factual basis for your Fifth Defense that "[a]ll actions by Defendant for ULLICO were performed in good faith pursuant to advice of legal counsel and professional accounting and financial advisors retained by or on behalf of plaintiff and therefore were reasonably believed to be in the best interest of the company and were performed with the care an ordinary prudent person in a like position would use in similar circumstances."

**ANSWER:** I relied upon all the information provided to the Board of Directors of ULLICO, Inc., by ULLICO's officers, attorneys, accountants and other professional advisers, none of which raised any suggestion, hint or possible issue as to the propriety or legality of the programs and transactions referred to in Plaintiff's Complaint; and my understanding and belief was that the programs had been developed and/or approved by disinterested, independent financial and legal advisers. I also rely on all the reasons, opinions and conclusions contained in the Hanks

LAW OFFICES
HOGAN & HEALD
11130 FAIRFAX BOULEVARD
SUITE 310
FAIRFAX, VIRGINIA 22030
(703) 591-0003

Memorandum and the Sidley Austin Summary Analysis.

**INTERROGATORY NO. 8**  State the factual basis for your Second Defense that "Plaintiff's claims are barred by estoppel, by the Statute of Limitations and/or by laches."

**RESPONSE:**  Plaintiff's Complaint alleges claims against this Defendant that expired or lapsed prior to October 27, 2003 and Plaintiff was also extremely dilatory in pursuing any of the claims alleged in this suit.  Plaintiff's claims are barred by estoppel due to the rejection by its own Special Committee of disinterested Directors of the recommendation of the Thompson report that "profits" be returned, and the approval thereafter by the Board of directors at its next meeting.

**INTERROGATORY NO. 9**  Identify any communications between January 1, 1997 and May 30, 2003 from any person that you intend to rely on in support of any of your affirmative claims or defenses in this action.

**RESPONSE**:  I rely on the reasons, opinions and conclusions contained in the Hanks Memorandum and in the Sidley Austin Summary Analysis.  Also, on March 25, 2003, when the Special Committee made its report to the Board of Directors, Mr. Terence M. O'Sullivan, who is now the Chairman and CEO of ULLICO, Inc., stated that he agreed that nothing had been done illegally by any ULLICO Director or Officer.

**INTERROGATORY NO. 10**  If you contend that Robert Georgine was authorized to cause the repurchase of ULLICO stock from individual stockholders, during the period May 10, 2000 through April 30, 2001, at the price of $146.04 per share, state the factual basis for that contention.

LAW OFFICES
HOGAN & HEALD
11130 FAIRFAX BOULEVARD
SUITE 310
FAIRFAX, VIRGINIA 22030
(703) 591-0003

- 5 -

**RESPONSE:** The Board of Directors authorized and ratified all such repurchases on November 3, 2000. I also rely on the reasons, opinions and conclusions contained in the Hanks Memorandum and the Sidley Austin Summary Analysis.

**INTERROGATORY NO. 11** If you contend that the Board of Directors validly adopted the Actual 2000 Repurchase Program, state the factual basis for that contention.

**RESPONSE:** Defendant has no reason to believe that the Board of Directors' adoption of that Repurchase Program was not "valid". Plaintiff has the burden of proof in this suit and therefore is required to prove that that action of the Board of Directors was <u>not</u> "valid". I also rely on the reasons, opinions and conclusions contained in the Hanks Memorandum and the Sidley Austin Summary Analysis.

**INTERROGATORY NO. 12** If you contend that the following statements in the tender offer documents associated with the Actual 2000 Repurchase Program were accurate, state the factual basis for that contention: "[t]he Company has not been advised that any of its directors and officers presently intend to tender any Shares personally owned by them pursuant to the Offer" and that the shares of ULLICO "represent[ed] an excellent long-term investment".

**RESPONSE:** At the time of the November 3, 2000 meeting of the Board of Directors I did not have any knowledge myself as to whether any directors or officers intended to tender any shares personally owned by them, nor did I know whether any director or officer had "advised the Company" in any way that he or she intended to tender any personally owned shares. I also personally believed that owning shares in ULLICO was an excellent long-term investment. Therefore, to the best of my knowledge, information and belief, those statements were accurate

LAW OFFICES
HOGAN & HEALD
11130 FAIRFAX BOULEVARD
SUITE 310
FAIRFAX, VIRGINIA 22030
(703) 591-0003

- 6 -

at the time. Additionally, the statement in the tender offer documents that the shares of ULLICO were an excellent long-term investment was essentially the same statement made by the Chairman at the Board of Directors' meetings, and I did not have any reason to believe that they were false or misleading. I also rely on the reasons, opinions and conclusions contained in the Hanks Memorandum and the Sidley Austin Summary Analysis.

**INTERROGATORY NO. 13**  If you contend that any ULLICO employee, officer, or director, interfered with your ability to execute your fiduciary duties during your employment by ULLICO, state the factual basis for that contention.

**RESPONSE:**  I was never employed by ULLICO, Inc., nor did I have "fiduciary duties" as a member of the Board of Directors.

**INTERROGATORY NO. 14**  If you contend that you disclosed to any member of the Board that you redeemed your stock through the Discretionary Repurchase Program, state the factual basis for that contention.

**RESPONSE:**  I did not disclose to any members of the Board of Directors that I had redeemed some of my shares in January, 2001.

**INTERROGATORY NO. 15**  If you contend that anyone other than yourself disclosed to the Board that you redeemed your stock through the Discretionary Repurchase Program, state the factual basis for that contention.

**RESPONSE:** Not applicable.

LAW OFFICES
HOGAN & HEALD
11130 FAIRFAX BOULEVARD
SUITE 310
FAIRFAX, VIRGINIA 22030
(703) 591-0003

- 7 -

**INTERROGATORY NO. 16** State the factual basis for your denial with respect to ¶ 14 of the Complaint that "[t]hese programs were either to the exclusion of ULLICO's other shareholders or structured in a manner that allowed defendant and other insiders to disproportionately benefit himself in relationship to other larger shareholders."

**RESPONSE:** I was not personally involved in the creation of the stock offer programs or the repurchase programs that are referenced in ULLICO's Complaint. I relied upon all the information provided to the Board of Directors of ULLICO, Inc., by ULLICO's officers, attorneys, accountants and other professional advisers, none of which raised any suggestions, hint or possible issue as to the propriety or legality of the programs and transactions referred to in Plaintiff's Complaint; and my understanding and belief was that the programs had been developed and/or approved by disinterested, independent financial and legal advisers. I had no knowledge that any opportunity to purchase shares of ULLICO stock was "timed" to minimize the risk of investing, nor did I have any knowledge that the redemption programs would necessarily have an unfair effect on other shareholders. I also rely on the reasons, opinions and conclusions contained in the Hanks Memorandum and in the Sidley Austin Summary Analysis.

**INTERROGATORY NO. 17** State the factual basis for your denial with respect to ¶ 19 of the Complaint that "[b]ecause members of the Compensation Committee were eligible to participate in the 1998 and 1999 Stock Offer Programs, the actions of the Compensation Committee violated the February 11, 1998 and February 13, 1999 Executive Committee resolutions that expressly prohibited the Compensation Committee from participating in matters directly affecting their own compensation. In addition, the Compensation Committee exceeded the delegation of authority pursuant to the February 13, 1999, Executive Committee resolution when

LAW OFFICES
HOGAN & HEALD
11130 FAIRFAX BOULEVARD
SUITE 310
FAIRFAX, VIRGINIA 22030
(703) 591-0003

- 8 -

it included directors as eligible participants under the 1999 Stock Offer Program."

**RESPONSE:** See the April 2, 2003 Memorandum of James J. Hanks, Jr., Esquire. Since ULLICO historically had given directors the opportunity to purchase shares and my wife and I had previously been allowed to invest in shares of ULLICO Inc. in 1995, 1996, and 1997, I had no reason to believe that we would not be eligible to purchase additional shares in 1998 and 1999, particularly since the Board had authorized the Chairman to offer shares of ULLICO stock to, *inter alia*, Directors of ULLICO, in May, 1997. All shares purchased by my wife and I were paid for by our own after-tax dollars and were not "compensation" to me as a Director.

**INTERROGATORY NO. 18** State the factual basis for your denial with respect to ¶ 26 of the Complaint that "[t]he Compensation Committee lacked authority to cause ULLICO to issue stock to Casstevens in 1998 and 1999 and, therefore, the sale of stock to Casstevens is invalid."

**RESPONSE:** See above Response to Interrogatory No. 17.

**INTERROGATORY NO. 19** State the factual basis for your denial with respect to ¶ 38 of the Complaint that "Casstevens, who was a shareholder and member of the Board of Directors, never took any steps to correct these misleading and incorrect statements in the November 21, 2000 letter."

**RESPONSE:** Defendant denies that the November 21, 2000 letter made any statements that, to his knowledge, information and belief, were "misleading and incorrect."

LAW OFFICES
HOGAN & HEALD
11130 FAIRFAX BOULEVARD
SUITE 310
FAIRFAX, VIRGINIA 22030
(703) 591-0003

I declare under penalty of perjury that the foregoing Responses are true and correct to the best of my knowledge, information and belief.

Executed on this 14th day of March, 2007.

*Billy Casstevens*
Billy Casstevens

Respectfully submitted,

HOGAN & HEALD

By: *Thomas M. Hogan*
Thomas M. Hogan, Esquire
DC Bar No. 104950
HOGAN & HEALD
11130 Fairfax Blvd., Suite 310
Fairfax, VA 22030
(703) 591-0003
*Attorneys for Defendant*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the a copy of the foregoing Responses of Defendant to Interrogatories was faxed and mailed by first-class, pre-paid postage mail on this 14th day of March 2007 to:

Anthony J. Trenga (DC Bar #218255)
Brian A. Hill (DC Bar # 456086)
Matthew T. Reinhard (DC Bar # 474941)
Victor Tsbak (DC Bar # 480333)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, NW, Suite 900
Washington, DC 20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
*Attorneys for Plaintiff*

*Thomas M. Hogan*
Thomas M. Hogan, Esquire

LAW OFFICES
HOGAN & HEALD
11130 FAIRFAX BOULEVARD
SUITE 310
FAIRFAX, VIRGINIA 22030
(703) 591-0003

- 10 -