# AFFIDAVIT OF JAMES J. HANKS, JR.

I am a partner in the 520-lawyer firm of Venable LLP and am licensed to practice law in the State of Maryland. I am also an Adjunct Professor of Law at Cornell and Northwestern Law Schools. I received an A.B. from Princeton University; an LL.B. from the University of Maryland Law School, where I was an editor of the *Maryland Law Review*; and an LL.M. from Harvard University. During the 1967-68 term, I served as law clerk to Judge Charles Fahy of the United States Court of Appeals for the District of Columbia Circuit.

In private practice, I advise publicly- and privately-held corporations and other entities on matters of Maryland law in connection with securities offerings and other financing transactions, corporate governance and other matters. I have advised buyers or sellers in more than 250 mergers or acquisitions, including many valued at more than one billion dollars (U.S.). I often serve as independent counsel to the boards of directors and board committees of corporations in connection with major transactions, stockholder litigation, conflicts of interest and corporate governance issues. I also advise foreign governments on revision of their corporate and securities laws and I appear in the current edition of *The Best Lawyers in America*.

Since 1996, I have taught a course in U.S. and European corporate governance at the Cornell Law School-Université de Paris I (Sorbonne) Summer Institute in Paris. I am the author of Maryland Corporation Law (Aspen Publishers Supp. 2006), a comprehensive treatise of over 600 pages, and the co-author (with former Stanford Law School Dean Bayless Manning) of the third edition of Legal Capital (Foundation Press 1990). I am also the author of several law review articles and a frequent speaker on corporation law issues. I have been actively involved in the revision of the Model Business Corporation Act, which has been adopted substantially in its entirety by approximately 25 American states, and I am a member of The American Law Institute. During the Fall 2003, I was Commerzbank Visiting Professor of Law at Bucerius Law School in Hamburg, Germany, and I was also a Visiting Professor of Law there in the Fall 2005.

I have reviewed the following documents relating to Billy Casstevens ("Mr. Casstevens") and his service as a director of ULLICO Inc., a Maryland corporation (the "Company"), in connection with certain stock issuances to, and redemptions from, the officers and directors of the Company: (1) the Complaint (the "Complaint") in case number 1:06CV01388 (RJL) in the United States District Court for the District of Columbia; (2) the Expert Report of Richard M. Leisner (the "Leisner Opinion") prepared by the plaintiff's expert in connection thereto and (3) The Report of the Special Counsel: ULLICO Stock Purchase Offer and Repurchase Programs and Global Crossing Investment, dated November 26, 2002, by James R. Thompson, including the exhibits and appendices thereto (the "Thompson Report").

Subject to the assumptions, limitations and qualifications stated herein, the issuances to and repurchases of stock from Mr. Casstevens should not be voided as interested director transactions nor be determined to constitute a breach of Mr. Casstevens' duties under Maryland law. I have not independently verified the accuracy of any facts or other information presented to me. In addition, I have assumed that all statements and information contained in documents that I have reviewed are true and complete and that there has been no oral or written

modification or amendment to any of such documents, and there has been no waiver of any provision of any of such documents, by action or omission of the parties or otherwise.

In this memorandum, where I state my opinion, it is my opinion as an expert in Maryland corporation law and corporate transactions, including transactions between a corporation and its directors and officers, and my opinion is based solely on the facts expressly set forth in the Thompson Report.

## I.    Facts

Based upon the information that I have reviewed as of the date of this memorandum, my understanding of the relevant facts and circumstances is as follows:

### A.    The Company.

The Company is a financial services company that had approximately 320 stockholders during the period Mr. Casstevens served as a director.  All of the Company's stockholders have some relationship to organized labor, as required by the Bylaws of the Company (the "Bylaws").  The stockholders of the Company fall into one of two categories: (1) past or present officers and directors of the Company and their family members or (2) unions and union-related pension funds, trust funds, retirement plans and other union-related institutional investors, which constitute virtually all of the Company's largest stockholders.  Article IV, Section 2 of the Company's Bylaws provides that at least three-fourths of the members of the Company's Board of Directors (the "Board") must at all times be members of trade unions affiliated with the AFL-CIO.

### B.    The Company's Outstanding Stock.

The Company had three classes of stock outstanding: Capital Shares, Class A Shares and Class B Shares.  Capital Shares have been issued by the Company since its formation in 1925.  Capital Shares were the original and, until 1995, the only class of stock issued by the Company.  In May 1992, the Company adopted a Preferred Certificate Program pursuant to which qualified investors were offered Preferred Certificates that would be redeemed, beginning in 1995, on a one-for-one basis for Class A Shares or Class B Shares.  Class A Shares and Class B Shares have rights identical to each other except that Class B Shares have no voting rights.  A stockholder's Class A Shares that are in excess of the applicable percentage of the total outstanding voting shares of the Company are automatically converted into Class B Shares.  Class A Shares also have been issued to the directors and officers of the Company pursuant to the Stock Offers (as defined below).

### C.    The Company's Global Crossing Investment.

In February of 1997, the Company made a $7,600,000 investment in an entity that subsequently became Global Crossing Ltd. ("Global Crossing").  As specifically acknowledged in Mr. Thompson's letter, dated November 26, 2002 and accompanying the Thompson Report, "[t]he Global Crossing investment was consistent with [the Company's] philosophy of supporting

investments which might create opportunities for its labor constituency." Global Crossing's initial public offering occurred in August 1998. By the end of 1999, the value of the Company's investment in Global Crossing was more than $1,500,000,000. In 1999 and 2000, the Company sold in five separate transactions a portion of its shares of Global Crossing stock and realized an aggregate after-tax gain of more than $330,000,000. Based on the figures for total assets shown on the Company's year-end balance sheets included in the Company's annual reports, the value of the Company's Global Crossing stock as a percentage of the Company's total assets at the end of each fiscal year was 0.26% in 1997, 10.6% in 1998, 30.5% in 1999, 7.8% in 2000 and 0.53% in 2001.

D.    The Stock Offers.

On May 6, 1997, the Board approved a resolution authorizing and directing "the Chairman of the Corporation [, Mr. Georgine,] . . . at his sole discretion to offer shares of the Corporation's Stock that have been repurchased and returned to the status of authorized, but unissued shares, to authorized investors as specified in the Corporation's Charter and By-laws." On two separate occasions, July 27, 1998 and May 13, 1999, Mr. Georgine appeared before the Compensation Committee of the Board, consisting of John J. Barry, Jacob F. West and William H. Wynn (the "Compensation Committee"). In each of these meetings, Mr. Georgine and the Compensation Committee discussed the Company's offering Class A Shares to its directors and officers.

Following the Compensation Committee meeting on July 27, 1998, each director and officer was given the opportunity to purchase 2000 Class A Shares at a purchase price of $28.70 per share (the "First Stock Offer"), and, on October 13, 1998, each director and officer was given the opportunity to purchase an additional 2000 Class A Shares at a purchase price of $28.70 per share (the "Second Stock Offer"). As a result of the May 13, 1999 Compensation Committee meeting, on December 17, 1999, each director and officer was given the opportunity to purchase 4000 Class A Shares at a purchase price of $53.94 per share (the "Third Stock Offer" and, together with the First Stock Offer and the Second Stock Offer, the "Stock Offers"). In each instance, the purchase price of each Stock Offer represented the book value per share of the stock as reflected in the prior year's year-end audited financial statements.

E.    Repurchases of the Company's Outstanding Stock.

The Company has repurchased shares of its stock under one of two programs. The Company, acting at the discretion of its Chairman of the Board, has repurchased shares from stockholders from time to time at the stockholders' request (the "Informal Repurchase Program"). As stated in the Thompson Report, this Informal Repurchase Program "dates back many years" prior to Mr. Georgine becoming Chairman of the Board. Thompson Report at 38. Because questions were raised as to whether the Informal Repurchase Program had ever been authorized and based upon the advice of outside counsel to the Company, the Board authorized and ratified the Informal Repurchase Program on November 3, 2000. Those resolutions provide that:

> [T]he Chairman of [the Company] is hereby authorized and empowered, in his discretion, whenever he deems it consistent

with sound financial practice and the best interests of [the Company], to repurchase shares of Class A Stock or Class B Stock . . . or Capital Stock from those shareholders offering the same to [the Company]; provided that the authorization granted under this resolution shall not be exercised . . . in a total amount with respect to any particular stockholder in excess of 1% of the total outstanding [Class A Shares, Class B Shares and Capital Shares], taken in the aggregate, of [the Company] computed immediately preceding the repurchase in question.

The resolutions further provide that Mr. Georgine was authorized to effect such repurchases of stock "at such price per share as he shall deem appropriate; provided, however, that such price shall not be greater than that most recently specified by the Board of Directors." The resolutions also provided that the Informal Repurchase Program "may be exercised with respect to Stock or Capital Stock held by any Director of Officer whatsoever of the Corporation as fully as if such Directors of Officers were persons eligible to purchase Stock or Capital Stock of the Corporation…." The repurchase price of shares under the Informal Repurchase Program was, until May 1997, $25.00 per share, the price for which the shares were originally issued, and after 1997, equal to the Repurchase Program Price (as defined below). The November 3, 2000 resolutions contain no ratification of the specific informal repurchases that occurred prior to November 3, 2000, but the resolutions do provide that "any and all actions taken by the Chairman or other appropriate officers of [the Company] falling within the scope of any of the preceding resolutions and consistent therewith taken at any time, whether prior or subsequent hereto, are hereby confirmed, ratified, and approved." In addition, the minutes of the November 3, 2000 meeting reflect that Mr. Georgine mentioned that "[s]ince the founding of this Corporation we have repurchased stock, from individuals, from unions and from estates."

Second, in May 1997, well before the success of the Company's investment in Global Crossing, the Company instituted a formal repurchase program (the "Formal Repurchase Program") designed to provide liquidity for Class A Shares, Class B Shares and Preferred Certificates, but not Capital Shares. The Formal Repurchase Program was developed for the Company by Credit Suisse First Boston ("Credit Suisse") and was authorized by the Executive Committee of the Board (the "Executive Committee") on May 5, 1997. The next day, Bill Egan of Credit Suisse provided a presentation to the full board regarding the Formal Repurchase Program and Mr. Georgine informed the full board of its approval by the Executive Committee. Under the Formal Repurchase Program, the Company would repurchase outstanding Class A Shares, Class B Shares and Preferred Certificates at the book value of the stock (the "Repurchase Program Price"). The May 5, 1997 resolutions of the Executive Committee authorizing the Formal Repurchase Program provide: "[T]he repurchase program will be based on 'Book Value.' The Book Value will be determined at each repurchase date based on the prior year end audited financials of ULLICO Inc. The calculation shall be accomplished by taking the 'Total of Stockholders Equity' as shown on the financial statement and dividing it by the total number of shares outstanding of Class A, Class B, Capital Stock and any Preferred Certificates still outstanding." The Repurchase Program Price was set by the Executive Committee at its May meeting each year (except in 2000 and 2001, as noted below) and applied to all sales and repurchases of the Company's stock to all stockholders for the upcoming year. The Repurchase

Program Price was $27.06, $28.70, $53.94, $146.04 and $74.87 in 1997, 1998, 1999, 2000 and 2001, respectively.  The May 5, 1997 resolutions indicate that the Formal Repurchase Program served several business purposes, including creating a market for the Company's shares of stock and improving the Company's credit rating by reducing the Company's historically large dividends, "which [had] hampered investment in future growth [which] has become a critical factor in the future of the Company."

      The May 5, 1997 resolutions of the Executive Committee authorized the Formal Repurchase Program, which authorized the Company to repurchase up to $180,000,000 of the Company's Class A Stock, Class B Stock and Preferred Certificates over a period of eleven years ending in 2007.  Those same resolutions authorized the repurchase of up to $30,000,000 in equity from the Company's stockholders in 1997.  In 1998 and 1999, the Executive Committee authorized the repurchase of up to $15,000,000 in equity each year.

      On May 11, 2000, the Board authorized the repurchase of $240,000,000 in equity for that year and established a Repurchase Program Price for 2000 of $146.04.  The May 11, 2000 Board resolutions state that the 2000 repurchase program was subject to Global Crossing's stock trading at no less than $43 per share (the "Trigger Price").  Because it appeared that Global Crossing's stock would not reach the Trigger Price, on November 3, 2000, the Board revised its repurchase program for 2000 and decreased the maximum amount of equity subject to the repurchase to $30,000,000.  The same repurchase price of $146.04 was maintained but without the $43 per share trigger.  In 2001, the Board authorized the repurchase of $15,000,000 in equity and a Repurchase Program Price of $74.87.

      The Company notified its stockholders of the Formal Repurchase Program each year by means of an Offer to Purchase.  The stockholders had approximately one month from the date of the Offer to Purchase in which to tender their shares to the Company before the offer expired.  The Company sent each holder of Class A Shares and Class B Shares an Offer to Purchase.

      All holders of Class A Shares and Class B Shares were eligible to participate in the Formal Repurchase Program.  In 1997 only, holders of Preferred Certificates were also eligible to participate in the Formal Repurchase Program.  A stockholder with fewer than 10,000 shares (a threshold that at all relevant times exceeded the holdings of all of the directors and officers except for Mr. Georgine) had the option to tender all (but not less than all) of his shares and have 100% of his shares redeemed.  Stockholders with more than 10,000 shares and stockholders with less than 10,000 shares who did not tender all their shares could tender their shares as well, but the number of shares of each such stockholder that would be repurchased was subject to proration if there were not sufficient funds in the program for that year to repurchase all the tendered shares (the "10,000 Share Rule").  In 2000, the Board approved an additional requirement of the Formal Repurchase Plan that provided, unless all holders of more than two percent of the Company's stock tendered 100% of their shares, the 2000 Formal Repurchase Program would not be implemented.

      In September 1999, the Board authorized the Company to enter into a five-year employment agreement with Mr. Georgine and delegated authority to negotiate the terms and

conditions of the agreement to the Compensation Committee. Mr. Georgine entered into an employment agreement with the Company on October 1, 1999 (the "Employment Agreement"). As part of the Employment Agreement and pursuant to a Stock Purchase and Credit Agreement, dated December 30, 1999, by and between the Company and Mr. Georgine (the "Stock Purchase Agreement"), the Company issued 40,000 Class A Shares to Mr. Georgine in exchange for a note (the "Note") that was forgivable over five years (at 20% per year) provided that Mr. Georgine continued to serve as Chairman, President and Chief Executive Officer of the Company. The 40,000 shares served as collateral for the Note, with 20% of the shares (8,000 shares) being released from the security interest each year on the anniversary of the execution of the Stock Purchase Agreement. In accordance with the Stock Purchase Agreement, Mr. Georgine had the right to require the Company to repurchase "all or any portion of the [40,000 shares] that no longer constitute Collateral, and the [Company] shall promptly so purchase such shares at a purchase price per share equal to Fair Market Value," which was defined as the Repurchase Program Price.

In 2000, the Compensation Committee learned that the Employment Agreement neglected to include a provision "that had been discussed by the [Compensation] Committee and approved at prior meetings." On October 20, 2000, the Compensation Committee approved an amendment to the Employment Agreement that provided Mr. Georgine the right to require the Company to redeem any shares of the Company's stock held by him. Sometime later, an Addendum to Employment Agreement was entered into between the Company and Mr. Georgine effecting this resolution of the Compensation Committee and dated effective October 1, 1999. The minutes of the October 20, 2000 meeting of the Compensation Committee reflect that the language of the Addendum was before the Committee.

F.    <u>Mr. Casstevens' Role</u>.

Mr. Casstevens served as a director of the Company from 1997-2003. Mr. Casstevens purchased the full amount of stock offered to him pursuant to the Stock Offers – 8,000 shares - and the Company repurchased 7,642 of his shares pursuant to the Informal Repurchase Plan in January of 2001. Mr. Casstevens was not a member of the Compensation Committee, nor did he participate in the Formal Repurchase Plan or the Informal Repurchase Plan before it was approved by the Board in November of 2000.

## II.    Discussion

The claims against Mr. Casstevens by the plaintiff are premised upon three main arguments for liability. First, Mr. Casstevens' purchase of stock pursuant to the Stock Offers and his sale of stock pursuant to the Informal Repurchase Program are voidable as interested director transactions. Second, Mr. Casstevens breached the duties he owed to the Company as a director. Finally, that the proper corporate formalities were not followed regarding the approval of the Stock Offers and the Informal Stock Repurchase Program, and thus the sale of stock to Mr. Casstevens and the repurchase of his stock are voidable. I conclude that, under the MGCL, the transactions resulting from Mr. Casstevens' participation in the Stock Offers and the Informal Repurchase Program are not voidable, either as interested director transactions or for failure to follow corporate formalities, and that Mr. Casstevens did not breach any of his duties as a director of the Company.

**A. Analysis of Whether the Transactions Resulting From Mr. Casstevens' Participation in the Stock Offers and the Informal Repurchase Program are Voidable Under Section 2-419 of the MGCL.**

The first claim against Mr. Casstevens is that Mr. Casstevens' purchase of stock pursuant to the Stock Offers and the redemptions of his stock under the Informal Repurchase Program are voidable as interested director transactions.

        1.    <u>Section 2-419 of the MGCL.</u>

Section 2-419 of the MGCL provides that a transaction between a corporation and a director is not void or voidable solely because of the presence of the interested director at the meeting in which the transaction was approved or because of the counting of the interested director's vote for the authorization, approval or ratification of the transaction if:

> (a)  The fact of the interest is disclosed or known to the board of directors and the board of directors authorizes the transaction by the affirmative vote of a majority of the disinterested directors even if less than a quorum;

> (b)  The fact of the interest is disclosed or known to the stockholders and the stockholders, other than stockholders who are interested in the transaction, approve the transaction; or

> (c)  The contract or transaction is fair and reasonable to the corporation.

In evaluating whether any of the three foregoing safe harbors of Section 2-419 applies based on approval by disinterested directors, the following principles should be considered:  (1) A director is "disinterested" in a transaction if neither he nor any entity in which he has a material financial interest is a party to or has a material financial interest in the transaction; (2) a material financial interest is one of such significance that it would reasonably be expected to influence the director's judgment; (3) a separate vote of the disinterested directors is not necessary; (4)  a single disinterested director is sufficient; (5) the size of the benefit to the interested directors is not relevant to whether approval by disinterested directors is effective; and (6) the interest of the interested directors must have been "disclosed or known" to the board. JAMES J. HANKS, JR., MARYLAND CORPORATION LAW § 6.22[b] (Aspen 2006 Supp.).  In addition, the very fact that the statute contemplates approval by disinterested directors as a safe harbor indicates that the interest of one director in a transaction is not attributable to, and does not taint, the remaining otherwise disinterested directors.

If the approval procedures set forth above (*i.e.,* disinterested director or disinterested stockholder approval) are not followed and the interested director transaction is attacked, "the person asserting the validity of the contract or transaction bears the burden of proving that the contract or transaction was fair and reasonable to the corporation at the time it was authorized, approved or ratified."  MGCL § 2-419(d)(1).  However, this shifting of the burden "does not apply to the fixing by the board of directors of reasonable compensation for a

director, whether as a director or in another capacity." MGCL § 2-419(d)(2). The concept of "fair and reasonable" has been analyzed as follows:

> The word "fair" means that the material terms of the transaction are within the range that might have been agreed to by economically motivated disinterested persons negotiating at arms' length with knowledge of all material facts known to any party to the transaction. The word "reasonable" means that it makes sense for the corporation to enter into the transaction under the particular circumstances prevailing at the particular time . . . . Fairness and reasonableness are determined as of the time the corporation enters into the contract or transaction.

HANKS § 6.22[b] (*quoted in Independent Distributors, Inc. v. Katz*, 99 Md. App. 441, 457, 637 A.2d 886, 893 (1994)).

If the requirements of Section 2-419 are satisfied, "then the transaction is immune from attack, no matter how egregious the transaction may seem, on the ground that one of the parties is a director of the corporation." HANKS § 6.22[b].

2.    The Approval of the Stock Offers Was Within One of the Safe Harbors of Section 2-419 of the MGCL.

The Board authorized Mr. Georgine to authorize the issuance of stock of the Company within the parameters defined by the Board in connection with the Stock Offers. As explained above, under Section 2-419 of the MGCL, an interested director transaction is not void or voidable if the transaction is "fair and reasonable" to the corporation. Moreover, in the case of establishing "reasonable compensation for directors," the burden of proving that the director compensation was not "fair and reasonable" to a corporation remains with the party asserting the attack. MGCL § 2-419(d)(2). The approval of the Stock Offers was likely within the "fair and reasonable to the corporation" safe harbor of Section 2-419(b)(2) of the MGCL for the following reasons:

First, issuing officers and directors stock in the corporation is common, and not requiring officers and directors to pay for stock that they have received is also common. In one study in 2000, for example, William M. Mercer, Incorporated examined the proxy statements, annual reports and 10-K filings of 350 major industrial and service companies and found that "94% of companies made stock grants [i.e., without payment] to directors; the median grant value comprised 57% of the [director's] total compensation package." MARTIN KATZ & GREGORY SMITH, WILLIAM M. MERCER, INCORPORATED, EXECUTIVE COMPENSATION PERSPECTIVE (Sept. 2001).

Second, officers and directors are often granted "in-the-money" options (options with an exercisable price less than the current value of the stock) for their services.[1]  Options provide directors with the potential advantage of any increase in the value of a company's stock without the corresponding downside risk of potential loss associated with actually paying for the stock.  Furthermore, the purchase price of the Stock Offers in any given year was tied to the same underlying valuation upon which the Repurchase Program Price was based, namely, the book value of the Company as of the most recent fiscal year end.

Third, the Company did not offer options but rather shares at the Repurchase Program Price, the price of the stock that was used for <u>all</u> sales and repurchases of stock of the Company during the same year (including sales to and repurchases from non-director and non-officer stockholders), namely, the book value of the stock as of the most recent fiscal year end.  Accordingly, the directors and officers who participated in the Stock Offers were required, as is strenuously urged by corporate governance advocates, to pay for the stock that they received.[2]

Fourth, even if the prices established by the Board for the Stock Offers were below the underlying value of the Company's stock at the time the repurchases occurred, that fact is not inherently problematic.  The potential for a director to receive substantial profits is inherent in all forms of stock ownership rights, and such profits should not necessarily be used in hindsight as evidence that the granting of such rights was unreasonable at the time it was granted.

---

[1]   For example, a study of the 200 largest public industrial and service corporations in the U.S. (excluding mutual companies, regulated utilities and companies with dominant insider ownership) by compensation consultants Pearl Meyer & Partners found that the cash component of non-employee directors' compensation packages as a percentage of their total compensation had decreased every year from a high of 67% in 1996, but cash nevertheless continued to represent approximately 38% of such directors' total compensation in 2001.  PEARL MEYER & PARTNERS, 2001 DIRECTOR COMPENSATION 7 (2001); *see also*, *e.g.*, HENRY I. MORGENBESSER, RETAINING YOUR EMPLOYEES THROUGH COMPETITIVE COMPENSATION PLANS 239 (Practising Law Institute, Corporate Law and Practice Course Handbook Series No. B0-019D, 2002) ("'In-the- money' options that are not yet vested are often the best 'golden handcuff' retention device that a company has in its compensation arsenal.").

[2]   *See, e.g.,* Randall S. Thomas & Kenneth J. Martin, *The Determinants of Shareholder Voting on Stock Option Plans*, WAKE FOREST L. REV. 31, 66 (2000) ("Some shareholders have criticized compensation committees that award large grants of restricted stock because they have value whether the company's stock performs well or not.  These critics claim that restricted stock rewards executives merely for remaining with the company, rather than for performing well."); Sanjai Bhagat, Dennis C. Carey & Charles M. Elson, *Director Ownership, Corporate Performance, and Management Turnover*, 54 BUS. LAW. 885, 898 (1999).

Fifth, the directors were at economic risk when they purchased stock pursuant to the Stock Offers. As explained above, despite the success of the Company's investment in Global Crossing, the value of that asset at year end generally remained a relatively small percentage of the value of the Company's total assets. Even at its highest point, in 1999, the Company's investment in Global Crossing comprised only approximately 30% of its total assets at year end. Furthermore, there was always the possibility that the Board would rescind or alter the Formal Repurchase Program or Informal Repurchase Program in a manner that would prevent a director from being able to sell their stock.

Sixth, the evidence suggests the absence of a plan, much less any collusion, on the part of the members of the Board to benefit themselves at the expense of the stockholders of the Company. Not every officer and director exercised his or her full right to purchase pursuant to the Stock Offers. In the First Stock Offer, only 53.62% of the shares offered for purchase were actually purchased. The percentages for the Second Stock Offer and Third Stock Offer were even lower - 26.33% and 27.66% respectively. Overall, only 33.81% of the total shares offered to officers and directors for purchase in all three Stock Offers combined were actually purchased. This also suggests that the directors viewed the Stock Offers as entailing real economic risk that the value of the Company's stock could drop and could drop quickly. Some might suggest that the Third Stock Offer was the least risky Stock Offer because it involved the shortest number of days between the setting of the Repurchase Program Price and the Stock Offer. The very limited participation of the directors and officers in the Third Stock Offer, however, as noted above, does not bear this out.

Finally, at least with respect to the Third Stock Offer when the applicable sale/repurchase price had nearly doubled from the previous year, stockholders other than directors and officers had their shares repurchased by the Company at the same price and at approximately the same time at which the Stock Offer was made. On December 22, 1999 (less than one week after the Third Stock Offer was made), five institutional stockholders sold back 118,097, 42,171, 36,772, 36,772 and 3824 Class A Shares for a gross sales price of approximately $6.3 million, $2.2 million, $1.9 million; $1.9 million; and $206,000 respectively.

3.    The Approval of the Informal Repurchase Program Was Within One of the Safe Harbors of Section 2-419 of the MGCL.

On November 3, 2000, the Board passed a resolution, prepared by the law firm of Arnold & Porter, approving the Informal Repurchase Program. Because that resolution was approved by a majority of disinterested directors, it had the effect, among other things, of authorizing redemptions of stock under the Informal Repurchase Program after November 3, 2000. Mr. Casstevens did not have any of his stock redeemed until early 2001. It is important, as indicated above, that the interest of one director is not attributable to any other director and that the approval by even one disinterested director satisfies the safe harbor provision of Section 2-419 of the MGCL.

Two directors, Mr. Georgine and Terrence O'Sullivan, who were present at the November 3, 2000 meeting, were disinterested with respect to redemptions pursuant to the Informal Repurchase Program after the November 3, 2000 resolution. Mr. Georgine was independent because, by virtue of the put rights in his employment agreements discussed above,

he could redeem his shares without participating in either the Formal Repurchase Program or the Informal Repurchase Program. Mr. O'Sullivan was independent because he held no stock in the Company as of November 3, 2000. Each of these directors voted in favor of approval of the Informal Repurchase Program. Moreover, each of these two directors approved the Informal Repurchase Program with, as is required by Section 2-419 of the MGCL, knowledge of the other directors' potential interest. The resolutions specifically acknowledge that the stock of directors and officers could be purchased. Consequently, redemptions made pursuant to the Informal Repurchase Program after November 3, 2000 fit within at least one safe harbor of Section 2-419(b).

**B.    Analysis of the Alleged Breach of Duty Under Maryland Law.**

The second claim against Mr. Casstevens is that he breached his duties by approving the 2000 Formal Repurchase Program and the Informal Repurchase Program. Again, Maryland has a statute that directly governs this issue. Even if it were determined that Mr. Casstevens breached his duties as a director of the Company, he is likely exculpated from liability to the Company under Maryland law and the Company's charter. Moreover, I am unaware of any action or inaction by Mr. Casstevens that would rise to the level of a breach of his duty as a director of the Company under Maryland law.

1.    <u>Section 2-405.1 of the MGCL.</u>

In approving a transaction, even one that falls under the safe harbor provisions of Section 2-419 of the MGCL, directors are held to the statutory standard of conduct for directors of a Maryland corporation and, therefore, the directors' approval of the transaction itself may be attacked based on an alleged violation of that standard of conduct. Significantly, Maryland has a statutory standard of conduct - set forth in Section 2-405.1(a) of the MGCL - that is applicable to corporate directors rather than, as in Delaware and some other states, a judicially developed standard of conduct based upon the concept of fiduciary duty. HANKS, *supra*, at § 6.6[b]. To perform his or her duties in compliance with the standard of conduct set forth in Section 2-405.1(a), a director must act (a) in good faith; (b) with a reasonable belief that his or her action is in the corporation's best interest; and (c) with the care of an ordinarily prudent person in a like position under similar circumstances.[3]

Under Section 2-405.1(e) of the MGCL, an act of a director of a corporation is presumed to satisfy the three-part standard of conduct set forth in Section 2-405.1(a) of the MGCL. This presumption places an additional burden on a plaintiff challenging the conduct of a director. Further, Section 5-417 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland (the "Courts and Judicial Proceedings Article") provides that "[a] person who

---

[3]    The Complaint misstates the duty of care of a director as requiring a director to conduct himself with the "same degree of care that a *very* prudent person would use in similar circumstances." Complaint at 15 (emphasis added). No authority is cited for this misstatement of the standard.

performs the duties of that person in accordance with the standard provided under § 2-405.1 of the [MGCL] has no liability by reason of being or having been a director of a corporation."

The statutory standard of conduct set forth in Section 2-405.1(a) of the MGCL is based almost word for word upon former Section 8.30(a) of the Model Business Corporation Act (the "MBCA") as it existed in 1976, when the General Assembly of Maryland enacted Section 2-405.1. In setting forth the standard of conduct applicable to directors of a corporation, former Section 8.30(a) of the MBCA omitted any reference to the "fiduciary" duty of directors. In fact, the Official Comment to former Section 8.30(a) specifically disclaimed the use of the word "fiduciary" to characterize a director's duties "because that term could be confused with the unique attributes and obligations of a fiduciary imposed by the law of trusts, some of which are not appropriate for directors of a corporation." MBCA §8.30 (1984), Official Comment ¶1.[4] Even before Section 2-405.1(a) of the MGCL went into effect, the United States District Court for the District of Maryland had noted that directors under Maryland law were "not in a fiduciary relationship with an individual stockholder." *Goodman v. Poland*, 395 F.Supp. 660, 680 (D. Md. 1975).

Maryland courts have recently reiterated the principle that the obligations of a fiduciary under trust law do not apply to corporate directors. In *Wittman v. Crooke*, 120 Md. App. 369, 375, 707 A.2d 422, 424 (1998), the Maryland Court of Special Appeals specifically declined to apply trust law in determining whether the members of the board of directors of a corporation had breached their duties. In *Wittman*, the plaintiff stockholder argued that the defendant directors had breached their duties of loyalty to the corporation by voting to approve a merger involving the corporation because each director "stood a chance of being named to the new company's board." *Id.* at 423. The plaintiff stockholder argued that the Court should apply the law of trusts in determining whether the interest of the directors was in conflict with the interest of the stockholders. *Id.* at 424. In declining to do so, the Court stated:

> [W]hat constitutes a violation of duty by one kind of fiduciary does not necessarily constitute a violation of duty by another kind of fiduciary. The duty of loyalty owed by a trustee to his beneficiaries, for example, ordinarily is more intense than . . . that owed by a corporate director to the corporation.

*Id.* (*citing Parish v. Maryland & Virginia Milk Producers Ass'n, Inc.*, 261 Md. 618, 680-81, 277 A.2d 19 (1971)).[5]

---

[4]     Where provisions of the MGCL are based upon provisions of the MBCA, the Court of Appeals of Maryland has held that it is appropriate to refer to the Official Comment to the MBCA in interpreting the statute. *See National Shoe Stores Co. v. National Shoes of N.Y., Inc.*, 213 Md. 328, 334-35, 131 A.2d 909, 911 (1957).

[5]     As *Wittman* demonstrates, some Maryland courts occasionally still rely on the term "fiduciary duty" or similar terms when analyzing the duties of directors of Maryland corporations, despite the fact that such language was purposefully omitted from Section 2-405.1(a) of the MGCL. Section 2-405.1(a) is a legislative standard that supersedes the

(continued...)

Accordingly, the Plaintiff's repeated use of the phrase "fiduciary duties" in connection with the analysis of the actions of the directors of the Company is misplaced and misleading.  Section 2-405.1(c) of the MGCL provides that a "person who performs his duties in accordance with the standard provided in this section shall have the immunity from liability described under § 5-417 of the Courts and Judicial Proceedings Article."  As noted above, Section 5-417 of the Courts and Judicial Proceedings Article provides "[a] person who performs the duties of that person in accordance with the standard provided under § 2-405.1 of the [MGCL] has no liability by reason of being or having been a director of a corporation."  A basic tenet of the separation of powers is that "'[w]hen the common law and a statute collide, the statute, if constitutional, controls.'"  *Stearman v. State Farm*, 381 Md. 436, 454, 849 A.2d 539, 550 (2004), quoting *State ex rel. Sonner v. Shearin*, 272 Md. 502, 510, 325 A.2d 573, 578 (1974).

Maryland corporation law expressly provides that a director may rely on any information, opinion, report or financial statement prepared by an officer or employee whom the director believes to be reliable and competent with respect to the matters presented (MGCL § 2-405.1(b)(1)(i)), a lawyer, a certified public accountant or other similar person with respect to matters the director reasonably believes to be within the person's professional or expert competence (MGCL § 2-405.1(b)(1)(ii)) or a committee of the board as to any matter within its designated authority, if the director reasonably believes the committee merits confidence (MGCL § 2-405.1(b)(1)(iii)).  I note that a director who knew that the advice of outside counsel had been sought with regard to a particular business issue could reasonably conclude that outside counsel would have discovered and communicated any legal concerns relating to the approval of the business issue in question if such concerns existed.  Moreover, the fact that a director did not specifically ask outside counsel to provide advice on how the director may satisfy his or her standard of conduct with regard to a particular matter does not preclude a director from asserting advice of counsel as evidence of satisfaction of his or her statutory duties.

2.    <u>Mr. Casstevens' Potential Liability is Limited by Maryland Law and the Company's Charter</u>.

Any claim alleging a violation of Mr. Casstevens' duties under Section 2-405.1(a) of the MGCL due to his approval of the Formal Repurchase Program or his ratification of the Informal Repurchase Program for repurchases made prior to November, 2000 would not support any liability for Mr. Casstevens.  Even if someone were able to prove that Mr. Casstevens

---

(...continued)

common law standard and is binding on the courts.  HANKS § 6.6[b].  The MGCL provides that a director who performs his or her duties in accordance with the statutory standard of conduct set forth in Section 2-405.1(a) will be immune from liability.  MGCL § 2-405.1(c).  Therefore, acts or omissions of a director not amounting to a violation of the statutory standard of conduct may not be the basis for imposition of any liability on the director, either for legal or equitable relief.  HANKS § 6.6[b].

violated his statutory standard of conduct, which as discussed below is not likely, the right of the Company to seek money damages from him is limited.

Section 5-418 of the Courts and Judicial Proceedings Article authorizes the charter of a Maryland corporation to eliminate the liability of directors and officers of a Maryland corporation for money damages in suits by or on behalf of the corporation or by stockholders, <u>except for</u> (a) actual receipt of an improper benefit or profit in money, property or services or (b) active and deliberate dishonesty established by a final judgment as being material to the cause of action.  Pursuant to this statute, Article Ninth of the Company's charter provides for the maximum possible limitation of liability for directors and officers.  Since Mr. Casstevens did not participate in the Formal Repurchase Program or the Informal Repurchase Program prior to ratification, he did not receive any improper benefit or profit from his approval of the Formal Repurchase Program or ratification of the prior repurchases from others under the Informal Repurchase Program.

3.     <u>None of Mr. Casstevens' Actions Constituted a Breach of His Duties Under Section 2-405.1(a) of the MGCL</u>.

Even if the charter of the Company did not exculpate Mr. Casstevens from liability for most of his alleged violations of his duties under Section 2-405.1(a), Mr. Casstevens is not liable because he did not violate his duties.  The Complaint asserts that Mr. Casstevens' approval of the 2000 Formal Repurchase Program[6] and the Informal Repurchase Program was a breach of his duties to the Company.

In any action against a director of a Maryland corporation for a breach of his or her duties under Section 2-405.1(a), the plaintiff has the burden of proving the violation.  *See Crowther v. Hirschmann*, 174 Md. 100, 109, 197 A. 868, 872 (1938) ("It is a well-recognized principle that the burden of proof of the issue on which suit is brought rests with the plaintiff …."); *Yost v. Early*, 87 Md. App. 364, 380, 589 A.2d 1291, 1299 (1991) (citing *Crowther*).  Additionally, as noted above, Section 2-405.1(e) provides that "[a]n act of a director is presumed to satisfy [Section 2-405.1(a)]."  Accordingly, the plaintiff is required to not only meet the burden of proof but also overcome the statutory presumption of Section 2-405.1(e) that the director satisfied his or her statutory standard of conduct.  The plaintiff has failed to do so in this case.

a.     <u>Mr. Casstevens' Approval of the Formal Repurchase Program</u>.

As set forth above, Section 2-405.1(a) of the MGCL provides that a director must act (a) in good faith; (b) with a reasonable belief that his or her action is in the corporation's best interest; and (c) with the care of an ordinarily prudent person in a like position under similar circumstances.  "Acts or omissions of a director not amounting to a violation of Section 2-405.1(a) may not be the basis for imposition of any liability on the director, either for legal or equitable relief."  HANKS, *supra*, § 6.6[b] (citing Section 2-405.1(c)).

---

[6]     The Complaint does not allege that the approval of the Formal Repurchase Program in any other year was a breach of his duties.

i.    <u>Good Faith</u>.

No director of the Company, including Mr. Casstevens, acted in bad faith under Maryland corporation law with regard to his or her vote to approve the 2000 Formal Repurchase Program, which, as in prior years, included the 10,000 Share Rule, even though the directors who voted to approve the program could have benefited from the program, had the opportunity under the program to sell all of their shares and allegedly should have known that the 10,000 Share Rule would result in severe proration and a disproportionate benefit to stockholders, including directors and officers, who held fewer than 10,000 shares.

The 10,000 Share Rule had been included as a provision in the Formal Repurchase Program since the commencement of the Formal Repurchase Program in 1997.  That the Board did not remove the 10,000 Share Rule in approving the 2000 Formal Repurchase Program despite the fact that many of the directors at that time held shares below the 10,000 share threshold does not in itself indicate that any director was acting in bad faith.  No principle of Maryland corporation law would require the directors of a Maryland corporation to alter such a long-standing, neutral provision that may benefit directors and officers in a particular year given that the directors could have reasonably concluded that the 10,000 Share Rule had been beneficial to the Company in the past and remained so in 2000.  Moreover, under Maryland law, there is no rule requiring a corporation to treat stockholders equally when it repurchases its shares.[7]  Simply because it would have been reasonable for the directors to omit the 10,000 Share Rule from the 2000 Formal Repurchase Program does not mean that it was unreasonable for the directors to vote to approve the 2000 Formal Repurchase Program with the 10,000 Share Rule included.

Moreover, the resolutions were drafted by outside counsel, which is evidence that the directors were not acting in bad faith.  See *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1142 (Del.Ch. 1994) (finding a "board's reliance upon experienced counsel to evidence good faith and the overall fairness of the process") *aff'd* 663 A.2d 1156 (Del. 1995).  As noted above, a director who knew that outside counsel had been involved with the drafting of the resolutions (even though the resolutions dealt with business issues) could reasonably conclude that outside counsel would have discovered and raised any legal problems related to the resolutions if such problems existed.  Advice of counsel is relevant not only to a director's good faith but also to compliance with the other two requirements of the standard of conduct – reasonable belief and ordinary prudence – for a director of a Maryland corporation.  In addition, if advice is provided generally with respect to a transaction, the failure to pose separate questions as to every possible issue cannot serve to negate reliance.  If outside counsel has been involved in the drafting and review of documents for a transaction and counsel does not raise a question with respect to the validity or enforceability of the transaction or the directors' action in

---

[7]    *See Toner v. Baltimore Envelope Co.*, 304 Md. 256, 278-80, 498 A.2d 642, 653-54 (1985) (holding that a Maryland corporation was not required *per se* to accord a stockholder an equal opportunity to sell her shares to the corporation under the same terms and conditions offered to other stockholders).

approving it, then a director is reasonable in concluding that counsel does not believe that the director will violate his or her duties as a director by approving the transaction.

ii.      Reasonable Belief.

As noted above, to perform his or her duties in compliance with the standard of conduct set forth in Section 2-405.1(a) of the MGCL, a director must, among other things, act with a reasonable belief that his or her action is in the corporation's best interest. Under Maryland corporation law, a director is presumed to act in a manner he or she reasonably believes to be in the best interests of the corporation. MGCL § 2-405.1(e). Acts or omissions of a director that do not amount to a violation of Section 2-405.1(a) may not be the basis for a finding of breach of the director's duties. A reasonable belief requires that the director have at least some rational basis for his or her decision. See HANKS, *supra*, § 6.6(b). See also *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971) ("[a] board of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to *any* rational business purpose. A court under such circumstances will not substitute its own notions of what is or is not sound business judgment." (Emphasis added.)) While a director would have to balance his or her rational basis against any countervailing reason, the reasonable belief requirement does not authorize judicial review of the wisdom of a director's action or failure to act. See WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA CORPORATIONS § 1033 (West 2005) ("[a]n evaluation of the existence of a rational basis for the directors' decision does not constitute an assessment of the correctness of the decision or a determination of whether it was the best possible decision under the circumstances").

Mr. Casstevens could have formed a reasonable belief that the 2000 Formal Repurchase Program was in the best interests of the Company.

There were several rational reasons to approve the retention of the 10,000 Share Rule in the 2000 Formal Repurchase Program. First, the Thompson Report indicates that certain officers of the Company had stated that the 2000 Formal Repurchase Program included the 10,000 Share Rule to ensure that payments to stockholders for their shares under the Formal Repurchase Program would not be taxed as dividends. The fact that most stockholders were tax-exempt does not suggest in itself that the Board had no rational basis for deciding to maintain the 10,000 Share Rule in the 2000 Formal Repurchase Program for tax reasons. As to those stockholders that were not tax-exempt, the rule was a benefit; to those stockholders who were tax-exempt, the rule had no effect from a tax perspective. Therefore, a director could have reasonably concluded that maintaining the 10,000 Share Rule was in the best interests of the Company as it provided a tax benefit to some stockholders.

Second, the Thompson Report indicates that certain officers of the Company had stated that the 2000 Formal Repurchase Program included the 10,000 Share Rule to avoid certain requirements of the federal securities laws that would apply to the Company if it had more than 500 stockholders. Compliance with these requirements would have given rise to substantial expense, which the directors rationally may have sought to minimize or eliminate. The fact that the Company had significantly fewer than 500 stockholders when the 2000 Formal Repurchase Program was approved is irrelevant. The directors did not have to wait until the number of stockholders more closely approached 500 in order to have acted rationally in attempting to

avoid the Company's becoming subject to the securities law requirements that would apply if the Company had more than 500 stockholders. The fact that the Company desired to avoid exceeding 500 stockholders does not in itself suggest that it was not rational for the Board to promote this objective while, at the same time, the Corporation made the Stock Offers to the directors and officers. Companies often pursue more than one goal simultaneously. For example, it is common for public corporations to issue stock while at the same time buying back their own shares in the open market. Here it would have been rational for the Company to repurchase stock for one corporate purpose while at the same time offering stock for another purpose.

Third, the Thompson Report indicates that certain officers of the Company have stated that the 2000 Formal Repurchase Program included the 10,000 Share Rule to eliminate small stockholders and thereby reduce the general administrative expenses associated with such additional stockholders. A director could have reasonably concluded that this rationale provided a sufficient basis for maintaining the 10,000 Share Rule. As stated above, any alleged inconsistency between the Stock Offers and the Formal Repurchase Program is illusory.

Finally, outside counsel was involved in the documentation of the Formal Repurchase Program and the preparation of the resolutions for the approval of the 2000 Formal Repurchase Program. As more fully explored above, Mr. Casstevens could reasonably rely on advice of outside counsel in arriving at his conclusion that the program was in the best interests of the Company.

iii.    Ordinary Prudence.

As noted above, to perform his or her duties in compliance with the standard of conduct set forth in Section 2-405.1(a) of the MGCL, a director must, among other things, act with the care of an ordinarily prudent person in a like position under similar circumstances. Under Maryland corporation law, a director is presumed to act with such care. MGCL § 2-405.1(e). Acts or omissions of a director that do not amount to a violation of Section 2-405.1(a) may not be the basis for a finding of breach of the director's duties.

A director of the Company could have acted with ordinary prudence in voting to approve the November 3, 2000 resolutions even though the Board members did not inquire as to or know the specific amount of stock that was owned by the directors and officers before the Board approved the 2000 Formal Repurchase Program, which included the 10,000 Share Rule, and even though (a) the rule might result in the severe proration of shares tendered by certain stockholders and (b) many directors participated in the Formal Repurchase Program.

First, each director had available to him or her information concerning the stock holdings of the directors based on the annual proxy statements. Second, each director had available to him or her information concerning the amount of stock that the other directors and the officers had the opportunity to purchase because the letters sent by Mr. Georgine to each director making the Stock Offers available provided the amount of each offer. In any event, the directors did not need to know the precise percentage of the Company's stock that each director and officer owned prior to November 3, 2000 before voting to approve the November 3, 2000 resolutions to have acted with ordinary prudence. Third, as previously noted, Credit Suisse

assisted in the development of the Formal Repurchase Program[8] and the November 3, 2000 resolutions were drafted by outside counsel.  Finally, as explained above, a director is entitled to a statutory presumption that he or she acted with ordinary prudence and a person challenging the director's actions must show that those actions were inadequate, not merely that other or additional actions could have been taken.  Accordingly, a director of the Company could have acted with ordinary prudence in voting to approve the November 3, 2000 resolutions even though, as alleged in the Thompson Report and the Leisner Opinion, the directors did not inquire as to the amount of stock that was owned by the directors and officers.

b.    Mr. Casstevens' Approval of the Informal Repurchase Program.

Plaintiff also asserts that the approval of the Informal Repurchase Program violated the directors' (including Mr. Casstevens') duties under Section 2-405.1(a) of the MGCL to exercise due care in approving the program since the directors did not inquire as to the amount of stock owned by the other directors and that Mr. Casstevens acted in bad faith by voting to approve the Informal Repurchase Program without specifically disclosing to the Board that he held stock that could be repurchased pursuant to the Informal Repurchase Program.  Both arguments fail for the same reason -- Mr. Casstevens and the rest of the directors were made sufficiently aware that directors held stock that could be repurchased through the program. Consequently, the directors were adequately informed to satisfy their duty of due care and Mr. Casstevens was under no obligation to disclose what the Board already knew.[9]

As noted above, each director had available to him or her information concerning the stock holdings of the directors based on the annual proxy statements.  Additionally, the letters sent by Mr. Georgine to each director making the Stock Offers available provided the amount of each offer.  Thus, the directors would have known that each of the other directors could have purchased at least 8,000 shares – the amount purchased by Mr. Casstevens in the Stock Offers.  The resolutions specifically indicated that the Informal Repurchase Program would apply to "Stock or Capital Stock held by any Director or Officer…."

---

[8]    I note that the Formal Repurchase Program was designed in 1997 to be an eleven-year program.  Not only would it have been impractical from a business viewpoint to re-evaluate a program specifically designed for long-term application, but also doing so on a yearly basis would have occasioned unwarranted costs and an administrative burden.

[9]    The claim that Casstevens did not fulfill his obligations under Section 2-419 of the MGCL by failing to disclose his holdings to the disinterested directors reflects a misunderstanding of Section 2-419 of the MGCL.  That statute provides safe harbors for interested director transactions, not affirmative obligations for directors.  See *Shapiro v. Greenfield*, 136 Md. App. 1, 14, 746 A.2d 270, 277 (2000) ("§ 2-419… creates a 'safe harbor' for certain transactions which satisfy the statute").  Furthermore, the statute provides that approval by disinterested directors is satisfied if the interest is "disclosed or *known to*" the disinterested directors, emphasizing that disclosure is unnecessary where the independent directors already have knowledge of the interest.  (Emphasis added).

Any argument specifically focusing on Mr. Casstevens' approval of the ratification of repurchases made pursuant to the Informal Repurchase Program prior to November, 2000 without specific knowledge of the each of the prior repurchases would likewise fail to establish a lack of due care. The minutes of the November 3, 2000 meeting reflect that Mr. Georgine stated that "[s]ince the founding of this Corporation we have repurchased stock, from individuals, from unions and from estates." In addition, because the resolutions provide general ratification language, the directors were aware that the resolutions applied to retroactive repurchases. The directors could have made further inquiry if they had deemed the details of past discretionary repurchases important. Additionally, each director was approving the Informal Repurchase Program on a prospective (as well as a retrospective) basis. A director may have reasonably concluded that, if the Informal Repurchase Program would be in the best interests of the Company prospectively, any past discretionary repurchases that fit within the Informal Repurchase Program were also in the best interests of the Company and did not need to be individually ratified. Finally, as mentioned above, a director is entitled to a statutory presumption that he or she acted with ordinary prudence and a person challenging the director's actions must show that those actions were inadequate, not merely that other or additional actions could have been taken.

## C.     Analysis of the Alleged Failure to Follow Corporate Formalities.

The Complaint's final argument rests on the proposition that the Stock Offerings and the Informal Stock Repurchase Program were not validly authorized by the necessary corporate action and are consequently voidable. To the contrary, both programs were authorized by the Board through proper resolutions and the programs do not conflict with the MGCL nor any of the Company's governing documents.

### 1.     The Stock Offerings.

The Plaintiff asserts that the Stock Offerings violated corporate formalities because the Board did not properly delegate its authority to issue stock pursuant to the Stock Offerings, and thus that they were never properly authorized. The Plaintiff's argument is based on faulty understandings of the facts.

The May 6, 1997 resolutions authorized Mr. Georgine "at his sole discretion to offer shares of the Corporation's Stock that have been repurchased and returned to the status of authorized, but unissued shares, to authorized investors as specified in the Corporation's Charter and By-laws." This resolution is the source of authority for Mr. Georgine's approval of the Stock Offerings.

Section 2-411 of the MGCL authorizes a corporation to form committees consisting of one or more directors and delegate to those committees any of the powers of the board except for a few specific exceptions. One of those exceptions is the issuance of stock unless the board has "given general authorization for the issuance of stock providing for or establishing a method or procedure for determining the maximum number of shares to be issued…." Section 2-411(b) of the MGCL.

Although not specifically set forth in the May 6, 1997 resolutions, the only reasonable interpretation of those resolutions is that the Board formed a committee of the Board, consisting of a single member, Mr. Georgine, and delegated to this committee the power to approve, on behalf of the Company, issuances of its stock. Therefore, actions taken by Mr. Georgine in connection with the Stock Offers pursuant to this delegated authority were in his capacity as the sole member of this committee. *In re Staples, Inc. Shareholders Litigation*, 792 A.2d 934, 961-64 (Del. Ch. 2001) (acknowledging that delegation to a chairman of the board can be delegation to a one director committee). Section 2-411(b) of the MGCL requires only that a board provide for a method of determining the maximum number of shares to be issued when the board authorizes a committee to issue stock. The May 6, 1997 resolutions do so by limiting offers to the total number of shares "that have been repurchased and returned to the status of authorized, but unissued shares." As a result, Mr. Georgine's discretion to issue shares was necessarily dependent upon the decision of stockholders to sell their shares back to the Company because, pursuant to the May 6, 1997 resolutions, only shares that had been repurchased by the Company could be reissued on Mr. Georgine's authority.[10] The fact that the Compensation Committee was consulted does not undermine the authority granted to Mr. Georgine by the May 6, 1997 resolutions.

Plaintiff's claim that the Stock Offerings were not made pursuant to properly delegated authority from the Board is based on the mistaken assumption that the source of authority for the Stock Offerings was the Compensation Committee. Thus, that argument is inapposite.

2.    The Informal Repurchase Program.

The November 3, 2000 Board resolutions authorizing the Informal Repurchase Program provide:

> [T]he Chairman of [the Company] is hereby authorized and empowered, in his discretion, whenever he deems it consistent with sound financial practice and the best interests of [the Company], to repurchase shares of Class A Stock or Class B Stock . . . or Capital Stock from those shareholders offering the same to [the Company]; provided that the authorization granted under this resolution shall not be exercised . . . in a total amount with respect to any particular stockholder in excess of 1% of the total outstanding [Class A Shares, Class B Shares and Capital Shares], taken in the aggregate, of [the Company] computed immediately preceding the repurchase in question.

---

[10]    The limit placed by the Board is a sensible one. Since the limit was equal to the total number of shares of the Company that had ever been repurchased by the Company, the limit ensured that the total number of shares that could be authorized by Mr. Georgine to be issued by Company did not exceed the total number of shares of the Company that had ever been outstanding, thus preventing any further dilution or any overissuance.

The resolutions further provide that Mr. Georgine was authorized to effect such repurchases of stock "at such price per share as he shall deem appropriate; provided, however, that such price shall not be greater than that most recently specified by the Board of Directors."  This delegation of authority to Mr. Georgine does not violate corporate formalities.   Nothing in Section 2-310 or the rest of the MGCL prevents the delegation of the authority to administer such a program to an officer.[11]

Furthermore, despite Plaintiff's claims, the Board resolutions alone constituted sufficient corporate action under Section 2-310(a)(1) to authorize the Informal Repurchase Program.  Section 2-310(a)(1) of the MGCL provides, in its entirety: "Subject to the provisions of its charter and § 2-311 of this subtitle, if authorized by its board of directors, a corporation may acquire the corporation's own shares."  There are no restrictions in Section 2-311 of the MGCL or the charter that are relevant here.  The Plaintiff claims that the resolutions lacked sufficient detail to constitute "authorization" under the statute, evidently because the resolutions did not specify a dollar limit on the total amount of stock that Mr. Georgine was authorized to repurchase.  Leaving aside the fact that the resolutions limited the total by restricting the purchases from any stockholder to no more than 1% of the total outstanding stock (which inherently sets a limit on the total number of shares to be redeemed) and setting the maximum price per share, nothing in Section 2-310(a)(1) requires such detail for authorization.  Any assertion that such a resolution is statutorily insufficient to constitute "authorization" is unsupported by the statute or any other source of Maryland law.  If the General Assembly of Maryland had intended to require a board of directors of a corporation to provide such detail, they would have explicitly said so.  See Section 2-203(a)of the MGCL (regarding the issuance of stock or convertible securities, requiring the board of directors to adopt a resolution that: (1) authorizes the issuance, (2) sets the minimum consideration or a formula for its determination and (3) fairly describes any consideration other than money).

## III.        Conclusion

For the reasons set forth above, Mr. Casstevens' participation in the Stock Offers and the repurchases under the Informal Repurchase Program after November 3, 2000 should not be voided as interested director transactions under Maryland law.  Furthermore, Mr. Casstevens' actions in approving the 2000 Formal Repurchase Program or the Informal Repurchase Program does not support a claim that he violated his statutory standard of conduct under Maryland law.  Finally, neither the Stock Offers nor the Informal Repurchase Program are voidable for any deficiencies in corporate formalities regarding the authorization of such programs.

---

[11]     Even if such a restriction did exist, Georgine was also a member of the Board, and thus the November 3, 2000 resolutions authorized him to administer the program as a single-member committee of the Board, as the Board had done in May 6, 1997 resolutions for the Stock Offers as discussed above.  The repurchase of stock is not among the few excepted powers in 2-411 of the MGCL that a board of directors cannot delegate to a committee.

I have executed the forgoing affidavit as of June 22, 2007, and state, under penalty of perjury, that the forgoing is true and correct.


/s/ James J. Hanks, Jr._____
James J. Hanks, Jr.