Exhibit 33

Massachusetts Ave.

Proxy for Annual Meeting of Stockholders
to be held May 11, 2000

Votes  364,268
LIUNA Local Union & District Council Pension Fund
c/o Henry Moreshi, Fund Administrator
905 16th Street, N.W.
Washington, DC 20006

The undersigned stockholder of ULLICO Inc. hereby appoints Joseph E. Maloney, Douglas J. McCarron, and William H. Wynn as the Proxy Committee, with Robert A. Georgine, Chairman, President, and Chief Executive Officer, to have full power of substitution for the member or members of the Proxy Committee in the event of any vacancy or vacancies occurring on this Committee, the attorneys and proxies of the undersigned, for and in the name of the undersigned, to attend the Annual Meeting of Stockholders of the Company to be held on May 11, 2000 at The Washington Court Hotel, 525 New Jersey Avenue N.W., Washington, D.C., and at said meeting, and at any adjournment or adjournments thereto, to represent and vote the stock of the undersigned.

Management recommends in favor of:

|  | FOR | AGAINST |
|---|---|---|
| (1) The election of its nominees as directors | ☐ | ☐ |
| (2) The selection of PricewaterhouseCoopers as independent accountants for the fiscal year ending December 31, 2000 | ☐ | ☐ |

If a choice is not specified, this Proxy shall be voted in accordance with the management recommendations.

The management is not aware of any matters to be presented requiring action by the Stockholders at the meeting other than those above indicated. In the event other matters are presented, the undersigned confers discretionary authority upon said proxies with respect thereto.

Receipt is acknowledged of the notice of the meeting and Proxy statement, each dated April 13, 2000.

**This Proxy is solicited on behalf of the management.**

Witness the hand and seal of the undersigned this _____ day of _____, 2000 *

By: _____
Signature

By: _____
Signature**

_____
Title***

* Proxy must be dated
** Required for joint stockholders
*** Required only for organizational stockholder

OVER PLEASE

USDC 187604

Exhibit 34

ULLICO Inc.
111 Massachusetts Avenue, N.W
Washington, DC 20001

**Proxy for Annual Meeting of Stockholders
to be held May 11, 2000**

Votes: 2,228 1/3
Laborers International Union of N.A.
c/o Nations Bank Trust Income Processing
Post Office Box 830780
Dallas, TX 75283-0780

The undersigned stockholder of ULLICO Inc. hereby appoints Joseph F. Maloney, Douglas J. McCarron, and William H. Wynn as the Proxy Committee, with Robert A. Georgine, Chairman, President, and Chief Executive Officer, to have full power of substitution for the member or members of the Proxy Committee in the event of any vacancy or vacancies occurring on this Committee, the attorneys and proxies of the undersigned, for and in the name of the undersigned, to attend the Annual Meeting of Stockholders of the Company to be held on May 11, 2000 at The Washington Court Hotel, 525 New Jersey Avenue, N.W., Washington, D.C., and at said meeting, and at any adjournment or adjournments thereof, to represent and vote the stock of the undersigned.

Management recommends in favor of:

|  | FOR | AGAINST |
|---|---|---|
| (1) The election of its nominees as directors ............................... | ☐ | ☐ |
| (2) The selection of PricewaterhouseCoopers as independent accountants for the fiscal year ending December 31, 2000 ............................... | ☐ | ☐ |

If a choice is not specified, this Proxy shall be voted in accordance with the management recommendations.

The management is not aware of any matters to be presented requiring action by the Stockholders at the meeting other than those above indicated. In the event other matters are presented, the undersigned confers discretionary authority upon said proxies with respect thereto.

Receipt is acknowledged of the notice of the meeting and Proxy statement, each dated April 11, 2000.

**This Proxy is solicited on behalf of the management.**

Witness the hand and seal of the undersigned this _____ day of _____, 2000.*

By: _____
Signature

By: _____
Signature**

_____
Title***

*    Proxy must be dated
**   Required for joint stockholders
***  Required only for organizational stockholder

OVER PLEASE

USDC 187603

Exhibit 35

# ADDENDUM
# TO
# EMPLOYMENT AGREEMENT

WHEREAS, ULLICO Inc. (the "Corporation") and ROBERT A. GEORGINE ("Employee") entered into an Employment Agreement dated as of October 1, 1999 ("Original Agreement"), which set forth the terms and conditions of Employee's employment by the Corporation as Chairman of the Board, President and Chief Executive Officer;

WHEREAS, the Corporation and Employee wish to amend the Original Agreement as set forth in this Addendum to Employment Agreement ("Addendum") as of the Effective Date of the Original Agreement; and

WHEREAS, the Board of Directors of the Corporation (the "Board") duly approved and authorized a five year agreement employing Robert A. Georgine as Chairman, President and Chief Executive Officer at a meeting held on September 23, 1999, at which meeting a quorum was present, and authorized and directed the Compensation Committee of the Board to prepare and execute on behalf of the Corporation an employment agreement with Employee containing such terms and conditions as the Compensation Committee deems appropriate;

NOW, THEREFORE, in consideration of the foregoing and of the mutual promises and covenants herein contained, the parties hereto agree as follows:

1.    **Interpretation.**  Each capitalized terms used but not defined in this Addendum shall have the meaning assigned to it in the Original Agreement.

2.    **Put Option.**  Paragraph 3 of the Original Agreement is hereby amended by renumbering subparagraph (d) as subparagraph (e) and by adding a new subparagraph (d) to read as follows:

"(d)    Put Option.  The Corporation and Employee acknowledge that Employee owns, has owned and may acquire certain shares of the Corporation's Class A Common Stock, par value $1.00 per share and/or the Corporation's Capital Stock, par value $25.00 per share (collectively, the "Shares").  As of the Effective Date and at any time during or after the Employment Term, at Employee's election, Employee may require, at Employee's election, the Corporation to purchase from Employee, in cash, all or any portion of the Shares, and the Corporation shall promptly so purchase such Shares at a purchase price per Share equal to Fair Market Value.  For purposes hereof, the term "Fair Market Value" means the book value of a Share as of December 31 of the preceding calendar year as determined by the Board and/or the Executive Committee of the Board for purposes of repurchases under the Stock Repurchase Program; provided; however, that if at the time of any determination of Fair Market Value, the book value of a Share as of the preceding December 31 has not been determined under the Stock Repurchase Program, Fair Market Value shall mean the book value of a Share as determined by the

U 041217

Corporation in good faith in a manner consistent with past practices for determining book value for purposes of the Stock Repurchase Program. For purposes hereof, "Stock Repurchase Program" means the program initiated by the Corporation during 1991 pursuant to which the Corporation offers to repurchase from its shareholders a specified number of shares of its common stock at a purchase price per share equal to the per share book value."

3. **Ratification.** Except as amended and modified by this Addendum, the parties hereby confirm that the Original Agreement is unmodified and is in full force and effect. This Addendum shall modify the Original Agreement effective retroactively to the Effective Date.

IN WITNESS WHEREOF, the Corporation has caused this Addendum to be executed by its duly authorized representatives and Employee has executed this Agreement.

Attest:                                    **ULLICO INC.**

By: _____
John J. Barry,
Member of the Compensation
Committee of the Board of Directors

By: _____
John E. Cullerton,
Member of the Compensation
Committee of the Board of Directors

By: _____
Jake F. West,
Member of the Compensation
Committee of the Board of Directors

By: _____
William Wynn,
Member of the Compensation
Committee of the Board of Directors

- 2 -

U 041218

By: _____
Joseph A. Carabillo,
Vice President,
Chief Legal Officer and
Assistant Secretary

Witness:

**EMPLOYEE**

_____
Robert A. Georgine

**U 041219**

Exhibit 36

**CHECK REQUEST**  **ullico** FAMILY OF COMPANIES

CR # 783249

| MONTH | DAY | YEAR |
|-------|-----|------|
| 7 30 | 30 | 00 |

**BATCH**
ACCOUNTING USE ONLY

| COMPANY | SOURCE | APPROVAL DATE | | | SIGNATURE OF PERSON APPROVING FOR PAYMENT |
|---------|--------|---------------|--|--|-------------------------------------------|
| | | MONTH | DAY | YEAR | |
ACCOUNTING USE ONLY

**FORMAT 1**

| CHECK AMOUNT | TAX IDENTIFICATION | STATE | CHECK NUMBER | DATE | VENDOR CODE |
|--------------|--------------------|-------|--------------|------|-------------|
| $584,160.00 | | | 22000393 | 7-24-00 | 7-26-00 |
| | | (PLEASE PRINT) | | | |

**FORMAT 2**
FILE ROOM USE ONLY

PAYEE NAME: Robert A Georgine and Mely Robt Georgine

ADDRESS LINE 1:

ADDRESS LINE 2: STATE  ZIP CODE

ADDRESS LINE 3:

**FORMAT 5**
TRANSACTION DESCRIPTION: Redeem 4000 Class A

**FORMAT 6**
CHECK STUB DETAIL
LINE 1 (INVOICE #): Redeem 4,000 shares Class A
LINE 2: @ $xxx.xx per share
LINE 3:

**FORMAT 7**

| AMOUNT | SBU | PRIME | MIN | CTR | PROD | CUSTOM | MS1 | MSC2 | D/C | UFL1 | USER FLD2 |
|--------|-----|-------|-----|-----|------|--------|-----|------|-----|------|-----------|
| 484,160.00 | | 3008 | | 000 | | | | | D | | RDEEM CAP |
| 4,000.00 | | 3081 | | 000 | | | | | D | | RD M STC |
| 96,000.00 | | 3013 | | 000 | | | | | D | | RDEEM RTN |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

Confidential Treatment
Requested

| REQUESTED BY | AUDITED BY AND DATE | ACCOUNTING APPROVAL BY AND DATE |
|--------------|---------------------|----------------------------------|
| C.Ruebnic | | |

USEC 021998

☐ MAIL  ☐ MAIL WITH ATTACHED  ☑ RETURN CHECK TO Fogel/Erin   NEED BY __/__/__

EXHIBIT
106

**ULLICO Inc. (Company)**

Director/Officer Request for Repurchase

I request the Company repurchase ___4,000___ shares of ULLICO Inc. ___Class A___
 (Number)                              (Capital or Class A)

stock represented by the attached Certificate(s)* numbered ___121, 145_____

It is my understanding that the repurchase will be at the value set by the Executive Committee/Board
of Directors for the current calendar year.

In the event the Certificate(s) submitted represent more shares than the number of shares submitted
for repurchase the Company will issue a new Certificate for the balance of shares in the same name(s)
and form of ownership as the original Certificate(s).

By: _____
    Robert A. Georgine
    print name

By: _____
    Mary Rita Georgine**
    print name

\* Certificate(s) must be executed on the reverse side to authorize repurchase.
\*\* Second signature required only if Certificate(s) is/are jointly held.

executive/deffered complemens/repurchase cert

Confidential Treatment
Requested

USEC 021999



**ULLICO Inc.** 1 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(202) 682 - 0900

22000393

62-17
311

| DATE | | AMOUNT |
|---|---|---|
| 07-24-00 | PAY EXACTLY | $ **584160.00 |

PAY EXACTLY          **584160     DOLLARS     00     CENTS

VOID AFTER 180 DAYS

TO THE ORDER OF   ROBERT A. AND MARY RITA GEORGINE

ALLFIRST FINANCIAL CENTER, M.A. MILLSBORO, DE 19166

TWO SIGNATURES REQUIRED

⑈22000393⑈ ⑆031100173⑆ 35330704⑈

DETACH LOWER PORTION AT PERFORATION AND RETAIN FOR YOUR RECORDS



| REFERENCE NUMBER | DATE | CHECK NUMBER |
|---|---|---|
| 783249 | 07-24-00 | 22000393 |

REDEEM 4,000 SHARES CLASS A @ $146.04 PER SHARE

100007

Confidential Treatment
Requested

USEC 022000

**ULLICO Inc.** 111 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(202) 682 - 0900

003          CHECK AMOUNT
**584160.00

Exhibit 37

**MINUTES OF THE
COMPENSATION COMMITTEE
OF
ULLICO INC.
Held October 20, 2000**

ATTENDEES:
John J. Barry (via telephone)
John E. Cullerton
Jacob F. West
William H. Wynn

ALSO IN ATTENDANCE:
Robert A. Georgine
Joseph A. Carabillo

Mr. Georgine opened the meeting with an outline of the issues to be discussed and then asked Mr. Carabillo to address the Committee. The first item was an Amendment to the Employment Agreement for the Chairman, President, and Chief Executive Officer, Robert A. Georgine. The Committee in developing Mr. Georgine's compensation package had specifically discussed a Put option to Mr. Georgine allowing him to sell shares of his stock to the corporation in accordance with Board established values. Mr. Cullerton noted that this issue had been discussed by the Committee and approved at prior meetings. Mr. Carabillo agreed indicating that the Put was discussed and was incorporated in the document that dealt with the stock incentive but through an oversight had not been incorporated into Mr. Georgine's Employment Agreement, the Addendum to that Agreement, being considered today, corrects that situation. If approved and signed by the Committee, Mr. Carabillo will present, at the Committee's next meeting, an amended and restated document creating a unified contract for the Chairman, President, and Chief Executive Officer. There was discussion by the Committee that this was the Committees' intent in the original discussion and approval of the terms of Mr. Georgine's Employment Agreement pursuant to the grant of authority from the Board of Directors. Motion was made and unanimously approved adopting the language of the Addendum which was before the Committee.

The second item to be discussed was the Non-Qualified Deferred Plan which had been established for the Senior Officers of the Corporation in 1998. The Non-Qualified Deferred Plan allows Senior Officers to defer a portion of their compensation into a non-qualified account. The assets remain corporate assets and available to general creditors even though placed in trust with a third party. This Plan allows them an additional mechanism for financial planning purposes and investment opportunities. The original opportunities included a tracking option to allow values to track Ullico Inc. stock and, it allowed investments in a fixed interest account with a specified rate of interest and options to track Separate Accounts "A", "M" & "R" of The Union Labor Life Insurance Company. This is very similar to the 401(k) Plan that was in existence at the time of the original adoption of the Non-Qualified Plan. This mechanism has proved burdensome. While the amounts deferred are held by Allfirst Bank and invested—those investments do not exactly track the investment options in the Plan. This has led to expense and accounting that Management would like to eliminate for the Corporation.

Mr. Carabillo discussed with the Committee a proposal submitted by Allfirst, formerly First National Bank of Maryland, to establish Allfirst as administrator of this Plan. Allfirst has made available 27 mutual funds from which management may pick ten mutual funds of varying investment strategies and risk. The Allfirst proposal will be at no cost to the Corporation for the establishment of the Plan. The only fees that will be charged are to those individuals who have deferred money into this Plan through the fees generated by the mutual funds selected by each individual investor. Therefore each person participating in the Plan will have the opportunity to control their investment options and the Corporation will incur no administrative expenses other than those normally associated with payroll withholding and transmitting funds to Allfirst. There was discussion—each

USDC 0123775

member of the Committee was familiar with plans of this nature. It was pointed out that the Officers would lose the option of tracking value on ULLICO stock as part of this program. This was understood and the Committee approved the substitution of Allfirst and the program described as presented in the Allfirst proposal for the current Non-Qualified Deferred Plan as previously adopted.

An expansion of the plan was then presented. There had been discussion among management to expand this Plan to include as many individuals as possible. Basically to allow employees to defer current compensation for tax purposes. Under recent case law the group that can be subject to such a Plan has been expanded and it is currently believed that a Plan can be developed to encompass all Officers of all Companies within the ULLICO Group of Companies. Authority was sought from the Committee to complete research and to expand the Plan to as many individuals who are elected Officers of the various affiliates and subsidiaries of ULLICO Inc. as possible. Committee discussion concluded that this is a worthwhile benefit with no additional cost to the Company. Motion was made to allow the Corporation to expand the Non-Qualified Deferred Plan to as many eligible individuals as possible who are in position of an elected officer of ULLICO Inc. or any of its affiliates or subsidiaries. Motion was unanimously approved.

The final item on the Agenda was a briefing of the Committee as to the latest correspondence from the attorneys representing Michael R. Steed in discussions with the Company over his separation. The Chairman discussed the general posture of the Company to meet its legal obligations to Mr. Steed, but the Chairman believed that it was only appropriate to meet those legal obligations. The Committee then reviewed the contents of the letter received from Mr. Steed's attorneys dated October 12, 2000. There was extensive discussion of the proposal and while no Committee action was sought the Committee was in agreement with the overall posture of the discussions and that they should continue.

Mr. Georgine then indicated his desire for an Executive Session to discuss with the Committee compensation for Senior Officers. At the conclusion of the Executive Session the Committee asked Mr. Carabillo to return. With Mr. Georgine then absent, he was informed by the Committee Members that the Chairman had reviewed with them the Senior Officer compensation that had been awarded and that the Committee has unanimously ratified the salaries and incentive amounts for Senior Officers of the Corporation. In addition, the Committee indicated that it had discussed in executive session an incentive for Mr. Georgine of $300,000 to be payable currently. Mr. Carabillo was asked to both reflect that in the minutes and to initiate the process for arranging payment.

Motion was made to adjourn and Committee concluded its meeting at approximately 4:45 p.m..


Joseph A. Carabillo
Assistant Secretary

320 Corp Secy Meetings Minutes 2000
Oct 20, 2000-Corp Com

USDC 0123776

Exhibit 38

MEETING OF THE BOARD OF DIRECTORS
OF
ULLICO INC.
HELD DECMEBER 2, 2002

AT THE OFFICES OF SIDLEY AUSTIN BROWN & WOOD LLP
WASHINGTON, D.C.

ATTENDEES:

Morton Bahr                     Joseph F. Maloney
John J. Barry                   Douglas J. McCarron
William G. Bernard              James F. M. McNulty
Marvin Boede                    Lenore Miller
Billy J. Casstevens             Daniel H. Mintz
John F. Gentleman               Terence M. O'Sullivan
Robert A. Georgine              Vincent R. Sombrotto
John T. Joyce                   James H. Rankin
Earl J. Kruse                   John W. Wilhelm
James La Sala                   Roy Wyse
Martin J. Maddaloni

ABSENT:

Morris Biller                   Frank D. Hurt
John T. Dunlop

OTHERS IN ATTENDANCE:

Joseph A. Carabillo             Karen A. Popp, Esq.
Steven T. Cottreau, Esq.        B. Michael Rauh, Esq.
Gerald M. Feder, Esq.           Frank T. Santana
Thomas C. Green, Esq.           Henry F. Schuelke, III, Esq.
John K. Grelle                  Joseph Semo, Esq.
John W. Kern, Esq.              Randall J. Turk, Esq.
James W. Luce                   Teresa E. Valentine
Grover L. McKean                Samuel J. Waldon, Esq.
Herbert J. Miller, Jr., Esq.    Jacqueline J. Wong

     Chairman Georgine called the meeting to order at 12:30 p.m. and noted that absent at the meeting were Messrs. Biller, Hurt, and Dunlop. Mr. Georgine noted that Mr. Hanley, Mr. Sweeney and Mr. Thompson would not be attending because their resignation letters were received that morning. Messrs. Maddaloni and Wilhelm participated via conference call.

    Counsel from Sidley Austin Brown and Wood LLP provided the members of the Board with a letter regarding the Report of Special Counsel, a copy of which is included as an addendum to this minutes. The letter was to be executed by each ULLICO officer, director and counsel. Included with the letter was the following resolution:

USDC 0003444

"WHEREAS, the Board of Directors determined that it was in the best interests of ULLICO Inc. (the "Company") to retain Governor James R. Thompson, Jr. to render legal advice based upon, *inter alia*, a review of the facts and circumstances surrounding the Company's issuance and repurchase of its own stock since 1997 and such legal advice has been rendered in the form of a written report made available to the Board of Directors starting on November 26, 2002. And,

WHEREAS, the Company previously retained Sidley Austin Brown & Wood LLP and Feder Semo & Bard PC (together, along with all other firms that represented the Company, "Company Counsel") to render legal advice in connection with all investigations into the Company's issuance and repurchase of its own stock since 1997. And,

WHEREAS, the Board of Directors will now begin reviewing and deliberating on the issues arising out of the report prepared by Governor Thompson. And,

WHEREAS, Company Counsel will also present additional legal materials and discussions regarding its review of the facts and circumstances surrounding the Company's issuance and repurchase of its own stock since 1997 and the issues arising out of the report prepared by Governor Thompson. And,

WHEREAS, the entire report prepared by Governor Thompson, the deliberations, discussions and other legal materials relating thereto are confidential and privileged under, *inter alia*, the attorney-client privilege and work product doctrine. And,

WHEREAS, Directors, Officers, and other employees of the Company are bound by law to protect the confidentiality and privilege of all such legal advice and work product until such time, if ever, that the Company properly waives the attorney-client privilege and the work product protection. And,

WHEREAS, the Board of Directors determined that it is in the best interests of the Company not to waive the attorney-client privilege and the work product protection at this time. Therefore, be it

RESOLVED:     "That Directors, Officers, and other employees of the Company are instructed and required to keep Governor Thompson's report, Company Counsel's legal advice and work product, including any discussions and notes regarding such matters, confidential and privileged." And, be it

FURTHER
RESOLVED:     "That Directors and Officers, and their counsel, should hereupon execute the 'Acknowledgement' form attached to these Resolutions and failure to do so shall be grounds for exclusion from the Board's meetings."

A motion was made, seconded and approved.

There was a privileged and confidential discussion with corporate counsel, Mr. Thomas C. Green and others of Sidley, Austin, Brown & Wood.

After the discussion, the following resolution was presented to the Board:

"Whereas, the Board has received the "Report of the Special Counsel on the ULLICO Purchase and Repurchase Program and Global Crossing Investment" prepared by Winston & Strawn (the "Report").

Whereas, the Report makes certain recommendations with regard to the profits realized by certain officers and directors of the Company upon their sale of Company stock to the Company pursuant to the Company's November 2000 formal stock repurchase program and its discretionary stock repurchase program.

2

USDC 0003445

Whereas, the Report makes certain recommendations with respect to the Company's corporate governance practices.

Whereas, the Board has determined that it is in the best interest of the Company that the recommendations made in the Report with respect to such sales and the Company's corporate governance practices be considered promptly in order that the Board be enabled to determine what action, if any, would be appropriate in response to such recommendations.

Whereas, the Board has determined that it would be in the Company's best interest if such recommendations be initially reviewed by directors who had not participated in the company's formal and discretionary stock repurchase programs and that the Board receive the benefit of the considered views of such directors before it takes any responsive actions. Therefore, it was:

RESOLVED: "That there be established a special committee of the Board of Directors (the "Special Committee") that shall be authorized and directed to review the Report and make recommendations to the Board as to the appropriate action or actions that the Board should take in response to the recommendations made in the Report with respect to (1) the profits realized upon the sales of Company stock purchased by certain directors and officers in the Company's 1998 and 1999 stock purchase offers and sold to the Company pursuant to the Company's formal 2000 stock repurchase program and its discretionary stock repurchase program (2) issues relating to other stock transactions involving officers and directors referred to in the Report's recommendations; and (3) the Company's corporate governance practices." And, be it

FURTHER RESOLVED: "That the Special Committee is hereby authorized to interview such Company personnel, to consult with the Company's internal and outside legal counsel and other advisors, and to retain such other advisors, at the Company's expense, as the Special Committee shall deem appropriate to carry out its responsibilities." And, be it

FURTHER RESOLVED: "That the members of the Special Committee shall be, subject to their consent, as follows:  And, be it

FURTHER RESOLVED: That the Special Committee is requested to report to the Board its recommendations as soon as practicable."

A motion was made, seconded and approved.

The Meeting was then adjourned and the Chairman was authorized to select the time and place of the next meeting.

Joseph A. Carabillo
Assistant Secretary

330 CORP SECY MEETINGS MINUTES/2002
Dec 2, 2002-UCO BOD Minutes

3

Exhibit 39

MEETING OF THE BOARD OF DIRECTORS
OF
ULLICO INC.
HELD MARCH 13, 2003
AT 111 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C.

**ATTENDEES:**

Morton Bahr
John J. Barry
William G. Bernard
Marvin Boede
Billy J. Casstevens
John F. Gentleman (via conference call)
Robert A. Georgine

John T. Joyce
Earl J. Kruse
James La Sala
Joseph F. Maloney
James F. M. McNulty
Lenore Miller (via conference call)
James H. Rankin (via conference call)
Roy Wyse

**ABSENT:**

Morris Biller
John T. Dunlop
Frank D. Hurt
Martin J. Maddaloni
Douglas J. McCarron

Daniel H. Mintz
Terence M. O'Sullivan
Vincent R. Sombrotto
John W. Wilhelm

**OTHERS IN ATTENDANCE:**

Joseph A. Carabillo
James W. Luce

Grover L. McKean
Frank T. Santana

EXHIBIT
187

Chairman Georgine called the meeting to order and noted that absent at the meeting were Messrs. Biller, Dunlop, Hurt, Maddaloni, McCarron, Mintz, O'Sullivan, Sombrotto, and Wilhelm. Mr. Gentleman and Rankin and Mrs. Miller participated via conference call.

The first action was the adoption of the minutes for the ULLICO Inc. Board of Directors meeting, held on February 21, 2003. The minutes were circulated with the preliminary Agenda. The Chairman asked if there was any comment or adjustments to the minutes. There was discussion of a modification, which was adopted, it was

> RESOLVED:    "That the Minutes of the Board of Directors Meeting of February 21,
> 2003, as distributed with the Agenda for this meeting, be and hereby are
> approved."

JK 019157

Motion was made, seconded and approved.

Next, because the February meeting ran so late, the Board did not get to one very important item that the Chairman intended to discuss with the full Board. On motion duly made and seconded, the following resolution was unanimously adopted:

WHEREAS, there are currently a total of seven vacancies on the Board of Directors and Robert A. Georgine, as Chairman, recommends the election of five new members to the Board of Directors to fill these vacancies until the Annual Meeting scheduled for May 8, 2003 in Washington, D.C. And,

WHEREAS, the Chairman recommends that Mr. Dana Brigham, Mr. Douglas H. Dority and Ms. Sandra Feldman be elected for the seats available in the class of directors standing for election in 2004; and that Messrs. John J. Flynn and Joseph J. Hunt for the seats standing for election in 2005. Therefore, be it

RESOLVED:    "That Mr. Dana Brigham, Mr. Douglas H. Dority and Ms. Sandra Feldman be elected to the Board of Directors for the seats which are currently vacant in the Director Class standing for re-election in 2004; Messrs. John J. Flynn and Joseph J. Hunt be elected to the Board of Directors for the seats which are currently vacant in the Director Class of 2005." And, be it

FURTHER
RESOLVED:    "That said elections are subject to the Chairman's securing each named individual's agreement to serve on the Board of Directors and to standing for election by the stockholders at the May 8, 2003 Annual Meeting."

The next item addressed the authority of the Special Committee of disinterested directors. It was determined that it would be in the Company's best interest if the Committee was free to consider recommendations as contained in the Governor's opinion and act independently, without the interim step of reporting to the Board of Directors for concurrence. In fact, because of the nature of any recommendations, only disinterested directors' votes should be considered in any event. Therefore, the next resolution was really not a momentous change in the structure of this committee. On motion duly made and seconded, the following resolution was unanimously adopted:

WHEREAS, at the December 2, 2002, meeting of the ULLICO Inc. (the "Company") Board of Directors, a resolution as adopted formed a special committee to be established and empowered. And,

WHEREAS, there is a recommendation to grant the Special Committee authority to act independently, it is recommended that the following modified whereases and resolutions be adopted. And,

WHEREAS, the Board has received the "Report of the Special Counsel on the ULLICO Purchase and Repurchase Program and Global Crossing Investment" prepared by Winston & Strawn (the "Report"). And,

WHEREAS, the Report makes certain recommendations with regard to the profits realized by certain officers and directors of the Company upon their sale of Company stock to the Company pursuant to the company's November 2000 formal stock repurchase program and its discretionary stock repurchase program. And,

WHEREAS, the Report makes certain recommendations with respect to the Company's corporate governance practices. And,

JK 019158

2

WHEREAS, the Board has determined that it is in the best interest of the Company that the recommendations made in the Report with respect to such sales and the Company's corporate governance practices be considered promptly in order that the Board be enabled to determine what action, if any, would be appropriate in response to such recommendations. And,

WHEREAS, the Board has determined that it would be in the Company's best interest if such recommendations be reviewed by directors who had not participated in the Company's formal and discretionary stock repurchase programs and that the Special Committee comprised of such directors take independent responsive actions. Therefore, be it:

RESOLVED:     "That there be established a special committee of the Board of Directors (the "Special Committee") that shall be authorized and directed to review the Report and make recommendations to the Board as to the appropriate action or actions that the Board should take in response to the recommendations made in the Report with respect to (1) the profits realized upon the sales of ULLICO Inc. (the "Company") stock purchased by certain directors and officers in the Company's 1998 and 1999 stock purchase offers and sold to the Company pursuant to the Company's formal 2000 stock repurchase program and its discretionary stock repurchase program (2) issues relating to other stock transactions involving officers and directors referred to in the Report's recommendations; and (3) the Company's corporate governance practices." And, be it

FURTHER
RESOLVED:     "That the Special Committee is hereby authorized to interview such Company personnel, to consult with the Company's internal and outside legal counsel and other advisors, and to retain such other advisors, at the Company's expense, as the Special Committee shall deem appropriate to carry out its responsibilities." And, be it

FURTHER
RESOLVED:     "That the members of the Special Committee shall be, subject to their consent, as follows: Daniel H. Mintz (Co-Chair), John T. Dunlop (Co-Chair), John T. Joyce, Lenore Miller, Terence M. O'Sullivan, James H. Rankin, Vincent R. Sombrotto, and John W. Wilhelm." And, be it

FURTHER
RESOLVED:     "That the Special Committee is to independently take such responsive actions as it deems necessary as soon as practicable." And, be it

FURTHER
RESOLVED:     "That the grant of authority in the above resolution is limited by any prohibitions on delegations of authority by a Board of Directors as set forth in the General Corporation Law of Maryland, for example, the authority to amend the Corporation's by-laws; or to make recommendations to the stockholders are two powers that the Board may not delegate. Any such items may be recommended to the full Board of Directors for consideration."

JK 019159

3

The Chairman then moved to an Executive Session.  A copy of his statement is attached hereto.

_Teresa Valentine_
Teresa. E. Valentine
Interim Chief Legal Officer

330 CONF SECY MEETING MINUTES 2000
Mar 13, 2000 UCO BOD Minutes

JK 019160

Exhibit 40

# ULLICO

# REPORT

# OF

# THE SPECIAL COMMITTEE

# TO THE

# BOARD OF DIRECTORS

# March 25, 2003

EXHIBIT

215

LUCE 01236

The following is the report of the Special Committee of the Board of Directors (Board) of ULLICO regarding the Report of the Special Counsel on ULLICO's Purchase and Repurchase Program and Global Crossing Investment (the Report).

## MEMBERS

Professor John T. Dunlop (Co-Chair)          Terence O'Sullivan
Daniel H. Mintz, MD (Co-Chair)                James Rankin
John Joyce                                             Vincent Sombrotto
Lenore Miller                                          John Wilhelm

On 2 December 2002, the ULLICO Board of Directors adopted a resolution establishing this Special Committee consisting of eight members of the Board, none of whom participated in the stock transactions under review, and directed it to review the report of the Special Counsel. On March 13, 2003 the Board attempted to clarify the resolution to empower the Special Committee to independently take such action, as it deems necessary.

The Committee met on eight occasions including four teleconferences spanning three months. The Committee thoroughly reviewed primary documents pertaining to the ULLICO stock purchase and repurchase programs in question and the 109 page Thompson report and the 30 pages of exhibits. We also referred, as needed, to the three volume appendix to the Report containing documents and other materials. The Special Committee also reviewed written opinions from the law firms of Sidley Austin Brown and Wood; Feder, Semo and Bard; James J. Hanks, Esq. (the framer of Maryland Corporate Law) and Robert Jones (Compensation Expert). The Committee held a three-hour meeting with Governor Thompson and his colleagues from the law firm of Winston and Strawn, along with Mark Sargent, Dean of the Law School at Villanova University. The Committee also met with Thomas Green and his colleagues from Sidley, Austin Brown, and Wood.   Thomas Green presented a summary analysis of the Special Counsel's Report, Karen Popp in her presentation focused on "Lawyer, Client Privilege" issues and Joseph Armbrust addressed contemporary concepts of Corporate Governance.

The Committee's work focused on the three major aspects of the Report:

1. Issues of law and legally binding regulations pertaining to the purchase and repurchase programs;
2. Corporate Governance questions with particular reference to the Report's recommendations and the earlier work done by ULLICO's Corporate Governance Committee;
3. The remedial action questions left by the Report to the Board and Special Committee.

LUCE 01237

## The Background

Union Labor Life Insurance Company was formed in 1926 by a number of US unions primarily to provide death benefits for their members. By 1991, that mission no longer had the same relevance to the labor movement. The Company had negative assets of $50 million and was technically bankrupt. In the following decade, however, the Company with a new management team was restructured and re-capitalized into a new holding company, ULLICO, with 22 subsidiary companies providing not only life insurance, but also a full range of insurance and financial services to working people, their unions and their trust funds. A clear purpose in forming the holding Company was to raise capital through bond sales and then stock offerings. The total assets of the company at fiscal year 2002 end were $3.6 billion. In 1998 and 1999 there were 34 officers and directors of ULLICO. In 1998, 23 of them bought shares at the established price of $28.70 per share for a total of about $1.5 million. In 1999, 17 directors and officers purchased ULLICO shares at $53.94 per share for a total of roughly $1.9 million. During the course of the following two years, 20 Board members and officers sold shares back to the company at $146.04 per share in 2000, and 4 officers and directors sold shares back to the company for $74.87 per share in 2001. The total net profit to all the officers and directors who participated in the transactions amounted to roughly $8.0 million.

There are several background factors that are relevant to our review of the transactions. The first, and most dramatic of these factors is the phenomenal growth of a ULLICO investment in Global Crossing, a company formed to develop the business potential of a fiber-optic cable it was laying between North America and Europe. ULLICO invested seven and a half million dollars in the company; those shares soared to a market value over one billion dollars at their peak before the company crashed as part of the market collapse of high-tech stocks.

ULLICO gained approximately one half billion dollars on its investment. No question has been raised as to the propriety of ULLICO's investment in Global Crossing. Indeed, it proved to be a very wise, bold investment. The ULLICO Board obtained an equity position at the right time and liquidated its holdings at the right time, at each juncture going against the trend of the market. ULLICO invested in the company, before investment managers were urging investors to buy, and sold when investment managers were still urging investors to buy.

A second factor, as alluded to above, was that the mechanisms relating to the sale and repurchase of shares and determining the price of each share were in place long before Global Crossing's unexpectedly meteoric rise.

LUCE 01238

A third background factor the Special Committee considered was that we were being asked to examine events that took place many years ago, and we were being asked to evaluate them against a background in which corporate scandals abound.

The Special Committee tried to step back in time and evaluate the enthusiasm that had to have surrounded the success of a revitalized company and its quest to acknowledge properly and fairly the individuals who were responsible for the enormous turnaround.

Although the company and its mission had been literally transformed, independent compensation studies performed in the late 1990s and the recent expert Compensation Report by Robert Jones indicated that compensation for the officers and directors of ULLICO lagged far behind compensation paid to similar corporate counterparts.

The intersection of the pre-established price and sale/repurchase machinery with the phenomenal growth in value of Global Crossing made it possible to recognize the contributions to ULLICO of the officers and directors who had brought about a remarkable turnaround of the company. As the Jones compensation report points out, however, compensation to the officers and directors, even with their gains on the purchase and resale of ULLICO stock, still lags behind that of comparable companies although the gap is narrowing.

In the spring of 2002, press reports appeared casting the transactions in an unfavorable light, and, without specifying wrongdoing on the part of the ULLICO officers and Directors. The strong inference of these reports was that the Board set up new procedures and manipulated share prices to personally exploit the Global Crossing earnings and enrich themselves at the expense of other shareholders. Sources were quoted comparing the ULLICO transactions with the Enron scandal, a scurrilous comparison given the gross misuse of public and pension fund dollars and the loss of jobs that characterized that scandal.

Apparently stimulated by the press reports, a number of government and regulatory agencies began looking into the issue. The Board had acted on the advice of legal and professional counsel in connection with all aspects of the transactions in question. Nonetheless, the Board concluded as a prudential matter at the suggestion of the President and CEO to retain an eminent attorney not connected with ULLICO or the transactions to review those transactions and advise the Board if in his view there were, contrary to the belief of the Board, any violations of law or regulations.

On 29 April 2002, the Board voted to retain Governor James R. Thompson of the law firm of Winston and Strawn to review the transactions. In the light of potential adversarial proceedings, it was understood from the outset that the work of the Governor and his colleagues would be

LUCE 01239

covered by the rules governing attorney-client privilege. Early in the process it became apparent that information relating to the process under way was being leaked to the press in a highly selective way injurious to the credibility of ULLICO. To minimize the possibility that the attorney-client privilege would be breached by these leaks, Governor Thompson's staff worked with the attorneys for the company, for the officers, and for the directors to develop a mechanism to control distribution and access to the report. The Governor's report was made available to the Board on 26 November 2002.

## The Decision of the Committee

## Remedial Recommendations

The Committee is of the view that selecting an outside counsel to determine what, if any, laws may have been inadvertently violated by actions of the Company was an excellent idea; and further, that Governor Thompson, with his prosecutorial background, was a good choice. Indeed given his background, the Special Committee placed special weight to the primary conclusion of the report: no criminal or federal securities laws were violated. And it is noteworthy that in line with the Board's original decision to retain Governor Thompson, the firm of Winston and Strawn had unfettered access to documents and witnesses. The Special Committee was satisfied that Winston and Strawn had access to everything they needed to reach their judgment.

In general, we judge the Report to be thorough, detailed and very helpful in directing the thoughts of the ULLICO Board to areas important to the next phase of ULLICO's development. The Committee does not agree with all of the conclusions, characterizations and value judgments in the report. Rather than dwell on peripheral value judgments, however, the Committee chooses in this decision to focus on what it sees as central issues.

The Report concluded, and the other attorneys agreed, that there were no violations of federal law and regulations. Nothing in the review by the Special Committee suggested anything to the contrary. The Special Committee further concludes that the sales and repurchase of ULLICO shares to officers and directors were transacted in accordance with provisions and procedures developed by competent legal and accounting professionals, did not materially violate corporate by-laws or previous Board actions, and was consistent with the culture and traditional decision making procedures of ULLICO. Neither the Report nor the Committee found any evidence that corporate management deliberately withheld information pertinent to Board decisions. The Committee found no evidence of any accounting irregularities or material misstatement of fact. Nor did the Committee find that the transactions

materially injured the interests of any ULLICO employees, shareholders or the corporation.

The Governor's report does note that under the procedures followed, the officers and directors who participated in the transactions received a proportionally greater benefit than the large institutional investors did. But any financial recognition in any form of the role of the officers and directors in both the Global Crossing gains and the turnaround of the company would have had the same effect. Furthermore, if new procedures had been put in place prior to the transactions in question which did not favor the officers and directors, the results would have varied only slightly particularly in light of the overall sale and repurchase program which resulted in $180 million having been distributed to shareholders since its inception. Finally, nothing before the Committee supported the notion that there is any law requiring that all sales and repurchases of ULLICO stock must in every instance produce an equal proportional result for all shareholders. These facts substantially obviate, therefore, the Thompson Report concern among interactions between a number of the procedural rules adopted well before the transaction in question, such as the "10000 share rule" exempting those with fewer than 10000 shares from pro-rationing upon repurchase, the fixed formula used to calculate the repurchase price of stock, both set in 1997 and the 2% rule intended to prevent larger share holders from acquiring unbalanced voting authority that was required by the bylaws. Examined at fixed points in time stock repurchases can appear to be inequitable. Over time, however, the apparent disparities were substantially diminished. Thus, from 1997- 2002 the directors and officers have net proceeds of about 9 million dollars and the shareholders have net profits of about 55 million dollars in addition to the increased value of stocks still held.

Quite apart from law, ordinary prudence would obviously suggest that practices relating to such transactions must be reasonable, fair and uniformly applied. The Committee concludes that the actions of the ULLICO board satisfied such a test. Dean Mark Sargent additionally noted that Maryland law requires that such transactions must, in the decision of the Board, be in the interest of the Company. The Board obviously felt that providing an incentive to management and directors that also aligned their interests with the Company satisfied that requirement. Allowing directors and officers to share in the results of exceptional performance certainly aligns the interests of officers and directors with the interests of the company.

The Thompson Report noted that it could be argued that the directors breached duties owed to the company as defined in Maryland Corporate law. It did not find definitive breeches. In the end this appeared to be the central focus that underscored the Thompson's Report legal analysis. Thomas Green of Sidley Austin Brown and Wood presented a contrary interpretation that Maryland Corporate laws were

LUCE 01241

not properly applied in the Report. The Special Committee also studied the point-by-point rebuttal of the Report's interpretation of Maryland Corporate law written by Mr. Jim Hanks, the framer and foremost expert on Maryland Corporate law.

The Special Committee was persuaded in its deliberations by arguments advanced by Mr. Hanks that Maryland corporate law was not violated by the directors and officers in the areas in question.

For all of the forgoing reasons -- the majority of the Special Committee concludes that the Thompson Report uncovered no illegality on the part of Board Members and Officers. John Wilhelm and Terry O'Sullivan (with dissenting views noted below) did not subscribe fully to the analysis adopted by the Special Committee in this section. The majority of the Committee concluded that there was no basis to call for the disgorgement by any officer or director of the proceeds of their investment in the Company.

Other reasons for disgorgement were suggested either in the Thompson Report or in our Committee discussions: such as; media induced perceptions of wrong doing, a cultural aversion among some trade unionists to the notion of anyone personally profiting from the operations of a trade union owned company, or the potential of mitigating prosecution or civil suits. In the view of the majority of the Committee it would be profoundly unfair and immoral to punish or make scapegoats of individuals innocent of any wrongdoing for reasons of pragmatism or expediency.

Two different dissenting views were advanced. Director Sombrotto, agreeing with the majority that nothing illegal was done, opined that voluntary restoration of profits experienced by directors and officers would go a long way in repairing damage done to the Company. Directors Wilhelm and O'Sullivan dissented from the views of the majority of the Special Committee on the grounds that only full adoption of the Thompson Report's remedial actions would put these issues behind the Company, whether the transactions in question were illegal or not. They recommend repayment of all after tax profits by directors and officers of ULLICO stock purchased in 1998 and 1999, the return of all after tax profits by Chairmen Georgine of ULLICO stock acquired under the Stock Purchase and Credit Agreement of 1999 and further that the Board take necessary action to invalidate the addendum to the Chairman's Employment Agreement with respect to stock awarded to him, and to secure return of the remaining shares he holds under this program, without compensation. In addition, they recommend that directors and officers return after tax profits from redemption of Capital Stock and Class A stock acquired through the preferred certificate program, and that Officers Luce and Grelle be asked to return all after tax profits obtained under various repurchase programs, as well.

LUCE 01242

Directors Wilhelm and O'Sullivan recommended further that any director or officer who fails to restore their profits or fails to forfeit stock in their possession should be barred from further service as a director or officer and, if an employee, they should not be eligible for any severance pay or post termination payments or benefits except for ERISA-protected vested benefit.

Lastly, they recommend that conditions for repurchase of stock, going forward, be re-evaluated by securities experts, to include, as well, alternative valuation methodologies. This recommendation gained unanimous support of the Special Committee, as well.

The members of the Special Committee weighed these views heavily, as they were sufficiently threatening to the potential well being of the Company so as to require very careful consideration.

The majority of the Special Committee, in the end, concluded that the gravest dangers to ULLICO come not from the actions the Board took on the sale and repurchase of ULLICO stock, nor from outside criticisms, but from how the situation is understood and characterized by key leaders within the labor movement.

While all Committee members acknowledge that perceptions of the transactions have damaged the company, the Special Committee majority is of the view that disgorgement will not repair that damage, whereas patient and thorough explanations to all of ULLICO's stakeholders of what actually happened will restore credibility to the Company over time. The real test of the company's ability to survive will depend on transparency in Company operations and on the performance of the company in meeting the needs of American working families and their institutions. To try to assign blame to mitigate adverse public relations is simply not consistent with trade union traditions.

## CORPORATE GOVERNANCE ISSUES

### Actions/Rationale

The Committee is in agreement with the need for a critical fresh look at Corporate Governance issues as recommended in the Report.

A step in this direction was, in fact, implemented in the year 2000, with a creation of a reconstituted Corporate Governance Subcommittee of the Board prior to the Report. The membership of the subcommittee was subsequently enlarged. The Corporate Governance Subcommittee had already engaged, but did not complete, a thorough exploration of most of the recommendations proposed in the Report.

The Special Committee in its recommendations is very mindful of the delicate balance that exists between Board, shareholders, and

LUCE 01243

management.    The fiber that holds these components together to produce an efficient and successful company, in our view, is a shared commitment to the mission of the Company on behalf of working people.

In a viable and progressive company each of these components must be able to execute proper responsibilities.

Central, in our view, to the health of ULLICO, is the desire to guarantee transparency in all of its corporate dealings.  If this principle is not woven into a fabric of corporate accountability, there are no rules, charters, or governance regulations that will otherwise achieve this ideal.    In its absence, it will always be the seed for divisiveness between the key components of the corporation.

In the view of the Special Committee, the future of ULLICO will continue to require strong, dynamic and un-compromised leadership that is in coherent control of the Company.

The Special Committee believes that the corporate strength of ULLICO is drawn equally from undiluted authority responsibly discharged by a CEO and from a Board, principally comprised of experienced union leaders who represent labor constituencies and their needs.

Although the Special Committee concludes that these relationships can indeed be strengthened by incorporating many of the recommendations of Governor Thompson relative to Governance issues, we do so cautiously with due concern that the worst result from imposing a governance structure that does not fit the unique culture of ULLICO would be to create competing centers of powers within the corporation.

## Specific Recommendations

#1
A.  Comprehensive written corporate governance guidelines, and
B.  A code of conduct and ethics.

The Special Committee agrees in principle with both recommendations.

The Special Committee reviewed corporate governance guidelines including web-based materials it had researched[1] and materials obtained, upon request, from Sidley Austin Brown and Wood [2]

---

[1] Corporate Governance Guideline Policy Statements from TIAA-CREF, CalPERS, AFL-CIO and the Sabenas-Oxley Act.

[2] Council of Institutional Investors, Principles of Corporate Governance (Business Roundtable), Governance Guidelines for the following companies: Microsoft, General Electric, United Parcel, Northern Trust, and Hawaii Electric Industries.

LUCE 01244

The source material for the Corporate Guideline recommendations in the Report was the NYSE proposed Rule 303A.9 that delineates new guidelines to deal with: director qualification standards, director access to management, and as necessary and appropriate, independent advisors, director compensation, director orientation and continuing education, management succession and annual performance evaluation of the Board.

While none of these provisions are legally required of ULLICO the Special Committee recommends that its source material be referred to the Governance Subcommittee of the Board and that the Subcommittee be directed to develop, as soon as possible, new Governance guidelines for ULLICO and recommend changes in the By-laws that may be required for their enactment.

NYSE Proposed Rule 303A.10, NASDAQ Proposed Rule 4350 (m) and the Sabenas-Oxley Act together providing the rationale for the recommendation in the Report that ULLICO "adopt and publicize a code of conduct and ethics for Directors, Officers and Employees with effective reporting and enforcement mechanisms". The code of conduct should address, amongst other things, conflicts of interest, corporate opportunities, confidentiality, compliance with laws, rules, and regulations including ERISA, and reporting illegal and unethical behavior.

The Special Committee reviewed the Ethical Standards of Conduct Section of Ullico Inc Employees Handbook and recommends that the Compliance Officer develop, as soon as possible, updated Codes applicable to Directors, Officers, and Employees that address the recommendations in the Report and other source documents, as they may apply to private companies.

#2 Appoint a Chief Compliance Officer to administer the Code of Conduct and Ethics.

The Company had previously appointed a Chief Compliance Officer. The Special Committee recommends that the Chief Compliance Officer administer the Code, and have un-tethered access to the Board for reporting on a regular basis.

#3 Distribute the Code of Conduct and Ethics.

The Special Committee recommends that the Chief Compliance Officer maintain annually updated records of acknowledgment forms for all directors, officers, and employees so as to provide management of the Company with assurances that recipients received the Company's Code of conduct and ethics and agree to abide by the terms.

LUCE 01245

#4  Eliminate discretionary repurchase program immediately, and if necessary replace it with a limited program, approved by the Board, that is designed to accommodate the needs of estates, retirees and shareholders demonstrating an immediate financial need. Any such program should set clear written standards for the repurchase of shares. These standards should be disclosed to all shareholders.

The Special Committee believes there is considerable merit to the discretionary repurchase program. It recommends that going forward any transaction falling under this umbrella program, not including the estate of an officer or director, should be referred to the Corporate Governance Committee for approval before being referred to the Board for final action.

#5  Training and Education – The Report recommends institution of a training and education program. The Governance Subcommittee previously defined the need for an ongoing educational program for directors, both newly appointed and experienced. The Report delineates some of the content areas to be included such as: a review of the legal and ethical responsibilities as directors, the financial condition, principally the operating and risks and performing factors materially important to the business, and the operation, significance, and incentive programs and related party transactions.

The Special Committee endorses this recommendation with enthusiasm. We urge that the Chief Compliance Officer develop with dispatch a curriculum for training and retraining new and experienced directors, respectively.

#6  Requires that effective immediately, the corporate Governance and Audit Committees or ULLICO shareholders review and approve each proposed material transaction between the Company and any director or officer of the Company including loans, guarantees, or redemption programs.

The Special Committee endorses the principal underlying this recommendation, namely that no material transaction should be undertaken without full approval of the Board. The Special Committee recommends that evolving proposals such as loan guaranties or repurchases through the discretionary or formal repurchase program be first considered by appropriate subcommittees of the Board (Audit, Compensation, Governance as examples or by more than one subcommittee) who will provide the full Board with a descriptive recommendation of the rationale and business value of the proposal before the Board takes final action. The Board should develop an operational definition of what it considers to be material.

LUCE 01246

#7 Disclose Transactions with Directors and Officers – The Report recommends disclosure in the proxy statements of all significant transactions between the Company and its directors, officers or other affiliates.

The Special Committee agrees in principal with this recommendation. SEC Regulation S-K, item 404 seems to be the source material for this recommendation. It provides that a company must describe any transaction to which the Company (or any of its subsidiaries) was or is a party, in which the amount involved exceeds $60,000 that involves the company and a) a director or executive officer, b) a nominee for a directorship, c) a security holder who owns greater than 5% of any class voting stock or d) any member of the immediate family of any of the forgoing.

The Special Committee endorses this recommendation without reservation. It recommends that any such significant transaction be disclosed in the annual Shareholders Report along with the Proxy Statement.

#8 Require information relating to officer and director compensation of all types be disclosed by the Compensation Committee, in writing, to the Board and shareholders.

The Special Committee agrees, in principle with this recommendation unless there is an important business reason for the Board to withhold such information.   The Special Committee agreed that a compensation philosophy and full disclosure of compensation of all types be disclosed to shareholders in the annual report.

#9 Reduce the size of the Board to allow it to function efficiently and effectively.

The Report concludes that the Board is extremely large compared to peer companies and that a reduction in size could improve its effectiveness in decision making. No reference source was uncovered to support this contention.

Nonetheless, the Special Committee considered that there are merits to considering a rearrangement of directors of the Company. We discussed creating a larger group of experienced directors to serve as a group of advisors on a newly created Consultative Board. The Consultative Board would meet annually in combination with an enlarged Executive Board of Directors. The Executive Board would be enlarged to approximately 15 members permitting the infusion of newly elected labor leaders into directorship roles within the company.

LUCE 01247

In addition, the Special Committee directs the Board's attention to its recommendation that Boards of Subsidiary Companies within the ULLICO family be reviewed and enlarged. The Special Committee wishes to draw on the specific strengths and experiences of directors who are on the Executive Board and Consultative Boards to bring their insights to the functioning of the subsidiaries of the Company. ULLICO will be well served and enriched by having some of its most distinguished human assets in positions of responsibility within the breath of the Company's operations.

#10 Require that at least a majority of the Board be independent. The Special Committee notes that all but two of the ULLICO Board members have been independent of company management, and the Committee fully embraces the continuation of this important principle.

The central importance of labor leaders to achieve  success of the Company was re-emphasized. Union leaders know each other but that does not preclude them from exercising independent judgment.

As leaders of unions, they represent the same constituency that is meant to be served by the Company; they are also independently responsible to that constituency. This independent responsibility carries with it political and legal imperatives that as a practical matter define their behavior while serving on the board. Thus, union leaders are interested and independent directors serving well the unique culture of the company.

The Special Committee concluded that the present arrangement whereby two-thirds of the directors come from the labor movement is appropriate. The Committee also concluded that the Board will be well served to identify specific areas in the business operations where the addition of special expertise and experience would be helpful to the Board. The Chairperson should be encouraged to help identify and recruit such individuals to the Board or Boards of the subsidiaries of the company.

Even though it does not legally apply to ULLICO, a guiding principle for selecting independent directors could be NASDAQ Rule 4350© that defines an independent director to mean a person other than an officer or employee of the company or its subsidiaries or any other individual having a relationship which would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.

#11 Require that the Board meet at least four times annually.

The Special Committee concluded that meetings of the Executive Board should be held at least four times annually. These meetings, unless called for specific considerations that come up from time to time should be scheduled 12 months in advance to allow proper planning on the part of the directors.

LUCE 01248

#12  Require that independent Board members or a committee of independent board members determine committee assignments.

The Special Committee concluded that the Chairperson should continue to be responsible for naming committee members, but that the selections must be submitted to the Board for approval.

#13  Require the board to delegate only specific, clearly defined responsibilities to its committees and effective immediately, further require all committees to maintain minutes and regularly report to the board.

The Special Committee developed extensive reference material relating to committee charters. The reference sources have been transmitted to the Chief Compliance officer of the company to develop, as soon as possible, charters for the Corporate Governance, Audit, Compensation and Nominating committees. The charters shall address, at least, the structure and function of the committee, frequency of meetings, responsibilities, delegated authority, and a method to seek advisors as needed to fulfill their responsibilities.

The Special Committee urges that a support staff, within the office of the President and CEO, be assigned to these committees to schedule meetings, prepare minutes, and reports of the committee deliberations for presentation to the full board and maintain files. The committees should be obligated to report its findings in a timely fashion. Annually, the committee will be expected to review its accomplishments and failings, suggesting remedial action to the full board so that it can consistently strengthen its performance.

#14  Require that all of the Audit, Compensation, Nominating and Corporate Governance committees be independent.

The Special Committee concluded that all directors not employed by the Company shall be eligible for service to the Audit Committee. Otherwise any director may serve on any other committees as approved by the board

#15  Rotate committee assignments regularly to ensure independence and to better draw on the talents of board members.

The Special Committee was concerned that rotation of committee assignments may adversely effect the development of expertise, and that the committees are better served by experienced directors.

LUCE 01249

#16 Authorize committees to engage independent advisors, as necessary.

The Special Committee concluded that the Audit and Compensation committees should have the authority to engage advisors. Other committees should have right to request assistance from the company, which shall obtain advisors as may be required

#17 Amend ULLICO'S by-laws to provide for the removal of any director who, absent exceptional circumstances, fails to attend three consecutive meetings.

The Special Committee noted that the Governance committee had already determined that absent legitimate excuses, missing three consecutive meetings is sufficient cause to seek removal of the director. This recommendation will require a change in by-laws.

#18 Require that all members of the Audit committee have financial and accounting experience and that at least one member of the Audit committee be a "financial expert".

Both the Sabenas-Oxley act and the NYSE Proposed Rule 303A.4 provide that at least one member of the audit committee must have accounting or related financial expertise.

The Special Committee endorses this principle noting that all members of the Audit committee, like union leaders generally, have extensive responsibilities for the fiscal affairs of their unions. The board is well served, however if, in addition, to this expertise, one additional person with professional expertise be included in the committees membership whenever possible.

#19 Consider barring loans to or arranging financing for directors and officers.

Sabenas-Oxley provides for significant restrictions upon personal loans to directors and officers of private companies.

The Special Committee discussed certain circumstances in which company loans will aid in recruitment or retention of especially talented individuals as examples of exceptions to the proposal. The committee concluded that each circumstance must be judged on its own merits but requires full exploration of its justification by the board as discussed earlier.

### Additional Considerations

The underlying causes of the problem ULLICO has been facing are not legal, but cultural. The successful performance of the Company since the late 1980's reflects a dramatic change in ULLICO's business operations culture. But the traditional corporate governance culture – in the broadest sense - of the company, which served the company so well in the past, is not in tune with the more dynamic and complex business operation that ULLICO has become.

The Committee is unanimous in its recommendation of a series of actions in two general areas.

## 1. Communications/Marketing

The communications issue is central to the problems we are considering. While we did not undertake any review of communication programs, let alone the more complex area of marketing, it is our general impression that communications activities of ULLICO have improved considerably over recent years, particularly in communicating specific programs to customers and potential customers.

The Company does not appear, however, to have yet mounted an aggressive and ongoing institutional communications program demonstrating how ULLICO advances the overall interests of the labor movement and our society. A new corporate communications program needs to be developed for consideration by the Board as soon as possible, preferably within the next 30 to 60 days.

A major component of that program must be a several year effort specifically focused on repairing the damage to ULLICO's image with all the constituencies important to the success of ULLICO at all levels.

Furthermore, in the future, communications aspect of any proposed major program must be presented to the Board as part of its decision making process. Someone with a strong communications background must put the question to the Board of how any significant action will be explained to the public and those we serve.

And finally, the company must recognize that the communication needs of a business are quite different from the communication needs of a trade union. Potentially adverse news items must be responded to on a timely, aggressive and proactive basis. A business simply cannot afford to appear to have "no comment" in the face of adverse developments, and all companies will encounter adverse or controversial situations over time. It appears ULLICO is not in a position to complain of "one-sided press reports" when the Company did not comment on the issues for nine months after the initial news. The coverage was "one sided", but only one

LUCE 01251

side was being conveyed to the press. Given the obvious rhetorical slant, and failure on the part of several of the publications which followed the story to question the motives of those leaking information, there is reason to doubt that they would have fairly presented the ULLICO side, but that is another question.

The Committee notes that in a very recent change in reporting responsibilities, the ULLICO communications director now reports directly to the President and CEO, rather than to the chief legal officer. This is an important step in the right direction; for in the situation at hand, it has been the attorneys for ULLICO that have inhibited direct communication with the public and the labor movement.

We doubt, however, that the change in reporting responsibilities will of itself be sufficient unless mechanisms are put in place to assure that the communications staff is concurrently informed of developments with a potential communications impact. Consideration should, therefore, be given to recasting the communication director's position as an integral part of the company's senior management group.

This is not a simply resolved problem, for in almost every organization there is a tension between the legal staff and the communications staff. The current and future reality is one of increasingly aggressive prosecutors and increasingly aggressive reporters, both of whom have a tendency to retroactively apply current notions of law and morality to decisions made in earlier times in a different context. The tension between the legal staff and the communications staff is, therefore, in it self, healthy. The challenge to management is to maintain a prudent balance, which, unfortunately, was not possible under ULLICO's previous reporting structure.

Communications programs provide the corporate backdrop to advertising and marketing, so some of these same issues spill over into the marketing area. But the marketing area raises a deeper layer of cultural issues to be addressed: the conflict between corporate and trade union cultures. The Committee feels this is a key issue to be addressed in the business plan development process recently announced by the President and CEO of ULLICO.

## 2. The legal review process

The Committee was unanimous in concluding that ULLICO and its Board of Directors were not well served by the legal analysis that provided a backdrop to the transactions in questions. The issue is not whether the advice of the attorneys was erroneous, nor whether the legal and professional firms consulted on various aspects of the programs under review were competent: certainly Arnold and Porter, LeBouef Lamb,

LUCE 01252

Credit Suisse Boston, Price Waterhouse Coopers and other professionals utilized are all top line, highly respected firms.

What was missing, however, was a review of how the transaction could be viewed from a perspective of someone who might take a hostile or adversarial legal view of the Board's actions. The Committee recognizes that the task is not as simple as it sounds, as the situation at hand illustrates. For what we have here is not a "package" of mechanisms, procedures and rules designed at the same time to achieve a single objective, but rather several distinct mechanisms, procedures and rules – each designed and implemented at different times – which more by coincidence than design intersect with a single investment with an extraordinary effect on the price of ULLICO stock.

It would not be realistic to undertake the kind of exhaustive review reflected in the Thompson Report on every major issue that comes before the Board. That being said, someone, whether General Counsel or Staff Counsel, must provide a "devil's advocate" analysis before Board decisions, rather than after Board decisions, as in the Thompson Report. As the Thompson Report "devil's advocate" study unfortunately reflects, hindsight analysis all too easily lends itself to taking factors not directly related to each other and raising the possibility that someone will divine a sinister linkage.

Management therefore needs to review the operations of in-house and outside legal counsel and to consider for review by the Board, the creation of a structure of an outside General Counsel and in-house Staff Counsel with clear definitions of the management responsibility for legal operations.

John T. Dunlop (Sub-Chair)
Lamont University Professor, Emeritus
Harvard University

Daniel H. Mintz, MD (Co-Chair)
Professor of Medicine
University of Miami, School of Medicine

John T. Joyce
President, International Construction Institute
Former Chairman of AFL-CIO Pension and Investment Committee

Lenore Miller
President Emeritus
Retail, Wholesale and Department Store Union

Terence O'Sullivan
General President
Laborers' International Union of North America

James Rankin
International President
Glass, Molders, Pottery, Plastic and Allied Workers' International

Vincent Sombrotto
President Emeritus
National Association of Letter Carriers

John Wilhelm
General President
Hotel Employees and Restaurant Employees International Union

LUCE 01254

Exhibit 41

Page 1

In the U.S. District Court

For the District of Columbia

-------------------------x

In Re: ULLICO, INC.        :
LITIGATION                 :
                           : NO. 1:03CV01556(RJL)

_____

RELATED TO:  ALL CASES     :

-------------------------x

                    May 16, 2006

DEPOSITION OF:

                Daniel Mintz,

a witness, called by counsel pursuant to notice,

commencing at 9:10 a.m., which was taken at

O'Melveny and Myers, 1625 Eye St., NW, Washington,

DC

Page 238

1  properly applied in the report. The special
2  committee also studied the point by point rebuttal
3  of the report's interpretation of Maryland corporate
4  law written by Mr. Jim Hanks --" do you need to take
5  that call? Let's go off the record.
6      (Pause)
7  BY MR. HILL:
8      Q.  "The special committee also studied the
9  point by point rebuttal of the report's
10  interpretation of Maryland corporate law written by
11  Mr. Jim Hanks, the framer and foremost expert on
12  Maryland corporate law. The special committee was
13  persuaded in its deliberations by arguments advanced
14  by Mr. Hanks that Maryland corporate law was not
15  violated by the directors and officers in the areas
16  in question."
17      Do you see that?
18      A.  Yes.
19      Q.  That accurately states what the committee
20  decided, doesn't it?
21      A.  Yes.

Page 239

1      Q.  Essentially you had two views, one
2  advanced by Governor Thompson and one advanced by
3  Sidley, Austin and Mr. Hanks and the committee
4  looked at both of them and decided to go with
5  Sidley, Austin and Mr. Hanks, is that accurate?
6      A.  Given that that was the evidence before
7  us, yes.
8      Q.  Do I understand you correctly that if it
9  turns out that Sidley, Austin and Mr. Hanks were
10  incorrect and Governor Thompson was correct and
11  there were in fact breaches of fiduciary duty it
12  wasn't your intention to give people a pass on
13  breaching their fiduciary duties?
14      A.  Absolutely not. Had Governor Thompson
15  been definitive in his conclusions with regard to
16  violation of Maryland corporate law I would have had
17  absolutely no question in my mind to accept the
18  report as then written.
19      Q.  If a court should ultimately determine
20  that Maryland corporate law was violated and
21  fiduciary duties were violated you are not saying

Page 240

1  people shouldn't have to give back the money they
2  took, are you?
3      A.  If a court would rule similar to the
4  suggestion of Governor Thompson, of course not.
5      Q.  You mentioned earlier that Mr. Sweeney had
6  resigned from the ULLICO board. What's your
7  understanding of why he resigned?
8      A.  I don't know why he resigned.
9      Q.  Do you know why Linda Chavez Thompson
10  resigned?
11      A.  I do not know why she resigned.
12      Q.  Do you know why Mr. Gene Upshaw resigned
13  from the board?
14      A.  No.
15      Q.  I'm going to hand you what we've marked as
16  exhibits 238 and 239. 238 purports to be a
17  chairman's statement of a board of directors meeting
18  March 28, 2003 and 239 is the minutes of that same
19  meeting.
20      (Whereupon the proffered item was
21  marked as exhibit number 238, 239.)

Page 241

1  BY MR. HILL:
2      Q.  Do you recall attending this meeting on
3  March 28, 2003?
4      A.  I do not.
5      Q.  Would you look at exhibit 238, the big one
6  that says chairman's statement?
7      A.  Yes.
8      Q.  Looking at the second page, it says: "I
9  also want to advise the board that Joe Carabillo is
10  resigning as the company's chief legal officer and
11  that I have appointed Teresa Valentine as ULLICO's
12  interim chief legal officer."
13      Do you recall that announcement being made?
14      A.  Yes.
15      Q.  What did you understand Mr. Georgine to
16  mean when he said that Mr. Carabillo was resigning?
17      A.  Just that.
18      Q.  Was there any indication given to the
19  board that Mr. Carabillo was on leave with pay at
20  this meeting that you recall?
21      A.  No.

Exhibit 42

Page 1

In the U.S. District Court

For the District of Columbia

--------------------------x

In Re: ULLICO, INC.          :
LITIGATION                   :
                             : NO. 1:03CV01556(RJL)

_____

RELATED TO:  ALL CASES    :

--------------------------x

                     May 23, 2006

DEPOSITION OF:

                John T. Joyce,

a witness, called by counsel pursuant to notice,

commencing at 10:00 a.m., which was taken at

O'Melveny and Myers, 1625 Eye St., NW, Washington,

DC

Overnite Court Reporting Service  (301) 593-0671        Fax - (301) 593-8353
Washington, DC Metro Area        www.DCCourtReporters.com
ef794de1-7e71-4702-a70d-7c599f51fd37

Page 274

1 talking about was the status or classification of
2 the company and that was in relationship to the
3 lines of coverage, the lines of insurance coverage
4 being provided.
5     That didn't tell me the company was near
6 bankrupt.
7     Q.  Back on page seven of the special
8 committee report, it says: "For all of the
9 foregoing reasons the majority of the special
10 committee concludes that the Thompson report
11 uncovered no illegality on the part of board
12 members. John Wilhelm and Terry O'Sullivan with
13 dissenting views noted below did not subscribe fully
14 to the analysis adopted by the special committee in
15 this section. The majority of the committee
16 concluded that there was no basis to call for
17 disgorgement by any officer or director of the
18 proceeds of their investment in the company."
19     A.  Yes.
20     Q.  Am I correct that this last sentence, the
21 majority concluding there was no basis to call for

Page 275

1 disgorgement, was based on the understanding of the
2 committee that there had not been any breaches of
3 fiduciary duty under Maryland law?
4     A.  Not only Maryland law but in general.
5     Nobody had presented a persuasive case to us
6 that there had been a breach of any law or
7 regulation.
8     Q.  If in fact it turns out that a court finds
9 that there were breaches of Maryland fiduciary duty
10 law you are not saying that people shouldn't have to
11 give the money back?
12         MS. MIN:  Objection.
13     A.  I would be saying I think the court was
14 wrong.
15     In terms of advising them whether to give
16 the money back or not, I wouldn't be in a position
17 to comment on what they should do in terms of their
18 legal liability or responsibility.
19 BY MR. HILL:
20     Q.  I just want to understand your position.
21 You weren't saying if in fact something was done

Page 276

1 wrong the company shouldn't have any remedy? That's
2 not what you intended to say here, is it?
3     A.  It isn't what we said here.
4     Q.  You said in your view there was nothing
5 done wrong; therefore, nobody had to pay the money
6 back?
7     A.  Right. That was our responsibility, to
8 look into the situation and express our view. That
9 was our charge.
10     (Pause)
11         MR. SCHUELKE:  Ladies and gentlemen,
12 by my calculation you all have about 45 minutes.
13 Maybe it would be a good idea for you all to caucus
14 and figure out how you can use it.
15         MR. HILL:  I think I'm going to be
16 done in about 20 minutes.
17 BY MR. HILL:
18     Q.  If you could locate exhibit 239?
19         MR. SCULLY:  Does that leave you
20 enough time?
21         MS. MIN:  Probably not. You be sure

Page 277

1 and get in all your questions because nobody else
2 matters.
3         MR. SCULLY:  I think a little
4 cooperation at this stage would go a long way to
5 avoiding unpleasantness later.
6     Why don't you speed it up and give
7 April her time?
8         MR. HILL:  As soon as we can go,
9 we'll go.
10         MR. SCHUELKE:  Let me make a
11 suggestion.
12     Why don't you take five minutes or ten
13 minutes, whatever it takes, to organize the rest of
14 your exhibits so you can go bang, bang, bang rather
15 than having us spend five, ten minutes between
16 questions while do you that?
17         MR. HILL:  Sure. We can go off the
18 record.
19     (Recess from 4:55 p.m. - 5:05 p.m.)
20 BY MR. HILL:
21     Q.  Take a look at exhibit 239, Mr. Joyce.

70 (Pages 274 to 277)

Exhibit 43

# MEETING OF THE BOARD OF DIRECTORS
## OF
### ULLICO Inc.
#### March 28, 2003
#### 111 Massachusetts Avenue
#### Washington, DC

**ATTENDEES:**

**DIRECTORS:**

Morton Bahr
John J. Barry
William G. Bernard
Marvin Boede
Bill Casstevens
John T. Dunlop, Ph.D. (via telephone)
John G. Gentleman (via telephone)
Robert A. Georgine
John T. Joyce
Earl J. Kruse
James La Sala

Martin J. Maddaloni
Joseph F. Maloney
James P. M. McNulty
Lenore Miller (via telephone)
Daniel H. Mintz, MD
Terence M. O'Sullivan
James H. Rankin
Vincent R. Sombrotto (via telephone)
Roy W. Wyse

**OFFICERS:**

James Luce
Grover McKean
Patrick Montgomery

Jerry Pollock
Frank Santana
Teresa Valentine

**OTHERS:**

Joseph W. Armbrust
Steve Cottreau
Jack Miller
Karen A. Popp

Michael Rauh
Joe Semo
Randy Turk
Dr. Quinn Mills

Meeting was called to order at 10:00 a.m. pursuant to duly given notice thereof. The Chairman noted the presence of a quorum. He advised the Board that Joe Carabillo is stepping aside as the Company's Chief Legal officer and that Teresa Valentine has been appointed ULLICO's interim Chief Legal Officer.

The Chairman stated that the major purpose of the meeting was to discuss the report of the Special Committee. However, there were three other matters to review.

USDC 0003510

The Maryland Insurance Administration's Final Report on Examination was distributed to the Board. Board members were asked to sign an Acknowledgement form stating that he or she had received a copy of the Report. The Chairman noted that the Report was a significant improvement from the draft report the Company received from the Maryland Insurance Administration almost one year ago. The Chairman explained that the report still raises questions about the Company's financials.

The second item discussed was the need for an undertaking from each of the Board members who has received advances for legal fees. Board members were provided an undertaking and asked to execute and leave the undertaking with the Company. Those participating by telephone will be sent an undertaking and were asked to send the executed undertaking to the Company.

The third item discussed was the work of the Senior Management Operations Committee. The Chairman introduced the Committee members: Bill Blanton, Chief Actuary; Jim Luce, Executive Vice President; Grover McKean, Senior Vice President of Investments; Pat Montgomery, Vice President of Finance and Interim Chief Financial Officer; Jerry Pollock, President of Zenith Administrators; and Frank Santana, Senior Vice President of Marketing.

The Committee has met daily in the last 20 days and has developed an immediate action plan, which focuses on the Company's short-term issues. The Committee is in the process of preparing a longer-term business plan. The Committee presented its recommendations to the Chairman on March 20, 2003. Thirty-eight (38) critical actions were identified with timeframes for completion and initial determination of the short term and longer-term financial impact. Based on the initial evaluation, twenty (20) items were determined to have a positive impact on the Company's consolidated annual pre-tax earnings by $30.7 million. In addition to improving ULLICO's earnings, these recommended actions are expected to provide additional capital and positive cash flow for ULLICO Inc.

The Chairman noted that he has engaged the assistance of Dr. Quinn Mills, a management expert to identify if and how the company should restructure its operations to make it a more competitive business and better serve its market niche.

The Company has been talking with several organizations informing them that their investments in "J" for Jobs are protected against all creditors and there are no creditors of the life company or the holding company. Investor money is secure, the asset liability match in that account is excellent, and it has generated excellent returns for many years.

The Chairman then turned to the Special Committee Report that had been distributed at the outset of the meeting to all Board members. The Chairman thanked all of the Committee members, in particular the Committee Chairs, Professor Dunlop and Dr. Mintz for their dedication, hard work, and perseverance.

2

USDC 0003511

Dr. Mintz thanked his co-chair Professor Dunlop, as well as the other members of the Committee and explained the structure of the Special Committee's Report. He explained that the Committee had deliberated long and hard for three months and determined that there had been no violations of federal laws by ULLICO directors and officers. The Majority of the Committee found no violation of fiduciary duty with respect to Maryland Corporate law and, therefore, did not believe there should be any type of disgorgement. The Majority had weighed heavily the dissenting view expressed in the Special Committee Report.

With regard to Corporate Governance matters, Dr. Mintz stated that the central theme was a desire for transparency in all corporate activities and that there should be accountability.

Committee Members Miller and Joyce thanked the Company staff for their full cooperation. Mr. Joyce reiterated that no Committee member felt there had been any illegal or any other type of wrongdoing.

A discussion ensued concerning the confidentiality of the Special Committee Report in light of various pending subpoenas and whether the Special Committee report should be released to shareholders.

A discussion also took place regarding the applicability of ULLICO subpoenas to individual Board members acting in their capacity as Board member.

Mr. O'Sullivan then spoke for the Special Committee's Minority Opinion. He concurred with Mr. Joyce's statement that nothing had been done illegally by any ULLICO Director or Officer. He expressed concern, however, that perception becomes reality and thus believed there should be remediation. He also expressed his view that the report should be released and concurred with the corporate governance recommendations of the Special Committee.

The Board took a twenty-minute break to read the Special Committee Report.

The Board reconvened at which time discussion took place as to whether or not to release the Thompson Report, the Special Committee Report and the analysis prepared by the Sidley firm to the Company's Shareholders. The Board members were presented with a proposed resolution to release these materials to Shareholders as well as give the Company's attorneys the ability to cooperate with all government authorities with respect to the matters to which the Thompson report relates. Karen Popp of Sidley, Austin, Brown & Wood, counsel for ULLICO, explained that a release of these materials to government authorities would waive the attorney-client privilege.

A motion was made, and duly seconded, to pass the resolution. With Mr. Maddaloni abstaining from the vote, it was unanimously:

USDC 0003512

RESOLVED: "That because it is advisable and in the best interests of ULLICO, the Board of Directors directs that the report of the Special Committee, the Thompson Report, and the Sidley Report be made available to shareholders as soon as possible." And, be it

FURTHER
RESOLVED: "That because it is advisable and in the best interest of ULLICO, the Board of Directors authorizes the Company to release copies of the report of the Special Committee, the Thompson Report, the Sidley Report, and such other documents as the Company deems appropriate and in the best interests of the Company to the Governmental Authorities and such other parties as the Company deems appropriate and in the best interests of the Company."

After discussion in which Dr. Mintz explained why the majority of the Board concluded that it was not necessary to act upon Governor Thompson's recommendation that the Board ratify the actions taken at the November 3, 2000 meeting, a decision was made to concur that there was no need to ratify the actions taken previously at the Company's November 3, 2000 meeting.

A discussion then ensued regarding the return of profits by directors. It was decided that a return of profits would not be in the best interest of the Company since there was no illegal conduct or wrongdoing by the directors and officers as determined by Governor Thompson and the Special Committee of the Board of Directors.

The Chairman informed the Board that the Special Committee evaluated and made recommendations for the Company's Corporate Governance. The Special Committee will be working with Company counsel to put together resolutions implementing these suggestions. These resolutions will be completed early next week. Prompt approval and implementation of these corporate governance actions will be an important step in moving the Company forward.

The Chairman then advised the Board that John Wilhelm resigned from the Board. The Chairman expressed his appreciation for Mr. Wilhelm's service. Despite Mr. Wilhelm's recent surgery, he gave the Company the benefit of his intellect and precious time.

The Chairman then introduced Dr. Quinn Mills who gave a brief summary of his plans to perform a strategic review of the Company's business.

4

USDC 0003513

Lastly, the Chairman asked that the meeting be continued for further deliberations until Wednesday, April 2, 2003 at 11:00 a.m., when the Board could re-assemble to discuss the Special Committee's corporate governance recommendations. Whereupon, with agreement, the meeting was continued until April 2, 2003.

*Teresa B. Valentine*

Teresa B. Valentine
Interim Chief Legal Officer

5

USDC 0003514