Exhibit 44

**Privileged and Confidential**
**Attorney-Client Privilege**
**Attorney Work Product**

# Report of the Special Counsel
## ULLICO Stock Purchase Offer and Repurchase Programs and Global Crossing Investment

Governor James R. Thompson
Chairman
WINSTON & STRAWN

WINSTON & STRAWN

*Privileged and Confidential*                                    *Report of the Special Counsel*

November 26, 2002

To the ULLICO Board of Directors:

On April 29, 2002, I accepted your appointment as Special Counsel to investigate the events surrounding ULLICO's 1998 and 1999 stock purchase offers to directors and senior officers, its stock repurchase programs and the Global Crossing investment. After seven months of investigation by Winston & Strawn, more than 40 interviews and the review of thousands of documents, I believe we have a sound understanding of the events at issue.

ULLICO recorded an extraordinary return of approximately $486 million on its $7.6 million investment in Global Crossing. The Global Crossing investment was consistent with ULLICO's philosophy of supporting investments which might create opportunities for its labor constituency.

In 1997, before the success of the Global Crossing investment became apparent, ULLICO's Board of Directors changed the manner in which ULLICO distributed profits to shareholders. It reduced, and eventually eliminated, dividends and adopted a formal stock repurchase program. ULLICO also continued its practice of repurchasing stock from time to time under an informal repurchase program administered by its Chairman.

As a result of the confluence of certain events, the repurchase programs as implemented in later years led to disproportionate distributions to certain officers and directors. What may have begun as appropriate programs supported by legitimate business purposes developed into programs that were not in the best interest of all the Company's shareholders.

Certain ULLICO officers and Board members arguably acted inappropriately and to the detriment of the rights of ULLICO institutional shareholders. As a result of their actions, certain officers and directors received preferential treatment in the sale of their ULLICO stock. It is important, in these times of highly publicized cases of deliberate corporate malfeasance, to distinguish what happened at ULLICO from these other cases by emphasizing that we have not found evidence of criminal intent.

In the following pages we set forth an executive summary of our report and thereafter the details of the evidence gathered in the investigation, our legal analysis thereof, and our findings and recommendations. The recommendations are designed to remedy what occurred, to prevent its reoccurrence and to guide future corporate governance of the Company. We emphasize that changes in ULLICO's corporate governance are essential and should be undertaken promptly.

*Privileged and Confidential*                              *Report of the Special Counsel*

We believe each director should have and take the opportunity to fully review the Report in its entirety before deliberating and acting on our recommendations. Because of the Report's length and detail, it may well be advisable for each director to receive in advance a copy of the Report for study with the caveat that it contains privileged information. In the meantime, we have made available to directors and their counsel copies of the Report to review at our offices or elsewhere. It is essential that each director read the full Report carefully.

My staff and I stand ready to make an in-person presentation of our findings and recommendations at your convenience and, of course, to answer any questions any Board member may have.

We appreciate the confidence you have entrusted in us to conduct this investigation, and we are grateful to the Company's staff for their cooperation with our inquiry.

Respectfully submitted,

Governor James R. Thompson
Special Counsel

*Privileged and Confidential*                                    *Report of the Special Counsel*

# Table of Contents

**Executive Summary of Special Counsel Report** ............................................................. 1

   Factual Background ........................................................................................................ 1

   Legal Analysis ............................................................................................................... 5

      ■  Fiduciary Duties ..................................................................................................... 5

      ■  Securities Law ..................................................................................................... 10

      ■  Criminal Law ...................................................................................................... 11

      ■  Findings and Recommendations ......................................................................... 12

**Preface** ............................................................................................................................ 13

**Special Counsel Report** ............................................................................................... 14

**Introduction** ................................................................................................................. 14

**Factual Background** ..................................................................................................... 15

   The Company ............................................................................................................... 15

   Preferred Certificate Program ...................................................................................... 16

   Global Crossing Investment ......................................................................................... 16

   ULLICO's Stock Offer, Stock Repurchase and Employee Incentive Programs ......... 18

      ■  1997 Stock Repurchase Program ........................................................................ 18

      ■  1998 Employee Incentive, Stock Offer and Stock Repurchase Programs ........... 22

            ●  1998 Employee Incentive Programs ........................................................... 22
                ◆  Global Incentive Program .................................................................... 22
                ◆  "Top Hat" Non-Qualified Deferred Compensation Plan ...................... 23
                ◆  1998 Director/Officer Stock Purchase Offers ...................................... 25
            ●  1998 Stock Repurchase Program ................................................................. 28

      ■  1999 Stock Offer and Repurchase Programs ...................................................... 30

            ●  1999 Director/Officer Stock Offer Program ............................................... 30
            ●  1999 Stock Repurchase Program ................................................................. 34

      ■  2000 Stock Repurchase Programs ...................................................................... 35

            ●  Proposed "Extraordinary" Stock Repurchase Program ............................... 35
            ●  Discretionary Stock Repurchases ................................................................ 38
            ●  Actual 2000 Stock Repurchase Program ..................................................... 40
                ◆  November 3, 2000 Board Meeting ....................................................... 40
                ◆  Tender Offer and Other Repurchases at $146.04 ................................. 44

      ■  2001 Stock Repurchase Program ........................................................................ 49

      ■  2002 Stock Repurchase Program ........................................................................ 49

   Chairman Georgine's Employment Agreements ........................................................... 50

      ■  Stock Purchase and Credit Agreement ............................................................... 51

      ■  Employment Agreement Addendum ................................................................... 52

**Legal Analysis** ..............................................................................................................**54**

   Fiduciary Duty Law..................................................................................................54

     ■  Interested Director Transactions ......................................................................54

     ■  Statutory Duties Imposed on Directors Under Maryland Law...........................55

        •  Subsection 2–405.1(a)(1)–"Good Faith" .................................................56
           ◆  1998 and 1999 Stock Offers to Directors and Senior Officers.............56
           ◆  2000 Stock Repurchase Program .......................................................56
        •  Subsection 2–405.1(a)(2)–"Reasonable Belief" Requirement...................57
           ◆  1998 and 1999 Stock Offers to Directors and Senior Officers.............58
           ◆  2000 Repurchase Program ................................................................59
        •  Subsection 2–405.1(a)(3)–"Ordinarily Prudent Person" ..........................61
           ◆  1998 and 1999 Stock Offers to Directors and Senior Officers.............61
           ◆  2000 Stock Repurchase Programs ....................................................62
         •  Business Judgment Rule ...........................................................................63
     ■  Fiduciary Duties Imposed on Officers Under Maryland Law.............................63

     ■  Fiduciary Duties Under the Federal Labor Laws ..............................................65

   Securities Law ..........................................................................................................65

     ■  General ..........................................................................................................65

     ■  Disclosure Issues ...........................................................................................67

     ■  Deceptive Acts or Practices Issues.................................................................72

     ■  Intent, Causation and Reliance Issues ...........................................................75

     ■  State Securities Law Issues ...........................................................................75

   Criminal Law............................................................................................................76

   Role of Counsel and Other Professionals.................................................................76

   Disgorgement, Rescission and Ratification...............................................................81

     ■  Disgorgement or Rescission ...........................................................................81

     ■  Ratification ....................................................................................................82

**Corporate Governance** ....................................................................................**83**

     ■  Introduction ...................................................................................................83

     ■  Board Independence .......................................................................................84

     ■  Board and Committee Performance ................................................................85

     ■  Board and Committee Membership ................................................................85

     ■  Shareholder Participation ...............................................................................86

     ■  Corporate Governance Committee .................................................................87

*Privileged and Confidential*                                                    *Report of the Special Counsel*

**Findings**................................................................................................................**88**

■  The Global Crossing Investment ............................................................88

■  Stock Repurchase Programs ...................................................................88

■  Stock Offers to Directors and Senior Management..................................89

■  ULLICO Management and Corporate Governance ...................................90

■  Fiduciary Obligations of Directors and Officers......................................91

■  Securities Law .......................................................................................92

■  Non-Qualified Deferred Compensation Plan ...........................................93

■  Role of Counsel and Other Professionals.................................................94

■  Lack of Criminal Intent .........................................................................94

**Recommendations**...............................................................................................**95**

■  Remedial Recommendations and Commentary ........................................95

■  Corporate Governance Recommendations ...............................................102

**List of Interviews Conducted and Submissions Received** ....................................**108**

■  Directors ...............................................................................................108

■  ULLICO Executives...............................................................................109

■  Advisors ................................................................................................109

■  Others ...................................................................................................109

**Special Counsel Staff** .........................................................................................**138**

**Notice**...............................................................................................................**139**

*Privileged and Confidential*                                              *Report of the Special Counsel*

## Executive Summary of Special Counsel Report

### Factual Background

In 1987, ULLICO, Inc. ("the Company" or "ULLICO") was formed as a holding
company for the Union Labor Life Insurance Company and various subsidiaries
which provide insurance, pension, health and investment management and lending
services to unions, union members and union pension funds. The by-laws of the
Company authorize a 32-member Board of Directors, which has historically
consisted primarily of present or former officers of major unions and pension funds
that are substantial ULLICO shareholders.

A clear purpose in forming the holding company in 1987 was to raise capital—first
through a bond sale and then a stock offering (the preferred certificate program)
under which many union pension funds became shareholders for the first time. New
subsidiaries were added, debt was reduced, and outside investments were proposed.
Returns on core operations, however, continued to be variable, and in certain years
operating losses were incurred.

Beginning in or about 1991, the ULLICO Board of Directors and senior management
decided to undertake an aggressive investment program. To this end, ULLICO
Chairman and Chief Executive Officer Robert A. Georgine hired Michael R. Steed as
the Senior Vice President of Investments, and Steed proposed that the Company
make a variety of private equity investments. One investment proved extraordinary
by any measure: in February 1997, the Executive Committee of the Board, on the
recommendation of Chairman Georgine and Steed, approved a $7.6 million
investment in a new company called Nautilus LLC, the predecessor of Global
Crossing. This investment eventually resulted in an incredible gross profit to
ULLICO of about $486 million, or a return of approximately 6,390%.

In May 1997, well before the success of the Global Crossing investment became
apparent, the Board approved a formal stock repurchase program under which the
Company would repurchase shares of ULLICO Class A and B Stock acquired
through the preferred certificate program. This stock repurchase program was
intended to replace the historically high (often 9% cash and 10% stock) annual
dividends paid by the Company, which dividends were reduced in 1997 and
eliminated in 1999. The use of the stock repurchase program to replace dividends
was a key element in the Company's strategy to improve the credit ratings of its
insurance subsidiaries.

As initially envisioned and developed in consultation with Credit Suisse First Boston,
the formal repurchase program was intended to allow the Company to repurchase
$180 million in Class A and Class B Stock over 11 years, with $30 million of stock
being repurchased in 1997 and $15 million of stock being repurchased in each of the
following 10 years. The Company's other type of stock, Capital Stock, was not
eligible for repurchase in the formal repurchase program.

*Privileged and Confidential*                                                      *Report of the Special Counsel*

The formal repurchase program had to be considered and approved by the Board of Directors or its Executive Committee each year it was offered, as there was no assurance that sufficient funds would be available to fund the program in each of the ten years after 1997.

The formal repurchase program, according to Chairman Georgine, was intended to be a "means for [ULLICO] to provide liquidity to [its] larger stockholders." This formal program, along with an informal, "discretionary" repurchase program that had apparently been in existence for a number of years but not formally authorized by the Board until November 2000, was overseen principally by Chairman Georgine and the Company's Chief Legal Officer, Joseph A. Carabillo. Capital Stock was eligible for repurchase through the "discretionary" program.

To facilitate the stock repurchase programs, the price for the Company's stock, which historically had been set at $25 per share, was annually set by the Company beginning in May 1997 based on ULLICO's prior year-end audited book value per share. Book value per share was calculated by dividing the Company's total stockholders' equity by the number of shares of ULLICO Capital, Class A and Class B Stock outstanding. The initial price set in May 1997, upon the adoption of the first formal repurchase program, was $27.06 per share, the per share book value of the Company's stock as of December 31, 1996. The price established for the repurchase programs was also used to value shares sold by the Company from time-to-time.

When Global Crossing completed its initial public offering in August 1998 and the value of ULLICO's Global Crossing investment skyrocketed, the book value of ULLICO's stock followed. By the end of 1999, ULLICO's unrealized and after-tax realized gains on its Global Crossing investment were more than $1 billion, or approximately 85% of the Company's total stockholders' equity. Because the ULLICO stock price was set only once a year (in May, based upon the audited financial statements for the prior calendar year), any ULLICO shareholder considering whether to redeem or purchase ULLICO stock had advance notice, based upon Global Crossing's stock price performance, as to whether ULLICO's shares would likely be higher or lower the following year.

As Global Crossing's value rose dramatically in 1998 and 1999, it was a good time to buy ULLICO stock, and each director and senior officer (but no other authorized ULLICO investor) was given an opportunity by the Company to buy up to 4,000 shares in the second half of 1998 and another 4,000 shares in December 1999. The purchase price for the shares offered was $28.70 in 1998 and $53.94 in 1999, the book values per share as of the December 31 preceding the dates of purchase. The stated purpose for the stock offers, which were purportedly approved by the Compensation Committee, was to align the interests of officers and directors with shareholders. All of the senior officers and most of the directors bought stock pursuant to this offer. Some bought 8,000 shares, others less. Many of those who participated in the stock offers made substantial profits.

*Privileged and Confidential*

ULLICO's senior officers received additional benefits as a result of the success of the Global Crossing investment. In July 1998, the Compensation Committee, in consultation with William M. Mercer and Company, an executive compensation consulting firm, approved a "Global Incentive Program" bonus under which the five most senior executives received a four-year special bonus (in addition to their base compensation and regular annual bonus) based on the performance of ULLICO's Global Crossing investment. By 2001, the five ULLICO executives, Georgine, Carabillo, James W. Luce, John K. Grelle and Steed (who received only two payments before he resigned), received a total of $5.67 million through this bonus program.

In July 1998, the Compensation Committee also authorized a "top hat" non-qualified deferred compensation plan for ULLICO's senior officers, Georgine, Steed, Carabillo, Grelle and Luce. The purpose of the deferred compensation plan was to allow senior executives to defer income (and thereby defer income tax) on a portion of their earnings and to make deemed investments of such deferred income in one or more investment alternatives. Amounts deferred under the plan are not required to be actually invested in the available investment alternatives. Rather, the investment alternatives simply provide a measure of return to plan participants. One of the investment alternatives was ULLICO Class A Stock.

ULLICO's senior officers took advantage of the flexible terms of the deferred compensation plan to exploit the large, but short-lived, increase in the book value per share of ULLICO's stock between 1998 and 2000. When the stock price was attractive in 1998 and late 1999, the senior officers allocated deferred compensation to deemed investments in ULLICO stock under the plan. When the book value per share peaked in 2000, these same officers withdrew all amounts allocated to the ULLICO investment stock account under the plan. This simple and quite common retirement planning vehicle was the source of approximately $4 million of earnings by Georgine over a two-year period from 1998 to 2000. ULLICO's other senior officers who participated in the plan each received between $350,000 and $600,000 during the same period.

On May 10, 2000, the Executive Committee of the Board approved a record-high stock price of $146.04 per share, based on the book value per share from the Company's audited financial statements as of December 31, 1999. At the same meeting, the Board also conditionally approved an "extraordinary" stock repurchase program based on the Global Crossing investment success. Under this program, ULLICO would repurchase from all shareholders (including holders of Capital Stock) up to 20% of ULLICO's outstanding stock having an aggregate value of approximately $240 million. The "extraordinary" repurchase program provided that, in the event the offer were over-subscribed, holders of 100 or fewer shares would be able to redeem all of the shares they tendered in the program while larger shareholders would be subject to proration. The "extraordinary" stock repurchase

program was subject to several conditions, including that the price of Global Crossing stock had to be not less than $43 per share.

However, by November 2000, Global Crossing's stock price had not reached the $43 trigger price, and the Board determined, on November 3, 2000, to replace the "extraordinary" program with a $30 million stock repurchase program. Under this replacement program, if the offer were over-subscribed, shareholders who held fewer than 10,000 Class A and Class B shares could redeem 100% of their stock at the $146.04 per share price. These shareholders were principally the officers and directors who had bought stock pursuant to the 1998 and 1999 stock offers.

In contrast, ULLICO's large institutional shareholders owning 10,000 or more shares who tendered their stock pursuant to the repurchase program would be subject to proration in the event the offer were over-subscribed. This 10,000 share threshold had been included in prior programs approved by the Board.

The 2000 stock repurchase program, unlike the repurchase programs in 1997 through 1999, also contained a condition that all shareholders who owned more than 2% of the outstanding stock subject to the program had to tender all of their respective shares for repurchase in the program. This 2% Rule ensured that holders of 10,000 or more shares would be severely prorated given that those shareholders who were subject to the 2% Rule collectively held more than $800 million in stock in a repurchase program capped at $30 million.

Under the terms of the 2000 repurchase program, if the 2% Rule were not satisfied, the Chairman would have had limited authority to waive that condition of the program. The Chairman did not need to exercise this power because, as it turned out, the 2% Rule was satisfied. In fact, ULLICO's shareholders holding 10,000 or more shares collectively tendered about $1.1 billion of stock in the 2000 stock repurchase program. Under the proration rules of the program, the Company could repurchase only 2.2% of the shares tendered by each of these large shareholders. Thus, for example, a union or a pension fund that owned 10,000 shares could only redeem 220 shares at $146.04 per share through the 2000 repurchase program and receive $32,129. In contrast, however, a director or officer who owned 9,999 shares could redeem all of his or her shares at $146.04 per share and receive $1,460,254.

Paradoxically, the November 2000 $30 million stock repurchase program, under which proration was a virtual certainty, set a higher proration threshold than the May 2000 $240 million "extraordinary" repurchase program, which treated all shareholders (other than those holding 100 or fewer shares) equally. The result was that, under the $30 million replacement repurchase program, insiders received a substantially larger percentage of the funds distributed than they would have received under the previously proposed $240 million "extraordinary" program.

The November 2000 stock repurchase program failed to treat all shareholders equally and indeed greatly favored the very people, ULLICO's directors and officers, who had formulated, approved and implemented the program. Since dividends had been

*Privileged and Confidential*                                          *Report of the Special Counsel*

eliminated and there was no liquid market for ULLICO stock, the formal repurchase
program was, other than the "discretionary" repurchase program discussed below, the
only practical method by which a ULLICO shareholder could redeem Company
stock.

Under the "discretionary" repurchase program administered by Chairman Georgine, a
shareholder could sell shares of ULLICO stock, including Capital Stock. Historically,
under long-time criteria, the Chairman exercised this discretion when a shareholder
died, an officer or director resigned, or a union had a financial emergency. On
November 3, 2000, Chairman Georgine told the directors that the "discretionary"
program was "neither advertised nor encouraged." However, between May 2000 and
April 2001, when the ULLICO stock price remained at $146.04 per share, the
Chairman approved approximately $14.7 million in stock repurchases, mostly from
insiders, through the "discretionary" program, even though most of these repurchases
did not satisfy the traditional criteria.

By April 2001, twenty ULLICO directors and officers, who collectively owned less
than 2% of the Company's outstanding stock as of May 2000, received $13.7 million,
or 31% of the approximately $44.6 million paid to ULLICO's shareholders through
the formal and "discretionary" programs in 2000 and early 2001 at the $146.04 per
share price. In contrast, the pension funds and unions that owned over 90% of the
Company's stock received approximately $28 million, or about 63% of all sums
distributed. (The remaining 6% of shareholders held fewer than 10,000 shares but
were not directors or officers.)

Despite the Chairman's comment at the November 3, 2000 Board meeting that
ULLICO "is a long-term investment and has been a long-term investment since
1925," four current senior officers (Georgine, Carabillo, Grelle and Luce) who
bought stock in 1998 and 1999 pursuant to the exclusive stock offers sold virtually all
of these shares to the Company at the $146.04 per share price. Of the 20 directors
(excluding Georgine) who bought shares in 1998 and 1999 pursuant to the exclusive
stock offers, 15 sold most, if not all, of their shares to the Company at the $146.04
per share price. Only three current directors (Biller, Kruse and Sweeney) and one
former director (Upshaw) still hold all of the ULLICO Class A Stock they purchased
in 1998 or 1999.

## Legal Analysis

### ■ Fiduciary Duties

ULLICO's directors and executive officers have fiduciary duties to the Company's
shareholders under Maryland state law, where ULLICO is incorporated. Under state
statutory law, directors must perform their duties: (1) in good faith; (2) in a manner
they reasonably believe to be in the best interests of the Company; and (3) with the
care that an ordinary, prudent person in a like position would use under similar
circumstances. Officers owe duties of loyalty, obedience and care to the Company.

*Privileged and Confidential*                                    *Report of the Special Counsel*

The Company's 1998 and 1999 stock offers and 2000 stock repurchase programs resulted in numerous self-interested transactions, *i.e.*, transactions with the Company in which the directors and officers stood to personally benefit. In general, self-interested transactions that are approved by a majority vote of disinterested directors after full disclosure and consideration of all relevant information are not void or voidable solely because of the involvement of interested directors.

The Company has identified five potential disinterested directors who voted to approve the November 3, 2000 Board resolutions. Four of these five directors held no Class A Stock at the time of this Board meeting (Directors Hurt, Joyce, Miller and O'Sullivan). However, three directors (Directors Hurt, Joyce and Miller) held Capital Stock that could have been repurchased through the "discretionary" program, which the Board approved on November 3, 2000. Only Director O'Sullivan, who was appointed to the Board in 2000, held no stock, Capital or Class A, as of November 3, 2000. Finally, outside Company counsel[1] have suggested that the fifth director, Chairman Georgine, although he held Class A and Capital Stock, was disinterested because, by virtue of the put rights in his employment agreements, he could redeem his shares without participating in either the 2000 formal repurchase program or the "discretionary" program.

While there are questions as to whether these five directors were both disinterested and fully informed of the relevant information, Maryland law requires only one disinterested director to approve self-interested transactions concerning other directors. Outside Company counsel have argued that at least one of these five directors was fully disinterested and fully informed, and that the transactions approved at the November 2000 Board meeting would not be void or voidable on the sole basis that they are self-interested transactions as to other directors.

However, compliance with Maryland law on approving self-interested transactions does not excuse the requirement that directors fulfill their fiduciary duties under Maryland law, *i.e.*, that they act in good faith, in a manner they reasonably believed is in the best interests of the company and with due care in approving the transactions. Under the facts discovered in the investigation, a compelling argument exists that directors, particularly those who benefited from self-interested transactions, did not satisfy these requirements. An equally forceful argument applies to the principal officers, Georgine and Carabillo, who were instrumental in creating and implementing the stock offer and repurchase programs, and who benefited from ULLICO stock transactions.

Good faith is the absence of any desire to obtain a personal benefit and is synonymous with adherence to what is referred to in many other states as a duty of loyalty or the duty of fair dealing. Most directors who approved the stock offer and repurchase programs had the opportunity to personally benefit from them, and many

---

[1] "Outside Company counsel" refers to the lawyers hired by the Company in connection with this investigation, including Feder Semo Clark & Bard, P.C. and Sidley Austin Brown & Wood.

*Privileged and Confidential*             *Report of the Special Counsel*

of them did. The stock offers were made available exclusively to directors and senior officers, and the repurchase programs were structured and administered in a manner that, intentionally or not, favored directors and officers over other (largely institutional) shareholders.

In performing his or her duties, a director must have a rational basis for his or her action and have knowledge of that basis when taking such action. We have been unable to discern the precise business purpose or basis for the 1998 and 1999 stock offers to directors and officers. Some directors and officers we interviewed believed that the stock offers were intended, at least in part, as compensation. Others, including Georgine and outside Company counsel, have disagreed.

To the extent the 1998 and 1999 stock offers were designed to provide directors and officers with a bona fide investment opportunity, these offers carried little or virtually no investment risk. The July 1998 offer to buy 2,000 shares occurred shortly before the Global Crossing initial public offering, which foreseeably would, and in fact did, substantially increase the value of ULLICO's Global Crossing investment and the book value of ULLICO's shares. The October 1998 stock purchase offer of 2,000 shares carried even less investment risk as ULLICO's unrealized gain on its Global Crossing investment had increased even further by that time.

Even though the price of Global Crossing stock could fluctuate up or down in 1998, downside risk on the ULLICO shares purchased by directors and officers in 1998 was limited. Any of the shares purchased in 1998 could have been redeemed at their cost through the formal repurchase program later that year.

The December 1999 stock purchase offer of 4,000 shares carried virtually no investment risk because: (1) the offer closed on December 29, 1999, two days prior to the date used to calculate the 1999 book value per share of $146.04; (2) the Company had earlier in the year realized approximately $193 million in a partial sale of its Global Crossing holdings, essentially ensuring that its book value would increase in 2000; and (3) Global Crossing's share price was near its all-time high in December 1999. Further underscoring the lack of risk in the December 1999 offer is the fact that three of the executive officers (Georgine, Carabillo and Grelle) took the unusual step of incurring a one-year bank loan to purchase their respective 4,000 shares.

If the stock offers were designed to align the interests of ULLICO's directors and officers with those of ULLICO's shareholders, as Chairman Georgine and others asserted, they were poorly suited to achieve that purpose. Any "alignment" of interests was very short-lived since almost 90% of the shares purchased by directors and officers in 1998 and 1999 were repurchased by the Company by January 2001.

To the extent the stock offers were intended as compensation, as some directors have asserted, the offers may have resulted in excessive compensation to several ULLICO directors, and perhaps officers as well. More importantly, if the stock offers were a means of compensation, then these offers should have been treated as such with

appropriate standards set to determine what amounts, if any, should be paid to directors and officers and without tying the payment of those amounts to shareholder repurchase programs. These repurchase programs were purportedly for the equal benefit of all shareholders but were implemented in a manner that disproportionately favored directors and officers by allowing them to redeem all of the Class A Stock they purchased in 1998 and 1999.

Moreover, a serious question exists as to whether the 1998 and 1999 stock offers were properly authorized. The Compensation Committee purported to approve the stock offers, but did not have the authority to issue stock and its members were prohibited from deciding any matter relating to their own compensation. Thus, one could make a strong argument that the members of the Compensation Committee in approving the stock offers violated their fiduciary duties by approving matters outside their authority.

In light of questions raised regarding the Compensation Committee's authority to approve the stock offers, certain members of the Company's management, and others, have suggested that the authority for the stock offers may have come from a resolution of the Board adopted at its May 6, 1997 meeting. Pursuant to this resolution, the Board purported to authorize Georgine "in his sole discretion to offer shares of the Corporation's Stock that have been repurchased and returned to the status of authorized, but unissued shares[.]" However, it is at best questionable whether this delegation was intended to cover the exclusive stock offers to directors and officers and, even if so intended, it is questionable that such a wholesale delegation of authority by the Board would have been consistent with the directors' fiduciary duties.

Similarly, the investigation revealed no coherent "rational basis" for the Board's action in approving the 2000 formal repurchase program containing the 10,000 share threshold. The threshold led directly to a fundamental disparity in the way ULLICO's individual shareholders (mostly officers and directors) and its institutional shareholders (mostly union and pension funds) were treated under the program.

While there may have been a rationale for the 10,000 share proration threshold in 1997 when the long-term repurchase program was initially adopted, we could discern no meaningful rationale for that threshold in 2000. In fact, the use of the threshold in 2000, under the then-existing circumstances, seemed inconsistent with Chairman Georgine's statement to the Board in 1997 that the repurchase program was a means for "[the Company] to provide liquidity to [its] *larger shareholders*." (Emphasis added.) In any event, it is likely that whatever objectives the Board intended to achieve through the use of the 10,000 share proration threshold could largely have been achieved through other means that did not so significantly favor ULLICO's insiders at the expense of its large institutional shareholders.

In approving both the stock offer and repurchase programs, certain of ULLICO's directors did not act as an "ordinarily prudent person" would act in a "like position

*Privileged and Confidential*

under similar circumstances." The stock offers lacked a clear business purpose and involved an excessive, and perhaps unauthorized, delegation of responsibilities. The terms of the repurchase program, at least in 2000, and the foreseeable proration effect, were (at best) not adequately considered, particularly given the extent to which officers and directors personally benefited from this program.

Outside Company counsel submits that the directors should have the benefit of the so-called "business judgment rule," which has essentially been codified under Maryland law for directors. In a court case, the business judgment rule would provide a procedural presumption in favor of directors' actions. This procedural presumption can be rebutted by a showing of a lack of either good faith or an informed basis for the directors' decisions. Under the facts of this case, it cannot be said with any reasonable degree of certainty that the business judgment rule would protect those directors who benefited from the programs at issue.

In addition to the directors, Georgine and Carabillo bear responsibility for the defects in the stock offer and repurchase programs from which they benefited. These officers were heavily involved in the creation, evaluation and implementation of the programs. Georgine exercised almost unfettered discretion in administering the "discretionary" repurchase program, and the Compensation Committee granted Georgine the discretion to determine the timing of all the stock offers. Each year's repurchase program was approved by the Board and/or the Executive Committee in the form presented by management. Carabillo, as ULLICO's Chief Legal Officer, assisted and provided legal advice to Georgine and the Board in connection with these matters. It is unclear under Maryland law whether officers' decisions are subject to the procedural protection of the business judgment rule.

Finally, outside Company counsel have indicated that the actions by directors and officers in connection with the stock offer and stock repurchase programs were based upon advice of both the Company's Chief Legal Officer Carabillo and outside counsel. Significantly, the burden is on the proponent of the advice of counsel defense (which is not a complete defense but, instead, provides evidence of good faith) to establish reasonable reliance on independent legal advice. This is a difficult burden to satisfy because Carabillo could not be deemed "independent" counsel as he stood to benefit from, and assisted in the structuring of, the transactions at issue. Moreover, while outside counsel provided significant legal services to the Company, it does not appear that they were ever specifically requested to evaluate the fiduciary duty issues implicated by the stock offer and repurchase programs. As important, the critical issues presented here were not legal issues, but rather primarily involved the appropriateness of certain business decisions, such as the timing of the exclusive stock offers and the design and implementation of the repurchase programs. These factual judgments diminish the relevance of any reliance on counsel defense in connection with the transactions at issue.

Traditional remedies for a breach of fiduciary duty resulting in profits to a director or officer include the return of profits received from the transactions at issue, or rescission of the transactions themselves.

■ **Securities Law**

Federal securities laws prohibit a person from making material misstatements or omissions in connection with the purchase or sale of securities. These laws also prohibit any scheme, device or practice which acts as a fraud or deceit upon any person. In order to violate federal securities laws, a person or company must generally act with "severe recklessness," a higher standard than the gross negligence required for a breach of fiduciary duty.

Under the federal securities laws, a statement or omission is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. The tender offer documents for the 2000 repurchase program arguably contained material misstatements and omissions.

Specifically, the tender offer documents did not disclose the individual stock ownership of directors and officers, nor the July 1998 or December 1999 exclusive stock offers. The documents did not disclose a 40,000 share stock bonus afforded Chairman Georgine in 1999 and financed by ULLICO, nor the existence of Georgine's put rights under his employment agreements. The documents did not disclose the existence of the "discretionary" repurchase program administered by the Chairman or the fact that directors and officers sold a significant number of shares pursuant to this program in 2000 at the $146.04 per share stock price. The tender offer documents also did not clearly disclose the potential impact of the repurchase program's proration provisions, which were particularly significant in 2000.

The tender offer documents not only may have failed, in our view, to provide sufficient disclosure regarding the purchase and sale of stock by directors and officers, but (at least in 2000) they also may have misled ULLICO shareholders regarding management's position on, and participation in, the formal repurchase program. For example, the 2000 tender offer documents stated that ULLICO and its Board of Directors believed shares of the Company's Capital Stock were an "excellent investment opportunity for investors seeking long-term growth of capital." The documents also stated, apparently with little or no basis for doing so, that ULLICO "has not been advised that any of its directors and executive officers presently intend[s] to tender any shares personally owned by them pursuant to the offer." Finally, the disclosure documents contained the statement that "neither the Company nor its Board of Directors makes any recommendation as to whether any shareholder should tender any or all of such shareholder's shares pursuant to the offer." It is difficult to reconcile these statements with the fact that, around the same time these statements were being made, officers and directors were selling a substantial amount of their ULLICO shares.

*Privileged and Confidential*                                        *Report of the Special Counsel*

The juxtaposition of the 1998 and 1999 exclusive officer and director stock purchase offers with the terms of the 2000 formal stock repurchase program (including the 10,000 share proration threshold) and the "discretionary" repurchase program arguably constituted deceptive or manipulative acts or practices which were implemented through misrepresentations and material omissions in violation of federal securities laws.

While directors may have acted negligently in approving the 2000 formal stock repurchase program and the "discretionary" repurchase program, in our view neither the Company nor the directors acted with the severe recklessness required to establish a federal securities law violation. Further, even if one were to demonstrate that certain of ULLICO's directors and officers acted with severe recklessness in formulating, approving and implementing the stock offer and repurchase programs, it is not clear that the other elements of a federal securities law claim based upon material misrepresentations or omissions in the tender offer disclosure documents, such as causation and reliance, could be satisfied.

While we have not analyzed the state securities, or Blue Sky, laws of all 50 states, some jurisdictions apply a negligence standard for liability as a result of material misstatements or omissions in connection with the purchase or sale of securities. Therefore, with this lower intent standard, it is possible that ULLICO and its directors and officers who approved, implemented and benefited from the stock offer and repurchase programs could be subject to civil securities claims under state law.

Finally, because of the highly technical nature of the applicable federal securities law requirements and the fact that outside securities counsel were specifically hired to review these requirements, a reliance on counsel defense may be available in connection with federal securities law claims. However, the reliance on counsel defense may not be available in connection with claims based on applicable state securities laws which may be violated by negligent acts.

### ■ Criminal Law

Underlying every criminal prosecution is the element of criminal intent. In a financial fraud prosecution, a prosecutor is required to demonstrate beyond a reasonable doubt that a defendant had the specific intent to defraud his victim. Civil liability, on the other hand, can be established by showing negligence or severe recklessness under a lesser burden of proof. While the evidence gathered in the investigation demonstrates that certain ULLICO officers and directors were treated far more favorably than institutional shareholders in the sales of their ULLICO stock, their actions in connection with these sales, while arguably improper, were not criminal. Based on the information available to the Special Counsel, no evidence of criminal intent has been discovered.

*Privileged and Confidential*                                    *Report of the Special Counsel*

■ **Findings and Recommendations**

The Special Counsel's findings and recommendations are set forth on pages 88 through 107.

*Privileged and Confidential*

## Preface

Exhibits referenced in the following
Report are located at the end of the Report.

Documents referenced in the following Report
with a "U __, Tab __" designation are located in
a separate Appendix submitted with the Report.

*Privileged and Confidential*                                             *Report of the Special Counsel*

# Special Counsel Report

## Introduction

On April 29, 2002, ULLICO's Board retained Governor James R. Thompson, Chairman of Winston & Strawn, "as counsel to render legal advice and make recommendations to the Board of Directors regarding the facts and circumstances surrounding the…Company['s] issuance and repurchase of its own stock since 1997, and any actions of the Company and persons associated with the Company in connection with the initial public offering of Global Crossing, Inc., and such other matters as he may deem appropriate." (U 17424, Tab 1)

In connection with this Report, Winston & Strawn interviewed over 40 witnesses, including ULLICO directors, officers, employees, outside consultants and attorneys who are identified on pages 108-109. Winston & Strawn also reviewed thousands of documents provided by the Company and others and consulted an expert on Maryland state corporate law and federal and state securities laws.[2] We have done our best, given the available time and resources, to conduct a careful and impartial investigation. However, there were practical and legal limitations on the information available to us. For example, we had no power to compel third parties to submit to interviews, produce documents or otherwise provide information.[3] In addition, certain directors were unavailable.[4]

---

[2]  This expert is Mark A. Sargent, Dean and Professor of Law, Villanova University School of Law. A brief summary of Dean Sargent's evaluation of certain matters contained in this Report is attached as Exhibit 8.

[3]  Credit Suisse First Boston, for example, declined our request for an interview, as did ex-director Upshaw.

[4]  The Company advised us that directors Biller, Maddaloni and West were unavailable because of health problems. Former directors Cullerton and Wynn are deceased.