*Privileged and Confidential*                                                    *Report of the Special Counsel*

## Factual Background

### The Company

ULLICO Inc. ("ULLICO" or the "Company"), located in Washington, D.C., is the holding company for several insurance companies that principally serve union members and their families. Formed in 1925 as Union Labor Life Insurance Company ("Union Labor Life") by the American Federation of Labor, the Company was created in large part because union members in high-risk jobs had difficulty obtaining life insurance coverage.

Union Labor Life offered life insurance and, through its subsidiaries, other insurance products. By 1987, Union Labor Life had grown to the point where it was decided, for capital creation purposes, to form a holding company called ULLICO Inc. In 1987, ULLICO had 10 subsidiary companies under its umbrella. By 1997, it had 24 subsidiaries.

ULLICO, through it subsidiaries, offers group life and health benefits and property and casualty insurance through agents and through direct response marketing. It also provides, among other things, pension fund, mortgage lending and real estate investment services.

ULLICO is managed by an executive staff headed, since December 1990, by Chairman and Chief Executive Officer ("CEO") Robert A. Georgine. ULLICO's by-laws authorize a 32-member Board of Directors ("Board"), which historically has consisted primarily of executives or retired executives of the unions and pension funds that ULLICO serves. These unions and pension funds are also ULLICO's major shareholders. Approximately two-thirds of the present directors were recommended for nomination to the Board by Georgine. (Georgine Interview)

ULLICO is a private stock company. Between 1925 and 1996 (inclusive), the stock was effectively valued at $25 per share. The Company paid substantial dividends throughout this period. For example, during the 10 years prior to 1992, ULLICO and its predecessor, Union Labor Life, paid 10% stock dividends per year, and a 9% cash dividend in eight of those 10 years. (U 030314, Tab 9)

Prior to 1997, if a shareholder wanted to sell the shareholder's stock, the shareholder had to first offer the stock to the Company, which could repurchase it at the $25 per share price. (U 030545, Tab 2) If the Company did not exercise its right to repurchase the tendered stock, the shareholder could sell it to another qualified shareholder (generally unions, organizations or individuals affiliated with the union movement) with the Company's approval. (U 030545, Tab 2)

ULLICO's mission statement includes a promise to "provide fair and equitable returns for our labor partners—OUR STOCKHOLDERS." (U 18157, Tab 18)

*Privileged and Confidential*                                                    *Report of the Special Counsel*

## Preferred Certificate Program

Prior to 1992, the Company had issued only voting capital stock ("Capital Stock"). In 1992, the Board approved the sale of up to 12 million preferred certificates at a purchase price of $25 per certificate. The preferred certificates were convertible at any time by the holder into Class A voting shares ("Class A Stock") or, under certain circumstances, Class B non-voting shares ("Class B Stock").[5] Three years following the issuance of the preferred certificates, ULLICO had to either redeem the preferred certificates for cash or convert them into shares of Class A or B Stock.

Approximately $232 million in preferred certificates were sold over three years (1992–1995) and the vast majority of the certificates were converted over a three-year period into a like number of shares of Class A or B Stock. Prior to their conversion, the certificates provided semi-annual cash payments at an annualized rate of 8% of the $25 face value of the certificate. Upon conversion, another $1 was paid to holders of preferred certificates, making the last year dividend equivalent to 12%. The proceeds from the preferred certificate offering were used for operations, expansion and investment.

The preferred certificate program was aimed specifically at attracting pension funds as new ULLICO shareholders, although existing shareholders could also participate. (Steed Interview) All of the preferred certificates were converted by June 1998, by which time the Company had issued and outstanding about 256,000 shares of Capital Stock, 6.7 million shares of Class A Stock and 753,000 shares of Class B Stock.

## Global Crossing Investment

In 1991, Chairman Georgine hired Michael Steed[6] as an outside financial advisor. Steed knew leaders associated with ULLICO as a result of his work as the Executive Director of the Democratic National Committee. In 1992, Steed formally joined the Company as Senior Vice-President of Investments. His job was to devise a strategy to increase ULLICO's assets and returns thereon. (Steed Interview)

On February 14, 1997, as a result of Steed's connections with Gary Winnick (the founder of Global Crossing), the Executive Committee, on Georgine's recommendation, approved an investment of up to $10 million in Nautilus LLC, which eventually became Global Crossing. (U 17350–51, Tab 3) ULLICO's actual investment was $7.6 million, and this investment was made through MRCo., a subsidiary of the Company. Union Labor Life loaned MRCo. $8 million to consummate this transaction. (U 000018, Tab 5) An LLC membership interest of approximately 10% in Nautilus LLC was received by MRCo. Other founding

---

[5] Class B Stock has the same par value of $1.00 per share as Class A Stock. (U 027989, Tab 47) The Company issues Class B Stock, which is non-voting stock, to large shareholders to avoid running afoul of ULLICO's by-laws requirement that no shareholder hold more than 9% of the Company's voting stock. (U 030547, Tab 2; Carabillo Interview)

[6] Michael Steed, former Senior Vice-President of Investments, left ULLICO on December 10, 1999. He filed a federal ERISA claim against ULLICO in June 2001 in connection with ULLICO's failure, among other things, to pay him all amounts he was allegedly owned under the Global Crossing incentive award program. The case has been settled.

*Privileged and Confidential*                                            *Report of the Special Counsel*

shareholders included Canadian Imperial Bank of Commerce, CNA Insurance, and Pacific Capital Group (an entity controlled by Winnick). (Steed Interview)

By the time of Global Crossing's initial public offering ("IPO") in August 1998, ULLICO's stake in Global Crossing was worth more than 30 times its original investment. (U 000927–000925, Tab 25) Eventually, due to stock splits, ULLICO would own 33 million Global Crossing shares.

The Global Crossing IPO had a six-month underwriter lock-up. (U 044741, Tab 4) The founders also signed a Shareholders Agreement and a Registration Rights Agreement that restricted the sale by founders of their respective Global Crossing shares for two years, with certain exceptions such as tender offers. (U 044750, Tab 6; U 044782, Tab 7)

At first, it was contemplated that the ULLICO senior officers and directors would have the opportunity to purchase shares in the IPO as part of a "friends and family" program. (Steed Interview) Senior officers were subsequently removed from the friends and family list, but directors could, and some did, participate in that program.

In June 1999, ULLICO sold 9% of its Global Crossing stock in a tender offer made by US West for $192,688,809. The original lock-up restrictions on the sale of ULLICO's Global Crossing stock expired in March 2000 when the founders' Shareholders Agreement was terminated. (U 044750, Tab 6; Carabillo Interview)

In April 2000, ULLICO sold 2,568,160 shares in a secondary offering at $32.01 per share, resulting in gross proceeds of $82,206,801. As part of the secondary offering terms, ULLICO was once again restricted from further sales for 90 days.

In September 2000, ULLICO sold an additional 960,000 shares of Global Crossing stock through Merrill Lynch at $35.34 per share, resulting in gross proceeds of $33,929,617. In October 2000, ULLICO sold another three million shares in a block sale through Credit Suisse First Boston ("CSFB") at $26.91 per share, resulting in gross proceeds of $80,730,000. (U 045715, Tab 11; Linehan Interview) Also in October 2000, ULLICO entered into a prepaid forward sale with respect to five million Global Crossing shares through Bear Stearns. This prepaid forward sale protected those shares from further price erosion and provided ULLICO with an immediate payment of approximately $95 million. (Exhibit 5)

As of the end of October 2000, ULLICO held almost 19 million Global Crossing shares,[7] and did not dispose of any more shares until the Spring of 2002 when, between May 14 and June 5, it sold 11,216,959 shares at an average price of 7 ½ cents per share and received gross proceeds of $843,834. As of June 5, 2002, ULLICO held 7,364,403 of Global Crossing shares. (McKean Interview)

---

[7]    It was Chairman Georgine's decision to hold the 19 million shares. Others in the Company suggested earlier in the year to sell one-third, hedge one-third and hold one-third of the Company's Global Crossing shares. (Grelle Interview) It does not appear from the Company's corporate records that ULLICO's liquidation strategy with respect to the Global Crossing investment was ever meaningfully discussed with the Board or the Executive Committee.

*Privileged and Confidential*

Through 2001, ULLICO's after tax gains on its Global Crossing investment totaled $305,100,000. (U 045567, Tab 10; U 045715, Tab 11; Stephani Interview) This amount is more than 10 times ULLICO's net income for 1997, the last year before any gains on the Global Crossing investment were recorded. (Exhibit 4) During the period from 1999 through 2001, while ULLICO was realizing gains on its Global Crossing investment, it was incurring substantial losses on its non-investment business operations. (Exhibit 4)

## ULLICO's Stock Offer, Stock Repurchase and Employee Incentive Programs

■ **1997 Stock Repurchase Program**

In 1997, ULLICO decided to abandon its fixed price share valuation in favor of a "book value" valuation method. In May 1997, the book value of each share was established at $27.06 based on ULLICO's audited balance sheet as of December 31, 1996. The Executive Committee minutes explain that "[b]ook value" per share is calculated "by taking the 'Total of Stockholders Equity' as shown on the financial statement and dividing it by the total number of shares outstanding of Class A, Class B, Capital Stock and any Preferred Certificates still outstanding."[8] (U 000014, Tab 5)

On May 5, 1997, William Egan of CSFB made a presentation concerning a proposed stock repurchase program to the Executive Committee. According to the minutes, "Mr. Egan, from [CSFB, explained] that the value added to the corporation in book value as a measure of value was practical, and passing along this measure to the stockholders aligned both the stockholders' interests and the Company's interests. The Company benefits by being able to retain capital for future growth, the stockholders benefit by participating in that growth more directly than they ever have in the history of the Company." (U 000013, Tab 5)

The minutes further reflect that "[s]everal officers participating in the discussion indicated that this repurchase program created a market, therefore, set the price for stockholders, especially those which are pension funds and need to record this in their portfolio." Another indicated that "one of the issues which has concerned rating agencies is the payment of large dividends which has hampered investment in future growth, and in this competitive environment, that has become a critical factor in the future of the Company." (U 000013, Tab 5)

According to Steed, tax issues were another primary motivation for the repurchase program. That is, dividends are taxed as ordinary income whereas repurchases could be taxed at capital gains rates. These tax benefits, however, affected individual investors only because unions and pension funds are tax-exempt. (Steed Interview)

On May 6, 1997, after another presentation by Egan of CSFB, the Board adopted a stock repurchase program under which the Company intended to repurchase $180

---

[8]  According to Kenneth Hugessen of the corporate consulting firm William M. Mercer & Company (ULLICO's former compensation consultant), it is not uncommon for closely-held companies to use "book value" to value stock, and it is common for such companies to set such book value once a year.

*Privileged and Confidential*

million of Class A and B Stock over an 11-year period. Under this program, the Company would offer to repurchase $30 million of stock in 1997 and, "subject to having sufficient earnings and cash flow from operations," $15 million of stock in each of the subsequent 10 years. (U 000033, Tab 12) The per share repurchase price would be determined pursuant to the "book value" formula described above.

In his May 6, 1997 prepared statement to the Board outlining the repurchase program, Chairman Georgine stated that "the repurchase program...is a means for us to provide liquidity to our *larger stockholders*." (Emphasis added) (U 001210, Tab 13; see also U 000017, Tab 5) That is, the repurchase program was intended to essentially replace dividends as the principal return mechanism for shareholders. (Steed Interview) The Board thus decreased its cash dividend from 8% ($2.00) per share in 1996 to 2% ($0.54) per share in 1997. (U 000032, Tab 12) No dividends have been paid since 1998. (Exhibit 4)

The Stock Repurchase Program Term Sheet attached to the May 6, 1997 Board minutes explains the following repurchase program procedure: "If more shares are tendered than the Company has agreed to purchase, shares will be taken up pro rata and new certificates will be issued for returned shares. Tenders by holders of 10 or fewer shares will be accepted without pro ration. There is no minimum number of shares that must be tendered." (U 000033, Tab 12) As discussed below, this 10 share threshold was later replaced by a 10,000 share threshold prior to the commencement of the 1997 repurchase program.[9]

Although the stock repurchase program did not include Capital Stock shareholders, the Stock Repurchase Program Term Sheet addressed this issue: "Although the offer would not be made for Capital Stock, the Company intends in the future to offer the greater of book value or $25 per share to repurchase Capital Stock when exercising its right of first refusal *upon the death of a shareholder*. In the event a holder of Capital Stock gives notice of a desire to transfer such shares, the Company intends to offer to repurchase the shares at book value." (Emphasis added) (U 000033, Tab 12) This statement is the closest the Board came, until November 2000, to expressly approving the so-called "discretionary" repurchase program administered by Chairman Georgine (and further discussed below).[10]

Also on May 6, 1997, the Board authorized, directed and empowered the Chairman, "at his sole discretion to offer shares of the Corporation's Stock that have been repurchased and returned to the status of authorized, but unissued shares, to

---

[9] The Company has noted that, as of May 1997, 18 shareholders held fewer than 10,000 Class A shares, 14 of these shareholders held fewer than 5,000 Class A shares, 10 of these shareholders held fewer than 1,000 Class A shares, one shareholder held 100 or fewer Class A shares and no shareholder held 10 or fewer Class A shares. In 1997, only one shareholder who participated in the repurchase program held fewer than 10,000 shares, but that shareholder did not tender 100% of the shares and, therefore, did not satisfy all of the conditions of the 10,000 share proration exception. As of 2000, 43 shareholders held fewer than 10,000 Class A shares, 34 shareholders held fewer than 5,000 Class A shares, 17 areholders held fewer than 1,000 Class A shares and 3 shareholders held 100 or fewer Class A shares. In addition, unlike in 1997, 19 shareholders ﬂuding 14 directors or officers) avoided proration under the 2000 formal repurchase program's 10,000 share proration threshold. (U 018243-44, 97; U 27713, Tab 88). This issue is discussed in more depth below.

[10] atement is repeated in the term sheets used for future stock purchase programs. (see, e.g., 048222, Tab 6; U 019359, Tab 14; U 001368, Tab

*Privileged and Confidential*                                    *Report of the Special Counsel*

authorized investors as specified in the Corporation's Charter and By-Laws." (U 000030, Tab 12) This is the closest the Board came to authorizing Georgine to make the 1998 and 1999 stock offers to senior officers and directors discussed below.

On June 15, 1997, Georgine sent a letter to ULLICO's shareholders describing the new stock repurchase program. This letter notified shareholders that, although holders of Capital Stock could not redeem their stock in the program, they could offer their stock for repurchase by the Company: "Holders of Capital Stock, while not included within the formal repurchase program, still are expected to comply with the requirement that any company stock be offered for sale to the Corporation first, and so long as the Corporation is able, and it is within a good corporate policy, we will continue our past practice of repurchasing Capital Stock when offered by a holder of Capital Stock." (U 027721, Tab 16) As far as we could determine, this statement (and a similar statement in 1998 discussed *infra*) is the closest the Company came to disclosing the Chairman's "discretionary" repurchase program to its shareholders. The Chairman would employ this "discretionary" program in subsequent years to redeem not only Capital Stock but Class A Stock as well.

The May 5, 1997 Executive Committee resolutions stated that the repurchase offer should take place on June 1, 1997 or "as soon thereafter as is practical—with repurchase to be effective on June 30, 1997." The offer did not actually commence until November 1997.

On November 10, 1997, pursuant to the Board's May 6, 1997 authorization, ULLICO formally offered to repurchase $30 million of its Class A and B Stock at $27.06 per share. (U 001059, Tab 17) This tender offer remained open until December 10, 1997, and was over-subscribed.

The draft tender offer documents initially adopted the 10 share threshold reflected in the original Stock Repurchase Program Term Sheet discussed above. During the review process, however, that threshold was changed to 100 shares and then to 10,000 shares. (U 035240, Tab 19; U 035108, Tab 20) No person interviewed has been able to explain at whose direction these changes were made.

The tender offer documents explained how the 10,000 share threshold impacted stock repurchases in the following terms:

> The Company, upon the terms and subject to the conditions of the Offer, will accept for purchase, without proration, all Shares properly tendered and not withdrawn before the Expiration Date by or on behalf of holders of fewer than 10,000 Shares.... To avoid proration, however, such holder must properly tender all Shares that such holder beneficially owns. Partial tenders will not qualify for purchase without proration. The offer to purchase without proration is not available to owners of 10,000 or more shares even if such owners have separate stock certificates for fewer than 10,000 Shares. (U 001066, Tab 17)

*Privileged and Confidential*                                      *Report of the Special Counsel*

Accordingly, pursuant to the repurchase program, holders of 10,000 or more shares (defined as Class A and Class B Stock) could tender all of their respective shares but would be prorated if the offer were over-subscribed. In contrast, holders of fewer than 10,000 shares could avoid proration so long as they tendered all of their respective shares.

In 1997, shareholders tendered 3,099,490 shares for repurchase and 1,108,647 were repurchased, resulting in a 35.76% proration. (Exhibit 6) Only one shareholder, a pension plan, holding fewer than 10,000 shares participated in the 1997 program. That shareholder, however, did not tender 100% of its holdings and, therefore, was prorated at the same level as the shareholders holding 10,000 or more shares. (U 046998–99, Tab 67)

Neither the Executive Committee nor the Board expressly approved the 10,000 share threshold in 1997. This threshold was adopted in subsequent years of the repurchase program and, in 2000, as discussed below, resulted in ULLICO's larger shareholders being able to redeem only 2.2% of their tendered shares while its under-10,000 shareholders, mostly directors and officers, were able to redeem 100% of their tendered shares.

One purpose behind a proration threshold, whether 10,000 shares or some another number, was reportedly tax-driven. According to ULLICO executives, outside counsel advised ULLICO that if every shareholder were to participate equally, the repurchase program would be treated as a dividend with unfavorable tax consequences to individual shareholders.[11]

Dividend income is taxed at rates applicable to ordinary income while gains on the sale of stock held for more than one year are taxed at more favorable rates applicable to long-term capital gains. Significantly, unions and pension funds, ULLICO's largest shareholders, are exempt from taxation. Accordingly, any tax motivation for the 10,000 share threshold was necessarily designed for individual shareholders, the vast majority of whom were officers and directors. Two directors indicated in their interviews that a reason for the 10,000 share threshold was to benefit officers and directors, many of whom owned fewer than 10,000 shares.

Another purported purpose behind the 10,000 share threshold was to eliminate small shareholders. Eliminating small shareholders would ease administrative burdens and help keep the total number of shareholders under 500, which is the limit for a privately-held company to avoid certain Securities and Exchange Commission ("SEC") reporting requirements. (Carabillo Interview)

---

[11]    No attorney interviewed in this investigation recalled providing such advice. But this advice may have come from David Woodward, of LeBoeuf Lamb, who died in 1998. The tender offer documents warned that the IRS could view the redemptions as dividend income, regardless of how the transactions had been structured.

*Privileged and Confidential*                                                                *Report of the Special Counsel*

■ **1998 Employee Incentive, Stock Offer and Stock Repurchase Programs**

  • **1998 Employee Incentive Programs**

In August 1998, Global Crossing completed its IPO, resulting in a large unrealized gain in the value of ULLICO's investment in Global Crossing. The success of ULLICO's investment in Global Crossing resulted in the creation of several programs designed to benefit ULLICO's senior executives, who some have contended were historically under-compensated when compared to their peers. (Carabillo and Manley Interviews)

According to the Company, each of these employee incentive programs was developed by ULLICO with the assistance of one or more of the following advisors: CSFB, PricewaterhouseCoopers ("PwC"), Mercer, Arnold & Porter and LeBoeuf, Lamb, Greene & MacRae, LLP ("LeBoeuf Lamb"), although which firm provided advice in connection with the implemented stock offer program for directors and officers is not clear.

Other than the October 1998 stock offer to directors and officers of ULLICO stock discussed below, which was disclosed in connection with the 1998 stock repurchase program, none of ULLICO's employee incentive programs were disclosed to ULLICO's shareholders. (U 009093, Tab 27)

  ♦ *Global Incentive Program*

On July 27, 1998, the Compensation Committee considered a compensation report provided by consultant William M. Mercer & Company ("Mercer") and approved an incentive program, referred to as the Global Incentive Program, for certain senior executives. This program was tied to ULLICO's profits on its Global Crossing investment.[12] (U 011974, Tab 21; U 000324, Tab 22; U 020216, Tab 23; U 020102, Tab 24)

In his statement to the Compensation Committee on July 27, 1998, Georgine said: "We will disclose this plan [the Global Incentive Program] to the Executive Committee at its next meeting, and ask them to ratify the action taken today. Partly, because this is the first program of its kind at ULLICO and because we want to set the stage for a more structured approach to long-term compensation." (U 000930, Tab 25) According to our records, the next Executive Committee meeting was held on November 30, 1998, but there was no mention of the Global Incentive Program at that meeting or, as far as we could determine, any Executive Committee or Board meeting.

The Global Incentive Program payments to ULLICO's five senior executives (Georgine, Steed, Grelle, Luce and Carabillo) from 1998 through 2001 totaled $5,673,824. These payments, and each executive's total cash compensation for each

---

[12] Mercer was not told that the Company intended to make the ULLICO stock purchase offers to directors and senior officers discussed *infra*, but Kenneth Hugessen of Mercer did not believe that this stock purchase program would have substantially changed his recommended Global Incentive Program. (Hugessen Interview)

*Privileged and Confidential*

year in the period 1996 through 2001 (including earnings under the non-qualified deferred compensation plan and profits on the sale of ULLICO stock), are reflected in Exhibit 2.

- ◆ *"Top Hat" Non-Qualified Deferred Compensation Plan*

Senior executives also were able to participate in the Deferred Compensation Plan effective as of August 1, 1998. (U 021800, Tab 26) Edward Bintz of Arnold & Porter prepared this program for the Company. (Bintz Interview)

On July 27, 1998, the Compensation Committee approved the ULLICO Non-Qualified Deferred Compensation Plan (the "Deferred Compensation Plan"), which allowed eligible participants to defer up to 25% of their base salary and up to 100% of their bonuses (including incentive awards under the Global Incentive Program) under the Plan. The purpose of the Deferred Compensation Plan was to allow senior executives to defer income (and thereby defer income tax) on a portion of their earnings and to make deemed investments of such deferred income in one or more investment alternatives. Amounts deferred under the Plan are not required to be actually invested in the available investment alternatives. Rather, the investment alternatives simply provide a measure of return to Plan participants.

ULLICO is obligated under the Deferred Compensation Plan to distribute deferred amounts and deemed interest and earnings on such amounts upon the request of Plan participants (subject to certain restrictions). The Deferred Compensation Plan was intended to be, and appears to satisfy the requirements of, a non-qualified, "top-hat" plan under ERISA. Top-hat plans are not subject to ERISA's fiduciary requirements.[13] The participants under the Deferred Compensation Plan were Georgine, Carabillo, Grelle, Luce and Steed. (See Tab 109)

Deferred compensation plans, such as ULLICO's, are quite common and, in many cases, appropriate retirement planning vehicles for highly-compensated executives. However, ULLICO's senior executives received a windfall in 2000 and 2001 as a result of "deemed" purchases and sales of ULLICO stock under the Deferred Compensation Plan. These deemed purchases and sales of ULLICO stock under the Deferred Compensation Plan raise some of the same issues as the exclusive stock offers in 1998 and 1999 and the Company's repurchase programs in 2000 and 2001.

The Deferred Compensation Plan allowed participants to elect among several deemed investment alternatives, including: "ULLICO Stock (which shall be valued at its current book value from time to time, as set each year by the Board of Directors of the Company or such Board's Executive Committee)."[14] The Deferred Compensation Plan also allowed a participant to:

---

[13] 29 U.S.C. § 1101(a)(1).

[14] In addition to the ULLICO stock account, participants in the Deferred Compensation Plan initially could also allocate deferred income to three Separate Accounts in Union Labor Life or an account which bore interest at the rate of the 15-year treasury rate plus 2%. These other investment alternatives appear to have changed over time.

*Privileged and Confidential*

> elect to change the deemed investment of his Account as of any
> Valuation Date (but no more than once in any calendar quarter) by
> giving at least 30 days' advance notice to the Company's Vice
> President of Human Resources on such election form as may be
> prescribed by the Company's Vice President of Human Resources.

The Deferred Compensation Plan defines the term "Valuation Date" to mean the last
day of each calendar month.

From the information provided to us during the investigation, it appears as if
Georgine, Carabillo, Luce and Grelle deferred a significant portion of their earnings
in 1998 and 1999 under the Deferred Compensation Plan, a substantial part of which
was deemed to have been invested in ULLICO stock. Deemed investments in
ULLICO stock in 1998 were made at the price of $28.70 per share, while deemed
investments in 1999 were made at the price of $53.94 per share. Deemed investments
in ULLICO stock were revalued annually following the adjustment to the book value
per share approved by the Board or the Executive Committee.

So, for example, in September 1998, Georgine deferred $716,727 of his bonus under
the Global Incentive Program and elected to have such amount allocated to the
ULLICO Class A Stock investment account. His deemed investment was made at
$28.70 per share. As a result of the increase in the book value per share of ULLICO's
stock to $53.94 per share in May 1999, Georgine's $716,727 deferral was revalued to
approximately $1.35 million in 1999. In August 1999, Georgine deferred an
additional $656,366 and such amount was allocated to the ULLICO stock investment
account at a price of $53.94 per share. In 2000, when the book value per share of
$146.04 was approved by the Executive Committee, Georgine's deferred investment
account grew to over $5.4 million, representing an almost 300% return on his original
investments.

ULLICO's other senior officers also experienced extremely large returns on their
deemed investments in ULLICO stock, although somewhat lower than Georgine.
(Exhibit 2) In addition, unlike Georgine, who until 2001 had invested only in the
ULLICO stock investment account under the Plan, Carabillo, Grelle and Luce
changed their investment elections in December 1999 to shift all amounts allocated to
non-ULLICO investment accounts into the ULLICO stock investment account.
Deemed investments in ULLICO stock as a result of these change in investment
elections were made at $53.94 per share, just prior to the date used to calculate the
1999 book value, i.e., December 31, 1999. Amounts allocated to the ULLICO stock
investment account in December 1999 by Carabillo, Grelle, and Luce almost tripled
when the book value per share was adjusted less than six months later.

Notwithstanding their exceptional investment success under the Deferred
Compensation Plan, Georgine, Carabillo, Grelle and Luce each shifted all amounts
allocated to their ULLICO stock account to other investment accounts after the book
value per share of ULLICO stock rose to $146.04 per share in May 2000 and before
the book value per share declined to $74.87 in May 2001. Carabillo, Grelle and Luce

*Privileged and Confidential*                                      *Report of the Special Counsel*

did so in June 2000. Georgine apparently did so in 2001.[15] Amounts withdrawn from the ULLICO stock account were reallocated to deemed money market accounts by Georgine, Carabillo and Grelle. Carabillo apparently withdrew all deferred income and deemed earnings (a total of approximately $606,000) from the Deferred Compensation Plan sometime in 2001 or early 2002. Luce reallocated his deemed investment in ULLICO stock to several investment alternatives.

♦ *1998 Director/Officer Stock Purchase Offers*

Finally, directors and senior officers were able to participate in exclusive stock offers, under which the participants were granted the opportunity to purchase ULLICO Class A Stock at the price per share most recently established by the Board. There were no restrictions on the ability of participants in this program to subsequently sell any shares that they purchased. This program was new for ULLICO in the post-preferred certificate program period era, but the concept of allowing directors and officers to purchase stock was not unprecedented. Georgine's predecessor, Daniel O'Sullivan, occasionally provided directors and officers the opportunity to purchase Capital Stock at $25 per share. (Carabillo, Luce, Brown, Boede, McNulty and Steed Interviews) Prior to 1997, however, the value of ULLICO's stock was effectively fixed at $25 per share.

On February 11, 1998, the Executive Committee, pursuant to Article VI, § 1 of the by-laws, appointed a Compensation Committee, which consisted of Directors Barry, West and Wynn. The Compensation Committee was "authorized to act on all matters concerning compensation and the establishment and administration of all programs and agreements relating to compensation, whether current or deferred." The resolution added: "*No member of the Committee shall participate in the determination of any matter affecting his own compensation.*" (Emphasis added) (U 17329, Tab 28)

On July 27, 1998, pursuant to this purported authority and "[b]ecause of the unusual nature of this significant event," *i.e.*, the Global Crossing investment success, the Compensation Committee "decide[d] to authorize the offer of 2,000 shares of Class A Stock of ULLICO Inc. to each Director and Officer of the Company and instructed the Chairman to make that available at the earliest opportunity." (U 000325, Tab 22) Chairman Georgine also reported to the Compensation Committee at this meeting that: "[E]ach Director and Officer will have the opportunity to buy ULLICO stock, up to 2000 shares (*can go up to 4000*) at the current 28.70 book value." (Emphasis added) (U 000929, Tab 25) The Compensation Committee minutes, however, do not reflect the authorization for the "up to 4000" stock purchase opportunity.[16]

---

[15] Outside Company counsel have indicated that Georgine may have shifted his deferred income out of the ULLICO stock investment account as a result of a change in the plan administrator under the Deferred Compensation Plan. He apparently did so, however, just prior to the time ULLICO's stock price decreased from $146.04 to $74.87 per share.

[16] Frank Manley, ULLICO's former compensation expert, characterized this offer as similar to "in the money" options; that is, an equity benefit without investment risk. He also felt that the Company could not justify a significant award to directors based on the Global Crossing investment success given

*Privileged and Confidential*                                                    *Report of the Special Counsel*

"[E]ach Director and Officer" eligible to participate in the stock offer program included those directors on the Compensation Committee. This action by the Compensation Committee members was contrary to the February 11, 1998 Executive Committee resolution discussed above, which expressly prohibited members of the Compensation Committee from participating in a matter directly affecting their own compensation.

By letter dated July 29, 1998, Chairman Georgine offered each senior officer and director of ULLICO the right to purchase 2,000 shares of Class A Stock at the $28.70 per share stock price, stating:

> In recent years the subject of corporate governance has been frequently debated. The idea is that management and the board of directors should have their interests in line with the stockholders, and good common sense tell us that this is a good idea. If the stockholders, the true owners of the corporation, do well then the officers and directors should also do well. And the officers and directors in conducting their everyday business should have the interests of the stockholders foremost in their minds.

In this letter, Georgine also said: "Over the years I have purchased ULLICO stock whenever it was available, and I intend to purchase additional stock at this time." (U 028021, Tab 29)

By letter dated October 13, 1998, Chairman Georgine offered each senior officer and director the right to purchase an additional 2,000 shares of Class A Stock at the $28.70 stock price. In this letter, Georgine explained that the offer "reinforces our belief that it is important to have Directors who participate in the Company's equity[.]"[17] The stock offer program for directors and senior officers had the effect of creating more small shareholders, the antithesis of one of the stated administrative goals of the 10,000 share proration threshold in the formal repurchase program. (U 028019, Tab 30)

It is unclear how the Compensation Committee was able to authorize Georgine to make the 1998 stock offers (as well as the 1999 stock offer discussed below) consistent with the Company's by-laws. Arnold & Porter, in a memorandum dated July 9, 2002 (prepared pursuant to our request), asserted that such authority came from the Executive Committee. (U 047020, Tab 31) But even if, as Arnold & Porter asserts, "ULLICO's By-Laws provide that compensation of directors and certain officers is to be fixed (or in the case of appointed officers, approved) by the Executive Committee," the by-laws (Art. VI, § 2) expressly state that "the Executive Committee...*shall not have authority to...issue Stock.*" (Emphasis added.) (U 030552, Tab 2) As discussed above, the Compensation Committee obtained its

---

that the directors had a minimal role in connection with that investment. (Manley Interview) Georgine did not dispute the fact that the directors had a minimal role in the investment. (Georgine Interview)

[17]   Exhibit 1 is a chart that shows those officers and directors who purchased stock pursuant to the July 1998 and October 1998 stock offers, as well as a subsequent 4,000 share offer in 1999, and the sums received when some of them redeemed those and other ULLICO shares they owned at a price of $146.04 per share in 2000-01.

authority from the Executive Committee. Accordingly, based on a plain reading of the by-laws themselves, it appears that the Compensation Committee lacked authority "to…issue Stock" and, in particular, "to authorize the offer of 2,000 shares of Class A Stock of ULLICO Inc. to each Director and Officer of the Company."

Chief Legal Officer Joseph A. Carabillo acknowledged that the Compensation Committee lacked authority to instruct Georgine to make stock offers to directors and senior officers. (Carabillo Interview) Nevertheless, according to Carabillo and Arnold & Porter, Georgine did not need authorization from the Compensation Committee to make these offers because, on May 6, 1997, the Board authorized, directed and empowered the Chairman, "at his sole discretion to offer shares of the Corporation's Stock that have been repurchased and returned to the status of authorized, but unissued shares, to authorized investors as specified in the Corporation's Charter and By-Laws." (U 000030, Tab 12; U 047020, Tab 31) In addition to the issue of whether this purported approval involved an excessive, and perhaps impermissible, delegation of authority, this argument, however, may be flawed for at least two reasons.

First, Article II(B) § 2 of the by-laws defines authorized investors of ULLICO to include, among others, "such Directors or Officers as may be elected or employed by the Company, *as the Board of Directors may from time to time grant the right of purchase.*" (Emphasis added.) (U 030546, Tab 2) Neither Carabillo nor Arnold & Porter has addressed the fact that the by-laws authorize directors and officers to purchase stock only "as the *Board of Directors* may from time to time grant[s] the right of purchase." (Emphasis added.) The Board, in its May 6, 1997 resolution at issue, did not delegate to Georgine the specific authority to "grant the right of purchase" to "directors or officers." Therefore, an issue remains as to whether the May 6, 1997 Board resolution discussed above authorized Georgine to offer stock *to officers and directors*.

Second, even if the May 6, 1997 resolution authorized Georgine to offer stock to other directors and officers, there is no indication that the Board authorized Georgine to issue stock to himself. When asked if Georgine had authority to approve his own purchases of ULLICO Class A Stock, Carabillo replied that this was a good question. (Carabillo Interview).

Georgine, when interviewed, said that his intent in making the 1998 and 1999 stock offers was to provide directors and officers with a long-term investment opportunity and not compensation.[18] However, he believed that directors and officers should be able to sell their shares whenever they needed money. As discussed below, most of the stock purchased by directors and officers in 1998 and 1999 was sold back to the Company in 2000 and 2001, and no stock offers have been made to directors or officers since 1999. Georgine also said he relied upon Carabillo's advice regarding his authority to issue stock.

---

[18] Georgine's counsel, in subsequent discussions, indicated that regardless of the original intent underlying the 1998 and 1999 stock offers, those offers should be viewed as compensatory.

*Privileged and Confidential*

The July 1998 offer to buy 2,000 shares occurred shortly before the Global Crossing initial public offering, which foreseeably would, and in fact did, substantially increase the value of ULLICO's Global Crossing investment and the book value of ULLICO's shares. The October 1998 stock purchase offer of 2,000 shares carried even less investment risk as ULLICO's unrealized gain on its Global Crossing investment had increased even further by that time. Even though the price of Global Crossing stock could fluctuate up or down in 1998, downside risk on the ULLICO shares purchased by directors and officers in 1998 was limited. Any of the shares purchased in 1998 could have been redeemed at their cost through the formal repurchase program later that year.

Based upon the facts that (1) the stock offer was purportedly approved by the Compensation Committee allegedly pursuant to its authority to fix directors' and officers' compensation, (2) the Compensation Committee alluded to the success of ULLICO's investment in Global Crossing as a basis for making the offer, and (3) the purchases carried minimal investment risk, it is clear that the 1998 stock offers (as well as a similar offer made in 1999 and discussed below) had the effect of providing additional compensation to ULLICO's directors and officers when they later sold their stock.

- **1998 Stock Repurchase Program**

On May 4, 1998, the Executive Committee authorized a $15 million repurchase program for Class A and B Stock at a "book value" price of $28.70 per share. (U 17326–27, Tab 32)

On May 5, 1998, the Chairman told the Board that the stock price had risen to $28.70 per share, but the minutes make no mention of the 1998 stock repurchase program adopted by the Executive Committee. (U 000034, Tab 106) The Board did, however, adopt a 2% cash dividend (or $0.57 per share). (U 000036, Tab 106)

On June 30, 1998, Georgine sent a letter to ULLICO's shareholders announcing the 1998 stock repurchase program. In this letter, Georgine explained: "Capital Stockholders will be treated as they have been in the past with liquidity provided whenever possible by the Corporation, in accordance with sound corporate practice, based on a request for repurchase from a holder of Capital Stock. Therefore, Capital Stock is not considered to be within the repurchase program." (U 027307, Tab 107) As far as we could determine, this statement did not appear in letters to shareholders describing stock repurchase programs in subsequent years.

On November 9, 1998, ULLICO formally offered to repurchase $15 million of its stock at $28.70 per share. (U 009065, Tab 27) This offer included the 10,000 share threshold used in the 1997 tender offer documents. (U 009071, Tab 27) Before the tender offer documents were finalized, however, outside counsel Douglas Beck of LeBoeuf Lamb raised a question of whether repurchases of stock from the under-10,000 shareholders could cost the Company more than the $15 million made

available in the repurchase offer.[19] (U 037894, Tab 33) This question highlighted the disproportionate impact the proration threshold could have on shareholders. The issue was never addressed in the tender offer documents or, as far as we could determine, elsewhere.[20]

The 1998 repurchase offer was under-subscribed: there were only 149,693 shares tendered, and therefore shareholders holding 10,000 or more shares were not prorated. (Exhibit 6) The Company repurchased only $4.3 million of stock. This was likely due to the upward trend in Global Crossing's stock price during 1998 and an expectation that the increase in Global Crossing's stock price would result in a significantly higher book value for ULLICO stock.

In August 1998, Global Crossing was trading at $25 per share. When the 1998 repurchase offer was initiated on November 9, 1998, Global Crossing's stock price had risen to $32 per share. Global Crossing's stock price closed at $37 on December 1st, and reached $43 on December 9th. The 1998 repurchase offer was open until December 11th. Consistent with this trend, Steed recalled that the Qualified Pension Asset Managers ("QPAMs"), who managed pension funds that were major ULLICO shareholders, came to the conclusion that the ULLICO stock price would be higher in 1999. (Steed Interview)

The October 1998 stock purchase offer to directors and officers, but not the July 1998 stock purchase offer, was disclosed in the 1998 repurchase offer disclosure document sent to all ULLICO shareholders. Apparently, only purchases within 40 business days preceding the commencement of the repurchase offer were disclosed. (U 009093, Tab 27) It is not clear why ULLICO adopted this 40 business day standard, although it is similar to a specific disclosure standard applicable to public company tender offers.

On November 30, 1998, Chairman Georgine hailed the success of the Global Crossing investment in his report to the Executive Committee. He explained that ULLICO's "original 80 thousand shares had transformed themselves into 16,590,130 shares, with additional warrants for another 349,000 shares, which have not yet been exercised. Our per share acquisition cost is well below $1 per share on the original investment. As of Friday, November 27th, the stock was trading at $37 3/8ths. On paper, not considering taxes and other questions, it is worth $620 million as of close of business on Friday."[21] (U 17325, Tab 34)

---

[19] Before August 1998, Carabillo chiefly relied on David Woodward at LeBoeuf Lamb for legal advice. Douglas Beck, another LeBoeuf Lamb corporate partner, and Arnold & Porter took more active roles in advising the Company on corporate law matters after Woodward passed away suddenly in the Summer of 1998. (Beck Interview)

[20] LeBoeuf Lamb counsel Douglas Beck's subsequent comment on a draft of the 2000 tender offer document that the number of shares held by fewer than 10,000 shareholders should be specifically disclosed was not adopted by the Company. (U025692, Tab 85).

[21] A few months after this statement, in March 1999, Global Crossing announced a 2 for 1 stock split, doubling the shares ULLICO owned.

- **1999 Stock Offer and Repurchase Programs**

  - **1999 Director/Officer Stock Offer Program**

    On February 13, 1999, the Executive Committee, pursuant to Article VI § 1 of the
    by-laws, appointed the Compensation Committee (consisting of Directors Barry,
    Cullerton, West and Wynn) with "full authority to act on all matters concerning
    compensation of officers and other employees, including all current and deferred
    compensation, *and including the establishment and administration of all plans,
    programs, and agreements, and including the issuance of stock*." (Emphases added)
    (U 17318, Tab 35) Although the underscored phrase is new, it does not change the
    fact that this attempt to delegate authority conflicts with Article VI, § 2 of the by-
    laws, which expressly states that "the Executive Committee...*shall not have authority
    to...issue Stock*." (Emphasis added) (U 030552, Tab 2) The Executive Committee
    resolution also states that: "No member of the Committee shall participate in the
    determination of any matter affecting his own compensation." (U 17318, Tab 35)

    On May 13, 1999, the Compensation Committee (Cullerton not attending) authorized
    Georgine to offer up to 4,000 shares of ULLICO stock to senior officers and
    directors. "That offer would be at book value [*i.e.*, $53.94 per share] and will be
    made some time during the course of the year 1999 *at the Chairman's discretion*."
    (Emphasis added) (U 000328, Tab 36; U 001580, Tab 37) Providing the Chairman
    with absolute discretion to determine the timing of the offer in 1999 differed from the
    Compensation Committee resolution approving the 1998 stock offer, which
    specifically instructed the Chairman to make the shares available "at the earliest
    opportunity."

    As previously discussed, the Compensation Committee lacked authority to issue
    stock under ULLICO's by-laws. In addition, because the stock purchase offers were
    clearly in the nature of compensation, Directors West, Barry and Wynn participated
    in determining their own compensation in contravention of the February 13, 1999
    Executive Committee resolution.

    On December 10, 1999, Chief Legal Officer Carabillo sent the Chairman a memo
    attaching a draft letter offering stock to officers and directors and discussing several
    issues in connection with such offer. In the memo, Carabillo first explains that, based
    on a discussion with Edward Bintz and Dennis Lyons of Arnold & Porter, "there are
    issues involved in any sale at this time."[22] Nevertheless, according to Carabillo,
    "there appear to be no prohibitions on us going forward [with] the sale of stock to
    officers and directors." (U 021378, Tab 38) Second, Carabillo explains that one
    potential issue concerning the stock offer was the "possibility, however remote, that
    the [Internal Revenue Service ("IRS")] on audit could question a sale at this stage of
    the year arguing that there was an intrinsic value." (U 021378, Tab 38) Third,
    Carabillo explains to Georgine that his authority to make these stock offers came
    from the May 6, 1997 Board resolution that authorized the Chairman "to sell stock

---

[22] Neither Bintz nor Lyons recalled this conversation. (Bintz Interview, Lyons Interview)

*Privileged and Confidential*                                                      *Report of the Special Counsel*

that has been retired through prior acquisitions" and from the Compensation Committee. (U 021378, Tab 38) As discussed above, this legal analysis is subject to challenge. The Chairman, in his interview, stated that he relied upon Carabillo's advice for his authority to make the offer.

By letter dated December 17, 1999, Chairman Georgine offered each senior officer and director the right to purchase up to 4,000 shares of Class A Stock at a price of $53.94 per share, the book value per share based on ULLICO's December 31, 1998 audited balance sheet. Again, the Chairman explained: "Over the years I have purchased ULLICO stock whenever it was available, and I intend to purchase additional stock at this time." (U 007090, Tab 44) This letter was distributed on the date the 1999 stock repurchase program expired and a week after Steed resigned from the Company.

As previously discussed, the Compensation Committee left the timing of this stock offer to Chairman Georgine's discretion. He waited until December 17, 1999 to make the offer. Carabillo stated in his interview that he repeatedly urged Georgine to make the offers in the Fall of 1999, but Georgine was preoccupied with other matters. (Carabillo Interview) Georgine had no recollection of the reason he waited until December 17, 1999, to make the offer, but he denied that the timing of this offer had anything to do with Steed's departure from the Company or the term of the 1999 stock repurchase program. (Georgine Interview)

At its December 17, 1999 meeting, the Compensation Committee again addressed the "concept of having the directors and senior officers participate through an offer of stock in the Company at $53.94." At this meeting, "[t]he concept was advanced by Mr. Carabillo that since the corporation is not publicly traded and stock options do not have the same effect as in a publicly traded corporation, whether the Committee would desire to make loans to individuals to facilitate the purchase of the stock." But "[t]he Committee declined to make such an offer of financing."[23] (U 011990, Tab 39; U 024743, Tab 40) Georgine stated that he opposed having the Company make loans to the officers and directors to buy stock. (Georgine Interview)

Nevertheless, on December 28, 1999, Chairman Georgine sent a letter acknowledging the assignment of 4,000 shares of ULLICO stock to Mellon Bank (MD) N.A. ("Mellon Bank") as collateral for a one-year loan of $215,760 to Carabillo and Karin E. Vaughn. This amount was needed to buy 4,000 shares of ULLICO stock pursuant to the December 17, 1999 offer. This letter also granted Mellon Bank the absolute right, exercisable at any time, to put the shares of stock to ULLICO "for an amount sufficient to repay any borrowing by [Carabillo], including principal amount, interest outstanding and/or penalties." (U 009945–46, Tab 41) Also on December 28, 1999, Chairman Georgine sent an identical letter to Mellon Bank

---

[23] At this same meeting, the Compensation Committee approved a Stock Purchase and Credit Agreement with Georgine pursuant to which Georgine was offered the opportunity to purchase 40,000 shares of ULLICO stock with the proceeds of a loan provided by ULLICO. The loan would be forgiven over the ensuing five-year period, provided that Georgine remained employed by the Company. The Stock Purchase and Credit Agreement also allowed Georgine to put the 40,000 shares to the Company as the loan was forgiven or repaid. This agreement is discussed in more depth below.

*Privileged and Confidential*                                         *Report of the Special Counsel*

concerning a $215,760 loan to Chief Financial Officer John K. Grelle and his wife, and Carabillo sent an identical letter to Mellon Bank concerning a $215,760 loan to Georgine and his wife. (U 009947–50, Tab 42 and 43)

These letters likely constituted indirect guarantees by ULLICO of the loans made by Mellon Bank to the officers personally.[24] We are unaware of any action taken by the Board of Directors or any of its committees authorizing Georgine and Carabillo to deliver these letters. Nor was there anything in the corporate records to indicate that such letters were ever disclosed to the Board or any of its committees. In their interviews, Grelle and Carabillo stated that they had never previously borrowed money to buy stock in any company. Georgine, in his interview, noted that he had done so only once before. (Grelle, Carabillo and Georgine Interviews)

According to Carabillo, Paul Berger and Edward Bintz of Arnold & Porter approved Chairman Georgine's December 17, 1999 stock offer. (Carabillo Interview) Bintz denied that he even knew about the actual stock offer, although he was involved in discussions concerning a potential stock offer and Company loans to officers and directors in late 1999. (Bintz Interview) Berger said he first learned of this stock offer in 2002.[25] (Berger Interview)

Carabillo stated that LeBoeuf Lamb and PwC concluded that ULLICO had no obligation to disclose this offer to shareholders. (Carabillo Interview) PwC's Gary Stephani, however, asserted that while, in his view, United States generally accepted accounting principles ("GAAP") did not necessarily require the Company to disclose stock offers and repurchases to or from directors in its audited financial statements, PwC did not advise ULLICO on required disclosure in its formal repurchase offer disclosure documents. (Stephani Interview) Douglas Beck of LeBoeuf Lamb denied that he knew about the December 17, 1999 stock offer until mid–2002. (Beck Interview) Teresa Valentine, ULLICO in-house counsel who worked on the stock repurchase programs, confirmed that she never spoke with Beck concerning the stock offers to directors and officers. (Valentine Interview)

Each senior officer of ULLICO eligible to participate in the 1999 stock offer purchased the maximum of 4,000 shares. (It cost each officer $215,760 to purchase 4,000 shares at the $53.94 stock price.) Twelve directors (other than Georgine) participated in the 1999 stock offer, purchasing an aggregate of 15,400 shares.

All the stock purchases by officers and directors were recorded in the stock ledger on December 29, 1999, two days before the date used to calculate the 1999 "book value," *i.e.*, December 31, 1999. At this point, Global Crossing's stock price had risen to $50 per share (even after a two-for-one stock split in March 1999). In

---

[24] In addition, on February 1, 2000, Chairman Georgine signed a promissory note payable to the Company for $215,760—the precise cost of 4,000 shares of Class A Stock at the $53.94 stock price. According to the note, "[n]o interest shall accrue if the principal sum is paid prior to February 15, 2000." (U 006959, Tab 46) Neither Georgine nor his counsel could explain why this note was executed.

[25] In or about June 1999, Arnold & Porter represented Georgine in his personal capacity in connection with certain income and estate planning issues. (U 043064, Tab 51) Arnold & Porter also represented Steed in the Fall of 1999 in connection with the formation of a new private equity fund to be managed by Steed. (U 038743, Tab 52)

*Privileged and Confidential*                                   *Report of the Special Counsel*

addition, the Company had earlier in the year realized $192 million in a partial sale of its Global Crossing holdings, virtually ensuring that ULLICO's book value would increase significantly in 2000. Accordingly, the officers and directors had strong reason to believe that, at the time of their respective stock purchases pursuant to the December 17, 1999 offer, the Global Crossing investment success would result in a much higher Company share price when set by the Board in the Spring of 2000 based upon the Company's December 31, 1999 book value.

Although Steed was not offered the opportunity to purchase stock after he resigned in December 1999, he claims to have believed that the Company's stock price would increase based on the December 31, 1999 financial statements, perhaps even double. Similarly, Grover McKean, who replaced Steed as ULLICO's Senior Vice President of Investments, offered that any reasonable investor could have concluded in December 1999 that the Board would adopt a book value in May 2000 that was significantly higher than the prior year's book value. (McKean Interview)

A similar observation caused PwC, in connection with the 2001 audit, to restate the Company's 2000 financial statements. PwC revised the accounting for officer and director stock purchases in 1998 and 1999 due to the lack of investment risk assumed by the purchasers. According to PwC, in order for the stock purchases by officers and directors to receive the original (more favorable) accounting treatment, these investors would be required to make a "substantive investment and be at risk for a significant period of time." In the course of expanded audit procedures undertaken by PwC in early 2002, PwC reviewed director and officer stock transactions between 1998 and 2000 (including sales and repurchases) and concluded that the criteria for the original accounting treatment was not satisfied. (Grelle and Stephani Interviews)

ULLICO included a note in the Company's 2001 audited financial statements explaining: "For 2000, this revision caused an increase in sales, general and administrative expenses [*i.e.*, compensation expenses] of $11.7 million and a like amount decrease in net income." (U 027993, Tab 47) According to Gary Stephani of PwC and others, ULLICO has not yet addressed the tax consequences of the 2000 restatement, including the possibility of amending its tax returns to take a tax deduction for the increase in compensation expense. The Company has not asked us to analyze the appropriateness of the tax treatment by the Company or individual directors and officers of the 1998 and 1999 stock offers. The determination that the Company should take a compensation expense tax deduction could cause all or a portion of the funds received by directors and officers from the stock repurchases to be taxable as ordinary income as opposed to capital gains.[26] (Stephani Interview)

ULLICO has not made shares available for purchase to its officers and directors since the December 1999 offer. Carabillo recalled asking Georgine in 2000 whether

---

[26] Another note was added to the 2001 audited financial statements disclosing 40,000 shares purchased by "stockholder" (*i.e.* Chairman Georgine) with the proceeds of a loan from ULLICO. The loan was forgivable if certain conditions were met. See discussion on pages 51 through 52. (U 028010, Tab 47; Stephani and Grelle Interviews)

*Privileged and Confidential*                                                          *Report of the Special Counsel*

Georgine wanted to again offer to directors and officers the opportunity to buy ULLICO stock. Carabillo, through his counsel, stated that Georgine's response was that he had already done enough for the officers and directors and that at ULLICO's current price ($146.04) no one would participate.

- **1999 Stock Repurchase Program**

On May 17, 1999, the Executive Committee authorized a $15 million repurchase program at a "book value" price of $53.94 per share. (U 17314–15, Tab 48) At the meeting, "[t]he Chairman discussed the decision to authorize a stock repurchase again for 1999. He commented that this decision was not without substantial discussion since Management is not recommending any cash dividend this year." (U 17314, Tab 48) The Executive Committee resolution approving the 1999 stock repurchase program made no mention of a 10,000 share proration threshold, but the threshold was mentioned in the repurchase program term sheet. (U 048222, Tab 8)

On May 18, 1999, the Chairman made the following comments to the Board: "The Corporation experienced a tremendous gain in the value of ULLICO Inc. stock— based primarily on unrealized gains from Global Crossing. The Executive Committee voted a repurchase program yesterday based on book value for year end 1998 at *$53.94* per share—a *gain of more than 87%*." (Emphasis added) (U 000041, Tab 49) The Chairman further noted that "Global Crossing is a wonderful event, but it has the potential of overshadowing our true mission—the way we serve the labor movement." The Board minutes made no mention of the 10,000 share proration threshold. No dividend was authorized in 1999.

On September 21 and 22, 1999, the Executive Committee and the Board, respectively, received a report on the status of ULLICO's operating results, including ULLICO's receipt of a gross realized gain of $185.2 million ($108.4 million after taxes) on the sale of 9% of its Global Crossing stock in response to a US West tender offer in June 1999. (U 17307, Tab 50; U 17381, Tab 53)

Moreover, at the September 22, 1999 Board meeting, Director Cullerton made a motion on behalf of the Compensation Committee members to "authorize a five-year employment agreement for Mr. Georgine as Chairman, President and CEO." After discussion, the Board moved unanimously to award this five-year term of employment to Georgine and to delegate to the Compensation Committee the full authority to negotiate all terms and conditions of the contract. (U 17383, Tab 53) The Board, however, did not specifically delegate any authority to the Compensation Committee to issue stock or lend corporate funds to Chairman Georgine. This issue is discussed in more detail below.

On November 16, 1999, ULLICO formally offered to repurchase $15 million of its stock at $53.94 per share. (U 026662, Tab 54) The repurchase offer, which expired on December 17, 1999, was over-subscribed, but the proration of shares tendered by

*Privileged and Confidential*                                    *Report of the Special Counsel*

shareholders holding 10,000 or more shares was slight as 91.93% of the shares tendered were redeemed.[27] (Exhibit 5)

The offer repeated the 10,000 share threshold used in the 1997 and 1998 tender offers. (U 026668, Tab 54) Although outside counsel Douglas Beck commented that the 10,000 share threshold disclosed in the draft tender offer documents was "awfully high," the threshold was never altered. (Beck Interview; U 026280, Tab 55)

Information about the officers and directors' stock offer program was not in the repurchase program tender offer disclosure document sent to shareholders on November 16, 1999, because the disclosure document only included information about purchases or sales by officers and directors within the 40 business days prior to commencement of the repurchase offer. (U 026698, Tab 54) The actual purchases of ULLICO shares by directors and officers pursuant to the December 17, 1999 offer letter occurred shortly after the 1999 tender offer closed.

Even though ULLICO's stock price had virtually doubled between 1998 and 1999, no officer or director sold in 1999 the stock acquired by him in 1998. Presumably, the officers and directors correctly believed that ULLICO's stock price would increase further the following year.

- ## 2000 Stock Repurchase Programs

  - ### Proposed "Extraordinary" Stock Repurchase Program

On May 10, 2000, the Executive Committee adopted a repurchase price of $146.04 per share based on the Company's "book value" calculated as of December 31, 1999. According to the minutes, "[m]anagement recognizes that the Global share price is down *and that we may repurchase at a premium*. The Company has a commitment to honor in the repurchase program. It would not be appropriate for the Company to act inconsistently in 2000. Management believes that Global Crossing will again return to its previous trading values as it did in 1999." (Emphasis added) (U 17285, Tab 57)

The Executive Committee also discussed and approved an "extraordinary" stock repurchase program based on the Global Crossing investment success. Under this program, ULLICO would repurchase up to 20% of ULLICO's outstanding stock (having an aggregate value of approximately $240 million) from *all* shareholders, including holders of Capital Stock, at $146.04 per share. To pay for this program and obtain additional cash, the Company planned to sell $360 million of its Global Crossing shares by the end of 2000. (U 17284–85, Tab 57)

The Executive Committee established certain conditions for this "extraordinary" repurchase program. One condition was that the market price of Global Crossing

---

[27] By letter dated January 5, 2000 to Carabillo, Stanley R. Heimbigner, the Secretary-Treasurer of a local affiliate of the Bakery, Confectionery, Tobacco Workers & Grain Millers International Union expressed concerns about the manner in which ULLICO valued its stock in the 1999 repurchase program. (U 007182, Tab 56) Heimbigner noted that the use of the per share book value as of December 31, 1998, significantly under-valued the Company's stock given the success of the Global Crossing investment during 1999. Heimbigner noted, in particular, that even if the Company utilized the unaudited stockholders' equity as of June 30, 1999, the book value per share would have been nearly $102. Georgine responded to Heimbigner's letter without raising his concerns to the Board.

stock had to be not less than $43 per share at the closing of the offer. The Chairman explained to the committee that although Global Crossing traded at $50 per share by the end of 1999 (the stock price used to calculate "book value" as of December 31, 1999), the stock was trading at only about $33 per share in May 2000. The $43 "trigger" price was necessary to give the Company "a reasonable opportunity to realize its gain on the stock in order to fund this offer." In addition, the "extraordinary" repurchase program was conditioned upon either 93% of all shares outstanding being tendered, or all shareholders holding 1% or more of the Company's outstanding stock participating in the tender offer. (U 17284, Tab 57)

Finally, instead of adopting the 10,000 share threshold used in prior years, the "extraordinary" repurchase program term sheet states: "Tenders by holders of 100 or fewer shares will be accepted in total." (U 17287, Tab 57)

On May 11, 2000, the Board approved this "extraordinary" stock repurchase program with the same conditions described above. Chairman Georgine explained that the condition requiring that either 93% of all shares outstanding be tendered or all shareholders holding 1% or more of the Company's outstanding stock tender their respective shares protected the Company "from a significant reapportionment of the ownership of the Corporation through a repurchase of this magnitude." Chairman Georgine further explained that the reason for requiring all shareholders with 100 or fewer shares to tender all of their respective shares if they intended to participate in the program was "to eliminate unnecessary bookkeeping—we have many shareholders with less than 100 shares of Capital Stock, our older form of stock, that have been on the books for many years." (U 000049, Tab 58)

Under this proposed program, any shareholder holding more than 100 shares, including directors and officers, would have been treated equally. If all shareholders tendered all of their respective shares in the offering then each shareholder would have been able to redeem 20% of the shareholder's ULLICO holdings.

According to the minutes, "Credit Suisse First Boston evaluated the [extraordinary] repurchase program and they have issued an opinion, which was included with the agenda item. They concluded that the offer is favorable to our stockholders and has been balanced in a manner so it will not jeopardize the Corporation's well being." (U 000050, Tab 58) In a memorandum dated May 10, 2000, to Chairman Georgine, Jonathan Plutzik and Paul W. Brown of CSFB explained the basis for this opinion:

> Because ULLICO's by-laws state that Shares may not be transferred without giving ULLICO the option to purchase the Shares for $25.00, in the absence of an alternative repurchase offer from ULLICO the value of the Shares is effectively capped at $25.00 per Share. This is the case even if ULLICO failed to exercise its option to purchase in a particular instance—it is unlikely that anyone else would agree to pay more than $25.00 for Shares that would continue to be subject to the same $25.00 purchase option in the hands of the new shareholder. The Repurchase Price of $146.04 is significantly in excess of price that a

shareholder could obtain in absence of the Repurchase. (U 046890, Tab 59)

As far as we could determine, however, when the extraordinary $240 million stock repurchase program was abandoned in November 2000 because Global Crossing had not hit the $43 trigger price, CSFB did not prepare an evaluation of the replacement $30 million repurchase program (discussed below) or its components, including its 10,000 share proration threshold.

In spite of several references to a "100" share threshold in the documents related to the $240 million proposed extraordinary repurchase program, Georgine, when interviewed, said that he believed the "100" reference was a typographical error and should have been "10,000." Several other [directors] indicated that the reference to a "100" share threshold may have been a "typo." We were not able to find supporting evidence for the assertion that the "100" share threshold resulted from a typographical error.

At its May 2000 meeting, the Board also authorized Chairman Georgine to appoint members of a new committee on Corporate Governance, which was requested "to examine our practices and procedures as we begin the Year 2000 and a new millennium of service." (U 000047, Tab 58; U 040602, Tab 60) On August 29, 2000, the Executive Committee appointed Georgine (as Chair), Bahr, McCarron and Cullerton as members of the Corporate Governance Committee. (U 17278–79, Tab 61)

It appears, however, that the creation of the Corporate Governance Committee may have been designed to preempt questioning from a director or shareholder on the issue of executive compensation disclosures. In or about April 2000, Carabillo retained Arnold & Porter to address potential questions from directors and shareholders concerning the disclosure of executive compensation, particularly the compensation received by Chairman Georgine, and other issues.[28] (U 038605, Tab 63; U 044491, Tab 64; Smith Interview) Arnold & Porter prepared a "ULLICO 2000 Strategy Book" that addressed potential issues or challenges that could be raised at the May 2000 Board meeting together with various possible responses. (U 039819, Tab 65; Baltz and Smith Interviews)

This memorandum suggests the appointment of a "blue ribbon" corporate governance committee as a "pre-emptive strike" against questions concerning "disclosure of ULLICO's executive compensation practices at the Board meeting." (U 039822–24, Tab 65) Arnold & Porter drafted potential areas of inquiry for the committee, but the firm apparently did not provide ULLICO with further advice concerning this matter. (U 038854, Tab 66)

As it turned out, no director or shareholder raised questions concerning executive compensation at the May 2000 Board and shareholder meetings. Nonetheless, based

---

[28] A memorandum on the rights of shareholders to obtain Company information which management viewed as confidential was previously prepared by Dennis Lyons of Arnold & Porter on December 14, 1995. (U 037202, Tab 62)