on information obtained through certain director interviews, it appears as though the Corporate Governance Committee has convened.

- **Discretionary Stock Repurchases**

Several shareholders asked to have certain of their shares repurchased by the Company in the Summer and early Fall of 2000 pursuant to the so-called "discretionary" stock repurchase program historically administered by the Chairman. Under this program, which was not formally approved by the ULLICO Board until November 2000, Georgine entertained requests by shareholders to have some or all of their respective shares (Class A, Class B or Capital Stock) repurchased on an ad hoc basis. As indicated above, the practice of allowing the Chairman to repurchase stock on a discretionary basis dates back many years. In general, however, this practice was limited to repurchasing shares when a shareholder died, an officer or director resigned or a union had a financial emergency. (Carabillo Interview)

The 2000 repurchases pursuant to the "discretionary" repurchase program were not so limited. Between May and November 2000, Georgine authorized ULLICO to repurchase the following shares from non-retiring officers and directors: (1) 3,000 Class A shares from Carabillo on May 31, 2000; (2) 4,000 Class A shares from Grelle (CFO) on June 1, 2000; (3) 4,000 Class A shares from Georgine on July 20, 2000; (4) 4,000 Class A shares and 1,250 Capital shares from West (director) on August 9, 2000; (5) 3,386 Class A shares and 886 Capital shares from Luce (Executive Vice President) on August 9, 2000; (6) 8,664 Class A shares from Bernard (director) on September 13, 2000[29]; and (7) 2,000 shares from Maddaloni (director) on October 10, 2000. (U 047005–06, Tab 67) ULLICO created a specific "Director/Officer Request for Repurchase" form that was used to facilitate discretionary repurchases from officers and directors. (U 027121, Tab 68) At this point, the $146.04 stock price adopted by the Board was, by far, the highest stock price in the history of ULLICO and its predecessor. During the Summer of 2000, the market price of Global Crossing's stock remained well-below the $50 per share price as of December 31, 1999.

It appears that officers and directors redeemed stock through the "discretionary" program for one or more of the following reasons: (1) to redeem only some of their shares, which was not permitted without proration under the formal program; (2) to redeem Capital Stock, which was not historically included in the formal repurchase program; (3) because they needed the money; or (4) because they wanted to take advantage of the record-high share price. (Carabillo, Georgine and other Interviews) For example, John Grelle, the Company's Chief Financial Officer, told us that in June or July 2000 he received a note saying that the Chairman was

---

[29] Director Bernard held more than 10,000 shares of Class A Stock as of May 11, 2000, when the Board set ULLICO's stock price at $146.04 per share. Bernard received 7,894 shares of Class A Stock through the 1992 preferred certificate program and a total of 3,000 shares in the 1998 and 1999 director and officer stock purchase offers. This discretionary redemption of 6,664 shares of Class A Stock from Bernard allowed him to redeem all of his remaining Class A shares pursuant to the 2000-01 formal repurchase program as an under-10,000 shareholder. Bernard would have been able to redeem only 2.2% of his Class A shares if he had not participated in the "discretionary" repurchase program.

redeeming some of his shares. He then decided to redeem the shares he purchased in 1998 to pay off the loan he incurred in connection with the shares he purchased in 1999. (Grelle Interview)

None of the discretionary repurchases were contemporaneously, if ever, disclosed to the full Board. They also were not disclosed in the 2000 tender offer disclosure document, which in fact suggested that directors and officers would not participate in the formal repurchase program and that they "believe[d] the shares represent[ed] an excellent long-term investment opportunity." (U 000213, Tab 82)

On September 9, 2000, in connection with his work on the Steed dispute, Carey Smith of Arnold & Porter authored an e-mail expressing doubt that discretionary stock repurchases were authorized by the Board.[30] (U 038452, Tab 70) Arnold & Porter eventually suggested that the Company formalize the "discretionary" repurchase program through a Board resolution and at least attempt to ratify prior "discretionary" repurchases. (Lyons Interview)

Dennis Lyons of Arnold & Porter believed the discretionary repurchases from directors reflected a degree of self-dealing. Lyons advised Carabillo in or about the Fall of 2000 to have disinterested directors review these repurchases (although he did not recall if he used the term "self-dealing" in his conversation with Carabillo). Lyons further recommended that all information concerning these repurchases be fully disclosed to these directors. Such disclosures should identify the officers and directors involved, the number of shares repurchased, and other relevant information. (Lyons Interview)

Lyons and Carabillo also discussed drafting resolutions for the November 2000 Board meeting. Lyons suggested to Carabillo that the Board pass a resolution requiring disinterested Board members approve the discretionary repurchases of ULLICO stock from other directors and officers. Carabillo, however, took the position that instead of having a disinterested committee of the Board vote to approve these stock repurchases, this issue should be handled by requiring reports to the Compensation Committee of discretionary repurchases from officers and directors. (Lyons Interview) Lyons apparently did not advise Carabillo that this approach would be inappropriate.

An Arnold & Porter e-mail dated October 17, 2000, indicates that Carabillo was "reluctan[t] to have specific information on repurchases go to the Comp[ensation] Committee or board." (U 043461, Tab 71; Smith Interview) Georgine, however, apparently felt that a report of repurchases from officers and directors should be made from time to time to the Compensation Committee. According to another Arnold & Porter e-mail dated November 1, 2000, Carabillo told Georgine that this

---

[30]  An Arnold & Porter memorandum dated July 9, 2002 (which was prepared in response to our inquiry), conflicts with the conclusion reached by Carey Smith. According to that memorandum, Article V, § 3 of the by-laws grants Chairman Georgine "full authority and responsibility for the management, conduct and control of the affairs of the Company," and this authority allowed Georgine to administer the "discretionary" repurchase program even before it was formalized in November 2000. See MGCL §§ 2-103(10), 2-310(a)(1). (U 047020, Tab 31)

approach "was not strictly necessary," but it "buttressed the optics." (U 038397, Tab 72; U 038401, Tab 73; Smith Interview)

Additional officer and director discretionary repurchases occurred after the November 3, 2000 Board meeting, where, as discussed below, an attempt was made by the Board to ratify the Chairman's discretionary power to redeem stock. These repurchases, made at $146.04 per share, included the following: (1) 7,312 Class A shares from Casstevens (director) on January 16, 2001; (2) 1,500 Class A shares from Cullerton (director) on January 16, 2001; (3) 2,900 Class A shares from Luce on January 16, 2001; (4) 12,523 Class A / 4,345 Capital shares from Georgine on February 14, 2001; (5) 1,097 Capital shares from Gentleman on March 2, 2001, and (6) 1,535 Capital shares from McNulty (director and Union Labor Life General Counsel) on March 2, 2001. In sum, directors and officers redeemed 62.6% of all shares repurchased through the "discretionary" program at the $146.04 stock price.

In the end, it appears that the director and officer repurchases were disclosed to, but not specifically approved by, the Compensation Committee during its March 6, 2001 meeting.[31] These discretionary repurchases of 62,728 shares approved by the Chairman and having an aggregate value of $9.2 million were neither disclosed to, nor expressly approved by, the Board, the Executive Committee or ULLICO's shareholders.

- **Actual 2000 Stock Repurchase Program**

On August 29, 2000, the Executive Committee reported a $478.8 million decline in the market value of ULLICO's Global Crossing investment since December 31, 1999. (U 017283, Tab 61) The August 30, 2000 Board meeting minutes further state: "Future volatility in the carrying value of the Global stock will continue to impact stockholders' equity until such time as all Global shares have been divested or securitized." (U 17402, Tab 75)

As discussed below, this decline in Global Crossing's stock caused the Company to abandon its proposed "extraordinary" repurchase program and adopt a new repurchase program that—along with the 1998 and 1999 stock purchase offers to directors and officers and the "discretionary" repurchase program described above—are at the core of this investigation.

- ◆ *November 3, 2000 Board Meeting*

On November 3, 2000, the Board abandoned the "extraordinary" repurchase program conditionally approved in May 2000 because the market price of Global Crossing did not hit the $43 trigger price. (U 000055, Tab 76) At the time, Global Crossing stock was trading at only $23 5/8 per share. Accordingly, a replacement repurchase program providing for the repurchase of up to $30 million of Class A and Class B Stock at $146.04 per share was approved, and no dividend was authorized. Notwithstanding the significant decline in the value of ULLICO's Global Crossing

---

[31] We only have draft minutes of that meeting. (U 021066, Tab 74) Carabillo did not believe that these minutes were ever finalized. (Carabillo Interview)

*Privileged and Confidential* ————————————————————

investment, it does not appear as if the Board considered or discussed a lower repurchase price that more accurately reflected its then-existing book value per share.

Arnold & Porter assisted ULLICO in drafting the November 2000 Board resolutions. (U 039236–37, Tab 77) Edits to draft versions of the November 2000 resolutions by two Arnold & Porter attorneys reflect a proposal to change the 10,000 share proration threshold to a 5,000 share threshold.[32] (U 044317, Tab 78; U 039168, Tab 79; Baltz and Smith Interviews) It is unclear what led to this proposed change and why it was not adopted, but it appears that the Company decided to act consistently with past programs. On July 24, 2000, Carabillo sent a memo to Georgine explaining that the Company should keep the 10,000 share threshold consistent with prior years "for credibility reasons" despite the fact that the Global Crossing investment success "has significantly distorted our numbers."[33] (U 047022, Tab 69)

Prior to the November 2000 Board meeting, there was also a debate concerning whether shareholders holding fewer than 10,000 shares should be categorically exempt from proration, even if they did not tender all of their respective shares. For example, a draft memorandum from Carabillo to Georgine dated October 31, 2000 (attached to a fax from Carabillo to Baltz and Smith of Arnold & Porter) describes this proposal:

> The fifth (v), is a "Resolved" that allows you to treat Shareholders who hold 10,000 shares or less in two fashions. *One, it specifies they are not subject to the prorating provisions—this allows the Corporation to buy back the entirety of their shares—but also gives you the authority in your discretion to repurchase a portion thereof. I do not believe that we want to force those holders to come in for their entire holding of stock and this will allow us to consider them on a discretionary basis for a portion thereof.*

(Emphasis added) (U 044939–40, Tab 80). The proposed resolution stated: "Tenders of shares of Stock by stockholders who hold 10,000 shares or less of Stock . . . will not be subject to the prorationing provisions[.]" (U 040355, Tab 81) This proposal (that under-10,000 shareholders be categorically exempt from proration regardless of whether they tender 100% of their respective shares) conflicts with Carabillo's statement at his interview that one of the two principal purposes of the 10,000 share threshold was to eliminate small shareholders, which, according to him, were shareholders holding fewer than 10,000 shares.

This proposed modification of the 10,000 share threshold was rejected, but it is not clear why or by whom. The 10,000 share threshold actually submitted to, and adopted by, the Board was consistent with the threshold adopted in the prior years, with one exception. Unlike in prior years, the resolution gave the Chairman the

---

[32] In his interview, Grover McKean expressed his belief that a 5,000 share threshold would have been more appropriate to accomplish the goal of eliminating small ULLICO shareholders. (McKean Interview)

[33] Rick Baltz of Arnold & Porter told Carabillo that 10,000 shares was not a typical "odd lot" as defined under the SEC's tender offer rules, which define an "odd lot" as fewer than 100 shares. (Baltz Interview)

discretion to have the Company repurchase outside of the formal program some, but not all, shares held by a shareholder who tenders 10,000 shares or fewer. In addition, this resolution purports to ratify the "discretionary" repurchases made by the Chairman before November 3, 2000:

> A tender of shares of Stock by a stockholder who holds 10,000 shares or fewer of Stock and who properly tenders all shares of Stock that such stockholder beneficially owns will not be subject to the prorationing provisions nor in the aggregate to the overall limit on purchases set forth above. A tender of shares of Stock by a stockholder who holds 10,000 shares or fewer of Stock and who properly tenders less than all shares of Stock that such stockholder beneficially owns will be subject to the prorationing provisions and in the aggregate to the overall limit on purchases set forth above. *Purchases from such stockholders otherwise may be made by the Chairman at or below the price from time to time last established by the Board of Directors, whether or not during the pendency of the tender offer provided for by this resolution, at any time from the date of the annual meeting in the year 2000 to the date next preceding of the annual meeting in the year 2001. Such purchases shall be of the entirety of the Stock held by the stockholder offering the same or, at the discretion of the Chairman, of a portion thereof.*

(Emphasis added) (U 000059–60, Tab 76).

The implementation of the 2000 repurchase program was also subject to the Corporation receiving tenders of 100% of the shares beneficially owned by each and every stockholder that held in excess of 2% of the outstanding shares of Class A and B Stock (the so-called "2% Rule"); provided that management could modify or waive such condition at the discretion of the Chairman so long as the repurchase would not cause a "significant redistribution of equity." (U 000060, Tab 76) The 2% Rule was apparently intended to avoid a significant reallocation of shareholder ownership and ensure compliance with the by-laws' requirement that no ULLICO shareholder own more than 9% of the Company's voting stock. (U 030545, Tab 2; Carabillo and Brown Interviews)

The combination of the high stock price ($146.04) and the 2% Rule—under which the Company should have expected shareholders to tender collectively stock worth at least $883 million in an offering capped at $30 million—virtually guaranteed that shareholders holding more than 10,000 shares would be subject to extreme proration. (Beck Interview)

At the November 3, 2000 Board meeting,[34] Chairman Georgine delivered a detailed statement reflected in the minutes. (U 000055–58, Tab 76) Georgine generally described the revised repurchase program and the history of the Global Crossing investment. The Chairman explained: "As we have said from the very beginning,

---

[34] The November 3, 2000 Board meeting was attended by directors Bahr, Barry, Bernard, Boede, Casstevens, Cullerton, Georgine, Hurt, Joyce, La Sala, Maloney, McCarron, McNulty, Miller, O'Sullivan, West, Wynn, Wyse as well as officers Carabillo, Grelle, Luce and McKean. Directors who did not attend included Biller, Brown, Coia, Gentleman, Kruse, Maddaloni, Sombrotto, Sweeney, Upshaw, Wilhelm and Hanley.

*Privileged and Confidential*                                    *Report of the Special Counsel*

ULLICO Inc. is a long-term investment and has been a long-term investment since 1925." He also indicated that additional funds that might otherwise have been available for the repurchase program, thereby allowing a tender offer of greater than $30 million, had been set aside for the contemplated purchase by ULLICO of Amalgamated Bank of Chicago. (U 000057, Tab 76) Because of a failure to receive regulatory approval, this proposed transaction was never completed. (Grelle and Luce Interviews)

The Board then addressed several other matters. First, the Board authorized the informal "discretionary" repurchase program described above under which Georgine could approve stock repurchases outside of the formal repurchase program at a price no greater than that most recently specified by the Board (so long as the repurchase with respect to any particular stockholder did not exceed 1% of the total outstanding Class A, Class B and Capital Stock). (U 000058, Tab 76) In his prepared remarks for the Board, Georgine explained: *"We do not advertise this [program] and we do not encourage it."* (Emphasis added) (U 000057, Tab 76)

Second, the Board resolved that only stockholders who are currently eligible to purchase stock could participate in the formal and informal stock repurchase programs. (U 000059, Tab 76) This resolution had the effect of precluding Steed and Maloney, both former ULLICO officers, from participating in the program. (Carabillo Interview)

Finally, the Board passed the following general ratification resolution: "That any and all actions taken by the Chairman or other appropriate officers of the Corporation falling within the scope of any of the preceding resolutions and consistent therewith taken at any time, whether prior or subsequent hereto, are hereby confirmed, ratified, and approved." (U 000061, Tab 76)

The discretionary repurchases from directors and officers from May to October 2000 that the Board purported to ratify were actually not specifically disclosed to the Board. Moreover, as discussed below, no aspect of the "discretionary" repurchase program was disclosed in the 2000 tender offer documents. (U 00211, Tab 82)

Arnold & Porter never provided ULLICO with a formal opinion as to whether the ratifications at the November 2000 Board meeting would be deemed effective under applicable law. (Baltz Interview; U 041079, Tab 83). At Paul Berger's request, Carey Smith prepared a memo to the file in connection with an Arnold & Porter opinion concerning the Company's dispute with Steed. In this memo, Smith disclaims opining on Carabillo's "view" that the purported ratification in the above-quoted resolution was legally effective. (U 041079, Tab 83; Smith Interview)

Sometime prior to the November 2000 Board meeting, in a conversation with Carabillo concerning the November 2000 proposed Board resolutions which would approve the actual 2000 repurchase program, Arnold & Porter attorney Dennis Lyons identified a potential issue. He explained that, pursuant to the proposed resolution, those director shareholders who owned fewer than 10,000 shares of ULLICO stock

*Privileged and Confidential*                                        *Report of the Special Counsel*

would be asked to approve a transaction that would grant them preferential treatment over other shareholders, *i.e.*, those shareholders holding 10,000 or more shares. Lyons, therefore, advised Carabillo that this program needed to be approved by a majority of disinterested directors. Lyons emphasized that no interested director should be permitted to vote for the November 2000 stock repurchase program. (Lyons Interview) However, this issue was never presented to the Board and all directors who attended the November 2000 meeting were allowed to vote on the program, which was unanimously approved without any discussion of the potential preferential treatment. Carabillo, through his counsel, has denied that Lyons provided this advice to him.

◆   *Tender Offer and Other Repurchases at $146.04*

On November 21, 2000, Georgine sent a letter to ULLICO's shareholders announcing the change in the 2000 repurchase program. In this letter, Georgine incorrectly stated that all shareholders would be prorated and, therefore, "share equitably in the offering":

> The Company anticipates receiving shares in excess of the $30 million it is offering to repurchase, *so it will pro-rate each submission so all participating Stockholders share equitably in the offering.* Other terms and conditions of the repurchase will be described in the Offering Memorandum.

(Emphasis added) (U 027728, Tab 84) Notably, this letter did not indicate that shareholders holding fewer than 10,000 shares could avoid proration.

On December 14, 2000, ULLICO formally offered to repurchase $30 million of its Class A and Class B Stock (but not Capital Stock) at $146.04 per share. (U 000211, Tab 82) The offer ended on January 16, 2001. Notwithstanding the inaccurate statement in Georgine's November 21, 2000 letter described above, the 10,000 share proration threshold in the formal repurchase program was fully disclosed in the tender offer documents.[35] (U 000219, Tab 82) What was not disclosed in the tender offer documents, however, was the "discretionary" repurchase program, including the ability of the Chairman to repurchase through the "discretionary" program all or any portion of the shares held by holders of fewer than 10,000 shares, notwithstanding the terms of the formal repurchase program. Nor did the offering documents disclose (1) that all ULLICO senior executives and directors, except Georgine, who owned ULLICO stock (a total of 24, excluding former executives Steed and Maloney) held fewer than 10,000 shares of Class A Stock, or (2) that several of the directors and officers redeemed shares through the Chairman's "discretionary" program several months before the 2000 tender offer commenced.

Moreover, the following language suggested by Doug Beck of LeBoeuf Lamb in the "Introduction" to the tender offer disclosure document was never incorporated into

---

[35]   The 10,000 share threshold adopted by the Board applied to holders of "10,000 shares or fewer," but the tender offer described the 10,000 share threshold as applying to holders of "fewer than 10,000 shares." This discrepancy did not appear to have any effect on the implementation of the program.

the final version: "In addition, the Company also hereby offers to purchase all Shares held by any holder of fewer than 10,000 Shares as of [date] that tenders all of the Shares beneficially owned by such holder. As of [date], there were [___] Shares held by holders of fewer than 10,000 Shares." (U 025691, Tab 85) This language would have given shareholders some idea as to the amount of the $30 million that might be paid to shareholders holding fewer than 10,000 shares of stock. It is unclear why this suggested revision was rejected.

As in prior years, the tender offer documents included the following statement: "The Company has not been advised that any of its directors and executive officers presently intend to tender any Shares personally owned by them pursuant to the Offer." (U 000217, Tab 82) There appears to have been no attempt by the Company, however, to determine whether officers and directors intended to participate in the program. (Valentine Interview) Nor did ULLICO disclose the "discretionary" repurchase program or the substantial repurchases from directors and officers under that program in the Summer and early Fall of 2000.

ULLICO, however, did disclose that, "[a]s of September 30, 2000, the Company's directors and executive officers as a group (33 persons) beneficially owned an aggregate of 100,971 outstanding Shares (Class A Common Stock) representing approximately 1.3% of the outstanding Shares." (U 000217, Tab 82) In comparison, the 1999 tender offer documents disclosed that "[a]s of September 30, 1999, the Company's directors and executive officers as a group (33 persons) beneficially owned an aggregate of 63,929 outstanding Shares (Class A Common Stock) representing approximately 0.8% of the outstanding Shares." (U 026666, Tab 54) Outside Company counsel contends that a shareholder who had received both documents could have deduced from this comparison that directors and executive officers as a group were given some opportunity to purchase collectively at least 37,042 Class A shares.

In addition, the proxy statement for the May 2000 stockholders meeting disclosed the number of voting shares of ULLICO stock owned by each director. (U 17467–68, Tab 45) A shareholder could have compared this proxy statement to the proxy statements for the May 1999 and May 1998 stockholder meetings to determine which directors purchased and redeemed stock during this period. (U 17472, Tab 86; U 17474–75, Tab 108) In addition, the proxy statement revealed that all directors, other than Georgine, held fewer than 10,000 shares of Class A Stock.

The 2000 repurchase offer was over-subscribed, and the proration for shareholders holding 10,000 or more shares of Class A and Class B Stock was extreme, as only 2.2% of their tendered shares were redeemed. (Exhibit 6). In contrast, the Company repurchased at the $146.04 stock price *all* of the shares tendered by senior officers and directors, a substantially larger amount than they would have otherwise received if the earlier proposed "extraordinary" program had been similarly over-subscribed. In other words, management and the Board implemented a replacement 2000 formal repurchase program that reduced the amount available to shareholders from $240

*Privileged and Confidential*                                                    *Report of the Special Counsel*

million to $30 million while potentially providing a larger portion of the funds available for repurchase to the class of shareholders that included directors and officers (*i.e.*, under-10,000 shareholders).

Following the expiration of the 2000 repurchase program in January 2001, and prior to the May 2001 Board meeting at which a substantially lower share price was established, Chairman Georgine approved additional share repurchases at the $146.04 stock price other than the director and officer repurchases discussed above. For example, the Chairman authorized the Company to repurchase half of the number of shares tendered by four unions and pension funds. (U 038895, Tab 91; U 038896, Tab 92; U 012558, Tab 93; U 047011, Tab 67; Grelle Interview)

On January 23, 2001, Chairman Georgine received a fax from Carabillo listing which shareholders who tendered stock pursuant to the 2000 repurchase program would be prorated and which shareholders would not be prorated because they held fewer than 10,000 shares. According to this list, 14 of the 19 shareholders who were able to take advantage of the under-10,000 proration exception were officers or directors of the Company.[36] (U 018243–44, Tab 87; U 027713, Tab 88)

The list also reflects that four directors and the family member of a fifth director requested and received "exceptions" to the 10,000 share threshold procedures. Finally, this shareholder list reflects that four of the seven shareholders who redeemed Capital Stock at the $146.04 stock price were directors (although director Hurt eventually decided not to redeem his Capital Stock).[37] (U 018245, Tab 87) The list shows that shareholders holding 10,000 or more shares were prorated drastically and only redeemed 2.2% of their tendered shares.[38]

When interviewed, Georgine said that the 2.2% proration was not apparent to him when he reviewed the list. When offered a specific example of how a director received more under the repurchase program than a pension fund which tendered more than forty times the number of shares tendered by the director, Georgine's response was to refer to the rules of the program. The Chairman and his Chief Legal Officer participated in designing these rules, which, in 2000, favored themselves and other insiders.

ULLICO repurchased a total of 305,636 shares of Class A and Capital Stock in 2000–01 at the $146.04 per share stock price through the formal and "discretionary"

---

[36] This list, which is dated January 19, 2001, does not include the redemption of 4,345 shares of Capital Stock held by Georgine on February 14, 2001. The Company did not send checks to shareholders who participated in the 2000-01 stock repurchase program until almost one month after the offer expired, on February 20, 2001.

[37] Hurt sent a request dated January 9, 2001, to Georgine asking to redeem 100 of his 110 shares of Capital Stock. (U 027500, Tab 89) On April 4, 2001, Carabillo granted Hurt's request conditioned on Hurt tendering the original stock certificate. (U 027505, Tab 90) Hurt decided not to tender any of his shares due to a comment made by Carabillo in early 2001 that directors normally did not ask to have Capital Stock repurchased until they retired. (Hurt Interview) However, the 2000-01 redemptions of certain other non-retiring directors (West, Gentleman, McNulty and Casslevens) and one officer (Luce) included Capital shares redeemed at the $146.04 share price pursuant to the Chairman's "discretionary" program. (Exhibit 1)

[38] The Company has asserted that ULLICO's shareholders received a huge benefit simply from the increased value of their shares. However, in a private company with limited and discretionary redemption rights and a stock price set once a year, realizing the increased share value is problematic, as evidenced by the 2.2% proration in 2000.

programs, utilizing approximately $44.6 million in Company funds. The 20 directors and officers who redeemed Class A and Capital shares at the $146.04 price in 2000–01 redeemed a total of 93,923 shares and received a total of $13.7 million, or 31% of the total funds distributed by the Company while its stock price was set at $146.04 per share. (Exhibit 1)

About $9.63 million of the $13.7 million was used to repurchase shares originally purchased by the directors and officers in the 1998 and 1999 stock offers. About $1.54 million of the $13.7 million related to shares of Class A Stock received through the conversion of preferred certificates. About $1.38 million of the $13.7 million related to shares of Capital Stock redeemed through the "discretionary" program. (The remaining $1.17 million related to the 8,000 shares Georgine redeemed pursuant to his Stock Purchase and Credit Agreement.)

Approximately $4 million of the $13.7 million was paid to the directors and officers through the formal repurchase program, and the remainder ($9.7 million) was paid to directors and officers through the "discretionary" repurchase program. The directors and officers realized a collective pre-tax profit of at least $10.7 million.

Exhibit 1 (attached) lists those directors and officers who took advantage of the exclusive opportunity to buy up to 8,000 Class A shares in 1998 and 1999. This chart also shows the repurchases by ULLICO at the $146.04 stock price of most of these purchased shares (as well as, in some instances, Capital Stock and Class A Stock acquired in the preferred certificate program) through the formal and/or "discretionary" repurchase programs.

The directors we interviewed expressed mixed reactions to the repurchases of stock at the $146.04 stock price from officers and directors under the formal and "discretionary" programs as compared with the repurchases of stock from other shareholders.

Director Wyse was surprised to learn that officers and directors received about one-third of the funds paid to shareholders through the formal and "discretionary" programs at the $146.04 stock price. Had he known that this would be the result, he probably would have spoken out on the issue. (Wyse Interview) Director Bahr stated that had he known about the severe proration that large shareholders would suffer in the 2000 program he would not have approved the program. (Bahr interview)

Director McNulty, who is also the General Counsel of Union Labor Life, expressed no concerns about the effects of the 10,000 share threshold because no one objected to the program. But had he known about the severe proration impacting larger shareholders he would have considered whether this raised fiduciary duty issues. (McNulty Interview)

Directors Sweeney and Chavez-Thompson expressed concerns about whether repurchases of stock from officers and directors were consistent with positions taken by the AFL-CIO. (Sweeney and Chavez-Thompson Interviews) Several directors

*Privileged and Confidential*                                              *Report of the Special Counsel*

were surprised or shocked by the $13.7 million in director/officer repurchases at the $146.04 price. (Wilhelm, Hanley, Chavez-Thompson and other Interviews)

In contrast, Kenneth Brown, a former director, had no reaction to these repurchases and feels that the repurchase program is sound. (Brown Interview) Director Hurt was not surprised by these repurchases. (Hurt Interview) Director Kruse voiced no concern about the stock offer and repurchase programs because he relied on professionals for advice concerning these programs. (Kruse Interview) Director Casstevens and other directors made similar remarks and felt that the director repurchases posed a public relations problem, but not a legal problem, and therefore the special investigation was not needed. (Casstevens and other Interviews) Director Joyce stated that the repurchase program in 2000 was structured to provide directors and officers with additional compensation, and these directors and officers were entitled to this money because they had earned it. He also noted that shareholders holding 10,000 or more Class A or B shares would have only been able to each redeem only a few more shares than they would have redeemed if the threshold had been 100 instead of 10,000. (Joyce Interview)

Several directors noted that the Board was kept in the dark as to certain matters, including executive compensation, and believed that compensation information should be given to the Board and the shareholders.

In the course of our interviews, several directors and officers suggested that the repurchase programs were a "win-win" situation for both insiders and other ULLICO shareholders. They essentially argued that all shareholders benefited from share repurchases at increasingly higher prices between 1997 and early 2001 and that even the lower repurchase prices in the latter part of 2001 and in 2002 were above the $25 per share price that most ULLICO shareholders paid for their stock.

While most ULLICO shareholders who participated in the share repurchase programs profited in an absolute sense, smaller shareholders (primarily insiders) were certainly treated more favorably in a relative sense. By virtue of the 10,000 share proration threshold, smaller shareholders were able to sell all of their shares in the formal repurchase program, while larger shareholders were not. This was particularly stark in 2000, where larger shareholders were only able to sell approximately 2.2% of the shares they tendered. Smaller shareholders were treated more favorably under the "discretionary" repurchase program as well, typically being permitted to redeem 100% of their shares while the few larger shareholders who participated in the "discretionary" program were frequently only able to redeem 50% of their tendered shares. As a result of this disparate treatment between smaller and larger shareholders, insiders received a disproportionate amount of the funds paid to shareholders for shares repurchased by the Company at $146.04 per share between May 2000 and May 2001.

At his interview, Georgine stated that the directors deserved some credit for the Global investment by ULLICO since they approved it. He did not believe their action

*Privileged and Confidential*                                                    *Report of the Special Counsel*

were surprised or shocked by the $13.7 million in director/officer repurchases at the $146.04 price. (Wilhelm, Hanley, Chavez-Thompson and other Interviews)

In contrast, Kenneth Brown, a former director, had no reaction to these repurchases and feels that the repurchase program is sound. (Brown Interview) Director Hurt was not surprised by these repurchases. (Hurt Interview) Director Kruse voiced no concern about the stock offer and repurchase programs because he relied on professionals for advice concerning these programs. (Kruse Interview) Director Casstevens and other directors made similar remarks and felt that the director repurchases posed a public relations problem, but not a legal problem, and therefore the special investigation was not needed. (Casstevens and other Interviews) Director Joyce stated that the repurchase program in 2000 was structured to provide directors and officers with additional compensation, and these directors and officers were entitled to this money because they had earned it. He also noted that shareholders holding 10,000 or more Class A or B shares would have only been able to each redeem only a few more shares than they would have redeemed if the threshold had been 100 instead of 10,000. (Joyce Interview)

Several directors noted that the Board was kept in the dark as to certain matters, including executive compensation, and believed that compensation information should be given to the Board and the shareholders.

In the course of our interviews, several directors and officers suggested that the repurchase programs were a "win-win" situation for both insiders and other ULLICO shareholders. They essentially argued that all shareholders benefited from share repurchases at increasingly higher prices between 1997 and early 2001 and that even the lower repurchase prices in the latter part of 2001 and in 2002 were above the $25 per share price that most ULLICO shareholders paid for their stock.

While most ULLICO shareholders who participated in the share repurchase programs profited in an absolute sense, smaller shareholders (primarily insiders) were certainly treated more favorably in a relative sense. By virtue of the 10,000 share proration threshold, smaller shareholders were able to sell all of their shares in the formal repurchase program, while larger shareholders were not. This was particularly stark in 2000, where larger shareholders were only able to sell approximately 2.2% of the shares they tendered. Smaller shareholders were treated more favorably under the "discretionary" repurchase program as well, typically being permitted to redeem 100% of their shares while the few larger shareholders who participated in the "discretionary" program were frequently only able to redeem 50% of their tendered shares. As a result of this disparate treatment between smaller and larger shareholders, insiders received a disproportionate amount of the funds paid to shareholders for shares repurchased by the Company at $146.04 per share between May 2000 and May 2001.

At his interview, Georgine stated that the directors deserved some credit for the Global investment by ULLICO since they approved it. He did not believe their action

merited a cash bonus. However, he did not view the stock offer programs as a bonus program.

■ **2001 Stock Repurchase Program**

On May 7, 2001, the Executive Committee authorized a $15 million repurchase program at a "book value" price of $74.87 per share, based on the Company's December 31, 2000 audited financial statements. (U 17269–70, Tab 94)

At its May 8, 2001 meeting, the Board adopted the identical program, which included the same 10,000 share proration threshold used in the 2000 formal repurchase program. At this meeting, the Chairman announced that

> [T]he value had been reduced substantially from the value set in May of 2000, when ULLICO Inc.'s Board adopted a value of $146.04. But considering the market turmoil, and the impact on the overall market and Global Crossing in particular, which was trading at around fifteen dollars at year end, ULLICO Inc.'s stock held up well.

(U 000064, Tab 95)

On December 17, 2001, ULLICO formally offered to repurchase $15 million of its Class A and Class B Stock (but not Capital Stock) at $74.87 per share. (U 026756, Tab 96) The offer expired on January 17, 2002, and was substantially over-subscribed. The proration for holders of more than 10,000 shares was again extreme at 2.657%. (Exhibit 5). Even though the directors and officers should have been aware that holders of 10,000 or more shares suffered a 2.2% proration in the 2000 program, no changes were made to the repurchase program to prevent the reoccurrence of similarly severe proration in the 2001 program.

Five under-10,000 shareholders, including one officer (Executive Vice President Luce), participated in the formal 2001 repurchase program. Luce was allowed to redeem 1,100 of his 1,500 Class A shares. That he was allowed to do this under the formal repurchase program (as opposed to tendering all of his share holdings) indicates that he was granted an exception to the condition that holders of fewer than 10,000 shares tender all of their shares to avoid proration.

One director, Martin Maddaloni, redeemed 800 of his shares at the $74.87 price pursuant to the Chairman's discretionary authority in October 2001. (U 047011, Tab 67)

■ **2002 Stock Repurchase Program**

At its recent Board meeting in May 2002, the Board set a $46.58 stock price and approved another $15 million repurchase program. Director Linda Chavez-Thompson moved to suspend the 2002 stock repurchase program pending the completion of Winston & Strawn's internal investigation. That motion received no support and was withdrawn. (Chavez-Thompson Interview) Director Wilhelm indicated he wanted to make a motion to eliminate the 10,000 share proration threshold in the 2002 proposed program, but according to Wilhelm, Chairman Georgine did not allow him to make

*Privileged and Confidential*                                          *Report of the Special Counsel*

the motion. (Wilhelm Interview) Chairman Georgine denies that he knowingly kept
Wilhelm from making the motion. (Georgine Interview)

As of the date of this Report, only four individuals (Biller, Kruse, Sweeney and
Upshaw) who bought shares pursuant to the 1998 or 1999 stock offers to directors
and senior officers still retain all of those shares. Their action appears to be consistent
with the stated purpose of the stock offers, *i.e.*, to align the interests of directors with
other shareholders through a long-term investment in the Company.

## Chairman Georgine's Employment Agreements

Chairman Georgine's base salary, annual bonus, and payments from the Global
Incentive Program discussed above, totaled $1,627,273 in 1998, $1,316,025.50 in
1999, $1,466,862.57 in 2000 and $1,254,166.50 in 2001. (Exhibit 2) In addition,
Georgine received earnings on his non-qualified deferred compensation investments
of $4,051,060 (Exhibit 2) Finally, Georgine received gross proceeds of $3,047,563
(yielding an estimated net pre-tax profit of $2,595,303) from the Company's
repurchase of 16,523 shares of Class A Stock and 4,345 shares of Capital Stock at the
$146.04 per share price in 2000–2001. (Exhibit 1) This stock purportedly was
repurchased pursuant to Georgine's employment agreements entered into in the latter
part of 1999. It is unclear, however, whether those agreements were duly
authorized.[39]

On September 22, 1999, ULLICO's Board, in Executive Session, unanimously
approved and authorized a five-year agreement employing Georgine as Chairman,
President and CEO, and delegated to the Compensation Committee "full authority to
negotiate all terms and conditions of the contract." (U 17383, Tab 53)

The members of the Compensation Committee and Chairman Georgine entered into
the employment agreement contemplated by the Board in December 1999, with an
effective date of October 1, 1999 ("Employment Agreement"). (U 041221, Tab 97)
As part of his compensation package, Georgine also entered into a Split-Dollar Life
Insurance Agreement dated February 9, 2000. (U 041237, Tab 97) As indicated
above, he also participated in the Deferred Compensation Plan. (U 041220, Tab 97)
Moreover, Georgine had, in the past, entered into a Supplemental Retirement
Agreement dated August 30, 1994 (U 041247, Tab 97; U 041266, Tab 97), and a
Trust Agreement dated November 5, 1994 (U 041256, Tab 97). While these
agreements and arrangements appear to have been duly authorized, two other
agreements with Georgine, a Stock Purchase and Credit Agreement and an
Addendum to Georgine's Employment Agreement, may not have been.

---

[39] Georgine also received a salary from the AFL-CIO until he retired in or about April 2000. He donated his net salary from the AFL-CIO to charity from 1995 to 2000.

*Privileged and Confidential*                                    *Report of the Special Counsel*

## ■ Stock Purchase and Credit Agreement

The December 17, 1999 and December 27, 1999 Compensation Committee minutes reflect that the committee approved a "bonus" to Georgine of 40,000 shares of Class A Stock. (U 011989, Tab 39; U 011987, Tab 99; U 038443, Tab 100) There is no indication in the corporate records provided to us that this bonus was expressly approved or contemplated by the Board in its September 1999 resolution discussed above or otherwise. Carabillo expressed his view, however, that this bonus was consistent with the Board's intent. However, he was not at the Executive Session during which this issue was discussed. (Carabillo Interview)

On the basis of the Compensation Committee action in December 1999, Georgine and each member of the Compensation Committee executed a Stock Purchase and Credit Agreement. (U 039222, Tab 101) This agreement allowed Georgine to purchase 40,000 shares of Class A Stock at $53.94 per share with a loan from the Company of $2,157,600. The loan would be forgiven ratably over a five-year period, so long as Georgine continued to serve as Chairman, President and CEO. The loan was secured by a pledge of the 40,000 shares, which pledge would be released as the loan was forgiven.

The Stock Purchase and Credit Agreement is dated December 30, 1999, and Georgine received the 40,000 shares on or about February 1, 2000. Georgine, however, did not execute the agreement until February 11, 2000, and Directors Wynn, West, Barry and Cullerton did not execute the agreement until February 28, 2000, April 6, 2000, April 6, 2000, and May 10, 2000, respectively. (U 005762, Tab 98; U 039229, Tab 101) The delay in the execution of this agreement has not been explained and, according to Arnold & Porter attorney Bintz, may relate tax and accounting issues. (Bintz Interview) This agreement was never expressly disclosed to directors or shareholders. However, the proxy statement for the May 2000 Stockholders Meeting reflected that Georgine owned 52,868 shares of voting stock, which would have included the 40,000 shares received pursuant to the Stock Purchase and Credit Agreement. (U 17467, Tab 45) Also, in a footnote to the financial statements in the 2001 Annual Report (note 14) there is an oblique reference to the issuance of the 40,000 shares to a "stockholder," but few details are provided and Georgine's name is not mentioned.[40] (U 028010, Tab 47)

The Stock Purchase and Credit Agreement contains a put option: "At Employee's election, Employee may, upon thirty (30) days' advance written notice to the Corporation, require the Corporation to purchase from Employee, in cash, all or any portion of the Purchased Shares [*i.e.*, the 40,000 shares issued pursuant to the Stock Purchase and Credit Agreement] that no longer constitute Collateral, and the Corporation shall promptly so purchase such shares at a purchase price per share equal to Fair Market Value." (U 039227, Tab 101)

---

[40] Frank Manley, ULLICO's former compensation expert, believed that Georgine's employment agreements, including the incentive bonus, were not unusual for the industry. (Manley Interview)

*Privileged and Confidential*                                                *Report of the Special Counsel*

The December 27, 1999 Compensation Committee minutes explain the rationale underlying this put option, as follows:

> It was also noted that it would be important for Mr. Georgine to be able to realize value on the shares of stock he owns in order to meet his assignment. Recognizing that ULLICO is not a public market stock a 'Put' option should be included in the document to allow Mr. Georgine the right to submit shares of stock at will, for a price consistent with that established by ULLICO's Executive Committee, or the Board of Directors, pursuant to its responsibilities.

(U 011987, Tab 99) Carabillo further explained that the put option allowed Georgine to put the shares at his discretion to pay taxes resulting from the loan forgiveness. (Carabillo Interview)

Georgine sold the first 8,000 shares released under this agreement on February 14, 2001 at $146.04 per share, although it is unclear whether he gave the required 30 days advance written notice to the Company of his election to exercise the put option. (U 047010, Tab 67) Aside from this minor issue, there is a serious question as to whether the 40,000 share bonus and the corresponding loan granted to Georgine pursuant to the Stock Purchase and Credit Agreement were duly authorized.

First, although the Board on September 22, 1999, approved and authorized a five-year agreement employing Georgine as Chairman, President and CEO, and delegated to the Compensation Committee "full authority to negotiate all terms and conditions of the contract," the Board did not expressly authorize the Compensation Committee to enter into the Stock Purchase and Credit Agreement *in addition to* the five-year Employment Agreement. Nor did the Board authorize the Compensation Committee to issue any stock to Georgine. (U 17383, Tab 53)

Second, the Compensation Committee lacked the authority to issue stock on its own accord and, therefore, could not have issued the 40,000 share bonus to Georgine without express authority from the Board. On February 13, 1999, the Executive Committee appointed the Compensation Committee with "full authority to act on all matters concerning compensation of officers and other employees, including all current and deferred compensation, and including the establishment and administration of all plans, programs, and agreements, *and including the issuance of stock.*" (Emphasis added) (U 17318, Tab 35) Notwithstanding the emphasized phrase, which purports to grant the Compensation Committee authority to issue stock, the by-laws make it clear that "the Executive Committee...*shall not have authority to...issue Stock.*" (Emphasis added) (U 030552, Tab 2) Accordingly, the authority to issue stock delegated by the Executive Committee to the Compensation Committee described above is suspect.

◾ **Employment Agreement Addendum**

In addition to the 8,000 share repurchase discussed above, ULLICO repurchased from Georgine the 8,000 shares he purchased in 1998 and 1999 pursuant to the exclusive director/officer stock offers, 523 Class A shares purchased through the

preferred certificate program as well as 4,345 shares of Capital Stock, all at the $146.04 stock price. ULLICO repurchased 4,000 of these shares on July 20, 2000, and the remainder of these shares on February 14, 2001. (U 047005, Tab 67, U 047010, Tab 67)

In the Fall of 2000, Carabillo discovered that Georgine's October 1, 1999 Employment Agreement (as opposed to the Stock Purchase and Credit Agreement) did not include a put option that would have authorized the July 20, 2000 repurchase. (Carabillo Interview) Accordingly, the July repurchase of 4,000 shares of Georgine's stock necessarily was made pursuant to the "discretionary" program administered by Georgine himself as opposed to his Employment Agreement. (U 039238, Tab 102; U 038451, Tab 103; U 043461, Tab 71) This obviously created a conflict of interest.

Carabillo brought this issue to the attention of the Compensation Committee. (Carabillo Interview) On October 20, 2000, just before the Board approved the 2000 formal stock repurchase program and the "discretionary" repurchase program on November 3, 2000, the Compensation Committee concluded that it was intended that the October 1, 1999 Employment Agreement was to include a put option that would have authorized Georgine's July 20, 2000 redemptions. But, "through an oversight," such put option was inadvertently omitted from Georgine's Employment Agreement. The Compensation Committee then approved an Addendum to Georgine's October 1, 1999 Employment Agreement and explained that the put option in this Addendum was "pursuant to the grant of authority from the Board of Directors." (U 012273, Tab 104) For the reasons previously stated concerning the compensation committee's apparent lack of authority to issue stock or approve the Stock Purchase and Credit Agreement, this explanation is also suspect.

The Addendum is undated, but it is deemed to have modified "the Original Agreement effective retroactively to the Effective Date," *i.e.*, October 1, 1999. (U 006306–07, Tab 105) The put option in the Addendum gave Georgine the right "at any time during or after the Employment Term" to "require, at Employee's election, the Corporation to purchase from Employee, in cash, all or any portion of the Shares [Class A or Capital], and the Corporation shall promptly so purchase such Shares as a purchase price per Share equal to Fair Market Value [*i.e.*, book value]."

On March 6, 2001—after the repurchases discussed above were completed—the Compensation Committee again discussed Georgine's put options and, according to the draft minutes of that meeting (we have not been provided with the final minutes), unanimously approved and ratified the repurchase of all shares Georgine sold to the Company in 2000 and 2001. (U 021067, Tab 74) The Board, however, never expressly ratified the repurchase of Georgine's stock in July 2000 discussed above.

### Legal Analysis

## Fiduciary Duty Law

The Company's 1998 and 1999 stock offers and 2000 stock repurchase programs
resulted in numerous self-interested transactions, *i.e.*, transactions with the Company
in which the directors and officers stood to personally benefit. These transactions
may not be voidable solely on the ground that they were self-interested transactions.
However, under the facts discovered in the investigation, a compelling argument
exists that directors, particularly those who benefited from self-interested
transactions, did not satisfy their fiduciary duties to the Company and its shareholders
in connection with the exclusive stock offers to directors and senior officers in 1998
and 1999 and the formal and "discretionary" repurchase programs in 2000. An
equally forceful argument applies to the principal officers, Georgine and Carabillo,
who were instrumental in creating and implementing the stock offer and repurchase
programs, and who benefited from ULLICO stock transactions.

■ **Interested Director Transactions**

Section 2–419 of the Maryland General Corporate Law ("MGCL") provides that a
transaction is not void or voidable solely because of the presence of an interested
director at the meeting in which the transaction was approved if:

> (a) The fact of the interest is disclosed or known to the board of
> directors and the board of directors authorizes the transaction by the
> affirmative vote of a majority of the disinterested directors even if
> less than a quorum; or

> (b) The fact of the interest is disclosed or known to the stockholders
> and the stockholders, other than stockholders who are interested in
> the transaction, approve the transaction; or

> (c) The contract or transaction is fair and reasonable to the
> corporation.

Maryland law does not require a separate vote of disinterested directors, nor does it
require that a committee of disinterested directors be formed. Moreover, a single
disinterested director may approve a contract or transaction. See James J. Hanks, Jr.,
Maryland Corporation Law § 6.22 (Aspen 2001) ("Hanks"). If a majority of
disinterested and informed directors approves a transaction, then that transaction
cannot be attacked solely on the basis that it is a self-interested transaction.

The Company has identified five potential disinterested directors who voted to
approve the November 3, 2000 Board resolutions. Four of these five directors held no
Class A Stock at the time of this Board meeting (Directors Hurt, Joyce, Miller and
O'Sullivan). But three of these directors held Capital Stock that could have been
repurchased through the "discretionary" program, which the Board approved on
November 3, 2000. Only Director O'Sullivan, who was appointed to the Board in

2000, held no stock, Capital or Class A, as of November 3, 2000. Finally, outside Company counsel have suggested that Chairman Georgine, although he held Class A and Capital Stock, was disinterested because, by virtue of the put rights in his employment agreements, he had no need to participate in either the 2000 formal repurchase program or the "discretionary" program.

While it is questionable whether these five directors were both disinterested and fully informed of the relevant information, Maryland law requires only one fully informed, disinterested director to approve self-interested transactions to invoke the protection of Section 2–419. Outside Company counsel have argued that at least one of these five directors was fully disinterested and fully informed, and that the transactions approved at the November 2000 Board meeting would not be void or voidable on the sole basis that they were self-interested transactions as to other directors.

However, compliance with Section 2–419 in approving self-interested transactions does not satisfy the directors' statutory duties under Maryland law, *i.e.*, that they act in good faith, in a manner they reasonably believe to be in the best interests of the company and with due care in approving the transactions.

## ◼ Statutory Duties Imposed on Directors Under Maryland Law

Certain duties are imposed on the directors of ULLICO, which is a Maryland corporation, as a matter of Maryland law. Section 2–405.1(a) of the MGCL provides that a director shall perform his or her duties:

(1) in good faith;

(2) in a manner he reasonably believes to be in the best interests of the corporation; and

(3) with the care that an ordinarily prudent person in a like position would use under similar circumstances.

MGCL § 2–405.1(a) (2002). The failure by a director to satisfy any one of these statutory standards would constitute a breach of the director's fiduciary duties.

MGCL section 2-405.2, however, allows a Maryland corporation to limit the recovery of damages from officers or directors for certain breaches of fiduciary duty. Pursuant to this statute, ULLICO's Articles of Incorporation were amended on May 24, 1989, to provide that ULLICO's directors and officers, when acting in their capacities as directors or officers, shall not be liable for money damages to the Company or its stockholders except: (1) "to the extent it is proven that they actually received an improper benefit or profit in money, property, or services, for the amount of the benefit or profit in money, property, or services actually received"; or (2) "to the extent that a judgment or other final adjudication adverse to the person is entered in a proceeding based on a finding in the proceeding that the person's action, or failure to act, was the result of active and deliberate dishonesty and was material to the cause of action adjudicated in the proceeding." (U 030377, Tab 113) This

*Privileged and Confidential*

provision of the Articles of Incorporation provides the maximum protection to directors and officers permitted under Maryland law.

Based on MGCL section 2-405.2 and ULLICO's Articles of Incorporation, those directors who did not personally benefit from the transactions at issue would not likely be held liable for money damages to the Company or its stockholders.

- **Subsection 2–405.1(a)(1)—"Good Faith"**

"Good faith," as applied to a director pursuant to subsection 2–405.1(a)(1), is the absence of any desire to obtain a personal benefit or a benefit for some person other than the corporation. See Yost v. Early, 589 A.2d 1291, 1298 (Md. App. 1991). "Good faith is generally synonymous with adherence to what is referred to in other states as the duty of loyalty or the duty of fair dealing." Hanks § 6.6(b).[41] The obligation of good faith includes a duty of candor with the stockholders to reveal to them all facts about important matters involving the corporation. This duty arises in order to provide stockholders with sufficient information to, among other things, decide how to vote in the election of directors and whether to continue to hold their shares or sell them. See Hanks at § 6.6(b).

  - *1998 and 1999 Stock Offers to Directors and Senior Officers*

While the precise business purpose for the 1998 and 1999 stock offers is unclear, the stock offers undoubtedly had the effect of compensating certain of ULLICO's directors and senior officers. The Compensation Committee purportedly approved the 1998 and 1999 stock offers in direct conflict with the Executive Committee resolution stating: "No member of the Committee shall participate in the determination of any matter affecting his own compensation." Moreover, under ULLICO's by-laws, the Compensation Committee was not authorized to issue stock. Therefore, one could make a strong argument that those members of the Compensation Committee who purported to approve the 1998 and 1999 stock offers violated their fiduciary duties to the Company and its shareholders by approving matters outside their authority from which they derived a substantial personal benefit.

  - *2000 Stock Repurchase Program*

On November 3, 2000, the Board approved the 2000 formal stock repurchase program and purported to ratify the "discretionary" stock repurchase program. At that point in time, a majority of the Board members had a specific interest in the repurchase program and benefited from the fact that the formal repurchase program as well as the Chairman's "discretionary" program (which was not generally "advertised") afforded the interested directors the ability to tender 100% of their shares while significantly limiting the sale opportunities available to shareholders owning 10,000 shares or more (other than Georgine).

---

[41] Demonstrating that a director has an interest in a transaction creates a *prima facie* case that the director was not acting in good faith supporting the transaction but is not conclusive on the issue. A director is not required, just because he is director, to forego acting in some other capacity in which he is dealing with the corporation. See Waterfall Farm Sys., Inc. v. Craig, 914 F. Supp. 1213, 1228 (D. Md. 1995).

*Privileged and Confidential*                                                    *Report of the Special Counsel*

Management was not forthcoming in explaining to the Board the purpose or effect of the 10,000 share threshold or the foreseeable impact of the threshold upon the Company's larger shareholders. However, it should have been clear to a director exercising due care that the 2000 formal repurchase program would result in a severe proration to the holders of 10,000 or more Class A shares. It should also have been clear to the directors that any of them who participated in the repurchase program (all of whom but Georgine owned fewer than 10,000 Class A shares) could disproportionately benefit by redeeming 100% of their tendered shares.[42]

The Board's action in approving the 2000 formal repurchase program and the "discretionary" repurchase program administered by the Chairman occurred at a time when ULLICO had eliminated conventional cash and stock dividends, which historically had been as high as 18% per year. The only distributions afforded shareholders were through the formal and "discretionary" repurchase programs, the latter available to only those shareholders who were familiar with it. There was no guarantee that in the future ULLICO would be able to offer future dividends or large formal repurchase programs.

A strong argument exists that those directors who participated in, and disproportionately benefited from, the 2000 formal stock repurchase program did not act in good faith in approving that program. These directors acted to the detriment of ULLICO's larger shareholders who, unlike the directors, would be subject to proration under the program. Moreover, those directors who participated in the "discretionary" repurchase program before November 3, 2000, voted in favor of ratifying these stock repurchases without fully disclosing the transactions to the full Board. As a result, many directors were unaware of all the prior discretionary repurchases that they purportedly ratified at the Board meeting. Likewise, Georgine, who administered the "discretionary" program, may have breached his duty of good faith by failing to fully disclose the benefits received by other directors under the program while, at the same time, asking the Board to ratify the undisclosed transactions.

- **Subsection 2–405.1(a)(2)—"Reasonable Belief" Requirement**

The "reasonable belief" requirement under Maryland law means that there must be some rational basis for a director's action, that the director must have knowledge of that basis when taking such action and that his performance must be based upon that knowledge. See Martin Marietta Corp. v. Bendix Corp., 549 F. Supp. 623, 633–34 (D. Md. 1982). Moreover, directors are required to act in a manner they reasonably believe to be "in the best interests of the corporation," rather than the best interests of

---

[42] The high likelihood that the 2000 repurchase offer would be over-subscribed was apparently well-known. Georgine, in a letter to stockholders on November 21, 2000, in which he summarized the upcoming repurchase offer, stated: "[T]he Company anticipates receiving shares in excess of the $30 million it is offering to repurchase ...." (U 027728, Tab 84)

*Privileged and Confidential*                                        *Report of the Special Counsel*

any particular stockholder or group of stockholders. See Werbowsky v. Collomb, 766 A.2d 123, 133 (Md. App. 2001).[43]

◆   *1998 and 1999 Stock Offers to Directors and Senior Officers*

We have been unable to discern the business purpose for the 1998 and 1999 stock offers to directors and senior officers. Chairman Georgine, in correspondence to directors and senior officers, stated that the purpose of these stock offers was "that management and the board of directors should have their interests in line with the stockholders[.]" Some directors and officers we interviewed postulated additional or different purposes. For example, certain directors stated that they believed the stock offers and repurchases were intended to be a form of director compensation while others viewed the stock offers as an "equity opportunity."

Even if one were to assume that the business purpose for the stock offers was that expressed by Chairman Georgine, the offers were not structured to achieve that purpose. For example, unlike typical director or employee equity awards, the stock offers at issue here—which arguably were made at below fair market value (particularly the stock offers made in December 1999)—contained no vesting conditions or restrictions on the ability of directors and officers to immediately sell stock purchased in the program. In fact, several directors and officers did just that. Of the 86,565 shares purchased by directors and officers in the 1998 and 1999 stock offers, 68,063 shares were repurchased by ULLICO at the $146.04 stock price in 2000 and early 2001.

Therefore, it is unclear to us whether the 1998 and 1999 stock offers had any coherent business purpose and, if so, what that purpose was. At best, the stock offers appear to have been ill-suited to achieve ULLICO's stated objective. The stock offers resulted in only a short-lived alignment of the interests of directors and officers with those of ULLICO's other shareholders since 20 out of 24 directors and officers who purchased stock in 1998 and 1999 (excluding Michael Steed and Mark Maloney) sold most, if not all, of their shares to the Company by 2001, in most cases at $146.04 per share. This ultimately resulted in directors and officers being disproportionately favored over ULLICO's other shareholders in the repurchases made in 2000 and 2001 at the $146.04 per share stock price pursuant to the formal and "discretionary" repurchase programs. The sales by directors and officers in 2000 and 2001 were also contrary to Georgine's statement to the Board at the November 2000 Board meeting, at which the 2000 formal repurchase program and the "discretionary" repurchase program were approved, that ULLICO "is a long-term investment and has been a long-term investment since 1925."

---

[43]  A Maryland corporation has the general power to acquire any of its own stock. MGCL § 2-103(10). In addition, Maryland law provides specific grants of authority in two different sections that allow a corporation to acquire its own shares. See MGCL § 2-309(a) ("If authorized by its board of directors, a corporation may make distributions to its stockholders, subject to any restriction in its charter and the limitations in § 2-311."); id § 2-310(a)(1) ("Subject to the provisions of its charter and § 2-311...if authorized by its board of directors, a corporation may acquire the corporation's own shares.").

*Privileged and Confidential*                                    *Report of the Special Counsel*

◆ *2000 Repurchase Program*

While the stock repurchase program may have been originally designed in 1997 with the "reasonable belief" that the program was in the Company's best interests, the program, as implemented in 2000, worked largely to the benefit of certain directors and executive officers of the Company at the expense of the other shareholders. There does not appear to have been any "rational basis" for this disparate treatment.

In particular, the investigation revealed no rational basis for the Board's action in approving the 2000 formal repurchase program containing the 10,000 share proration threshold. The threshold led directly to a fundamental disparity in the way ULLICO's individual shareholders (mostly officers and directors) and its institutional shareholders (mostly unions and pension funds) were treated under the program. Even ULLICO's own outside counsel noted that the 10,000 share proration threshold was "awfully high" and that a threshold of below 100 shares, known commonly as an odd lot, is standard.[44]

ULLICO's management has put forward two principal reasons for exempting holders of fewer than 10,000 shares from proration in the formal repurchase program. The first is that the threshold was "tax driven." According to management, a 10,000 share demarcation line was needed because a repurchase program that essentially treated all shareholders equally would be viewed as a dividend by the IRS and would affect each shareholder's ability to receive capital gains tax treatment on any profits realized from such shareholder's stock sale.[45] Unions and pension funds, which held a substantial majority of ULLICO's shares, are tax exempt and would have had no interest in this tax-driven motivation. Accordingly, the principal beneficiaries of the proration threshold, from a tax perspective, were the officers and directors who sold their shares. This justification is inconsistent with Chairman Georgine's statement to the Board in 1997 that "the repurchase program…is a means for us to provide liquidity to our *larger stockholders*." (Emphasis added)

Management's second rationale for the 10,000 share threshold was that it was designed to eliminate small shareholders, thereby reducing administrative expenses and avoiding potential reporting requirements under the Securities Exchange Act of 1934 (the "Exchange Act") that would apply if the Company had more than 500 shareholders.[46] This second rationale is also not persuasive and is at odds with the effect of the 1998 and 1999 stock offers, which resulted in more, not fewer, "small" shareholders. Nor was ULLICO particularly close to the 500 shareholder ceiling.

---

[44] The resolution adopted by the Board in connection with the first repurchase program in 1997 provided for a 10 share proration threshold. LeBoeuf Lamb incorporated the same in its first draft, only to change it to 100 shares thereafter. The Company then appears, without Board approval, to have changed the proration threshold to 10,000 shares. Outside counsel in subsequent years suggested the 10,000 share threshold was too high. Indeed, the resolution for the $240 million repurchase program conditionally adopted in May 2000, but later abandoned, provided for a 100 share proration threshold, which is more typical for partial tender offers. Outside counsel then suggested that the $30 million repurchase program adopted by the Board in November 2000 have a 5,000 share proration threshold, which also was rejected by the Company.

[45] The formal tender offer documents warned that even with the 10,000 demarcation line the IRS might still view a repurchase of stock as a dividend.

[46] Companies with assets in excess of $10 million and more than 500 shareholders are required to register their equity securities under Section 12 of the Exchange Act.