*Privileged and Confidential*                                              *Report of the Special Counsel*

Finally, the Company likely could have achieved the same or similar objectives without so disadvantaging ULLICO's large shareholders through other means, such as: (1) using a lower, more reasonable proration threshold; (2) including Capital Stock in the repurchase program; (3) limiting the aggregate number of shares that would be exempted from the proration threshold; or (4) limiting or precluding repurchases from insiders under the proration threshold.

It seems clear that while the precise business purpose for the 1998 and 1999 stock offers is unclear, the stock offers, which arguably were made at below fair market value, undoubtedly had the effect of compensating certain of ULLICO's directors and senior officers. Maryland law allows directors to set their own compensation as long as the compensation is reasonable. See MGCL § 2–419(d)(2)(2002). However, if the true purpose for the 2000 stock repurchase program, as well as the redemptions through the "discretionary" repurchase program in 2000 and 2001, was, as some have suggested, to compensate directors and certain executives, the program still would have lacked sufficient business justification.

According to the 2000 tender offer documents, "the Company's directors and executive officers as a group (33 persons) beneficially owned...approximately *1.3% of the outstanding Shares*." (Emphasis added) Nevertheless, the Company repurchased from directors and senior officers about $13.7 million (*or approximately one-third*) of the approximately $44.6 million of shares repurchased in 2000–01 at the $146.04 share price through the formal and "discretionary" programs. The pre-tax profits realized in 2000 and 2001 by the 16 directors (excluding Georgine) who sold their shares amounted to more than $5.7 million. We are unaware of any legitimate business justification for distributing compensation through this type of transaction as opposed to simply increasing directors' fees or awarding bonuses. In addition, if these stock profits represented compensation to directors, such compensation would not appear to be justified by the limited services they performed for the Company (except perhaps as to those directors who received nominal amounts).[47]

ULLICO's four senior officers who sold stock to the Company during this period collectively received pre-tax profits of approximately $4.9 million. The amounts received by the senior officers as a result of their stock sales also may have been unreasonable under the circumstances, particularly given the fact that these officers were already being directly and substantially compensated for the success of the Global Crossing investment under the Global Incentive Program, the Deferred Compensation Plan and other employee compensation programs.

In sum, if the 2000 stock repurchase program was intended, in part, to compensate directors and officers, that purpose was not adequately disclosed or considered, and the program itself was poorly designed to achieve that purpose in an equitable manner.

---

[47]   For example, Bernard's pre-tax profit was $1,329,620; West's pre-tax profit was $989,060; Casstevens's pre-tax profit was at least $809,628; and Joseph Maloney's pre-tax profit was $418,880. In contrast, Brown's pre-tax profit was $4,605.

*Privileged and Confidential*                                      *Report of the Special Counsel*

- **Subsection 2–405.1(a)(3)—"Ordinarily Prudent Person"**

Section 2–405.1(a)(3) of the MGCL requires a director to act with the same care that an "ordinarily prudent person" would act in a "like position under similar circumstances." The principal focus of § 2–405.1(a)(3) regarding directors executing their duties as a reasonably prudent person is on "the process by which the decision is made, not the wisdom of the decision or the results." Hanks § 6.6(b). While the process by which a director makes his decision will necessarily vary with the significance, complexity and other aspects of the decision, as a general rule, board members should have available to them all information material to the decision and should have some opportunity to ask questions of management and to meet and evaluate the matter with other directors and management.

While section 2-405.1(a)(3) appears to impose an ordinary negligence standard, Maryland courts to date have continued to require proof of gross negligence as the basis for recovery against directors for a breach of the "ordinarily prudent person" standard. See Billman v. Maryland Deposit Ins. Fund Corp., 593 A.2d 684, 697 (Md. App. 1991); Mountain Manor Realty, Inc. v. Buccheri, 461 A.2d 45, 50 (Md. App. 1983) (general rule is that court will not interfere with proper exercise of business judgment by board unless plaintiff presents evidence of gross or culpable negligence).

- *1998 and 1999 Stock Offers to Directors and Senior Officers*

The approval of the stock offers involved an excessive, and perhaps impermissible, delegation of authority by the Board. The Compensation Committee purported to approve the stock offers but, as discussed earlier, may not have been authorized to do so under ULLICO's by-laws. Moreover, the Compensation Committee did not impose nor, as far as we could determine, consider any reasonable conditions on the terms of the stock offers, including the timing of the stock offers. Instead, the Compensation Committee delegated this discretion solely to Chairman Georgine. Finally, based on ULLICO's corporate records, it does not appear as if the approval of the stock offers by the Compensation Committee or the participation by directors and officers in the stock offer program was reported to ULLICO's Board or Executive Committee.

In light of questions raised regarding the Compensation Committee's authority to approve the 1998 and 1999 stock offers, certain members of the Company's management and others have suggested that the authority for the stock offers may have come from a resolution of the Board adopted at its May 6, 1997 meeting. Pursuant to this resolution, the Board purported to authorize Georgine "in his sole discretion to offer shares of the Corporation's Stock that have been repurchased and returned to the status of authorized, but unissued shares[.]" (U 000030, Tab 12) It could be argued that, in effect, the Board properly delegated its authority to issue stock to a Board committee, consisting solely of Georgine.

*Privileged and Confidential*                                                    *Report of the Special Counsel*

Under MGCL Section 2-411, a board of directors may delegate to a committee composed of one or more directors the power to issue stock if the board has "establish[ed] a method or procedure for determining the maximum number of shares to be issued." Here, the Board established no "method or procedure" for determining the maximum number of shares to be issued, other than to restrict Georgine from issuing more stock than the Company had repurchased. Given that, under the "discretionary" repurchase program, Georgine had sole discretion to repurchase shares from time-to-time, one could argue that there was no meaningful restriction on his authority to issue stock and, therefore, no "method or procedure" for determining the maximum number of shares to be issued.

Moreover, the Board's authorization did not set any parameters regarding the procedure for offering the stock, the price at which the stock was to be offered, the amount of stock to be offered or when or to whom the stock would be offered. Even assuming the Board's delegation was permissible under MGCL Section 2-411, which is unclear, it is doubtful that such a wholesale delegation of authority by the Board was intended. If the Board did intend such a wholesale delegation of authority, it is questionable whether such delegation was consistent with the directors' duty of due care. As provided in Section 2-411(d) of the MGCL, "the appointment of a Committee, the delegation of authority to it, or action by it under that authority does not constitute, of itself, compliance by any director, not a member of the committee, with [his or her fiduciary duties] under §2-405.1[.]"

- ◆ *2000 Stock Repurchase Programs*

Certain directors similarly may have failed to exercise due care in approving the formal and "discretionary" repurchase programs in 2000. Based on our review of corporate records and interviews with directors, there appears to have been little meaningful discussion regarding the terms of the formal repurchase program in 2000. In fact, most directors were unable to articulate a clear justification for the 10,000 share threshold, other than the fact that the same threshold had been used in the previous years. Although a few directors viewed the 10,000 share threshold as a means to compensate directors, this purpose, as far as we could tell, was never discussed at the Board meeting.

In our view, an "ordinarily prudent person" should have realized that the 10,000 share proration threshold, when combined with the 2% Rule, would have resulted in severe proration to the shareholders holding 10,000 or more shares. At a minimum, a prudent director should have at least requested information from management regarding the impact of these components of the 2000 repurchase program on the directors and the shareholders as a whole. Directors should have inquired into how much stock was owned by individual directors and officers and, therefore, how much stock would be eligible to be resold in the repurchase program without proration. Likewise, before ratifying the "discretionary" program, directors should have made themselves aware of all stock repurchases from insiders under that program.

*Privileged and Confidential*

Certain directors commented to us that if they had been aware of the severe proration that would result in the 2000 repurchase program or the insider repurchases under the "discretionary" program, they would not have voted to approve the programs. A strong argument exists that the formal repurchase program, at least as structured and implemented in 2000, was not in the best interests of the Company's shareholders. It appears that due care was not exercised by the directors in approving the programs at issue, particularly those directors who participated in these programs and were, therefore, well aware of the programs' benefits to insiders. That is, it is questionable whether the directors adequately informed themselves prior to approving the 2000 formal repurchase and "discretionary" programs.

- **Business Judgment Rule**

The business judgment rule creates the presumption that in making business decisions, the directors of a Maryland corporation have acted in accordance with the fiduciary duties imposed by Section 2-405.1(a). See Yost v. Early, 589 A.2d 1291, 1298 (Md. App. 1991); MGCL § 2-405.1(e). The effect of the business judgment rule under Maryland law is to place upon the person attacking the directors' action the burden of proving, prior to any further inquiry, lack of good faith or an informed basis for the decision. Once sufficient evidence is presented to rebut the presumption, the burden of proof is on the directors to present evidence that they satisfied their fiduciary duties. See Hanks at § 6.8.

Under the facts of this case, it cannot be said with any reasonable degree of certainty that the business judgment rule would protect the actions of those directors who benefited from the programs at issue. There is a greater likelihood that those directors at the time of the November 3, 2000 Board meeting who did not profit from the stock offer and repurchase programs would be deemed to have satisfied their fiduciary duties by virtue of the presumption under the business judgment rule. These directors include Directors Biller, Coia, Hanley, Hurt, Joyce, Kruse, Miller, O'Sullivan, Sombrotto, Sweeney, Upshaw and Wilhelm.

## ■ Fiduciary Duties Imposed on Officers Under Maryland Law

While there is no statutory standard of conduct for corporate officers under Maryland law, officers are subject to general agency principles. See Hanks at § 6.19. Under Maryland law, an officer, as an agent of the corporation, owes the corporation duties of loyalty, obedience and care. See Ins. Co. of N. Am. v. Miller, 765 A.2d 587, 596–98 (Md. App. 2001). A corporation acts under the supervision and direction of its board of directors. Implicit in an officer's duties of loyalty and care is the obligation of the officer to disclose to the board all information in his possession that is required by the members of the board to perform their corporate responsibilities. See id. at 597; Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc., 389 A.2d 887, 903 (Md. 1978) (quoting Herring v. Offutt, 295 A.2d 876, 879 (1972)) (recognizing duty of fiduciary "to make full disclosure of all known information that is significant and material to the affairs" of the fiduciary relationship); see also Hanks § 6.19. Unlike

with directors, it is unclear whether officers can invoke the protection of the business judgment rule. That is, there may not be a presumption that officers acted in a manner consistent with their fiduciary duties.

The obligation of an officer to disclose information is heightened when the officer has an interest that conflicts with the interests of the corporation or its shareholders. When faced with a conflict of interest, an officer is required to disclose the conflict prior to acting on behalf of the corporation. The taking of any action by an officer prior to such disclosure would constitute a breach of such officer's duties of loyalty and care. See Ins. Co. of N. Am., 765 A.2d at 597 (citing RESTATEMENT (SECOND) OF AGENCY § 389 (1958)).

Georgine and Carabillo were heavily involved in the formulation and implementation of the 1998 and 1999 stock offers, the formal stock repurchase program and the "discretionary" stock repurchase program. In fact, Georgine exercised almost unfettered discretion in administering the "discretionary" repurchase program, and the Compensation Committee granted Georgine the discretion to determine the timing of the stock offers. Carabillo, as ULLICO's Chief Legal Officer, assisted and provided legal advice to Georgine in connection with these matters. The terms of the repurchase program (including the 10,000 share threshold) were ultimately approved by the Board and/or the Executive Committee in the form presented by management.

Notwithstanding their significant involvement in the stock offer and repurchase programs, certain officers of ULLICO, principally Georgine and Carabillo, failed to adequately disclose to the Board their personal interests in these programs. Nor did they disclose to the Board the extent to which they personally benefited from ULLICO stock transactions. In fact, our investigation revealed that senior management engaged in a concerted effort to withhold executive compensation information from the Board, including compensation received indirectly from the stock offer and repurchase programs.

In the course of our investigation, we found several instances where the Board was asked to act without receiving all relevant information. For example, in November 2000, the Board was asked to ratify various stock repurchases under the "discretionary" program without being informed that a substantial portion of the repurchases had been made from directors and officers. To the contrary, the Chairman emphasized at the Board meeting that ULLICO "is a long-term investment and has been a long-term investment since 1925." The Board was also not informed of the reasons for, or the impact of, certain terms of the programs it was asked to approve, including the 10,000 share proration threshold in the formal repurchase program. Finally, management had access to detailed information concerning participation in the stock offer and repurchase programs and was aware of the disparate treatment between under-10,000 Class A shareholders (primarily officers and directors) and the remaining Class A and B shareholders (primarily unions and pension funds). This information was not fully shared with the Board members.

Had management made adequate and complete disclosure of all relevant information regarding the stock offer and repurchase programs to the Board, including their personal interests in these programs, it is possible that the Board and its committees would have acted differently. In fact, several directors told us that they might not have voted to approve these programs had they been aware of the extent to which certain insiders profited from such programs at the expense of the other shareholders.

### ■ Fiduciary Duties Under the Federal Labor Laws

Fiduciary duties similar to those imposed by Maryland law which may be applicable to self-interested transactions involving officers and directors may also arise under the Federal Labor-Management Disclosure and Reporting Procedure Act ("LMDRA") (29 U.S.C. § 501 *et seq.*) and the Employment Retirement Income Security Act ("ERISA") (29 U.S.C. § 1100 *et seq.*). These statutes impose fiduciary duties upon individual directors who may be officers of unions or trustees of pension funds who are ULLICO shareholders. These duties are similar to the statutory and fiduciary duties discussed above. However, outside Company counsel have advised the Special Counsel that the Special Counsel's mandate does not extend to the consideration of the applicability of these statutes to the conduct by individual directors because of the union or pension fund positions that they hold. Therefore, we have not analyzed these issues.

ULLICO provides pension fund administrative services. The Company has advised us that it does not make any investment decisions for, and therefore has no fiduciary duties under ERISA to, the pension funds for which it provides administrative services. Finally, ULLICO makes investment decisions for its own pension fund. ERISA fiduciary obligations exist in connection with acts by ULLICO's pension trustees (including Georgine and Carabillo) who also were heavily involved in the formulation and implementation of the repurchase programs. However, outside Company counsel have advised the Special Counsel that the Special Counsel's mandate does not extend to the consideration of the applicability of ERISA to the conduct by ULLICO pension fund trustees. Therefore, we have not analyzed these issues.

## Securities Law

### ■ General

As part of our investigation, we evaluated the impact of the Company's actions through its officers and directors under applicable federal securities laws, including the general anti-fraud provisions of the Exchange Act as set forth in Section 10(b) and Rule 10b–5 and, in connection with tender offers, as set forth in Section 14(e) and the rules promulgated thereunder. We have also considered the applicability of the anti-fraud provisions of state securities, or "Blue Sky," laws. A brief discussion of potential liability issues under Blue Sky laws is included at the end of this section.

Rule 10b–5(b) proscribes, in connection with the purchase or sale of a security where interstate commerce or the mails are used, the making of "any untrue statement of material fact or…[omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Rule 10b–5 also prohibits a "device, scheme or artifice to defraud" under subsection (a) thereof and, under subsection (c), any act, practice or course of business which acts as a "fraud or deceit" upon any person.[48]

Section 14(e) is a component of the Williams Act provisions regulating tender offers. Section 14(e) provides that: "It shall be unlawful for any person…to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer."

Section 14(e) also delegated to the SEC rulemaking authority to prescribe "means reasonably designed to prevent such acts and practices as are fraudulent, deceptive, or manipulative."[49] Section 14(e) is a "broad antifraud prohibition" that was modeled on the antifraud provisions of Section 10(b) and Rule 10b–5. It supplements the more precise disclosure provisions found elsewhere in the Williams Act while requiring disclosure "more explicitly addressed to the tender offer context than that required by Section 10(b)."[50] In addition, it has been interpreted as indicating Congressional intent "to assure basic honesty and fair dealing" in connection with tender offers.[51]

People who control primary violators may also be liable for violations of Section 10(b), Section 14(e) or the rules promulgated thereunder.[52]

---

[48]  To establish liability under Section 10(b) of the Exchange Act and under Rule 10b-5, subsection (b), a plaintiff must show that "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." Phillips v. LCI Int'l, Inc., 190 F.3d 609, 613 (4th Cir. 1999). Federal courts in D.C. impose an identical standard. See IDT Corp. v. eGlobe Inc., 140 F. Supp. 2d 30, 32-33 (D.D.C. 2001). Scienter in this context means "an intent to deceive or defraud." See Media Gen., Inc. v. Tomlin, 2001 U.S. Dist. LEXIS 11712, at *12 (D.D.C. Aug. 9, 2001).

In addition to the "misrepresentation or omission" prongs of 10b-5, the Rule also imposes liability for "any device, scheme or artifice to defraud" (Rule 10b-5(a)) or any other "act, practice or course of business" that "operates…as a fraud or deceit." Rule 10b-5(c). Subsections (a) and (c) arguably do not require a misrepresentation or omission. See Affiliated Ute Citizens of the State of Utah v. United States, 406 U.S. 128, 152-53 (1972) ("To be sure, the second subparagraph of [Rule 10b-5] specifies the making of an untrue statement of a material fact and the omission to state a material fact. The first and third paragraphs are not so restricted."); see also Shores v. Sklar, 647 F.2d 462, 469-70 (5th Cir. 1981); Ross v. Bank South, N.A., 885 F.2d 723, 729-30 n.10 (11th Cir. 1989) (following Shores but noting that scienter requirement met by showing of "severe recklessness"). In Santa Fe Indus., Inc. v. Green, 430 U.S. 462 (1977), the Court determined that 10b-5 was not violated in the absence of any "deception, misrepresentation or nondisclosure," lending support to the argument that "deception" could occur, even in the absence of a misrepresentation or nondisclosure. Id. at 476. In two recent Supreme Court decisions on Rule 10b-5, the Court emphasizes that Rule 10b-5 should be broadly interpreted to meet its remedial purposes. See S.E.C. v. Zandford, 122 S. Ct. 1899 (2002); Wharf Ltd. v. United Int'l Holdings, Inc., 532 U.S. 588 (2001).

[49]  15 U.S.C. 78n(e) (1994). LeBoeuf Lamb provided a detailed memorandum to ULLICO discussing the rules and requirements of Section 14(e) on March 27, 1997.

[50]  Schreiber v. Burlington Northern, Inc., 472 U.S. 1, 10-11 (1985) (citations omitted).

[51]  Macfadden Holdings, Inc. v. JB Acquisition Corp., 802 F.2d 62, 66 (2d Cir. 1986).

[52]  Section 20(a) provides: "Every person who, directly or indirectly, controls any person liable under any provision of this Act or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

*Privileged and Confidential*

To prove a violation of Section 10(b) or Section 14(e), the alleged wrongdoer needs to have acted with extreme or severe recklessness. In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1, 19 (D.D.C. 2000) (finding scienter based on allegations of extreme recklessness). In Baan, the district court stated that scienter can be found based on "facts that constitute circumstantial evidence of either reckless or conscious behavior…A reckless statement is one involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendants or is so obvious that the actor must have been aware of it." Baan, 103 F. Supp. 2d at 20–21; see also Chris-Craft Indus. Inc. v. Piper Aircraft Corp., 480 F.2d 341, 343 (2d Cir. 1973) ("In determining whether 14(e) violations were committed…we shall follow the principles developed under Rule 10b-5 regarding the elements of such violations.").[53]

■ **Disclosure Issues**

In 1997, the cash dividend paid to shareholders was substantially reduced from 8% to 2% and eliminated totally by 1999. The only method for distributions to most shareholders was the formal repurchase program and, to those shareholders who were aware of it, the "discretionary" repurchase program administered by the Chairman. In 1998 and 1999, during the time ULLICO's shareholder's equity was increasing because of the success of the Global Crossing investment, directors and officers *only* were allowed to purchase more shares.

There was little or no investment risk associated with the purchase of these shares because of the timing of the purchases and the manner in which ULLICO set its yearly share price, which did not timely account for this increase in stockholders' equity. These same directors and officers were allowed to sell their shares back to ULLICO at the highest possible price ($146.04) in 2000 and early 2001 due to the following factors: (1) all but one of the directors' and officers' holdings were below the 10,000 share proration threshold, allowing them to redeem 100% of their tendered shares in the formal repurchase program; (2) the discretionary authority of the Chairman to redeem shares in his discretion and, in the case of the officers and directors, included all that they tendered; and (3) the put options under Georgine's employment agreements.

The directors who participated in the Company's repurchase programs voted to approve the formal repurchase program and ratify the "discretionary" repurchase program at the November 3, 2000 Board meeting, except for three directors who benefited but did not attend that meeting. Those three directors nonetheless were

---

[53] There is no private right of action for aider and abettor liability for a 10b-5 violation, although the SEC can pursue the same under Section 17 of the Act. See Newcome v. Esrey, 862 F.2d 1099 (4th Cir. 1988). Also, mere breaches of fiduciary duty, not constituting deception or manipulation, do not violate Section 10(b) and Rule 10b-5. See Santa Fe Indus. v. Green, 430 U.S. 462 (1977). In a suit brought under Rule 10b-5, "the plaintiff must show both 'loss causation—that the misrepresentations or omissions caused the economic harm—and transaction causation—that the violations in question caused the [plaintiff] to engage in the transaction in question." Bennett v. United States Trust Co., 770 F.2d 308, 313 (2d Cir. 1985). A direct or proximate relationship between the loss and the misrepresentation must be shown. See id. at 314.

aware, or should have been aware, of the resolution effectuating the programs in which they participated, and they did not object to their implementation or otherwise disclose to the Board their interests in the approved transaction.

The Company's two principal officers, Georgine and Carabillo, were instrumental in the design of the repurchase programs, and were directly responsible for their implementation and the disclosures made to the Board and the Company's shareholders. When announcing the 2000 formal repurchase program to the shareholders in a letter dated November 21, 2000, Chairman Georgine stated that all shareholders would "share equitably in the offering." After reviewing relevant transactions, it is clear that they did not. In fact, holders of fewer than 10,000 shares who participated in the repurchase programs (primarily directors and officers) were treated significantly better than ULLICO's other shareholders.

The disclosure documents delivered in connection with the formal repurchase program arguably contained material misstatements or omissions in violation of the disclosure requirements of Rule 10b–5 and Section 14(e) of the Exchange Act. Under these provisions, a statement or omission is material if "there is a substantial likelihood that a reasonable investor would consider it important [in making an investment decision.]" Put another way, there must be a substantial likelihood that the disclosure of the information "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[54]

The disclosure documents used under the formal repurchase program prior to 2001 did not disclose the individual stock ownership of directors and officers, nor the July 1998 or December 1999 exclusive stock offers. The documents did not disclose the 40,000 share stock bonus afforded Chairman Georgine in 1999 and financed by ULLICO, nor the existence of Georgine's put rights under his employment agreements. The documents did not disclose the existence of the "discretionary" repurchase program administered by the Chairman or the fact that directors and officers sold a significant number of shares pursuant to this program in 2000 at the $146.04 per share price. The repurchase offer documents also did not clearly disclose the potential impact of the repurchase program's proration provisions, which were particularly significant in 2000 and 2001. Nor did they clearly disclose how these proration provisions benefited directors and officers. Arguably, these disclosures would have been material to the decision by shareholders to participate in the repurchase offers.

The possible inadequacy of ULLICO's repurchase offer disclosure is most apparent in the case of the 2000 repurchase program, given the stock issuances to ULLICO's directors and officers in 1998 and 1999 and the substantial stock repurchases by ULLICO at $146.04 per share in 2000, much of which occurred prior to the commencement of the formal repurchase program. Moreover, it was or should have been apparent to the directors and the principal officers of ULLICO that the 2% Rule

---

[54]  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).

*Privileged and Confidential*                                    *Report of the Special Counsel*

in the 2000 program, together with the record-high share price, would result in severe proration to holders of 10,000 or more shares. In our view, this impact was foreseeable and should have been better disclosed. As to the Chairman's "discretionary" repurchase program, he personally advised the Board at the November 3, 2000 meeting that it was *not* a program which he "advertised." In fact, the tender offer disclosure documents did not disclose the existence of the "discretionary" repurchase programs or any repurchases thereunder, including repurchases from insiders, other than possible repurchases of Capital Stock upon the death of a shareholder.

The repurchase offer disclosure documents may not have only failed to provide sufficient disclosure regarding the purchase and sale of stock by directors and officers, but they also may have contained specific disclosures that were arguably misleading, at least in the 2000 formal repurchase program. For example, the disclosure documents in each year stated that ULLICO "has not been advised that any of its directors and executive officers presently intend[s] to tender any shares personally owned by them pursuant to the Offer." In fact, according to witness accounts, ULLICO never asked directors or officers whether or not they intended to participate in the formal tender offers, raising a question as to whether ULLICO had any basis for making this disclosure.

Again, this is particularly true in 2000, when several officers and directors did participate in the formal repurchase program and tendered a significant number of shares pursuant to the "discretionary" repurchase program and, in the case of Chairman Georgine, his employment agreements. During 2000 and early 2001, ULLICO repurchased approximately $13.7 million of stock from directors and officers at a price of $146.04 per share, pursuant to the formal and "discretionary" repurchase programs and the Georgine employment agreements, both before and after the tender offer was made. None of these repurchases were clearly disclosed to shareholders.

The 2000 tender offer disclosure documents also stated, as did the tender offer documents used in prior years, that ULLICO and its Board of Directors believed the shares to be an "excellent investment opportunity for investors seeking long-term growth of capital."[55] Chairman Georgine made similar statements to directors and shareholders in correspondence relating to stock purchases as well as at Board meetings. It is difficult, however, to reconcile these statements, at least those made in 2000, with the fact that officers and directors (including Chairman Georgine) were, at the same time these statements were being made, selling a substantial amount of ULLICO shares. In light of these statements, it is unclear how the disclosure of repurchases by ULLICO from directors and officers would not have been viewed as material to a shareholder's decision to participate in the formal repurchase program.

---

[55] It is interesting to note that this statement was deleted from the 2001 repurchase offer.

*Privileged and Confidential*                                          *Report of the Special Counsel*

During the period between 1997 and 2001, the only director and officer stock transactions that were specifically disclosed in the tender offer documents were the purchases by directors and officers in the Fall of 1998. The purchases made in the Summer of 1998 and the Winter of 1999 were never clearly disclosed to shareholders, nor were any repurchases from directors or officers pursuant to the formal or "discretionary" repurchase programs or the Georgine employment agreements.

The apparent rationale for not disclosing these transactions was that they fell outside a "40 business day" standard used in the disclosure documents. The tender offer disclosure documents contained disclosure stating that "based upon ULLICO's records and upon information provided to ULLICO by its directors and executive officers, neither ULLICO nor any of its subsidiaries nor, to the best of ULLICO's knowledge, any of the directors or officers of ULLICO,...has effected any transactions in ULLICO's shares during the 40 business days prior to the date [of the relevant disclosure document]."

We have been unable to ascertain precisely why ULLICO used a "40 business day" cut-off in determining its disclosure obligation. However, an outside attorney for ULLICO indicated that it may have been used by analogy to a specific disclosure rule applicable to public company tender offers. However, this specific disclosure requirement should not have superseded the general disclosure requirement under Rule 10b–5 and Section 14(e), which prohibits the making of "any untrue statement of material fact or...[omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, *not misleading*." (Emphasis added.)

Information regarding purchases and repurchases from directors and officers that was omitted from the tender offer disclosure documents arguably could have been material to the investment decision being asked of ULLICO's shareholders. The information may also have led certain shareholders to oppose, or seek to enjoin, the formal repurchase program. Moreover, ULLICO may have made matters worse by providing limited disclosure to the effect that no stock transactions had occurred within the preceding "40 business days." While literally true, this disclosure, in the context of the other disclosures in the tender offer documents, arguably created a misleading impression that ULLICO's officers and directors were not actively engaged in the sale of Company stock.

Finally, the tender offer disclosure documents did not contain any information regarding executive compensation, nor was executive compensation information (including information regarding the Georgine employment agreements) available to shareholders from any other source. In fact, in the course of our investigation, we found substantial evidence that ULLICO management engaged in a concerted effort

to withhold executive compensation information from members of ULLICO's Board of Directors and its shareholders.[56]

There is a plausible argument that compensation information regarding ULLICO's executives would not have been material to ULLICO's shareholders in making their decisions as to whether to participate in the formal repurchase program and, therefore, disclosure was not required. Moreover, executive compensation disclosure is generally not included in tender offer disclosure documents for public companies (although the information is always available through another publicly-available filing). However, where, as here, a substantial amount of the benefits received by ULLICO's senior officers and directors (particularly Chairman Georgine) was in the form of stock issued and repurchased by ULLICO pursuant to transactions and agreements that were not otherwise disclosed, one could take the position that some disclosure of executive financial benefits should have been made, particularly in 2000 and 2001 when the bulk of the stock repurchases from management occurred.

Another disclosure issue in connection with ULLICO's tender offer documents involves its recommendation with respect to the offer. Rule 14e–2 under the Exchange Act provides that the subject company of a tender offer must, within 10 business days from the dissemination of the tender offer, make a statement to its shareholders that it: (1) recommends acceptance of the offer; (2) recommends rejection of the offer; (3) is remaining neutral; or (4) is unable to take a position.[57] ULLICO facially complied with this rule by including in the tender offer disclosure documents a statement that "neither the Company nor its Board of Directors makes any recommendation as to whether any shareholder should tender any or all such shareholder's shares pursuant to the offer."[58]

However, as previously discussed, the 2000 repurchase offer disclosure document also stated that ULLICO and its Board of Directors believed that the shares represented "an excellent investment opportunity for investors seeking long-term growth of capital" and that ULLICO "had not been advised that any of its directors and officers intended to tender any shares pursuant to the offer." Despite possible technical compliance with Rule 14e–2, it is difficult to reconcile the disclosure contained in ULLICO's repurchase documents with the actions of ULLICO's directors and officers, particularly in 2000.

In 2000, at the same time that ULLICO took a neutral position with respect to the repurchase offer, denied knowledge of any intention by the directors and officers to participate in the repurchase offer, and endorsed the shares of ULLICO as an excellent long-term investment opportunity, ULLICO management was aware that

---

[56] In a memorandum dated December 14, 1995, Dennis Lyons of Arnold & Porter advised the Company that some authorities had contended that under state corporate law a corporation that solicits proxies for an annual meeting, even though not subject to the SEC proxy rules, has an obligation to make available to the Company's shareholders information regarding the Company's senior management, including compensation information.

[57] See Rule 14e–2.

[58] This statement is taken from the ULLICO Offer to Purchase dated December 14, 2000. There are similar statements in each year's repurchase offer disclosure document.

*Privileged and Confidential*

several directors and officers were selling a substantial number of shares pursuant to a "discretionary" repurchase program and, in the case of Georgine, his employment agreements.

While the disclosure in ULLICO's repurchase offer documents clearly could have been better, reasonable persons could disagree over whether the disclosure deficiencies are actionable. For example, while ULLICO did not disclose in the 2000 repurchase offer disclosure documents that all directors and executive officers (other than Georgine) owned fewer than 10,000 shares and, therefore, would benefit from the proration threshold, ULLICO's proxy materials, distributed several months earlier, did disclose individual director share ownership. Similarly, a very conscientious shareholder could have compared annual proxy materials between 1998 and 2001 and inferred that the Company was issuing and repurchasing stock from insiders. Moreover, the impact of the Global Crossing investment on the Company's shareholders' equity (and book value per share) was discussed in the Company's disclosure documents and a reasonable investor would likely have concluded in 2000, based on the disclosure provided and information generally available, that it was a good time to sell ULLICO stock. Therefore, one could conclude that the disclosure inadequacies, while significant, should not give rise to a claim under Rule 10b-5 or Section 14(e) of the Exchange Act. There also is an argument that even if material, the disclosure deficiencies were not the primary cause of any harm suffered by ULLICO's larger shareholders.

■ **Deceptive Acts or Practices Issues**

As discussed above, Rule 10b–5 prohibits any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce…from (a) employing "any device, scheme, or artifice to defraud"… or (c) engaging in "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," in connection with the purchase or sale of any security. In addition, Section 14(e) prohibits a person from engaging in any "fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer."[59] Section 14(e) also delegates to the SEC rulemaking authority to prescribe "means reasonably designed to prevent" such acts and practices as are "fraudulent, deceptive or manipulative."[60]

Arguably, the stock issuances in 1998 and 1999 and the subsequent repurchases pursuant to the formal and "discretionary" repurchase programs constituted deceptive or manipulative acts or practices in violation of Rule 10b–5(a) and (c) and Section 14(e). A central element of the formal repurchase program is that it has treated holders of fewer than 10,000 shares in a significantly different manner than ULLICO's other shareholders. In addition, there is evidence that in the

---

[59]    United States v. O'Hagan, 521 U.S. 642, 667, 673 (1997).

[60]    The Supreme Court has interpreted this phrase to authorize SEC prohibition not only of the "core" activity, namely fraud, but also of sufficiently related activity that, although not necessarily fraudulent, nonetheless falls within the prophylactic scope of a rule "reasonably designed" to prevent the core activity (such as deceptive or manipulative acts or practices). Id.

*Privileged and Confidential*                                    *Report of the Special Counsel*

"discretionary" repurchase program, smaller shareholders (principally directors and officers) were treated preferentially. As discussed earlier, we have not been able to discern the precise business purpose or basis for distinguishing between smaller shareholders (principally directors and officers) and ULLICO's other shareholders under the formal and "discretionary" repurchase programs in such a significant manner.

In particular, it is unclear why ULLICO adopted and retained the 10,000 share proration threshold in the 2000 repurchase program. Although certain of ULLICO's directors and officers have offered explanations for the threshold, none appears compelling and it should have been apparent, particularly in 2000, that the threshold would result in a dramatic disparity in the treatment of ULLICO's shareholders under the formal repurchase program. Both LeBoeuf Lamb and Arnold & Porter questioned the appropriateness of this 10,000 share threshold, but these concerns apparently were ignored.[61]

In addition, one could argue that the stock purchases made by the directors and officers in 1999 (and perhaps in 1998) violated Rule 14e–3. Rule 14e–3 was adopted in an effort to regulate insider and tippee trading in the tender offer context.[62] In United States. v. O'Hagan,[63] the Supreme Court approved Rule 14e–3 as a preventative rule designed to prevent violations of Section 14(e). Rule 14e–3(a) is triggered if any person has taken a "substantial step" to commence a tender offer. This rule applies both before and after a tender offer has commenced and, indeed, even if a tender offer never commences as long as a substantial step has been taken.[64]

Under Rule 14e–3, once a company has taken a "substantial step" to commence a tender offer, it is illegal for those who possess material information regarding the

---

[61] Although ULLICO is not a public company, by way of comparison, its proration provisions would not have complied with the rules governing tender offers for public companies. Rule 13e–4 of the Exchange Act governs tender offers by public companies of their own equity securities (so-called "issuer tender offers"). Under the Rule, in a situation where an issuer is making a tender offer for less than all of the outstanding securities of any class, if the offer is over-subscribed, the issuer must purchase those securities tendered on a pro-rata basis. A limited exception to this rule is for holders of fewer than 100 shares of a security (an "odd-lot") who may sell all of their securities without proration. This practice is often used to eliminate "odd lot" owners of a security.

[62] Rule 14e-3(a) provides in pertinent part:

If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the "offering person"), it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of Section 14(e) of the [1934] Act for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from:

(1) The offering person,

(2) The issuer of the securities sought or to be sought by such tender offer, or

(3) Any officer, director, partner or employee or any other person acting on behalf of the offering person or such issuer,

to purchase or sell or cause to be purchased or sold any of such securities or any securities convertible into or exchangeable for any such securities or any option or right to obtain or to dispose of any of the foregoing securities, unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed by press release or otherwise.

[63] 521 U.S. at 672-73.

[64] See SEC v. Mayhew, 121 F.3d 44, 53 (2d Cir. 1997) (citing SEC v. Maio, 51 F.3d 623 (7th Cir. 1995) (meeting of officials "much more serious than any previous discussion between the parties" satisfies substantial step requirement); SEC v. Musella, 578 F. Supp. 425, 443 (S.D.N.Y. 1984) (retaining law firm before tender offer is substantial step); Camelot Indus. Corp. v. Vista Res., Inc., 535 F. Supp. 1174, 1183 (S.D.N.Y. 1982) (meeting between officers is a substantial step)).

*Privileged and Confidential*                                    *Report of the Special Counsel*

tender offer to purchase or sell securities of that company prior to the time the tender offer is publicly disclosed. Although we have not identified a reported case in which Rule 14e–3 was applied in a similar context, it could be argued that the purchases of stock by directors and officers in 1998 and 1999 violated Rule 14e–3(a).

The 1999 purchases, in particular, were completed on December 29, 1999, pursuant to offers made by Chairman Georgine on December 17, 1999. The purchases were effected at the price per share established by ULLICO's Board of Directors in May 1999 based on the book value per share as of December 31, 1998. Accordingly, the purchase price for the shares offered in December 1999 was based on financial information that was almost one-year old. During this one-year period, the price of Global Crossing stock had, on a split-adjusted basis, more than doubled.

ULLICO's stockholders' equity experienced an even greater increase during the course of 1999. ULLICO's stockholders' equity increased by nearly 90% from December 31, 1998 to June 30, 1999 and by an additional 40% from June 30, 1999 to the end of the year, largely based on unrealized gains from ULLICO's investment in Global Crossing. Moreover, based on our investigation, it is quite clear that, at the time, management was aware of the significant increase in the value of this investment and its corresponding effect on the book value of ULLICO's stock.

At the time of the December 1999 stock purchases by officers and directors, it is likely that ULLICO had already taken "substantial steps" to commence the 2000 tender offer, as such term has been interpreted under Rule 14e–3. The Board approved an 11-year $180 million repurchase program in 1997. While the terms of each specific tender offer were thereafter approved annually by the Board, the repurchase program was a long-term program designed to replace cash dividends as the principal means of making distributions to ULLICO's shareholders, and ULLICO never significantly deviated from the program (other than the proposed "extraordinary" program adopted in May 2000 that was later abandoned). In fact, the terms of the program, including the manner in which ULLICO's shares were valued and the 10,000 share proration threshold, remained very consistent between 1997 and 2001, and we found no evidence that either ULLICO's management or Board of Directors considered abandoning or significantly altering (other than with respect to size) the repurchase program during this time period.

In December 1999, at least certain directors and officers were clearly in a better position than ULLICO's other shareholders to predict the substantial increase in ULLICO's book value per share that would be used for purposes of the 2000 repurchase offer. Directors and officers were also in an inherently more favorable position to assess the likelihood of the 2000 repurchase offer being approved and the probable terms of the offer.

Therefore, one could argue that the stock purchases made by directors and officers in 1999 (and perhaps in 1998 as well) were made in anticipation of the subsequent year's tender offer at a higher price per share after ULLICO had undertaken

*Privileged and Confidential*

"substantial steps" to commence such tender offer. As a result, if one were to conclude that at the time of the stock purchases directors and officers possessed material, inside information regarding the following year's repurchase offer, these purchases could arguably constitute deceptive practices within the meaning of Section 14(e) of the Exchange Act.[65] In our view, however, the hurdles to establishing a violation of Rule 14e-3 would be quite significant.

### ■ Intent, Causation and Reliance Issues

Any violation of the federal securities laws requires that the violator acted with at least extreme or severe recklessness. While directors may have acted negligently in approving the 2000 stock repurchase program and the "discretionary" repurchase program, in our view they did not act with severe recklessness.

In addition, given the highly technical nature of the applicable securities law requirements, and the fact that numerous lawyers and law firms were aware of the 1998 and 1999 stock offers and were provided the opportunity to review the structure of the repurchase programs and the disclosure documents prepared in connection with those programs, the Company and certain of its directors and officers may have a viable reliance on counsel defense to any federal securities law claim.

Finally, even if one were to demonstrate that certain of ULLICO's directors and officers acted with severe recklessness in formulating, approving and implementing the stock offer and repurchase programs, it is not clear that the other elements of a federal securities law claim relating to material misrepresentations or omissions in the tender offer disclosure documents, such as causation and reliance, could be satisfied.

### ■ State Securities Law Issues

In addition to the federal securities laws, securities transactions are subject to the general antifraud provisions of state securities, or "Blue Sky," laws.[66] These laws typically provide for criminal and civil penalties and, in some cases, private remedies for investors injured as a result of violations. They also generally provide for control person liability.

The state securities laws of a jurisdiction may be applied whenever there has been an offer or sale of securities in that jurisdiction, regardless of the offeror's state of incorporation or its place of business. Accordingly, in a situation such as here, where

---

[65]  Moreover, paragraph (d) of Rule 14e-3 makes it unlawful for any person to communicate material nonpublic information relating to a tender offer if it is foreseeable that the communication is likely to result in an improper purchase, except for specified communications that are generally necessary to the tender offer process. To the extent that ULLICO's directors and officers communicated with each other or others regarding the terms of any tender offer undertaken during the relevant period, it is possible that they did so in violation of Rule 14e-3(d).

[66]  We have not included in the Report an analysis of the subject transactions under a common law fraud theory (fraudulent misrepresentation or concealment) since Rule 10b-5 has generally been held to be substantively broader, and subject to a lower burden of proof, than a common law fraud action. However, in situations involving corporate mismanagement, it is possible that the common law may provide redress in areas where Rule 10b-5's application has been somewhat limited.

*Privileged and Confidential*                                    *Report of the Special Counsel*

ULLICO made offers to sell and repurchase securities to shareholders residing throughout the United States, the Blue Sky laws of many states could be implicated.

In contrast to federal law, there is a lower standard for culpability under the Blue Sky laws of many states in the context of a civil securities claim relating to inaccurate or misleading disclosures in offering documents. While we have not analyzed the Blue Sky laws of all 50 states, in many states, if a plaintiff proves material misstatements or omissions in an offering document, to avoid liability, the defendant must then establish that he did not know, and in the exercise of reasonable care could not have known, of the misstatement or omission.[67] In effect, these states apply a negligence standard.

It is therefore possible that, because of the lower intent standard, ULLICO and its "control persons" who designed, approved, implemented and, in some cases, benefited from the stock offer and repurchase programs could be subject to claims of civil liability under the Blue Sky laws of certain states in which offers were made. A reliance on counsel defense may not be available for violations of those state securities laws where the culpability standard is negligence. See Idaho v. Montgomery, 135 Idaho Rptr. 348, 351 (2001); Colorado v. Terranova, 38 Col. App. 476, 481-82 (1976).

## Criminal Law

Underlying every criminal prosecution is the element of criminal intent. For example, in a financial fraud case, a prosecutor is required to demonstrate beyond a reasonable doubt that a defendant had the specific intent to defraud the victim. Civil liability, on the other hand, can be established through a showing of severe recklessness or even negligence, depending upon the legal theory used. While the evidence gathered in our investigation demonstrates that certain ULLICO officers and directors were treated more favorably than other shareholders in the sales of their ULLICO stock, their actions in connection with these sales, while arguably improper, were not criminal. Based on the information available to the Special Counsel, no evidence of criminal intent has been uncovered and therefore, in our opinion, a prosecutor, based upon the present record, should not conclude that criminal statutes reviewed as part of our investigation have been violated.

## Role of Counsel and Other Professionals

In our investigation, several directors and officers of ULLICO indicated that, with respect to the design and implementation of the exclusive stock offer and repurchase programs, they relied on inside and outside counsel as well as other professionals, including CSFB and PwC.

In performing his or her duties on behalf of the corporation, a director may rely on information, opinions, reports and statements prepared by an officer or employee of

---

[67]   See, e.g., Maryland, District of Columbia, Michigan, Indiana, Massachusetts and Wyoming.

*Privileged and Confidential*                                         *Report of the Special Counsel*

the corporation whom the director reasonably believes to be reliable and competent in the matters presented. MGCL Section 2–405.1(b)(1)(i). A director may similarly rely on information provided by a professional or expert, including a lawyer, investment banker or certified public accountant, as to matters the director reasonably believes to be within that person's professional or expert competence. MGCL Section 2–405(b)(1)(ii).[68] The burden of proof is on the director defendant to demonstrate that he or she meets the requirements of Section 2-405.1(b). <u>Yost v. Early</u>, 589 A.2d 1291, 1299 (Md. App. 1991). Reliance on counsel is not a complete defense but, instead, constitutes evidence of good faith. Moreover, "[a] director is not acting in good faith if he has any knowledge concerning the matter in question which would cause such reliance to be unwarranted." MGCL Section 2-405(b)(2).

Officers may invoke a common law advice of counsel defense. To invoke an advice of counsel defense under Maryland law, a defendant must show "(1) that he or she communicated to counsel all facts he or she knew or reasonably should have known; and (2) that he or she relied in good faith upon the advice given." <u>VF Corp. v. Wrexham Aviation Corp.</u>, 686 A.2d 647, 653 (Md. App. 1996). "Seeking and relying upon the advice of an attorney not only constitutes no evidence of fraud, but it is evidence of the contrary." <u>VF Corp. v. Wrexham Aviation Corp.</u>, 715 A.2d 188, 198 (Md. 1998).[69] As with directors, the burden of proof is on the officer defendant to demonstrate that he or she has a valid advice of counsel defense. <u>SEC v. Scott</u>, 565 F. Supp. 1513, 1534 (S.D.N.Y. 1983).

Outside Company counsel have contended that the directors and officers of the Company relied heavily on outside counsel, specifically two law firms, LeBoeuf Lamb and Arnold & Porter. Both firms provided advice during the relevant period, with LeBoeuf Lamb being principal outside corporate counsel until some time in 1999, and Arnold & Porter thereafter assuming that role. Both firms at various times also reviewed the disclosure documents related to the 1997 through 2001 formal repurchase programs.

As to LeBoeuf Lamb, David Woodward, who for many years was the principal LeBoeuf Lamb attorney servicing the ULLICO account, died suddenly in 1998. Douglas Beck, a younger partner at LeBoeuf, took over for Woodward but did not serve ULLICO in the same role Woodward had, *i.e.*, as *de facto* outside general counsel. By the Fall of 2000, LeBoeuf Lamb's role had significantly diminished.

---

[68] See also <u>Billman v. Maryland Deposit Ins. Fund Corp.</u>, 593 A.2d 684, 697 (Md. App. 1991); <u>Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R.</u>, 875 F.2d 549, 552 (6th Cir. 1989). A director may also rely upon information and other reports from board committees. However, "[t]he appointment of any committee, the delegation of authority to it, or action by it under that authority does not constitute, of itself, compliance...with the standard provided in § 2-405.1[.]" <u>Yost v. Early</u>, 589 A.2d 1291, 1299 (Md. App. 1991).

[69] "A defendant must establish that he actively sought and relied on the advice of counsel..." <u>SEC v. Scott</u>, 565 F. Supp. 1513, 1535 (S.D. N.Y. 1983). A defendant seeking to assert the advice of counsel defense must also apprise his counsel of all the material facts. <u>Id.</u> at 1534. (Defendant failed "to apprise his counsel of all the material facts and therefore cannot rely on his counsel's advice to shield him from culpability."). "Good faith reliance on the advice of counsel means more than simply supplying counsel with information. Corporate executives have an independent duty to insure that proper disclosures are made." <u>SEC v. Enter. Solutions, Inc.</u>, 142 F. Supp. 2d 561, 576 (S.D.N.Y. 2001).

*Privileged and Confidential*                                    *Report of the Special Counsel*

While Beck reviewed the tender offer disclosure documents for the 2000 repurchase program (whose elements significantly favored the director and officer shareholders), it does not appear that he was asked to consider the broader issues about the program, including its fairness to all of ULLICO's shareholders and potential self-interested transactions. In addition, there is no evidence that LeBoeuf Lamb knew, at the time, of the stock purchase offers to directors and officers in July 1998 and December 1999.

Arnold & Porter was more substantively involved during the critical period leading up to the implementation of the 2000–01 stock repurchases. Arnold & Porter lawyers were involved in drafting and/or reviewing the May and November 2000 Board resolutions which approved the programs at issue. Arnold & Porter was also involved in a substantive review of the terms of, and the disclosure documents pertaining to, the 2000 formal repurchase offer. In addition, Arnold & Porter lawyers were aware of substantial repurchases of stock from directors and officers pursuant to the "discretionary" program in the Summer and early Fall of 2000 as well as the 1998 and 1999 stock offers.

The Company and its directors and officers have contended that because of Arnold & Porter's work for the Company in 2000, and the information available to the law firm, the potential fiduciary duty issues related to the repurchase programs should have been apparent to Arnold & Porter. However, the evidence is not persuasive that Arnold & Porter or, for that matter, LeBoeuf Lamb, was specifically requested to consider the fiduciary duty issues implicated by the approval of the 1998 and 1999 stock offers and 2000 repurchase programs through which certain officers and directors significantly benefited. These law firms deny having been given this assignment and Chief Legal Officer Carabillo denies specifically giving such an assignment. Nevertheless, Arnold & Porter arguably had access to sufficient information about the stock offers, the "discretionary" repurchase program and the structure of the formal 2000 repurchase program such that, if asked, it could have provided advice concerning the fiduciary duty implications of these programs.

In fact, there is evidence that one Arnold & Porter partner, without being asked by ULLICO, did recognize potential issues related to director self-interested transactions in connection with the repurchase programs approved in November 2000 and communicated certain concerns to the Company. Dennis Lyons, a senior partner at Arnold & Porter, stated at his interview that he advised Carabillo in connection with the preparation of the November 3, 2000 Board resolutions that there was an issue in connection with the Board approving a repurchase program from which certain directors would benefit. Lyons stated that he told Carabillo that it was advisable that ULLICO have an independent committee of the Board comprised of disinterested directors approve the 2000 formal repurchase program and review any repurchases from directors through the "discretionary" program. According to Lyons, Carabillo responded that he intended to have the information related to prior "discretionary" stock repurchases disclosed to the Compensation Committee instead of having these transactions approved by the Board or one of its committees. It appears that Carabillo's

*Privileged and Confidential*                                          *Report of the Special Counsel*

decision was not objected to by Arnold & Porter. This advice by Arnold & Porter, not followed by Carabillo, appears to be the only advice affirmatively provided by outside counsel relevant to the fiduciary duty issues discussed in this Report.

Outside Company counsel and counsel for ULLICO's directors and officers have nonetheless asserted that the outside law firms, given the information in their possession, had a professional responsibility to identify and make the Company aware of the potential fiduciary duty implications of the stock offer and repurchase programs. Even assuming that such a duty existed, Maryland law does not allow directors to satisfy their fiduciary duties based on a mere assumption from outside counsel's silence that the transactions at issue did not raise fiduciary duty concerns. To the contrary, the pertinent Maryland statute allows directors to rely on information contained in an affirmative "opinion, report, or statement" but makes no reference to the ability of directors to rely on the absence of legal advice. MGCL Section 2-405.1(b). Similarly, Maryland common law requires reliance "in good faith upon the advice *given.*" VF Corp., 686 A.2d at 653 (emphasis added). Therefore, it is unlikely that the Company, its directors and officers could succeed in meeting their burden of showing that an advice of counsel defense is warranted under this theory.

Moreover, advice of counsel would not shield officers and directors from liability based on poor business, as opposed to legal, decisions. As one commentator noted in connection with the advice of counsel defense:

> Many defendant officers and directors, in the course of litigation against them, seek to justify their actions through a claim that they relied on the advice of their legal counsel. Technically speaking, this is not a defense in and of itself, but rather only an evidentiary fact relevant in certain causes of action in helping to establish the defendant's reliance upon the business judgment rule...

> A corporate officer or director is expected to have his own good business judgment and the fact that he or she relied upon an attorney's business judgment would not absolve the officer or director from having exercised due care.

Dan L. Goldwasser, Reliance on Advice of Counsel, 623 PLI/Comm 181, 183 (June 4, 1992).

Similarly, in Hines v. Dataline Sys. Inc., 787 P.2d 8, 19 (Wash. 1990) (en banc), the Washington State Supreme Court stated as follows:

> Reliance on counsel regarding the materiality of facts does not sustain the officer's burden of proof that he didn't know of the *existence of the facts* by reason of which liability is alleged to exist...We agree with the Court of Appeals that a director cannot "wash his hands of all corporate decisions particularly when he has access to the same facts as counsel did in the case at hand."

(Emphasis added.)

Accordingly, directors may also have difficulty meeting their burden of establishing an advice of counsel defense to a fiduciary duty claim given that the transactions at issue primarily involved business, as opposed to legal, decisions.[70] Any reliance on counsel by directors and officers would also not likely shield them from responsibility for their actions based on the facts they knew or should have known. In short, a strong argument exists that the exercise of good business judgment and due care should have led a reasonably prudent director and officer to conclude that the repurchase programs as structured and implemented, at least in 2000, impermissibly benefited insiders.

To the extent directors and officers claim that they relied on advice provided by Chief Legal Officer Carabillo, such reliance may not be sufficient to provide a defense given that Carabillo's advice was neither independent nor objective. Carabillo could not be deemed "independent" legal counsel given that he helped design the programs at issue and personally benefited from those programs. See, e.g., SEC v. Cavanagh, 1 F. Supp. 2d 337, 374 (S.D.N.Y. 1998) (holding advice of counsel defense unavailable because defendant "could not reasonably have expected [counsel] to render an independent opinion as to the legality of the transaction given his personal involvement in structuring it and his financial stake in its completion"). Although we have not found a Maryland case on point, Maryland statutory law is consistent with this principle in that it states: "A director is not acting in good faith if he has any knowledge concerning the matter in question which would cause such reliance to be unwarranted." MGCL Section 2-405(b)(2).

As indicated above, however, the advice of counsel inquiry is different in the federal securities law context. Given the highly technical nature of the applicable securities law requirements, and the fact that numerous lawyers and law firms were aware of the 1998 and 1999 stock offers and were provided the opportunity to review the structure of the repurchase programs and the disclosure documents prepared in connection with those programs, the Company and certain of its directors and officers may have a viable reliance on counsel defense to any federal securities law claim. However, a reliance on counsel defense may not be available for violations of those state securities laws where the culpability standard is negligence.

As to the other professionals providing advice to ULLICO, only PwC and CSFB have been identified as companies upon which management and the Board relied in implementing the programs at issue. However, our investigation revealed that PwC did not provide advice on the substantive terms of the stock offers or repurchase programs but was principally involved in providing and verifying financial information contained in the tender offer documents. While CSFB helped design the 1997 repurchase program and reviewed the 2000 "extraordinary" repurchase program, we were provided with no evidence that CSFB ever reviewed the 1998 and

---

[70] The civil application of the reliance on counsel defense is different than in the criminal context where, "[g]ood faith reliance on advice of counsel by a criminal defendant may rebut a showing of criminal intent." SEC v. Enter. Solutions, Inc., 142 F. Supp. 2d 561, 576 (S.D.N.Y. 2001).

*Privileged and Confidential*

1999 stock purchase offers or the stock repurchase programs (formal and "discretionary") adopted by the Board in November 2000.

## Disgorgement, Rescission and Ratification

### ■ Disgorgement or Rescission

"Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." SEC v. First City Fin. Corp., 890 F.2d 1215, 1230 (D.C. Cir. 1989). The concept of disgorgement is applied similarly whether the violations at issue constitute securities fraud or breaches of fiduciary duty.

Courts have broad equitable powers to order disgorgement in securities fraud cases. See SEC v. First Pac. Bancorp., 142 F.3d 1186, 1191 (9th Cir. 1998) ("The district court has broad equity powers to order the disgorgement of 'ill-gotten gains' obtained through the violation of the securities laws."); see also First City Fin. Corp., 890 F.2d at 1230 ("We see no indication in the language or the legislative history of the Exchange Act that even implies a restriction on the equitable remedies of the district courts."). Courts will typically order defendants to disgorge their "ill-gotten gains" where it is necessary to prevent unjust enrichment and deter others from violating the securities laws.[71] In ordering disgorgement, courts may only exercise their equitable power over property causally related to the wrongdoing. First City Fin. Corp., 890 F.2d at 1231. However, "disgorgement need only be a reasonable approximation of profits causally connected to the violation." Id.

Similarly, "[t]here are many potential remedies for a breach of fiduciary duty, including restitution, rescission, disgorgement of profits, and constructive trusts." Avianca, Inc. v. Corriea, 1993 WL 797455, at *4 (D.D.C. 1993). "It is well established that a court has extraordinary powers when confronted with a violation of a fiduciary duty." Id. "The reason such unusual remedies are tolerated—even encouraged—is that there is a pressing need for remedies in fiduciary duty cases, remedies that will serve to deter violations of fiduciary duty." Id. Maryland law recognizes both restitution and disgorgement as remedies for breaches of fiduciary duty. Lerner Corp. v. Three Winthrop Props., Inc., 723 A.2d 560, 566 (Md. App. 1999).

In lieu of disgorgement, the Company could also consider rescission. Under this remedy, the Board could declare some or all of the transactions under review as void at their inception, and treat the transactions as if they had never happened. Rescission is commonly used as a remedy in securities fraud cases. See United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 498 (4th Cir. 1999).

---

[71] See SEC v. Fischbach Corp., 133 F.3d 170, 175 (2nd Cir. 1997) ("The primary purpose of disgorgement orders is to deter violations of the securities laws by depriving violators of their ill-gotten gains."); First Pacific Bancorp., 142 F.3d at 1190 (9th Cir. 1998) ("Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable."); SEC v. Johnston, 143 F.3d 260, 262 (6th Cir. 1998) ("The purpose of disgorgement is to force [a] defendant to give up the amount by which he was unjustly enriched rather than to compensate the victims of fraud.").