Privileged and Confidential                    Report of the Special Counsel

Similarly, courts have broad equitable powers to order rescission as a remedy for breaches of fiduciary duty. See Arkrotirianakis v. Burroughs, 262 F. Supp. 918, 924 (D. Md. 1967); see also Avianca, Inc., 1993 WL 797455, at *4 ("There are many potential remedies for a breach of fiduciary duty, including … rescission[.]").

In determining whether to recommend disgorgement or rescission, the Company, in consultation with its tax counsel, should consider the potential tax consequences each remedy will trigger.

■ **Ratification**

In general, a self-interested or unauthorized transaction between a corporation and one of its directors or officers is not void or voidable on those grounds if disinterested directors or disinterested stockholders approve the transaction at issue. MGCL §§ 2–419(a), (b); Wittman v. Crooke, 120 Md. App. 369, 707 A.2d 422 (Md. App. 1998) ("Maryland has long recognized the proposition that a board of directors is not 'liable to stockholders for acts ratified by them.'").

To have a valid ratification, the interest must be fully "disclosed or known" to the board, committee or stockholders approving the transaction. MGCL § 2–419(b)(1). Moreover, a majority of disinterested directors or shareholders must vote to approve the transaction. Id. § 2–419(b)(1)(i) & (ii). The presence of interested directors at the meeting where the board approves the transaction and the counting of the interested director's vote does not vitiate the ratification, so long as a majority vote of disinterested directors approves the transaction. Id. §§ 2–419(a)(2) & (3). The vote may occur either prospectively to approve the transaction or retrospectively to ratify it, and approval "is effective without regard to the size of the benefit that the director may receive from the contract or transaction." Hanks § 6.22[b] at 220.4.[72]

---

[72] In addition to director or shareholder approval, the Maryland statute allows for ratification of an interested director transaction by "[a]ny procedures authorized by Section 2-418." MGCL § 2-419(e). The procedures referred to in § 2-418 are those for a determination of eligibility for indemnification by a special counsel. Id. § 2-418 (e)(2). Interested directors may participate in the selection of special legal counsel if a quorum of disinterested board members cannot be established. Id. § 2-418(e)(2)(ii).

## Corporate Governance

■ **Introduction**

During our investigation, it has become apparent that many of the significant issues related to ULLICO's sales and repurchases of its own stock might have been avoided had the Company implemented and enforced sound corporate governance policies. ULLICO's Board took an important first step in this regard by establishing a Corporate Governance Committee in 2000.

Sound corporate governance necessarily implicates a host of important issues, including board composition, director qualifications and executive and director compensation. A critical element of corporate governance and accountability is "independence." A corporation should be managed under the direction and supervision of a board of directors that is independent from management. Our investigation revealed that management too often injected itself into and was permitted to direct the Board's deliberative process. Moreover, the Board too often wholly delegated core responsibilities (such as executive compensation) to committees, the members of which were essentially chosen by the Chairman (U 30552, Tab 2), raising questions as to whether Board or committee actions were inappropriately influenced by management. Committee actions were not adequately disclosed to or monitored by the Board.

Senior management and the Board must collaborate, but it is critical that the Board make its own informed and independent business judgments. Moreover, in those areas where there is or may be a conflict of interest with management, independent directors should have exclusive control, *e.g.*, audit, compensation, nominating/governance committees. Management and those directors affiliated with members of management should not be on these committees and should not participate in their deliberations. Moreover, the members of these committees should be selected by the Board as a whole, or by an independent committee of the Board, and not by the Chairman and Chief Executive Officer.

Another fundamental element of corporate governance and accountability is the full and complete disclosure of all material matters and developments to the company's governing body: the board of directors. The board of directors of a corporation is ultimately responsible for governing the corporation. Management operates under the supervision and at the direction of the board of directors. A board can only act in the best interests of shareholders if it is adequately informed. It is rarely, if ever, appropriate for management to withhold important information from members of a company's board of directors, even if management concludes that disclosure is not legally required. In those instances where withholding information may have a legitimate business purpose, that determination should be made not by management, but rather through a process that includes a disinterested group of directors.

*Privileged and Confidential*

■ **Board Independence**

The New York Stock Exchange ("NYSE") and NASDAQ recently adopted proposed listing standards that would require that independent outside directors comprise a majority of the Board and that key committees (*e.g.*, audit, compensation, and nominating/governance committees) be made up solely of independent directors. Institutional investors and other organizations, including CalPERS, TIAA-CREF and AFL-CIO, have established voting guidelines that highlight the importance of independent directors. See, e.g., AFL-CIO Proxy Voting Guidelines (1997); TIAA-CREF Policy Statement on Corporate Governance (1997); CalPERS U.S. Corporate Governance—Core Principles & Guidelines (1998); Damon Silvers Testimony to NYSE (AFL-CIO) (May 2002).

ULLICO's Board currently has only two management-directors, and most directors would likely be considered "independent" as that term has been historically defined. However, the concept of director independence has recently received substantial attention and many have suggested tightening the definition of "independent" director.

The NYSE, for example, has proposed listing standards that would disqualify any director from being "independent" if he or she has a "material relationship" with the company on whose board the director serves. The NYSE has also proposed specific relationships that are "per se" bars to independence. In our view, it is important that ULLICO's Board thoroughly evaluate all circumstances and relationships that might result in actual or potential conflicts of interest, or that might bear on the issue of director independence. In making independence determinations, the Board should consider all relevant facts and circumstances.

Relationships that could impair director independence may include commercial relationships with a director or a director's affiliated union, personal or business relationships with members of management, or familial relationships. In this regard, we note that numerous ULLICO directors have affiliations with the Building and Construction Trades Department of the AFL-CIO, of which Mr. Georgine served (until recently) as president.[73] In situations where ULLICO or members of its management do have a relationship with a particular director, the Board should determine whether or not it compromises the director's independence.

The Board's basic criteria for making independence determinations, and specific findings that a given relationship is not sufficiently material to compromise a director's independence, should promptly be disclosed to ULLICO's shareholders. See, e.g., NYSE Corporate Accountability and Listing Standards Report (June 2002); NYSE Corporate Governance Rule Proposals (August 2002). The Board may wish to require that different persons hold the positions of Chairman and CEO since the

---

[73] Approximately two-thirds of present Board members were recommended for nomination to the Board by Chairman Georgine.

*Privileged and Confidential*                                           *Report of the Special Counsel*

Chairman's duty to oversee management could be compromised if self-monitoring is required. AFL-CIO Proxy Voting Guidelines (1997).

### ■ Board and Committee Performance

ULLICO's Board has historically been comprised of leaders in the United States labor movement. The Board is extremely large as compared to peer companies, and it meets infrequently, typically twice a year. Attendance at Board meetings is poor. The average attendance at Board meetings from May 1997 through April 2002 is about 70%. (Exhibit 7) There may have been compelling business or personal reasons why directors were unable to attend these Board meetings. However, when such reasons significantly interfere with the ability of a director to perform core director functions, such as attending meetings, the director should resign.

Several notable commentators have recently suggested that the performance of a board, its committees and individual members should be regularly evaluated to help focus corporate responsibility and promote accountability. See Jay A. Conger et al., Corporate Boards: Strategies For Adding Value At The Top (Jossey-Bass 2001); Harvard Business Review On Corporate Governance (Harvard 2000). In this regard, specific governance objectives and director responsibilities should be clearly defined, perhaps in formal corporate governance policies and committee charters that describe responsibilities, objectives and powers, and provide for periodic self-evaluations.

In addition, the Board may wish to evaluate its Board composition and the frequency of its meetings. See NYSE Corporate Accountability and Listing Standards Report (June 2002). A large board can lead to excessive delegation and make it difficult to convene and to keep all members fully informed. A somewhat smaller board may enhance director participation and result in effective and timely decision-making. To draw on the talents of former directors and other prominent leaders, ULLICO could form an advisory board. In addition, the Board should delegate only specific, clearly defined responsibilities to its committees, and committees should regularly report to the Board. Members of these committees should be selected by the Board as a whole or an independent committee of the Board. The Board might also want to consider rotating committee assignments to better draw on the talents of Board members.

### ■ Board and Committee Membership

The directors serve to protect the best interests of the shareholders. AFL-CIO Proxy Voting Guidelines (1997). In recruiting directors, the Company should consider the expertise and knowledge of individual directors so that the Board as a whole has the ability to understand and play a meaningful role in the Company's core business, significant management issues and shareholder concerns. Jay A. Conger et al., Corporate Boards: Strategies For Adding Value At The Top (Jossey-Bass 2001); Harvard Business Review On Corporate Governance (Harvard 2000).

Specifically, the Company should consider diversifying its Board by recruiting not only leaders from the labor movement but also those with significant finance,

accounting, legal, and management experience. The Company may also want to encourage individual Board members to attend corporate governance training seminars, so that members are kept apprised of current financial, legal and ethical developments that impact their service as directors. NASDAQ Corporate Governance Proposals (July 2002).

A properly functioning audit committee is critical to effective corporate governance. Members of the audit committee should have financial and accounting experience, and at least one member of the audit committee should be a financial expert. See, e.g., Sarbanes-Oxley Act (July 31, 2002); NYSE Corporate Accountability and Listing Standards Report (June 2002). In view of the size and scope of ULLICO's operations, the audit committee should play a more significant and active role in the governance and oversight of the Company. This is particularly true in situations that pose actual or potential conflicts of interest with management.

■ **Shareholder Participation**

Meaningful shareholder participation depends, in large part, on disclosure to shareholders, including the disclosure of each director's potential conflicts of interest and material relationships with the Company. NYSE Corporate Accountability and Listing Standards Report (June 2002); Harvard Business Review On Corporate Governance (Harvard 2000). The Board should conduct a thorough evaluation of ULLICO's communications with its shareholders, both formal and informal, including a review of proxy and annual report disclosures.

Disclosures should be sufficient such that the shareholders, the ultimate owners of the Company, can make meaningful and informed decisions regarding the election of directors and other matters requiring a shareholder vote and whether or not to continue to hold their shares. In particular, the Board should evaluate policies on disclosure of executive compensation, related party transactions and stock issuances and repurchases. In the "discretionary" program, for example, Chairman Georgine stated that the repurchase program was neither "advertise[d] nor encourage[d.]" Yet, some (but not necessarily all) shareholders were clearly aware of the program. There would seem to be something inherently inappropriate about a program that could so significantly impact shareholders but that is not fully disclosed to all shareholders.

In addition, ULLICO should provide full and complete disclosure of executive and director compensation to all ULLICO shareholders, unless, and only to the extent, the Board determines that there is a valid business purpose for withholding that information. AFL-CIO Proxy Voting Guidelines (1997); NASDAQ Corporate Governance Proposals (July 2002). To the extent specific compensation information is not disclosed, the Board should provide an explanation to shareholders of its compensation policies (particularly with respect to CEO compensation) and the rationale for withholding specific compensation information.

The Board should also consider seeking shareholder approval for those material matters that are either unusual or pose inherent conflicts of interest, even if

*Privileged and Confidential*

shareholder approval is not legally required. Examples of these matters would include Company loans to directors or executive officers as well as equity-based compensation programs.

■ **Corporate Governance Committee**

The Company and its advisors recognized the need for a corporate governance committee in 2000, and indeed the Board may wish to revisit some of the recommendations regarding the proposed responsibilities of that committee. (U 38853–55, Tab 66). For example, in its August 3, 2000 memo faxed to Joseph Carabillo, Arnold & Porter suggested that the Corporate Governance Committee review the composition of the Audit Committee and observed that "[m]ost public companies have adopted audit committee charters setting forth the duties of the audit committee. In addition, audit committee members must be 'independent' and meet certain financial sophistication requirements." (U 38854, Tab 66) Arnold & Porter also suggested that the Board consider reducing its size and creating an advisory board. (Id.) Most significantly, Arnold & Porter suggested that the Corporate Governance Committee might consider reviewing the Company's policies relating to the repurchase of stock from shareholders and the compensation of directors and officers. (Id. at 38855) Indeed, ULLICO might have avoided its current difficulties had the Corporate Governance Committee formulated clearly defined standards relating to the issuance and repurchases of stock as well as executive compensation.

Following up on the Arnold & Porter recommendations, the Board might decide to delegate to the Corporate Governance Committee the task of developing comprehensive corporate governance guidelines and a code of business conduct and ethics that address, among other things, director qualification standards, director responsibilities and company policies regarding executive officer and director compensation, conflicts of interest, confidentiality, the protection and proper use of company assets and compliance with laws and regulations. NYSE Corporate Accountability and Listing Standards Report (June 2002); NASDAQ Corporate Governance Proposals (July 2002); NYSE Corporate Governance Rule Proposals (August 2002).

*Privileged and Confidential*                                               *Report of the Special Counsel*

## Findings

■ **The Global Crossing Investment**

In 1997, ULLICO made a $7.6 million investment in Global Crossing that yielded a return of about $486 million. Without doubt, this 6295% return was extraordinary by any measure. Further, this return occurred when the Company was in need of capital to support its core business operations.

The Chief Financial Officer recommended in the Summer of 2000 that the Company sell one-third of its Global Crossing stock, hedge one-third of the stock and retain the remaining one-third of the stock. The Chairman decided to sell or hedge 40% and hold 60% (or 19 million shares) of the Company's Global Crossing stock in the hope that the stock price would rebound. While 18 months later Global Crossing was bankrupt, and the stock became virtually worthless, the Chairman's decision not to sell further shares was not unreasonable given the sentiment of market professionals at the time.[74]

The Chairman and other executive officers, and to a much lesser extent the Board, deserve credit for the Global Crossing investment success. Therefore, it did not appear unusual for the executive officers, and to some extent the Board, to have been rewarded for this success. However, as discussed at length in this Report, the method by, and the extent to which, management and the Board were effectively compensated through certain stock transactions were inappropriate.

■ **Stock Repurchase Programs**

The November 3, 2000 decision by the Board to implement the 2000 formal repurchase program with a combination of: (1) the condition requiring all shareholders holding more than 2% of Class A and B shares to tender all of their shares; (2) the 10,000 share proration threshold; and (3) an inflated repurchase price, ensured that there would be severe proration of shares tendered by the Company's largest shareholders participating in the program. The directors and officers, meanwhile, would be able to redeem 100% of their holdings.

The repurchase program approved in November 2000 replaced an "extraordinary" repurchase program conditionally approved in May 2000. The replacement repurchase program reduced the amount available to shareholders in the formal repurchase program from $240 million to $30 million while potentially providing a larger portion of the funds available for repurchase to the class of shareholders that included directors and officers (*i.e.*, under-10,000 shareholders). In addition, the directors and officers could, and did, take advantage of the Chairman's "discretionary" repurchase program, which the directors also approved at the November 3, 2000 meeting.

---

...aps the only criticism of the Chairman's action is that, given the significance of the Global Crossing investment to ULLICO's financial condition, ...ions concerning the disposition of that asset should have been made by the Board after informed debate.

*Privileged and Confidential*                                      *Report of the Special Counsel*

In the course of our interviews, many of the Company's directors and advisors were unable to articulate the purpose for using the 10,000 share proration threshold in the 2000 formal repurchase program, other than that it had been used in prior years. The Company's management and certain directors have indicated that the 10,000 share threshold was originally implemented to eliminate small shareholders and for tax reasons. However, neither rationale is persuasive, at least with respect to the 2000 repurchase program.

The Company created more, not fewer, small shareholders through its officer and director stock offers in 1998 and 1999. Moreover, unions and pension funds did not pay taxes on the sale of their ULLICO stock, so any tax benefit occurred only to individual shareholders, mostly the directors and officers. The Company likely could have achieved the same or similar objectives through other means without so disadvantaging its larger shareholders. Therefore, without passing on the wisdom of the repurchase program in general, we have concluded that the specific terms of the 2000 repurchase program were materially flawed given the circumstances that existed at the time. These flaws redounded to the benefit of certain directors and officers at the expense of ULLICO's large institutional shareholders.

■ **Stock Offers to Directors and Senior Management**

The 1998 and 1999 stock offers were implemented and purportedly approved (with questionable authority) by Georgine or the Compensation Committee in anticipation of the prospect that after Global Crossing's IPO the value of ULLICO stock would increase. Indeed, the ULLICO stock price nearly doubled from 1998 to 1999 and nearly tripled from 1999 to 2000. During this time, only directors and officers were given the opportunity to purchase additional shares of ULLICO stock.

While we have been unable to discern the precise business purpose for the 1998 and 1999 stock offers, it clearly had the effect of compensating certain of ULLICO's directors and officers. The stock offers carried little or no investment risk and thus did not, as Chairman Georgine suggested, align the interests of management and the Board with those of other ULLICO shareholders.

Twenty of the twenty-four directors and officers who purchased stock in 1998 and 1999 (excluding Steed and Mark Maloney) sold most, if not all, of their shares back to the Company by 2001, in most cases at $146.04 per share. Of the approximately $44.6 million paid to shareholders selling shares at the $146.04 per share price in 2000–01, $13.7 million was paid to officers and directors, with sixteen directors (other than Georgine) who sold stock, receiving almost $7.5 million of this amount. These directors received preferential treatment over other shareholders, and such preferential treatment was never disclosed. Further, except perhaps for those directors who received nominal amounts, it is questionable whether the profits received by those directors who sold their stock at $146.04 were reasonably related to the services they performed for the Company.

It is unclear whether the total compensation paid to ULLICO's senior officers (Georgine, Carabillo, Luce and Grelle) was reasonable when compared to the compensation received by executives at peer companies. However, these executives were already receiving a bonus, separate from their regular annual bonus, under the Global Incentive Program and significant earnings under the Deferred Compensation Plan tied to their deemed investment in ULLICO stock. Therefore, these officers may not have been entitled to another "bonus" tied to the Global Crossing investment success, which the stock offer program represented.

Even if one were to assume, however, that the total compensation paid to the directors and senior officers was reasonable, the method by which they received compensation under the repurchase programs was not appropriate. Compensation should not have been paid to the directors and officers at the expense of shareholders holding 10,000 or more Class A and Class B shares through the formal repurchase program. Nor should it have been paid through the "discretionary" repurchase program that was originally designed for a different purpose and administered solely by the Chairman.

## ULLICO Management and Corporate Governance

ULLICO's Board has historically been comprised of leading leaders in the United States labor movement. The Board is extremely large as compared to peer companies, and it meets infrequently, typically twice a year. Attendance at Board meetings is poor. On average, from 1997 to 2002, only 70% of Board members have attended Board meetings. (Exhibit 7) The Company does not have any informal or formal director training program.

The Board has never adopted corporate governance guidelines delineating director responsibilities and fundamental corporate policies. The Board delegates key corporate decisions to various Board committees and management, often in a wholesale manner. In some cases, it appears that the delegations were not permissible. For example, the stock offers were purportedly approved by the Compensation Committee notwithstanding the fact that the committee had no authority to issue stock and its members were barred from setting the terms of their own compensation.

In addition, committee decisions have not always been reported to the Board in a timely manner. Candidates for the Board are identified, and members of key Board committees (including the Executive Committee and the Compensation Committee) are selected, by the Chairman. There are no term limits on Board or committee membership. The role of the Chairman in the selection of Board and committee members, and the involvement by senior management generally in the deliberations of the Board and its committees, casts doubt on the independence of Board and committee actions.

A properly functioning and active audit committee is a key component of corporate governance. The Board's Audit Committee, which until recently had not kept

*Privileged and Confidential*                                            *Report of the Special Counsel*

meeting minutes, historically has been passive. The Audit Committee could benefit from the addition of more members with financial expertise.

The composition of the Board, and the manner in which it has discharged its responsibilities, has made it difficult for it to play a significant and active role in the governance and oversight of the Company. In connection with the matters under investigation, the extent of involvement by senior management (particularly Georgine and Carabillo) in Board and committee decisions, and the passiveness of the directors in discharging their duties, resulted in the inability of the Board to exercise independent and informed business judgments. This is particularly true with respect to the 1998 and 1999 stock offers and the 2000 formal and "discretionary" repurchase programs, where senior management had both conflicts of interest and substantial involvement.

■ **Fiduciary Obligations of Directors and Officers**

Under the facts discovered in the investigation, a compelling argument exists that directors, particularly those who benefited from self-interested transactions, did not satisfy their fiduciary duties to the Company and its shareholders in connection with these transactions. An equally forceful argument applies to the principal officers, Georgine and Carabillo, who were instrumental in creating and implementing the stock offer and repurchase programs, and who benefited from ULLICO stock transactions. Directors' fiduciary duties have been codified under Maryland state law. Officers' duties are governed by common law.

The Company's 1998 and 1999 stock offers and the 2000 stock repurchase programs resulted in numerous self-interested transactions. Under Maryland law, a transaction is not void or voidable solely because of the presence of an interested director at the meeting in which the transaction was approved if the transaction is approved by at least one fully informed, disinterested director. It is questionable whether any fully informed, disinterested director was present at the November 2000 Board meeting at which the 2000 formal repurchase program and the "discretionary" repurchase program were approved. However, the existence of a disinterested director at the November 2000 Board meeting is not at all dispositive of whether members of the Board satisfied their statutory fiduciary duties in approving the programs.

Compliance with the Maryland law provision concerning self-interested transactions means only that the transactions at issue are not void or voidable *solely* because of the involvement of interested directors. It does not excuse the requirement that directors fulfill their fiduciary duties under Maryland law, *i.e.*, that they act in good faith, in a manner they reasonably believe to be in the best interests of the company and with due care in approving the transactions.

Under the facts revealed in this investigation, a compelling argument exists that those directors who benefited from the transactions at issue did not satisfy these requirements. The exclusive stock offers and the 2000-01 repurchase programs, as structured and implemented, improperly benefited directors and officers at the

*Privileged and Confidential*

expense of ULLICO's larger shareholders. Our investigation uncovered no clear rationale for the approval of the exclusive stock offers or the Board's approval of the 2000 formal repurchase program containing the 10,000 share proration threshold. Moreover, the approval of the stock offers involved excessive, and perhaps impermissible, delegation of authority by the Board.

The process by which the Compensation Committee and the Board evaluated and approved the stock offer and repurchase programs raises questions of whether ULLICO's directors satisfied their duty of due care under Maryland law. Certain directors were either inadequately informed (through their own and management's fault) about the purposes and impact of the programs, or knowingly approved programs that a reasonably prudent director should have realized (under the circumstances existing at the time) were not in the best interests of the Company or its shareholders. In this regard, certain directors failed to give due consideration to, or provide an adequate justification for, the substantial and disproportionate benefits received by directors and officers under the stock offer and repurchase programs.

Outside Company counsel have argued that the directors would have the benefit of the business judgment rule. In a court case, the business judgment rule would provide a procedural presumption in favor of directors' actions. This procedural presumption can be rebutted by a showing of a lack of either good faith or an informed basis for the directors' decisions. Under the facts of this case, it cannot be said with any reasonable degree of certainty that the business judgment rule would protect the actions of those directors who benefited from the programs at issue.

A forceful argument exists that certain senior officers of the Company, principally Georgine and Carabillo, violated their duties of loyalty and care to the Company. Georgine and Carabillo were heavily involved in the creation, implementation and disclosure of the exclusive stock offer and repurchase programs, and personally profited from these programs. Georgine and Carabillo also failed to adequately disclose to the Board and the Company's shareholders the extent to which they (and other insiders) participated in and benefited from ULLICO stock transactions. In addition, Georgine and Carabillo should have been more forthcoming with members of the Board and shareholders regarding the reasons for, and the impact of, the stock offer and repurchase programs (including the 10,000 share proration threshold) and other matters that may have influenced the directors' decisions to approve the programs. Georgine and Carabillo were also primarily and most directly responsible for the Company's disclosure documents that were, in some cases, incomplete and potentially misleading. The law is unclear as to whether officers could even attempt to invoke the business judgment rule which, in any event as noted, can be overcome.

## Securities Law

ULLICO is a private company not subject to most of the requirements of the federal securities laws relating to tender offers. However, the securities transactions under

the stock offer and repurchase programs were subject to the anti-fraud provisions of
Sections 10(b) and 14(e) of the Exchange Act.

The repurchase offer disclosure document used by the Company in connection with
the 2000 formal repurchase program may have contained material misstatements or
omissions in violation of the anti-fraud provisions of the federal securities laws. In
addition, the juxtaposition of the 1998 and 1999 stock purchase offers made
exclusively to directors and officers with the terms of the 2000 formal repurchase
program (including the 10,000 share proration threshold) and the "discretionary"
repurchase program arguably constituted deceptive or manipulative acts or practices
implemented through misrepresentations and material omissions in violation of these
laws.

However, any violation of these laws require that the person act with "severe
recklessness." While directors may have acted negligently in approving the 2000
stock repurchase program and the "discretionary" repurchase program, in our view
they did not act with the severe recklessness required to establish a federal securities
law violation, particularly given their reliance on counsel concerning securities law
matters. Even if one were to demonstrate that certain of ULLICO's directors and
officers acted with severe recklessness in formulating, approving and implementing
the stock offer and repurchase programs, it is not clear that the other elements of a
federal securities law claim relating to material misrepresentations or omissions in
the tender offer disclosure documents, such as causation and reliance, could be
satisfied.

While we have not analyzed the state securities, or Blue Sky, laws of all 50 states,
some jurisdictions apply a negligence standard for liability as a result of material
misstatements or omissions in connection with the purchase or sale of securities.
Therefore, with this lower intent standard, it is possible that ULLICO and its
directors and officers who approved, implemented and benefited from the stock offer
and repurchase programs could be subject to civil securities claims under the
securities laws of those jurisdictions in which offers or sales of securities occurred.

■ **Non-Qualified Deferred Compensation Plan**

The large increase in the book value of ULLICO stock between 1998 and 2000
allowed ULLICO's senior officers, Georgine, Carabillo, Grelle and Luce, to make
substantial returns on amounts deferred under ULLICO's Deferred Compensation
Plan. This simple and quite common retirement planning vehicle, for example, was
the source of approximately $4 million of earnings by Georgine over a two-year
period from 1998 to 2000. ULLICO's senior officers took advantage of the flexible
terms of the Deferred Compensation Plan to exploit the large, but short-lived,
increase in the book value per share of ULLICO's stock between 1998 and 2000.
When the stock price was attractive in 1998 and late 1999, the senior officers
allocated deferred compensation to deemed investments in ULLICO stock under the
Plan. When the book value per share peaked at $146.04 in 2000, these same officers

*Privileged and Confidential*                                          *Report of the Special Counsel*

withdrew all amounts allocated to the ULLICO investment stock account under the Plan.

The opportunity to so easily exploit the terms of the Deferred Compensation Plan to generate such large returns based on the short-lived increase in the book value of ULLICO stock was the result of either a serious design flaw in the Plan or the purposeful decision by the Compensation Committee to permit the Company's senior officers to earn substantial additional compensation under the Plan. In the course of our investigation, we found no evidence that the latter was intended or, if intended, adequately considered.

## ■ Role of Counsel and Other Professionals

In light of the evidence developed in the investigation, it appears unlikely that a defense based on the advice of counsel or other professionals would be available to ULLICO's officers and directors in connection with a breach of fiduciary duty claim. Although attorneys prepared the November 2000 Board resolutions, there is limited evidence that attorneys or other professionals provided ULLICO with advice concerning whether the 1998 and 1999 stock purchase offers, the "discretionary" stock repurchase program or the formal 2000 stock repurchase program raised fiduciary duty concerns. Moreover, the issues present here primarily involve the appropriateness of certain business, as opposed to legal, decisions, such as the timing of the exclusive stock offers and the design and implementation of the repurchase programs.

In contrast, a defense based on reliance on counsel may be available to certain directors and officers, as well as the Company, in connection with any federal securities law claims. It is less clear, however, whether such a defense is available in connection with state securities laws which can be violated through negligent acts.

## ■ Lack of Criminal Intent

Based upon the information available to the Special Counsel, there is no basis to conclude that any person acted with criminal intent in connection with the transactions at issue.

withdrew all amounts allocated to the ULLICO investment stock account under the Plan.

The opportunity to so easily exploit the terms of the Deferred Compensation Plan to generate such large returns based on the short-lived increase in the book value of ULLICO stock was the result of either a serious design flaw in the Plan or the purposeful decision by the Compensation Committee to permit the Company's senior officers to earn substantial additional compensation under the Plan. In the course of our investigation, we found no evidence that the latter was intended or, if intended, adequately considered.

■ **Role of Counsel and Other Professionals**

In light of the evidence developed in the investigation, it appears unlikely that a defense based on the advice of counsel or other professionals would be available to ULLICO's officers and directors in connection with a breach of fiduciary duty claim. Although attorneys prepared the November 2000 Board resolutions, there is limited evidence that attorneys or other professionals provided ULLICO with advice concerning whether the 1998 and 1999 stock purchase offers, the "discretionary" stock repurchase program or the formal 2000 stock repurchase program raised fiduciary duty concerns. Moreover, the issues present here primarily involve the appropriateness of certain business, as opposed to legal, decisions, such as the timing of the exclusive stock offers and the design and implementation of the repurchase programs.

In contrast, a defense based on reliance on counsel may be available to certain directors and officers, as well as the Company, in connection with any federal securities law claims. It is less clear, however, whether such a defense is available in connection with state securities laws which can be violated through negligent acts.

■ **Lack of Criminal Intent**

Based upon the information available to the Special Counsel, there is no basis to conclude that any person acted with criminal intent in connection with the transactions at issue.

## Recommendations

■ **Remedial Recommendations and Commentary**

We recommend that the Board create a committee comprised of disinterested directors (that is, those directors who did not hold stock as of November 3, 2000 or who have been appointed as a ULLICO director since that date) that will, based upon full consideration of the events described in this Report, decide the appropriate remedies. This special committee should decide either to recommend return to the Company of the profits received by directors and officers as a result of those sales or to ratify the sale of shares purchased in the 1998 and 1999 stock offers (which arguably were not properly authorized in the first instance).

Our remedial recommendations discussed below include a strong recommendation that directors and certain officers return profits made on the sale of stock they bought in 1998 and 1999. We also recommend that the special committee consider whether other amounts received by directors and officers should also be returned.

Any breach of directors' and officers' duties outlined in this Report is not predicated on whether the amounts received by the directors and officers were or were not compensation or, if compensation, whether the compensation was reasonable. Even if the stock offers were a means of compensation, these offers should have been treated as such with appropriate standards set to determine what amounts, if any, should be paid to directors and officers and without tying the payment of those amounts to shareholder repurchase programs. These programs were purportedly for the equal benefit of all shareholders but were implemented in a manner that disproportionately favored directors and officers over large institutional shareholders by allowing the former to redeem all of their Class A Stock, and leaving the latter with the ability to redeem only 2.2% of their Class A Stock.

Some of the directors and officers in their interviews, and their lawyers in recent submissions to the Special Counsel, have suggested that the stock offer and repurchase programs should or could be viewed as a form of compensation as support for their argument that no funds should be returned. As discussed in detail throughout this report, the precise business purpose of the 1998 and 1999 stock offers and the preferential treatment of directors and officers received under the repurchase programs is unclear. Some of the directors and officers we interviewed believed that the stock transactions were intended, at least in part, as compensation. Others, including Georgine and outside Company counsel, disagreed. In any event, whether intended or not, the manner in which the stock offers and repurchases were structured and implemented did, in fact, provide substantial financial benefits to certain of ULLICO's directors and senior officers.

Just prior to the release of this Report, outside Company counsel provided us with a preliminary study of the compensation paid to the directors and senior officers of ULLICO between 1991 and 2001 prepared by a recognized compensation consulting

*Privileged and Confidential*

firm. The compensation study was apparently commissioned by counsel to Chairman Georgine and essentially concludes that, even considering the stock transactions, the compensation paid to Company directors and officers during this time period was competitive and reasonable.

We were engaged by ULLICO to investigate the events surrounding the 1998 and 1999 stock offers, the Company's repurchase programs and the Global Crossing investment. We were not engaged to evaluate the reasonableness of compensation paid to ULLICO's directors and officers, although we have attempted to identify those programs and arrangements that may properly be reviewed as compensation and the legal issues related thereto.

To the extent the disinterested committee of the Board, in considering and implementing the recommendations outlined in the Report, believes it is important to evaluate the fairness and reasonableness of the compensation paid to ULLICO's directors and senior officers, we urge it to employ a process that truly ensures an objective and impartial analysis. If the retention of experts or advisors becomes necessary, the disinterested committee, not management or interested directors, should select the experts and advisors and outline the parameters of their engagement. The experts and advisors should have no prior association or affiliation with management or interested directors (or their affiliates) that could even arguably taint their independence.

Finally, in considering or evaluating any report of outside experts or advisors, the disinterested committee should ensure that the outside expert or advisor is fully informed about all aspects that could affect its analysis, and critically evaluate the assumptions, methodology and analysis contained in the report. In this regard, the study recently submitted by management makes numerous assumptions, findings and comparisons that a diligent committee member might reasonably question. For example, the study suggests that there was "improving corporate performance at ULLICO" during this period from 1998 to 2001. It also concludes that, based on several of the "metrics" they used to measure corporate performance, ULLICO's performance has been "superior" over this time period compared to the performance of a "peer group." The members of the peer group are not identified in the study.

The compensation study also concludes that ULLICO's management team demonstrated "superior performance" based, again, on a comparison to this unidentified peer group. In its comparable company and transaction analysis, the study compares ULLICO to companies that do not appear at all comparable. For example, the study cites to a recent study of equity compensation paid at Fortune 50 companies. The study also evaluates ULLICO's Global Incentive Program and other compensation programs in the context of transaction bonuses and awards paid by clearly distinct companies, such as JP Morgan, Chase Manhattan Corp., and Chevron, involved in significantly different transactions.

As mentioned earlier, we are not compensation experts and a review of the reasonableness of the compensation or other amounts paid to ULLICO's directors and officers through the stock transactions, the Global Incentive Program, the Deferred Compensation Plan and other programs is outside our mandate. However, to the extent the disinterested committee finds it appropriate to conduct or commission this analysis, it should do so in a careful and impartial manner. For example, in evaluating the Company's operating and management performance over the past several years, compared to peer group companies, the committee should consider not only the Global Crossing investment success but also the apparent financial difficulties in certain of the Company's core operations. (Exhibit 4) Moreover, in constructing the appropriate peer group, the committee should carefully evaluate whether such companies are truly comparable to ULLICO. Given management's apparent involvement with the preliminary compensation study furnished to us, we would suggest that the disinterested committee give it little or no weight in considering and implementing our recommendations.

In addition to the compensation study, just prior to the release of this Report outside Company counsel provided the Special Counsel with a legal memorandum on certain issues of Maryland law prepared by Jim Hanks, a notable authority on Maryland law, and a legal memorandum prepared by outside Company counsel on the availability of a reliance on counsel defense to ULLICO's directors and officers under Maryland law. We were well aware of Hanks's treatise on Maryland corporate law prior to receiving his memorandum and, in preparing the Report, carefully considered the arguments made by Hanks and outside Company counsel in their respective memoranda. We also consulted extensively with our own expert on Maryland corporate law, Dean Mark A. Sargent. A summary of Dean Sargent's evaluation of the memoranda prepared by Hanks and outside Company counsel is attached as Exhibit 8. For the reasons outlined in this Report, we concur with Dean Sargent's evaluation.

Our specific remedial recommendations are as follows:

1.  Directors and certain officers should return to the Company profits from sales of ULLICO stock purchased in 1998 and 1999. These pre-tax profits are as follows:

| | |
|---|---|
| Morton Bahr | $35,202 |
| John J. Barry | $280,730 |
| William G. Bernard | $326,780 |
| Marvin J. Boede | $234,680 |
| Kenneth J. Brown | $4,605 |
| Joseph A. Carabillo | $720,420 |
| Bill J. Casstevens | $603,080 |
| John E. Cullerton | $176,010 |
| John J. Gentleman | $29,335 |
| Robert A. Georgine | $837,760 |

| | |
|---|---|
| James LaSala | $88,005 |
| Martin J. Maddaloni | $234,680 |
| Joseph F. Maloney | $418,880 |
| Douglas J. McCarron | $418,880[75] |
| James F.M. McNulty | $95,189 |
| Jacob F. West | $837,760 |
| Roy Wyse | $23,025 |
| William H. Wynn | $234,680 |
| **Total** | **$5,599,701** |

*Commentary.* We strongly recommend that the return of the profits received by those directors who sold stock in 2000 and 2001 which they had purchased in 1998 and 1999 be the remedy in a matter where the directors and officers were so disproportionately favored.

We also strongly recommend that Chairman Georgine be asked to return the profits he received from the repurchases at the $146.04 price of the 8,000 shares of Class A Stock he purchased pursuant to the 1998 and 1999 stock offers. His pre-tax profits were $837,760. Georgine is the Chairman of the Board, administered the stock offer program, determined the timing of the stock offers, voted for and implemented the repurchase programs at issue and, as CEO and President, played a principal role in sponsoring these programs. The shares Georgine purchased in 1999 were also financed by a loan from Mellon Bank, for which the Company provided credit support that apparently was not authorized by the Board or any of its committees. Moreover, there is a serious question regarding whether Georgine was authorized by the Board to issue stock to himself.

Even if Georgine's profits from the sale of shares he acquired in 1998 and 1999 were deemed a form of compensation for the Global Crossing investment success, the return of such profits may well be appropriate given that the Compensation Committee (which purported to approve the stock offers) was not authorized to issue stock and Georgine received more than $2 million pursuant to the Global Incentive Program, which was intended to reward him for the Global Crossing investment success. He also (1) received approximately $4 million in profits between 1998 and 2000 under the Company's Deferred Compensation Plan, (2) received a 40,000 share stock bonus under the Stock Purchase and Credit Agreement, and (3) participated in several other compensation and fringe benefit programs. (Exhibit 2) Our conclusions would be the same whether the repurchases of Georgine's ULLICO stock occurred through the "discretionary" program or pursuant to the put option contained in the Addendum to Georgine's Employment Agreement, which was entered into under questionable circumstances.

---

[75] Before the issuance of this Report, Director McCarron voluntarily agreed to return to the Company the profits made on his stock purchases.

Finally, we strongly recommend that Chief Legal Officer Carabillo be asked to return the profits he received from the repurchases at the $146.04 price of the 7,000 shares of Class A Stock he purchased pursuant to the 1998 and 1999 stock offers. His pre-tax profits were $720,420. He was principally involved with, and benefited from, all of the transactions at issue—*i.e.*, the 1998 and 1999 stock offer programs, the formal 2000 stock repurchase program with its 10,000 share threshold and the "discretionary" stock repurchases from directors and officers. The shares Carabillo purchased in 1999 were also financed by a loan from Mellon Bank, for which the Company provided credit support that apparently was not authorized by the Board or any of its committees. Moreover, Carabillo supervised the preparation of the tender offer disclosure documents to ULLICO's shareholders. As the Company's Chief Legal Officer, Carabillo was the officer most directly responsible for ensuring that the programs and disclosures at issue were legal and proper.

Even if Carabillo's profits were deemed to be a form of compensation for the Global Crossing investment success, return of such profits may well be appropriate given that the Compensation Committee (which purported to approve the stock offers) was not authorized to issue stock and Carabillo has received about $750,000 under the Global Incentive Program, which was intended to reward him for the Global Crossing investment success. He also received approximately $320,000 in profits between 1998 and 2000 under the Company's Deferred Compensation Plan and participated in other compensation programs.

Assuming the special committee decides that return of the profits is the appropriate remedy, the Board should then decide whether to distribute the returned proceeds to other shareholders who tendered stock in the 2000 formal repurchase program and were prorated, or otherwise retain and reinvest these funds. If the committee ratifies some of the transactions at issue, it should decide whether shareholder ratification would also be prudent.

2. Determine whether a return of profits by Chairman Georgine is appropriate in connection with his Stock Purchase and Credit Agreement.

*Commentary.* The special committee should consider whether to recommend return of profits received by Georgine on the repurchase at $146.04 per share of 8,000 of the 40,000 shares he acquired under the Stock Purchase and Credit Agreement in December 1999 at the $53.94 stock price.

As discussed above, there is a serious question as to whether the issuance of the 40,000 shares acquired pursuant to the Stock Purchase and Credit Agreement was duly authorized. In addition, the timing of this bonus raises several questions that should be reviewed by the special committee.

In his interview, Carabillo explained that the Compensation Committee initially intended to grant a $2 million bonus to Georgine in 1999, but decided instead to offer Georgine the opportunity to purchase 40,000 shares financed by a loan provided by ULLICO, with the loan to be forgiven over a five-year period. According to

Carabillo, the stock issuance was more favorable to Georgine from a tax perspective. At the time the Stock Purchase and Credit Agreement was purportedly approved by the Compensation Committee (December 1999), ULLICO's stock price was $53.94 per share, based on the book value per share as of December 31, 1998. Accordingly, 40,000 shares would have been valued at $2,157,600. The Stock Purchase and Credit Agreement, however, is dated December 30, 1999, one day before the date used to calculate the 1999 "book value." At this point, it had to have been clear to those involved that, based on the increased value of ULLICO's Global Crossing investment, the 40,000 shares would be worth significantly more than $2,157,600.

In fact, the Stock Purchase and Credit Agreement was not executed by Georgine and the Compensation Committee members until well after December 31, 1999. Significantly, Director Cullerton, the last member of the Compensation Committee to execute the Stock Purchase and Credit Agreement, signed the agreement on May 10, 2000, the very same day the Executive Committee adopted a ULLICO stock price of $146.04 per share. Arguably, therefore, at the time the Stock Purchase and Credit Agreement was fully executed, the 40,000 shares acquired by Georgine were worth $5,841,600, almost triple the intended bonus of $2 million.

The special committee should evaluate these circumstances and determine whether the terms of the Stock Purchase and Credit Agreement are consistent with what the Compensation Committee and the Board of Directors intended. The committee should then decide whether to consider ratification of that agreement and the stock repurchases pursuant to that agreement or seek to amend that agreement and/or require a return of the profits to the Company. If the special committee chooses to ratify the redemption of Georgine's 8,000 bonus shares in February 2000 (under which Georgine received $1.17 million), it may wish to seek a limitation of the remaining shares he is entitled to redeem under the Stock Purchase and Credit Agreement. The committee should also consider whether to ratify or seek to invalidate the Addendum to Georgine's Employment Agreement to the extent that there is any question concerning the authorization for, and the repurchases under, that Addendum.

3.  Determine whether a return of profits or ratification is the appropriate remedy for the director and officer redemptions of Capital Stock and Class A Stock acquired through the preferred certificate program ("Class A Preferred Stock"). The pre-tax profits from these redemptions are as follows:

William G. Bernard – $1,002,839 (Class A Preferred Stock)

Bill J. Casstevens – $166,604 (Class A Preferred Stock) and at least $39,943 (Capital)[76]

John F. Gentleman – at least $132,780 (Capital)

---

[76] We have been unable to determine the cost basis for those directors and officers who redeemed Capital Stock in 2000 and 2001. Although we assumed a cost basis of $25 per share, Capital Stock received as dividends would have a cost basis of zero, thus increasing the profits stated above.

*Privileged and Confidential*

Robert A. Georgine – $66,378 (Class A Preferred Stock) and at least $525,918 (Capital)

James F. M. McNulty – at least $185,796 (Capital)

Jacob F. West – at least $151,300 (Capital)

*Commentary.* The special committee should evaluate the repurchases of Capital Stock and Class A Preferred Stock from directors and officers at the $146.04 stock price. These transactions did not result from the 1998 and 1999 stock offers. However, these transactions may have nonetheless been inappropriate because: (1) most of the transactions occurred through the "discretionary" repurchase program, which was not fully disclosed to ULLICO's directors or shareholders; or (2) the repurchases occurred through the formal repurchase program and the directors benefited from the 10,000 share proration threshold. Again, the committee should decide whether to ratify these transactions or to recommend return of the profits to the Company.

4. Determine whether a return of profits is appropriate in connection with the stock profits received by officers Luce and Grelle. These pre-tax profits are as follows:

John K. Grelle – $837,760 (all Class A from 1998 and 1999 stock offers)

James W. Luce – at least $789,299 ($582,270 Class A from 1998 and 1999 stock offers, $99,787 Class A Preferred Stock and at least $107,241 Capital Stock)

*Commentary.* The special committee of disinterested shareholders should determine the reasonableness of the "compensation" received by the senior officers other than Georgine and Carabillo (*i.e.*, Grelle and Luce[77]) in the form of stock sales. These executives did not appear to be significantly involved in the creation or promotion of the 1998 and 1999 stock offer programs, the 2000 stock repurchase program or the "discretionary" stock repurchase program. Nor does it appear that they were directly responsible for recommending or approving any of these programs. It is also unclear whether the overall compensation received by these executives (including gains on stock repurchases) is disproportionate to the market value of their respective services. Accordingly, even if the special committee recommends return of profits from the directors and other senior officers, it may nonetheless be reasonable for the committee to ratify the stock purchases and repurchases of these two officers.

The committee should pay particular attention, however, to those repurchases from senior officers pursuant to the "discretionary" stock repurchase program given that this program was not fully disclosed to ULLICO's directors or shareholders. Further, the committee should recognize that Luce and Grelle were already being compensated for the success of the Global Crossing investment through the Global Incentive Program, with each officer receiving aggregate bonuses of about $750,000

---

[77]    Steed and Maloney were unable to participate in the 2000–01 stock repurchase program.

under the Program between 1998 and 2001. In addition, Grelle and Luce also received approximately $570,000 and $605,000 in profits, respectively, under the Company's Deferred Compensation Plan between 1998 and 2000. (Exhibit 2) The committee should thus consider whether the profits made by Luce and Grelle on the sale of Class A Stock purchased in 1998 and 1999 represent an additional and unwarranted bonus.

Finally, the committee may decide to distinguish between Luce and Grelle, given: (1) Grelle's larger role in the programs as Chief Financial Officer; (2) his detailed understanding of the impact of the Global Crossing success on the calculation of book value per share; (3) his necessary involvement in the accounting issues surrounding the restatement of ULLICO's 2000 financial statements; and (4) the fact that he incurred a loan from Mellon Bank that was indirectly supported by the Company to finance the purchase of 4,000 Class A shares pursuant to the December 1999 stock offer.

5. Determine conditions for future sale of stock bought by officers and directors in 1998 and 1999 and still held.

*Commentary.* The special committee should determine whether those directors who purchased shares in 1998 and 1999 and have not sold the same may keep those shares. We suggest that the special committee determine that such action would be appropriate given that these directors apparently purchased their respective shares of ULLICO stock to align their interests with the shareholders, consistent with the stated purpose of the stock offers. If the committee adopts this recommendation, however, it should decide what restrictions, if any, should be placed upon the sale of these shares in the future.

6. Re-examine the manner in which ULLICO sets the value of its stock and impose adequate safeguards to ensure that the stock price utilized in connection with any purchase or sale of Company stock represents a reasonable approximation of the fair value of such stock.

*Commentary.* ULLICO currently sets the value of its stock five months after year-end. While at its inception this practice may have been appropriate, this practice over time created opportunities for self-interested transactions which led to this investigation and Report. The Company should revisit its stock price valuation practices and periodically evaluate whether the practices makes sense in view of general market conditions, variations in its operating and investment results, fluctuations in its stockholders' equity and alternative valuation methodologies.

■ **Corporate Governance Recommendations**

We strongly urge that the Board and its Corporate Governance Committee develop comprehensive corporate governance guidelines and a code of business conduct and ethics that address, among other things, director qualification standards, director responsibilities and company policies regarding director and officer compensation,

conflicts of interest, confidentiality and compliance with applicable laws and regulations. While ULLICO is not a public company and its mission is to provide "fair and equitable returns" to its labor partner shareholders, there is no reason to believe that many of the corporate governance reforms that have swept public companies should not have equal application and benefit to a company like ULLICO. The duties of loyalty and care are at the core of most corporate governance reforms.

While it is important that the Board and the Corporate Governance Committee tailor these guidelines and standards to fit ULLICO's unique corporate culture and mission, we would recommend, at a minimum, that, as soon as possible, they consider the following recommendations.

1.  Adopt comprehensive written corporate governance guidelines and a code of conduct and ethics within 60 days.

*Commentary.* ULLICO, which does not have a comprehensive code addressing the conduct of directors and officers, should adopt and publicize a code of conduct and ethics for directors, officers and employees with effective reporting and enforcement mechanisms. The code of conduct should address, among other things: conflicts of interest; corporate opportunities; confidentiality; compliance with laws, rules and regulations, including ERISA; and reporting on illegal and unethical behavior.

The adoption of clear corporate governance guidelines is equally important. These guidelines should address, among other things: a strategic planning process; director qualification standards and responsibilities; director orientation and continuing education; director compensation; annual board and committee evaluations; establishment of an effective system of internal controls; and plans for succession of management.

2.  Appoint, within 60 days, a Chief Compliance Officer to administer the code of conduct and ethics and to report semi-annually to the Board on all compliance efforts.

*Commentary.* The Company should appoint a Chief Compliance Officer who is knowledgeable about corporate governance and will be directly responsible for the administration of the code of conduct and ethics and its standards and procedures. This person should be a senior member of management and should report semi-annually to the Board on all compliance efforts and issues. Board minutes should reflect the reporting.

3.  Distribute the code of conduct and ethics to all directors, officers and employees for signature and maintain a file of acknowledgement forms.

*Commentary.* It is essential that all directors, officers and employees sign a certification form acknowledging the reading and receipt of the code of conduct and ethics.