4. Eliminate the "discretionary" repurchase program immediately and, if necessary, replace it with a limited program, approved by the Board, that is designed to accommodate the needs of estates, retirees and shareholders demonstrating an immediate financial need. Any such program should set clear written standards for the limited repurchase of shares. These standards should be disclosed to all shareholders.

*Commentary.* As originally envisioned, the discretionary repurchase program was designed to provide liquidity and accommodate the needs of estates, retirees and shareholders demonstrating an immediate financial need. This salutary purpose became secondary in 2000 and 2001. The discretionary repurchase program should return to its original limited purpose with clear written standards.

5. Institute and maintain a training and education program, within 60 days, for all directors and officers in regard to: (a) their legal and ethical responsibilities as directors; (b) the financial condition, the principal operating risks and the performance factors materially important to the business of ULLICO; and (c) the operation, significance and effects of compensation and incentive programs and related party transactions.

*Commentary.* The need of all corporate directors and officers to fully understand their statutory and management responsibilities has never been greater. Regular training and continuing education of officers and directors will best address this need and ensure their understanding of current best practices and legal and industry developments. New Board members should have an opportunity to confer with senior management and generally be briefed on the strategies, goals and risks of the Company as well as its major business concerns. Jon F. Elliott, Directors' and Officers' Liability § I-3.F 3 (2002)

6. Require that, effective immediately, the Corporate Governance Committee, the Audit Committee or ULLICO's shareholders review and approve each proposed material transaction between the Company and any director or officer of the Company, including any loan, guaranty or redemption program of the Company. Such review and approval shall include:

(a) a written explanation of why the transaction is in the best interests of the Company without regard to the interest or desire of the individual;

(b) a documented rationale for engaging in the transaction;

(c) a specific determination of the fairness of the transaction; and

(d) written disclosure regarding all material terms of the transaction to all directors and, in the event shareholder approval is sought, all shareholders a substantial period of time prior to the Company entering into the transaction.

*Commentary.* Our investigation indicated that a significant number of directors did not fully understand the monetary benefits granted to other directors and to officers under the programs at issue. The Corporate Governance Committee must focus on related party transactions and procedures.

7.  Disclose in the annual proxy statements all significant transactions between the Company and its directors, officers and other affiliates.

*Commentary.* The only way that the shareholders with a vested legal interest in the Company can realistically understand all significant transactions between the Company and its directors, officers and other affiliates is through full written disclosure in the annual proxy statements.

8.  Require information relating to officer and director compensation of all types (*e.g.,* salary, bonus, fees, equity, loans, retirement plans and perquisites) be disclosed by the Compensation Committee in writing to the Board and to the shareholders at least on an annual basis unless, and only to the extent, the Board determines in writing that there is an important business purpose for withholding such information. In addition, the Company's overall compensation policies should be disclosed to shareholders.

*Commentary.* There is likely no greater focus today in corporate governance than on officer and director compensation. Shareholders are entitled to a full understanding of this compensation. The structure of management compensation should directly link the interests of management to the interests of all shareholders, and that structure and linkage should be disclosed not only to the full Board but to all shareholders.

9.  Reduce the size of the Board to allow it to function efficiently and effectively.

*Commentary.* The ULLICO Board at present is authorized to have 32 members. Directors have attended an average of only 70% of the Board meetings even though ULLICO has fewer Board meetings than most comparably-sized public companies. (Exhibit 7) One part of the attendance solution may be to significantly reduce the size of the Board. The size of the Board should be determined with a view to the Board's ultimate effectiveness in decision-making. Former Board members could still assist the Company as part of an advisory group.

10. Require that at least a majority of the members of the Board be independent.

*Commentary.* Because of its labor origin, mission and values, most ULLICO directors have had close ties to senior Company management. Independent directors will increase the quality of Board oversight and lessen the possibility of damaging conflicts of interest. We also recommend that the Board be expanded to include persons who have not served as union presidents or pension fund trustees. This recommendation in no way suggests that independent directors not be fully committed to the labor movement and the traditional mission and values of the Company.

11. Require that the Board meet at least four times annually.

*Commentary.* Board meetings have not been held in a uniformly consistent manner. (Exhibit 7) The issues that ULLICO faces requires regular oversight by a Board that holds at least four meetings annually.

12. Require that independent Board members, or a committee of independent directors, determine committee assignments.

*Commentary.* Many committee members have been recommended for nomination solely by Georgine. A Nominating Committee consisting solely of independent directors should assume this responsibility.

13. Require the Board to delegate only specific, clearly defined responsibilities to its committees, and, effective immediately, further require all committees to maintain minutes and report regularly to the Board.

*Commentary.* There have been few charters at ULLICO to guide and define committee responsibilities and to evaluate committee performance. Charters for Audit, Corporate Governance and Nominating Committees can address: (a) the committee's purpose; (b) the committee's goals and responsibilities; and (c) annual performance evaluations. The preparation and distribution of accurate and complete meeting minutes is important in evaluating director performance and maintaining proper corporate records.

14. Require that all members of the Audit, Compensation, Nominating and Corporate Governance Committees be independent.

*Commentary.* Independent directors are essential to sound and responsible committees and lessen the probability of damaging conflicts of interest.

15. Rotate committee assignments regularly to ensure director independence and to better draw on the talents of Board members.

*Commentary.* It is important to receive new input and to draw on the talents of new directors on committees. Regular rotation of committee assignments increases the likelihood of achieving this goal. Directors who have special qualifications (e.g., legal or financial qualifications) may sit on a specific committee for extended periods.

16. Authorize committees to engage independent advisors as necessary.

*Commentary.* In the course of fulfilling their duties, committees may need and want to engage independent advisors. The committees should be empowered to retain such advisors without seeking Board or management approval.

17. Amend ULLICO's by-laws to provide for the removal of any director who, absent exceptional circumstances, fails to attend three consecutive Board meetings.

*Commentary*. A diligent director should attend board meetings on a regular basis and, if a member of a committee of the board, committee meetings as well. Regular attendance ensures that a director is knowledgeable about the plans, programs and developments of the company. Jon F. Elliott, <u>Directors' and Officers' Liability</u> § I-3.B 3 (2002). Parenthetically, public reporting companies must disclose in their proxy materials the identity of any incumbent director not attending at least 75% in the aggregate of meetings of the board and committees on which the director sits. A significant number of ULLICO directors missed several consecutive Board meetings between 1997 and 2001. While directors may have other important business commitments, that does not excuse the failure of directors to regularly attend Board meetings. If directors' other commitments are too great, they should resign from the ULLICO Board and permit those who can regularly attend Board meetings to serve. Each director who misses a meeting must fully inform himself or herself of the matters discussed, and actions taken, at that meeting.

18. Require that all members of the Audit Committee have financial and accounting experience and at least one member of the Audit Committee be a "financial expert" as that term shall be defined by the Securities and Exchange Commission pursuant to the considerations outlined in the Sarbanes-Oxley Act of 2002.

*Commentary*. The increasing importance of audit committees cannot be overstated. Public and private companies need to ensure that at least one member of the committee is a financial expert. The ULLICO audit committee would be well served to have several members with significant financial and/or accounting experience.

19. Consider barring loans to or arranging financing for directors and officers (in Sarbanes-Oxley).

*Commentary*. Loans to executive officers and directors have come under increased scrutiny due to the inherent conflicts of interest they present. To the extent the Company grants such loans, such loans should be fully disclosed to and approved in advance by the full Board or the shareholders.

## List of Interviews Conducted and Submissions Received

■ **Directors**

1. Morton Bahr, ULLICO Director (President, Communication Workers of America)
2. John J. Barry, ULLICO Director (International President Emeritus, International Brotherhood of Electrical Workers)
3. William G. Bernard, ULLICO Director (President Emeritus, International Association of Heat and Frost Insulators & Asbestos Workers)
4. Marvin J. Boede, ULLICO Director (Former President, United Association of Journeymen & Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada)
5. Kenneth J. Brown, ULLICO Director (Former President, Graphic Communications International Union)
6. Bill J. Casstevens, ULLICO Director (Former Secretary-Treasurer, United Automobile, Aerospace and Agricultural Implement Workers of America Union ("UAW")
7. Linda Chavez-Thompson, ULLICO Director (Executive Vice-President, AFL-CIO)
8. John F. Gentleman, ULLICO Director (Former President, ULLICO, Inc.) (oral proffer by counsel)
9. Frank H. Hanley, ULLICO Director (General President, International Union of Operating Engineers)
10. Frank D. Hurt, ULLICO Director (President, Bakery, Confectionery, Tobacco Workers & Grain Millers International Union)
11. John T. Joyce, ULLICO Director (Former President, International Union of Bricklayers and Allied Craftworkers)
12. Earl J. Kruse, ULLICO Director (President United Union of Roofers, Waterproofers and Allied Workers)
13. James LaSala, ULLICO Director (President, Amalgamated Transit Union)
14. Joseph F. Maloney, ULLICO Director (Secretary-Treasurer Emeritus, Building & Construction Trades/AFL-CIO)
15. Douglas J. McCarron, ULLICO Director (General President, United Brotherhood of Carpenters and Joiners of America)
16. James F. M. McNulty, ULLICO Director (General Counsel, The Union Labor Life Insurance Company)
17. Lenore Miller, ULLICO Director (Former President, Retail, Wholesale & Department Store Union)
18. Terrence M. O'Sullivan, ULLICO Director (General President, Laborers' International Union of North America)
19. James H. Rankin, ULLICO Director (President, Glass, Molders, Pottery, Plastics & Allied Workers International Union)
20. Vincent R. Sombrotto, ULLICO Director (President, National Association of Letter Carriers) (Written Submission)
21. John J. Sweeney, ULLICO Director (President, AFL-CIO)
22. John W. Wilhelm, ULLICO Director (General President, Hotel Employees and Restaurant Employees International Union)
23. Roy Wyse, ULLICO Director (Former Secretary-Treasurer, UAW)

*Privileged and Confidential*

■ **ULLICO Executives**

24. Erin Barrow, Senior Corporate Legal Assistant
25. Joseph A. Carabillo, Vice President, Chief Legal Officer and Assistant Secretary
26. Robert A. Georgine, Chairman, CEO and President
27. John K. Grelle, Senior Vice President and Chief Financial Officer
28. Joseph Linehan, Vice-President, Private Capital
29. James W. Luce, Executive Vice-President
30. Grover L. McKean, Senior Vice President, Investments
31. Teresa Valentine, Assistant Vice-President and Chief Compliance Officer

■ **Advisors**

32. Zeyad Awad, Auditor, PricewaterhouseCoopers
33. Richard Baltz, Attorney, Arnold & Porter
34. Douglas Beck, Attorney, LeBoeuf Lamb
35. Paul Berger, Attorney, Arnold & Porter
36. Edward Bintz, Attorney, Arnold & Porter
37. Kenneth Hugessen, Director, Mercer & Co., Outside Compensation Consultant, 1998-1999
38. Dennis Lyons, Attorney, Arnold & Porter
39. Frank Manley, Outside Compensation Consultant
40. Carey Smith, Attorney, Arnold & Porter
41. Gary Stephani, Lead Engagement Partner, PricewaterhouseCoopers

■ **Others**

42. John Hiatt, General Counsel, AFL-CIO
43. Damon Silvers, Assoc. General Counsel, AFL-CIO
44. Michael R. Steed, Former ULLICO Executive Vice-President, Investments

*Privileged and Confidential*

WINSTON & STRAWN
*Report of the Special Counsel*

# Exhibits

*Privileged and Confidential*

WINSTON & STRAWN
*Report of the Special Counsel*

## Exhibit 1

### Officer and Director Stock Holdings and 2000–01 $146.04 Repurchases

| Officers and Directors | Title or Affiliation | Capital Stock | Class A Shares | | | All Shares Sold 2000–2001 Prog/x-Prog $146.04 | Gross $ (All Sales) | Minimum[78] Pre-Tax Profits | | Remaining Stock As Of May 2001 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Pref. Cert. | '98 28.70 | '99 53.94 | | | All Sales | Sales of '98 and '99 Class A Shares | Capital | Class A |
| Georgine[79] | Ch/CEO | 4,345 | 523 | 4000 | 4000 | 0/20,868 | $3,047,563 | $2,598,378 | $837,760 | | |
| Carabillo | Ch. Leg. Ofr. | 0 | 0 | 3000 | 4000 | 4000/3000 | 1,022,280 | 720,420 | 720,420 | 0 | 32,000 |
| Grefle | CFO | 0 | 0 | 4000 | 4000 | 4000/4000 | 1,168,320 | 837,760 | 837,760 | 0 | 0 |
| Luce[80] | Exec. V.P. | 886 | 786 | 3000 | 4000 | 0/7172 | 1,047,399 | 789,299 | 582,270 | 0 | 0 |
| M. Maloney[81] | V.P., Sales | 308 | 784 | 4000 | 4000 | N/A | N/A | N/A | N/A | 308 | 1,500 |
| Steed[82] | V.P., Invsmnt. | 262 | 524 | 2000 | (quit) | N/A | N/A | N/A | N/A | 262 | 8,784 |
| Bahr | Commun. | 0 | 0 | 300 | 0 | 300/0 | 43,812 | 35,202 | 35,202 | 0 | 0 |
| Barry | Electrical | 165 | 0 | 2000 | 500 | 2500/0 | 365,100 | 280,730 | 280,730 | 165 | 0 |
| Bernard | Asbestos | 270 | 7,894 | 2000 | 1000 | 2230/8664 | 1,590,960 | 1,329,620 | 326,780 | 270 | 0 |
| Biller | Postal | 146 | 941 | 4000 | 250 | 0 | 0 | 0 | 0 | 146 | 5,191 |
| Boede | Plumbers | 292 | 0 | 2000 | 0 | 2000/0 | 292,080 | 234,680 | 234,680 | 292 | 0 |
| Brown | Graphics | 292 | 0 | 0 | 50 | 50/0 | 7,302 | 4,605 | 4,605 | 292 | 0 |
| Casstevens | Auto | 330 | 1,312 | 4000 | 4000 | 0/7642 | 1,116,038 | 809,628 | 603,080 | 292 | 0 |
| Cullerton | Hotel | 0 | 0 | 2000 | 0 | 0/1500 | 219,060 | 176,010 | 176,010 | 0 | 2,000 |
| Gentleman | ULLICO | 1,097 | 0 | 250 | 0 | 250/1097 | 196,716 | 162,116 | 29,335 | 0 | 500 |
| Kruse | Roofers | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 0 | 100 |
| LaSala | Transit | 602 | 0 | 750 | 0 | 750/0 | 109,530 | 88,005 | 88,005 | 0 | 0 |
| Maddaloni[83] | Plumbers | 0 | 0 | 2000 | 1000 | 0/2000 | 292,080 | 234,680 | 234,680 | 602 | 0 |
| J. Maloney | Construct | 212 | 0 | 2000 | 2000 | 4000/0 | 584,160 | 418,880 | 418,880 | 0 | 1,000 |
| McCarron[84] | Carpenters | 0 | 0 | 2000 | 2000 | 4000/0 | 584,160 | 418,880 | 418,880 | 212 | 0 |
| McNutty | Un. Lab. Life | 1,685 | 0 | 615 | 250 | 865/1535 | 350,496 | 280,986 | 95,189 | 0 | 0 |
| Sweeney | AFL-CIO | 355 | 0 | 250 | 0 | 0 | 0 | 0 | 0 | 150 | 0 |
| Upshaw | Athletes | 0 | 0 | 1000 | 0 | 0 | 0 | 0 | 0 | 355 | 250 |
| West | Iron | 1,250 | 0 | 4000 | 4000 | 4000/5250 | 1,350,870 | 989,060 | 837,760 | 0 | 1,000 |
| Wynn | Food | 892 | 0 | 2000 | 0 | 2000/0 | 292,080 | 234,680 | 234,680 | 892 | 0 |
| Wyse | Auto | 0 | 0 | 0 | 250 | 250/0 | 36,510 | 23,025 | 23,025 | 0 | 0 |
| Totals | | | | | | 93,923 | $13,716,516[85] | $10,666,644 | 7,019,731 | | |

78  Certain of the shares acquired and sold by various officers and directors may have been received by them as dividends prior to 1998. The basis of those shares paid as dividends would be zero. The pre-tax profit is calculated using a $25 per share basis. To the extent any of these shares had a zero basis, the pre-tax profit would therefore increase.

79  8,000 of the shares that Georgine redeemed at $146.04 were received by him as part of his 1999 Stock Purchase and Credit Agreement.

80  Luce also redeemed 1,100 Class A shares at $74.87 per share in the 2001 formal repurchase program.

81  Maloney brought a lawsuit against the Company, which is pending, relating to the disposition of these shares.

82  Steed settled his lawsuit against ULLICO on March 21, 2002. Among other things, the settlement agreement provided a $53.94 per share price, the applicable book value at the time Steed resigned in December 1999, for Steed's shares.

83  Maddaloni also redeemed 800 shares in October 2001 at $74.87 per share.

84  McCarron transferred 3,000 of these shares to his mother. We have treated these 4,000 shares as redeemed through the formal program, but the Company's documents are inconsistent on this point. (U 018243-44)

85  This figure represents 31% of the $44,835,000 in total redemptions at $146.04.

## Exhibit 2

| ULLICO INC. Senior Officer Financial Benefits (Including Stock Profits at $146.04 Per Share and Earnings on Deferred Compensation Plan) Years 1996 through 2001* | | | | | | |
|---|---|---|---|---|---|---|
| | Year 1996 | Year 1997 | Year 1998 | Year 1999 | Year 2000 | Year 2001 |
| **Robert A. Georgine** | | | | | | |
| Chairman, President &CEO | | | | | | |
| Base Salary | $650,000 | $650,000 | $ 650,000 | $ 650,000 | $ 650,000 | $ 650,000 |
| Annual Incentive | 250,000 | N/A | 250,000 | N/A | 300,000 | 500,000 |
| Global Incentive | N/A | N/A | 727,273 | 666,025 | 516,862 | 104,166 |
| Stock Profits | N/A | N/A | N/A | N/A | 469,360 | 2,129,018 |
| Deferred Comp. Earnings | N/A | N/A | N/A | 630,321 | 3,420,739 | Unknown |
| **Totals** | **$900,000** | **$650,000** | **$1,627,273** | **$1,946,346** | **$5,356,961** | **$3,383,184** |
| **Michael R. Steed** | | | | | | |
| Senior Vice President of Investments | | | | | | |
| Base Salary | $ 309,000 | $ 318,300 | $ 335,000 | $ 360,000 | N/A [B] | N/A [B] |
| Annual Incentive | N/A | 49,680 [A] 77,187 [A] | 130,000 | 132,500 | N/A [B] | N/A [B] |
| Global Incentive | N/A | N/A | 727,273 | 666,025 | N/A [B] | N/A [B] |
| Stock Profits | N/A | N/A | N/A | N/A | N/A [B] | N/A [B] |
| Deferred Comp. Earnings | N/A | N/A | N/A | N/A | N/A [B] | N/A [B] |
| **Totals** | **$ 309,000** | **$445,167** | **$1,192,273** | **$1,158,525** | **N/A [B]** | **N/A[B]** |
| **John K. Grelle** | | | | | | |
| Senior Vice President & CFO | | | | | | |
| Base Salary | $ 200,000 | $ 260,000 | $ 290,000 | $ 305,000 | $ 500,000 | $ 500,000 |
| Annual Incentive | N/A | 40,700 [C] | 90,000 | 80,800 | 145,600 | 281,250 |
| Global Incentive | N/A | N/A | 272,727 | 249,779 | 193,830 | 39,064 |
| Stock Profits | N/A | N/A | N/A | N/A | 469,360 | 368,400 |
| Deferred Comp. Earnings | N/A | N/A | N/A | 22,622 | 547,326 | Unknown |
| **Totals** | **$ 200,000** | **$300,700** | **$ 652,727** | **$658,201** | **$1,856,316** | **$1,188,714** |
| **James W. Luce** | | | | | | |
| Executive Vice President | | | | | | |
| Base Salary | $ 262,500 | $ 275,600 | $ 290,000 | $ 300,000 | $ 420,000 | $ 420,000 |
| Annual Incentive | N/A | 20,000 [A] 43,000 [A] | 90,000 | 80,800 | 120,000 | 236,250 |
| Global Incentive | N/A | N/A | 272,727 | 249,779 | 193,830 | 39,064 |
| Stock Profits | N/A | N/A | N/A | N/A | 505,983 | 283,316 |
| Deferred Comp. Earnings | N/A | N/A | N/A | 19,382 | 586,285 | Unknown |
| **Totals** | **$ 262,500** | **$ 338,600** | **$ 652,727** | **$649,961** | **$1,826,098** | **$978,630** |
| **Joseph A. Carabillo** | | | | | | |
| Vice President & Chief Legal Officer | | | | | | |
| Base Salary | $ 187,250 | $ 200,000 | $ 210,000 | $ 220,000 | $ 350,000 | $ 350,000 |
| Annual Incentive | N/A | 17,700 [A] 43,000 [A] | 55,000 | 48,800 | 84,600 | 196,875 |
| Global Incentive | N/A | N/A | 272,727 | 249,779 | 193,830 | 39,064 |
| Stock Profits | N/A | N/A | N/A | N/A | 352,020 | 368,400 |
| Deferred Comp. Earnings | N/A | N/A | N/A | 13,549 | 304,001 | 0 |
| **Totals** | **$ 187,250** | **$ 260,700** | **$ 537,727** | **$532,128** | **$1,239,451** | **$954,339** |

\* The salary and incentive payment information reflected in this Exhibit were provided by the Company and have not been independently verified by the Special Counsel

[A] Annual Incentives listed for Year 1997 are bonuses for years 1995 and 1996 combined and paid in 1997.

[B] Mike Steed resigned from ULLICO Inc. on December 10, 1999.

[C] Incentive payment in 1997 is for 1996 performance only due to Grelle's employment at ULLICO beginning January 2, 1996.

**Exhibit 3**

| ULLICO v. Global Crossing Share Price 1996–2002 | | |
|---|---|---|
| Year | ULLICO Share Price | Global Crossing Share Price[86] |
| 1996 | $25.00 | N/A |
| 1997 | $27.06 (as of 5/97) | N/A |
| 1998 | $28.70 (as of 5/98) | $24.94 (as of 8/17) |
| | | $45.13 (as of 12/31) |
| 1999 | $53.94 (as of 5/99) | $94.88 (as of 5/31) |
| | | $100.00 (as of 12/31) |
| 2000 | $146.04 (as of 5/00) | $50.12 (as of 5/31) |
| | | $28.62 (as of 12/31) |
| 2001 | $74.87 (as of 5/01) | $25.40 (as of 5/31) |
| | | $1.68 (as of 12/31) |
| 2002 | $46.58 (as of 5/02) | $0.14 (as of 5/31) |
| | | N/A |

---

[86] Global Crossing's Stock Split in March 1999. The Global Crossing Stock Price from this point onward is adjusted to reflect this stock split, *i.e.*, the actual Global Crossing Stock Price for each period is half of the amount shown in the Exhibit

*Privileged and Confidential*

WINSTON & STRAWN
*Report of the Special Counsel*

## Exhibit 4

| Year | ULLICO Pre-Tax Net Income (12/31) (Excluding Realized Gains on Investments) | ULLICO Net Income (12/31) (Including Global Crossing and Other Investment Gains and Losses) | ULLICO Dividend |
|---|---|---|---|
| 1996 | $7,515,000 | $10,018,000 | 8% Cash (Capital)<br><br>8% Cash (Preferred Certificates & Class A/B) |
| 1997 | $10,066,000 | $28,759,000 | 2% |
| 1998 | ($2,455,000) | $8,282,000 | 2% |
| 1999 | ($90,723,000)[87] | $58,900,000 | Not Applicable |
| 2000 | ($77,362,000)[88] | $111,990,000 | Not Applicable |
| 2001 | ($41,961,000)[89] | $12,747,000 | Not Applicable |

\* The information in this chart was provided by the Company and does not include minority interest impact.

---

[87]  According to the Company's 2000 Annual Report, total net realized gains on investments, excluding Global Crossing, were $19.0 million.

[88]  According to the Company's 2000 Annual Report, total net realized gains on investments, excluding Global Crossing, were $27.7 million.

[89]  According to the Company's 2001 Annual Report, total net realized gains (losses) on investments, excluding Global Crossing, were ($10.9 million).

## Exhibit 5

| Return to ULLICO on its Global Crossing Investment | | | | |
|---|---|---|---|---|
| Date | Transaction | No. of Shares | Net Price per Share[90] | Before Tax Proceeds |
| Jun 99 | US West Tender Offer | 3,070,738 | $62.75 | $192,688,809 |
| Apr 00 | Secondary Offering | 2,568,160 | 32.01 | 82,206,801 |
| Sep 00 | Open Market Sales | 960,000 | 35.34 | 33,929,617 |
| Oct 00 | Block Trade | 3,000,000 | 26.91 | 80,730,000 |
| Oct 00 | Forward Sale | 5,000,000 | 19.03 | 95,157,990 |
| May 14–Jun 5, 2002 | Misc. Sales | 843,834 | .07523 | 843,834 |
| | | | | Gross Pre–Tax: $485,557,052[91] |

---

[90]  Rounded to two decimal places

[91]  Net After Tax through 2001: $305,100,000. ULLICO held approximately 18 million shares as of June 5, 2002, valued at approximately 7.5 cents per share.

*Privileged and Confidential*

**Exhibit 6**

| Over 10,000 Shareholders Prorations 1997–2001 | | | |
|---|---|---|---|
| Date | Shares tendered | Shares Redeemed | Proration |
| 1997 | 3,099,490 | 1,108,645 | 35.76% |
| 1998 | 149,693 | 149,693 | 100% |
| 1999 | 302,496 | 278,086 | 91.93% |
| 2000 | 7,400,693 | 162,891 | 2.2% |
| 2001 | 7,129,749 | 189,464 | 2.657% |

*Privileged and Confidential*

WINSTON & STRAWN
*Report of the Special Counsel*

**Exhibit 7**



### Board Meeting Attendance Chart
#### January 1997 Through March 2002

*Privileged and Confidential*

**Exhibit 8**

Privileged and Confidential
Attorney-Client Privilege
Attorney Work Product

## MEMORANDUM

**TO:**     Winston & Strawn

**FROM:**     Mark A. Sargent

**DATE:**     November 22, 2002

**RE:**     **ULLICO**

---

I am Dean and Professor of Law at the Villanova University School of Law.  Prior to assuming my present position I taught corporate and securities law at the University of Maryland and University of Baltimore law schools for over 15 years.  I also served as Chairman of the Corporation Laws Committee of the Maryland State Bar Association.

At your request and pursuant to the protections of the attorney-client privilege and work product doctrine, I have reviewed the *Report of the Special Counsel, ULLICO Stock Purchase Offer and Repurchase Programs and Global Crossing Investment* (the Report); Affidavit of Lenore Miller, dated November 12, 2002; Declaration of John T. Joyce, dated November 12, 2002; a Memorandum of Jim Hanks to Baker Botts L.L.P and Sidley Austin Brown & Wood LLP dated November 13, 2002; and a Memorandum of Thomas C. Green to Winston & Strawn dated November 13, 2002.  You have asked me to review Hanks' and Green's analysis and conclusions with respect to the application of Maryland law to the ULLICO stock purchase offer and repurchase programs (the Programs).  I have not undertaken an independent investigation of

*Privileged and Confidential*                                                                 *Report of the Special Counsel*

the facts and circumstances relating to the Programs. My observations in this letter are thus based entirely on my review of the documents referenced above and my familiarity with Maryland law. My general conclusion is that nothing in the Hanks or Green Memoranda undermines the analysis or conclusions contained in the Report. I have also found nothing distinctive in Maryland law that would mandate analysis or conclusions different from those contained in the Report.

1.      The Hanks Memorandum.

While accurate in some respects in its description of certain aspects of Maryland corporation law, Mr. Hanks' memorandum does not address, let along dispel, the most important fiduciary concerns raised by the Report, and reaches some conclusions that are largely irrelevant.

A key example is his extended discussion of section 2-419 of the Maryland General Corporation Law (MGCL), through which he reaches the conclusion that the repurchase programs are not void or voidable because of their approval by an interested director. This discussion is largely irrelevant, because the Report acknowledges that the repurchase programs seem to have been approved by at least one disinterested director. The Report's concerns are with the broader question of whether approval of the transactions nonetheless constituted a breach of the standard of conduct required of directors. Mr. Hanks acknowledges that this question must be considered even when a transaction is not voidable under section 2-419.

Even though Mr. Hanks' conclusions about section 2-419 are irrelevant, it should be noted that several of his assumptions about the applicability of section 2-419 are questionable. For example, it is my understanding from the Report that fewer of the directors were disinterested at least with respect to the 2000 Formal Repurchase Program and the Informal

*Privileged and Confidential*                                    *Report of the Special Counsel*

Repurchase Program than Mr. Hanks seems to assume. More important, Mr. Hanks' conclusion

that the stock purchase offers were "fair and reasonable" to the corporation under section 2-

419(c) seems to me to be questionable. His analysis of this issue argues that the offers were "fair

and reasonable" for the following reasons: granting directors and officers stock in the

corporation, even without charge, is common, as is granting in-the-money options; the directors

and officers were required to pay for the stock; selling stock to directors and officers at a price

below their underlying value is not inherently problematic; the directors were at economic risk

when they purchased the stock; there was no evidence of a plan on the part of the members of the

Board to benefit themselves at the expense of the stockholders; stockholders other than directors

and officers were given the opportunity to have their shares repurchased at the same price as the

directors and officers; and Maryland law permits a director to be compensated for board service

and for a board to set its own compensation.

    This analysis combines points of little relevance, questionable assumptions and an

avoidance of the major issues actually raised. For example, it may be true that directors and

officers are often compensated for their services with stock, and sometimes with in-the-money

options, that they are sometimes allowed to purchase stock for less than their underlying value,

and the boards may set their members' compensation, but none of those observations address the

specific concerns raised by the Report about these particular transactions. Similarly, the

observation that outside stockholders were given the opportunity to purchase the shares at the

same price as the directors and officers may also be true, but does not in itself compel the

conclusion that the offers were fair, when the transactions are viewed in light of the whole

sequence of events. Furthermore, it is my understanding that there is significant disagreement

*Privileged and Confidential*

about whether the directors and officers did in fact assume any meaningful risk associated with their purchases of ULLICO stock. For example, Mr. Hanks' argument that the fact that some directors chose not to purchase the stock suggests that the stock presented economic risk is a *non sequitur*. There may have been other reasons personal to each director that led them to not participate in the purchase program. Outside directors also simply may not have understood the type of economic windfall the opportunity represented. Furthermore, Mr. Hanks downplays the importance of the Global Crossing investment to the value of the ULLICO stock by pointing out that the investment represented only 30% of ULLICO's total assets at its highest point. More significant to the question of economic risk, however, was the fact that the Global Crossing investment represented a substantially greater percentage of ULLICO's shareholders' equity, the key determinant of the stock's value, and hence the economic risk to the directors and officers who purchased the stock.

Most important, the conclusion that the stock purchase offers as a whole were "fair and reasonable to the corporation" fails to take into account the questionable relationship between the amount of "compensation" paid to the directors and the minimal services they provided in connection with the Global Crossing investment; the unauthorized delegation of power to issue stock to Robert A. Georgine; the unauthorized actions of the Compensation Committee in setting its members' own compensation; and Georgine's failure to meet his duty of candor in informing the board and the stockholders of all material facts relating to the transactions. It also is worth noting that on page 14 of his Memorandum Mr. Hanks does not address the question of whether the preferential impact of the 10,000 share provision in the Formal Repurchase Program was

"fair and reasonable." He simply dismissed the 10,000 share requirement as "irrelevant" because he claims that the transaction was approved by disinterested directors.

Thus, if the stock offers and the repurchase programs were to be evaluated pursuant to section 2-419(b)(2), there would be a significant possibility that they would not be found "fair and reasonable." In any event, Mr. Hanks' conclusion that they would be found "fair and reasonable" is essentially a red herring, because the Report does not depend upon a finding that the repurchase programs were voidable under section 2-419.

A similar red herring is his extended discussion of the meaning of fiduciary duty under the MGCL. While it is correct that the MGCL does not use the term "fiduciary," the Maryland courts certainly do, as Mr. Hanks concedes, particularly in cases involving the duty of loyalty. Furthermore, section MGCL § 2-405.1 is, in effect, a codification of the concept of fiduciary duty. The failure to use the specific term is thus of little significance. Mr. Hanks uses the distinction to make the obvious point (and one universal in American corporate law) that the director of a corporation does not have the same level of fiduciary obligation as a trustee. Whatever practical significance that distinction may have it is completely irrelevant here, because the Report does not assume that the directors had some type of heightened trustee-type duty. The Report analyzes the conduct of the directors explicitly under the statutory standard of conduct applicable to them under section 2-405.1.

To get to the heart of the matter, Mr. Hanks' analysis of the programs under section 2-405.1 is conclusory and, in my opinion, not substantiated by the facts, thus leaving intact the serious concerns raised by the Report under that section.

First, with respect to the question of "good faith," Mr. Hanks seems to conclude that the directors acted in good faith primarily upon the basis of self-serving assertions by two directors that they acted in good faith. Obviously, self-serving assertions such as these are of little weight. Furthermore, their representations do not establish the state of mind of the other directors, many of whom were tainted by a conflict of interest. The assertion by the two directors that they sought the advice of Arnold & Porter also does not in itself establish good faith. In addition, there is not only a good faith problem but a possible breach of the duty of loyalty on the part of those directors who stood to receive substantial benefits through approving the stock purchase offers and repurchase programs. The taint of conflict of interest will undermine any presumption under Maryland law that the directors acted in "good faith" for purposes of section 2-405.1.

Second, his conclusion that the directors acted "[i]n a manner he [or she] reasonably believes to be in the best interests of the corporation," ignores the serious questions raised by the Report as to whether the Programs were in fact designed and implemented to achieve their avowed objectives as opposed to enriching insiders.

Third, Mr. Hanks' conclusion that the directors acted "with the care of an ordinarily prudent person under the circumstances" seems to be based upon an assumption that they spent an adequate amount of time in meetings and were adequately briefed and advised. These facts do not take into account the Board's grossly negligent and unauthorized delegation of stock issuance authority to Georgine without "providing for or establishing a method or procedure for determining the maximum number of shares to be issued," as required by MGCL § 2-411(b); its failure to supervise Georgine's conduct of the Informal Repurchase Program; its failure to prevent the Compensation Committee's unauthorized determination of its members' own compensation; and its failure to prevent material

misstatements and omissions in public disclosures to shareholders. Furthermore, even those directors who approved the repurchase programs but did not participate in them may not have acted with due care, because they apparently failed to consider the preferential impact of the repurchase and the enrichment of other directors and officers at the expense of the stockholder.

In short, in my opinion, the Report has identified facts and provided a legal analysis raising the significant possibility that there was a material and widespread failure on the part of the members of the ULLICO board to meet the required standard of conduct under the Maryland statute. Nothing in Mr. Hanks' analysis on pp. 15-16 alters that conclusion.

2.      The Green Memorandum

While the Green Memorandum is correct that reliance upon counsel can be used in defense of a fiduciary duty claim under section 2-405.1(b)(1), the Report indicates that there are significant factual questions about: (i) what information was actually communicated to ULLICO's outside counsel and by whom; (ii) what counsel reasonably would infer about the Programs from what was communicated; (iii) what advice was sought from that counsel with respect to the Programs; (iv) what advice actually was provided and; (v) the extent to which that advice was communicated to the full board and actually relied upon.

Even more important, much of the "reliance" asserted in the Green memorandum seems to have been reliance on counsel's silence, i.e., an argument that because sophisticated counsel knew something about the transactions and did not object, the client could rely on counsel's silence to assume that the transaction was proper. Furthermore, recognition of a defense of reliance on a counsel's silence seems singularly inappropriate when the directors who would substantially benefit from the repurchase programs were called upon to approve the transactions, especially when the scale of that benefit would be grossly disproportionate

to the directors' ordinary fee-based compensation.  Under those circumstances, the directors should have sought more detailed and specific assurance of the legality and the fairness of the transactions from independent counsel and other outside experts in order to invoke the reliance on counsel defense.

In my opinion, there is thus a serious legal question under Maryland law as to whether reliance upon counsel's silence is sufficient to establish a reliance upon counsel defense under section 2-405.1(b)(1).

*Privileged and Confidential*

## MARK A. SARGENT

Villanova University School of Law
299 North Spring Mill Road
Villanova, Pennsylvania 19085-1682
(610)519-7007; (610) 519-6472 (Fax)
sargent@law.villanova.edu

### PROFESSIONAL EMPLOYMENT

1. Dean and Professor of Law
   Villanova University School of Law (July 1, 1997-Present)

2. University of Maryland School of Law (UMSL)
   Associate Dean for Academic Affairs (1994-1997)
   Piper & Marbury Professor of Law (1993-1997)
   Professor of Law (1989-1997)
   Director, Law and Entrepreneurship Program (1989-1997)
   Faculty Editor, The Business Lawyer (1991-1997)

3. Southern Methodist University School of Law
   Visiting Associate Professor of Law (Spring 1988)

4. Washington College of Law, American University.
   Visiting Professor of Law (Fall 1987)

5. University of Baltimore School of Law (UBSL)
   Professor of Law (1987-1989)
   Associate Professor of Law (1983-1987)
   Assistant Professor of Law (1980-1983)

6. Csaplar & Bok
   Boston, Massachusetts
   Private Practice (1978-1980)

### ARTICLES

1. "Blue Sky Mysteries of the National Securities Markets
   Improvements Act," 23 Sec. Reg. L.J. 172 (1997).

2. "Compounding the Enigma: Are LLC Interests Securities?," 2 NASAA
   Enforcement L. Rep. 185 (1994).

3. "A Future for Blue Sky Law," 61 U.Cinn. L. Rev. 471 (1993)
   (symposium piece).

4. "Are Limited Liability Company Interests Securities?," 18
   Pepperdine L. Rev. 1069 (1992) (symposium piece).

5. "The New Regulation D: Deregulation, Federalism and the Dynamics
   of Regulatory Reform," 68 Wash. U. L.Q. 225 (1990) (reprinted at
   22 Sec. L. Rev. 3 (1991)).

6. "Two Cheers for the Maryland Directors and Officers Liability
   Statute," 18 U. Balt. L. Rev. 278 (1989) (symposium piece).

7. "State Disclosure Regulation and the Allocation of Regulatory
   Responsibilities," 46 Md. L. Rev. 801 (1987) (symposium piece)
   (reprinted in Contemporary Issues in Securities Regulation,
   Butterworth, 1988, at 103-48).

**MARK A. SARGENT**
**PAGE 2**

8.    "Do the Second Generation State Takeover Statutes Violate the Commerce Clause?," 8 Corp. L. Rev. 3 (1985) (reprinted in <u>Tender Offers: Developments and Commentaries</u>, Quorum Books, 1985, at 75-103).

9.    "State Limited and Private Offering Exemptions: The Maryland Experience in a National Perspective," 13 U. Balt. L. Rev. 496 (1984) (symposium piece).

10.    "A Reexamination of the Agency Doctrine of Election," 36 U. Miami L. Rev. 411 (1982) (Co-author: Arnold Rochvarg).

11.    "On the Validity of State Takeover Regulation: State Responses to <u>MITE</u> and <u>Kidwell</u>," 42 Ohio St. L. J. 689 (1981) (reprinted at 14 Sec. L. Rev. 221 (1982)).

<u>EDITING PROJECTS</u>

1.    "Symposium: Religion and Investing," 3 Vill. J. L. & Investment Mgmt. _____ (2002)

2.    "Symposium: The National Securities Markets Improvements Act One Year Later," 53 Bus. Law. 507 (1998).

3.    "Check-the-Box and Beyond: The Future of Limited Liability Entities," 52 Bus. Law. 605 (1997) (Co-editor: Larry Ribstein).

4.    "Review of Developments in State Securities Regulation - Blue Sky Law in Cyberspace," 52 Bus. Law. 315 (1996).

5.    "Symposium on the Maryland Director and Officer Liability Statute," 18 U. Balt. L. Rev. 225 (1989).

6.    "Symposium on State Securities Regulation," 13 U. Balt. L.Rev. 435 (1984).

<u>REPORTS</u>

1.    "Report and Recommendations on Mental Health Inquiries on the Maryland Bar Application," October 1995 (report prepared for the Section of Legal Education and Admissions to the Bar, Maryland State Bar Association).

2.    "Report on State Merit Regulation of Securities Offerings," 41 Bus. Law. 785 (1986) (prepared for the ABA State Regulation of Securities Committee).

<u>SHORTER ARTICLES</u>

1.    "Legal Defense: When Sued, How Should the Church Behave?," Commonweal, June 14, 2002, at 13.

2.    "The Real Scandal: Enron's `Crimes' Were Legal," Commonweal, March 8, 2002, at 10.

*Privileged and Confidential*

**MARK A. SARGENT**
**PAGE 3**

3.  "An Alternative to the Sectarian Vision: the Role of the Dean in an `Inclusive' Catholic Law School," 13 U. Toledo L. Rev. 171 (2001) (symposium piece).

4.  "Another Mouse that Roared: Maryland's Leadership in the Law of Business Organizations," 30 Md. B.J. 15 (Jan./Feb.1997).

5.  "Immigration Law: The Maryland Law School Experience," 30 Md. Bar J.1 (May/June 1997).

6.  "State Treatment of LLC Interests as Securities," 3 J. Lim. Liab. Co. 137 (1997).

7.  "What Does it Take? The Hallmarks of a Business Lawyer," Business Law Today, July/August 1996, at 11.

8.  "LLCs as Securities - California Style," 1 J. Lim. Liab. Co. 181 (1995).

9.  "Are LLC Interests Securities? - Part I," 1 J. Lim. Liab. Co. 34 (1994); "Are LLC Interests Securities? - Part II," 1 J. Lim. Liab. Co. 127 (1994).

10. "Will Limited Liability Companies Punch a Hole in the Blue Sky?", 21 Sec. Reg. L. J. 429 (1993).

11. "No More Tinkering!", Business Law Today, July-Aug. 1992, at 5.

12. "SCOR One for the Issuer," N. Y. L. J., June 1, 1992, at 7.

13. "A Blue Sky State of Mind: The Meaning of 'Willfully' in Blue Sky Criminal Cases," 20 Sec. Reg. L. J. 96 (1992).

14. "ULOE: New Hope, New Challenge," 45 Bus. Law. 1319 (1990) (co-author: Hugh Makens).

15. "The SCOR Solution," 18 Sec. Reg. L. J. 93 (1990).

16. "RUSA Revisited," 16 Sec. Reg. L. J. 79 (1989).

17. "Director Liability Statutes Placed in Perspective," Nat'l L. J., July 4, 1988, at 23.

18. "Blue Sky Enforcement Actions - Some Practical Considerations," 14 Sec. Reg. L. J. 343 (1987).

19. "Some Thoughts on the Revised Uniform Securities Act," 14 Sec. Reg. L. J. 62 (1986).

20. "State Regulation of Investment Companies - Sources of the Current Controversy," 13 Sec. Reg. L. J. 167 (1985).

21. "The Challenge to Merit Regulation - Part II," 12 Sec. Reg. L. J. 367 (1985).

**MARK A. SARGENT**
**PAGE 4**

22. "The Challenge to Merit Regulation - Part I," 12 Sec. Reg. L. J. 276 (1984).

23. "Bluer Skies in Maryland: An Introduction to the New Maryland Exemptions for Limited and Private Offerings," 1983 U. Balt. L. Forum 22 (Co-author: K. H. Matney).

24. "Research in Securities Regulation Revisited," 79 Law Libr. J. 259 (1987) (co-author: Melanie L. Senter).

25. "Research in Securities Regulation: Access to the Sources of the Law," 75 Law Libr. J. 98 (1982) (Co-author: Emily R. Greenberg).

## COMMERCIAL PUBLICATIONS

1. <u>Proxy Rules Handbook</u> (Clark Boardman Callaghan 8th ed. 2000) (Co-author: Dennis R. Honabach).

2. <u>D&O Liability Handbook</u> (Clark Boardman Callaghan 10th ed. 2000) (Co-author: Dennis R. Honobach).

3. <u>Limited Liability Company Handbook</u> (Clark Boardman Callaghan 9th ed. 2000) (Co-author: Walter D. Schwidetsky).

## BOOK REVIEWS

1. Review of Ercole, Levine et al., <u>Maryland Limited Liability Company Forms and Practice Manual</u>, Daily Record (Baltimore), Dec. 31, 1993, at 12.

2. Review of Hanks, <u>Maryland Corporation Law</u>, and Schulman, Moscow & Lesser, <u>Michigan Corporation Law and Practice</u>, 47 Bus. Law. 1355 (1992).

3. "A Sense of Order: The Virtues and Limits of Doctrinal Analysis," review of Loss & Seligman, <u>Securities Regulation</u>, vols. I-IV, 104 Harvard L. Rev. 634 (1990).

4. Review of Moscow & Makens, <u>Michigan Securities Regulation</u>, 39 Bus. Law. 359 (1983).

5. Review of Karmel, <u>Regulation by Prosecution</u>, and Seligman, <u>The Transformation of Wall Street</u>, 12 U. Balt. L. Rev. 371 (1982).

## DRAFTING PROJECTS

1. Co-Reporter, Revision of the Uniform Securities Act, National Conference of Commissioners on Uniform State Laws, 1982-83.

2. Reporter, Revision of the Maryland Securities Act, Maryland State Bar Association, 1985-88.

*Privileged and Confidential*

**MARK A. SARGENT**
**PAGE 5**

3.   Principal Draftsman, Maryland Securities Division Regulations .09 and .15, private and limited offering exemptions under the Maryland Securities Act, 1981-82.

## COURSES

Securities Regulation; Securities Regulation Workshop; Business Associations; Business Crime; Business Planning; Business Lawyering; Mergers & Acquisitions; Law & Finance of High Technology.

## LAW SCHOOL AND UNIVERSITY SERVICE

1.   Chair, UMAB Presidential Search Committee (June 1993-February 1994).

2.   Chair, UMAB Defining Quality Advisory Committee (1992-93).

3.   Chair, UMSL Strategic Planning Committee (1990-92).

4.   Law School Representative, Task Force for the Unification of the University of Maryland at Baltimore and the University of Maryland - Baltimore County; Chair, Mission Statement Writing Group (1991-1992).

5.   Chair, UBSL Long-Range Planning Committee (1988-89).

6.   Chair, UBSL AALS Self-Study Committee (1982-83).

7.   Coordinator, UBSL Faculty Colloquium on Business Organizations (1983-85).

8.   Coordinator, UBSL Faculty Workshop (1986-87, 1988-89).

9.   Adviser, Maryland Law Review (1990-1991).

10.  Adviser, Maryland Journal of International Law and Trade (1989-1991).

11.  Adviser, UMSL Business Law Society (1989-1992).

## DISTINCTIONS

1.   Teacher of the Year, University of Maryland School of Law 1994-95.

2.   Member, American Law Institute (1991-Present).

3.   Spirit of Excellence Award, University of Baltimore 1984.

## EDITORIAL POSITIONS

1.   Co-Editor-in-Chief, Villanova Journal of Law and Investment Management (1998-Present).

2.   Member, Editorial Board, The Business Lawyer (1997-1999).

*Privileged and Confidential*

**MARK A. SARGENT**
**PAGE 6**

   3.   Faculty Editor, The Business Lawyer (1992-1997).

   4.   Member, Board of Editors, Journal of Limited Liability Companies (1994-1999).

   5.   Member, Board of Contributing Editors and Advisers, Securities Regulation Law Journal (1992-1995).

**BAR LEADERSHIP**

   1.   Chair, Corporation Laws Committee, Maryland State Bar Association (1996-1997).

   2.   Chair, Committee on Representing Emerging Companies, Maryland State Bar Association (1990-1994).

   3.   Chair, Section Council, Section of Legal Education and Admissions to the Bar, Maryland State Bar Association (1995-96).

   4.   Member, Section Council, Section of Business Law, Maryland State Bar Association (1990-1993).

**BOARDS**

   1.   Member, Board of Trustees, Wilmington Trust Mutual Funds, 2002-present.

   2.   Independent General Partner, Fiduciary Capital Partners SBIC (1998-2002).

   3.   Member, Board of Directors, Saint Thomas More Society of Pennsylvania (1998-Present)

   4.   Member, Board of Directors, Empowerment Zone Legal Services, Inc. (1996-1997)

   5.   Member, Advisory Board, UMBC Technology Enterprise Center (1989-1995).

   6.   Member, Board of Trustees, Handel Society of Baltimore (1989-94)

**MISCELLANEOUS**

   1.   Member, National Adjudicatory Council, National Association of Securities Dealers, Inc. (2000-Present)

   2.   Arbitrator, American Arbitration Association (1998-Present)

   3.   Arbitrator, National Association of Securities Dealers, Inc. (1988-92).

   4.   Arbitrator, SEC v. Prudential Securities, Inc. Settlement (1994-1996).

*Privileged and Confidential*                                    *Report of the Special Counsel*

**MARK A. SARGENT**
**PAGE 7**

5.  Hearing Officer, Division of Securities, Office of the Maryland
    Attorney General (seven matters, 1982-89).

6.  National Endowment for the Humanities Summer Fellowship, Stanford
    Law School (1982).

7.  Continuing legal education program chairman and instructor:  ALI-
    ABA; Practicing Law Institute; ABA Section of Business Law; ABA
    Torts and Insurance Practice Section; Warren Gorham Lamont;
    Maryland Institute for Continuing Professional Education of
    Lawyers; Michigan Institute of Continuing Legal Education;
    Minnesota Institute Legal Education; Maryland State Bar
    Association; North American Securities Administrators Association
    (NASAA); Northwest Securities Institute; SMU School of Law;
    Suffolk University Law School; Maryland Lawyers for the Arts.

8.  Pro Bono Consultancies:  ABA; NASAA; Michigan State Bar; Virginia
    Corporation Commission; Maryland Division of Securities.

9.  Executive Producer, "Insight Out," (October, 1995) (a training
    video for use with a campus-wide Americans with Disabilities Act
    evaluation survey).

**EDUCATION**

1.  Wesleyan University
    B.A., magna cum laude, 1973

        -Member:  Phi Beta Kappa
        -High Honors:  Comprehensive Examinations in the College of
                       Letters
        -Junior Fellow, Wesleyan Center for the Humanities
        -Connecticut State Scholar (1969-73)

2.  Cornell University
    M.A., Medieval and Renaissance History, 1975

        -Danforth Fellowship

3.  Cornell Law School
    J.D., 1978

        -Student research assistant: Cornell Institute on Organized
                                      Crime

**PERSONAL**

1.  Admitted to Massachusetts Bar, 1978.

2.  Born April 28, 1951, New London, Connecticut.

3.  Married to Joan Taranto Sargent with one child, Alexander.

*Privileged and Confidential*                                    *Report of the Special Counsel*

**Mark A. Sargent**                                             May 31, 2002
**Representative Presentations**

1.  Presenter, "A Vision of an 'Inclusive' Catholic Law School," Conference on Catholics in the Public Square, Pew Foundation and Commonweal Magazine, Malibu, CA, February 24, 2002.

2.  Panelist, "The Forces of Secularization in the Legal Academy," Conference of Religiously Affiliated Law School, Malibu, CA, February 22, 2002.

3.  The Phillip Hallie Lecture, "The Crisis in Catholic Social Thought," College of Letters, Wesleyan University, Middletown, CT, October 24, 2001.

4.  "The Role of Independent Directors in Mutual Fund Governance," Conference on Mutual Fund Regulation in the Next Millennium, New York Law School, New York, N.Y., February 4, 2000.

5.  "Will Lawyers Be the Providers of Legal Advice in the 21st Century?," Association of American Law Schools (AALS) Annual Meeting, Washington, D.C., January 6, 2000.

6.  Chair, Panel Discussion, "The National Securities Markets Improvements Act: Unanswered Questions," North American Securities Administrators Association, Annual Meeting, Nashville, Tennessee, October 5, 1998.

7.  "A Program in Law & Entrepreneurship," AALS Workshop on Teaching Business Associations, Washington, D.C., May 1, 1998.

8.  "The (Un)importance of SEC-Mandated Disclosure of Executive Compensation," Symposium on Corporate Disclosure and its Impact on Corporate Morality, Columbus School of Law, Catholic University, Washington, D.C., April 16, 1998.

9.  "Subject-Matter Focused Externships," Conference on Externship Pedagogy: Theory and Practice, Columbus School of Law, Catholic University, Washington, D.C., March 7, 1998.

10. "When are LLC Interests Securities?", New Jersey Institute of Continuing Legal Education, Rutgers University, New Brunswick, New Jersey, November 20, 1996.

11. "Conversions Into LLCs," Suffolk University Law School, Boston, November 8, 1996.

12. "Raising Capital via Private Placements - Legal Issues," Dingman Center for Entrepreneurship, University of Maryland, September 16, 1996.

*Privileged and Confidential*

13. "Problems of Fiduciary Obligation in LLC Law", Minnesota Institute of Legal Education, Minneapolis, MN, May 2, 1996.

14. "Non-Tax Issues in LLC Law: An Overview", Maryland Institute for Continuing Professional Education of Lawyers (MICPEL), Baltimore, Maryland, May 1, 1996.

15. Organizer and Panelist, Panel Discussion on *"Hopwood v. Texas*: Its Implications for Affirmative Action in Legal Education," Maryland State Bar Association Section of Legal Education and Admissions to the Bar, Baltimore, Maryland, April 29, 1996.

16. "The Evolution of Limited Liability Entities", Maryland Judicial Institute, Annapolis, Maryland, April 19, 1996.

17. Testimony on the "Capital Markets Deregulation and Liberalization Act of 1995," before the Subcommittee on Telecommunications and Finance Subcommittee of the Committee on Commerce, U.S. House of Representatives, December 5, 1995.

18. "Fiduciary Problems in LLCs," Suffolk University Law School, Boston, November 29, 1995.

19. "Why Mandatory CLE?," Maryland State Bar Association Annual Meeting, Ocean City, Maryland, June 9, 1995.

20. "Living Within the Securities Laws," Limited Liability Conference, Warren Gorham & Lamont, Hilton Head, South Carolina, June 6, 1995.

21. Panelist, "The Role of the Character Committee Interview in the Bar Admissions Process," Section of Legal Education and Admissions to the Bar of the Maryland State Bar Association, Annual Meeting, Baltimore, May 3, 1995.

22. "New Approaches to Regulating LLCs," North American Securities Administrators Association, ABA Subcommittee on State Securities Regulation, Annual Meeting, Boston, MA, Oct. 10, 1994.

23. "Legal Constraints on Private Placements," Dingman Center for Entrepreneurship, University of Maryland-Baltimore County, October 4, 1994.

24. "Experiential Learning and the Training of Business Lawyers," Morgan, Lewis & Bockius (Securities Law Department), Washington, D.C., September 19, 1994.

25. "Are LLC Interests Securities?," "Should a Law Firm Be an LLC or an LLP?," Minnesota Institute of Legal Education, Minneapolis, MN, June 15, 1994.

26. "Access to Private Capital for Small Businesses," Baltimore Chamber of Commerce, Baltimore, MD, April 26, 1994.

27. "Main Currents in D&O Liability,"  Program on Developments in the Law Affecting Corporate Officers and Directors, ABA Torts and Insurance Practice Section, Baltimore, MD, December 14, 1993.

28. "Creating an Entrepreneurial Culture,"  Maryland Partnership Symposium, Dingman Center for Entrepreneurship, University of Maryland-College Park, September 14, 1993.

29. "Intellectual Property Dilemmas in the Life-cycle of Entrepreneurial Companies," Program for the Maryland Department of Economic and Employment Development, Baltimore, MD, July 27, 1993.

30. "Goals of Externship Programs in Business Law," Clinical Legal Education Association Conference on Externships, McLean, VA, May 5, 1993.

31. "Professional Practice Plans in Legal Education," University of Maryland School of Social Work, Baltimore, March 4, 1993.

32. "A Critical Analysis of the SEC's Small Business Initiative," Northwest Securities Institute, Vancouver, BC, February 27, 1993.

33. "Financial Resources for Early-Stage Biotechnology Companies," Greater Baltimore Committee Biotech Professionals' Forum, Baltimore, January 14, 1993.

34. "A Future for Blue Sky Law," Washington-Baltimore Corporate Law Teachers Working Group, George Washington University National Law Center, Nov. 11, 1992; University of Maryland School of Law Faculty Workshop, Nov. 19, 1992.

35. "Venture Capital Financing Agreements," MICPEL, Business Document Drafting Series, Baltimore, Oct. 21, 1992.

36. "The New SEC Rules for Small Business Securities Offerings," Maryland State Bar Association (MSBA), Securities Law Committee Program, Baltimore, Oct. 2, 1992.

37. "Review of Recent Maryland Corporation and Partnership Law Decisions," MSBA Section of Business Law Program, MSBA Annual Meeting, Ocean City, MD, June 11, 1992.

38. "Duties, Rights and Liabilities of Directors of Non-profit Corporations," First Annual Non-profit Organizations Institute, Goucher College, Towson, MD, May 28, 1992.

39. "A Program in Law & Entrepreneurship," ABA Section of Business Law, Committee on Legal Education, Annual Section Meeting, Orlando, FL, April 10, 1992.

40. "Are Limited Liability Company Interests Securities?", Symposium on Current Issues in Securities Regulation, Pepperdine School of Law, Malibu, CA, Feb. 22, 1992.

*Privileged and Confidential*

41.   "Origins of the Fiscal Crisis," Teach-In on Maryland's Fiscal Crisis, University of Maryland School of Law, Baltimore, Jan. 29, 1992.

42.   "Fear and Loathing in the Law World," The Breakfast Club, Baltimore, Feb. 13, 1992.

43.   "The Maryland Court of Appeals in Review," MSBA Section of Judicial Administration, Mid-year Meeting, Baltimore, Nov. 9, 1991.

44.   "Private Placements Under the State Securities Laws," PLI Program on Private Placements 1991, New York, NY, Apr. 12, 1991.

45.   "A Legal Primer for Maryland Arts Organizations," Maryland State Arts Council, Baltimore and Easton, MD, Oct. 13 and Nov. 10, 1990.

46.   "A Defense of Socratic Teaching: Comments on Jerold Israel," University of Maryland School of Law (UMSL) Orientation Program, Baltimore, Aug. 23, 1990.

47.   "Procrustes' Bed: The Impact of Merit Regulation on Business Financing," ABA Section of Business Law, Annual Meeting, Chicago, IL, Aug. 7, 1990.

48.   "Problems in Planning Exempt Transactions Under Federal and Maryland Securities Law," MICPEL Program on Raising Money Privately, College Park, MD, Nov. 3, 1989.

49.   "Comments on the Revised Uniform Securities Act," ABA Section of Business Law, State Regulation of Securities Committee, Annual Section Meeting, Houston, TX, April 1, 1989.

50.   "Blue Sky Internationalization," North American Securities Administrators Association (NASAA), Annual Meeting, Santa Fe, NM, Oct. 12, 1988.

51.   "Analysis of the New Michigan Fair Price Takeover Statute," Michigan Institute of Continuing Legal Education, Ann Arbor, MI, July 29, 1988.

52.   "The New State Takeover Statutes: Constitutional Considerations," ALI-ABA Program on State Takeover Regulation Today, Philadelphia, PA, Oct. 27, 1988.

53.   "The Legal Framework of Blue Sky Enforcement," SMU School of Law, Program on Blue Sky Law Today, Dallas, TX, Oct. 22, 1987.

54.   "Sources of the D & O Liability Crisis," University of Baltimore School of Law, Program on the Current Crisis in Directors' Liability, Baltimore, Feb. 24, 1987.

55.   "Maryland Corporation Law Decisions 1983-86," MSBA Mid-Year Meeting, Bethesda, MD, Jan. 9, 1987.

*Privileged and Confidential*

56.   "What is Merit Regulation?," ABA Young Lawyers Division, Program on Merit Regulation, ABA Annual Meeting, New York, NY, Aug. 12, 1986.

57.   "Edgar v. MITE Corp. and the Origins of the Second Generation State Takeover Statutes," ALI-ABA Program on New Directions in State Takeover Regulation, San Diego, CA, May 10, 1986.

58.   "Law School Twenty-five Years Ago and Today," Serjeant's Inn, 25th Anniversary Dinner, Baltimore, Dec. 11, 1985.

59.   "Blue Sky Regulation of Real Estate Securities Offerings," ALI-ABA Program on Modern Real Estate Transactions, Charlottesville, VA, June 26, 1985.

60.   "The Historical Development of the Dual Regulatory System," ABA Section of Business Law, Annual Meeting, Los Angeles, CA, March 29, 1985.

61.   "Blue Sky Law: The Current Controversy," University of Maryland School of Law Symposium on Corporate and Securities Law Developments, Baltimore, Nov. 1, 1984.

62.   "Securities Disclosure: Myth & Meaning," NASAA Analysts' Symposium, St. Louis, MO, Aug. 21, 1985.

63.   "Introduction to State Regulation of Real Estate Securities Offerings," ALI-ABA Program on the Effect of Securities Regulation on Real Estate Transactions, New York, NY, Oct. 24, 1983.

64.   "After the Fall," University of Baltimore School of Law, Program on New Directions in State Takeover Regulation, Baltimore, March 30, 1983.

65.   "Revising the Uniform Securities Act During the Financial Revolution," NASAA Financial Institutions Forum, Baltimore, Jan. 24, 1983.

66.   "MITE and its Progeny," NASAA Annual Meeting, Seattle, WA, Oct. 6, 1982.

67.   "On Revising the Uniform Securities Act," NASAA Annual Meeting, Seattle, WA, Oct. 4, 1982.

## Special Counsel Staff

The senior members of the Special Counsel staff, all lawyers at Winston & Strawn, have substantial experience in corporate internal investigations, securities regulation, securities litigation and criminal law.

Special Counsel James R. Thompson, Chairman of Winston & Strawn, is the former Governor of Illinois (1977-1991) and United States Attorney for the Northern District of Illinois (1971-1975). Governor Thompson is a member of numerous corporate boards.

Special Counsel Staff Director Robert W. Tarun is co-author of the treatise Corporate Internal Investigations and has supervised scores of internal investigations. Mr. Tarun is a former Executive Assistant United States Attorney and has substantial criminal defense and regulatory experience. Stephen J. Senderowitz supervised, as the Deputy Chief of Special Prosecutions Division in the United States Attorney's Office, financial markets prosecutions, and in private practice has concentrated his practice in civil and criminal securities and derivatives litigation. Daniel A. Ninivaggi specializes in corporate finance and securities transactions. Timothy M. Broas and Charles B. Klein are litigators experienced in both complex civil and criminal law as well as corporate internal investigations.

Attorneys Jon J. Kramer, Christopher M. McClellan and Raymond W. Mitchell provided substantial assistance in connection with the legal research and analysis thereof used in the Report. Attorneys Thomas P. Fitzgerald, Barry J. Hart and Karen M. Kowalski assisted on tax issues, and Attorney Michael S. Melbinger provided advice on employee benefit plans.

Paralegal services were provided by Megan Bushor, Kevin J. Behan and John D. Frier. Abbe L. Wright provided graphics assistance.

*Privileged and Confidential*

# Notice

The following changes have been made to the Report since it was first issued on November 26, 2002:

1. The name "Wilhelm" was added to footnote 34 on page 42 and also at the end of the third full paragraph on page 63.

2. The names "Wyse, McCarron" were deleted from the third line from the bottom of page 38, as the reference quoted from their interviews related to the formal program and not the discretionary program as indicated.

3. Director Hanley's name was added to the end of footnote 34 on page 42.

4. In the first full paragraph on page 40, the following reference "(4) 12,523 Class A shares from Georgine; (5) 4,345 Capital shares from Gentleman (director and former officer) on March 9, 2001;" was corrected to read as follows: "(4) 12,523 Class A / 4,345 Capital shares from Georgine on February 14, 2001; (5) 1,097 Capital shares from Gentleman on March 2, 2001;".

5. The name "Bernard" was deleted from footnote 37 on page 46.

Exhibit 45

# MEETING OF THE BOARD OF DIRECTORS
## OF
## ULLICO INC.
### HELD APRIL 2, 2003
### AT 111 MASSACHUSETTS AVENUE, N.W.
### WASHINGTON, DC 2001

**ATTENDEES:**

**DIRECTORS:**

Morton Bahr
John J. Barry
William G. Bernard
Marvin Boede
Bill Casstevens
John T. Dunlop, Ph.D.
John G. Gentleman
Frank D. Hurt
Robert A. Georgine
John T. Joyce
Earl J. Kruse
James La Sala

Martin J. Maddaloni
Joseph F. Maloney
James F. M. McNulty
Lenore Miller
Daniel H. Mintz, MD
Terence M. O'Sullivan
James H. Rankin
Vincent R. Sombrotto
Roy W. Wyse

**OFFICERS:**

Bill Blanton
James Luce
Grover McKean

Patrick Montgomery
Frank Santana
Teresa Valentine

**OTHERS:**

Joseph W. Armbrust
Steve Cottreau
Karen A. Popp

Michael Rauh
Joe Semo
Randy Turk

The meeting was called to order at 11:00 a.m.. The Chairman noted that this was the continuation of a meeting begun on March 28, 2003 and would continue with consideration of the Corporate Governance recommendations made by the Special Committee of the Board established to review Governor Thompson's report. The Special Committee had put forward 27 resolutions for consideration, a copy of which was circulated for consideration by the Board and which is attached to these minutes. The Chairman proceeded to review each in turn with the assistance of Mr. Armbrust, counsel associated with Sidley Austin Brown & Wood.

The first resolution recommended that the source material for the corporate governance recommendations in the Thompson Report be referred to our Governance Committee to develop, as soon

1

USDC 0003519



as possible, new governance guidelines for ULLICO and to recommend to the Board such changes in the By-Laws as may be required for the enactment of such guidelines. It was noted that the resolution should reflect that this was a continuation of work begun by the Corporate Governance Committee and not a start of such work. There being unanimous agreement with this, a motion was made and duly seconded, and it was unanimously:

> RESOLVED: "That the Board of Directors hereby authorizes and directs the Governance Committee to continue its work to develop and recommend new governance guidelines for the Company and to recommend such changes to the By-Laws as may be required for their enactment."

The second and third resolutions proposed that the Chief Compliance Officer, who is Teresa Valentine, develop, as soon as possible, updated codes of conduct and ethics applicable to Directors, Officers and employees that address the recommendations in the Special Committee Report for consideration and recommendation by the Corporate Governance Committee. It was suggested that the resolution be modified to reflect that "updated and enhanced" codes of conduct were to be considered, acknowledging that a code of conduct already is in place. Whereupon, a motion was made and duly seconded, and it was unanimously:

> RESOLVED: "That the Board of Directors hereby authorizes and directs the Chief Compliance Officer to develop for review and approval by the Governance Committee, as soon as possible, updated and enhanced codes of conduct and ethics for Directors, Officers and employees that address the recommendations in the Thompson Report (the "Code of Conduct")." And,

> FURTHER
> RESOLVED: "That the Board of Directors hereby authorizes and directs the Governance Committee to review and approve the Code of Conduct as appropriate and in the best interests of the Company."

The next two resolutions addressed administration of the Company's Code of Conduct. The first proposes that the Compliance Officer make at least annual reports to the Board and the second requires annual acknowledgement of the Code of Conduct by all Board members, officers and employees. Whereupon, after brief discussion, a motion was made and duly seconded, and it was unanimously:

> RESOLVED: "That the Chief Compliance Officer is hereby authorized and directed to administer the Code of Conduct and to report to the Board of Directors on matters relating to Compliance with the Code of Conduct whenever such Officer deems it appropriate and at least annually." And,

> FURTHER
> RESOLVED: "That the Chief Compliance Officer is hereby authorized and directed to maintain such annually updated records of acknowledgement for all Directors, Officers and employees so as to provide assurance to the Company that such Directors, Officers and employees have received ULLICO's Code of Conduct and they have agreed to abide by its terms."

The next two resolutions addressed the repurchase of shares and how the Company might provide liquidity when needed. As clarification, it was noted that the reference to retiree meant a retiree from the Company or the Board of Directors. Whereupon, after discussion in which the Chairman identified recent

2

USDC 0003520



repurchases from institutional shareholders and that there was at least one pending request, a motion was made and duly seconded, and it was unanimously:

RESOLVED:    "That the Governance Committee is hereby authorized and directed to re-evaluate the conditions for repurchases of the Company's stock under all of its stock repurchase programs, including all valuation methodologies, and that such committee be authorized to engage securities experts and other experts to assist in their deliberations." And,

FURTHER
RESOLVED:    "That any transaction under the Company's discretionary stock repurchase program, other than a transaction with the estate of a Director or Officer or of a retiree from the Company or the Board of Directors, shall be referred to the Governance Committee for its approval prior to being submitted to the Board of Directors for final approval."

The Special Committee endorsed the recommendation for the institution of an ongoing training and education program for directors. The Chairman noted that the Corporate Governance Committee had earlier made such a recommendation that an expert on governance matters be retained and that candidates were already being considered to provide such instruction. It was agreed that the Governance Committee should continue to oversee this process. Whereupon, a motion was made and duly seconded, and it was unanimously:

RESOLVED:    "That the Chief Compliance Officer is hereby authorized and directed to develop as soon as possible for review and approval by the Governance Committee a curriculum for training new directors and retraining experienced directors to further the program currently being administered by the Governance Committee."

The next three resolutions concerned transactions between the Company and its directors or officers. The Chairman explained that the resolution that defines a material transaction under the rules that apply to a public company, means a transaction of at least $60,000. The Chairman expressed his concern that flexibility be retained for the company to act quickly and that a special rule be added to modify the resolutions by adding one further provision. He explained that the Chairman customarily gave ten days notice of a special Board meeting, although the By-laws only required five days reasonable notice. He noted that there will be times when it will not be convenient to give the customary ten days notice for a meeting. He proposed the following resolution:

RESOLVED: "That where the Chairman designates a transaction as requiring immediate action, action may be taken at a meeting called upon 48 hours notice so long as at least three independent directors are present."

Whereupon, after discussion, a motion was made to adopt the resolutions as modified and was duly seconded, and it was unanimously:

RESOLVED: "That any proposed material transaction between ULLICO and any Director or Officer of ULLICO be first reviewed and considered by an existing committee or committees of the Board of Directors as the Chairman of the Board of Directors deems appropriate, which committee will provide the Board of Directors with a

3

descriptive recommendation of the rationale and business value of the proposed transaction before the Board takes final action." And, be it

FURTHER
RESOLVED: "That any proposed material transaction between ULLICO and any Director or Officer of ULLICO must be finally approved by the full Board of Directors." And, be it

FURTHER
RESOLVED: "That for purposes of the foregoing resolution, a transaction shall be deemed to be material if such transaction would, in the judgment of ULLICO's counsel, be required to be disclosed in the Company's proxy statement if the Company would be required to file such proxy statement with the Securities and Exchange Commission were it a public company." And, be it

FURTHER
RESOLVED: "That at any time that the Chairman of the Board of Directors deems it necessary that a material transaction be reviewed by the Board of Directors, he may call for a meeting of the Board of Directors to review such transaction upon two days notice given in accordance with the By-Laws of the Company." And, be it

FURTHER
RESOLVED: "That to give effect to the foregoing resolution and all other resolutions adopted at this meeting of the Board of Directors relating to corporate governance, the Governance Committee is hereby authorized and directed to submit to the Board of Directors for its approval such amendments to the By-Laws as they and Company Counsel may determine to be necessary to give effect to such resolutions."

The next resolutions address disclosure of compensation practices and compensation of directors and officers. Disagreement with the proposed exception from disclosure of compensation information for a business reason was voiced by several directors. Also, a concern was expressed that the resolution should direct disclosure specifically in the Shareholders Report as well. Whereupon, a motion was made and duly seconded, and it was unanimously:

RESOLVED: "That ULLICO's officers who are responsible for the preparation of the Company's annual proxy statement shall undertake to disclose in the proxy statement and in the annual Shareholders Report any significant transaction between ULLICO and any of its Directors, Officers or other affiliates that occurred during the fiscal year ending prior to the issuance of the proxy statement if such transaction would have been required to be disclosed in the Company's proxy statement or Shareholders Report if the Company would be required to file such proxy statement or Shareholders Report with the Securities and Exchange Commission were it a public company." And, be it

FURTHER
RESOLVED: "That the Executive Committee is hereby authorized and directed to prepare annually a statement of the Company's philosophy with respect to the compensation of Officers and Directors that shall be included in the annual Shareholders Report and that the Officers responsible for the preparation of the

4

annual Shareholders Report shall include therein information with respect to all types of compensation paid to its Directors and Executive Officers."

The Chairman explained that the next subject addressed by the Special Committee proposed consideration of a change to the Board structure, creating a 15 member Board of Directors and a Consultative Board, who will undertake to share their counsel with the Board but will not have the legal responsibilities or liabilities of directors. The Chairman noted that some thought along these lines was discussed at the Corporate Governance Committee. The Chairman further noted that the Corporate Governance Committee had also considered whether some of the directors might be better utilized serving as a director of one of the subsidiary companies. Whereupon, after discussion, a motion was made and duly seconded, and it was unanimously:

RESOLVED: "That the Chairman of the Board is hereby authorized and directed to consider the appointment of current Directors who have such strengths and experiences that would be particularly beneficial to certain subsidiaries of the Company to the boards of such subsidiaries." And, be it

FURTHER
RESOLVED: "That the Governance Committee is hereby authorized and directed to develop and prepare for approval by the Board amendments to the Company's By-Laws that would effectuate the recommendations of the Special Committee with regard to the Consultative Board and the Executive Board and that would be phased in over a period of three to five years."

The Chairman explained that Governor Thompson's staff questioned whether the Board should have so many of its directors from the labor movement. Presently, the by-laws provide for two-thirds of the board members to be from the labor movement. The Special Committee agreed with the present structure and rejected requiring the directors be persons outside the labor movement. The Committee did urge that the Company look for candidates with the special expertise it may need. Whereupon, a motion was made and duly seconded, and it was unanimously:

RESOLVED: "That the Chairman of the Board is hereby authorized and directed to act in conjunction with the Nominating Committee to identify and recruit individuals with special expertise to serve on the Board or boards of subsidiaries of the Company."

The next recommendation supports what the Company is already doing, which is appointing directors who do not depend upon the Company for their employment income. The Special Committee has determined that the majority of directors should be persons other than an officer or employee of the company or its subsidiaries or any other individual having a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director. This was discussed in the Corporate Governance Committee previously. The Chairman noted that its directors come from the labor movement, and the fact that their unions and benefit funds may be customers does not make them lack independence. Whereupon, after discussion, a motion was made and duly seconded, and it was unanimously:

RESOLVED: "That the Governance Committee is hereby authorized and directed to include in the governance guidelines that it has been directed to develop a requirement that at least a majority of the Directors of the Board be independent."

5

USDC 0003523

The Special Committee further recommended that there should be at least four directors' meetings each year. Whereupon, a motion was made and duly seconded, and it was unanimously:

RESOLVED: "That the Governance Committee is hereby authorized and directed to submit to the Board of Directors for its approval an amendment to the By-Laws to effectuate the determination of the Special Committee that the new Executive Board, when created, shall meet at least four times annually."

Next, the Special Committee proposed that the Board give prior approval of the Chairman's nominations of directors to committees. The Chairman noted that he had no objection to this suggestion. Whereupon, a motion was made and duly seconded, and it was unanimously:

RESOLVED: "That the Chairman of the Board of Directors shall submit the names of proposed committee members to the independent members of the Board of Directors or a committee of independent members of the Board of Directors for their prior approval."

The Special Committee proposes that the Chief Compliance Officer should develop, as soon as possible, charters for the Governance, Audit, Compensation and Nominating committees. The Chairman stated that he concurred with this. Whereupon, a motion was made and duly seconded, and it was unanimously:

RESOLVED: "That the Chief Compliance Officer is hereby authorized and directed to develop for review by the Governance Committee, before submission to the Board of Directors for their approval, charters for the Governance, Audit, Compensation and Nominating Committees that shall address the structure and function of the committees, compensation of Board and committee members, frequency of meetings, responsibilities, delegated authority, a method to seek advisors as needed to fulfill responsibilities, a periodic review of the committees' accomplishments and failings and remedial actions as necessary to strengthen the committees' performances."

The Chairman presented the next resolution to authorize staffing as appropriate for Committees. Whereupon, a motion was made and duly seconded, and it was unanimously:

RESOLVED: "That the Chairman is hereby authorized and directed to cause the Company to provide support staff to the Board of Directors, the Governance, Audit, Compensation and Nominating Committees and each other committee of the Board of Directors, and each such committee shall be required to maintain minutes and their files and to regularly report to the Board of Directors."

Continuing in the presentation of the resolutions regarding Committees, the Chairman presented the next resolution that proposed a restriction regarding membership of the Audit Committee so that no director employed by the company should serve on that committee.

RESOLVED: "That the Governance Committee is hereby authorized and directed to include in the governance guidelines that it has been directed to develop a provision that the Audit Committee be composed solely of independent directors."

6

The Chairman explained that the Governor recommended that the Board evaluate whether directors should rotate committee work. The Chairman noted that while there is some merit to that view, there is an experience cost in doing so. The Special Committee has stated its concern that rotation of committee assignments may adversely affect the development of Director expertise, and the committees are better served by experienced Directors. Whereupon, after discussion, a motion was made and duly seconded, and it was unanimously:

RESOLVED: "That the Governance Committee is hereby authorized and directed to include in the governance guidelines that it has been directed to develop a provision that in determining committee assignments, the committees are better served by experienced directors and mandatory rotation of directors shall not be required."

Furthering the authority of Committees to act independent of management, the Special Committee proposed to delegate authority directly to the Audit and Compensation committees to obtain independent guidance. The Chairman recommended adoption of this proposal noting that this should silence critics who always see collusion among advisors and management. Whereupon, a motion was made and duly seconded, and it was unanimously:

RESOLVED: "That the Audit and Compensation Committees are hereby authorized to engage such independent advisors as they may deem appropriate, and the fees of such independent advisors shall be paid for by the Company and the Company shall engage such advisors as it may deem appropriate for the other committees upon their request."

Next, the Chairman noted that there was concern that a few directors do not have good attendance records. This has been criticized and the Special Committee is proposing a rule similar to one discussed at the Corporate Governance Committee that if a director misses three consecutive meetings without a good excuse, he should be dismissed as a director. Whereupon, a motion was made and duly seconded, and it was unanimously:

RESOLVED: "That the Governance Committee is hereby authorized and directed to include in the governance guidelines it has been directed to develop a provision that Directors shall not, absent legitimate excuses, fail to attend three consecutive meetings, and such committee shall prepare a proposed By-Law for approval by the Board to implement such provision."

The Chairman noted that the Board had discussed the need for a diverse board of directors before and the need for special financial expertise. Whereupon, a motion was made and duly seconded, and it was unanimously:

RESOLVED: "That Governance Committee is hereby authorized and directed to include in the governance guidelines it has been directed to develop and in the charter for the Audit Committee provisions requiring that at least one member of the Audit Committee have professional expertise in accounting or finance."

The Chairman next presented the final proposed resolution. He explained that while the last resolution looks straightforward and reasonable he thought there were hidden difficulties with it and recommended that it be modified or referred to the Corporate Governance Committee. He explained, as an example, that the use of a Company credit card might be viewed as a loan. The advance payment of legal fees

7

USDC 0003525



where there is an expected right to indemnification might be argued t be a loan. He suggested that the Corporate Governance Committee review this with counsel more closely. In the alternative, the Chairman suggested that the resolution should provide as follows:

> RESOLVED: "That the Company shall not provide loans to or arrange financing for ULLICO's officers and directors except upon recommendation of the Chairman with Board approval."

Whereupon, after discussion, a motion was made and duly seconded to adopt the resolution as made by the Chairman and it was:

> RESOLVED: "That the Governance Committee is hereby authorized and directed to develop for approval by the Board of Directors guidelines that would govern the provision of loans to, or the arrangement of loans for, Officers and Directors and that would specify the types of loans to which such guidelines would be applicable."

The Chairman thanked the Board for its attention. Further, the Chairman thanked the Special Committee for its services and noted that its work was now complete. The Board applauded the members of the Special Committee.

Finally, the Chairman noted that counsel has begun the process of meeting with regulators. The Chairman asked that the meeting be continued for further deliberations until April 16, 2003 at 11:00 a.m., when the Board could re-assemble to obtain an update of legal proceedings and actions being taken by management to address the current challenges faced by the Company, and prepare for the shareholders' meeting. Whereupon, with agreement, the meeting was continued until April 16, 2003 at 11:00 a.m.

*Teresa Valentine*

Teresa E. Valentine
Interim Chief Legal Officer

8

USDC 0003526

Exhibit 46

**MEETING OF THE BOARD OF DIRECTORS**
**OF**
**ULLICO INC.**
May 13, 2003
Laborers' International Union
Washington, D.C.

ATTENDEES:

DIRECTORS

William G. Bernard
Marvin J. Boede
Dana A. Brigham
Billy J. Casstevens
John T. Dunlop (via phone)
John J. Flynn
James A. Grogan
James Heczko
Joseph Hunt
Frank D. Hurt
Earl J. Kruse
James La Sala
Martin J. Maddaloni (via phone)

Joseph F. Maloney
James F. M. McNulty
Abner Mikva (via phone)
Lenore Miller
Jeremiah J. O'Connor
Terence M. O'Sullivan
James H. Rankin
Richard Ravitch
Vincent R. Sombrotto
Edward C. Sullivan
Michael J. Sullivan
George Tedeschi
Richard L. Trumka

ABSENT:

Morton Bahr

Alexis Herman

OTHERS:

William Bergfeld, Assistant to the Chairman & CEO
Theodore T. Green, Counsel to the Chairman & CEO
Janice Kneeland, Assistant to the Chairman & CEO
Damon Silvers, Counsel to the Chairman and CEO
Teresa E. Valentine, Vice President & Interim Chief
Legal Officer

Daniel A. Ninivaggi, Esq., Winston & Strawn
Stephen J. Senderowitz, Esq., Winston & Strawn
Gov. James R. Thompson, Winston & Strawn
Robert W. Tarun, Esq., Winston & Strawn
Megan Bushor, Winston & Strawn

The Chairman began the meeting by introducing from Winston & Strawn Governor James Thompson, Steve Senderowitz and Dan Ninivaggi, ULLICO's special counsel. The Governor then gave a presentation on the Report of Special Counsel (the "Report"). The Board members were provided a summary of the presentation.

After the presentation, the Board members were given the opportunity to ask the Governor and his team questions. A discussion ensued on various issues related to the Report. Rich Trumka expressed his view that the Board's duty was to ULLICO and that he believed there was no choice but to seek remedial action if the Board reached a finding of breach of fiduciary duty. He also asked if the Board would be in breach of its fiduciary duty if it did not seek the return of profits from the directors and officers. Governor Thompson stated that he could not give a flat answer. Attorney Ninivaggi, in

USDC 0003553

addressing some of Mr. Trumka's other questions, stated that under the facts of this case, there is not a reasonable degree of certainty that the business judgment rule would apply to the directors.

Lenore Miller expressed the following concerns: possibility of Governor Thompson's conflict of interest since he serves on the review board of a union that is a large ULLICO shareholder; omission of fact that unions represented on this board had used the discretionary repurchase program over the years and therefore, were certainly aware of its existence; profit made by all unions participating in ULLICO investment; the variance between Thompson Report and two other reports (Sidley Austin and Hanks) regarding purchases and sales of shares in 1998, 1999, and 2000 that also had been considered by the Special Committee. She also expressed her view that the acceptance of some of the recommendations of the Special Counsel will result in other litigation. Governor Thompson responded that the Special Counsel did not begin the investigation with a prosecutorial view or an end objective in mind. The Governor also stated that he wished the Report had been released sooner as important parts of the Report were exculpatory.

Bill Casstevens, Marvin Boede, Bill Bernard and Lenore Miller expressed their belief that the Board should hear from Tom Green of Sidley, Austin, Brown and Wood ("Sidley") regarding Sidley's report. Lenore Miller made a motion that the Board first hear from Sidley before voting whether to accept the Special Counsel's Report. The motion was seconded, a vote was taken and the motion was defeated by a vote of 11 to 15.

A resolution was then distributed to the Board members regarding Governor Thompson's findings and the return of profits to the Company. Messrs. Maloney and Bernard stated that the resolution appeared to be in conflict with the Report of the Special Committee. Attorney Silvers explained that this new Board was free to adopt a different position and the resolution if it saw fit.

A discussion then ensued regarding indemnification of directors. Attorney Silvers explained that the Directors are indemnified under the Company's By-laws to the extent Maryland law provides for indemnification. Silvers pointed out further that if a director was removed from the Board and then sued the Company, that director would not be entitled to recoup the costs of that litigation from the company under the By-Laws. He also stated that the resolution just passed on the return of profits was not in itself a finding of intentional misconduct nor that the Company would definitely pursue action against any director refusing to repay his profits.

Bill Bernard stated that he and others who had participated in the stock transactions had relied on outside experts and had done no wrongdoing.

Mr. Casstevens requested the following be added to these Minutes: "I stated that I believed that everyone in the room would have voted on the stock purchase program the way we did based upon the facts that were before the Board at that time. Outside financial experts developed the program. Outside lawyers drafted all the resolutions we voted on and never raised a question much less a red flag about anything being improper. ULLICO had implemented the identical program several times before, with absolutely no questions or complaints."

A motion to approve the resolution on the return of profits was made and seconded. A voice vote was taken. The resolution was approved by a vote of 14 to 8, with 3 abstentions and one recusal.

| Morton Bahr | Absent | Joseph F. Maloney | No |
| William G. Bernard | No | James F. M. McNulty | No |
| Marvin J. Boede | No | Abner Mikva | Yes |
| Dana A. Brigham | Yes | Lenore Miller | No |

2

| | | | |
|---|---|---|---|
| Billy J. Casstevens | No | Jeremiah J. O'Connor | Yes |
| John T. Dunlop | No | Terence M. O'Sullivan | Yes |
| John J. Flynn | Yes | James H. Rankin | Yes |
| James A. Grogan | Yes | Richard Ravitch | Yes |
| Alexis Herman | Absent | Vincent R. Sombrotto | Abstain |
| James Heczko | Yes | Edward C. Sullivan | Yes |
| Joseph Hunt | Recuse | Michael J. Sullivan | Yes |
| Frank D. Hurt | Yes | George Tedeschi | Abstain |
| Earl J. Kruse | No | Richard L. Trumka | Yes |
| James La Sala | Abstain | | |
| Martin J. Maddaloni | Yes | | |

This fully reflects, in accordance with his written statement, that Professor Dunlop voted in the negative. The resolution is as follows:

WHEREAS, on April 29, 2002, the Board of ULLICO Inc. appointed former Illinois Governor James Thompson as Special Counsel to investigate a number of issues relating to stock transactions by ULLICO Inc. officers and directors. And,

WHEREAS, on November 30, 2002, Governor Thompson made his report available to the Board of Directors of ULLICO Inc.

Now, therefore, be it

RESOLVED: "That ULLICO Inc. shall ask present and former directors and officers who profited from sales of ULLICO stock purchased in 1998 and 1999 to return those profits, as set forth in Governor Thompson's first remedial recommendation." And, be it

FURTHER RESOLVED: "That should any of the above named individuals not make satisfactory arrangements with the Company to repay the above stated monies within thirty calendar days, the Company take whatever steps are necessary to remove those individuals from any positions they hold with the Company. The Company shall reserve its rights to take additional steps as may be in the best interests of ULLICO Inc. at that time to recover the monies involved from such individuals." And, be it

FURTHER RESOLVED: "That the Board shall review the transactions and policies described by Governor Thompson in remedial recommendations 2-6 of Governor Thompson's report to the Board, as recommended by Governor Thompson." And, be it

FURTHER RESOLVED: "That the Company shall take whatever steps are necessary and appropriate to determine the liability of providers of professional services to the Company related to the transactions examined by Governor Thompson and to recover any monies owed to the Company from said providers."

3

USDC 0003555

The Chairman then stated that he was enlisting staff from other organizations to assist him, specifically Ted Green, Bill Bergfeld and Janice Kneeland from the Laborers' International and Damon Silvers from the AFL-CIO. The Chairman explained that the activity of attorneys and other professionals working on behalf of the Company was frozen until a review is taken and a decision is made whether they should continue their services. A motion was made to accept the assistance of these individuals. The motion was seconded and unanimously approved.

A resolution was presented regarding committees of the Company.

The Chairman requested the appointment of a Nominating Committee. Whereupon, a motion was made, seconded, and it was unanimously approved that:

WHEREAS, in accordance with Article VI, Section 1, of the By-laws of ULLICO Inc., it is necessary to appoint a Nominating Committee to nominate candidates for election as Directors at the 2004 Annual Meeting of Stockholders. This appointment is submitted for approval as required by the Corporation's By-laws. Therefore, be it

RESOLVED:   "That a Nominating Committee consisting of Dana A. Brigham, Terence M. O'Sullivan, George Tedeschi, Vincent R. Sombrotto, and James H. Rankin be hereby appointed."

The Chairman then requested the appointment of a Proxy Committee. Whereupon, a motion was made, seconded, and unanimously approved that:

WHEREAS, in accordance with Article VI, Section 1, of the By-laws of ULLICO Inc., it is necessary to appoint a Proxy Committee to serve on behalf of the Stockholders in connection with the election of Directors and such other matters as may be brought before and acted upon at the 2004 Annual Meeting of Stockholders. This appointment is submitted for approval as required by the Corporation's By-laws. Therefore, be it

RESOLVED:   "That a Proxy Committee consisting of Terence M. O'Sullivan, Earl J. Kruse, and John T. Dunlop be hereby appointed, with the Committee to have full power of substitution in the event a member or members of the Committee become(s) unable to serve."

Next, the Chairman requested the appointment of a Compensation Committee for 2003. Whereupon, a motion was made, seconded and unanimously approved that:

WHEREAS, in accordance with Article VI, Section 1, of the By-laws of ULLICO Inc., it is necessary to appoint a Compensation Committee. The Committee has authority to act on all matters concerning compensation of officers with the approval of the Executive Committee and the compensation of other employees of the Corporation and its subsidiaries and affiliates under common control, including all current and deferred compensation, and including the award and fixing of current compensation, and establishment and administration of all plans, programs, and agreements relating to compensation. This appointment is submitted for approval as required by the Corporation's By-laws. Therefore, be it

RESOLVED:   "That a Compensation Committee consisting of Abner Mikva, Terence M. O'Sullivan, and Michael J. Sullivan be appointed, and that they be hereby authorized to exercise all the powers of the Board of Directors, in all matters

4

concerning the compensation of officers with the approval of the Executive Committee and the compensation of other employees of the Corporation, and its subsidiaries and affiliates under common control, including the award and fixing of current compensation, and the establishment and administration of all plans, programs, and agreements relating to compensation."

The Compensation Committee will report to the Board of Directors.

The Chairman then requested the appointment of a Business Evaluation and Regulatory and Litigation Oversight Committee. Whereupon, a motion was made, seconded, and unanimously approved that:

WHEREAS, in accordance with Article VI, Section 1, of the By-laws of ULLICO Inc., it is necessary to appoint a Business Evaluation and Regulatory and Litigation Oversight Committee. The Committee will be divided into two Sub-Committees. And,

WHEREAS, the Business Evaluation Sub Committee will have full authority to evaluate the business lines of ULLICO Inc. and its subsidiaries. This appointment is submitted for approval as required by the Corporation's By-laws. Therefore, be it

RESOLVED:    "That a Business Evaluation Committee consisting of James Heczko, Richard Ravitch, Joseph Hunt, and Frank D. Hurt be appointed, and that they be hereby authorized to address all matters concerning the business lines of ULLICO Inc. and its subsidiaries subject to the approval of the Board."

The Chairman then requested the appointment of a Regulatory and Litigation Oversight Sub Committee. Whereupon, a motion was made, seconded, and unanimously approved that:

WHEREAS, the Committee will have full authority to deal with regulatory and special litigation issues facing ULLICO Inc. and its subsidiaries. This appointment is submitted for approval as required by the Corporation's By-laws. Therefore, be it

RESOLVED:    "That a Regulatory and Litigation Oversight Sub Committee consisting of Abner Mikva, Edward C. Sullivan, Alexis Herman, and Morton Bahr be appointed, and that they be hereby authorized to address all matters concerning regulatory and litigation issues facing ULLICO Inc. and its subsidiaries subject to the approval of the Board."

Next, the Chairman requested the appointment of a Corporate Governance Committee. Whereupon, a motion was made, seconded, and unanimously approved that:

WHEREAS, in accordance with Article VI, Section 1, of the By-laws of ULLICO Inc., it is necessary to appoint a Corporate Governance Committee. This appointment is submitted for approval as required by the Corporation's By-laws. Therefore, be it

RESOLVED:    "That a Corporate Governance Committee consisting of Lenore Miller, Abner Mikva, Terence M. O'Sullivan, Richard L. Trumka, John J. Flynn, Jeremiah J. O'Connor, and Michael J. Sullivan be hereby appointed."

The Corporate Governance Committee will report to the Board of Directors.

5

The Chairman stated that these Committees would start work immediately.

James La Sala then stated he would be retiring from the Board effective June 30, 2003.  The Chairman thanked him for his dedication and his life-long commitment to organized labor.

A paper was distributed listing potential dates for future Board meetings.  Board members were asked to choose dates based on their availability.

There being no further business to conduct, the meeting was then adjourned.

Edward C. Sullivan
Secretary-Treasurer

6

USDC 0003558